## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SAMUEL TROICE,** | § | |
| **HORACIO MENDEZ,** | § | |
| **ANNALISA MENDEZ** | § | |
| **and PUNGA PUNGA FINANCIAL, LTD.** | § | |
| **individually and on behalf of a class** | § | |
| **of all others similarly situated** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **PROSKAUER ROSE, LLP, and** | § | |
| **THOMAS V. SJOBLOM** | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

NOW COME PLAINTIFFS, SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of a class of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Original Class Action Complaint against Defendants, PROSKAUER ROSE, LLP and THOMAS V. SJOBLOM. (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

### I. PREFACE

#### 1.

This putative class action is filed in representation of a class of defrauded investor clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial"). This action has been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities & Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management LLC, et al.*, in the United States District Court for the Northern District of Texas–

Dallas Division (the "SEC Action"). This action alleges participation by these Defendants in the massive investment fraud scheme perpetrated by the Stanford Financial Group and its principals from, by and through Texas that led to the intervention by the SEC in Texas and appointment of Ralph Janvey as Receiver.

## II. PARTIES

2.

Plaintiff, SAMUEL TROICE, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

3.

Plaintiff, HORACIO MENDEZ, is a dual citizen of the Untied States of America and Venezuela and is currently residing in Travis County, Texas.

4.

Plaintiff, ANNALISA MENDEZ, is a citizen of the Untied States of America and is currently residing in Travis County, Texas.

5.

Plaintiff, PUNGA PUNGA FINANCIAL, LTD., is a Panamanian company with its principal place of business in Mexico City, Mexico which is wholly owned and controlled by Mexican citizens from Mexico City, Mexico.

6.

Additionally, this case seeks certification of a class of all investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009.

7.

Defendant Proskauer Rose, LLP, ("Proskauer") is a limited liability partnership organized under the laws of the State of New York.  Proskauer may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.  Prokauer may be served by serving its registered agent/chairman Allen I. Fagin at 1585 Broadway, New York, New York, 10036-8299.

8.

Defendant Thomas V. Sjoblom, ("Sjoblom") is an individual currently employed at Proskauer Rose, LLP at both the Washington D.C. and New York offices at 1001 Pennsylvania Avenue, NW Suite 400 South, Washington D.C. 20004-2533 and 1585 Broadway, New York, New York 10036-8299.  Sjoblom may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

### III.  SUBJECT MATTER JURISDICTION

9.

This Court has original jurisdiction over this proceeding pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action because this lawsuit constitutes a judicial proceeding against certain agents "related to the Receivership Estate".  This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(B) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of the Republic of Mexico and all Defendants are citizens of a State within the United States.

### IV.  PERSONAL JURISDICTION

10.

This Court has personal jurisdiction over the non resident Defendants under the Texas Long Arm Statute. Defendants have conducted continuous and systematic business in the State of Texas for many years and are therefore subject to general jurisdiction. Furthermore, as described herein, Defendants have engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Defendants have done business and committed torts, in part, in the State of Texas. Since at least 2005, if not before, Defendants served as the attorneys for the Stanford Financial group headquartered in Houston, Texas, and in that capacity engaged in extensive contacts with Stanford Financial personnel based in Houston, Texas and traveled to Houston to service said Texas-based client. In conjunction with the provision of their professional services to Stanford Financial, Defendants engaged in contacts with the State of Texas designed to assist and perpetuate the Stanford fraud, as described herein. Based on their general and specific contacts with the State of Texas, Defendants have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

## V. <u>VENUE</u>

11.

Venue is mandatory in this Court pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action.

## VI. <u>FACTUAL BACKGROUND</u>

### A.     The Stanford Financial Empire

12.

From the mid-1980s through February 2009, R. Allen Stanford ("Stanford"), a former gym owner from Mexia Texas, built a financial service empire that at its height boasted 30,000 customers in 130 countries allegedly managing $50 billion dollars in investment funds.  The empire was comprised of over 140 companies from across the globe that operated under the brand name "Stanford Financial" with its worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: Houston, Texas-based Stanford Group Company ("SGC") and Stanford Capital Management, LLC ("SCM"); Stanford International Bank ("SIB") and Stanford Trust (one in Louisiana and another in Antigua), all of which were controlled and managed from the United States, principally Houston, Texas.  In Mexico, Stanford Financial operated under the names Stanford Group Mexico S.A. and Stanford Fondos S.A. de C.V., both of which were ultimately owned by Stanford Financial and operated by David Nanes, who himself remained an officer of Houston, Texas-based SGC until 2009.

13.

Begun initially as an offshore banking operation in the mid-1980s, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer services worldwide from its headquarters base in Houston, Texas.  Stanford Financial gave all the appearances of a highly successful outfit, with lavish offices in some of the world's premier cities.  Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

14.

The most important facet underlying the Stanford Financial empire, and the key to its success and sustainability, was the carefully crafted Stanford Financial image.  The Stanford Financial

image, cultivated over the years, was one of success, prestige, and, most importantly, safety and solidity.  The Stanford Financial image was centered around and built upon money – the money Stanford Financial received from its investor clientele.  With the money it received from its clients, Stanford Financial was able to project an image of success and solidity.  From the marble and mahogany of the Houston headquarters, to the huge bonuses paid to lure and retain top producers, to the $500 lunches for clients in Mexico City, to the helicopters and private jets that flew the Stanford Financial executives around, Stanford Financial oozed money, thus lending an air of legitimacy to the Stanford "myth".

15.

Part of the Stanford legend was that Stanford Financial was a continuation of the insurance business begun by Stanford's grandfather, Lodis Stanford, during the Great Depression.  Based on that connection, Stanford Financial boasted to the world that it had over 70 years history of growing and protecting people's wealth.  Of course, this legend, like most of the Stanford image,[1] was false, as Stanford's father sold the old insurance business in 1983.  Yet Stanford continued to foster that image of decades of family tradition and work ethic as late as a 2008 edition of the *Stanford Eagle* magazine.

16.

Charitable giving and sponsorships of sporting events and teams, as well as massive political contributions, constituted additional pillars supporting the Stanford Financial image.  As with everything else, Stanford spent lavishly on philanthropic endeavors, giving to hospitals, theaters and museums, and sponsoring sports teams and celebrities such as the Miami Heat and Vijay Singh, all with the objective, once again, of sustaining the Stanford Financial image.  Stanford made a huge

---

[1]       Stanford's claim to be a descendent of the founder of Stanford University, a claim which he disseminated widely, was also false.

splash in the world cricket establishment in particular.  Stanford also gave generously to political campaigns and urged his employees to do the same as well, to the tune of millions of dollars.

17.

Stanford Financial obtained the money it needed to perpetuate its image from one primary source:  the sale of Certificates of Deposit from the Antiguan offshore bank wholly owned and controlled by Stanford himself – SIB.  Clients who were introduced to the Stanford Financial group quickly found out that the main financial product being peddled by the group was the SIB CD.  The SIB CDs were sold worldwide by a web of different Stanford Financial promoter companies whose sole function was the sale of the SIB CDs.  By 2009, SIB had sold over $7.2 billion in CDs.

**B.    The Stanford Reality**

18.

The reality of the Stanford Financial empire was that it was nothing but a massive, worldwide Ponzi scheme.  The Stanford Financial companies operated together as a single business joint enterprise dedicated to the fraudulent sale of SIB CDs, which sales were the lifeblood of the entire enterprise.  The master manipulator and salesman, Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level.  Stanford became a true international financial "pirate", absolutely intent on operating an "outlaw" investment company from his Caribbean "safe haven" completely outside the regulatory confines of the laws of any country, whether the United States, Antigua, Mexico or elsewhere.

19.

Allen Stanford's personal history, by itself, was cause enough to question the veracity of the image he created for the Stanford Financial empire.  His first business, a chain of Waco, Texas-based gyms called "Total Fitness", collapsed into bankruptcy in 1982.  Allen Stanford declared

personal bankruptcy as well in 1984 and was discharged from $13.6 million in obligations.[2] Stanford fled to the Cayman Islands where he became a scuba diving instructor. It was there that he met Dutch ex pat Frans Vingerhoedt, who introduced him to the world of offshore banking.

20.

By 1985 Stanford opened his first bank, Guardian International Bank ("Guardian"), on the tiny (12,000 residents) Caribbean island of Montserrat, which at that time was known mostly for its extremely lax banking regulations. Virtually all of the banks that were opened in Montserrat in the 1980s were "paper" banks dedicated to fraud. In fact David Marchant, the editor of "Offshore Alert", was quoted as stating that "the only reason you opened a bank in Montserrat was to commit fraud."[3]

21.

It was at that time, in the late 1980s, that Stanford began the charade linking his new offshore banking business to the insurance business his grandfather had run in Mexia in the 1930s, creating the illusion for investors that the Stanford Financial companies had been in the finance business for decades, instead of just a couple of years. By 2008 even most Stanford Financial employees believed the myth that Stanford Financial had been in business for over 70 years.

22.

Guardian served as the starting point roadmap for the eventual creation of the Stanford Financial empire. Stanford established representative offices for Guardian in Miami and Houston, under the name of Guardian International Investment Services, designed to cater to wealthy Latin American clients.[4] Stanford brought in his old college roommate James Davis to help run operations. Guardian offered CDs with rates typically 2-3% above the average rates available in the

---

2       *BusinessWeek*, March 5, 2009, "Stanford's Rocky Start."
3       As quoted in Bryan Burroughs, "*Pirate of the Caribbean*", Vanity Fair, at 81 July 2009.

market, all with the confidentiality associated with offshore private banking.

23.

By 1989 the banking system in Montserrat came under investigation by British and U.S. authorities.  Guardian came under scrutiny for possible drug money laundering, and so Stanford began looking for other locations for his bank.  In December 1990 Stanford incorporated Guardian in Antigua.  By May 1991 Stanford's banking charter was revoked by Montserrat.  So Stanford moved his banking operations to Antigua, and simply continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of the bank from Guardian to Stanford International Bank ("SIB") in 1994.

24.

Once established in Antigua, Stanford quickly set about establishing a symbiotic relationship with the local government.  In return for political cover, Stanford eventually became a major source of funding for the entire island, loaning hundreds of millions of dollars to the Antiguan government over the years.  Stanford even bought the Antiguan newspaper, the Antiguan Sun.  By 2004, the island government owed Stanford Financial over $87 million – nearly half of its annual tax revenues. In that same year, SIB had grown to over $3 billion in deposits.

25.

So tight was the relationship between Stanford and the Antiguan government that, when Stanford Financial was accused of money laundering in 1999, the Antiguan government turned to Stanford himself to rewrite the country's banking laws.  Stanford and his agents were then named to the commission, the Antiguan Financial Services Regulatory Commission ("FSRC"), created and charged with supervising Antigua's banks.  Stanford then used the new commission to wrest control

---

4       *BusinessWeek*, Feb. 24, 2009, "Did Court Ruling Prolong Stanford Probe?"

of Antigua's offshore banking industry from the Government. As a result, the U.S. State Department issued an advisory to U.S. banks to scrutinize all financial transactions coming in or out of Antigua for evidence of money laundering.[5]

26.

Jonathan Winer, then-head of the State Department's Bureau for International Narcotics and Law Enforcement Affairs, said at the time that Antigua is "one of the most attractive financial centers in the Caribbean for money launderers", and that "Antigua has long been one of the worst regulated offshore centers in the world."[6] Winer was recently quoted as saying that when he asked an Antiguan banking official in the late 1990s why anyone would choose that country for banking as opposed to New York, London, Tokyo or Paris: "he scratched his head and after a while he said 'I guess would have to be the secrecy…I'd say it's the secrecy plus the lack of standards or real controls."[7]

27.

Antigua's well deserved reputation for corruption and lax banking regulations is borne out by the Plea Agreement entered by Stanford CFO Jim Davis, a true and correct copy of which is attached hereto as **Exhibit "1"** and incorporated herein for all purposes, as well as by criminal indictment of Leroy King ("King"), Stanford's good friend and the former head of Antigua's FSRC, as well as the allegations contained in the SEC's Second Amended Complaint in the SEC Action, the allegations of which are also incorporated herein by reference. The Plea Agreement and criminal indictment alleges that for years King, while acting as the CEO of the Antiguan FSRC, accepted bribes from

---

5        *Houston Chronicle*, July 16, 2000, Banker drawing scrutiny / Houstonian's Antigua empire raises questions
6        Statement to the US Congressional House Committee on Banking Financial Services, Jonathon Winer, US State Department, June 11, 1998.
7        "Stanford arrives for his Houston hearing", By MARY FLOOD and TOM FOWLER HOUSTON CHRONICLE, June 24, 2009.

Stanford and/or his associates in return for ensuring that the FSRC "looked the other way" and did not properly perform its regulatory functions or supervise SIB.  Indeed after the Stanford scandal broke, King was widely quoted in the press as describing the FSRC's previous regulatory attitude toward SIB as a "Friday afternoon cocktail".  As alleged by the Justice Department and the SEC, King even stooped to serving as Stanford's "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of Stanford Financial and SIB from 2005 all the way until 2009.  As discussed hereinafter, Defendants materially participated and aided Stanford in the responses formulated to hold the SEC at bay and insulate SIB from regulatory scrutiny.

28.

Stanford Financial began to grow exponentially beginning in 2000.  In 2001, Stanford filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. residents through SGC brokers in the United States. Stanford thereafter began the practice of "head hunting" for U.S. brokers and financial advisers, paying enormous signing bonuses to financial advisers to leave their jobs at other firms and transfer their book of clients over to Stanford Financial.  Once at Stanford Financial, these same financial advisers were then pressured into promoting and selling SIB CDs to their clients, and were rewarded with outsized bonuses or fired, sued to recover the bonuses and blackballed in the industry if they refused to cooperate and sell the CDs.  Fueled by this influx of veteran brokers and investment advisers, Stanford Financial grew from 6 branch offices in the United States to more than 25 between 2004 and 2007.

29.

From 2000 to 2008 Stanford Financial grew into a high-powered sales and marketing juggernaut.  The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and

"Superstars".  In order to market and sell the SIB CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial brokers and financial advisers, including those in Mexico, to "push" the SIB CDs on investors like Plaintiffs.  SIB paid disproportionately large commissions to its Stanford Financial brokers and advisers for the sale of CDs; they received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD.  Stanford Financial used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

30.

Beginning in 2003 Stanford's strategic plan to lure top financial advisers away from their employers to work for Stanford Financial began to back-fire as several U.S. advisers renounced their new position with Stanford and lodged complaints with FINRA f/k/a the NASD, including charges that Stanford Financial was running a massive Ponzi scheme.  Some of the advisers were fired for refusing to promote and sell the SIB CDs to their clients. Between 2003 and 2006 over a dozen Stanford Financial advisers and employees, including Leyla Basagoitia in 2003 and Lawrence J. DeMaria in 2006, were discharged or resigned amid allegations of fraudulent practices at Stanford Financial.

31.

The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company hedge fund or mutual fund from, by and through Houston, Texas in the guise of operating an offshore bank in Antigua.  In essence, SIB, acting through the Stanford Financial international network of brokers and advisers, lured ("*captaba*") money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then

pooled all of the investors' money together to make investments in various illiquid and high risk

assets worldwide – the very definition of an investment company.  As such, in reality Stanford

Financial was selling "shares" in an unregistered investment company to Plaintiffs and others from,

by and through Houston, Texas.  As a result of that reality, the SEC has alleged that SIB and SGC

violated the §7(d) of the Investment Company Act.  SIB was never registered or authorized to

operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs

Class, who were consistently and uniformly told verbally and via the Stanford Financial promotional

materials that SIB was part and parcel of the Stanford Financial group based in Houston, Texas,

authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London

insurance coverage.

32.

Besides the fraud committed on Plaintiffs and the Class based on the marketing of Stanford

Financial and SIB as being one and the same and completely insured, Stanford Financial also touted

the high liquidity of SIB's investment portfolio.  For example, in its marketing materials, Stanford

Financial emphasized the importance of the liquidity of the SIB CD, stating, under the heading

"Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a

protective factor for our depositors" and that the bank's assets are "invested in a well-diversified

portfolio of highly marketable securities issued by stable governments, strong multinational

companies and major international banks." Likewise, Stanford Financial trained its advisers to stress

liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that

"liquidity/marketability of SIB's invested assets" was the "most important factor to provide security

to SIB clients…"  To ensure that depositors could redeem their CDs, Stanford, through its brokers

and advisers, assured the investor clients that SIB's investments were liquid and diversified, and

therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.6 billion; (2) private equity and (3) real estate.

33.

Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to acquire private equity and real estate.  In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate.  By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua.  The rest of the money from investors was just blown by Stanford on creating and perpetuating the image charade with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige.  None of this was disclosed to Plaintiffs and the Class.

34.

As alleged in the SEC Second Amended Complaint and in the criminal Indictment of Allen Stanford and the others, Stanford and his CFO Jim Davis "fabricated the performance of the bank's

investment portfolio and lied to investors about the nature and performance of the portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements.  Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn.  Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments.  SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis signed these falsified financial statements."[8]

35.

At the end of the day, the entire Stanford Financial empire was dominated completely by one man—Allen Stanford.  Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis.

36.

In running the Stanford Financial empire from the United States, Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants.  The SIB Board of Directors included Stanford's 81 year old father and his 85 year old friend, O.Y. Goswick, a former rancher who was listed in Stanford Financial's annual reports as being somehow in charge of SIB's "investments", but who in reality, and according to his own son, did not have sufficient financial knowledge to understand SIB's operations and had suffered a stroke in 2000 that left his ability to

---

[8]     SEC Second Amended Complaint, at ¶4.

communicate "nonexistent".[9]   Defendants ignored all of these red flags in their zeal to assist Stanford Financial sell more CDs.

37.

Moreover nepotism predominated within Stanford Financial, where the upper level management team was comprised of a tightly linked web of friends and family of Stanford and Davis.  Just as Stanford brought in his old friend Davis, Davis in turn brought in his protégé, the young Laura Pendergest-Holt, whom Davis had met at the Mississippi Baptist church where Davis was a Sunday school teacher.  In turn, Perndergest-Holt's cousin Heather Sheppard was an "equity specialist" at Stanford Financial, while her sister's husband, Ken Weeden, was Stanford Financial's managing director for investments and research. Jim Davis' brother in law, Danny Bogar, served as SGC's President and ran Stanford Financial's operations for the entire United States.  Davis' son Zack also worked for Stanford Financial as an "equity specialist".

38.

Pendergest-Holt's resume, in particular, was an instant red flag.  As the Chief Investment Officer allegedly in charge of investments for SIB and overseeing an $8 billion portfolio, she had no real business or finance education or training.  Lawrence Lieberman, senior managing director at Orion Group, an executive recruiter firm for the money management industry, was quoted as saying that Pendergest-Holt was hired for the position as Chief Investment Officer probably because Stanford and Davis "needed someone they could trust and not someone who could pick stocks".[10] Davis recruited Pendergest-Holt to work at Stanford Financial in 1997 when she was a recent 22 year old college graduate from Mississippi State, where she earned a degree in Math.  She quickly worked her way up the ranks from research analyst to managing director of research and investments

---

9        Jamie Stengle, "*Dad, 81, to Stanford:  'Do the Right Thing'*", Associated Press, February 20, 2009.
10       Ana Driver and Svea Herbst-Bayliss, "*Stanford's CIO's Fast Path to Top a Red Flag*", Reuters, March 8, 2009.

until she became Chief Investment Officer when she was 30 years old, all with no degree or background in finance whatsoever.  According to Lieberman, Stanford "may not have wanted a legitimate CIO because that person might have asked a lot more questions and not played ball".[11]

39.

The same is true of the lead accountants for Stanford Financial, both of whom were recently indicted as well.  As alleged in the Indictment and the SEC's Second Amended Complaint, Gilberto Lopez was the Chief Accounting Officer for Stanford Financial, and yet he was not a licensed CPA. Mark Kuhrt, also indicted, served as the Global Controller for Stanford Financial, and yet was not a licensed CPA either.  These two non-CPAs were in charge of accounting for a global financial services company with (allegedly) $50 billion "under advisement".

40.

By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIB CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.  It was at the end of 2008, in the midst of the worldwide financial meltdown, that Stanford Financial began to stumble.

41.

As alleged by the SEC and the United States Justice Department, in order to cover up a hole in SIB's balance sheet that would cause it to fall below minimum capital requirements, in 2008 Stanford and Davis concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of property he purchased for $63 million and transferred it to some entities who "booked" it at $3.2 billion and then transferred shares in those entities back to SIB.

---

11     *Id.*

42.

In December 2008 Stanford Financial's clearing firm, Pershing, informed Stanford Financial that it would no longer process wire transfers from SGC to SIB for the purchase of CDs. Stanford Financial began suffering liquidity problems that prevented SIB from complying with client requests for transfers of funds. This had a huge impact on the ability of the financial advisers at Stanford Mexico to keep clients pacified.

43.

In January 2009, in the wake of the Madoff scandal, Venezuelan financial analyst Alex Dalmady performed a rudimentary review of SIB's returns over the years as a favor for a friend, and then published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings. Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck". The cat was out of the bag.[12]

44.

The U.S. federal authorities then issued subpoenas to Stanford Financial. In advance of a deposition before the SEC, Stanford Financial officials met with outside counsel in Miami on February 4, 2009. Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Allen Stanford an e-mail, copying David Nanes as well, that reads in part, that "*things are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means. There are real bullets out there with my name on, David's name and many others and they are very real…[w]e are all in this together.*"

45.

On February 17, 2009 the United States Securities and Exchange Commission ("SEC") filed a

Complaint against SGC and SIB, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions". The SEC obtained an injunction and froze the assets of the Stanford Financial group and appointed a receiver, Ralph Janvey to liquidate the companies.

46.

The SEC, through its Second Amended Complaint, has now alleged a fraud of shocking magnitude. The SEC alleges that Stanford, together with his co-conspirators, engineered and carried out a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and SIB into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his private harem of women and their children; a fleet of jets; yachts; and mansions in several different countries. On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation and money laundering. On August 27, 2009 CFO Jim Davis plead guilty to, *inter alia*, securities and wire fraud. Exhibit "1".

47.

**C.     Defendants' Participation in Stanford's Fraud**

In 2005, the SEC had initiated an investigation of Stanford Financial. By at least August of 2005, Stanford retained Proskauer Rose, LLP and partner Thomas Sjoblom as outside counsel to represent the interests of SIB in the SEC inquiry of SIB's sales practices. During that month, Sjoblom traveled to the SIB facility in Antigua where he met with Stanford, Davis, Leroy King and others to familiarize himself with the operations and finances of SIB. At that time, Sjoblom reviewed SIBL's disclosures to investors in its CD program.

48.

On July 30, 2006, Leroy King transmitted to Sjoblom in Houston, Texas, a letter dated July

---

12     *Id.*

11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB") to the FSRC in Antigua concerning, inter alia, the affiliate relationship of SIB to the Bank of Antigua.  Similarly, on August 1, 2006, King again faxed to Sjoblom in Houston, Texas, a proposed response to the ECCS letter which sought the input of Sjoblom in crafting a response by the FSRC calculated to mislead the ECCB as to the financial bona fides of SIBL to prevent legitimate scrutiny of SIB by the Eastern Carribean bank regulator.  Recognizing that he had already been paid through cash bribe payments from Stanford, King concluded the August 1, 2006 facsimile transmission with the following handwritten words: "Please do not bill me (laugh), Thanks a million, Lee"

49.

On September 25, 2006, King provided to Stanford and Sjoblom another confidential letter he had received from the SEC wherein the SEC again sought records and information regarding SIB's CD investment portfolio.  Stanford, DAVIS, and Sjoblom then proposed various responses designed to mislead the SEC and requested that King insert same into the FSRC's official response to the SEC's confidential letter, which King did.

50.

In late September of 2006, Sjoblom contacted the SEC and represented that he had "heard through the grapevine" that the FSRC had not been provided with an appropriate request from the SEC for documents; that the SEC should "go to Antigua" to review the SIB examination reports; that the SEC had "no basis" to request documents regarding SIB's investment portfolio from SIB; that he (Sjoblom) had spent 15 years investigating fraud for the SEC and was "well-equipped" to recognize the "hallmarks of fraud"; that he (Sjoblom) found SIB to be credible in all their business dealings; and that, based upon his review of the situation and personal visit to SIB, Sjoblom found

SIB to be an "incredible institution."

51.

In late 2008, Sjoblom was informed that SIB's CD investment portfolio included a previously

undisclosed third tier of investments (Tier III) that was not "managed" by Holt. Subsequently, in

early January 2009, Sjoblom was informed that this third tier included real estate investments and

private equity.  Sjoblom, through his prior review of SIB's disclosures knew and understood that this

third tier of investments, including the real estate investments, had not been disclosed to investors.

In early January of 2009 Sjoblom further learned that this undisclosed third tier of investments

constituted approximately 80% of SIB's investment portfolio or approximately $6 billion.

52.

On January 14, 2009, the SEC served, through Sjoblom, investigatory subpoenas to DAVIS

and Holt seeking testimony and documents related to SIB's investment portfolio.  Stanford also was

served an SEC subpoena through Sjoblom. Sjoblom understood that the SEC inquiry would require

the subpoenaed individuals to make a complete and transparent presentation to the SEC regarding all

of the assets related to SIB's CD program.

53.

On January 21, 2009, Sjoblom met at the SIB airplane hangar in Miami, Florida, to discuss

the SEC investigation with Stanford, DAVIS, Holt and others to determine who could make the

presentation to the SEC.  At that meeting, despite the knowledge that Stanford and DAVIS were in

the best position to disclose the assets in the Tier III portfolio, Stanford, DAVIS, Holt, and Sjoblom,

all agreed that Sjoblom would seek to convince the SEC that Holt and another SIBL executive were

the best individuals to present testimony and evidence to the SEC as to SIBL's entire investment

portfolio.  The participants also agreed to participate in a series of meetings in Miami, Florida during

the week of February 2, 2009, to bring Holt and the SIBL Executive up to speed on Tier 3" before the SEC presentation.

54.

On January 22, 2008, Sjoblom met in Houston, Texas with several SEC attorneys to discuss issues related to the SEC investigation.  The SEC attorneys reiterated that their investigation was seeking to determine where and how the entire portfolio of SIBL assets were invested and managed.  Sjoblom falsely maintained that Stanford and DAVIS did not "micro-manage" the portfolio but that Holt and the SIBL Executive were the "better people to explain the details" about SIBL's entire portfolio.  As a result of Sjoblom's misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and DAVIS and to take the testimony of the SIBL Executive and Holt on February 9-10, 2009, respectively.  Sjoblom also falsely informed the SEC attorneys at this meeting that SIBL was "not a criminal enterprise."

## VII. __PLAINTIFFS' INVESTMENTS__

55.

All Plaintiffs invested in the Stanford Financial charade by purchasing CDs or placing their money in other investment accounts from and with SIB.  Over the years that Plaintiffs purchased and maintained investments in SIB, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial representatives or via Stanford Financial promotional materials, that, *inter alia*:  (1) an investment in SIB was safer than investing in U.S. banks because SIB did not make loans but instead invested in safe and highly liquid instruments; (2) SIB and Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB was completely safe and secure because it was guaranteed and insured by Lloyd's, was audited by the Antiguan banking regulatory commission and by an "outside" audit firm and subjected to regular, "stringent" risk

management examinations.   All of this was false.

56.

During the time that Plaintiffs purchased and maintained investments in SIB, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*:  (1) SIB was not regulated by the U.S. Government;  (2) Plaintiffs' investments in SIB were <u>not</u> insured; (3) SIB was operating illegally as an unregistered investment company soliciting and selling unregistered securities by, from and through Houston, Texas;  (4) that SIB was not invested in safe secure and liquid instruments; and (5) that SIB was not audited or supervised by the Antiguan Government and was only audited by a one man "mom and pop" audit shop under the control of Allen Stanford and SIB was not subjected to stringent risk management examinations; or (6) that Defendants were assisting Stanford Financial to perpetuate its Ponzi scheme by, *inter alia*, engaging in conduct designed to keep the SEC at bay and thwart the SEC's investigation of Stanford Financial.

57.

Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial sales representatives and via Stanford Financial promotional materials, Plaintiffs decided to invest money in, and maintain investments in, the SIB CDs.

## VIII.  <u>PLAINTIFF CLASS</u>

58.

Plaintiffs are persons who in many cases, invested their life savings and retirement funds with Stanford Financial (through SIB) because they considered Stanford Financial a safe investment company because it was allegedly "based" in the United States and therefore subject to U.S. laws and regulations.  In reliance on Stanford Financial's fraudulently crafted "image" as a Texas-based

financial services group, and in further reliance on the illusion of safety and security, Plaintiffs transferred hundreds of millions of dollars to Stanford for investment in SIB.

59.

Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs continued to receive monthly account statements from Stanford showing that their money had been invested in the SIB CDs and were in fact profitable.  At no time were Plaintiffs ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures similar to a hedge fund;  that SIB had no real insurance that would protect Plaintiffs' investments; that the only "oversight" SIB was subjected to was a one man "mom and pop" audit firm in Antigua that was completely dominated by Stanford;  and that people like Defendants and Leroy King were complicit in protecting and insulating Stanford from regulatory scrutiny.   Instead, and lacking the type of information that might be gained from a full regulatory disclosure, Plaintiffs were led to believe by Stanford Financial that an investment in SIB was safer than any other investment in the market.  Now Plaintiffs stand to lose all of their investments.

## IX.  CLASS ALLEGATIONS

60.

Plaintiffs request this case be certified as a class action pursuant to FRCP 23.  Thousands of investors have money invested with Stanford Financial through SIB.  The number of affected investors are so numerous that joinder of all members is impracticable.  There are common questions of law and fact that are common to the class and these common questions predominate over individual issues.  The Named Plaintiffs' claims are typical of the class claims.  The Named Plaintiffs have no interest adverse to the interests of other members of the Class.  The Named Plaintiffs will fairly and adequately protect the class' interests.  The Named Plaintiffs have retained

counsel experienced and competent in the prosecution of class action and complex international litigation.

61.

Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

    i.      All persons or entities that held CD or other investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver; and

    ii.      Such other classes or sub-classes as the Court may determine.

               Excluded from the class are:

               a.      Defendants, and their employees and agents; and

               b.      Any officer, director, employee, or promoter of Stanford Financial, including SIB, as those entities have been defined herein

62.

The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## X.   STATUTE OF LIMITATIONS DEFENSES

### Discovery Rule/Inquiry Notice

63.

The SEC filed an action against Allen Stanford and SIB *et al*. on February 17, 2009, and on that same day the Receiver was appointed.   Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants until then.   Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud until now.

## XI.  CLASS CAUSES OF ACTION

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF ALL PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)

### A.  AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1.  SALES OF UNREGISTERED SECURITIES

64.

Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs.   In particular, by their actions described herein, Defendants provided substantial assistance to SIB and Stanford Financial and materially aided Stanford Financial and SIB to sell unregistered securities to Plaintiffs from, by and through Texas.   As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIB, with Defendants' participation, constitute "securities" under the relevant securities law jurisprudence.   By agreeing to assist Stanford Financial to avoid regulatory scrutiny by intentionally misleading the SEC during its 2005-2006 investigation of Stanford, Defendants knew or should have known that they were assisting and perpetuating the

sale of unregistered securities to Plaintiffs from, by and through Texas.  But for Defendants' participation, Stanford Financial and SIB could not have sold unregistered securities to Plaintiffs from, by and through Texas.

65.

Defendants had general awareness that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.  In assisting an offshore bank sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  None of the CDs sold to Plaintiffs were ever registered with the Texas Securities Commission and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act. Defendants acted intentionally or with reckless disregard for the truth and the law.  As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

2. SALES OF SECURITIES BY UNREGISTERED DEALERS

66.

Defendants aided and abetted SIB and the Stanford Financial Group in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Defendants knew or should have known that Stanford Financial and SIB were collectively

functioning as an unregulated, unregistered investment company, selling hedge or mutual fund participation units from, by and through Texas to investors and then pooling its customers' money together to make illiquid, speculative investments.

67.

Stanford Financial and SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, including Defendants, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, securities of which SIB was the issuer, without obtaining an order from the Texas State Securities Board permitting it to register as an investment company "dealer".

68.

Defendants intentionally and actively aided and abetted Stanford Financial to operate as an illegal hedge or mutual fund in Texas and sell securities from, by, and through Texas, by means of the conduct described herein.   With full knowledge that Stanford Financial and SIB were collectively acting as an unregistered securities investment company "dealer" in Texas selling securities from, by, and through Texas, and that Stanford Financial and SIB were being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial and SIB's violations of the Texas Securities Act by their conduct described herein.

69.

Defendants had general awareness that they were assisting an offshore, unregistered investment company "dealer" sell unregistered securities from, by and through Texas and otherwise engage in illegal conduct.   Defendants were all subjectively aware of, and absolutely indifferent to,

the risk posed by their conduct in intentionally engaging in conduct designed to mislead the SEC and thwart the SEC's investigation of Stanford Financial.  In assisting an offshore bank deceive the SEC so that it could continue to sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, absolutely aware they were engaged in illegal conduct.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  In fact, in their zeal to assist SIB, an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, to sell its debt obligation securities from, by, and through Texas via Stanford Financial, Defendants acted with wanton and arrogant disregard for the protections afforded by the Texas Securities Act.  As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 3. UNTRUTH OR OMISSION

70.

Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial and SIB and their principals in the sale of securities through the use of untrue representations or materially misleading omissions.  In particular, and as set forth in the SEC's Amended Complaint and Jim Davis' Plea Agreement (Exhibit 1) Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs.  In particular, Stanford Financial led

Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office, to believe that their money was being invested in safe, liquid investments that were completely insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments like private equity and real estate. Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, illegal mutual fund in violation of the Investment Company Act and the Texas Securities Act.

71.

Defendants had general awareness that they were involved in improper activity and that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas.  With knowledge that Stanford Financial and SIB, acting in concert as an unregistered investment company, were misleading investors about the scope and nature of and the extent of oversight over SIB, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SIB and Stanford Financial in agreeing to mislead the SEC so as to thwart the SEC's investigation of Stanford Financial and thereby materially aided the sales of securities through the use of untruths and materially misleading omissions.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in agreeing to assist Stanford and his criminal operation.  In assisting an offshore bank deceive the SEC so that it could continue to sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, absolutely aware they were engaged in illegal conduct. Defendant's conduct described herein was designed to perpetuate the Stanford Financial's Ponzi

Scheme. Defendants' actions as described herein allowed Stanford Financial and SIB to continue to sell securities to Plaintiffs from, by and through Texas using untruths and materially misleading omissions.

72.

In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial, or acted with reckless disregard for the truth or the law. In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein. Defendants' actions in aiding and abetting Stanford Financial's fraud caused Plaintiffs to enter into transactions or maintain their investments with SIB. As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 4. CO-CONSPIRATOR LIABILITY

73.

Defendants are jointly and severally liable as co-conspirators for Stanford Financial and SIB's primary violations of the Texas Securities Act. In particular, Defendants knowingly combined together to assist Stanford Financial to operate as an "outlaw", unregulated, unregistered investment company/dealer, and to sell unregistered securities from, by and through the State of Texas. As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIB to

accomplish the goal of selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### B. AIDING AND ABETTING/PARTICIPATION IN A FRAUDULENT SCHEME

74.

By their conduct described herein, Defendants aided and abetted and participated with Stanford Financial and SIB in a fraudulent scheme, making Defendants directly liable for fraud. In particular, Defendants made the conscious decision to assist and enable Stanford Financial to continue to sell SIB CDs based on the misrepresentations that investments in SIB were fully audited and regulated because SIB was subject to audits and risk management reviews by the Antiguan banking commission. Defendants' actions in participating in the fraudulent scheme are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in Stanford Financial as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### C. CIVIL CONSPIRACY

75.

Defendants conspired with each other and with Allen Stanford, Jim Davis, SIB, Stanford Financial and SGC to commit the wrongful conduct described herein, including fraud and violations of the Texas Securities Act. Defendants are each responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, Davis SIB, Stanford Financial, and SGC, in furtherance of the unlawful conspiracy and enterprise.

76.

Together with Allen Stanford, Davis, SIB, Stanford Financial, and SGC, the Defendants conceived, participated in, and implemented a common enterprise to sell SIB CDs for the pecuniary benefit of Stanford and Stanford Financial and, thereby, Defendants.  The object of the conspiracy was to help insulate Stanford Financial and SIB from regulatory scrutiny and so assist said entities to sell the SIB CDs in a massive Ponzi scheme.  There was a meeting of the minds between all Defendants and Allen Stanford, SIB, Stanford Financial, SGC, and Davis as to the object to be accomplished and the means for carrying out the scheme, namely the conduct described herein.

77.

During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting Allen Stanford, SIB, Stanford Financial, SGC, and Davis in furtherance of the common enterprise, engaged in specific overt acts as described herein.  Each of the Defendants engaged in overt acts in furtherance of the Stanford Financial CD conspiracy and effectuated their illicit scheme through and with the assistance and cooperation of Allen Stanford, SIB, Stanford Financial, SGC, and Davis.

78.

Defendants conspired to conduct, and participated in conduct including violations of securities laws and fraud.  To wit, over the span of four years, Defendants, in conspiracy with Allen Stanford, SIB, Stanford Financial, SGC, and Davis, knowingly participated in conduct designed to facilitate the misapplication of fiduciary property via a massive Ponzi scheme, as described herein. Defendants' participation in the conspiracy proximately caused Plaintiffs to lose their investments.

## XII.  RESPONDEAT SUPERIOR

79.

Defendant Proskaer Rose is liable for the tortious acts of its employee, Sjoblom, and all contacts with the State of Texas by said employee should be attributed to Proskauer Rose for purposes of the personal jurisdiction analysis.  Sjoblom was acting within the course and scope of his employment with Proskauer Rose, and in furtherance of Proskauer Rose's business, when he engaged in the wrongful conduct described herein.

## XIII.  <u>ACTUAL DAMAGES</u>

80.

Plaintiffs and the Class have suffered the loss of well in excess of $7 billion that was proximately caused by the wrongful conduct of Defendants described herein.  In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them.  Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

81.

The exact amount of maximum damages proximately caused by Defendants' wrongful conduct is unknown, but Plaintiffs believe that those damages exceed $7 billion.

## XIV.  <u>PUNITIVE DAMAGES</u>

82.

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

83.

All conditions precedent to filing this Complaint have been met.

## XV. <u>JURY DEMAND</u>

84.

Plaintiffs demand a trial by jury.

## <u>PRAYER</u>

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas  78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210


By:  s/ Edward C. Snyder
       EDWARD C. SNYDER
       State Bar No. 00791699
       esnyder@casnlaw.com
       JESSE R. CASTILLO
       State Bar No. 03986600
       jcastillo@casnlaw.com

**LEAD CLASS COUNSEL AND**
**ATTORNEYS IN CHARGE**
**FOR PLAINTIFFS**
**AND THE PUTATIVE CLASS**