UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, | § | |
| HORACIO MENDEZ, | § | |
| ANNALISA MENDEZ, | § | |
| PUNGA PUNGA FINANCIAL, LTD. | § | |
| individually and on behalf of a class | § | |
| of all others similarly situated | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:09-cv-01600-F |
| | § | |
| PROSKAUER ROSE, LLP, | § | |
| THOMAS V. SJOBLOM, | § | |
| P. MAURICIO ALVARADO, and | § | |
| CHADBOURNE & PARKE, LLP | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

NOW COME PLAINTIFFS, SAMUEL TROICE, HORACIO MENDEZ, ANNALISA

MENDEZ, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of a class of all

others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Second Amended

Class Action Complaint against Defendants, PROSKAUER ROSE, LLP, THOMAS V. SJOBLOM,

P. MAURICIO ALVARADO and CHADBOURNE & PARKE, LLP (collectively hereinafter

"Defendants"), and in support thereof would show the Court the following:

## I.    PREFACE

1.

This putative class action is filed in representation of a putative class of defrauded investor

clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial").  This action has

been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities &*

*Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management LLC, et al.*, in the United States District Court for the Northern District of Texas– Dallas Division (the "SEC Action"). This action alleges participation by these Defendants in the massive, ongoing investment fraud Ponzi scheme conspiracy perpetrated by the Stanford Financial Group and its principals from, by and through Texas that led to the intervention by the SEC in Texas and appointment of Ralph Janvey as Receiver.

## II.    **PARTIES**

2.

Plaintiff, SAMUEL TROICE, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

3.

Plaintiff, HORACIO MENDEZ, is a dual citizen of the Untied States of America and Venezuela and is currently residing in Travis County, Texas.

4.

Plaintiff, ANNALISA MENDEZ, is a citizen of the Untied States of America and is currently residing in Travis County, Texas.

5.

Plaintiff, PUNGA PUNGA FINANCIAL, LTD., is a Panamanian company with its principal place of business in Mexico City, Mexico which is wholly owned and controlled by Mexican citizens from Mexico City, Mexico.

6.

Additionally, this case seeks certification of a class of all investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International

Bank Ltd. as of February 2009, and, in the alternative, seeks certification of (i) a class of Mexican investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009; and (ii) a separate class of United States investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009.

7.

Defendant Proskauer Rose, LLP, ("Proskauer") is a limited liability partnership organized under the laws of the State of New York.  Proskauer may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.  Proskauer may be served by serving its registered agent/chairman Allen I. Fagin at 1585 Broadway, New York, New York, 10036-8299.

8.

Defendant Thomas V. Sjoblom, ("Sjoblom") is an individual currently employed at Proskauer Rose, LLP at both the Washington D.C. and New York offices at 1001 Pennsylvania Avenue, NW Suite 400 South, Washington D.C. 20004-2533 and 1585 Broadway, New York, New York 10036-8299.  Sjoblom may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

9.

Defendant P. Mauricio Alvarado, ("Alvarado") is an individual who resided in Texas during the time in questions but how is currently believed to be residing in Miami, Florida.  Alvarado may be served with service of process by serving him at his place of residence at 3593 Royal Palm Avenue, Miami, Florida, 01331.

10.

Defendant Chadbourne & Parke, LLP, ("Chadborne") is a limited liability partnership organized under the laws of the State of New York.  Chadbourne may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.  Chadbourne may be served by serving its registered agent/general managing partner Charles K. O'Neill at 30 Rockefeller Plaza, New York, New York, 10112.

## III.    SUBJECT MATTER JURISDICTION

11.

This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(B) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of the Republic of Mexico and all Defendants are citizens of a State within the United States.

## IV.    PERSONAL JURISDICTION

12.

This Court has personal jurisdiction over the non resident Defendants under the Texas Long Arm Statute.  Defendants have conducted continuous and systematic business in the State of Texas for many years and are therefore subject to general jurisdiction.  Furthermore, as described herein, Defendants have engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Defendants have done business and committed torts, in part, in the State of Texas.   Since at least 2005 Defendants served as the attorneys for the Stanford Financial group headquartered in Houston, Texas, and in that capacity engaged in extensive contacts with Stanford

Financial personnel based in Houston, Texas, including the General Counsel of Stanford Financial, and Defendants traveled to Houston and Fort Worth, Texas to service said Texas-based client.  In conjunction with the provision of their professional services to Stanford Financial, Defendants engaged in contacts with the State of Texas designed to assist and perpetuate the Stanford Ponzi scheme described herein, including obstructing an SEC investigation, as described herein.  Based on their general and specific contacts with the State of Texas, Defendants have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

**V.**     **<u>VENUE</u>**

13.

Venue is mandatory in this Court pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action.

**VI.**     **<u>FACTUAL BACKGROUND</u>**

**A.     The Stanford Financial Empire**

14.

From the mid-1980s through February 2009, R. Allen Stanford ("Stanford"), a former gym owner from Mexia Texas, built a financial service empire that at its height boasted 30,000 customers in 130 countries allegedly managing $50 billion dollars in investment funds.  The empire was comprised of over 140 companies from across the globe that operated under the brand name "Stanford Financial" with its worldwide headquarters located in Houston, Texas.   The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: Houston, Texas-based Stanford Group Company ("SGC") and Stanford Capital Management, LLC ("SCM"); Stanford International Bank ("SIB") and Stanford

Trust (one in Louisiana and another in Antigua), all of which were controlled and managed from the United States, principally Houston, Texas. In Mexico, Stanford Financial operated under the names Stanford Group Mexico S.A. and Stanford Fondos S.A. de C.V., while in Venezuela Stanford Financial operated under the name Stanford Group Venezuela Asesores de Inversion, C.A.

15.

Begun initially as an offshore banking operation in the mid-1980s, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer and investment advisory services worldwide from its headquarters base in Houston, Texas. Stanford Financial gave all the appearances of a highly successful outfit, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

16.

The most important facet underlying the Stanford Financial empire, and the key to its success and sustainability, was the carefully crafted Stanford Financial image. The Stanford Financial image was one of success, prestige, and, most importantly, safety and solidity. The Stanford Financial image was centered around and built upon money – the money Stanford Financial received from its investor clientele. With the money it received from its clients, Stanford Financial was able to project an image of success and solidity. From the marble and mahogany of the Houston headquarters, to the huge bonuses paid to lure and retain top producers, to the $500 lunches for clients in Mexico City, to the helicopters and private jets that flew the Stanford Financial executives around, Stanford Financial oozed money, thus lending an air of legitimacy to the Stanford image.

17.

Part of the Stanford legend was that Stanford Financial was a continuation of the insurance

business begun by Stanford's grandfather, Lodis Stanford, during the Great Depression.  Based on that connection, Stanford Financial boasted to the world that it had over 70 years history of growing and protecting people's wealth.  Of course, this legend, like most of the Stanford image,[1] was false, as Stanford's father sold the old insurance business in 1983.  Yet Stanford continued to foster that image of decades of family tradition and work ethic as late as a 2008 edition of the *Stanford Eagle* magazine.

18.

Charitable giving and sponsorships of sporting events and teams, as well as massive political contributions, constituted additional pillars supporting the Stanford Financial image.  As with everything else, Stanford spent lavishly on philanthropic endeavors, giving to hospitals, theaters and museums, and sponsoring sports teams and celebrities such as the Miami Heat and Vijay Singh, all with the objective, once again, of sustaining the Stanford Financial image.  Stanford made a huge splash in the world cricket establishment in particular.  Stanford also gave generously to political campaigns and urged his employees to do the same as well, to the tune of millions of dollars.

19.

Stanford Financial obtained the money it needed to perpetuate its image from one primary source:  the sale of Certificates of Deposit from the Antiguan offshore bank wholly owned and controlled by Stanford himself – SIB.  Clients who were introduced to the Stanford Financial group quickly found out that the main financial product being peddled by the group was the SIB CD.  The SIB CDs were sold worldwide by a web of different Stanford Financial promoter companies whose sole function was the sale of the SIB CDs.  By 2009, SIB had sold over $7.2 billion in CDs.

20.

---

1       Stanford's claim to be a descendent of the founder of Stanford University, a claim which he disseminated widely, was also false.

**B.      Stanford Financial's Texas Base**

Houston, Texas was the administrative nerve center and principal base for Stanford Financial/SIB, and all of the sales and marketing practices of Stanford Financial and SIB were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial.  SIB itself never had a sales force or marketing or promotional arm in Antigua.  The head of the global sales force for SIB was located in the United States, principally in Houston, Texas.

21.

Importantly, SIB's Annual Reports disclosed that SIB paid "referral fees" to Houston-based SGC based as a percentage of SIB's "managed client portfolio", and also disclosed the existence of a "management fee agreement" between SIB and SGC related to marketing and services, including "treasury–related functions, establishing and implementing trading policy, client communications, research, marketing and branding, government and public relations, technology and other related administrative services".  SGC's audited financial statements dating back to at least fiscal year 2003 also disclosed that SGC had entered into a joint market arrangement with SIB, and that "Pursuant to joint marketing agreements, the Company [SGC] and the affiliated foreign financial institution [SIB] agreed to jointly market and offer fixed income and trust products to their respective customers.  In connection therewith, the Company [SGC] is entitled to referral fees based upon percentages of the referred portfolio as defined in the respective agreements."

22.

All of the Stanford Financial/SIB sales practices, directives, techniques, strategies and reward programs were developed and crafted in Houston and disseminated to the Stanford Financial branch offices around the world, including in Mexico and Venezuela, to be implemented there.  All of the sales force training manuals, promotional literature and materials for SIB, including the

Spanish-language promotional materials, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world to be utilized by the local sales force in each country.

23.

In addition, mandatory sales training for the Stanford Financial sales force for SIB was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial personnel like Oreste Tonarelli, Monica Manzanares and David Charner.  In those mandatory training sessions, sometimes twice a year, the foreign financial advisers were trained to sell the Stanford Financial image.  The Stanford Financial "script" for why SIB was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled and drilled again into their heads.  The advisers were thereafter subjected to examinations to reinforce the script and sent back to their home countries to aggressively sell the SIB CDs.  Therefore all of the sales, marketing and promotional activities for Stanford Financial and SIB occurred in Texas.

24.

As part of the Stanford Financial sales process, investors like Plaintiffs and the Class were uniformly "sold" the Stanford Financial "image".  They were uniformly informed by the Stanford Financial brokers and advisers, whether from Stanford Mexico, Stanford Venezuela or from SGC in Houston, that, *inter alia*, investments in the SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government (the SEC and FINRA).  Indeed many foreign investors in SIB to this day never understood that they had invested in CDs issued by an Antiguan bank, but always thought their money was invested in Houston, Texas.  Investors like Plaintiffs were also uniformly told by

Stanford Financial sales agents that the CDs issued by SIB were safer even than U.S. bank–issued CDs because Stanford Financial had unique Lloyds of London insurance policies in place that went above and beyond FDIC insurance;  and that investments in the CDs were liquid and the CDs could be redeemed at any time because SIB, through Stanford Financial, only invested the money in safe, secure and liquid assets.   All of this was false.  These exact, uniform sales representations are contained almost verbatim in the Stanford Financial Training Manuals as well as in the uniform promotional materials for Stanford Financial and SIB that were designed and prepared in and issued from Houston, Texas.

25.

The Stanford Financial/SIB sales and promotional materials created in Texas and distributed uniformly throughout the world intentionally blurred the lines between Antigua-based SIB and the other U.S.-based Stanford Financial entities, including SGC, and intentionally created the false impression that SIB and Stanford Financial (SGC ) were one and the same and therefore that SIB enjoyed the same regulation and protections as a U.S.-regulated company, including regulation by the SEC and coverage by SIPC.  As the U.S. Receiver has stated, "Stanford's financial advisors used the apparent legitimacy offered by U.S. regulation of Stanford's U.S. brokerage subsidiary in order to generate sales of SIBL CDs worldwide."[2]  Little did the investors like Plaintiffs and the Class know that Allen Stanford, Jim Davis and others were engaged in a long running conspiracy to ensure that Stanford Financial and SIB evaded SEC regulation, and regulation from any other governmental agency, foreign or domestic, at all costs.

C.      The Stanford Reality

26.

The reality of the Stanford Financial empire was that, since at least 1988, it was nothing but a

massive, worldwide Ponzi scheme that for its very existence and success depended on concealment and the evasion of government regulations and regulators around the world.  The Stanford Financial companies operated together as a single business joint enterprise investment company called "Stanford Financial" dedicated to the fraudulent sale of its own, internal product/mutual fund "shares" or participation interests denominated as "CDs", which sales were the lifeblood of the entire enterprise.  The master marketing manipulator and salesman, Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level, convincing thousands of people worldwide to invest their money in his Stanford Financial investment company Ponzi scheme.  Stanford became a true international financial "pirate", absolutely intent on operating an "outlaw" investment company from his Caribbean safe haven completely outside the regulatory confines of the laws of any country, whether the United States, Antigua, Mexico or elsewhere.  In 2005 Stanford and Defendant Mauricio Alvarado ("Alvarado"), the former General Counsel of Stanford Financial, specifically hired Defendant Tom Sjoblom, at that time employed by Defendant Chadbourne & Parke LLP ("Chadbourne"), to help Stanford Financial evade and obstruct securities regulation and enforcement in the United States.

27.

Allen Stanford's personal history, by itself, was cause enough to question the veracity of the image he created for the Stanford Financial empire.  His first business, a chain of Waco, Texas-based gyms called "Total Fitness", collapsed into bankruptcy in 1982.  Allen Stanford declared personal bankruptcy as well in 1984 and was discharged from $13.6 million in obligations.[3] Stanford fled to the Cayman Islands where he became a scuba diving instructor.  It was there that he met Dutch ex pat Frans Vingerhoedt, who introduced him to the world of offshore banking.

---

2  "Report of the Receiver Dated April 23, 2009" in the SEC Action [docket #336], at 7.
3        *Business Week*, March 5, 2009, "Stanford's Rocky Start."

28.

By 1985 Stanford opened his first bank, Guardian International Bank ("Guardian"), on the tiny (12,000 residents) Caribbean island of Montserrat, which at that time was known mostly for its extremely lax banking regulations.  Virtually all of the banks that were opened in Montserrat in the 1980s were "paper" banks dedicated to fraud.  In fact David Marchant, the editor of "Offshore Alert", was quoted as stating that "the only reason you opened a bank in Montserrat was to commit fraud."[4]

29.

Guardian served as the starting point roadmap for the creation of the Stanford Ponzi scheme. Stanford brought in his old college roommate James Davis ("Davis") as Controller for Guardian to help run operations, and also established representative offices for Guardian in Miami and Houston, under the name of Guardian International Investment Services, designed to cater to wealthy Latin American clients.[5]   Guardian offered CDs with rates typically 2-3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

30.

What no one realized, precisely because part and parcel of Stanford's Ponzi scheme was a massive anti-regulatory concealment campaign from at least 1991 all the way through February 2009, was that beginning in 1988 Stanford and Davis had begun fabricating the investment returns for Guardian for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators in Montserrat.  Davis has himself now admitted making false entries into the bank's general ledger and otherwise falsifying SIB's financial records for some twenty years.  See Plea Agreement of James Davis, a true and correct copy of which is attached hereto as **Exhibit "1"**

---

4        As quoted in Bryan Burroughs, "*Pirate of the Caribbean*", Vanity Fair, at 81 July 2009.
5        *BusinessWeek*, Feb. 24, 2009, "Did Court Ruling Prolong Stanford Probe?"

and incorporated herein for all purposes, at ¶17(a).  For almost twenty years, Stanford and Davis just made up the numbers for SIB as they pleased.

31.

But even with such anti-regulatory concealment efforts, in 1989 the banking system in Montserrat, and Stanford's Guardian Bank in particular, came under investigation by British and U.S. authorities for money laundering.  As a result of this heightened regulatory scrutiny, Stanford began casting about for another, more amicable location for his outlaw Ponzi bank.  In December 1990 Stanford settled on Antigua because of its reputation for extremely lax regulatory oversight and enforcement and so he incorporated Guardian Bank there.  By May 1991 Stanford's banking charter was revoked by Montserrat.  So Stanford moved his entire banking operations to Antigua, and simply continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of the bank from Guardian to Stanford International Bank ("SIB") in 1994.

32.

Once established in Antigua, Stanford quickly set about ensuring that he would not be subjected to the same regulatory scrutiny he received in Montserrat.  At that time, in 1991, Stanford entered into conspiratorial meeting of the minds with Davis, that grew to include others within Stanford Financial, including Laura Pendergest-Holt, SIB President Juan Rodriguez Tolentino, and General Counsel Mauricio Alvarado, as well as members of the Antiguan Government and other professionals and service providers to Stanford Financial, to do whatever was necessary to evade regulatory scrutiny of SIB's activities and otherwise conceal the true nature of Stanford Financial's activities from regulators worldwide.  In furtherance of this concealment conspiracy that was part and parcel of, and central to, the overall Ponzi scheme conspiracy, Stanford moved to establish a

symbiotic relationship with the local government in Antigua, and, through corruption, bribes and kickbacks, placed the family of the Prime Minister Lester Bird firmly in his back pocket.  In return for political cover and no oversight or regulation of his business, Stanford eventually became a major source of funding for the entire island, loaning hundreds of millions of dollars to the Antiguan government over the years.  Stanford even bought the Antiguan newspaper, the Antiguan Sun.  By 2004, the island government owed Stanford Financial over $87 million – nearly half of its annual tax revenues. In that same year, SIB had grown to over $3 billion in deposits.

33.

So tight was the relationship between Stanford and the Antiguan government that, when Stanford Financial was accused of money laundering in 1999, the Antiguan government turned to Stanford himself to rewrite the country's banking laws.  Stanford and his agents were then named to the commission, the Antiguan Financial Services Regulatory Commission ("FSRC"), created and charged with supervising Antigua's banks.  Stanford then used the new commission to wrest control of Antigua's offshore banking industry from the Government.   As a result, the U.S. State Department issued an advisory to U.S. banks to scrutinize all financial transactions coming in or out of Antigua for evidence of money laundering.[6]

34.

Jonathan Winer, then-head of the State Department's Bureau for International Narcotics and Law Enforcement Affairs, said at the time that Antigua is "one of the most attractive financial centers in the Caribbean for money launderers", and that "Antigua has long been one of the worst regulated offshore centers in the world."[7]  Winer was recently quoted as saying that when he asked

---

[6]    *Houston Chronicle*, July 16, 2000, Banker drawing scrutiny / Houstonian's Antigua empire raises questions
[7]    Statement to the US Congressional House Committee on Banking Financial Services, Jonathon Winer, US State Department, June 11, 1998.

an Antiguan banking official in the late 1990s why anyone would choose that country for banking as opposed to New York, London, Tokyo or Paris: "he scratched his head and after a while he said 'I guess would have to be the secrecy…I'd say it's the secrecy plus the lack of standards or real controls."[8]

35.

Stanford's anti-regulatory conspiracy with members of the Antiguan Government is borne out by the Plea Agreement entered by Stanford CFO Jim Davis, Exhibit "1", as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and the former head of Antigua's FSRC, a true and correct copy of which is attached hereto as **Exhibit "2"** and incorporated herein for all purposes (the "Indictment"). The Plea Agreement and Indictment allege that for years King, while acting as the CEO of the Antiguan FSRC, accepted bribes from Stanford and/or his associates in return for ensuring that the FSRC "looked the other way" and did not properly perform its regulatory functions or supervise SIB. King even entered into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford. As part of the blood brother relationship and bribery, King became Stanford's regulatory spy and "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of Stanford Financial and SIB from 2005 all the way until 2009. All of this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by evading and obstructing regulation of SIB's activities at every turn and in every county.

36.

---

[8]      "Stanford arrives for his Houston hearing", By MARY FLOOD and TOM FOWLER HOUSTON CHRONICLE, June 24, 2009.

Stanford Financial began to grow exponentially beginning in 2000.  In 2001, Stanford filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. residents through SGC brokers in the United States. Stanford thereafter began the practice of "head hunting" for U.S. brokers and financial advisers, paying enormous signing bonuses to financial advisers to leave their jobs at other firms and transfer their book of clients over to Stanford Financial.  Once at Stanford Financial, these same financial advisers were then pressured into promoting and selling SIB CDs to their clients, and were rewarded with outsized bonuses.  If a financial adviser refused to sell the CDs, or otherwise questioned what was really going on at Stanford Financial, they were fired, sued to recover the bonuses and blackballed in the industry.  Fueled by this influx of veteran brokers and investment advisers, Stanford Financial grew from 6 branch offices in the United States to more than 25 between 2004 and 2007, during the time that Defendants represented Stanford Financial.

37.

From 2000 to 2008 Stanford Financial grew into a high-powered sales and marketing juggernaut.  The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  In order to market and sell the SIB CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial brokers and financial advisers, including those in Mexico, to "push" the SIB CDs on investors like Plaintiffs.  SIB paid disproportionately large commissions to its Stanford Financial brokers and advisers for the sale of CDs; they received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD.  Stanford Financial used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

38.

Beginning in 2003 Stanford's strategic plan to lure top financial advisers away from their employers to work for Stanford Financial began to back-fire as several U.S. advisers renounced their new position with Stanford and lodged complaints with FINRA f/k/a the NASD, including charges that Stanford Financial was running a massive Ponzi scheme.  Some of the advisers were fired or otherwise resigned for refusing to promote and sell the SIB CDs to their clients or for questioning what was going on at Stanford Financial. Between 2003 and 2008 over a dozen Stanford Financial advisers and employees, including Leyla Basagoitia and Charles Hazlett in 2003; Lawrence J. DeMaria in 2006; Charles Satterfield in 2007; and Mark Tidwell and Charles Rawl in 2008, were discharged or resigned amid allegations of fraudulent practices at Stanford Financial.  All of these employees, none of whom had 20 years legal experience working in enforcement for the SEC, quickly figured out that Stanford Financial was nothing but a Ponzi scheme; De Maria came to that conclusion in just a few months of working as a copy writer for Stanford Financial.

39.

The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company hedge fund or mutual fund (called "Stanford Financial") from, by and through Houston, Texas and issuing "shares" or participation interests (called "CDs") in the investment company via an offshore bank in Antigua.  At the end of the day, investors like Plaintiffs and the Class purchased participation interests in Stanford Financial and SIB's investment portfolio, just like any mutual or hedge fund.   SIB, acting through the Stanford Financial international network of brokers and advisers, lured money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then pooled all of the investors' money together and scattered it throughout the Stanford Financial enterprise to make investments in various illiquid and

high risk assets worldwide – the very definition of an investment company.  As such, in reality Stanford Financial was operating as a type of unregistered mutual or hedge fund and selling "shares" or participation interests to Plaintiffs and others from, by and through Houston, Texas.

40.

Any former SEC lawyer, especially one like Sjoblom with 20 years experience in enforcement, could see that Stanford Financial was operating an unlicensed, unregulated mutual or hedge fund directly in and from the United States.  Indeed the SEC, in its July 21, 2005 investigatory referral letter to FINRA, concluded that Stanford was running an investment company and selling "shares" or participation interests in said investment company to unwitting investors.  More recently, in its Complaint against Stanford and his entities, the SEC has alleged that SIB and SGC violated §7(d) of the Investment Company Act.  Neither Stanford Financial nor SIB were registered or authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or the Class, who were consistently and uniformly told verbally and via the Stanford Financial promotional materials that SIB was part and parcel of the Stanford Financial group based in Houston, Texas, authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London insurance coverage.  Nor were Plaintiffs ever told that Stanford Financial was engaged in a massive Ponzi scheme conspiracy that included, as a central component, evading and obstructing regulation and enforcement in the U.S. and Antigua.

41.

Besides the fraud committed on Plaintiffs and the Class based on the marketing of Stanford Financial and SIB as being one and the same and completely regulated, Stanford Financial also touted the high liquidity of SIB's investment portfolio.  For example, in its marketing materials, Stanford Financial emphasized the importance of the liquidity of the SIB CD, stating, under the

heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients…"  To ensure that depositors could redeem their CDs, Stanford, through its brokers and advisers, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.6 billion; (2) private equity and (3) real estate.  None of that was ever disclosed to Plaintiffs or the Class.

42.

Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to acquire private equity and real estate.  In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate.  By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua.  The rest of the money

from investors was just blown by Stanford on creating and perpetuating the image charade with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige.  None of this was disclosed to Plaintiffs and the Class.

43.

As alleged in the Davis Plea Agreement (Exhibit 1) and in the Indictment of Allen Stanford, Leroy King and the others (Exhibit 2), Stanford and his CFO Jim Davis "fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio.  Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements.  Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn.  Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments.  SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis signed these falsified financial statements."[9]

44.

At the end of the day, the entire Stanford Financial empire was dominated completely by one man—Allen Stanford.  Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis.

45.

In running the Stanford Financial empire from the United States, Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants. The SIB Board of Directors included Stanford's 81 year old father and his 85 year old friend, O.Y. Goswick, a former rancher who was listed in Stanford Financial's annual reports as being somehow in charge of SIB's "investments", but who in reality, and according to his own son, did not have sufficient financial knowledge to understand SIB's operations and had suffered a stroke in 2000 that left his ability to communicate "nonexistent".[10]

46.

Moreover nepotism predominated within Stanford Financial, where the upper level management team was comprised of a tightly linked web of friends and family of Stanford and Davis. Just as Stanford brought in his old friend Davis, Davis in turn brought in his protégé, the young Laura Pendergest-Holt, whom Davis had met at the Mississippi Baptist church where Davis was a Sunday school teacher. In turn, Pendergest-Holt's cousin Heather Sheppard was an "equity specialist" at Stanford Financial, while her sister's husband, Ken Widen, was Stanford Financial's managing director for investments and research. Jim Davis' brother in law, Danny Bogar, served as SGC's President and ran Stanford Financial's operations for the entire United States. Davis' son Zack also worked for Stanford Financial as an "equity specialist".

47.

Pendergest-Holt's resume, in particular, was an instant red flag. As the Chief Investment Officer allegedly in charge of investments for SIB and overseeing an $8 billion portfolio, she had no real business or finance education or training. Lawrence Lieberman, senior managing director at

---

9       SEC Second Amended Complaint, at ¶4.
10      Jamie Stengle, "*Dad, 81, to Stanford: 'Do the Right Thing'*", Associated Press, February 20, 2009.

Orion Group, an executive recruiter firm for the money management industry, was quoted as saying that Pendergest-Holt was hired for the position as Chief Investment Officer probably because Stanford and Davis "needed someone they could trust and not someone who could pick stocks".[11] Davis recruited Pendergest-Holt to work at Stanford Financial in 1997 when she was a recent 22 year old college graduate from Mississippi State, where she earned a degree in Math.  She quickly worked her way up the ranks from research analyst to managing director of research and investments until she became Chief Investment Officer when she was 30 years old, all with no degree or background in finance whatsoever.  According to Lieberman, Stanford "may not have wanted a legitimate CIO because that person might have asked a lot more questions and not played ball".[12]

48.

The same is true of the lead accountants for Stanford Financial, both of whom were recently indicted as well.  As alleged in the Indictment and the SEC's Second Amended Complaint, Gilberto Lopez was the Chief Accounting Officer for Stanford Financial, and yet he was not a licensed CPA. Mark Kuhrt, also indicted, served as the Global Controller for Stanford Financial, and yet was not a licensed CPA either.  These two non-CPAs were in charge of accounting for a global financial services company with (allegedly) $50 billion "under advisement".

49.

By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIB CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.  SIB sold between $4 billion and $5 billion in CDs between 2005 and February 2009.  It was at the end of 2008, in the midst of the worldwide financial

---

11      Ana Driver and Svea Herbst-Bayliss, "*Stanford's CIO's Fast Path to Top a Red Flag*", Reuters, March 8, 2009.
12      *Id.*

meltdown, that Stanford Financial began to stumble.

50.

As alleged in the Indictment (Exhibit 2) and admitted to by Davis in the Plea Agreement (Exhibit 1), in 2008 Stanford and Davis, aided by Defendant Alvarado and other, concocted a bogus $541 million shareholder equity infusion, in order to cover up a gaping hole in SIB's balance sheet that would cause it to fall below minimum capital requirements, by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of property he purchased for $63 million and transferred it to some entities who "booked" it at $3.2 billion and then transferred shares in those entities back to SIB.  This fraudulent transaction was just a continuation of the persistent falsification of SIB's financial condition and performance over the preceding 20 years. But the entire operation was finally coming unhinged.

51.

In December 2008 Stanford Financial's clearing firm, Pershing, informed Stanford Financial that it would no longer process wire transfers from SGC to SIB for the purchase of CDs.  Earlier in 2008, Pershing had requested that Stanford Financial provide it with an independent report of SIB's financial condition, which Stanford Financial refused to do.  Furthermore, and due to some $500 million in CD redemptions spurred by the global economic meltdown, Stanford Financial began suffering liquidity problems that prevented SIB from complying with client requests for transfers of funds.  This had a huge impact on the ability of the Stanford's financial advisers to keep clients pacified.

52.

In January 2009, in the wake of the Madoff scandal, Venezuelan financial analyst Alex Almay performed a rudimentary review of SIB's returns over the years as a favor for a friend, and

then published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings.  Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck".  The cat was out of the bag.[13]

53.

The U.S. federal authorities then issued subpoenas to Stanford Financial.  In advance of a deposition before the SEC, Stanford Financial officials met with Defendants in Miami on February 3-8, 2009.  During those meetings, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Allen Stanford an e-mail, copying the head of Stanford Mexico David Nanes, that reads in part, that "*things are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means.  There are real bullets out there with my name on, David's name and many others and they are very real…[w]e are all in this together.*"

54.

On February 17, 2009 the United States Securities and Exchange Commission ("SEC") filed a Complaint against SGC and SIB, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions".  The SEC obtained an injunction and froze the assets of the Stanford Financial group and appointed a receiver, Ralph Janvey to liquidate the companies.

55.

The SEC, through its Second Amended Complaint, has now alleged a fraud of shocking magnitude.  The SEC alleges that Stanford, together with his co-conspirators, engineered and carried out a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and SIB

---

13    *Id.*

into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his private harem of women and their children; a fleet of jets; yachts; and mansions in several different countries. On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation and money laundering. Exhibit "2". On August 27, 2009 CFO Jim Davis admitted to running a Ponzi scheme for 20 years and plead guilty to, *inter alia*, securities and wire fraud. Exhibit "1".

56.

### D.  Defendants' Participation in Stanford's Conspiracy

Central to Stanford's ability to perpetuate and keep alive a massive Ponzi scheme was the ability to shield SIB from regulators and conceal the true nature of Stanford Financial's activities and investment portfolio by blocking regulatory scrutiny at every level and in every country.  After having learned the lessons of Montserrat, Stanford determined that he did not want his fraudulent banking operations to be upended by a regulatory investigation again.  Once ensconced in his Antiguan safe haven, from at least 1991 on Stanford, in conspiracy with Davis and others, embarked on a campaign to protect his Ponzi scheme from outside regulatory interference, convinced that his schemes absolutely depended on his ability to conceal SIB's true nature and activities and to keep the regulators at bay around the world.  The success of Stanford's Ponzi scheme required concealment, and concealment inherently became part of and in furtherance of the main objectives of the Ponzi scheme conspiracy.  In order to accomplish that concealment, and as described herein, Stanford resorted to lies, trickery, bribery, "blood brother" voodoo rituals, obstruction of regulatory investigations and other machinations to throw off or otherwise co-opt regulators and insulate himself and his operations from regulatory scrutiny in several countries.

57.

Of course, Stanford could not keep the regulators at bay by himself, and so from 1991 onwards he entered into a meeting of the minds with Davis, Leroy King and others (including, later, Defendants) whose central objective was the continued evasion and concealment of Stanford Financial's activities from regulatory authorities. Frustration of investigatory efforts by the SEC, in particular, and other agencies in a highly regulated environment such as securities was central to the overall Stanford Ponzi scheme conspiracy, and Stanford and his co-conspirators' efforts to hinder and obstruct regulators was essential to, and therefore in furtherance of, the survival of the overall Stanford Ponzi scheme.

58.

The conspiracy to conceal, hinder and obstruct gained a sense of urgency in the summer of 2005, when the SEC and FINRA initiated investigations of Stanford Financial, SGC and SIB. On July 21, 2005 the SEC sent an investigatory referral letter to FINRA in which the SEC outlined its concerns that, *inter alia*, (1) Stanford was committing securities fraud; (2) the CDs constituted "securities" under U.S. law; (3) Stanford appeared to be illegally operating an unregistered investment company (a mutual or hedge fund) in the United States; (4) as of 2004, 63% of SGC's revenues were derived from the sales of CDs; and that (5) Stanford had sold over $1.5 billion in CDs, making it a potentially large problem.

59.

In response to the SEC investigation initiated in the summer of 2005, and as alleged in the Indictment (Exhibit 2), Allen Stanford, Davis and their co-conspirators, as part of the ongoing conspiracy to conceal, hinder and obstruct regulators, blocked and obstructed the SEC investigation at all turns from the summer of 2005 through February 2009. The Indictment alleges that from June

2005 through March 3, 2009, Stanford, Pendergest-Holt, Davis and others engaged in a conspiracy in the Southern District of Texas to "corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before…the SEC, in violation of 18 U.S.C. §1505". See Indictment, Ex. "2", at pps. 41-45.  The Indictment alleges that the object of the conspiracy was to obstruct the SEC's investigation of Stanford Financial and SIB so as to "perpetuate and prevent detection of an ongoing fraud" so that Stanford Financial and SIB could "continue receiving economic benefits from the fraud."  *Id*., at 42-43.

60.

In order to aid their conspiracy to obstruct the SEC investigation, on or before August 2005 Stanford retained Chadbourne & Parke, LLP and partner Thomas Sjoblom, Defendants herein, as outside counsel to represent the interests of Stanford Financial and SIB in the SEC investigation of Stanford Financial and SIB.   Importantly, Stanford hired Sjoblom because Sjoblom had been an SEC enforcement trial lawyer for some 20 years, and as such had experience in securities fraud schemes and SEC investigations and enforcement actions.  Upon hiring Sjoblom, there was a meeting of the minds as between Sjoblom (acting on behalf of Chadbourne), Stanford, Davis, Alvarado and Leroy King as to the objective of the conspiracy – being the obstruction of SEC investigations so as to allow Stanford Financial and SIB to evade SEC regulation – and Sjoblom thereafter worked closely with Stanford, Davis, King, Defendant Alvarado and others at Stanford Financial to advance Stanford Financial and SIB's interests in the SEC investigation, being to continue to evade and avoid SEC regulation of Stanford Financial and SIB's activities and obstruct the ongoing SEC investigation from 2005 through February 2009.

61.

As part of his retention, in August 2005, Sjoblom, acting as an employee of Chadbourne,

traveled to the SIB facility in Antigua where he met with Stanford, Davis, Antigua's head of the FSRC Leroy King and others to familiarize himself with the operations and finances of SIB.  Shortly prior to that meeting, in June 2005, King had received a confidential letter from the SEC in his capacity as head of the FSRC wherein the SEC had requested the FSRC's assistance in the investigation of Stanford Financial and SIB.  King had provided the confidential SEC letter to Stanford and Stanford, together with others, had assisted King prepare a false and misleading response to the SEC.

62.

It was in this atmosphere that Sjoblom traveled to Antigua to meet with Stanford and King in August 2005.  At that time, Sjoblom reviewed SIB's disclosures to investors in its CD program. Thus by August 2005 Sjoblom had an understanding of Stanford Financial's business operations, including that it was operating a securities marketing and sales operation from Houston, Texas issuing CDs from an offshore bank, and Sjoblom also understood that Stanford Financial was under investigation by the SEC and that the head of the SEC's counterpart in Antigua, King, was meeting and working together with Stanford, and that King was passing insider, confidential information about the SEC investigation to Stanford.  Thus by that time in August 2005, Sjoblom, a former SEC enforcement lawyer with 20 years experience, knew that Stanford was at the very least running an unregulated investment company mutual or hedge fund from his base in Houston, Texas in the guise of issuing CDs from a wholly owned bank in one of the most corrupt offshore tax and fraud havens in the Caribbean.  Instead of passing on this assignment, Sjoblom eagerly agreed to help.

63.

In October 2005, Sjoblom sent a letter to the SEC's Fort Worth office, with copy to the Dallas office of FINRA, in which he argued that the SEC did not have jurisdiction over Stanford

Financial's CD sales program because the CDs did not constitute securities under U.S. law. Sjoblom's letter cited case law from the U.S. Supreme Court indicating that CDs issued by banks in the United States and insured by the FDIC were not "securities" for purposes of the federal securities laws, and also highlighted case law holding that certain foreign bank-issued CDs did not constitute securities due to the availability of satisfactory bank regulation in the foreign country.   In the letter, Sjoblom argued that Antiguan law provided CD holders with priority claim status.  Sjoblom also argued to the SEC that SIB was subject to comprehensive regulation in Antigua, and that U.S. courts were bound to show respect to this regulatory system.

64.

All of Sjoblom's representations to the SEC and FINRA about Antiguan law were false. Antiguan law does not in fact provide true priority claim status for CD holders, and, as has become clear now, the protections offered by Antiguan law for the investors in the SIB CDs are, in fact, non-existent.   Specifically, Antiguan corporate law gives the payment of wind-up costs, the payment of officers and employees for up to three months prior to the seizure of the bank; all taxes due; and the "fees and assessments owing to the appropriate officer" priority over any portion of time deposit funds.  In addition, Antiguan law provides that time deposit holders are only given preference over other creditors for up to $20,000 in deposit funds.

65.

Furthermore, by the time he sent this letter in October 2005, Sjoblom had already been to Antigua and had met with Stanford's "blood brother", Leroy King, the head Antiguan "regulator" for SIB, and therefore was aware of the cozy relationship between King and Stanford, to such an extent that King was passing confidential, government-to-government regulatory communications concerning Stanford to Stanford.   Sjoblom also knew that the CD program was being marketed to

potential investors purely for investment – and no other -- purposes;  that SIB was not a commercial bank and, instead of making loans, SIB took the money it received from the sale of CDs and itself invested in an allegedly diversified portfolio that included stocks, bonds, notes, private equity, precious metals and other commodities , much like a mutual fund;  and that SIB itself, including its portfolio, was being managed and run from the United States.  He also knew that SIB had applied for and been granted a securities Regulation "D" exemption for sales to qualified U.S. investors.    With his 20 years of experience working in enforcement for the SEC, Sjoblom knew that Stanford was running an unregistered investment company disguised as an offshore bank; that the SIB CDs more than likely constituted securities under U.S. law; and that the CDs were being marketed and sold illegally from within the United States.

66.

As part of the ongoing conspiracy to obstruct the efforts of regulator worldwide, on July 30, 2006, Leroy King transmitted to Defendant Alvarado, in his capacity as Stanford Financial's General Counsel in Houston, Texas, a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB") to the FSRC in Antigua concerning, *inter alia*, the affiliate relationship of SIB to the Bank of Antigua.  Similarly, on August 1, 2006, King faxed to Defendant Alvarado in Houston, Texas, a proposed response to the ECCB letter which sought the input of Defendant Alvarado in crafting a response by the FSRC calculated to mislead the ECCB as to the financial bona fides of SIB to prevent legitimate scrutiny of SIB by the Eastern Caribbean bank regulator.  Recognizing that he had willingly ceded his regulatory authority and responsibilities to Allen Stanford's lawyers, King jokingly concluded the August 1, 2006 facsimile transmission with the following handwritten words: "Please do not bill me (laugh), Thanks a million, Lee"

67.

On September 25, 2006, King provided to Stanford and Defendant Alvarado another confidential letter he had received from the SEC wherein the SEC again sought records and information regarding SIB's CD investment portfolio.  Upon information and belief, Defendant Alvarado, in turn, consulted with Sjoblom regarding the contents of this new confidential SEC letter. Stanford, Davis, and Defendant Alvarado then proposed various responses designed to mislead the SEC and requested that King insert same into the FSRC's official response to the SEC's confidential letter, which King did.  Discovery will reveal what role Sjoblom had in the contents of that response letter.

68.

In late September of 2006, Sjoblom contacted the SEC and represented that he had "heard through the grapevine" that the FSRC had not been provided with an appropriate request from the SEC for documents; that the SEC should "go to Antigua" to review the SIB examination reports issued by the FSRC; that the SEC had "no basis" to request documents regarding SIB's investment portfolio from SIB; that he (Sjoblom) had spent 15 years investigating fraud for the SEC and was "well-equipped" to recognize the "hallmarks of fraud"; that he (Sjoblom) found SIB to be credible in all their business dealings; and that, based upon his review of the situation and personal visit to SIB, Sjoblom found SIB to be an "incredible institution."  Of course the "grape vine" that Sjoblom referred to was the insider, confidential information regarding the SEC investigation provided by King to Stanford and Defendant Alvarado.

69.

In response to the SEC investigation in 2005, Stanford Financial developed policies for use in the U.S. offices of SGC designed to evade, hinder and obstruct said SEC investigation.  Upon

information and belief, Defendants were involved in the development of these policies in conjunction with others at the SGC offices in Houston, Texas.  The policies implemented in 2005 and 2006 included the destruction of Stanford Financial records that might be uncovered in the SEC investigation.

70.

As alleged by former Stanford Financial brokers D. Mark Tidwell and Charles W. Rawl in their Harris County lawsuit against SGC, the new policies adopted by Stanford Financial included ordering the removal or destruction of information contained in client or company files in response to an ongoing SEC investigation into SGC's CD sales practices, and purging electronic data from its computers in response to the SEC investigation.  In particular, Rawl and Tidwell became concerned when, in the summer of 2006 (right around the same time Sjoblom was calling the SEC to tell the SEC to leave Stanford Financial alone), all of the assistants to the Stanford Financial Advisers were told to remove any information that wasn't on Stanford Financial letterhead, including notes and inter-office e-mail, from their client files, just ahead of an SEC inspection.  Then in March 2007, Rawl and Tidwell were called into a meeting with management, in which they were told to stop enumerating any concerns they had about SIB in inter-company e-mails because the e-mails could fall into the hands of the SEC.  Rawl and Tidwell announced to their supervisor, Jay Comeaux, that they wanted to resign, but instead they were terminated by Stanford Financial and then sued, in what had become a common practice at Stanford Financial for anyone who questioned what was really going on.

71.

During this same 2005-2007 time period, when Defendants were representing Stanford Financial to counter the SEC investigation, another Stanford Financial employee, Charles

Satterfield, was terminated and thereafter alleged in a 2007 FINRA arbitration suit that Stanford

Financial executives held the SEC in "utter contempt" and refused to file required documents, hid

information from the SEC and destroyed files.  Satterfield alleged that he received more training

from Stanford Financial in what *not* to discuss in archived company e-mails (thus circumventing the

intent of records retention requirements) than he was given in how to comply with anti-money

laundering statutes.  Indeed, Satterfied was eventually fired, in part, because he continued to raise

issues of Stanford Financial's non-compliance in e-mail exchanges with his superiors.

72.

By June 2008, various agencies of the United States government were investigating Stanford

Financial, including the SEC, FBI, IRS and U.S. Postal Inspection Service.   See Affidavit of FBI

Special Agent Vanessa G. Walther, attached hereto as **Exhibit "3"** and incorporated herein for all

purposes.  In late 2008, Sjoblom was informed that SIB's CD investment portfolio included a

previously undisclosed third tier of investments (Tier III) that was not "managed" by Pendergest-

Holt. Subsequently, in early January 2009, Sjoblom was informed that this third tier included real

estate investments and private equity.  Sjoblom, through his prior review of SIB's disclosures knew

and understood that this third tier of investments, including the real estate investments, had not been

disclosed to investors.  In early January of 2009 Sjoblom further learned that this undisclosed third

tier of investments constituted approximately 80% of SIB's investment portfolio, or approximately

$6 billion.

73.

On January 14, 2009, the SEC served, through Sjoblom, investigatory subpoenas to Stanford,

Davis and Pendergest-Holt seeking testimony and documents related to SIB's investment portfolio.

Sjoblom understood that the SEC inquiry would require Stanford, Davis and Pendergest-Holt to

make a complete and transparent presentation to the SEC, under oath, regarding all of the assets related to SIB's CD program, including Tier III.

74.

On January 21, 2009, Sjoblom met with Stanford, Davis, Pendergest-Holt and others at the SIB airplane hangar in Miami, Florida, to discuss the SEC investigation and to determine who should testify before the SEC.  At that meeting, and despite their knowledge that only Stanford and Davis were in a position to discuss the assets in the Tier III portfolio, Stanford, Davis, Pendergest-Holt, and Sjoblom all agreed that Sjoblom would lie to the SEC and seek to convince the SEC that Stanford and Davis didn't know anything about SIB's assets and that Pendergest-Holt and another SIB executive, SIB President Rodriguez Tolentino, were the best individuals to present testimony and evidence to the SEC regarding SIB's entire investment portfolio.  The participants also agreed to participate in a series of meetings in Miami, Florida during the week of February 2, 2009, to bring Pendergest-Holt and Rodriguez Tolentino "up to speed on Tier 3" before their testimony to the SEC.

75.

On January 22, 2009, Sjoblom met with several SEC attorneys at a restaurant in Houston, Texas to discuss issues related to the SEC investigation of Stanford Financial and SIB.  The SEC attorneys reiterated that their investigation was seeking to determine where and how the entire portfolio of SIB assets were invested and managed, and that in order to do so they needed to depose Stanford Financial executives with the most knowledge of the "entire investment portfolio".  Sjoblom falsely represented to the SEC lawyers that Allen Stanford and Davis did not "micro-manage" the portfolio and that Pendergest-Holt and Rodriguez Tolentino were the "better people to explain the details" about SIB's entire portfolio.  Sjoblom also represented to the SEC attorneys that SIBL was "not a criminal enterprise" and that "all assets are there."

76.

The next day, January 23, 2009, Sjoblom met again with an SEC attorney at SFG's offices in Houston, Texas.  Sjoblom requested that the SEC attorney defer the SEC subpoenas to Allen Stanford and Davis, and once again lied to the SEC and represented that Pendergest-Holt and Rodriguez Tolentino would be better witnesses than Stanford and Davis, whom Sjoblom claimed were executive level officers of the company not involved in the "nuts and bolts" of the operations and who would not be able to tell the SEC attorneys about details of SIB 's assets.  As a result of Sjoblom's misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and Davis and to instead take the testimony of Pendergest-Holt and Rodriguez Tolentino on February 9-10, 2009, respectively.

77.

On January 24, 2009, Sjoblom sent an email to Defendant Alvarado, which Defendant Alvarado then forwarded on January 25, 2009 to Davis, Pendergest-Holt and Allen Stanford, in which Sjoblom stated that he had persuaded the SEC that Pendergest-Holt and SIB President Rodriguez-Tolentino, not Stanford and Davis, would be better witnesses to testify about SIB's entire portfolio of assets.  Sjoblom further stated that "[w]e can fully anticipate that the SEC will want [Rodriguez Tolentino] to testify under oath that the bank is 'real,' the CDs are 'real,' that the money is actually invested as described in our documents, and that client funds in the CDs are safe and secure.  The [SEC] staff will want to be protected against obstruction and perjury … [Rodriguez Tolentino] will have to be fully and carefully prepared so that he can provide details as best as humanly possible".  Sjoblom further stated in the e-mail that Pendergest-Holt would have to explain to the SEC her management and supervision of the bank portfolio and that, since she knew little about Tier 3, she would  "have to get up to speed on Tier 3 before the SEC investigation".  Sjoblom

finished the e-mail by stating that he wanted to make sure that Rodriguez Tolentino and Pendergest-Holt had enough time to "prepare and practice" the week before the SEC meeting.

78.

On or about January 27, 2009, Sjoblom sent an email to Pendergest-Holt and Rodriguez Tolentino, with a copy to Davis, regarding the need to address all three tiers of the SIBL asset portfolio, stating that they (Pendergest-Holt and Rodriguez Tolentino) needed to "rise to the occasion" and that "our livelihood depends on it." Sjoblom at that point was clearly intent on doing whatever was necessary to keep his client Stanford Financial (and SIB) in business.

79.

In the last week of January 2009, right in the midst of the red hot SEC investigation, Davis traveled to Antigua to meet with FSRC CEO King. King appeared very stressed, and related to Davis that he had once again been contacted by the SEC. King asked Davis if "we were going to make it?", to which Davis responded that he thought they were going to be ok.

80.

On February 3, 4, 5 and 6, 2009, Sjoblom met with Davis, Pendergest-Holt, Rodriguez Tolentino, Defendant Alvarado, and, ultimately, Stanford himself (on February 5) and others at the Stanford Financial offices in Miami in order to "prep" the witnesses for their testimony to the SEC. During those meetings, Pendergest-Holt disclosed that the value of the assets she actually managed in Tier II totaled approximately $350 million, down from $850 million in June of 2008. At the meetings, Davis further revealed that the purported value of Tier III of SIB's investment portfolio was made up of: (1) real estate valued at in excess of $3 billion which allegedly had been acquired earlier that year by SIBL for less than $90 million; (2) $1.6 billion in "loans" to Allen Stanford; and (3) various other private equity investments. Several of the Miami meeting participants

acknowledged that if this disclosure was accurate, then the bank was insolvent.  At that point, Rodriguez Tolentino stated that he would not testify before the SEC.  SGC President Danny Bogar broke down crying, and declared that he would have to go the SEC and disclose the information.  Instead, Sjoblom suggested that they pray together.

81.

The next day, February 5, 2009, Stanford himself made an appearance at the meetings and falsely informed the participants that despite what they had just been told, SIB had "at least $850 million more in assets than liabilities."  Later in the day of February 5, 2009, Stanford, Davis and Sjoblom attended a separate meeting where Stanford acknowledged that SIB's assets and financial health had been misrepresented to investors, and were overstated in SIB's financials.  After that meeting, Sjoblom entered the office of another Stanford Financial executive, Lena Stinson, and declared that the "party is over".

82.

On February 9, 2009 Sjoblom sent Defendant Alvarado an email admitting he'd helped Pendergest-Holt prepare the presentation she was going to give to the SEC.  Sjoblom further stated that she would be asked "lots of questions" about all players, SIB, marketing materials, and a little about Tier III to the extent she knew.  Defendant Alvarado responded with frustration about the presentation, saying it "needs to be complete, accurate and correct. Thus you need to postpone her appearance before the SEC."  Sjoblom opted instead to go forward with the presentation.

83.

During her testimony to the SEC on February 10, 2009 in Fort Worth, Texas, in which she, as an executive of Stanford  Financial, was represented by Sjoblom, Pendergest-Holt committed perjury over and over while Sjoblom sat there, clearly aware of the outright lies being spun by his

client to the SEC.  In fact Sjoblom actively suborned Pendergest-Holt's perjury.  In answering a direct question about who she had met with previously to help prepare for her testimony, Pendergest-Holt responded that she had only met with Sjoblom and no one else.  When the SEC lawyers pressed her a little more about whether anyone else was present during her meetings with Sjoblom, Sjoblom interrupted Pendergest-Holt as she started to answer the question and intentionally steered her to answer "no" by improperly recasting the question to narrow it to "when we were preparing *last night*, was there a third person present?", to which she answered "no". Testimony of Laura Pendergest-Holt, February 10, 2009, at 13:7-14:15.  In addition to failing to disclose the Miami meetings the prior week and the participants at the meetings, Pendergest-Holt falsely stated in her SEC testimony that she was unaware of the assets and allocations of assets in Tier III of SIB's portfolio, including specifically the existence of the $1.6 billion loan to Allen Stanford that was included in Tier III.

84.

On February 12, 2009 Defendants Sjoblom and Proskauer sent a letter to the SEC informing that they were withdrawing from further representation of Stanford Financial and SIB in all enforcement and other regulatory matters before the SEC.  Two days later, on February 14, 2009 Sjoblom sent an e-mail to SEC attorney Kevin Edmundson in which he disaffirmed "all prior oral and written representations made" by Sjoblom to the SEC regarding Stanford Financial and its affiliates from the beginning of his retention in 2005 (while at Chadbourne) through February 2009. See Sjoblom 2/12/09 letter and 2/14/09 e-mail, true and correct copies of which are attached hereto as **Exhibit "4".**

85.

On February 25, 2009, Pendergest-Holt was criminally charged with lying to the SEC during the testimony she gave on February 10, 2009.  In late March, 2009, Pendergest-Holt filed a lawsuit against Defendants Sjoblom and Proskauer for legal malpractice and breach of fiduciary duty, and alleged that, unbeknownst to Pendergest-Holt at the time, the night before Sjoblom met with her to prepare her to testify before the SEC, Sjoblom had solicited a multimillion-dollar retainer from Allen Stanford to represent Allen Stanford personally.

## VII.    PLAINTIFFS' INVESTMENTS

86.

All Plaintiffs invested in the Stanford Financial/SIB Ponzi scheme by purchasing CDs or placing their money in other investment accounts from and with SIB.  Over the years that Plaintiffs purchased and maintained investments in SIB, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial representatives or via Stanford Financial promotional materials, that, inter alia:  (1) an investment in SIB was safer than investing in U.S. banks because SIB did not make loans but instead invested in safe and highly liquid instruments; (2) SIB and Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB was completely safe and secure because it was guaranteed and insured by Lloyd's, was regulated by the Antiguan banking regulatory commission and by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

87.

During the time that Plaintiffs purchased and maintained investments in SIB, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*:  (1) SIB was not regulated by the U.S. Government; (2) Plaintiffs' investments in SIB were not insured; (3) SIB was operating illegally as an unregistered investment company soliciting and

selling unregistered securities by, from and through Houston, Texas; (4) that their money invested in SIB was not invested in safe secure and liquid instruments; and (5) that 80% of SIB's assets were invested in illiquid, high risk investments that included an unsecured $1.6 billion loan to Allen Stanford; (6) SIB was not regulated or supervised by the Antiguan Government and was only audited by a one man "mom and pop" audit shop under the control of Allen Stanford; and (6) that Stanford Financial (assisted by Defendants and others) was perpetuating a massive Ponzi scheme by, *inter alia*, engaging in conduct designed to evade regulation in various countries, including by the SEC, and was actively engaged in efforts to thwart SEC investigations of Stanford Financial and SIB from 2005 through February 2009.

88.

Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial sales representatives and via Stanford Financial promotional materials, Plaintiffs decided to, and did, invest money in, and maintain investments in, the SIB CDs.

## VIII.   PLAINTIFF CLASS

89.

Plaintiffs are persons who in many cases, invested their life savings and retirement funds with Stanford Financial (through SIB) because they considered Stanford Financial a safe investment company because it was allegedly "based" in the United States and therefore subject to U.S. laws and regulations.  In reliance on Stanford Financial's fraudulently crafted "image" as a Texas-based financial services group, and in further reliance on the illusion of safety and security, Plaintiffs and the Class transferred billions of dollars to Stanford for investment in SIB.

90.

Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs continued to receive monthly account statements from Stanford showing that their money had been invested in the SIB CDs and were in fact profitable.  At no time were Plaintiffs ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures similar to a hedge fund; that SIB had no real insurance that would protect Plaintiffs' investments; that the only "oversight" SIB was subjected to was a one man "mom and pop" audit firm in Antigua that was completely dominated by Stanford;  and that people like Defendants and Leroy King were complicit in protecting and insulating Stanford from regulatory scrutiny.  Instead, and lacking the type of information that might be gained from a full regulatory disclosure, Plaintiffs were led to believe by Stanford Financial that an investment in SIB was safer than any other investment in the market.  Now Plaintiffs stand to lose all of their investments.

## IX.    CLASS ALLEGATIONS

91.

Plaintiffs request this case be certified as a class action pursuant to FRCP 23.  Thousands of investors have money invested with Stanford Financial through SIB.  The number of affected investors are so numerous that joinder of all members is impracticable.  There are common questions of law and fact that are common to the class and these common questions predominate over individual issues.  The Named Plaintiffs' claims are typical of the class claims.  The Named Plaintiffs have no interest adverse to the interests of other members of the Class.  The Named Plaintiffs will fairly and adequately protect the class' interests.  The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international litigation.

92.

Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

    i.       All persons or entities that held CD or other investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action; and

    ii.      Such other classes or sub-classes as the Court may determine.

           Excluded from the class are:

         a.       Defendants, and their employees and agents; and

         b.       Any officer, director, employee, or promoter of Stanford Financial, including SIB and SGC, as those entities have been defined herein

93.

The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of fraud on the regulators.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

94.

Pleading in the alternative, Plaintiffs SAMUEL TROICE and PUNGA PUNGA FINANCIAL, LTD, on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all Mexican citizens and legal residents, or entities owned or controlled by Mexican citizens or legal residents, that held investment accounts with SIB

as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB, SGC and Stanford Venezuela, as those entities have been defined herein. The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of fraud on the regulators.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

95.

Pleading in the alternative, Plaintiffs HORACIO MENDEZ, and ANNALISA MENDEZ on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all United States citizens and legal residents, or entities owned or controlled by United States citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB  and SGC, as those entities have been defined herein.  The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. Indeed, this is a case of fraud on the regulators.  Many of the investors who are class members have

amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## X.   STATUTE OF LIMITATIONS DEFENSES

### Discovery Rule/Inquiry Notice

96.

The SEC filed an action against Allen Stanford and SIB *et al*. on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants until then.  Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud and conspiracy until now.

## XI.   CLASS CAUSES OF ACTION

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF ALL PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)

### A.   AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1.   SALES OF UNREGISTERED SECURITIES

97.

Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs.  In particular, by their actions described herein, Defendants provided substantial assistance to SIB and Stanford Financial and materially aided Stanford Financial and SIB to sell unregistered securities to Plaintiffs from, by and through Texas.  As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIB constitute "securities" under the relevant securities law jurisprudence.   By agreeing to assist Stanford Financial evade regulatory scrutiny by

intentionally misleading the SEC during its 2005-2006 investigation of Stanford, and continuing into 2008-2009, Defendants knew or should have known that they were assisting and perpetuating the sale of unregistered securities to Plaintiffs from, by and through Texas.  But for Defendants' participation, Stanford Financial and SIB could not have continued to sell unregistered securities to Plaintiffs from, by and through Texas because the SEC would have intervened and shut the Ponzi scheme down prior to 2009.  Upon information and belief, SIB sold well in excess of $4 billion in CDs between the summer of 2005 and February 2009.

98.

Defendants had general awareness that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.  In assisting an offshore bank sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  None of the CDs sold to Plaintiffs were ever registered with the Texas Securities Commission and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act. Defendants acted intentionally or with reckless disregard for the truth and the law.  As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

2.   SALES OF SECURITIES BY UNREGISTERED DEALERS

99.

Defendants aided and abetted SIB and Stanford Financial in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act. Specifically, and as alleged herein, Defendants knew or should have known that Stanford Financial and SIB were collectively functioning as an unregulated, unregistered investment company, called "Stanford Financial", selling hedge or mutual fund participation units from, by and through Texas to investors and then pooling its customers' money together to make illiquid, speculative investments.

100.

Stanford Financial, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, including Defendants, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, securities of which SIB was the issuer on behalf of Stanford Financial, without obtaining an order from the Texas State Securities Board permitting it to register as an investment company "dealer".

101.

Defendants intentionally and actively aided and abetted Stanford Financial to operate as an illegal hedge or mutual fund in Texas and sell securities from, by, and through Texas, by means of the conduct described herein. With full knowledge that Stanford Financial and SIB were collectively acting as an unregistered securities investment company "dealer" in Texas selling securities from, by, and through Texas, and that Stanford Financial and SIB were being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial and SIB's violations of the Texas Securities Act by their conduct described herein.

102.

Defendants had general awareness that they were assisting an offshore, unregistered investment company "dealer" sell unregistered securities from, by and through Texas and otherwise engage in illegal conduct.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in intentionally engaging in conduct designed to mislead the SEC and thwart the SEC's investigation of Stanford Financial from 2005 through February 2009.  In assisting an offshore bank deceive the SEC so that it could continue to sell securities through a Houston-based investment company enterprise, Defendants were, in fact, absolutely aware they were engaged in illegal conduct.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  In fact, in their zeal to assist SIB, an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, to sell its securities from, by, and through Texas via Stanford Financial, Defendants acted with wanton and arrogant disregard for the protections afforded by the Texas Securities Act.  As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

3.    UNTRUTH OR OMISSION

103.

Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial and SIB and their principals in the sale of

securities through the use of untrue representations or materially misleading omissions.   In particular, and as set forth in the SEC's Amended Complaint, the Davis Plea Agreement (Exhibit 1), and the Indictment (Exhibit 2), Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs.   In particular, Stanford Financial uniformly led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office, to believe that their money was being invested in safe, liquid investments that were completely insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments like private equity and real estate and unsecured loans to Allen Stanford.   Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, illegal mutual fund in violation of the Investment Company Act and the Texas Securities Act.

104.

Defendants had general awareness that they were involved in improper activity and that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas.   With knowledge that Stanford Financial and SIB, acting in concert as an unregistered investment company, were misleading investors about the scope and nature and extent of regulatory oversight over Stanford Financial and SIB, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SIB and Stanford Financial in agreeing to mislead the SEC so as to thwart the SEC's investigation of Stanford Financial from 2005 through February 2009 and thereby materially aided the sales of securities through the use of untruths and

materially misleading omissions.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in agreeing to assist Stanford and his criminal operation.  In assisting an offshore bank deceive the SEC so that it could continue to sell securities through a Houston-based investment company enterprise, Defendants were, absolutely aware they were engaged in illegal conduct.  Defendant's conduct described herein was designed to perpetuate the Stanford Financial's Ponzi Scheme; indeed Sjoblom himself stated that "our livelihood" depended on Pendergest-Holt's ability to deceive the SEC during her presentation.  Defendants' actions as described herein allowed Stanford Financial and SIB to continue to sell securities to Plaintiffs from, by and through Texas using untruths and materially misleading omissions.

105.

In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial, or acted with reckless disregard for the truth or the law.  In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein.  Defendants' actions in aiding and abetting Stanford Financial's fraud by helping Stanford obstruct regulatory investigations allowed Stanford Financial and SIB to continue in business and thereby caused Plaintiffs to enter into transactions or maintain their investments with SIB, which they have now lost.  As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 4.   CO-CONSPIRATOR LIABILITY

106.

Defendants are jointly and severally liable as co-conspirators for Stanford Financial and SIB's primary violations of the Texas Securities Act.  In particular, the central aim of Stanford's Ponzi scheme conspiracy extended to concealing the fraudulent nature of Stanford Financial and SIB and their operations and activities from regulators around the world.  There was a meeting of the minds between Stanford, Davis and others beginning in 1991 and extending until February 2009 as to the need to conceal Stanford Financial's true nature and activities and to evade regulatory scrutiny at all levels and in all countries.  This meeting of the minds grew to include other participants,

including Pendergest-Holt, Defendant Alvarado, Rodriguez Tolentino, members of the Antiguan Government, and, eventually, Defendants Chadbourne, Proskauer and Sjoblom.  Defendant Sjoblom, while employed by Chadbourne, joined the conspiracy and had a meeting of the minds with the principals of Stanford Financial in August 2005 and agreed to assist Stanford Financial to conceal the fraudulent nature of its activities by evading regulatory scrutiny from 2005 through February 2009, which concealment was crucial and central to the perpetuation of Stanford's Ponzi scheme. Sjoblom continued to be actively involved in furthering the objective of the conspiracy upon his employment with Proskauer later in 2006.  Defendants therefore knowingly combined together and with the principals of Stanford Financial to assist Stanford Financial to frustrate the investigatory efforts of the SEC and other U.S. regulatory agencies so as to enable Stanford Financial to continue operating as an "outlaw", unregulated, unregistered investment company/dealer, and to sell unregistered securities from, by and through the State of Texas from 2005 through 2009.

107.

As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIB to accomplish the goal of shielding Stanford Financial and SIB from regulatory scrutiny and therefore allow Stanford Financial and SIB to continue selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. These overt acts in furtherance of the conspiracy included lying to the SEC about Stanford Financial and SIB and encouraging others to lie to and otherwise mislead and deceive the SEC in an ongoing SEC investigation.  By doing so, Defendants acted pursuant to their meeting of the minds with Stanford, Davis and others in pursuit of the common purpose of the conspiracy – to conceal the fraudulent nature of Stanford Financial's activities and shield Stanford Financial from regulatory scrutiny by thwarting an active investigation by the SEC so as to allow Stanford Financial and SIB

to continue in business and continue perpetuating the Ponzi scheme.  Even though Defendants (with the exception of Alvarado) joined the conspiracy late, in 2005, under Texas law a party who joins in a conspiracy is jointly and severally liable "for *all acts done by any of the conspirators* in furtherance of the unlawful combination."  Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

108.

Defendants' actions in furthering the conspiracy to conceal, hinder and obstruct regulatory investigations were taken during the conspiracy's operation.  Indeed Defendants' actions were taken to protect the Stanford Financial scheme and to assist Stanford Financial to avoid regulatory intervention so that Stanford Financial and SIB could continue in business and continue selling CDs and continue paying Defendants' legal bills.  Therefore Defendants' actions were part of a continuing activity that was illegal in nature and that was essential to and therefore in furtherance of the survival of an ongoing Ponzi scheme conspiracy.  But for the overt acts taken by the members of the regulatory obstruction conspiracy to further the objectives of the Ponzi conspiracy described herein, Stanford would not have been able to carry out his Ponzi scheme, and billions of dollars belonging to the Plaintiffs and the Class would not have been lost.

### B.     AIDING AND ABETTING/PARTICIPATION IN A FRAUDULENT SCHEME

109.

By their conduct described herein, Defendants aided and abetted and participated with Stanford Financial and SIB in a fraudulent scheme, making Defendants directly liable for fraud.  In particular, Defendants made the conscious decision in August 2005 and continuing through 2009 to

assist and enable Stanford Financial to continue to sell SIB CDs in a massive Ponzi scheme based on the misrepresentations that investments in Stanford Financial and SIB were regulated because SIB was subject to audits and risk management reviews by the Antiguan FSRC and because Stanford Financial was regulated by the SEC.  Defendants, with full knowledge of the cozy relationship between Stanford and Leroy King in Antigua, participated in the fraudulent scheme by agreeing to assist Stanford Financial shield itself from regulatory scrutiny and thwart active investigations by the SEC, all with the goal of perpetuating Stanford Financial's business.  Said actions by Defendants in combination with Stanford Financial are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in Stanford Financial as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## C.   CIVIL CONSPIRACY

### 110.

Defendants conspired with each other and with Allen Stanford, Jim Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others to commit the wrongful conduct described herein, including fraud, theft of fiduciary property, breach of fiduciary duty, and violations of the Texas Securities Act.  Defendants are each responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, SIB, and others, in furtherance of the unlawful conspiracy and enterprise.

### 111.

Together with Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others, the Defendants joined in a conspiracy (which had been ongoing since at least 1991) to shield Stanford Financial from regulatory scrutiny and thwart active investigations by the SEC so as to allow Stanford Financial and SIB to continue to sell SIB CDs in a massive Ponzi scheme for the

pecuniary benefit of Stanford and Stanford Financial and, thereby, Defendants. The object of the ongoing conspiracy was to help insulate and shield Stanford Financial and SIB from regulatory scrutiny and so assist said entities to continue to sell the SIB CDs and conceal Stanford Financial's ongoing fraudulent activities. Central to Stanford's ability to perpetuate a massive Ponzi scheme was the ability to conceal the true nature of Stanford Financial's activities and investment portfolio by blocking regulatory scrutiny at every level and in every country. There was a meeting of the minds in August 2005 between Defendant Sjoblom (while employed at Chadbourne) and Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others as to the central objective of evading and concealing Stanford Financial's activities from regulators and a meeting of the minds between Defendants and Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others, as to the means for carrying out the scheme, being the active obstruction of an ongoing regulatory investigation into Stanford Financial's business affairs by the SEC and other governmental agencies, between August 2005 and February 2009. Sjoblom carried this meeting of the minds and agreement to conspire over to Proskauer when he joined that firm later in 2006.

112.

During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others, in furtherance of the common enterprise, engaged in specific overt acts as described herein. Defendants engaged in overt acts in furtherance of the Stanford Financial CD conspiracy and assisted Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others to effectuate their illicit scheme to conceal Stanford Financial's activities by obstructing regulatory investigation and enforcement in order to perpetuate and keep Stanford Financial and SIB alive and in business.

113.

Defendants conspired to conduct, and participated in conduct including violations of securities laws and fraud.  To wit, over the span of almost four years, from August 2005 through February 2009,  Defendant Sjoblom, while employed at Chadbourne and later at Proskauer, engaged in  a conspiratorial meeting of the minds with Allen Stanford, Davis, Pendergest-Holt, Defendant Alvarado, Rodriguez Tolentino, King, and others, and in furtherance thereof knowingly participated in conduct designed to perpetuate and keep alive a massive Ponzi scheme by agreeing to assist, and actively assisting, Stanford  Financial to obstruct SEC investigations and shield Stanford Financial and SIB from regulators, as described herein.  Defendants' conduct was part of continuing activity that was essential to and therefore in furtherance of the survival of the Stanford Ponzi scheme, which was an ongoing operation when Defendants joined the conspiracy.  Frustration of investigatory efforts by the SEC and other agencies in a highly regulated environment such as securities was central to the success and longevity of the overall Stanford Ponzi scheme conspiracy.  Stanford's Ponzi scheme proximately caused Plaintiffs to lose their investments, and Defendants, by joining in conduct designed to conceal and facilitate Stanford Financial's illicit conduct, which concealment was central to the perpetration of the Stanford Ponzi scheme, are jointly and severally liable with Stanford, Stanford Financial and SIB for all of Plaintiffs' losses.

### D.    NEGLIGENT RETENTION/NEGLIGENT SUPERVISION

114.

Defendants Proskauer Rose and Chadbourne Parke are directly liable to Plaintiffs for negligent retention and supervision of their employee Sjoblom.  From the time that Sjoblom joined the conspiracy described here in August 2005 until sometime in September 2006, Sjoblom was employed by Chadbourne Parke.   Thereafter, from September 2006 through the present time, Sjoblom has been an employee of Proskauer Rose.  Defendants Proskauer Rose and Chadbourne

Parke owed a duty to Plaintiffs to use ordinary care in the hiring, supervision and retention of their agents and employees and in monitoring the activities of their employee representing an offshore bank selling financial products in the United States that was under investigation by the SEC. Defendants Proskauer Rose and Chadbourne Parke knew or should have known that Sjoblom had been specifically retained by Stanford Financial to help it thwart an active SEC investigation of its activities.  As a result, Defendants Proskauer Rose and Chadbourne Parke breached the duty owed to Plaintiffs by not exercising ordinary care in the hiring, supervision and retention of Sjoblom and in not monitoring his activities with regard to this specific, inherently high risk, client matter. Defendants' breach of their duties and failure to supervise has proximately caused damages to Plaintiffs.

## XII.   RESPONDEAT SUPERIOR

### 115.

Defendants Proskauer Rose and Chadbourne Parke are liable for the tortious acts of their employee, Sjoblom, and all contacts with the State of Texas by said employee should be attributed to Proskauer Rose and Chadbourne Parke for purposes of the personal jurisdiction analysis.  From the time that Sjoblom joined the conspiracy described herein in August 2005 until sometime in September 2006, Sjoblom was employed by Chadbourne Parke.  Thereafter, from September 2006 through the present time, Sjoblom has been an employee of Proskauer Rose.  Sjoblom was acting within the course and scope of his respective employments with Proskauer Rose and Chadbourne Parke, and in furtherance of said law firms' respective businesses, when he engaged in the wrongful conduct described herein.

## XIII.   ACTUAL DAMAGES

### 116.

Plaintiffs and the putative Class have suffered the loss of well in excess of $7 billion that was proximately caused by the wrongful conduct of Defendants in conspiracy with Allen Stanford as described herein.  In the alternative, Defendants are liable for all damaged caused to Plaintiffs and the putative Class during the time period 2005-2009 during which Defendants participated in the conspiracy to obstruct the SEC investigation into Stanford Financial and SIB's fraudulent sales practices, amounting to well in excess of $4 billion in SIB CDs sales to Plaintiffs and the Class.  In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them.  Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

### 117.

The exact amount of maximum damages proximately caused by Defendants' wrongful conduct is unknown, but Plaintiffs believe that those damages total between alternatively between $4 billion and $7 billion.

## XIV.   PUNITIVE DAMAGES

### 118.

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

### 119.

All conditions precedent to filing this Complaint have been met.

## XV.   <u>JURY DEMAND</u>

120.

Plaintiffs demand a trial by jury.

## <u>PRAYER</u>

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas  78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

By:  s/ Edward C. Snyder
       EDWARD C. SNYDER
       State Bar No. 00791699
       esnyder@casnlaw.com
       JESSE R. CASTILLO
       State Bar No. 03986600
       jcastillo@casnlaw.com

**LEAD CLASS COUNSEL AND
ATTORNEYS IN CHARGE FOR
PLAINTIFFS AND THE PUTATIVE
CLASS**

Nicholas A. Foley
State Bar No. 07208620
Douglas J. Buncher
State Bar No. 03342700
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301
dbuncher@neliganlaw.com
nfoley@neliganlaw.com

EDWARD F. VALDESPINO
State Bar No. 20424700
edward.valdespino@strasburger.com
ANDREW L. KERR
State Bar No. 11339500
andrew.kerr@strasburger.com
**STRASBURGER & PRICE, LLP**
300 Convent Street, Suite 900
San Antonio, Texas 78205
Telephone:  (210) 250-6000
Facsimile: (210) 250-6100

DAVID N. KITNER
State Bar No. 11541500
david.kitner@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas  75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of October, 2009.  I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to all counsel of records, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.

<u>s/ Edward C. Snyder</u>