**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SAMUEL TROICE,** | § | |
| **HORACIO MENDEZ,** | § | |
| **ANNALISA MENDEZ,** | § | |
| **PUNGA PUNGA FINANCIAL, LTD.** | § | |
| **individually and on behalf of a class** | § | |
| **of all others similarly situated** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 3:09-cv-01600-F** |
| | § | |
| **PROSKAUER ROSE, LLP,** | § | |
| **THOMAS V. SJOBLOM,** | § | |
| **P. MAURICIO ALVARADO, and** | § | |
| **CHADBOURNE & PARKE, LLP** | § | |
| | § | |
| **Defendants.** | § | |

---

**PLAINTIFFS' JOINT RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND, IN**
**THE ALTERNATIVE, MOTION FOR LEAVE TO AMEND**

---

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas  78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

By:  s/ Edward C. Snyder
      EDWARD C. SNYDER
      State Bar No. 00791699
      esnyder@casnlaw.com
      JESSE R. CASTILLO
      State Bar No. 03986600
      jcastillo@casnlaw.com

**LEAD CLASS COUNSEL AND**
**ATTORNEYS IN CHARGE**
**FOR PLAINTIFFS**
**AND THE PUTATIVE CLASS**

| | |
|---|---|
| Nicholas A. Foley<br>State Bar No. 07208620<br>Douglas J. Buncher<br>State Bar No. 03342700<br>**NELIGAN FOLEY, LLP**<br>Republic Center<br>325 N. St. Paul, Suite 3600<br>Dallas, Texas  75201<br>Telephone: (214) 840-5320<br>Facsimile: (214) 840-5301<br>dbuncher@neliganlaw.com<br>nfoley@neliganlaw.com | **STRASBURGER & PRICE, LLP**<br>300 Convent Street, Suite 900<br>San Antonio, Texas 78205<br>Telephone:  (210) 250-6000<br>Facsimile: (210) 250-6100<br><br>   EDWARD F.  VALDESPINO<br>   State Bar No. 20424700<br>   edward.valdespino@strasburger.com<br>   ANDREW L. KERR<br>   State Bar No. 11339500<br>   andrew.kerr@strasburger.com<br><br>   DAVID N. KITNER<br>   State Bar No. 11541500<br>   david.kitner@strasburger.com<br>   STRASBURGER & PRICE, LLP<br>   901 Main Street, Suite 4400<br>   Dallas, Texas  75202<br>   Telephone: (214) 651-4300<br>   Facsimile: (214) 651-4330 |

February 1, 2010

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .................................................................................. 1

II.  OVERVIEW OF PLAINTIFF'S CASE .................................................................. 5

III. ARGUMENTS AND AUTHORITIES ................................................................ 11

    A. 12(B)(6) STANDARD OF REVIEW ................................................................. 11

    B. APPLICATION OF SLUSA ................................................................................ 12

        1. OBJECTION TO USE OF EXTRANEOUS DOCUMENTS ................................. 13

        2. SLUSA ARGUMENT IS PREMATURE AND PROCEDURALLY FLAWED .................................. 16

        3. SLUSA DOES NOT APPLY BECAUSE THE STANFORD CDS ARE NOT "COVERED"
        SECURITIES ................................................................................................. 17

    C. ATTORNEY QUALIFIED IMMUNITY DEFENSE ............................................ 24

        1. IMMUNITY DOES NOT APPLY TO CONDUCT OUTSIDE THE BOUNDS OF THE LAW .............. 24

        2. ATTORNEY IMMUNITY AFFIRMATIVE DEFENSE REQUIRES RESOLUTION OF FACT ISSUES . 26

    D. CIVIL CONSPIRACY ........................................................................................ 28

        1. TEXAS LAW ON CONSPIRACY ................................................................. 28

        2. CASE AGAINST SJOBLOM AND PROSKAUER 2006-2009 ........................... 31

        3. CASE AGAINST SJOBLOM AND CHADBOURNE 2005-2009 ........................ 33

        4. "SEPARATE" CONSPIRACIES ................................................................... 35

        5. CONSPIRACY TO VIOLATE THE TSA ....................................................... 36

        6. CONCLUSION ON CONSPIRACY ............................................................... 37

    E. AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT ................................. 39

        1. OVERVIEW OF TEXAS SECURITIES ACT ................................................... 40

        2. ELEMENTS OF AIDER/ABETTOR LIABILITY UNDER THE TSA ................... 41

        3. AIDING AND ABETTING SALES OF UNREGISTERED SECURITIES .................. 45

        4. AIDING AND ABETTING SALES BY UNREGISTERED DEALER ..................... 48

        3. AIDING AND ABETTING SALES OF SECURITIES USING UNTRUTHS AND MATERIAL
        OMISSIONS ................................................................................................ 50

    F. AIDING AND ABETTING FRAUD/PARTICIPATION IN A FRAUDULENT SCHEME ....................... 52

        1. AIDING AND ABETTING/PARTICIPATION IN FRAUD IS SEPARATE FROM CONSPIRACY ........ 52

        2. TEXAS COURTS HAVE LONG RECOGNIZED AND APPLIED AIDING AND ABETTING LIABILITY TO
        UNDERLYING TORTS. ................................................................................ 53

    G. KNOWLEDGE/INTENT ................................................................................. 54

        1. RULE 9(B) ................................................................................................. 54

        2. KNOWLEDGE ............................................................................................ 57

        3. INTENT ...................................................................................................... 58

    H. CAUSATION .................................................................................................... 61

    I. RESONDEAT SUPERIOR ................................................................................ 63

    J. NEGLIGENT SUPERVISION .......................................................................... 67

    K. STATUTE OF LIMITATIONS .......................................................................... 71

    L. RESPONSE TO MAURICIO ALVARADO'S MOTION .................................... 72

IV.  MOTION FOR LEAVE TO AMEND COMPLAINT ....................................... 76

V.   PRAYER ............................................................................................................... 77

# TABLE OF AUTHORITIES

## CASES

*Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101 (S.D. Cal. 2000) ...................... 24

*Accousti v. McKay Wolas*, No. 95-CV-5267, 1996 WL 1088218 (E.D.N.Y. 1996) ... 54, 65

*Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179 (S.D. Tex. 2008) .......................... 19

*Adami v. Dobie*, 440 S.W.2d 330 (Tex. Civ. App.—San Antonio 1969, writ dism'd) ................................................................................................................ 81

*Akin v. Dahl*, 661 S.W. 917 (Tex. 1983) ...................................................................... 47

*Alpert v. Crain, Caton & James, P.C.*, 178 S.W. 3d 398 (Tex.App.-Houston [1st Dist.] 2005, no pet.) ............................................................................................ 30

*Alpert v. Riley*, No. H-04-CV-3774, 2008 WL 304742 (S.D. Tex. 2008) ........................ 30

*Anheuser-Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705 (Tex. App.—Dallas 1996, writ dism'd by agr.) ............................................................................ 49

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ......................................................................... 4

*Backus v. Conn. Comm. Bank, N.A.*, No. 3:09-CV-1256, 2009 WL 5184360 (D. Conn. Dec. 23, 2009) ............................................................................................ 22

*Bagby v. Rydex Invs.*, No. 3:06-CV-1256, 2007 WL 507042 (N.D. Tex. Feb. 16, 2007) ..................................................................................................................... 50, 51

*Bailey v. State*, No. 08-02-00423-CR, 2008 WL 1914270 (Tex. App.—El Paso May 1, 2008, no pet.) ............................................................................................. 48

*Baker Hotel of Dallas, Inc. v. Rogers*, 157 S.W.2d 940 (Tex. Civ. App.—Dallas 1941, writ ref'd w.o.m.) ......................................................................................... 80

*Balistreri v. Pacifica Police Dep't*, 901 F. 2d 696 (5th Cir. 1988) .................................... 94

*Bayou Bend Towers Council of Co-Owners v. Manhattan Constr. Co.*, 866 S.W. 2d. 740 (Tex. App.—Houston. [14th Dist.] 1993, writ denied) ................................... 89

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 4, 12

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719 (5th Cir. 2003) .............. 18, 66

*Benchmark Electronics, Inc.*, 355 F.3d 356 (5th Cir. 2003) ....................................... 18, 66

*Bentley v. Bunton,* 94 S.W.3d at 561 (Tex. 2002) ............................................................. 77

*Berry v. Indianapolis Life Ins. Co*., 608 F. Supp. 2d 785 (N.D. Tex. 2009) ....................... 3

*Bilouris v. Sundance Res., Inc*. 559 F. Supp. 2d 733 (N.D. Tex. 2008) ................. 3, 44, 88

*Bootlocker.com, Inc. v. Amazon.com, Inc*., 650 F. Supp. 2d 89 (D. Me. 2009) ............... 19

*Bourland v. State,* 528 S.W.2d 350 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.) ...... 35

*Brehm v. Capital Growth Fin., Inc*., No. 8:07-CV-315, 2008 WL 553238 (D. Neb. Feb. 25, 2008) ..................................................................................................................... 21

*Brown v. Earthboard Sports USA Inc*., 481 F. 3d 901 (6th Cir. 2007) ....................... 56, 58

*Buck v. Blum,* 130 S.W.3d 285 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ........... 82

*Camp v. Dema*, 948 F. 2d. 455 (8th Cir. 1991) ................................................................ 70

*Capital Films Corp. v. Charles Fries Productions, Inc.*, 628 F.2d 387 (5th Cir.) 1980 .................................................................................................................................. 18

*Carroll v. Timmers Chevolet, Inc.,* 592 S.W.2d at 922 (Tex. 1979) ................................ 76

*Causey v. Sewell Cadillac-Chevrolet Inc.*, 394 F.3d at 285 (5th Cir. 2004) ..................... 18

*Chapman Children's Trust v. Porter Hedges, L.L.P.,* 32 S.W.3d at 429 (Tex. App.—Houston. [14[th] Dist.] 2000, pet denied) ............................................................... 32

*Chemtron Corp. v. Business Funds Inc*., 682 F. 2d 1149 (5th Cir. 1982) ......................... 37

*Chevron USA Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837 (1984) ............. 47

*Childs v. Haussecker*, 974 S.W.2d 31 (Tex. 1998) .......................................................... 89

*Chill v. General Electric Co.,* 101 F.3d 263 (2d Cir. 1996) ............................................ 73

*Chu v. Hong*, 249 S.W.3d 441 (Tex. 2008). ..................................................................... 30

*Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994) .............................................................. 15

*Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430 (Tex. 2007) .................... 48, 59

*City of Fort Worth v. Pippen*, 439 S.W.2d 660 (Tex. 1969) ............................................ 64

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000) ........................... 14

*Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195 (Tex. App.—San Antonio 1991, no writ)..............................................................................63

*Crescendo Invs., Inc. v. Brice*, 61 S.W. 3d 465 (Tex. App.— San Antonio 2001)(pet. Denied)..........................................................................................45

*Crisp v. S.W. Bancshares Leasing Co.*, 586 S.W.2d 610 (Tex. Civ. App.— Amarillo 1979, writ ref'd n.r.e.) ..................................................................63

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)..................48

*Delhomme v. Caremark Rx, Inc.*, 232 F.R.D. 573  (N.D. Tex. 2005)...............16

Deloitte & Touche Netherlands Antilles and Aruba v. Ulrich, 172 S.W.3d 255 (Tex.App.—Beaumont 2005, pet. denied )......................................................49

*Derdiger v. Tallman,* 75 F. Supp. 2d 322 (D. Del. 1999) ..........................13, 21

*Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395 (5th Cir. 1996)....................12

*Dorsey v. Portfolio Equities, Inc.*, 540 F. 3d 333 (5th Cir. 2008)...................50, 53, 61, 92

*Duff v. Yelin*, 721 S.W.2d 365 (Tex. App.—Houston [1st Dist.] 1986, writ withdrawn) ..................................................................................................78

*Estate of Arrington v. Fields*, 578 S.W.2d 173 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.) ..........................................................................................84

*Falkowski v. Imation Corp.*, 309 F.3d 1123 (9th Cir. 2002) ............................22

*FDIC v. First Interstate Bank of Des Moines*, NA, 885 F. 2d 423 (8th Cir. 1989)...........70

*Fernandez-Montez v.Allied Pilots Ass'n*, 987 F.2d at 278 (5th Cir. 1993)........................18

*Fisher v. Yates*, 953 S.W.2d 370 (Tex. App.—Texarkana 1997, no pet).........................88

*Flock v. Scripto-Tokai Corp.,* 319 F.3d 231 (5th Cir. 2003)............................75

*Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112 (Tex. 1971) ............................50, 53

*Four Bros. Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.*, 217 S.W. 3d 653 (Tex. App.—Houston [14[th] Dist.] 2006, pet. denied)..............................44

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380 (Tex. App.— Houston. [14th Dist.] 2000, pet denied)....................................................................................77

*Gavin v. AT&T Corp.*, 464 F.3d 634 (7th Cir. 2006) ................................21, 23

*Gonzales v. Willis*, 995 S.W.2d 729 (Tex. App.—San Antonio 1999, no pet.) ............... 84

*Gray v. Seaboard Sec. In*c., 126 Fed. Appx. 14 (2d Cir. 2005) ................................... 23, 27

*Great Plains Trust Co., et al., v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002)............................................................................................................... 94

*Green v. Ameritrade, Inc.*, 279 F.3d 590 (8th Cir. 2002)................................................. 23

*Green v. Ransor, Inc.*, 175 S.W.3d 513 (Tex. App—Fort Worth 2005, no pet.).............. 82

*Greenberg Traurig of New York, P.C. v. Moody,* 161 S.W. 3d 56 (Tex. App.— Houston [14th Dist.] 2005, no pet.) ................................................................................. 38

*Griggs v. Hinds Junior College*, 563 F.2d 179 (5th Cir. 1977) (per curiam)................... 94

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004)........................................................ 22

*Guidry v. Bank of LaPlace*, 740 F. Supp. 1208 (E.D. La. 1990), *aff'd*, 954 F.2d 278 (5th Cir. 1992)........................................................................................................... 66

*Gutierrez v. Deloitte & Touche,* 100 S.W. 3d 261 (Tex. App.—San Antonio 2002, pet. dism'd)...................................................................................................................... 49

*Harrison v. Safeco Ins. Co. of Am.*, No. Civ. A 06-9664, 2007 WL 1244268 (E.D. La. Jan. 26, 2007)........................................................................................................... 17

*Herrmann Holdings Ltd. v. Lucent Technologies, Inc.,* 302 F.3d 552 (5th Cir. 2002) ...... 68

*Hildebrandt v. Indianapolis Life Ins. Co.*, No. 3:08-CV-1815-B, 2009 WL 877713 (N.D. Tex. 2009)............................................................................................................. 50

*Hooper v. Pitney Bowes, Inc.*, 895 S.W.2d 773 (Tex. App.—Texarkana 1995, writ denied) ....................................................................................................................... 79, 80

*Houser v. Smith*, 968 S.W.2d 542 (Tex. App.—Austin 1998, no pet.)............................. 83

*Huddleston v. Herman & Maclean*, 640 F.2d 534 (5th Cir. 1981) ............................. 44, 74

*In re Arthur Andersen LLP*, 121 S.W.3d 471 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding [mand. denied])......................................................................... 63

*In re Carter-Wallace, Inc. Securities Litigation,* 220 F.3d 36 (2d Cir. 2000) ................. 73

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002)...................................................................................................................... 11

*In re Enron Corp. Securities Derivative & "ERISA" Litig.*, 623 F. Supp. 2d 798 (S.D. Tex. 2009) ............................................................................... 35, 37, 74, 76

*In re Enron Corp. Securities Litig.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) ......... 55, 62, 71

*In re Enron Corp. Securities, Derivative & "ERISA" Lit.*, 491 F. Supp. 2d 690 (S.D. Tex. 2007) .............................................................................. 51, 53

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, No. H-01-3624, 2006 WL 3716669 (S.D.Tex. Dec. 12, 2006) att;d 535 73d 325 (5th Cir. 2008) ......... 77

*In re Nat'l Century Fin. Enter., Inc. Inv. Litig.*, 604 F. Supp. 1128 (S.D. Ohio 2009) .............................................................................................. 54, 65

*In re Performance Nutrition, Inc.*, 239 B.R. 93 (Bankr. N. D.Tex.1999) ........................ 77

*Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340 (11th Cir. 2008) ............ 22

*Isquith v. Middle South Util., In*c., 847 F.2d 186 (5th Cir. 1988) ............................... 15, 18

*Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118 (2nd Cir. 1995) ............................................ 48

*J.T.T. v. Chon Tri*, 111 S.W.3d 680 (Tex. App.—Houston [1st Dist.] 2003), rev'd, 162 S.W.3d 552 (Tex. 2005) ......................................................................... 35

*Jenkins v. Mercantile Mortg. Co*., 231 F.Supp. 2d 737 (N.D. Ill. 2002) .......................... 71

*Jernigan v. Wainer*, 12 Tex. 189 (1854) ........................................................................... 63

*Juhl v. Arlington*, 936 S.W.2d 640 (Tex. 1996) .......................................................... 35, 63

*Kenneth Rothchild Trust v. Morgan Stanley Dean Witter*, 199 F.Supp. 2d 993 (C.D. Cal. 2002) ........................................................................................... 21

*King v. Shawver*, 30 S.W.2d 930 (Tex. Civ. App.—Fort Worth 1930, no writ) .............. 64

*Kinzbach Tool Co. v. Corbett-Wallace Corp*., 138 Tex. 565, 160 S.W.2d 509 (1942) ........................................................................................................ 64

*KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746 (Tex. 1998) ........................................................................................................ 89

*Lackshin v. Spofford*, No. 14-03-00977-CV, 2004 WL 1965636 (Tex. App.— Houston [14th Dist.] 2008, pet denied)(mem.op.) ............................................. 31

*LaSala v. UBS, AG*, 510 F. Supp. 2d 213 (S.D.N.Y. 2007) ....................................... 25, 28

*Laxson v. Giddens*, 48 S.W.3d 408 (Tex. App.—Waco 2001, pet. denied)................ 44, 88

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2nd Cir. 2006).......................... 54, 65

*Leveriette v. United States,* 434 U.S. 869 (1977) ................................. 36

*Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985, no writ)........................................................... 29

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996) ............. 15, 16

*Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997) ....................... 13

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) ................................... 17

*Lutheran Brotherhood v. Kidder Peabody & Co., Inc.,* 829 S.W.2d 300 (Tex. App.—Texarkana 1992, writ granted w.r.m.) ................................. 85

*Mackey v. U.P. Enterprises, Inc.*, 935 S.W.2d 446 (Tex. App.—Tyler 1996, no writ)................................................................................. 82

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004) ...................................................................... 12

*Mecom v. Vinson & Elkins,* No. 01-98-00280-CV, 2001 WL493426 (Tex. App.— Houston [1st Dist.], 2001, no pet)(not designated for publication)........... 87

*Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994)................................... 67

*Mendoza v. Fleming*, 41 S.W. 3d 781 (Tex. App. .—Corpus Christi 2001, no pet.)29, 31, 32

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006)..................... 21

*Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985)................................... 69

*Millan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760 (Tex. App.—San Antonio 2002, pet. denied).......................................................... 82

*Mims v. Bohn*, 536 S.W. 2d 568 (Tex. Civ. App.—Dallas 1976, no writ.)................ 37, 47

*Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573 (Tex. 2002) .............. 82

*Neitzke v. Williams*, 490 U.S. 319 (1989)........................................ 12

*Newby v. Enron Corp.* (*In re Enron Corp Sec. Derivative & "ERISA" Litig.*), 388 F. Supp.2d 780 (S.D. Tex. 2005)........................................... 50

*Novak v. Kasaks,* 216 F.3d 300 (2nd Cir. 2000) ................................................................. 73

*Pace v. Swerdlow*, 519 F. 3d 1067 (10th Cir. 2008) ......................................................... 75

*Pearce v. The First Nat'l Bank of Pecos*, No. 08-00-00043-CV, 2001 WL 633782
    (Tex. App.—El Paso June 7, 2001, no pet.) ................................................................. 85

*Peavey v. WFAA-TV, Inc*., 221 F. 3d 158 (5th Cir. 2000) ................................................. 34

*People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709-G, 2007 WL
    708872 (N.D. Tex. March 7, 2007) .............................................................................. 87

*Permian Basin Community Centers for Mental Health and Mental Retardation*,
    No. 11-07-00321-CV, 2008 WL 2687108 (Tex. App.—Eastland July 10, 2008,
    no pet.) ......................................................................................................................... 85

*Pharo v. Smith*, 621 F.2d. 656 (5th Cir. 1980) ................................................................. 19

*Plotkin v. IP Axess, Inc.*, 407 F.3d 690 (5th Cir. 2005) .................................................... 66

*Poole v. Houston & T.C. Ry.,* 58 Tex. 134 (1882) ........................................................... 29

*Press v. Chem. Inv. Sers. Corp*., 166 F.3d 529(2nd Cir. 1999) ........................................ 71

*Priester v. Lowndes County*, 354 F.3d 414 (5th Cir. 2004) .............................................. 12

*Prospect High Income Fund v. Grant Thornton*, 203 S.W.3d 602 (Tex. App.—
    Dallas 2006, pet. denied) ............................................................................................. 72

*Prostok v. Browning*, 112 S.W.3d 876 (Tex. App.—Dallas 2003 rev'd in part on
    other grounds, 165 S.W. 3d 336 Tex. 2005) ............................................................... 88

*Psimenos v. E.F. Hutton & Co*., 722 F.2d 1041 (2nd Cir. 1983) ..................................... 48

*R2 Inves. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005) ..................................... 14, 15, 16

*Reagan Nat'l Advertising of Austin, Inc. v. Hazen*, No. 03-05-00699-CV, 2008 WL
    298823, Tex. App.—Austin July 29, 2009, no pet.)(mem.op.) .................................... 30

*Reneker v. Offill*, 2009 WL 804134 (N.D.Tex. 2009) ........................................................ 2

*Renfroe v. Jones & Assoc*., 947 S.W.2d 285 (Tex. App.—Ft. Worth 1997, writ
    denied) ......................................................................................................................... 33

*Ring v. Axa Financial*, 483 F.3d 95 (2nd Cir. 2007) ........................................................ 26

*Rolf v. Blyth, Eastman Dillon & Co. Inc.*, 570 F.2d 38 (2nd Cir.) 1978) ......................... 72

*Ross v. Marshall*, 426 F.3d 745 (5th Cir. 2005) ................................................................ 79

*Rubinstein v. Collins*, 20 F.3d 160 (5th Cir. 1994) ......................................................... 74

*S.V. v. R.V.*, 933 S.W.2d. 1 (Tex. 1996) ............................................................................ 89

*Saenz v. Family Sec. Ins. Co. of Am.*, 786 S.W.2d 110 (Tex. App.—San Antonio 1990, no writ) ..................................................................................................................... 82

*Scanlan v. Texas A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) ...................................... 14, 17

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .......................................................................... 12

*SEC v. Brady*, No. 3:05-CV-1416-D, 2006 WL 1310320 (N.D. Tex. May 12, 2006) ................................................................................................................................ 66

*SEC v. Diversified Indus. Inc.,* 465 F. Supp. 104 (D.D.C. 1979) ...................................... 67

*SEC v. McNulty,* 137 F.3d 732 (2d Cir. 1998) .................................................................. 73

*SEC v. Reynolds*, No. 3-08-CV-0384-B, 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ................................................................................................................................ 12

*SEC v. Sharp Capital, Inc.,* No. Civ. A. 3-:-*-CV-2792G, 1999 WL 242691 (N.D.Tex. Apr. 16, 1999)(mem.) ............................................................................... 66, 67

*SEC v. Zandford,* 535 U.S. at 813 (2002) .......................................................................... 25

*Shields v. State*, 27 S.W.3d 267 (Tex. App.—Austin 2003, no pet.) ................................ 49

*Shinn v. Allen*, 984 S.W.2d 308 (Tex. App.—Houston [1st Dist.] 1998, no pet.) ............ 64

*Simmang v. Tex. Bd. of Law Examiners*, 346 F. Supp. 2d 874 (W.D. Tex. 2004) ............ 19

*Skrepnek v. Shearson Lehman Bros. Inc.*, 889 S.W.2d 578 (Tex. App.—Houston [14th Dist. 1994, no writ) ............................................................................................... 63

*South Cherry Street  LLC v. Hennessee Group LLC*, 573 F.3d 98 (2nd Cir. 2009)....72, 73

*SR Int'l Bus. Ins. Co. Ltd. v. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871 (N.D. Tex. 2008) ............................................................................................................. 13

*State v. Standard Oil Co.,* 130 Tex. 313, 107 S.W.2d 550 (1937) .................................... 77

*Stein v. Meachum*, 748 S.W.2d 516 (Tex. App.—Dallas 1988, no writ) ......................... 64

*Steiner v. Southmark Corp.*, 734 F. Supp. 269 (N.D. Tex. 1990) .................................... 67

*Sterling Trust Co. v. Adderley,* 168 S.W.3d 835 (Tex. 2005) .....................................51, 61

*Stokes v. Lokken,* 644 F.2d 779 (8th Cir. 1981) ................................................. 69

*Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094 (N.D. Cal. 2005) ................... 23

*Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971).......... 25

*Swenson v. Engelstad*, 626 F.2d 421 (5th Cir. 1980) ......................................... 56

*Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) ................................... 72

*Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551 (S.D. Fla. 1990) ...............54, 65

*Tex. Capital Securities v. Sandefer,* 58 S.W.3d 60 (Tex. App.—Houston [1st Dist.] 2001) .................................................................................................... 53

*Tex. Dep't of Transp. v. Olson,* 980 S.W.2d at 890 (Tex. App—Ft. Worth 1998, no pet.) ...................................................................................................... 75

*Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636 (5th Cir. 1999) ....................................... 65

*Tigue Invs. Co. Ltd v. Chase Bank of Texas, NA*, No. 3:03-CV-2490-N, 2004 WL 3170789 (N.D. Tex. 2004)...................................................................... 68

*Toles v. Toles*, 113 S.W.3d 899 (Tex. App.—Dallas 2003, no pet.) ..............28, 29, 31, 32

*Tompkins v. Cyr,* 202 F.3d 770 (5th Cir.2000)...........................................37, 47, 77

*Tri v. JTT and MT*, 162 S.W. 3d 552 (Tex. 2005).............................................. 35

*Triplex Communications Inc. v. Riley*, 900 S.W.3d 716 (Tex. 1995) ............................... 34

*Tuchman v. DSC Commc'ns Corp.,* 14 F. 3d 1061 (5th Cir. 1994) ................................ 67

*U.S. Mortgage v. Saxton*, 494 F.3d 833 (9th Cir. 2007)....................................... 26

*Udoewa v. Plus4 Credit Union*, No. H-08-3054, 2009 WL 1856055 (S.D. Tex. June 29, 2009)............................................................................. 84

*United States v. Ashley,* 555 F.2d 462 (5th Cir.1977) ....................................... 36

*United States v. Beasley,* 519 F.2d 233 (5th Cir.1975) ....................................... 36

*United States v. Capo,* 791 F.2d 1054 (2d Cir.1986) ........................................ 36

*United States v. Del Valle*, 587 F.2d 699 (5th Cir. 1979)..................................... 43

*United States v. Maldonado-Rivera*, 922 F. 2d 934 (2nd Cir. 1990)............................ 42, 46

*United States v. Mann*, 161 F. 3d 840 (5th Cir. 1998) ........................................ 43

*United States v. Russell*, 255 U.S. 138 (1921)..................................................... 46

*United States v. Russell*, 255 U.S. 138, 143 (1921) ........................................... 53

*United States v. Sprecher*, 783 F. Supp. 133 (S.D.N.Y 1992) ..................................... 45, 53

*United States v. Spudic,* 795 F.2d 1334 (7th Cir.1986).................................... 76

*United States v. Thomas,* 686 F.Supp. 1078, 1087-88 (M. D. Pa.1988) ........................... 37

*United States v. Upton,* 559 F.3d 3 (1st Cir. 2009) ......................................... 43

*Wagner & Brown Ltd. v. Horwood*, 58 S.W.3d 732 (Tex. 2001) ...................................... 89

*Washington v. Allstate Ins. Co*., 901 F.2d 1281 (5th Cir. 1990) ................................. 15, 18

*Westport Insurance Corp. v. Cotton Schmidt LLP*, 605 F. Supp. 2d 796 (N.D. Tex. 2009) ............................................................................................... 29

*Willard v. Humana Health Plan of Texas, Inc.*, 336 F. 3d 375 (5th Cir. 2003) ................. 94

*Williams v. United States of Am.*, 71 F.3d 502 (5th Cir. 1995)............................. 79, 80, 81

*Williams v. WMX Techs., Inc.*, 112 F.3d 175 (5th Cir.1997) ........................................ 66

*Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004 (11th Cir.1985) .................. 69

*Woodward v. Metro Bank of Dallas*, 522 F. 2d 84 (5th Cir. 1975)................................... 69

*Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489 (Tex. App.—Fort Worth 2002, no pet.) ............................................................................................... 83, 84, 86

*Zarzana v. Ashley*, 218 S.W.3d 152 (Tex. App. Houston [14th Dist.] 2007, no pet.) ...... 83

## STATUTES

15 U.S. C. § 77r(a)(1)..................................................................................... 58

15 U.S.C. § 77r(b)(1)................................................................................. 13, 20

15 U.S.C. § 77r(b)(4)(D) ............................................................................... 57

15 U.S.C. § 78bb(f)(5)(E)............................................................................ 13, 20

17 C.F.R. § 230.502(c) ........................................................................................ 56

17 C.F.R. § 230.506 ...................................................................................... 55, 56

17 C.F.R. §§ 230.501 & 502 ............................................................................... 55

Art. 581-33(M) ................................................................................................... 43

Tex. Rev. Civ. Stat. Ann. § 581-33A, F (Vernon Supp. 2009) ......................... 85

Tex. Rev. Civ. Stat. Ann. § 581-4C (Vernon Supp. 2009) ................................ 59

Tex. Rev. Civ. Stat. Ann. art 581-37 (Vernon 1964) ....................................... 55

Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(2) (Vernon Supp. 2009) ................... 60

Tex. Rev. Civ. Stat. Ann. art. 581-7A (Vernon Supp. 2009) ........................... 58

## RULES

Fed. R. Civ. P. 12(d) ...................................................................................... 14, 17

Fed.R.Civ. P. 9(b) ............................................................................................. 62

TO THE HONORABLE JUDGE DAVID C. GODBEY:

Now come PLAINTIFFS, **SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ**, and **PUNGA PUNGA FINANCIAL, LTD.**, individually and on behalf of a class of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this Joint Response and Brief in Opposition to Defendants, **PROSKAUER ROSE, LLP, THOMAS V. SJOBLOM, P. MAURICIO ALVARADO** and **CHADBOURNE & PARKE, LLP** (collectively hereinafter "Defendants")'s collective Motions to Dismiss Plaintiffs' Second Amended Complaint and, In the Alternative, Motion for Leave to Amend the Complaint, and in support thereof would show the Court the following:

## I.     PRELIMINARY STATEMENT

Defendants'12(b)(6) Motions raise issues which cannot properly be disposed of through a motion to dismiss because they involve questions of fact and therefore should be addressed at the summary judgment, class certification or jury trial stages.  Cutting through all of the technical legal arguments submitted by Defendants, particularly Proskauer Rose LLP and Chadbourne & Parke (together with Defendant Thomas Sjoblom, collectively referred to hereinafter as the "Sjoblom Defendants"), the only question for this Court to determine at this stage is whether or not the allegations in Plaintiffs' Second Amended Complaint ("SAC") concerning the conduct of the Sjoblom Defendants and Mauricio Alvarado,[1] state a claim upon which relief can be granted, reading the SAC in the light most favorable to Plaintiffs and indulging all reasonable inferences in favor of Plaintiffs.  The SAC clearly meets this test, and therefore Defendants' Motions must be denied.  Alternatively, and to the extent the Motions rely on evidentiary materials outside the pleadings, the Court should deny the Motions or treat them as summary judgment motions and allow Plaintiffs the opportunity to conduct discovery on the merits of their claims.

---

[1]   Because the majority of the arguments addressed herein respond to arguments made by the law firm defendants, Proskauer Rose and Chadbourne & Parke, Plaintiffs have devoted a separate section to the liability of Alvarado at the end of this Response, *infra*.

Plaintiffs have alleged a relatively simple case of aiding and abetting and conspiracy by these Defendants, whom Plaintiffs allege acted in complicity and in concert with the Stanford Financial group of companies from 2005-2009 in a conspiracy designed to shield Stanford Financial from regulatory scrutiny so as to allow Stanford Financial to continue to operate as an unregistered investment company selling unregistered securities from the State of Texas in violation of (*inter alia*) the Texas Securities Act.[2]   Plaintiffs have alleged that Sjoblom knew in 2005 that Stanford Financial was violating securities laws and evading SEC regulation, and that Stanford was not disclosing said violations and regulatory evasion to investors like Plaintiffs, but nevertheless knowingly agreed to assist Stanford Financial keep the SEC at bay through a campaign of regulatory evasion beginning in 2005 and lasting until the week before the SEC intervention into Stanford Financial in February 2009.[3]   Even more egregious, Plaintiffs allege that Sjoblom learned in late 2008 that Stanford Financial was committing a massive fraud on its investor clients like Plaintiffs, and yet Sjoblom still continued to lie to the SEC in the middle of its ongoing investigation of Stanford Financial anyway, until the whole house of cards collapsed over Mr. Sjoblom's head and he tendered his resignation as counsel for Stanford Financial in a letter to the SEC in which he purported to disaffirm all of his prior [mis]representations to the SEC made over the course of the previous three years.

Plaintiffs allege that, as to the Sjoblom Defendants, the conspiracy to evade regulation was linked to Stanford's conspiracy to defraud and violate securities laws by (1) Sjoblom's knowledge that Stanford Financial was committing fraud and violating securities laws and (2) Sjoblom's

---

[2]  Plaintiffs have alleged that the Stanford group of companies, including SIB and SGC, operated at all times as a "joint enterprise" under the brand name "Stanford Financial", and that Stanford Financial was an unregistered "dealer" of securities in Texas under the TSA.  SAC ¶26. Plaintiffs note that when Sjoblom announced his withdrawal from representation to the SEC, he referred to his representation of Stanford Financial, and not of SGC or SIB.  See February 12, 2009 letter and February 14, 2009 e-mail to Kevin Edmundson, attached as Exhibit "4" to the SAC.

[3]  Plaintiffs' allegations are similar to the ones made by Ron Reneker, acting as Special Receiver, against former SEC lawyer Phillip Offill and his law firm Godwin Papas in *Reneker v. Offill*, 2009 WL 804134 (N.D.Tex. 2009).  Judge Fitzwater dismissed the complaint, finding (*inter alia*) that the claims being asserted belonged to the investors and not the company's receiver.  *Id.* at *4-6.

decision to nonetheless assist Stanford Financial accomplish the regulatory evasion.  In other words, the gist of Plaintiffs' Complaint is that Defendants entered into a conspiracy with others to help Stanford Financial evade SEC regulation and thereby help it conceal its continued violations of securities laws and fraud, with the goal of keeping Stanford Financial in business operating outside the regulatory confines of U.S. securities laws.

Defendants ignore these clear allegations of wrongful conduct to focus on technical legal arguments and otherwise seek summary dismissal based on fact-intensive issues like knowledge, intent, and proximate cause that are more appropriately addressed at the summary judgment or jury trial stage.  The Sjoblom Defendants **do not deny** that Sjoblom lied to, or concealed information from, the SEC, or that he helped Stanford Financial evade SEC regulation.  Indeed, the Sjoblom Defendants' ultimate defense, once the technical legal arguments are stripped away, appears to be that *Sjoblom simply didn't know why he was lying to the SEC or what he was helping Stanford conceal*.  Such a position is absurd and begs the fundamental question:  *if he really thought his clients were <u>not</u> violating securities laws, then why in the world would Sjoblom need to lie to the SEC?*

Plaintiffs have adequately pled a case against these Defendants sufficient to survive Defendants' 12(b)(6) Motions.  Nevertheless, to the extent that the Court finds that the pleadings are deficient in any respect, the Plaintiffs request the opportunity to amend the Complaint to cure any deficiencies.  See, e.g., *Biliouris v. Sundance Resources, Inc*. 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008)(this Court dismissing fraud claims without prejudice and allowing plaintiffs leave to amend); *Berry v. Indianapolis Life Ins. Co*., 608 F. Supp. 2d 785, 805 (N.D. Tex. 2009)(Judge Boyle granting leave to amend and requiring plaintiffs to submit a 5 page synopsis explaining how the amendments overcome the grounds for dismissal).  Where specifically referenced below, Plaintiffs further request that the Court take judicial notice of some of the allegations made in the recently amended complaint filed by some of these very same Plaintiffs in the companion case filed in this

Court and pending within the MDL, styled *Troice, et al. v. Willis of Colorado, Inc., et al.*, Civil Action No. 3:09-cv-01274-L (the "Willis Case").

Under the Supreme Court's standard established in *Twombly* and *Iqbal*, a case should proceed to the discovery stage unless the complaint, on its face, fails to allege sufficient facts that provide a plausible basis for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558-562 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). In *Twombly*, the Supreme Court held that a claim "*has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged*". *Twombly*, at 556. In *Twombly*, the Supreme Court concluded that the "parallel behavior" alleged in the complaint as the *only* evidence of an antirust conspiratorial agreement was insufficient and therefore not plausible because there were other lawful, market-based reasons that "more likely" explained the parallel behavior. *Id.*, at 566-567. Like *Twombly*, the Court in *Iqbal* rested its ultimate conclusion in the case on the "obvious alternative explanation" for the alleged wrongful conduct -- that the alleged conduct was "likely lawful and justified by nondiscriminatory intent". *Iqbal*, 129 S. Ct 1937, at 1951-1952 (2009) (emphasis added).

The allegations contained in the Plaintiffs' SAC rise far above the requirements of *Twombly* and *Iqbal*. Not only are the factual allegations and theories of liability established in Plaintiffs' SAC plausible, but also probable, because **Defendants simply cannot explain any other reason for, or (even less) justifying, Sjoblom's or Alvarado's wrongful conduct**. There is simply no valid or legitimate reason for Sjoblom to have lied repeatedly to the SEC unless he knew about, and therefore intended, to assist his client to "get away with" its continued violations of securities laws and fraud and continue "business as usual". And, as described below, there is simply no legitimate reason for Alvarado to have served as Leroy King's "scribe", preparing response letters for King to sign and send to regulatory officials in the Caribbean, telling them, in effect, to mind their own

business when it came to SIB, unless he also was intent on deceiving regulators and shielding Stanford Financial from regulatory scrutiny.

Plaintiffs respond to each and every one of Defendants' arguments below. But the bottom line in this and every other civil lawsuit arising out of the Stanford Financial collapse is that Allen Stanford and his minions could not have carried out a fraud of this magnitude and complexity by themselves. Stanford needed corrupt regulatory officials (Leroy King); complicit internal accountants (Lopez, Kurt) and corrupted external auditors (C.A.S. Hewlett & Co.); and in-house and outside lawyers like Alvarado and Sjoblom willing to do whatever was necessary, including actively obstructing an ongoing SEC investigation and repeatedly lying point blank to the SEC, in order to carry out his nefarious schemes.

## II.       OVERVIEW OF PLAINTIFFS' CASE

Plaintiffs have alleged in the SAC that Defendants were members of a conspiracy to evade regulatory oversight of Stanford Financial's business operations, a conspiracy which Plaintiffs allege had been ongoing at Stanford Financial since Allen Stanford had been forced to flee the island of Montserrat in the early 1990s due to increased regulatory scrutiny there. SAC ¶32, 56-57. In his Plea Agreement, Davis describes how Stanford moved his operations from Montserrat to Antigua precisely to avoid regulatory enforcement there. Davis Plea ¶17(a). Plaintiffs have alleged that thereafter Stanford did everything in his power to co-opt regulators in Antigua (particularly the FSRC) and yet nevertheless used the façade of purported regulation by the FSRC to ward off regulation by the SEC in the United States. SAC ¶32-35; 63, 68; See Davis Plea at ¶¶17(e). Plaintiffs have alleged that, based on this effective lack of regulation in Antigua or the U.S., Stanford was able to run a joint enterprise group of companies that operated under the name "Stanford Financial" as an unlicensed investment company, akin to a mutual or hedge fund, from its base in Houston Texas, selling unregistered securities (the SIB CDs) from and through Texas in

violation of the Securities Act of 1933, Investment Company Act and the Texas Securities Act ("TSA").  SAC ¶26, 29.

Plaintiffs have alleged that Stanford Financial never told investors like Plaintiffs that Stanford Financial/SIB was operating in violation of Texas and federal securities laws.  SAC ¶40, 86-87, 90, 103-104, 109.  To the contrary, Plaintiffs have alleged that Stanford Financial led them to believe that the Stanford Financial group of companies was a U.S.-based group subject to, and compliant with, regulation by the SEC and FINRA and backed by SIPC insurance coverage, and that SIB was also subject to stringent and "comprehensive" regulatory supervision by the FSRC in Antigua.  *Id.*  Plaintiffs allege that Stanford Financial never disclosed to investors like Plaintiffs that, rather than complying with SEC regulation, it was doing everything it could to *evade* SEC regulation, and that it had co-opted and corrupted the FSRC, and particularly the head of said regulatory agency, indicted co-conspirator Leroy King ("King"), such that Stanford Financial was effectively operating in a regulatory void with no effective regulation anywhere whatsoever.  *Id.*, at ¶86-87, 90, 109.

Plaintiffs allege that in the summer of 2005, the SEC launched a regulatory investigation of Stanford Financial based on its suspicion that Stanford was operating an unlicensed investment company selling unregistered securities in violation of federal securities laws. SAC ¶58-59.   In response to that SEC investigation, Stanford hired Sjoblom, who had 20 years of experience as an SEC enforcement lawyer.  SAC ¶60.  Upon being retained in 2005, Sjoblom traveled to Antigua, where he met with, *inter alia*, Stanford and King, the head of the Antiguan FSRC charged with regulating SIB.  SAC ¶61; Davis Plea ¶17(u).

As part of his trip to Antigua, Sjoblom familiarized himself with Stanford Financial's operations, and, importantly, reviewed SIB's disclosures to investors in its CD program.  SAC ¶62. Plaintiffs allege that, as a result of his trip to Antigua in August 2005, Sjoblom gained an understanding of Stanford Financial's business operations, including that it was operating a

securities marketing and sales operation from Houston, Texas selling CDs from an offshore bank (SIB) in Antigua, and that, based on his retention, and his review of Stanford's business practices and disclosures to investors, Sjoblom knew that (i) Stanford was operating an unregistered investment company marketing and selling unregistered securities from within the United States in violation of federal and state securities laws, (ii) Stanford Financial was under investigation by the SEC for precisely that conduct, and (iii) Stanford was not disclosing said regulatory violations to the investors.   SAC ¶¶58-60 (Sjoblom hired to respond to SEC investigation); ¶62 (Sjoblom reviewed Stanford Financial's disclosures to investors and knew Stanford was running an investment company from Houston); ¶65 (Sjoblom knew Stanford was marketing and selling securities illegally from the U.S.); ¶¶40, 6-87, 90, 103-104, 109 (investor disclosures misrepresented that Stanford Financial's operations were authorized and regulated by the SEC and FSRC, and omitted to disclose that Stanford Financial was illegally operating in violation of securities laws and was evading regulation by the SEC, and that SIB was not regulated or supervised by the Antiguan Government).

Plaintiffs have also alleged that as a result of his trip to Antigua in August 2005, Sjoblom knew that the head of the FSRC, King, enjoyed a "cozy relationship" with Stanford and, importantly, that **King was passing insider, confidential Government-to-Government information about the SEC investigation to Stanford.**  SAC ¶¶62, 65.  Thereafter, in October 2005, Sjoblom sent a letter to the SEC in which he argued that the SEC did not have jurisdiction over Stanford Financial's CD sales program because, *inter alia*, SIB was subject to comprehensive regulation in Antigua.  SAC ¶¶63-65.  Plaintiffs have alleged that when he sent that letter, Sjoblom knew that his statements about the "comprehensive regulation" provided by the FSRC and Antiguan law were false (or suspect at best) because Sjoblom had met with King and was aware that King was passing confidential, Government-to-Government regulatory communications from the SEC

concerning SIB to Stanford.  SAC ¶¶62-65.  Sjoblom, Alvarado, and Stanford used the fraudulent

façade of "Antiguan regulation" of SIB as a shield to keep the SEC at bay for the next several years.

Plaintiffs allege that on September 25, 2006, King provided to Stanford and Defendant

Alvarado *another* confidential Government-to-Government communication he had received from

the SEC wherein the SEC again sought records and information regarding SIB's operations.  SAC

¶67.  Evidencing his knowledge of the King-Stanford relay, just days later Sjoblom contacted the

SEC and represented to the SEC that he had "*heard through the grapevine*" that the FSRC had not

been provided with an appropriate request from the SEC for documents; that the SEC had "*no

basis*" to request documents regarding SIB's investment portfolio from SIB; that he (Sjoblom) had

spent 15 years investigating fraud for the SEC and was "*well-equipped*" to recognize the "*hallmarks

of fraud*"; and that he (Sjoblom) found SIB to be credible and in compliance.  SAC ¶68.

As discussed *infra* in the section addressing Alvarado's liability, Plaintiffs have recently

discovered that at roughly the same time Sjoblom was telling the SEC to "mind its own business"

because the FSRC was adequately regulating and supervising SIB, Alvarado was telling the Eastern

Caribbean Central Bank ("ECCB") the same thing, *but on King's letterhead*.  On August 1, 2006,

Alvarado prepared a letter for King to sign and send along as if it were his own, informing the

ECCB that "*your agency should place reliance in the results of our [the FSRC's] continued

monitoring and examination of entities under our supervision.*"  See *infra*, pps. 74-76, and

Appendix Exhibit "B".

Plaintiffs further allege upon information and belief that, in response to the SEC

investigation, Sjoblom and Alvarado assisted Stanford Financial to develop policies for use in the

U.S. offices of SGC designed to evade, hinder and obstruct the SEC investigation. The policies

implemented in 2005 and 2006 included the destruction of Stanford Financial records that might be

uncovered in the SEC investigation.  SAC ¶69-71.  As alleged by former Stanford Financial brokers

D. Mark Tidwell and Charles W. Rawl, the new policies adopted by Stanford Financial included

ordering the removal or destruction of information contained in client or company files in response to an ongoing SEC investigation into SGC's CD sales practices, and purging electronic data from its computers in response to the SEC investigation.  SAC ¶70.

Plaintiffs allege that by late 2008 Sjoblom acquired actual knowledge of Stanford Financial's commission of a massive fraud on Plaintiffs with respect to the composition of Stanford Financial's investment portfolio, when he learned that Stanford Financial was investing its client's money in a "previously undisclosed" third tier of investments that was not managed by Pendergest-Holt, as had been previously represented to the investors, and which included real estate and private equity, a fact which he knew, from his previous review of Stanford Financial's disclosures, had not been disclosed to the investors.  SAC ¶72.  Despite this knowledge, on January 21, 2009, and in response to subpoenas from the SEC seeking full disclosure of SIB's investment portfolio, Sjoblom met with Stanford and others in Miami to discuss the SEC investigation and to determine who should testify before the SEC. At that meeting, and despite their knowledge that only Stanford and Davis were in a position to discuss the assets in the Tier III portfolio, **Stanford, Davis, Pendergest-Holt, and Sjoblom all agreed that Sjoblom would lie to the SEC** and seek to convince the SEC that Stanford and Davis didn't know anything about SIB's assets and that Pendergest-Holt and another SIB executive, SIB President Rodriguez Tolentino, were the best individuals to present testimony and evidence to the SEC regarding SIB's investment portfolio.  SAC ¶¶73-74.

Thereafter, on January 22 and 23, 2009, Sjoblom proceeded to execute the agreed upon conspiratorial plan by meeting with several SEC attorneys at a restaurant in Houston to discuss the SEC investigation of Stanford Financial.  SAC ¶75-76.  Sjoblom falsely represented to the SEC lawyers that Stanford and Davis did not know much about the portfolio and that Pendergest-Holt and Rodriguez Tolentino were the "better people to explain the details" about SIB's entire portfolio. *Id.*  Sjoblom also represented to the SEC attorneys that SIBL was "not a criminal enterprise" (even

though by this time he knew Stanford was committing a massive fraud on the investors) and that "all assets are there." *Id.*

On January 24, 2009, Sjoblom sent an email to Defendant Alvarado, in which Sjoblom informed his client that he had succeeded in persuading the SEC that Pendergest and Rodriguez-Tolentino, not Stanford and Davis, were better suited to testify about SIB's portfolio of assets. SAC ¶77. Evincing his knowledge that Pendergest and Rodriguez-Tolentino's testimony was designed to "pull the wool over" the SEC's eyes once again, in the same e-mail Sjoblom suggested that Rodriguez-Tolentino's testimony to the SEC "will be the performance of his life"; that Laura Pendergest should attend Rodriguez's day of testimony so as to ensure that her testimony the next day is "consistent"; and that Rodriguez and Pendergest will need ample time during an entire week to "practice" for their testimony before the SEC. SAC ¶77; see also See January 24, 2009 e-mail attached as Exhibit "2" to the Declaration of Jim Rouhandeh, appended to Proskauer's Motion. In a follow up e-mail to Pendergest and Rodriguez-Tolentino on January 27, 2009, Sjoblom insisted that "the actors" Pendergest and Rodriguez-Tolentino needed to "*rise to the occasion*" and that "***our livelihood depends on it.***" SAC ¶78.

Then, in the first few days of February 2009, Sjoblom discovered that Allen Stanford had looted some $1.6 billion from the investors. SAC ¶80. Yet he *still* continued to assist Stanford Financial to deceive the SEC by, *inter alia*, (i) presenting Pendergest for testimony before the SEC pursuant to the <u>same</u> fraudulent plan he had concocted with his co-conspirators at the January 21st Miami meeting (allegedly *before* he knew of the full Ponzi extent of the fraud), with full knowledge that Pendergest intended to lie to the SEC, and (ii) even steering her to lie, thus making Sjoblom an active participant in a Ponzi scheme obstruction of justice conspiracy. SAC ¶82-84.

Apparently on or about February 8, 2009, the night before Sjoblom met with Pendergest to prepare her final testimony to the SEC, Sjoblom solicited from Allen Stanford a multi-million (recently pegged at $10 million) retainer from Allen Stanford to represent Stanford individually in

any resulting criminal case (which might explain Sjoblom's reluctance to withdraw from representing Stanford Financial when he discovered the extent of the fraud in late 2008 or January 2009).  SAC ¶85.  On February 12, 2009, apparently seeing the writing on the wall, Sjoblom sent a letter to the SEC informing that Defendant Proskauer Rose was withdrawing from representation of Stanford Financial.  SAC ¶84.  Two days later, on February 14, 2009 Sjoblom sent an e-mail to SEC attorney Kevin Edmundson in which he disaffirmed "all prior oral and written representations made" by Sjoblom to the SEC regarding Stanford Financial since his retention in 2005 (while at Chadbourne) through February 2009.  SAC ¶84-85.  See Sjoblom 2/12/09 letter and 2/14/09 e-mail, true and correct copies of which are attached to the SAC as Exhibit "4".

With this factual overview of Plaintiffs' allegations, Plaintiffs respond to Defendants' specific arguments below.

## III.    ARGUMENTS AND AUTHORITIES

### A.    <u>12(b)(6) Standard of Review</u>

In reviewing a motion to dismiss under Rule 12(b)(6), the Court's task is limited. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 563, n.3 (S.D. Tex. 2002). The Court must accept all well-pleaded allegations as true and view them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *SEC v. Reynolds*, 2008 WL 3850550, at *3 (N.D. Tex. Aug. 19, 2008). The question under Rule 12(b)(6) "is not whether plaintiff will ultimately prevail on the merits, but whether he is entitled to offer evidence to support his claim."  *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996). A 12(b)(6) motion to dismiss should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Supreme Court in *Twombly* did not distance itself from its previous holding that Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual

allegations. *Twombly*, 550 U.S. at 556-557 (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Indeed, a well pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely". *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

In short, motions to dismiss are viewed with disfavor and rarely granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004); *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *SR Int'l Bus. Ins. Co. Ltd. v. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008) (citation omitted).

**B.** <u>**Application of SLUSA**</u>

The Sjoblom Defendants' first argument is that Plaintiffs' entire case is preempted by the Securities Litigation Uniform Standards Act, or SLUSA. SLUSA preempts state law claims where the gist of the lawsuit is premised on fraud in the purchase and sale of "covered securities", which are defined as securities that are traded on the national exchanges (the New York Stock Exchange, the American Stock Exchange, or the Nasdaq National Market) or securities issued by a registered investment company (e.g., registered mutual fund shares) or for which a registration statement has been filed under the Investment Company Act of 1940.[4] 15 U.S.C. § 77r(b)(1); 15 U.S.C. § 78bb(f)(5)(E); *see also Derdiger v. Tallman,* 75 F.Supp.2d 322, 324 (D.Del.1999).

Of course, this SLUSA argument has wide ranging implications not just for the present case, but for each and every potential class action lawsuit filed by the Stanford victims against any potentially liable third party "aiders" of Stanford's fraud and illegal conduct because Defendants' SLUSA argument seeks to utterly destroy the Stanford victims' ability to sue ***any*** third party "aider and abettors" of Stanford's fraud. Given the current state of the federal securities laws as interpreted by the federal courts post-*Central Bank*, which do not recognize "aider and abettor"

---

[4]  Defendants argue that Plaintiffs may be suing over Stanford Financial's "SAS" product. Proskauer Motion at 17-18. There is no mention anywhere in the SAC about the SAS product, and Plaintiffs are not making claims based on the SAS products.  The SAC is very clear that the Plaintiffs' claims relate to the sale of the SIB CDs.  If the Court feels there is any doubt as to that, Plaintiffs request leave to amend to address that issue.

liability, the Stanford victims will be left without any recourse whatsoever against third party "aiders" if this Court were to adopt the Sjoblom Defendants' SLUSA arguments.

### 1.        Objection to Use of Extraneous Documents

As a preliminary matter, Defendants (particularly Proskauer, although the same argument was adopted by all Defendants) base many of their arguments about SLUSA on certain assertions made by the SEC in its action against SIB, which Defendants contend show that "some" (as yet unidentified) investors liquidated "covered" securities to purchase SIB CDs.  Proskauer Motion at pp. 9 n. 3; 16 n. 7; and 18.

Plaintiffs object to Defendants' "going outside the pleadings" because a court generally may not consider documents outside the pleadings in deciding a motion to dismiss.  *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  A motion to dismiss must normally be decided on the basis of the contents of the pleadings and any attachments thereto.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  The Fifth Circuit has approved a limited exception to this rule where documents that are "referred to in the plaintiff's complaint and *are central to the plaintiff's claim* are attached to a motion to dismiss."  *Scanlan*, 343 F.3d at 536 (emphasis added).  A court may also consider judicially noticed documents in the public record, including papers filed in other litigation.  *R2 Investments LDC v. Phillips*, 401 F.3d 638, 640 n. 2 (5th Cir. 2005); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994).  However, judicially noticed documents may be considered <u>only</u> for the purpose of determining what statements the documents contain, ***not*** to prove the truth of the statements contained therein.  *R2 Investments* at 640 n. 2 (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to . . . the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Whenever a motion to dismiss is treated as a motion for summary judgment, the non-movant is entitled to the procedural safeguards of Rule 56, including discovery.  *Washington v.*

*Allstate Ins. C*o., 901 F.2d 1281, 1283 (5th Cir. 1990); *Isquith v. Middle South Utilities, In*c., 847 F.2d 186, 195 (5th Cir. 1988), cert. denied, 488 U.S. 926 (1988).

In their SLUSA arguments, Defendants rely on pleadings filed by the SEC in its action against Stanford Financial to, *inter alia*, support their assertion that some members of the putative class may have sold "covered securities" to purchase SIB CDs.  Proskauer Motion at pp. 16 n. 7, 18.  Proskauer contends that the Court may rely on these matters outside the pleadings because (i) the Plaintiffs rely on the SEC's allegations in the SAC and (ii) the SEC pleadings have been filed in related court proceedings and are matters of public record.   Proskauer Motion at p. 9 n. 3.  Proskauer is wrong, and the Court may not properly rely on the SEC pleadings in ruling on the Motions.

First, when a court takes judicial notice of documents in the public record, including papers filed in other litigation, those documents may only be considered for their contents, and may *not* be considered for the truth of the statements contained therein.  *R2 Investments*, 401 F.3d at 640 n. 2; *Lovelace*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).  For example, a public document filed with the SEC may be considered to determine what disclosures a party did or did not make, but may not be considered to prove the **truth** of those disclosures.  *See Delhomme v. Caremark Rx Inc.*, 232 F.R.D. 573 (N.D. Tex. 2005) (holding that court properly considered SEC Form 10-Q to determine that the Plaintiffs had knowledge of stock split in a given year, but that the court could not have properly considered the document to prove that such a split had actually occurred).  Thus, the Court may only consider the SEC pleadings "for the purposes of determining what statements the [pleadings] contain, [and] not to prove the truth of the [pleadings'] contents." *Lovelace* at 1018.

Proskauer completely ignores this prohibition,[5] and offers the SEC pleadings to prove the

---

[5]   Although Proskauer cites *R2 Investments* in the MTD for the proposition that the Court may rely on the SEC pleadings in ruling on the motion to dismiss, *see* Proskauer Motion at p. 9 n. 3, Proskauer fails to note that, in the same sentence it cites, the Fifth Circuit observed that outside documents may not be considered for the truth of the statements contained therein.

truth of the matter asserted therein – namely, that some investors sold "covered securities" to finance the purchase of SIB CDs.  Proskauer Motion at 16-18.  This Court may *not* consider the SEC pleadings as evidence that the Plaintiffs sold "covered securities" to finance their purchase of SIB CDs.  *R2 Investments*, 401 F.3d at 640 n. 2; *Lovelace*, 78 F.3d at 1018.

Proskauer also contends that the Court may consider the SEC pleadings because the Plaintiffs' Complaint relies on allegations made by the SEC.  MTD at p. 9 n. 3.  In deciding a motion to dismiss, a court may rely on documents that are "referred to in the plaintiff's complaint and are central to the plaintiff's claim [and which] are attached to a motion to dismiss."  *Scanlan*, 343 F.3d at 536.  At the outset, the Plaintiffs *do not even refer* to the actual SEC pleadings upon which Proskauer relies in it Motion.  While Plaintiffs do refer to the SEC's original and amended Complaints in the SEC Action, Proskauer attempts to introduce a Memorandum of Law and Appendix filed in support of the SEC's Application for a Preliminary Injunction, neither of which are referenced in the Plaintiffs' SAC.  Proskauer Motion at pp. 9 n. 3, 16 n. 7.

Moreover, the SEC pleadings are not central to the Plaintiffs' claims.  A document is central to a claim if it forms the basis of that claim.  *See Lum v. Bank of Am.*, 361 F.3d 217, 222 n. 3 (3d Cir. 2004).  By way of example, an insurance policy is "central" to the plaintiff's claims in an action on the policy.  *See Harrison v. Safeco Ins. Co. of Am.*, 2007 WL 1244268, at *3 (E.D. La. Jan. 26, 2007).  In contrast, the SEC pleadings are similar to the report at issue in *Scanlan* 343 F.3d at 536.  In *Scanlan*, the plaintiff's complaint referenced a published report regarding the Texas A&M bonfire accident at issue in the lawsuit to support its allegations, and the District Court relied on the report in granting the defendants' motion to dismiss.  *Id.*  On appeal, the Fifth Circuit held that the District Court erred in relying on the report because, *inter alia*, the report, although relevant, was not central to the plaintiffs' claims.  *Id.* at 537.  In so holding, the court noted that "[a]lthough the plaintiffs rely on the Final Report in their complaints, certainly the report alone is not central to their claims.  Indeed, it is much more central to the University Officials' defenses."

*Id.* at 537.  Similarly, although the Plaintiffs rely on the SEC pleadings to provide factual background, the SEC pleadings alone are not central to the Plaintiffs' claims.

In the event the Court considers the SEC pleadings or other matters outside the SAC for the truth of the statements contained therein (e.g. that the Plaintiffs liquidated "covered securities" to fund the purchase of SIB CDs), it must treat the motion to dismiss as a motion for summary judgment.  Fed. R. Civ. P. 12(d); *Causey v. Sewell Cadillac-Chevrolet Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Fernandez-Montez v. Allied Pilots Ass'n*, 987 F.2d 278, 283.  If the Court treats the MTD as a motion for summary judgment, the Plaintiffs are entitled to the procedural safeguards of Rule 56, including reasonable notice and an opportunity to conduct discovery.  *Allstate Ins. C*o., 901 F.2d at 1283; *Isquith*, 847 F.2d at 195; *Capital Films Corp. v. Charles Fries Productions, Inc.*, 628 F.2d at 387 (5th Cir. 1980) 391 n. 1 (5th Cir. 1980); *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 725 (5th Cir. 2003) ("[T]he district court erred by treating Huber's motion for judgment on the pleadings as a motion for summary judgment without providing Benchmark an opportunity to conduct discovery."), modified on denial of rehearing on other grounds, *Benchmark Electronics, Inc.,*, 355 F.3d 356 (5th Cir. 2003); *Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 189 (S.D. Tex. 2008).[6]

### 2.    *SLUSA Argument is Premature and Procedurally Flawed*

This Court does not even need to reach the SLUSA preemption issue at this stage of this proceeding because Defendants' SLUSA argument is premature and procedurally flawed.

Since this case is still in its pre-class certification stage, and no class has been certified, the only parties that are before this Court are the four named Plaintiffs.  See e.g., *Pharo v. Smith*, 621 F. 2d. 656, 663-664 (5th Cir. 1980); see also *Bootlocker.com, Inc. v. Amazon.com, Inc*., 650 F. Supp.

---

[6]   In the alternative, a court may decline to consider the matters outside the pleadings and decline to convert the motion to a motion for summary judgment.  *Simmang v. Tex. Bd. of Law Examiners*, 346 F.Supp.2d 874, 890 (W.D. Tex. 2004) ("[I]f little or no discovery has been conducted on the issue for which the extraneous material was submitted [in connection with a motion to dismiss under Rule 12(b)(6) ], the Court may decline to consider the attached materials and decline to convert the motion into a summary judgment motion.").

2d 89, (D. Me. 2009)("[a]s a consequence of the pre-certification nature of the matter, for the purposes of assessing the pending motion to dismiss, 'potential claims of the putative class members other than the named plaintiff are simply not before the court'").

As discussed above, Defendants argue that this entire class action lawsuit must be dismissed because, according to some extraneous statements made in a filing in the separate SEC case, "some" Stanford victims "may" have sold "covered" securities in order to purchase the bogus Stanford Financial CDs.  The problem with this argument is that there is absolutely no allegation made anywhere in the Complaint (or elsewhere) that the four Named Plaintiffs, who are the only relevant parties at this stage, sold any "covered" securities in order to buy CDs.[7]

Because the only parties before this Court at this stage of the proceedings are the four named Plaintiffs, the Sjoblom Defendants' argument that some unidentified investors might have sold "covered" securities in order to purchase CDs, is simply irrelevant at this stage of the proceedings and constitutes an impermissible request for what amounts to an advisory opinion from this Court. While, as discussed in detail below, Plaintiffs wholeheartedly disagree that the law would require some investors to completely lose their rights of redress against third parties just because they sold some stocks to buy the bogus CDs, at any rate, such an attempt to "divide" the investors into different groupings is more appropriately addressed at the class action certification stage, and not at the preliminary 12(b)(6) stage of this proceeding.

### 3.    SLUSA Does Not Apply Because the Stanford CDs Are Not "Covered" Securities

SLUSA does not apply anyway because the securities that are at the root of this fraud, the SIB CDs, are not covered securities, a fact that even Defendants must admit.   As stated above, a "covered security" for purposes of SLUSA is a security that is traded on the national exchanges (the

---

[7]  In making this strained argument, the Sjoblom Defendants (particularly Proskauer, although the same argument was adopted by all Defendants) actually stoop to affirmatively misrepresenting to this Court what is contained in Plaintiffs' Complaint.  To wit, on page 15 of its Motion, Proskauer cites to ¶39 of the SAC as standing for the proposition that "*Stanford Financial brokers sold off plaintiffs' prior investments in covered securities and reallocated the proceeds to SIB CDs*".  But a review of ¶39 reveals that it says nothing of the sort; Defendants just made that up.

New York Stock Exchange, the American Stock Exchange, or the Nasdaq National Market) or security issued by a registered investment company (e.g., registered mutual fund shares like Fidelity or USAA) or for which a registration statement has been filed under the Investment Company Act of 1940.[8] 15 U.S.C. § 77r(b)(1); 15 U.S.C. § 78bb(f)(5)(E); *see also Derdiger v. Tallman,* 75 F.Supp.2d 322, 324 (D.Del.1999).

SLUSA does not apply because Plaintiffs' fraud claims simply do not "involve[e] nationally traded securities . . . which is the Supreme Court's characterization of SLUSA's scope." *Gavin v. AT&T Corp.*, 464 F.3d 634, 639 (7th Cir. 2006); see also *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006)(SLUSA only applies to actions "involving nationally traded securities"). Consequently, "no matter how broad the reading, SLUSA cannot apply to cases where no 'covered securities' are involved". *Brehm v. Capital Growth Fin., Inc.*, 2008 WL 553238 (D. Neb. Feb. 25, 2008). While Plaintiffs allege that the SIB CDs qualify as securities under federal securities laws and the TSA, they certainly don't qualify as "covered" securities. *Kenneth Rothchild Trust v. Morgan Stanley Dean Witter*, 199 F.Supp. 2d 993, 999 (C.D. Cal. 2002)(even if bank CDs were "securities" they did not qualify as "covered" securities under SLUSA); see also *Bailey v. State*, 2008 WL 1914270 (Tex. App. – El Paso 2008)(CDs issued by offshore bank in Grenada were securities under TSA because, *inter alia*, Grenada did not have adequate regulatory scheme and had no deposit insurance plan).

To satisfy the "in connection with the purchase or sale of a covered security" requirement for SLUSA to apply, the alleged fraud must "*relate to the nature of the [covered] securities, the risk associated with their purchase or sale, or some other factor with similar connection to the **securities themselves**.*" *Backus v. Conn. Comm. Bank, N.A.*, 2009 WL 5184360, at * 6 (D. Conn. Dec. 23, 2009) (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002)(emphasis

---

[8] Plaintiffs allege that Stanford Financial was operating as an *underlined unregistered* investment company in violation of the Investment Company Act.

added).   Plaintiffs' central complaint is that they were defrauded into buying the SIB CDs.[9]

Plaintiffs allege that they were defrauded about the nature of the **CDs**, which are clearly not

"covered" securities under SLUSA.    Thus the fraud alleged is connected <u>solely</u> to the

misrepresentations in the marketing intended to induce the purchase of the CDs, and not the

purchase or sale of any other allegedly "covered" securities.   Even Defendants' own cases make

clear that under SLUSA, the controlling factor is ***what product is marketed for sale to the investor.***

See e.g., *Instituto de Prevision Militar v. Merrill Lynch*, 546 F. 3d 1340, 1352 (11th Cir.

2008)(citing *Grippo v. Perazzo*, 357 F. 3d 1218, 1224 (11th Cir. 2004)(SLUSA only applies to the

extent "covered" securities are marketed for sale to the plaintiff).   As a result, several circuits have

held SLUSA inapplicable where it is doubtful that fraud occurred in connection with the purchase

or sale of "covered securities".   See *Gavin v. AT&T Corp.*, 464 F. 3d 634 (7th Cir. 2006); *Green v.

Ameritrade, Inc.*, 279 F. 3d 590 (8th Cir. 2002).   S*ee also Strigliabotti v. Franklin Res., Inc.*, 398

F.Supp.2d 1094, 1100 (N.D. Cal. 2005) ("The fraud in question must…have more than some

tangential relation to the securities transaction.").

Proskauer argues that SLUSA applies because "some" unidentified investors may have sold

some "covered" securities in order to purchase the CDs.   While Plaintiffs submit that such an

argument is better addressed in the context of a class certification motion, even if Defendants'

allegation were true (and, as described above, it certainly was not alleged in the SAC and therefore

is irrelevant at this stage), Proskauer's argument misses the point, which is that SLUSA is only

designed to encompass cases of fraud where the **central focus** of the fraud alleged is centered on

the sale or purchase of a "covered" security.   Stated differently, a complaint contains allegations of

fraud "in connection" with the purchase or sale of a covered security if the allegedly harmful

---

[9]  Plaintiffs are not asserting "holder" claims, and they once again refer this Court to the recently filed Willis Amended
Complaint wherein two of the Named Plaintiffs describe precisely when they purchased the last CDs which they still
held when Stanford Financial collapsed.  The fraud being alleged is fraud in the sale of the CDs, not fraud causing these
Plaintiffs to "hold" the CDs.  In the alternative, Plaintiffs seek to leave to amend the complaint to identify the timing of
their purchases.

conduct "caused damages through transactions in [covered] securities." *Gray v. Seaboard Sec. In*c., 126 Fed. Appx. 14, 17 (2d Cir. 2005).

Defendants' argument proposes such an unlimited stretching of SLUSA's reach that, according to Defendants' strained interpretation, anytime someone is defrauded in the purchase of ***any*** product, security or no, then SLUSA applies <u>if</u> the defrauded buyer sold any "covered securities" in order to fund the purchase price.  For example, Defendants' argument, carried to its logical extreme, would make a SLUSA securities case out of garden variety fraud in the purchase of a car or a home if the affected buyer happened to liquidate some savings held in a money market mutual fund in order to fund the purchase of the car or home, because, according to Defendants' logic, such a case would involve "fraud in connection with the sale of a covered security".  All purchase-based fraud cases, regardless of the product purchased, would become SLUSA cases depending on how the purchaser obtained the money to purchase.  Congress clearly did not intend such a result.

Plaintiffs have alleged that the central focus of Stanford Financial's fraud was the sale of the CDs, which are not covered securities. Stanford Financial made the misrepresentations and omissions of material facts related to the CDs described in the SAC in order to sell the CDs, i.e., in order to induce Plaintiffs and the Class to part with their money to purchase the CDs.  Stanford Financial did not commit the fraud in order to induce some unnamed and unknown investors just to sell their "covered" securities to fund the purchase price for the CDs.  The primary focus of this fraud was the sale of the CDs, and it did not matter to Stanford Financial where the investors got the money to buy the CDs.  In the final analysis, the whole issue of whether an investor had to sell a "covered" security in order to buy a CD was irrelevant to Stanford Financial.  Therefore the fraud alleged by Plaintiffs was not "in connection" with the purchase or sale of a "covered security" – but rather in connection with the purchase of a non-covered security.  As such, the complaint does not allege fraud "in connection with" the purchase or sale of covered securities.

This point was made very clear by the well reasoned opinion in *Brehm*, 2008 WL 553238 (D. Neb. Feb. 25, 2008), in which the court held that SLUSA was not applicable so long as the state law claim advanced by the plaintiff does <u>not require</u> the plaintiff "to prove there was a sale or purchase of a covered security in reliance on a misrepresentation" in order to prevail on his claims. *Brehm*, 2008 WL 55238 at *2 (D. Neb. 2008)(citing *Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101, 1103 (S.D. Cal. 2000).   Plaintiffs will not have to even mention anything approximating "covered securities" in order to prevail on the elements of their claims in this case.   In sum, "[w]here the alleged conduct giving rise to the claim is too far removed from a [covered] securities transaction, the 'in connection with' requirement is not met."   *LaSala v. UBS, AG*, 510 F.Supp.2d 213, 240 (S.D.N.Y. 2007) (citing cases).

For that reason, the cases relied upon by Proskauer are inapposite.   In *Zanford*, the wrongdoers misappropriated the proceeds from the sale of the securities, which the Supreme Court noted was similar to what happened in *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, one of the cases relied on by Defendants on this issue, where the company's directors were duped into authorizing the sale of its portfolio of treasury bonds because they rightfully believed the company would receive the proceeds from the sale.   *SEC v. Zandford,* 535 U.S. at 821-822 (discussing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971).   The Supreme Court noted that the company "*was injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities.*"   *Id.*, (quoting *Bankers Life* at 10).   Thus the primary focus of the fraud in both *Zanford* and *Bankers Life* was to get the investors to sell securities *they already owned* in order to steal the proceeds *from the sale*. That is a far cry from the present case where Stanford Financial only wanted to get the investors to buy the CDs and didn't care how the investors got the money to purchase them.

The other case cited by Proskauer, *U.S. Mortgage v. Saxton*, is inapposite because that case involved a NASDAQ traded company, the shares of which were clearly "covered" securities, and

that fact informed and guided the Ninth Circuit's ultimate decision because the fraud alleged in that case arose from statements made in the company's SEC filings and offering statements for the sale of its "covered" securities. *U.S. Mortgage v. Saxton*, 494 F. 3d 833, 845 (9th Cir. 2007)(the "alleged harm stems from misrepresentations in Saxton's public filings and public statements", made in connection with the registration and issuance of its publicly-traded, covered securities). *Saxton* has no applicability to the case at hand at all because Stanford Financial was not a publicly traded company and the fraud and misrepresentations alleged by plaintiffs were not made in connection with the offering of any covered, NASDAQ-traded securities.

Proskauer also contends that SLUSA applies because the Plaintiffs' allege that Stanford Financial misrepresented to the investors that the SIB CDs were "backed" by marketable (and potentially "covered") securities.   However, once again Proskauer obfuscates the fundamental requirement that the fraud occur in connection with the purchase or sale of a covered security. Nowhere does the SAC allege that anyone ever bought any covered securities.  The fraud alleged in the complaint – misrepresentations inducing the purchase of the SIB CDs – only relates to the purchase of the **CDs**, which are *uncovered* securities.   The allegations of fraud do not relate to Stanford's purchase of the "covered" securities, and Plaintiffs certainly do not allege that Stanford purchased "covered" securities through fraud.   Nor do the Plaintiffs allege that the fraud they complain of relates to "the nature" of the covered securities purportedly backing the SIB CDs**,** or to the risk associated with purchasing or selling such securities.  The fraud alleged in the SAC only relates to the nature of the SIB CDs.

The Second Circuit's 2007 opinion in *Ring v. Axa Financial* is instructive on this issue. *Ring v. Axa Financial*, 483 F. 3d 95 (2nd Cir. 2007).  In *Ring*, the Second Circuit advanced the idea of "disaggregating" separate transactions to determine whether the transaction actually complained of involved covered securities.  In *Ring*, the Second Circuit found that it was "entirely consistent" to disaggregate two separate but related transactions in order to determine whether the plaintiff has

alleged fraud in connection with the purchase of a covered security. *Id.*, a 100-102. The Second Circuit ultimately held that "*we should not preempt and dismiss a suit that alleges fraud occurred in connection with a promise…that does not relate to a 'covered security' even where another promise in the same contract does concern a 'covered security'*". *Id.* Similarly, this Court should disaggregate Stanford Financial's alleged "purchase" of "covered securities" to "back" the CDs from the fraud in the sale of the non-"covered securities" CDs themselves.

The Defendants' arguments that the SIB CDs were "backed" by covered securities is similar to the defendants' arguments in *Brehm*, 2008 WL 553238, at *3 (D. Neb. Feb. 25, 2008). In that case, the plaintiffs purchased private placements securities and debentures. *Id*. at *2. When they were sued for fraud in connection with the private placement securities, the defendants argued that the claims should be preempted by SLUSA because the private placement memorandum provided that the defendants would invest the proceeds of the private placement securities in securities or other instruments traded on public markets. *Id*. at *3. The court held that these allegations – that the proceeds of the private, uncovered securities would be invested in covered securities – were insufficient to satisfy the "in connection with" requirement. *Id*. In so holding, the court noted that there was *no evidence* that the defendants issued, purchased, sold, or held any covered securities. *Id*. Similarly, the SAC at issue here includes no such allegations.

As in *Brehm*, the fraud alleged by the Plaintiffs is in connection with the purchase of the SIB CDs, and not "in connection with" the purchase or sale of covered securities. See also, *Gray*, 126 Fed. Appx. 14, 17 (2d Cir. 2005)(a complaint contains allegations of fraud "in connection" with the purchase or sale of a covered security only if the allegedly harmful conduct "caused damages through transactions in [covered] securities); *LaSala,* 510 F.Supp.2d 213, 240 (S.D.N.Y. 2007) (citing cases)("[w]here the alleged conduct giving rise to the claim is too far removed from a securities transaction, the 'in connection with' requirement is not met." The bottom line is that there is no allegation in the SAC that the fraud relating to the nature of the CDs resulted in the

"purchase or sale" of any "covered" securities.   Nothing Stanford Financial said about the "marketable" securities "backing" the CDs caused anyone, let alone Plaintiffs, to buy any "covered" securities. And, as described above, any fraud in the nature of the CDs conveyed to investors was committed in order to induce the investors to purchase the CDs, not to cause some investor to sell some covered securities elsewhere.

## C.   Attorney Qualified Immunity Defense

The Defendants argue strenuously that litigators are like "sacred cows" and can do anything they want and avoid civil liability as long as they are acting as lawyers in a litigation or adversarial setting.  Such an argument is clearly not supported by the law.

### 1.   Immunity Does not Apply to Conduct Outside the Bounds of the Law

As a preliminary matter, the attorney immunity affirmative defense (sometimes referred to as "litigation immunity") almost always arises in the context of an adversarial proceeding and is designed to prevent the opposing lawyer or the opposing party from suing the lawyer who is zealously representing his client in litigation or in an adversarial proceeding. See, e,g, *Toles v. Toles*, 113 S.W. 3d 899, 910 (Tex. App. – Dallas 2003)(explaining why litigation attorneys should be immune from suits by opposing parties in addition to suits by opposing counsel). It is questionable whether this exception even applies to a situation like the instant one where the Plaintiffs did not even know about Sjoblom or Alvarado and certainly were not adverse opposing parties to Sjoblom or Alvarado in litigation or in an adversarial proceeding.[10]

The "qualified" attorney immunity doctrine is, by its own terms, qualified and not absolute. Northern District Judge Terry Means addressed the limitations of the "attorney immunity" doctrine in a recent 2009 opinion.  *Westport Insurance Corp. v. Cotton Schmidt LLP*, 605 F. Supp. 2d 796 (N.D. Tex. 2009).  In that case, Judge Means recognized that "an attorney's immunity is, in fact,

---

[10]  As discussed below, the argument for "litigation" immunity for Alvarado is even more tenuous given that he was the General Counsel for Stanford Financial and did not make an "appearance" in any regulatory proceeding.  Everything Alvarado did was behind the scenes and/or under the table, and not out in the open in an adversarial proceeding.

limited". *Id.*, at 802. Texas law is clear that an attorney is only immune to the extent his conduct is "within the bounds of the law". *Mendoza v. Fleming*, 41 S.W. 3d 781, 787 (Tex. App. – Corpus Christi 2001)(reversing summary judgment based on fact question of whether attorney was acting within the bounds of the law). Conversely, when an attorney engages in "fraudulent or malicious" acts "he is liable for injuries to third parties." *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.App.-Houston [1st Dist.] 1985, no writ); See also, *Toles*, 113 S.W. 3d 899 (Tex. App. – Dallas 2003)(reversing summary judgment that dismissed aiding and abetting and conspiracy claims based on attorney litigation defense). This is because fraud and illicit acts are "foreign to the duties of an attorney." *Poole v. Houston & T.C. Ry.,* 58 Tex. 134, 137 (Tex. 1882).

The "illegal or fraudulent conduct" exception to attorney immunity was recently re-confirmed by the Texas Supreme Court's 2008 decision in *Chu v. Hong*, in which the Court explicitly recognized that "[a]n attorney who personally steals goods or ***tells lies on a client's behalf*** may be liable for conversion or *fraud* in some cases." *Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008).

Even the principal cases cited by the Defendants recognize that an attorneys' illegal or fraudulent conduct destroys the attorney immunity shield precisely because an attorney is "*not protected from liability to third parties for every tort committed by a lawyer that may be tangentially related to his professional role or which may occur during litigation*." *Alpert v. Riley*, not reported, 2008 WL 304742 at *18 (S.D. Tex. 2008)(motion to dismiss granted because the plaintiffs had "not met the requirements to plead that the Lawyer Defendants' alleged acts were fraudulent"); *Reagan Nat'l Advertising of Austin, Inc. v. Hazen*, not reported, 2008 WL 298823 at *9 (summary judgment affirmed because plaintiff did not meet his burden to raise a fact issue on whether the conduct in question constituted a crime); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W. 3d 398, 407 (Tex.App.-Houston [1st Dist.] 2005)(dismissal upheld because plaintiff failed to allege that the attorneys committed any independent tortious activity or misrepresentation).

In this case, Plaintiffs are clearly alleging illicit and fraudulent conduct by Defendants, conduct that is outside the bounds of the law and foreign to the duties of a lawyer, and which place Plaintiffs' claims plainly within the exception to attorney immunity.

### 2. *Attorney Immunity Affirmative Defense Requires Resolution of Fact Issues*

Moreover the Defendants' arguments are, once again, premature and procedurally flawed because the defense of "qualified attorney immunity" is an affirmative defense under Texas law and must be pled and proven by the Defendants because they bear the burden of proof on that issue.[11] See, e.g., *Reagan Nat'l Advertising of Austin Inc.*, not reported, 2008 WL 2938823 at *4 (Tex. App. – Austin 2008); *Lackshin v. Spofford*, not reported, 2004 WL 1965636 (Tex. App. – Hous. [14th Dis.] 2008); *Mendoza v. Fleming*, 41 S.W. 3d 781 (Tex. App. – Corpus Christi 2001).

Texas courts of appeals differ in how they treat assertions of attorney immunity and its exceptions. The Dallas Court of Appeals has indicated that, if the only ground for summary judgment is attorney immunity, then all that the plaintiff needs to do to fall within an exception is to allege a claim that purports to be an intentional tort based on fraudulent or malicious conduct. *See Toles,* 113 S.W.3d at 911-13.  Under this approach, once a plaintiff makes that allegation, then, in order to obtain summary judgment, a defendant is required to present evidence attacking the merits of said allegation;  otherwise the trial court should deny a motion for summary judgment. *See Toles,* 113 S.W.3d at 911-12. The Corpus Christi Court of Appeals has held that part of the defendant's burden in moving for summary judgment in reliance on attorney immunity is to **conclusively prove** that the attorney's alleged wrongful conduct does <u>not</u> fall within an exception to attorney immunity. *Mendoza,* 41 S.W.3d at 787. On the other hand, once a defendant has filed a motion for summary judgment asserting immunity, the Houston Fourteenth Court of Appeals has required the plaintiff to plead sufficient facts to show that the plaintiff asserts one or more claims that fall within the

---

[11]  Plaintiffs note that the majority of the Texas decisions cited by the Sjoblom Defendants in their Motions involved appeals of summary judgments.

exception to attorney immunity, i.e., show that the attorney engaged in illicit or fraudulent conduct. *See Chapman Children's Trust v. Porter Hedges, L.L.P.,* 32 S.W.3d at 429, 441-42 (Tex. App.— Houston (14th Dist) 2000, pet. denied.

Shifting the burden on this affirmative defense to Defendants makes sense. The qualified immunity defense exists to prevent an adverse party from suing the opposing counsel for tactics he may have employed during the course of a litigation or adversarial proceeding. A client in litigation deserves the zealous representation of his attorney, and the attorney should not be required to look over his shoulder and be worried about liability every time he files a pleading, makes a (perhaps) frivolous argument or objection, or otherwise engages in what the other side might consider to be "sharp" litigation tactics. But on the other hand, the qualified immunity doctrine clearly does not immunize lawyers against illegal or fraudulent conduct, nor should it, because there is no legitimate expectation by a lawyer, client, or society for that matter, that a lawyer be given "*carte blanche*" to run roughshod over the law and violate the public's trust by engaging in illicit conduct designed to help his client break the law and thereby harm third parties. There exists no justifiable public policy rationale to permit a lawyer to violate the law just because he, allegedly, is doing so as part of his role in an adversarial proceeding. See *Renfroe v. Jones & Assoc.*, 947 S.W. 2d 285 (Tex. App. – Ft. Worth 1997, writ denied)(lawyer immune only for actions which are 'within the bounds of the law'). Fraud and illegal conduct are "foreign" to the duties of a lawyer, and once a lawyer crosses the line from zealous advocacy to illicit and fraudulent conduct, he should be held to account for his conduct to the extent his actions assist another to harm third parties. *Chu*, 249 S.W. 3d 441, 446 (Tex. 2008)("attorney who personally steals goods or ***tells lies on a client's behalf*** may be liable for conversion or *fraud* in some cases").

In that respect, Plaintiffs note that the Eleventh Circuit has recognized that the proper way to handle the attorney immunity defense is to allow the defendant to present its affirmative defense via a jury question on whether the alleged conduct was "within the bounds of the law" so as to qualify

for immunity.  See *United States v. Mintmire*, 507 F. 3d 1273, 1294 (11th Cir. 2007).  In *Mintmire*, the Court found that the jury charge, which required the jurors to determine whether the Government had proven that the attorney was <u>not</u> providing lawful, bona fide legal services when he engaged in the conduct alleged, was adequate and constituted the proper standard by which the jury was to weigh the evidence.  *Id*., at 1294.

**D.**    <u>**Civil Conspiracy**</u>

Similar to a lot of their arguments, the Sjoblom Defendants' arguments attacking Plaintiffs' conspiracy claim reads like a motion for summary judgment, only without the evidence.[12]

Plaintiffs allege that Sjoblom's conduct is actionable as participation in a civil conspiracy on two fronts: (1) a civil conspiracy to violate the Texas Securities Act;[13]  and (2) a civil conspiracy to commit fraud arising from Allen Stanford's conspiracy to evade, impede and obstruct regulatory efforts by the SEC as part of his strategy to basically operate an "outlaw" investment enterprise unregulated by the laws of any country.

*1.    Texas Law on Conspiracy*

Under Texas law, as interpreted by the Fifth Circuit, *"[f]or a civil conspiracy to arise, the parties must be aware of the harm <u>**or wrongful conduct**</u> at the inception of the combination or agreement"*.  *Peavey v. WFAA-TV, Inc*., 221 F. 3d 158, 173 (5th Cir. 2000)(quoting *Triplex Communications Inc. v. Riley*, 900 S.W. 3d 716, 719 (Tex. 1995)(emphasis added).[14]  In *Peavey*, the Fifth Circuit held that summary judgment was not warranted because the evidence showed the

---

[12]  That said, Plaintiffs note that Defendants attach and, in fact, heavily rely on, extraneous evidentiary materials in an attempt to disprove knowledge and intent on the part of Sjoblom and Alvarado, which certainly would appear to, and should, trigger the Plaintiffs' right to delve fully into discovery on the merits of this case and test the Defendants' knowledge and intent argument via full discovery.  See Proskauer's Motion at 29.  Plaintiffs object once again to Defendants' "going outside the pleadings" and reliance on extraneous documents to attempt to prove or disprove the truth of the matter asserted therein with respect to knowledge or intent and once again request that the Court either ignore this evidence or allow Plaintiffs to engage in full discovery in this case in order to prepare a proper, evidence-based response.

[13]  Plaintiffs address Defendants' argument that there is no cause of action for conspiracy to violate the TSA in detail below.

[14]  Plaintiffs note that Defendants misinterpret the holdings in this line of cases (all of which were clearly intended to underscore that Texas law does not recognize a civil conspiracy to be negligent) by only highlighting the "aware of the harm" portion of the holding and obscuring the "<u>**or wrongful conduct**</u>" portion of the holding.

defendants were aware of the wrongful conduct, even if they didn't know the full extent of the illegality. *Id.*, at 173.

In order to prevail on a claim of civil conspiracy, a plaintiff must show that the defendant had the "'specific intent to agree to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means'". *Juhl v. Airington*, 936 S.W. 2d 640, 644 (Tex. 1996); *Triplex*, 900 S.W. 3d 716, 719. The Texas Supreme Court has made clear over the years that civil conspiracy is an intentional tort cause of action and, as such, requires intent because there is no cause of action for a conspiracy to be negligent. *See, e.g., Tri v. JTT and MT*, 162 S.W. 3d 552 (Tex. 2005)(no claim exists for conspiracy to be negligent); *Juhl*, 936 S.W. 2d 640 (Tex. 1996)(same). Of course, Plaintiffs do not allege a conspiracy to be negligent.

In a recent 2009 decision by Judge Melinda Harmon in the Enron litigation, Judge Harmon performed a painstaking review of Texas law on conspiracy in reaching her decision that J.P. Morgan/Chase could be held liable for Enron's fraudulent conduct as a co-conspirator under Texas common law of civil conspiracy. *In re Enron Corp. Securities Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 808-813 (S.D. Tex. 2009). In her decision, Judge Harmon noted that "[t]o impose liability on a defendant for civil conspiracy to defraud, plaintiff must establish (1) that there was such a conspiracy and (2) that the particular defendant…agreed with one or more of the conspirators about the claimed illegal object of the conspiracy and intended to have it brought about". *Id., at 809.*

Under Texas law, the conspiratorial agreement "need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details [of the conspiracy]; inferences of concerted action may be drawn from participation in the transactions." *Id.*, at 810 (citing *J.T.T. v. Chon Tri,* 111 S.W.3d 680, 684 (Tex. App.—Houston [1st Dist.] 2003) (*citing Bourland v. State,* 528 S.W.2d 350, 354 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.)), *reversed on other grounds, Tri,* 162 S.W.3d 552 (Tex.2005). Citing to federal criminal

conspiracy jurisprudence, Judge Harmon underscored that "[t]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him." *Id.*, (citing *United States v. Ashley,* 555 F.2d 462, 467 (5th Cir.1977), *cert. denied sub nom Leveriette v. United States,* 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977). She also pointed out that "it is axiomatic that it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id.* (citing *Ashley* at 468).

Furthermore, "a person may participate in a conspiracy without knowing the identities of all the other co-conspirators." *Id.*, *(citing United States v. Capo,* 791 F.2d 1054, 1066 (2d Cir.1986)). "[A] changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, 'slight evidence is all that is required to connect a particular defendant with the conspiracy.' " *Ashley,* 555 F2d at 467. "Further, even if this case does present circumstances of changing and overlapping membership and activities, they were all directed toward a common goal. In such circumstances, 'most courts have found, as we do here, sufficient evidence to uphold a jury verdict reflecting a single conspiracy.' " *Id. at 468 (citing United States v. Beasley,* 519 F.2d 233, 246 (5th Cir.1975)). In addition, "a co-conspirator is bound by the overt acts of other conspirators taken in furtherance of the conspiracy, whether or not said co-conspirator was a member of the conspiracy at the time...." *United States v. Thomas,* 686 F.Supp. 1078, 1087-88 (M.D.Pa.1988) (quoting *Ashley*).

Under Texas law, once a party joins a conspiracy, he is liable for all of the overt acts and wrongful conduct of his co-conspirators in the past and into the future. *Chemtron Corp. v. Business Funds Inc*., 682 F. 2d 1149, 1180 (5th Cir. 1982); *Tompkins v. Cyr,* 202 F.3d 770, 783 (5th Cir.2000)( "[E]ach of the losing defendants is jointly and severally liable for the actions of the others because all were found to be co-conspirators in a civil conspiracy."); *Mims v. Bohn*, 536 S.W. 2d 568 (Tex. App. – Dallas 1976); *Bourland*, 528 S.W. 2d 350 (Tex. App. – Austin 1975). This is true even though the defendant does not have actual knowledge of said overt acts or wrongful

conduct.  *Chemtron*, 682 F. 2d at 1179-1180.  In *Chemtron*, the Fifth Circuit held that a later-joining conspirator "takes the conspiracy as he finds it" and is liable for all acts previously or subsequently done in furtherance thereof.  *Id.*  In that respect, and because Plaintiffs' injury can be caused by any acts of a co-conspirator in furtherance of the conspiracy, the Defendants, if proven to have been conspirators, are liable to Plaintiffs "whether Plaintiffs' injury was substantially caused by [the Defendants'] actions or by a co-conspirator's".  *Enron*, 623 F. Supp. 2d at 832.  See also, *Greenberg Traurig of New York, P.C.,* 161 S.W. 3d 56, 89 (Tex. App. – Houston. [14th Dist.] 2005, no pet.)(evidence was sufficient to support a finding that Greenberg Traurig was part of a civil conspiracy and that fraudulent acts that caused damages to the plaintiffs were committed by other co-conspirators in furtherance of the conspiracy).

### 2.      Case Against Sjoblom and Proskauer 2006-2009

The Court can deny Proskauer and Sjoblom's Motions to Dismiss the conspiracy to defraud claim outright because they **admit** that Sjoblom learned in the first week of February that his client was engaged in a massive Ponzi scheme, and Plaintiffs have alleged that Sjoblom *still* continued to help Stanford Financial try and evade, impede and obstruct the SEC investigation thereafter.  See Proskauer Motion at 26; SAC at ¶80.

Plaintiffs allege that between February 3 and 6, 2009, Sjoblom learned that Allen Stanford had personally looted Stanford Financial to the tune of $1.6 billion.  SAC ¶80.  Despite having knowledge that Stanford had stolen over a billion dollars from his clients (including Plaintiffs), Sjoblom didn't resign but, instead, moved forward with the fraudulent plan to present Pendergest for testimony before the SEC as agreed during the January 21, 2009 meeting in Miami.  SAC ¶73-74.  The only thing that had changed was that now Sjoblom <u>knew</u> that Stanford was running a massive Ponzi scheme.  Yet he still proceeded to execute the fraudulent and obstructionist plan anyway, thereby joining the conspiracy to evade/conceal, which was linked to the Ponzi scheme conspiracy by Sjoblom's own knowledge of the existence of said Ponzi scheme.

This Court can also deny Proskauer and Sjoblom's Motion to Dismiss the conspiracy to defraud claim based on Plaintiffs' allegation that Sjoblom knew in late 2008 that Stanford Financial was committing a massive fraud on its clients with regard to disclosures about the composition of its investment portfolio.  SAC ¶72.  Plaintiffs have alleged that in late 2008, Sjoblom learned that SIB's CD investment portfolio included a *previously undisclosed* third tier of investments and learned in early January 2009 that said third tier included real estate investments and private equity, which he knew, through his prior review of SIB's disclosures, had not been disclosed to investors. *Id.*

Nevertheless, and despite being armed with this knowledge of fraud, Sjoblom proceeded to agree with his co-conspirators at the January 21st Miami meeting to lie to the SEC with the intent to impede and obstruct the SEC investigation.  SAC ¶73-74.  Thereafter, on January 22, 2009, Sjoblom proceeded to execute the agreed upon plan by lying to the SEC and informing the SEC that, *inter alia*, SIBL was "not a criminal enterprise" (even though by this time he knew Stanford was committing a massive fraud on the investors) and that "all assets are there."  SAC ¶75-76.  In doing so, he took an overt act in furtherance of the conspiracy to evade/conceal, which was linked to the fraud conspiracy by Sjoblom's own knowledge of the existence of said fraud in late 2008.

Furthermore, Sjoblom's participation in the conspiracy, and his understanding as to what the goal of the conspiracy was – to keep Stanford Financial alive and in business by keeping the SEC at bay –  is demonstrated by the fact that a few days later, when he reported back to his client representative, General Counsel Alvarado, he told Defendant Alvarado that the "actors" he had agreed to fraudulently present to the SEC, Pendergest-Holt and Rodriguez-Tolentino, needed to "***rise to the occasion***" because "***our livelihood depends on it***."  SAC ¶77-78.  Thus he knew that the intent of the conspiracy was to deceive the SEC enough to keep it at bay and so allow the Stanford Financial house of cards to continue intact.

Finally, this Court can deny Proskauer and Sjoblom's Motion to Dismiss the conspiracy to

defraud claim based on Plaintiffs' allegation that Sjoblom knew in September 25, 2006 that the FSRC's King had provided  Stanford and Alvarado with *another* confidential "Government-to-Government" communication from the SEC regarding the SEC's investigation of Stanford Financial, and that despite his knowledge of that regulatory infiltration by Stanford, Sjoblom thereafter wrote the SEC in an attempt to dissuade the SEC from pursuing its investigation of Stanford Financial because, based on Sjoblom's 20 years experience in SEC enforcement, the SEC could rely on the FSRC's regulation and examinations of SIB and there was therefore no basis for the SEC to seek more documentation on Stanford Financial's investment portfolio because Stanford Financial was not a fraud.  SAC ¶67-68.  *United States v. Mintmire*, 507 F. 3d 1273, 1291-1292 (11th Cir. 2007)(affirming conviction of attorney for obstruction of SEC investigation based on evidence that the lawyer had lied repeatedly to the regulators and tried to hide information from the SEC).

### 3.        *Case Against Sjoblom and Chadbourne 2005-2009*

Plaintiffs have alleged in this case that Sjoblom knew in 2005 that the way in which Stanford Financial was operating violated U.S. securities laws.  SAC at ¶62-65.  He also obviously knew that Stanford Financial was under investigation by the SEC for precisely those same alleged violations, because he was retained specifically to counter the SEC investigation.  SAC at ¶58-60. Plaintiffs also allege that Sjoblom knew from his visit to Antigua in 2005 that Stanford had a "cozy" relationship with the head of the FSRC, King, to such an extent that King was passing confidential "Government-to-Government" communications about the SEC investigation directly to Stanford. SAC ¶58, 62-65.

From his review of Stanford Financial's disclosures to its clients, Sjoblom knew that Stanford Financial was telling its investors that it was regulated by the SEC in the U.S. and by the FSRC in Antigua and compliant with the laws in both countries.  SAC at ¶62 (Sjoblom reviewed Stanford Financial's disclosures to investors); ¶40, 86-87, 90, 103-104, 109 (investor disclosures

misrepresented that Stanford Financial's operations were authorized and regulated by the SEC and FSRC, and omitted to disclose that Stanford Financial was illegally operating in violation of securities laws and was evading regulation by the SEC, and that SIB was not regulated or supervised by the Antiguan Government).  From his review of said disclosures in 2005, Sjoblom also knew that Stanford Financial had omitted to disclose to the investors like Plaintiffs that it was violating and/or, at the very least, evading compliance with, U.S. securities laws; or that it was under investigation by the SEC;  or that Stanford had such a "cozy" relationship with the head of the FSRC that King was "tipping" Stanford off about the SEC investigation.  SAC at ¶40, 62-65, 86-87, 90, 103-104, 109.  The bottom line is that Sjoblom knew that Stanford Financial was doing all of these things, and he also knew that the investors did not know that Stanford Financial was doing all of these things.

Plaintiffs further allege that, armed with the above-described knowledge of "wrongful conduct", and with the specific intent to help Stanford Financial delay and impede the SEC investigation and otherwise "make the SEC go away", Sjoblom agreed with Stanford to engage in acts designed to keep the SEC "at bay" by, *inter alia*, misrepresenting to the SEC the scope and nature of regulation of SIB by King and the FSRC in Antigua. Plaintiffs allege that after his trip to Antigua, in October 2005 Sjoblom sent a letter to the SEC in which he argued that the SEC did not have jurisdiction to regulate Stanford Financial's CD sales program because, *inter alia*, SIB was subject to "comprehensive" regulation in Antigua.  SAC ¶63-65.  Plaintiffs have alleged that Sjoblom's statements to the SEC about Antiguan law and the "comprehensive regulation" provided by the FSRC were false because Sjoblom had already been to Antigua and had met with Stanford and King and was aware that King was passing confidential, Government-to-Government regulatory communications concerning SIB to Stanford.  SAC ¶62, 64-65.[15]

---

[15]  Contrary to Defendants' arguments, Plaintiffs do not contend that Sjoblom committed direct fraud on them and do not contend that Sjoblom had a duty to disclose anything to them.  Plaintiffs' argument for joint and several liability is

### 4.   "Separate" Conspiracies

Despite federal precedent to the contrary, the Sjoblom Defendants attempt to separate and de-link the "regulatory evasion" portion of the conspiracy from the overarching "fraud and securities law violations" conspiracy.  The facts and the law do not support Defendants' argument.

Federal courts have routinely rejected the type of conspiracy "de-linking" argument advanced by the Sjoblom Defendants and, instead, have held that a conspiracy to conceal unlawful conduct becomes part of the underlying wrongful or fraudulent conspiracy where the concealment is a central and necessary component of the underlying fraud or wrongful conduct.  See *United States v. Sprecher*, 783 F. Supp. 133, 160 (S.D.N.Y 1992)(quoting *United States v. Maldonado-Rivera*, 922 F. 2d 934, 963 (2nd Cir. 1990) for the proposition that "*a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.*"); *Accousti v. McKay Wolas*, 1996 WL 1088218 at *2 (E.D.N.Y. 1996)(misrepresentations could "readily be viewed as efforts to conceal the Ponzi scheme" because "deceptions that stall or prohibit the discovery of the truth are material to the continuing vitality of the fraud").

The Fifth Circuit, in particular, has held that in many cases concealment becomes part of, necessary to, and in furtherance of an underlying fraud, including Ponzi schemes.  To wit, the Fifth Circuit held in *United States v. Del Valle* that:

> Second, the conspiracy here was not aimed at accomplishing a single objective with a precise moment of termination. This conspiracy had a continuing sequence of objectives. Third, the role of Davis in the conspiracy necessitated that he **protect it from those investigative agencies which threatened its continuation. *He was its shield.*** His attempts to influence witnesses were not acts of concealment related only to a past objective. They were parts of continuing activity that was essential to and therefore in furtherance of the survival of an ongoing operation. As this court recognized in <u>United States v. Diez</u>, *supra*, **concealment is sometimes a necessary part of a conspiracy**, **so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy**

premised on Sjoblom's commission of overt acts in furtherance of a conspiracy to obstruct an SEC investigation that places him in the middle of Stanford's regulatory evasion conspiracy.

*United States v. Del Valle*, 587 F. 2d 699, 704 (5th Cir. 1979); see also *United States v. Mann*, 161 F. 3d 840 (5th Cir. 1998)("the central aim of the conspiracy extended to conceal the fraudulent nature of the transaction in order to evade taxes and maintain control over the institution in the face of continual regulatory oversight. **Frustration of investigatory efforts…in a highly regulated environment was central to the conspiracy**"); *United States v. Upton,* 559 F. 3d 3, 13-14 (1st Cir. 2009)(acts of concealment that facilitate the central aim of the underlying conspiracy are in furtherance of the underlying conspiracy).

Plaintiffs have consistently alleged that Stanford Financial's ability to evade regulation across the globe was not only central, but absolutely essential to the continued vitality of Allen Stanford's Ponzi scheme fraud.  SAC ¶56, 111-113.

Furthermore, the facts of this case as alleged by Plaintiffs provide the "link" between the two alleged portions of the conspiracy that make them one – and the "link" is Sjoblom's knowledge itself.  To the extent that Sjoblom knew that Stanford Financial was committing fraud and violating securities laws, and also knew that Stanford Financial was engaged in a campaign to impede, delay or obstruct the SEC's investigation from 2005 through 2009, and that he was specifically hired to "stonewall" and keep the SEC "at bay" as part of that campaign, then the two conspiracies alleged by Defendants are united as one, because Plaintiffs have alleged, and the law itself directs, that the latter "subpart" was a necessary element of the former.  To "de-link" the two alleged sub-conspiracies, as the Sjoblom Defendants suggest, would be to validate another variation of the "*Sjoblom was lying to the SEC but he just didn't know why he was lying*" argument.

### 5.    *Conspiracy to Violate the TSA*

Finally, the Sjoblom Defendants argue that there is no liability for common law conspiracy to violate the TSA.  However, they cite no law for that proposition, and the TSA by its terms explicitly preserves all common law rights and remedies.  Art. 581-33(M).  Moreover, this Court in

*Biliouris v. Sundance Resources, Inc.* recognized that a violation of a Texas statute was sufficient to support a cause of action for civil conspiracy. See *Biliouris*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008)(citing *Laxson v. Giddens*, 48 S.W. 3d 408, 410-411 (Tex. App. – Waco 2001, pet. denied). See also, *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.*, 217 S.W. 3d 653, 667 (Tex. App. - Hous. [14th Dis.] 2006)(reversing summary judgment dismissing claim for conspiracy to violate the Texas Deceptive Trade Practices Act).

While the Fifth Circuit has never addressed this issue, it did render an opinion following a jury verdict in which it noted that one of the two "material" issues it was considering was a claim for conspiracy to violate the TSA. See *Huddleston v. Herman & Maclean*, 640 F. 2d 534, 539 (5th Cir. 1981). More recently, in 2001 the San Antonio Court of Appeals reviewed a district court's judgment following a jury trial in which a claim for conspiracy to violate the TSA had been submitted to the jury. *Crescendo Investments, Inc. v. Brice*, 61 S.W. 3d 465 (Tex. App.—San Antonio 2001). In doing so the court noted that the jury found several other settling parties were involved in a conspiracy. *Id.*, at 472. Later in the opinion the court noted that the conspiracy was a securities fraud conspiracy under the TSA, and one of the issues raised on appeal was the appellant's complaint about conflicting jury answers which found that the primary TSA violator did not violate the TSA but that the co-conspirators had engaged in a conspiracy. *Id.*, at 476-477. Thus Texas courts, both state and federal, have allowed a claim for conspiracy to violate the TSA to go to a jury.

### 6.       *Conclusion on Conspiracy*

Plaintiffs have sufficiently alleged that Sjoblom joined the conspiracy to defraud with regard to the securities regulatory evasion violations in 2005 (i.e., helped Stanford Financial evade the SEC with knowledge that Stanford was misrepresenting to investors the true nature and extent of regulation by the SEC and FSRC) and that he continued as a member of the conspiracy <u>even after</u> he learned in late 2008 that Stanford Financial was defrauding its investor clients with regard to the

composition of its investment portfolio and <u>even after</u> he learned in early February 2009 that Allen Stanford had stolen $1.6 billion from the investors.  Plaintiffs have also sufficiently alleged that Sjoblom engaged in overt acts designed to help conceal Stanford Financial's illegal conduct from the regulators from 2005 through February 2009.

In a similar case, the United States District Court for the Southern District of New York found the evidence "overwhelming" that an attorney had participated in a conspiracy with others to sell unregistered securities and make false statements to the SEC.  *United States v. Sprecher*, 783 F. Supp. 133, 159 (S.D.N.Y 1992).  In that case the attorney defendant, like the Sjoblom Defendants here, tried to dissect and splice one portion of the conspiracy from the overarching fraud conspiracy but the Court rejected the argument, citing Second Circuit precedent holding that "*a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance*."  *Id.*, at 160 (citing *United States v. Maldonado-Rivera*, 922 F. 2d 934, 963 (2nd Cir. 1990).  Relevant to the Defendants' arguments regarding causation, the Court, citing U.S. Supreme Court precedent, also held that it was *irrelevant* to the Court's finding whether the information concealed from the SEC was material or whether the defendant *succeeded* in his endeavor to obstruct, because all that was necessary was that the defendant "made an effort or essay to accomplish" the obstruction.  *Id.* at 164-165 (citing *United States v. Russell*, 255 U.S. 138, 143 (1921).

In a similar Texas case, the Houston 14th District Court of Appeals, in reviewing the sufficiency of evidence to support a jury verdict against the law firm for conspiracy, held that sufficient evidence existed to support the jury finding that the law firm had conspired to commit fraud, including (notably) evidence that the law firm (i) knew that its client had been in trouble with the SEC; (ii) knew that its client was selling unregistered securities; and (iii) knew, based on the number of securities sales, that there was no exemption to registration.  *Greenberg Traurig of New*

*York, P.C. v. Moody,* 161 S.W.3d 56, 89 (Tex. App.—Houston. [14th Dist.] 2005, no pet.). Responding to Greenberg Traurig's argument that the evidence was insufficient to prove that any alleged common objective or course of conduct resulted in damages to any of the plaintiffs (which is the same argument advanced by the Sjoblom Defendants in this case), the Court noted that under Texas law, "once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy". *Id.*, at 90 (citing *Akin v. Dahl*, 661 S.W. 2d 917, 921 (Tex. 1983)). The Court went on to hold that the evidence was sufficient to support a finding that Greenberg Traurig was part of a civil conspiracy and that fraudulent acts that caused damages to the plaintiffs were committed by *other co-conspirators in furtherance of the conspiracy. Id.*

As a result, if the jury returns a finding of conspiracy against the Defendants at trial in this case, Defendants are jointly and severally liable for all acts done by their co-conspirators at Stanford Financial in furtherance of Stanford's fraud and securities regulatory violation conspiracy committed previously or subsequently. *Tompkins,* 202 F.3d 770, 783 (5th Cir.2000)( "[E]ach of the losing defendants is jointly and severally liable for the actions of the others because all were found to be co-conspirators in a civil conspiracy."); *Mims*, 536 S.W. 2d 568 (Tex. App. – Dallas 1976)(once a party joins a conspiracy, he is liable for all of the overt acts and wrongful conduct of his co-conspirators in the past and into the future).

### E.    Aiding and Abetting Violations of the Texas Securities Act

Plaintiffs have alleged that Sjoblom knew since 2005 that Stanford Financial was operating as an unregistered investment company selling (and thereby acting as a "dealer") unregistered securities from the State of Texas in violation of federal and State of Texas securities laws. SAC ¶62-65.[16]

---

[16]     While not relevant to the Court's determination of the pending Motions, Plaintiffs note that the SEC has made the same essential allegation of violations of the Investment Company Act against SIB and SGC in the SEC

1.       *Overview of Texas Securities Act*

There is no question that the Texas Securities Act ("TSA") applies to the conduct and the transactions in question. See e.g., *Bailey*, 2008 WL 1914270 (Tex. App. – El Paso 2008)(CDs issued by offshore bank in Grenada were securities under TSA because, *inter alia*, Grenada did not have adequate regulatory scheme and had no deposit insurance plan).  Federal courts and Texas courts that have considered similar cases of offshore investment frauds being run from the United States have declared that one of the goals of the securities laws (both federal and state) is to prevent the United States from being "'used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.' " *Itoba Ltd. v. LEP Group PLC*, 54 F. 3d 118, 122 (2nd Cir. 1995)(quoting *Psimenos v. E.F. Hutton & Co.*, 722 F. 2d 1041, 1045 (2nd Cir. 1983);  See also, *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D. N.Y. 2001)(federal securities laws applied to offshore investment fund because the fraud was run from the United States).

The Texas Supreme Court has specifically applied the TSA to sales of unregistered securities to foreign investors to the extent marketing efforts occurred in Texas.  *Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430, 446 (Tex. 2007).  Plaintiffs have alleged that all marketing and sales activities were directed and controlled by Stanford Financial from Houston, Texas, such that the head of Stanford Financial's global sales force was located principally in Houston, Texas, and that therefore, sales of SIB CDs by SIB and Stanford Financial *worldwide* were made and controlled from Texas. SAC ¶20-25.   And other Texas appellate courts have recognized Texas' interest in preventing securities fraud schemes from using Texas as a base of operations.  *Gutierrez v. Deloitte & Touche,* 100 S.W. 3d 261, 274 (Tex. App. - San Antonio 2002, pet. dism'd)("Texas has

---

Action via their most recently filed Second Amended Complaint, and the SEC's interpretation of said statute is entitled to deference.  See Second Amended Complaint, at ¶128-131.  See e.g., *Chevron USA Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984)(mandating judicial deference to agency constructions of federal statutes).

---

a strong interest in assuring the integrity of investment firms that choose to operate in the state, and we cannot permit this state to be used as a base of operations by corporations seeking shelter from our securities laws"); *Deloitte & Touche Netherlands Antilles and Aruba v. Ulrich*, 172 S.W.3d 255, 269 (Tex.App.—Beaumont, 2005, pet. denied) (Texas has interest in claims arising from securities fraud involving offshore bank run from Houston where the group controlling the bank was based in Texas).

Courts are to construe the TSA "to effectuate its general purposes *to protect investors*." TEX. REV. CIV. STAT. art. 581-10-1B; *Shields v. State*, 27 S.W.3d 267, 273 (Tex. App. – Austin 2003, no pet.); *Anheuser-Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.— Dallas 1996, writ dismissed by agr.). The TSA is a remedial statute and should be given the widest possible scope. *Anheuser-Busch*, 934 S.W.2d at 708 (quoting *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex. 1971)).

## 2. *Elements of Aider/Abettor Liability under the TSA*

To state a claim for aider and abettor liability under the TSA a plaintiff must show (1) a primary violation of the securities laws, (2) that the aider and abettor has a general awareness of his role in the violation and (3) that the aider and abettor (i) directly or indirectly, (ii) with intent to deceive or defraud or with reckless disregard for the truth or the law, (iii) materially aided the primary violator in committing a violation of the Texas Securities Act. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008); *Bagby v. Rydex Investments,* 2007 WL 507042 (N.D. Tex. 2007).[17]

---

[17]     Both Chadbourne and Proskauer argue, either expressly or implicitly, that Plaintiffs must plead each and every element of an aiding and abetting claim with particularity under Rule 9(b).  There is no authority for this proposition.  *See Hildebrandt v. Indianapolis Life Ins. Co.*, No. 3:08-CV-1815-B, 2009 WL 877713, at *10, n.7 (N.D. Tex. 2009) (claim for aiding and abetting fraudulent scheme under Arizona law is not subject to Rule 9(b)); *Newby v. Enron Corp.* (*In re Enron Corp Sec. Derivative & "ERISA" Litig.*), 388 F. Supp.2d 780, 788 (S.D. Tex. 2005) (no mention by court of aiding and abetting allegations being subject to Rule 9(b) but specific reference to applicability of Rule 9(b) to common law and statutory fraud).  Proskauer's citation to *Dorsey*, as holding that Rule 9(b) applies to a claim of aiding and abetting under the TSA, is incorrect.  *See Dorsey*, 540 F.3d at 344 (court did not address applicability of Rule 9(b) to aiding and abetting claim).

The Texas Supreme Court has interpreted the requirement in Article 581-33F(2) that a defendant charged with aiding a securities violation must act with reckless disregard for the truth or the law to mean that the defendant must have general awareness of the primary violator's improper activities. *Sterling Trust Company v. Adderley,* 168 S.W.3d 835, 841 (Tex.2005). Thus "an alleged aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator." *Id.* at 841-42; *Bagby*, 2007 WL 507042 *3 (N.D. Tex. 2007) (in order to state claim for aiding and abetting under TSA, a plaintiff must aver that the defendant aided the primary violator even though he "knew there was a risk that [the primary violator] was deceiving or defrauding the plaintiff").

In a 2007 opinion in the *Enron* case, Judge Melinda Harmon (whose *Enron* decisions are relied on repeatedly by Defendants in their Motions) denied a plaintiff's motion for summary judgment against Merrill Lynch for aiding and abetting liability under the TSA by holding that the elements of a TSA aiding and abetting violation, including "general awareness", "substantial assistance", and "intentional or reckless" conduct, were "***at a minimum…questions of fact that should be left to the jury***." *In re Enron Corp. Securities, Deriv. & Erisa Lit*., 491 F. Supp. 2d 690, 698 (S.D. Tex. 2007).

Defendants argue that Plaintiffs make no factual allegation to support an inference that Sjoblom had "general awareness" of his role in Stanford Financial and SIB's violations of the TSA. In particular, Chadbourne argues with respect to its liability that the SAC only includes allegations that Sjoblom traveled to Antigua to meet with Stanford and King in August of 2005 and that Sjoblom reviewed SIB's disclosures to investors. While these facts would be sufficient to raise an inference of Sjoblom's general awareness of his role in Stanford's TSA violations, Plaintiffs' allegations are much more extensive than Defendants assert.

Plaintiffs have sufficiently alleged in the SAC that in 2005 Sjoblom had knowledge (or "general awareness" under the TSA) that he was involved in improper conduct based on his

knowledge that Stanford Financial was illegally operating as an unregistered investment company selling unregistered securities from Texas, and that it was under investigation by the SEC for precisely those activities.  SAC at ¶61-62, 65. Plaintiffs allege that Sjoblom was hired in 2005 by Stanford as part of a plan to evade and obstruct SEC investigations and that, at the time, Sjoblom had over 20 years of experience with SEC investigations and enforcement actions.  SAC ¶ 60. Plaintiffs allege that Sjoblom knew Stanford Financial was under investigation by the SEC and that he understood his role was to obstruct the SEC investigation to allow Stanford Financial and SIB to evade SEC regulation.  SAC ¶¶ 60, 62.

Furthermore, Sjoblom clearly knew that Stanford Financial was involved in improper activity when he met with SIB's purported principal regulator, King, in Antigua in 2005 and learned that King was relaying confidential Government-to-Government communications from the SEC, regarding the SEC's own investigation of Stanford Financial, to Allen Stanford directly.  SAC ¶¶ 62, 65, 67.  Plaintiffs further allege that, knowing these circumstances, and while employed at Chadbourne, Sjoblom sent false statements of law and fact to the SEC. SAC ¶¶ 63.  Thereafter, and while employed at Proskauer, Sjoblom told the SEC he was "well-equipped" to recognize the "hallmarks of fraud," then falsely stated that the SEC had "no basis" to continue its investigation and that SIB was an "incredible institution."  SAC ¶ 68.  Thereafter, Sjoblom continued to assist Stanford Financial and SIB to conceal information, including information regarding SIB's investment portfolio, despite knowledge that SIB had insufficient assets to be viable. (SAC ¶ 74-80).

As for the "substantial assistance" requirement, the Sjoblom Defendants argue that to satisfy this element Plaintiffs must allege a "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff."  But no such requirement exists under

the TSA.[18]  Cases construing the aider and abettor provisions of the TSA clearly set forth what must be pled to state a claim for aider and abettor liability, and causation is *not* an element. *See, e.g., Dorsey*, 540 F.3d at 344.  This is because, as discussed *infra* under "Causation", liability under the TSA is joint and several, such that causation derives from Stanford Financial's conduct as the primary violator.

Plaintiffs allege that Sjoblom's conduct substantially assisted Stanford Financial and SIB to sustain their ongoing violations of the TSA, because the false representations Sjoblom made to the SEC at a minimum forestalled earlier regulatory enforcement, and Defendants' conduct also prevented disclosure to investors about the true nature of regulatory supervision of Stanford Financial and its CD sales program. SAC ¶¶ 60, 62, 63 68.  Furthermore, the fact that Sjoblom's conduct did not permanently halt the SEC's investigations is irrelevant because, as the U.S. Supreme Court has held, all that is necessary is that the defendant "made an effort or essay to accomplish" the obstruction of the SEC's investigation.  See *United States v. Sprecher*, 783 F. Supp. 133, 164-165 (S.D.N.Y 1992)(citing *United States v. Russell*, 255 U.S. 138, 143 (1921).[19]

While what conduct constitutes "material" or "substantial" assistance in Texas has been left for the finder of fact to determine on a case by case basis, courts in several jurisdictions have established a standard definition in cases of common law aiding and abetting, notably New York, Florida and Ohio.  In said jurisdictions, a defendant aider/abettor renders "substantial assistance" when he "*affirmatively assists or **helps conceal***" the primary violator's wrongful conduct. See e.g., *Lerner v. Fleet Bank, N.A.*, 459 F. 3d 273, 295 (2nd Cir. 2006)(substantial assistance under New

---

[18]     All of Defendants' arguments are based on pre-1991 cases interpreting section 10(b) of the Securities Exchange Act.   But Texas courts have repeatedly held that the TSA is broader than the federal securities acts and must be given "the widest possible scope" in order to "protect investors".  *Texas Capital Securities v. Sandefer*, 58 S.W. 3d 60, 775 (Tex. App. – Hous. [1[st] Dis.] 2001); *Anheuser-Busch*, 934 S.W.2d at 708 (quoting *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex. 1971)).

[19]     Chadbourne also argues that Sjoblom could not have "substantially assisted" Stanford while he was a partner at Chadbourne because investors did not rely upon his letter.   Plaintiffs are not required to show they relied upon Sjoblom's letter.  *In re Enron Corp. Securities Derivative & "ERISA" Litig.*, 490 F. Supp.2d 784, 791, 821 (S.D. Texas 2007) ("Reliance is not an element of a TSA aider and abettor claim.").

York law occurs when a defendant affirmatively assists or helps conceal the wrongful conduct); *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1568-1569 (S.D. Fla. 1990)(aiding the concealment of a fraud constitutes aiding and abetting fraud under Florida law); *In re National Century Financial Enterprises Inc. Investment Litigation*, 604 F. Supp. 1128 , 1155-56 (S.D. Ohio 2009)(adopting New York definition).

In an unreported decision involving a Ponzi scheme that is directly on point, the United States District Court for the Eastern District of New York denied a motion to dismiss filed by an alleged aider/abettor defendant where the plaintiffs alleged that the alleged aider/abettor made just two (2) misstatements with the purpose of assisting the primary violator to conceal its wrongdoing. *Accousti*, 1996 WL 1088218 (E.D.N.Y. 1996).  The Court held that such misrepresentations could "*readily be viewed as efforts to conceal the Ponzi scheme*", which the Court found was material to the "*continuing vitality of the fraud*".  *Id.*, at *2 ("*deceptions that stall or prohibit the discovery of the truth are material to the continuing vitality of the fraud*").

Defendants also challenge Plaintiffs' pleading of *scienter*.  Plaintiffs address the *scienter* requirement in detail *infra*, and note that Judge Melinda Harmon held that obstruction of justice can be part of a Ponzi scheme concealment effort, and also is **evidence of scienter** for securities law violations. See *In re Enron Corp. Securities Litigation*, 284 F. Supp. 2d 511, 652 (S.D. Tex. 2003).

### 3.    *Aiding and Abetting Sales of Unregistered Securities*

Defendants argue that Plaintiffs cannot assert a claim based on SIB and Stanford Financial's sale of unregistered securities from Texas because the securities in question were exempt from registration under SEC Regulation D, Rule 506 and the National Securities Markets Improvement Act of 1996 ("NSMIA").  See 17 C.F.R. § 230.506.  While Plaintiffs allege that Stanford filed an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. residents through SGC brokers in the United States (SAC ¶ 36), merely filing a Form D, as required by 17 C.F.R. §

503, does not mean that the Regulation D exemption is available.[20]  Rule 506 states that one must also satisfy the other conditions of the Rule in order to be exempt.  Those conditions include meeting all of the "general conditions" contained in Rules 501 and 502 (17 C.F.R. §§ 230.501 & 502), limiting the number of sales to non-accredited investors, and assuring that each non-accredited investor (either alone or with his purchaser representatives) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment. Laying aside for the moment the impossibility of Stanford Financial's knowing that investors could adequately evaluate the risks of Stanford's Ponzi scheme, it is simply <u>not</u> Plaintiffs' burden to plead that Stanford Financial/SIB failed to comply with Regulation D in order to state a claim under the TSA that Stanford/SIB sold unregistered securities:

> It shall not be necessary to negative any of the exemptions in this Act in any complaint, information or indictment, or any writ or proceeding laid or brought under this Act; and the burden of proof of any such exemption shall be upon the party claiming the same.

Tex. Rev. Civ. Stat. Ann. art 581-37 (Vernon 1964).  Therefore, the alleged lack of a direct allegation that defendants failed to comply with Regulation D is not material or relevant to defendants' motion to dismiss, and Defendants' bear the burden in proving the exemption applies. See also, *Brown*, 481 F. 3d 901, 912 (6th Cir. 2007)(reversing summary judgment based on fact issue as to whether securities actually qualified for Reg. D exemption); *Swenson v. Engelstad*, 626 F. 2d 421, 425 (5th Cir 1980)(registration exemption is affirmative defense that must be raised and proven by the defendant).

Nonetheless, Plaintiffs allege elsewhere in their Second Amended Complaint that Stanford Financial at its height boasted 30,000 customers in 130 countries (SAC ¶ 14) and sold over $7.2

---

[20]  A Form D filing is a notice filing and is neither granted nor denied by the SEC.  Rather, exemption from registration under Regulation D depends upon compliance with such regulation in the offer and sale of the securities for which exemption is claimed.  See SEC Disclosure and Compliance Interpretation, Question 257.07 (January 26, 2009)(filing a Form D is not a condition to the availability of the exemption in Rule 506)  In that regard, plaintiffs withdraw their allegation that Sjoblom knew that SIB applied for and was *granted* a Regulation D exemption.  (SAC ¶ 65).  Plaintiffs request leave to amend their complaint to allege more precisely that Sjoblom knew that SIB had claimed a Regulation D exemption and that the CDs were not being offered or sold in compliance with the requirements thereof.

billion in SIB CDs by 2009 (SAC ¶ 19, 49) from and through its Houston, Texas, headquarters (SAC ¶ 20, 23).  Plaintiffs also allege that SIB sold between $4-5 billion in CDs between 2005 and February 2009 *alone* (SAC ¶ 49, 97) and that Plaintiffs and the class transferred billions of dollars to Stanford Financial for investment in the CDs (SAC ¶ 89).  Many of the class members, both U.S. and foreign, invested small amounts in SIB CDs (SAC ¶ 93-95).

The sheer number of alleged investors and the alleged low level of investment by many class members belie any assumption that Stanford/SIB complied with Regulation D by selling CDs solely to accredited U.S. investors or to 35 or fewer non-accredited investors.  By these allegations and the allegations that SIB/Stanford sold unregistered securities to Plaintiffs and class members, Plaintiffs have sufficiently raised claims regarding Stanford/SIB's noncompliance with the requirements of Regulation D, including the provisions thereof related to the permitted numbers of non-accredited purchasers as well as the means SIB/Stanford utilized in soliciting 30,000 investors.  See 17 C.F.R. § 230.506 (to be deemed a transaction not involving a public offering, and therefore exempt from registration, there can be no more than 35 non-accredited purchasers of securities); 17 C.F.R. § 230.502(c) (to qualify for exemption from registration under Regulation D, no general solicitation or general advertising is allowed).  Accordingly, Plaintiffs' claims that defendants aided and abetted the sale of unregistered securities should not be dismissed.

In addition, on December 31, 2009, representative Plaintiffs Troice and Punga Punga, individually and on behalf of a class of all Stanford investors, filed a Second Amended Class Action Complaint in a companion case filed in this Court and pending within the MDL, styled *Troice, et al. v. Willis of Colorado, Inc., et al.*, Civil Action No. 3:09-cv-01274-L, (the "Willis Complaint") in which they specifically allege that SIB and Stanford Financial failed to comply with Regulation D in the offer and sale of SIB CDs, thereby rendering ineffective the purported exemption of these securities from registration.  See Willis Complaint, ¶ 121.  Plaintiffs request that the Court either take judicial notice of the allegations made by these same Plaintiffs concerning the same securities

and same issues in the Willis Complaint, or, in the alternative, grant them leave to amend their complaint in this action to incorporate the same allegations with respect to Stanford Financial's failure to comply with Regulation D as it relates to Defendants' actions in aiding and abetting Stanford Financial's sale of unregistered securities to Plaintiffs and the Class.

Absent an exemption from registration, the SIB CDs were sold from Texas as unregistered securities, thus triggering liability under the Texas Securities Act.  See, e.g., *Citizens Ins. Co. of America v. Daccach,* 217 S.W.3d 430, 446-447 (Tex. 2007) (applying Texas Securities Act to sales of unregistered securities to foreign investors to the extent marketing efforts occurred in Texas); see also *Bailey*, 2008 WL 1914270 (Tex. App.—El Paso 2008) (CDs issued by offshore bank in Grenada were securities under TSA because, *inter alia*, Grenada did not have adequate regulatory scheme and had no deposit insurance plan).  Moreover, and based on the above, the CDs were not "covered securities" under the National Securities Markets Improvement Act of 1996 (NSMIA), 15 U.S.C. § 77r(b)(4)(D). *Brown v. Earthboard Sports USA Inc*., 481 F. 3d 901, 912 (6th Cir. 2007)(whether securities actually qualify for Reg. D exemption is question of fact and is affirmative defense for which defendants carry the evidentiary burden).  Because the CDs were not covered securities, the failure of SIB and Stanford Financial to register them in accordance with the Texas Securities Act is actionable as a violation of the TSA and not preempted by the NSMIA.  Tex. Rev. Civ. Stat. Ann. art. 581-7A (Vernon Supp. 2009); 15 U.S. C. § 77r(a)(1).

### 4.   *Aiding and Abetting Sales by Unregistered Dealer*

Plaintiffs allege that SIB and Stanford Financial offered and sold securities to Plaintiffs and class members without being registered as dealers in violation of the Texas Securities Act.  SAC ¶99.  Plaintiffs further allege that the head of Stanford Financial's global sales force was located principally in Houston, Texas, and that Stanford Financial/SIB did not have a sales force or

marketing arm in Antigua.   (SAC ¶20).[21]   Stanford Financial's activities in Texas included developing and disseminating **all** of the group's sales and marketing activities and promotional materials and bringing its global sales force to Texas for mandatory sales and marketing training. SAC ¶22-24.   Therefore, sales of SIB CDs by SIB and Stanford Financial *worldwide* were made and controlled from Texas.   These are the same factors relied upon by the Texas Supreme Court to constitute dealing in securities as an unlicensed dealer in Texas.   See *Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430, 447 (Tex. 2007).

Defendants contend that all sales were made through an affiliated, Houston-based company, SGC, and that SGC was a registered broker-dealer in Texas.   Citing art. 581-4C of the Texas Securities Act, they argue that because SGC was a registered dealer, SIB was not required to register as a dealer and that plaintiffs thereby fail to state a claim with respect to sales of the CDs by an unregistered dealer.   See Tex. Rev. Civ. Stat. Ann. § 581-4C (Vernon Supp. 2009).

However, Plaintiffs allege that a large majority of CD sales were also made from Texas directly by SIB, the issuer of the CDs, and/or Stanford Financial, <u>not</u> through SGC.   SAC ¶ 101. Under the Texas Securities Act, "[a]ny issuer other than a registered dealer of a security or securities, who, directly or through any person or company, other than a registered dealer, offers for sale, sells or makes sales of its own security or securities shall be deemed a dealer and shall be required to comply with the provisions hereof; …."   Tex. Civ. Stat. Ann. § 581-4C (Vernon Supp. 2009).

While some sales of CDs may have occurred through SGC, which was a registered dealer in Texas, Plaintiffs allege that Stanford Financial sold the SIB CDs worldwide not only through SGC but also through a web of different Stanford promoter companies in different countries, the sales and marketing activities of which were all controlled by Stanford Financial from Houston, Texas.

---

[21] Defendants misleadingly omit "in Antigua" from their argument that the complaint alleges that "SIB itself never had a sales force or marketing or promotional arm" ("Proskauer's Motion to Dismiss, p. 41).

SAC ¶14-24.  As a result, there is a fact issue as to whether or not Stanford Financial was acting as a dealer selling securities from and through Texas based on the fact that Plaintiffs have alleged that all marketing and sales activities were directed and controlled by Stanford Financial from Houston, Texas.  SAC ¶20-25.  See *Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430, 447 (Tex. 2007)(fact issue as to whether sales of securities to foreign nationals occurred in Texas based on substantial marketing efforts taking place in Texas).  Therefore, Plaintiffs have alleged viable claims that all direct offers and sales by Stanford Financial of the SIB CDs to Plaintiffs and class members were made as an unregistered dealer in violation of the Texas Securities Act and that Defendants aided and abetted such offers and sales.

### 5.      *Aiding and Abetting Sales of Securities Using Untruths and Material Omissions*

Plaintiffs' case against Defendants for aiding and abetting the sales of securities using "untruths and material omissions" is simple:  Plaintiffs allege that Stanford Financial deceived and misled them about the nature and scope of governmental regulation, both in the U.S. (SEC) and Antigua (FSRC), of its CD sales program in order to induce them to buy the CDs, and Plaintiffs allege that Defendants (i) knew about the deceit and omission of material facts and (ii) nevertheless assisted Stanford Financial to evade and obstruct regulation from 2005 through 2009.  As discussed above and throughout this Response, Plaintiffs have pled sufficient facts to raise inferences that Plaintiffs' theory of liability is both factually and legally plausible.

The Sjoblom Defendants argue that Plaintiffs fail to allege that Sjoblom "intended to deceive" Plaintiffs because they did not allege that Sjoblom had a motive to do so beyond receiving anything more than "ordinary fees."  The Sjoblom Defendants cite no case in which motive must be pled to state a claim for aider and abettor liability under the TSA; neither the TSA nor case law

interpreting the TSA impose such a requirement.   Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(2) (Vernon Supp. 2009); *Dorsey*, 540 F.3d at 344.[22]

The Sjoblom Defendants also argue that Plaintiffs have failed to allege facts demonstrating that Sjoblom acted with "reckless disregard for the truth or law."  "[R]eckless disregard for the truth or law means that an alleged aider can only be held liable if it rendered assistance in the face of a <u>perceived risk</u> that its assistance would facilitate untruthful or *illegal activity* by the primary violator."   *Sterling Trust Co.*, 168 S.W.3d 835, 842 (Tex. 2005) (internal quotations omitted)(emphasis added).  Importantly, "[t]his standard does <u>not</u> mean that the aider must know of the *exact* misrepresentations or omissions made by the seller, but it does mean that the aider must be subjectively aware of the primary violator's **improper activity**."   *Id.* at 837 (emphasis added). Plaintiffs have repeatedly alleged that Sjoblom was subjectively aware of illegal and improper activity by Stanford.   See generally *supra*.   Plaintiffs have alleged that other persons without Sjoblom's experience and knowledge about securities laws easily perceived that SIB was operating outside the law.  SAC ¶¶ 38.  Sjoblom's actions were, at the very least, in reckless disregard for the truth and the strictures of the TSA.

Proskauer also argues that "plaintiffs affirmatively plead facts that are fundamentally at odds with, and directly negate, any inference that Sjoblom or Proskauer formed an intent on or after February 5, 2009 to harm or deceive investors through the fraudulent sale of CDs."  This argument relates to Sjoblom's and Proskauer's February 12, 2009 withdrawal from representation of Stanford Financial and SIB and attempted disavowal of their actions for the prior four years.  Sjoblom's efforts to "right the ship" after the scheme was exposed, and after he had engaged in evasion and obstruction, were disingenuous and underscore Sjoblom's knowledge of Stanford's illegal activities and the consequences of his aiding and abetting such activities.  *In re Enron Corp. Securities*

---

[22]      Defendants' argument also ignores federal precedent on this subject, which holds "conscious behavior" as sufficient for a finding of *scienter* without the necessity of proving motive.  See discussion *infra*.

*Litigation*, 284 F. Supp. 2d 511, 652 (S.D. Tex. 2003) (obstruction of regulatory investigation is evidence of scienter for securities law violations). At the very least, Sjoblom's late-stage exculpatory conduct raises questions of fact that compel this case to go forward to the discovery stage.

**F.      Aiding and Abetting Fraud/Participation in a Fraudulent Scheme**

The Defendants argue generally that Texas law does not recognize a cause of action for common law aiding and abetting that is separate from a claim for civil conspiracy.  But Texas courts disagree.

### 1.      Aiding and Abetting/Participation in Fraud is Separate from Conspiracy

It has long been the law in Texas that "each party to a fraudulent scheme is responsible for the acts of the other participants done in furtherance of the scheme and ***liable for fraud***".[23]  Aiding and abetting and conspiracy are different methods of imposing participatory liability.  *See generally* O'CONNOR'S TEXAS CAUSES OF ACTION (2009) Chapter 40-40C (attached as **Appendix Exhibit "A"**, App. pp. 1-17).  Thus, both theories are methods of expanding the pool of defendants to those who assisted in wrongdoing. Texas has at least four methods of imposing participatory liability: assisting or encouraging (aiding), assisting and participating (abetting), concert of action, and conspiracy.  *Id*. at Chart 40-1, App. 3 (chart outlining and contrasting the elements of all four).  The first three are based on section 876 of the Restatement of Torts (Second), subsections (b), (c), and (a) respectively.  *Id*. at ch. 40-A, App. 4-11 (assisting or encouraging (aiding)), ch. 40-B, App. 12-13 (assisting and participating (abetting), ch. 40-C, App. 15-17 (concert of action); *see also Juhl*, 936 S.W.2d 640, 643-44 (Tex. 1996) (distinguishing the elements of §§ 876(a) with §§ (b) and noting that the latter requires that the defendant provide "substantial assistance").

---

[23]   *In re Arthur Andersen LLP*, 121 S.W. 3d 471, 481 (Tex. App. – Hous. [14th Dis.] 2003, orig. proceeding [mand. Denied]);*Skrepnek v. Shearson Lehman Bros. Inc*., 889 S.W. 2d 578, 580 (Tex. App. – Hous. [14th Dis. 1994, no writ); *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 202 (Tex. App.—San Antonio 1991, no writ); *Crisp v. Southwest Bancshares Leasing Co*., 586 S.W. 2d 610, 615 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.) (citing *Jernigan v. Wainer*, 12 Tex. 189, 194 (1854).

Conspiracy, however, has different elements from aiding and abetting, such as requiring that the defendant had a specific intent to agree to accomplish the wrongful goal and *not requiring actual participation in the wrong*.[24]   As O'Connor's distinguishes, "concert of action" has different elements than both aiding and abetting each do, but some courts have merged the concepts.[25]

### 2. *Texas courts have long recognized and applied aiding and abetting liability to underlying torts.*

Many Texas courts have recognized and applied aiding and abetting a tort claim.  As early as 1942, the Supreme Court of Texas held that a third party who knowingly participates in a breach of fiduciary duty becomes a joint tortfeasor to that breach.  *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d 509, 515 (1942).  The Court did not retreat from that holding over the years.  *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969) (holding same).

Much like the securities fraud context of this case, decades ago a Texas court applied aiding and abetting in a case concerning fraudulent sale of bonds.  *King v. Shawver*, 30 S.W.2d 930, 932 (Tex. Civ. App. – 1930, no writ) (upholding a jury question on aiding and abetting the fraudulent sale of bonds).  Moreover, the Dallas Court of Appeals has applied aiding and abetting to other underlying torts, such as assault.  *Stein v. Meachum*, 748 S.W.2d 516, 518-19 (Tex. App. – Dallas 1988, no writ).

Finally, the Fifth Circuit has implicitly recognized a cause of action for aiding and abetting fraud by holding that the limitations period applicable to such a claim of aiding and abetting fraud is the same as the underlying tort of fraud – four years.[26]

As for whether or not Plaintiffs have sufficiently alleged the elements of this cause of action, Plaintiffs will not repeat all of their allegations described herein, but submit that based on the above,

---

[24]  O'CONNOR'S at Ch. 40-1; *see also Juhl*, 936 S.W.2d at 644 (comparing civil conspiracy with concert of action).

[25]  O'CONNOR'S at Ch.  40-1; *see also Shinn v. Allen*, 984 S.W.2d 308 (Tex. App. – Houston [1st Dist.] 1998, no pet.) (applying Section 876(b) of the Restatement (aiding) but calling the claim "concert of action," and finding summary judgment proper on a claim against the passenger and passive drinking companion of a drunk driver).

[26]  *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 647 (5th Cir. 1999).

they have adequately alleged that Defendants knew Stanford Financial was defrauding investors like Plaintiffs with respect to the nature of its compliance with regulatory authorities in the United States and Antigua, and that Defendants engaged in conduct designed to help Stanford Financial continue to evade regulatory scrutiny by the SEC (in the case of all Defendants) and Caribbean regulators (in the case of Alvarado). And as described above, said conduct constitutes "substantial assistance" under the laws of several jurisdictions.  See e.g., *Lerner*, 459 F. 3d 273, 295 (2nd Cir. 2006)(substantial assistance under New York law occurs when a defendant affirmatively assists or ***helps conceal*** the wrongful conduct); *Accousti*, 1996 WL 1088218 (E.D.N.Y. 1996)("*deceptions that stall or prohibit the discovery of the truth are material to the continuing vitality of the fraud*"); *Tew*, 728 F. Supp. 1551, 1568-1569 (S.D. Fla. 1990)(aiding the concealment of a fraud constitutes aiding and abetting fraud under Florida law); *National Century*, 604 F. Supp. 1128 , 1155-56 (S.D. Ohio 2009)(adopting New York definition).

## G.      Knowledge/Intent

Defendants all attack the knowledge and intent elements of all of Plaintiffs' causes of action. Plaintiffs have already addressed the issue of Defendants' knowledge, *supra*, and believe that they have also addressed intent, but nevertheless offer the following as further support.

### *1.      Rule 9(b)*

Rule 9(b), which requires allegations of fraud to be pleaded with particularity, is intended to "facilitate a defendant's ability to respond to and prepare a defense to charges of fraud."  *SEC v. Sharp Capital, Inc.*, 1999 WL 242691, at *2 (citing *Guidry v. Bank of LaPlace*, 740 F. Supp. 1208, 1216 (E.D. La. 1990), *aff'd*, 954 F.2d 278 (5th Cir. 1992)). What constitutes particularity will necessarily differ with the facts of each case.  *Benchmark*, 355 F.3d 356 (5th Cir. 2003); *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir.1997). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were

fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir.2005); *SEC v.Reynolds*, 2008 WL 3850550 (N.D.Tex. 2008).

Rule 9(b) does <u>not</u> require "punctilious pleading detail."  *SEC v. Brady*, 2006 WL 1310320, at *3 (N.D. Tex. May 12, 2006) (quoting *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 273 (N.D. Tex. 1990)). Rule 9(b) does not require plaintiffs to plead detailed evidence or state all facts relevant to the case.  *Sharp,* 1999 WL 242691, at *2 (citing *SEC v. Diversified Indus. Inc.,* 465 F. Supp. 104, 111 (D.D.C. 1979) (stating that the "details of the scheme" were sufficient because they adequately apprised the defendants of the basic transactions and enabled them to prepare a defense)). Rather, Rule 9(b), "read in conjunction with Rule 8, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," *Brady*, 2006 WL 1310320, at *3, merely requires a plaintiff to plead facts "analogous to the first paragraph of a newspaper story, 'namely the who, what, when, where and how.'" *Id,*(quoting *Melder v. Morris*, 27 F.3d 1097, 1100 N.5 (5th Cir. 1994)).

Moreover, "the second sentence of Rule 9(b) relaxes the particularity requirement for conditions of the mind, such as scienter: 'Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.' " *Tuchman v. DSC Commc'ns Corp.,* 14 F. 3d 1061, 1068 (5th Cir. 1994)(quoting Fed.R.Civ. P. 9(b)). "Although Rule 9(b) expressly allows scienter to be 'averred generally', simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)." *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994). "The plaintiffs must set forth *specific facts* supporting an inference of fraud." *Id.* "Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud **or** (2) identify circumstances that indicate ***conscious behavior*** on the part of the defendant." *Herrmann Holdings Ltd. v. Lucent Technologies, In.,* 302 F.3d at 552, 565 (5th Cir. 2002)(internal quotations omitted).

Plaintiffs' "direct" fraud case is against Stanford Financial and its related companies and principals, who are not parties to this case.  Given the SEC Action, Davis Plea, and the fact that

Allen Stanford is in prison, there is no risk of impugning Stanford Financial's reputation, which, as this Court noted, is one of the principal concerns underlying Rule 9(b).  *Tigue Investments Co. Ltd v. Chase Bank of Texas, NA*, 2004 WL 3170789 *2 (N.D. Tex. 2004). The other concerns underlying Rule 9(b) articulated by the Fifth Circuit in *Tuchman*, reduction in the number of strike suits and preventing plaintiffs from filing baseless, "fishing expedition" suits in order to achieve discovery to find real wrongdoing, simply are not present in this case.

As described above, Plaintiffs submit that they have adequately alleged the "who, what, when" facts as to ***Defendants' "conscious behavior"*** and participation in the underlying fraud and conspiracy of Stanford Financial sufficient for these Defendants to file an Answer, and that the SAC, and the exhibits attached thereto, coupled with the "totality of the circumstances" and this Court's knowledge of the massive fraud committed by Stanford, satisfy the pleading requirements of 9(b).

As for the allegations of the underlying fraud by Stanford Financial, in this case Plaintiffs have alleged misrepresentations and omissions of material fact that were made uniformly to *all* investors of Stanford Financial over a period of many years.  With regard to omissions of facts like non-compliance with the Investment Company Act, sales of unregistered securities and the existence of the SEC investigation, such omissions were "made" (if such a term can be used) or not disclosed by multiple persons at Stanford Financial on a continual basis throughout the existence of Stanford Financial, and definitely during the 2005-2009 time period.  Given the nature of this case and the nature of the massive fraud involving continuous and consistently uniform misrepresentations and omissions alleged, Plaintiffs believe that they have adequately plead under 9(b).[27]

---

[27]    To the extent the Court determines that Plaintiffs have not adequately alleged the "who, what, when and where" of what Plaintiffs were told, either verbally or through the Stanford Financial written promotional materials, or (more importantly) what was ***not*** disclosed to them about Stanford Financial's compliance or noncompliance with U.S. securities regulations, then Plaintiffs hereby request leave to amend to address and correct that issue.

2.      *Knowledge*

In the pre-*Central Bank* case law relied on by Defendants, including *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), the Eighth Circuit set the standard for the knowledge requirement in an aiding and abetting securities fraud case by holding that the knowledge and substantial assistance elements "should be considered relative to one another ... [and] 'where there is a minimal showing of substantial assistance, a greater showing of scienter is required.'" *Id.* at 624 (quoting *Stokes v. Lokken,* 644 F.2d 779, 784 (8th Cir. 1981) and citing *Woodward v. Metro Bank of Dallas*, 522 F. 2d 84, 95 (5th Cir. 1975)).   In another case relied on by Defendants, the Eighth Circuit held that "[a] party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge" (citing  *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1010 (11th Cir.1985)).  *Camp v. Dema*, 948 F. 2d. 455, 459 (8th Cir. 1991).   "Conversely, a party whose actions are routine and part of normal everyday business practices would need a higher degree of knowledge for liability as an aider and abettor to attach".  *Id.* See also, *FDIC v. First Interstate Bank of Des Moines*, NA, 885 F. 2d 423 (8th Cir. 1989)(knowledge element for aiding and abetting satisfied when the aider/abettor knows that the conduct of its principal is unlawful and that its own role is part of an overall improper activity).

Plaintiffs have adequately alleged the Defendants' knowledge, including that:

(1) Sjoblom knew in 2005 that the FSRC's King was passing confidential, Government-to-Government communications regarding the SEC investigation directly to Stanford, which certainly is evidence that the relationship between Stanford and King was (to say the least) "improper", and which surely raised serious questions about the legitimacy of Antiguan regulation of SIB (SAC ¶62-65);

(2) In 2006, Sjoblom confirmed his knowledge of the King-Stanford "relay" when he wrote the SEC that he had "heard through the grapevine" about the SEC's confidential requests to the FSRC (SAC ¶67-68);

(3) Sjoblom knew in 2005, based on his 20 years at the SEC and based upon his understanding of Stanford Financial's business model and operations, that Stanford Financial was operating illegally as an unregistered investment company in violation of the Investment Company Act and that it was selling unregistered securities (SAC ¶58-62, 65);

(4) Sjoblom knew from his review of the disclosures to the investors that Stanford Financial had not disclosed to its investor clients that it was operating in violation of the Investment Company Act and selling unregistered securities; or that it was under investigation by the SEC; or that Stanford Financial was engaged in a long running campaign to evade regulatory scrutiny in both the United States and Antigua (SAC ¶62 (Sjoblom reviewed Stanford Financial's disclosures to investors); ¶40, 86-87, 90, 103-104, 109 (investor disclosures misrepresented that Stanford Financial's operations were authorized and regulated by the SEC and FSRC, and omitted to disclose that Stanford Financial was illegally operating in violation of securities laws and was evading regulation by the SEC, and that SIB was not regulated or supervised by the Antiguan Government);

(5) Sjoblom also knew from his review of the investor disclosures that Stanford Financial was representing to the investors that it was subject to regulation by the SEC in the United States and the FSRC in Antigua, without telling the investors that it was, in fact, evading regulation in both countries (*Id.*);

(6) Sjoblom knew by late 2008 that Stanford Financial was not only violating U.S. securities law registration requirements, but was also engaged in outright securities fraud with regard to its disclosures to its investors about the composition of its portfolio (SAC ¶72);

(7) Sjoblom knew in the first week of February 2009 that Allen Stanford had looted some $1.6 billion from the investors via Stanford Financial (SAC ¶80).

None of the above can be described as "routine business transactions".  Sjoblom knew he was engaged in improper conduct and his actions to impede and obstruct the SEC investigation provide further proof of his knowledge and his intent.  See, e.g., *Enron*, 284 F. Supp. 2d 511, 652 (S.D. Tex. 2003)(obstruction of justice was part of Ponzi scheme concealment efforts and was evidence of scienter for securities law violations).

### 3.      *Intent*

Again, in order to satisfy Rule 9(b), Plaintiffs must allege facts sufficient to support an inference of intent to defraud by alleging facts that show either (i) that the defendant had a motive

to commit fraud *or* (ii) *conscious behavior* on the part of the defendant.  In this case, Plaintiffs have clearly alleged conscious misbehavior on the part of these Defendants.

At any rate, "[w]hether a given intent existed is generally a question of fact appropriate for resolution by the trier of fact."  See e.g., *Press v. Chemical Investment Services Corp.*, 166 F. 3d 529, 538 (2nd Cir. 1999).  As such, intent is a question of fact not appropriate for resolution by a 12(b)(6) motion to dismiss.  *Jenkins v. Mercantile Mortg. Co.*, 231 F. Supp. 2d 737, 752 (N.D. Ill. 2002); *Prospect High Income Fund v. Grant Thornton*, 203 S.W. 3d 602, 616-617 (Tex. App. – Dallas 2006)(whether auditor issued audit reports "with the necessary intent to constitute a fraud, conspiracy, or aiding and abetting is a fact question unamenable to summary judgment).

Moreover, even under the more stringent, "heightened" pleading requirements of the PSLRA, which do not apply in this case, the federal courts have allowed an inference of intent to be established through a showing of recklessness.  See e.g., *Rolf v. Blyth, Eastman Dillon & Co. Inc.*, 570 F. 2d 38 (2nd Cir.)(cert. denied, 439 U.S. 1039 1978)(proof of a defendant's knowledge or intent will often be inferential and…of necessity cast in terms of recklessness); *South Cherry Street LLC v. Hennessee Group LLC*, 573 F. 3d 98 (2nd Cir. 2009).  *See also Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. at 308 (2007) ("Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement" for civil liability under § 10(b) and Rule 10b-5 "by showing that the defendant acted [either] intentionally or recklessly").

In its recent 2009 decision in *South Cherry*, the Second Circuit expounded upon its definition of what constitutes recklessness sufficient to infer intent and knowledge, by referring to conduct that "'at the least ... is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it,'".  *South Cherry*, 573 F. 3d 98, 108-110 (2nd Cir. 2009)(citing *In re Carter-Wallace, Inc. Securities Litigation,* 220 F.3d 36, 39 (2d Cir.2000) (emphasis in the original)); or to evidence that the "defendants failed to review or check *information*

*that they had a duty to monitor,* or **ignored *obvious* signs of fraud,**" and hence "should have known

that they were misrepresenting material facts," *Id.*, (citing *Novak v. Kasaks,* 216 F.3d 300, 308 (2nd

Cir. 2000)(emphases added)). "An *egregious* **refusal to see the *obvious*,** or to *investigate the*

*doubtful,* may in some cases give rise to an inference of ... recklessness**.**" *Chill v. General Electric*

*Co.,* 101 F.3d 263 (2d Cir. 1996) (internal quotation marks omitted)(emphases added); *see, e.g.,*

*SEC v. McNulty,* 137 F.3d 732, 741 (2nd Cir. 1998)(defendant corporate officer who prepared and

proceeded to file documents with the SEC containing statements whose veracity he himself had

questioned, had an obvious duty to verify the suspicious information).

Under the heightened pleading requirements of the PSLRA, which, again, are not applicable

here, litigants and courts need not "and should not employ or rely on magic words such as motive

and opportunity' " with respect to intent; but that a strong inference of the requisite state of mind:

> may arise where the complaint sufficiently alleges that the defendants: (1)
> benefited in a concrete and personal way from the purported fraud ...; (2) engaged
> in deliberately illegal behavior ...; (3) knew facts or had access to information
> suggesting that their public statements were not accurate ...; or (4) failed to check
> information they had a duty to monitor....

*Novak*, 216 F. 3d 300, 307-309 (2nd Cir. 2000).

Like the Second Circuit, the Fifth Circuit long ago adopted the recklessness standard for

scienter under the federal securities laws.  See *Huddleston*, 640 F. 2d 534, 545 (5th Cir. 1981);

*Rubinstein v. Collins*, 20 F. 3d 160, 169 (5th Cir. 1994)(scienter can be proven by "reckless

indifference" which "involves an extreme departure from the standards of ordinary care, and that

present a danger of misleading buyers…which is either known to the defendant or is so obvious that

the defendant must have been aware of it").

As this Court knows, "recklessness" (coupled with "general awareness") is also the standard

under the TSA.  See e.g., *Enron*, 2006 WL 3716669, at *8, fn 8 (S.D.Tex. 2006)).  Specifically, the

TSA defines an aider as one "who directly or indirectly with intent to deceive or defraud or with

*reckless disregard* for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.,*

citing art. 581-33F(1)-(2).  The Texas Supreme Court has held that the Act's "scienter requirement of 'reckless disregard for the truth or the law' standard means that an alleged aider can only be liable if it rendered assistance 'in the face of a perceived risk,' that its assistance would facilitate untruthful or illegal activity by the primary violator.... In order to perceive such a risk, the alleged aider must possess a general awareness that his role was part of an overall activity that is improper.'"  *Sterling,* 168 S.W.3d 835, 842 (Tex.2005).  Moreover, the TSA does not require the aider to have had direct dealing with the defrauded investor. *Id.* at 843.

In this case, Plaintiffs have alleged that Defendants knowingly engaged in conduct designed (and thereby with the intent) to help Stanford Financial evade U.S. securities regulations, including obstructing an SEC investigation.  Plaintiffs believe that they have alleged far more than, but at the very least, recklessness, on the part of these Defendants.

## H.    Causation

Defendants attack the proximate cause element of each of Plaintiffs' causes of action.

Once again, and like many of their other arguments, the issue of proximate cause is generally a question of fact preserved for a jury.  See, e.g., *Pace v. Swerdlow*, 519 F. 3d 1067, 1073-1074 (10th Cir. 2008)(reversing dismissal of case under 12(b)(6) because, under applicable Utah law, issue of proximate cause is reserved for the jury).  Under Texas law, the issue of causation is generally a question of fact for the jury.  See e.g., *Flock v. Scripto-Tokai Corp.,* 319 F.3d 231, 237 (5th Cir.2003) ("Under Texas law, causation generally is a question of fact for the jury."); *Texas Department of Transportation v. Olson,* 980 S.W.2d at 890, 893 (Tex. App.— Fort Worth 1998, no pet.) ("The question of proximate cause is one of fact particularly within the province of a jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances.").

Moreover, Defendants' arguments on proximate cause appear to overlook the vicarious liability nature of Plaintiffs' causes of action.  The bottom line is that Plaintiffs do not have to prove that Defendants' conduct, in isolation, caused them damages, as Defendants urge.  Rather, Texas

law is clear that all Plaintiffs have to prove is that Defendants aided and abetted and conspired with

Stanford Financial, thereby making Defendants liable for Stanford Financial's conduct, which latter

conduct proximately caused Plaintiffs' damages.

The exact same argument made by Defendants herein was rejected in Judge Harmon's

recent decision in Enron, wherein Judge Harmon noted that "in an effort to narrow its potential

liability, the JP Morgan Chase erroneously argue that it can only be liable for damages caused by

[its] own actions in the conspiracy".  *Enron*, 623 F. Supp. 2d 798, 830-83 (S.D.Tex. 2009).  In that

decision, Judge Harmon rejected the argument that a co-conspirator is only liable for the injury

proximately caused by his own overt acts in furtherance of the conspiracy. *Id.*  She cited to the

Seventh Circuit's decision in *United States v. Spudic,* 795 F.2d 1334, 1337 (7th Cir.1986), in which

the Seventh Circuit commented:

> "[I]t is not necessary for each coconspirator even to agree to or actually participate in
> every step of the conspiracy. A coconspirator is bound by the overt acts of other
> coconspirators furthering the conspiracy both before and after being enlisted even
> though he may not participate in each overt act. A coconspirator need not be, and
> often is not, aware of everything being done to further the conspiracy....
> [C]onspiracies involving elaborate arrangements generally are not born full-grown,
> but rather mature in successive stages as other parties are added who may not know
> all that has gone before. Nonetheless, ***these new members assume the risk.*** [citations
> omitted]."

*Id.*

In this case, because Plaintiffs' injury can be caused by any act(s) by a co-conspirator in

furtherance of the conspiracy, these Defendants, if proven to be conspirators, are liable whether

Plaintiffs' injury was substantially caused by Defendants' specific action(s), or by the actions of

their co-conspirator's, like Allen Stanford.

Texas law is clear that "[o]nce a conspiracy is proven, each co-conspirator 'is responsible

for all acts done by any of the conspirators in furtherance of the unlawful combination.' " *Carroll v.*

*Timmers Chevrolet, Inc.* 592 S.W.2d 922, at 925-26 (Tex. 1979)  (*quoting* W. Prosser, *Handbook*

*of the Law of Torts* § 46 at 293 (1971)), and *State v. Standard Oil Co.,* 130 Tex. 313, 107 S.W.2d

550, 559 (1937). Moreover, joint and several liability is imposed on all conspirators for actual

damages resulting from acts in furtherance of the conspiracy. *Id.* at 925.  Importantly, Texas "does not require the trial court to separately submit each co-conspirators's civil conspiracy damages. When the jury found that liability for a civil conspiracy existed, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators." *Bentley v. Bunton,* 94 S.W.3d 561, 619 (Tex.2002); see also *In re Performance Nutrition, Inc.,* 239 B.R. 93, 99, 113 (Bankr.N.D.Tex.1999)("Once a civil conspiracy is found, each coconspirator is responsible for any action in furtherance of the conspiracy performed by other conspirators. In other words, each action in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the acts."); *Tompkins,* 202 F.3d 770, 783 (5th Cir.2000)( "[E]ach of the losing defendants is jointly and severally liable for the actions of the others because all were found to be co-conspirators in a civil conspiracy.").

The same is true under the TSA --- Defendants are jointly and severally liable for the acts of Stanford Financial if they are found by a jury to have aided and abetted Stanford Financial's violations of the TSA. *Frank v. Bear, Stearns & Co*., 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet denied); *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2006 WL 3716669, at *8, fn 8 (S.D.Tex. 2006))(the Texas Securities Act expressly provides that aiders are jointly and severally liable with the primary violator).

As a result, at trial in this case, the jury will first be asked questions about the liability of, and causation of damages by, Stanford Financial and/or one of its principals (such as Allen Stanford), and then, if liability is found, then the jury will proceed to the next question of whether the Defendants herein conspired with and/or aided and abetted Stanford Financial in order to determine defendants' joint and several liability for Stanford Financial's wrongful conduct.  See, e.g., *Duff v. Yelin*, 721 S.W.2d 365, 370 (Tex. App.—Houston [1st Dist.] 1986, writ withdrawn)(issues of joint and several liability arise after the jury's determination of liability).

I.      ***Resondeat Superior***

---

After arguing to this Court that Sjoblom was always acting as a lawyer in the course of fulfilling his duties to represent and render legal services to his clients in an adversarial proceeding and therefore should escape liability under the "attorney immunity" doctrine,[28] the law firm Defendants then argue that they should not be held liable under the doctrine of *respondeat superior* because Sjoblom was *not* acting within the course and scope of his employment as an attorney rendering legal services to his clients.

Defendants' contradictory yet simplistic argument is based upon the false premise that an employee's wrongful conduct is always outside the scope of his employment because an employer would never condone or expect wrongful behavior.  But in Texas, *"[t]he fact that an employee does an act that is unauthorized or that would not be approved by his employer does not mean that the employee acted outside the scope of his employment.  The employer is liable for the act of his employee, even if the specific act is unauthorized or contrary to express orders, so long as the act is done while the employee is acting within his general authority and for the benefit of the employer."*  *Hooper v. Pitney Bowes, Inc.*, 895 S.W.2d 773, 777 (Tex. App.—Texarkana 1995, writ denied) (employer liable for defamatory statements made by employee during course of investigation of fellow employee); *Williams v. United States*, 71 F. 3d 502 (5th Cir. 1995)(applying Texas law).

The proper inquiry does not begin with whether the employee's alleged actions were malicious, wrongful or tortious, but, rather, whether they were within the scope of his employment, which, at any rate, is typically a "fact issue like negligence or proximate cause". *Ross v. Marshall*, 426 F. 3d 745 (5th Cir. 2005).  Here, Sjoblom is alleged to have acted within his general authority as an attorney/partner with both the Chadbourne and Proskauer firms in carrying out the representation of Stanford Financial and SIB on behalf of the law firms, i.e., he was alleged to have acted not for

---

[28]   Chadbourne argues that Sjoblom's conduct was "indisputably…made to facilitate the rendition of legal services".  Chadbourne Motion at 13.  Proskauer argues that Sjoblom was always acting within the "course of representing his clients in an adversarial proceeding".  Proskauer Motion at 23.

his own benefit, but for the benefit of his employers.  SAC ¶56, 60-61.[29]  Indeed, Plaintiffs allege

that Sjoblom was specifically retained by Stanford to represent Stanford Financial in the SEC

investigation because that was his area of expertise as a lawyer.  *Id.*, at ¶60.  Sjoblom's alleged

actions were taken within the scope of his employment inasmuch as they were (1) within the

general authority given him by the law firms, (2) in furtherance of his law firms' business, and (3)

for the accomplishment of the object for which he was employed.  *See Williams*, 71 F.3d 502, 506

(5th Cir. 1995).

That Sjoblom overstepped the proper bounds of such representation does not relieve the

Defendants from vicarious responsibility for his actions.  The question is <u>not</u> whether the Sjoblom

law firm Defendants authorized Sjoblom's *specific fraudulent* actions, but whether his actions grew

out of an authority that the Defendants had conferred upon him, i.e. the authority to render legal

services to clients like Stanford Financial as a partner in the Chadbourne and Proskauer firms.  *See*

*Baker Hotel of Dallas, Inc. v. Rogers*, 157 S.W.2d 940, 943 (Tex. Civ. App.—Dallas 1941, writ

ref'd w.o.m.).  The Fifth Circuit has recognized that an employer is liable for an employee's willful

and malicious acts as long as they are "*connected with and immediately grow out of another act of*

*the employee imputable to the employer*", even if such acts are criminal in nature.  *Williams*, 71 F.

3d at 506, note 10 (5th Cir. 1995).

In that respect, Sjoblom was doing what he was employed to do – obtain and retain clients

and represent clients in their legal matters on behalf of the law firms -- and although he may have

done things contrary to the law firm Defendants' will, against their instructions or without their

knowledge that were ill-advised, malicious or wanton, the defendant employers are liable because

they "set in motion the agency that produced the wrong."  *Rogers*, 157 S.W. 2d. at 943.  Therefore,

---

[29]  Plaintiffs note that Sjoblom's announcement of withdrawal from representation of Stanford Financial was made on behalf of Proskauer and that his purported disaffirmation of prior representations was made on behalf of Proskauer and Chadbourne.  See February 12, 2009 letter and February 14, 2009 e-mail from Sjoblom to the SEC, attached as Exhibit "4" to the Complaint.

even the willful and malicious actions of an employee acting within the scope of his employment are imputed to the employer and subject the employer to liability under the doctrine of *respondent superior*. *See Hooper*, 895 S.W.2d at 777-78. While sometimes partners in large law firms make horrifically bad judgment calls in their efforts to represent their clients, such bad judgment does not destroy liability for the partner's law firm under *respondeat superior*.

An exception, usually applied in cases involving serious criminal activity, is that an employer is not liable for intentional and malicious acts that are unforeseeable considering the employee's duties and which are "*wholly unrelated to the task assigned*". See *id* at 778, citing *Adami v. Dobie*, 440 S.W.2d 330, 334 (Tex. Civ. App.—San Antonio 1969, writ dism'd) (murder committed by ranch caretaker, whose brother and father were alleged to be his employers, over failure of neighboring ranch owner to close gate to adjoining ranch, was not within scope of caretaker's alleged employment); *Ross*, 426 F. 3d 745, 764-765 (not foreseeable to father who asked his son to "wrap up" party at their own house that son would thereafter build and transport a cross down the road and burn it on a neighbor's lawn, which was wholly unrelated to the task assigned).

However, if foreseeable, considering the employer's duties, even criminal acts can be in the course and scope of employment and, therefore, imputed to the employer. See *Williams*, 71 F.3d at 506, n.10. In this case, it is reasonably foreseeable by a law firm that one of its lawyers, who was specifically hired to represent entities under investigation by the SEC because of his prior experience working for the SEC, could act in such a manner so as to help the client to evade SEC regulation. Indeed, that is the classic "Washington revolving door" problem. Moreover, aiding and abetting securities regulatory violations or fraud, while serious, is not akin to murdering someone for leaving a ranch gate unlocked as in the *Adami* case – a clearly unforeseeable act.

Further, the cases relied upon by the Defendants to argue that an employee's wrongful conduct necessarily falls outside the scope of his employment involve situations in which the employee acted for his own benefit or gratification, not for the benefit of his employer. See *Mackey*

*v. U.P. Enterprises, Inc.*, 935 S.W.2d 446, 453-54 (Tex. App.—Tyler 1996, no writ) (assault was expression of personal animosity and not for the purpose of carrying out the master's business). *Millan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760, 768 (Tex. App.—San Antonio 2002, pet. denied) (broker stole money from his mother's account for his own benefit); *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (male employee lied to store manager about kissing female employee; this defamatory statement did not further store's business or accomplish purpose of employee's job); *Green v. Ransor, Inc.*, 175 S.W.3d 513, 517 (Tex. App—Fort Worth 2005, no pet.) (employee drove company truck after hours to a bar for his own benefit); *Buck v. Blum*, 130 S.W.3d 285, 288 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (doctor sexually assaulted patient for his own pleasure); *Saenz v. Family Security Ins. Co. of America*, 786 S.W.2d 110, 111 (Tex. App.—San Antonio 1990, no writ) (insurance agent's sale of policy on person's life so that he could collect proceeds after murdering that person was in furtherance of his own interests and not his employer's); *Zarzana v. Ashley*, 218 S.W.3d 152 (Tex. App. Houston [14th Dist.] 2007, no pet.) (plaintiff paid cash to a person alleged to be employee of muffler shop for a counterfeit inspection sticker; muffler shop did not perform inspections and had no record of sale; actions of alleged employee not in furtherance of muffler shop's business).

Plaintiffs have made no allegation that Sjoblom was acting in furtherance of his own interests. Rather, plaintiffs have alleged he acted within the course and scope of his employment as a partner in, and therefore in furtherance of the business of, defendants Chadbourne and Proskauer. (SAC ¶56, 60-61)  These allegations are based on the specific facts set forth in the SAC and are sufficient to withstand Defendants' Motions to Dismiss.

## J.      Negligent Supervision

Plaintiffs allege that the defendant law firms, Chadbourne and Proskauer, negligently retained and supervised Sjoblom while he was a partner and employee of those firms.  The elements

of a cause of action for negligent retention or supervision in this case are that (1) the law firms owed a legal duty to protect the Plaintiffs from Sjoblom's actions, and (2) the Plaintiffs sustained damages proximately caused by the law firm's breach of that legal duty.  See *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 495 (Tex. App.—Fort Worth 2002, no pet.).  An employer has a general duty to adequately hire, train and supervise employees.  See *Houser v. Smith*, 968 S.W.2d 542, 544 (Tex. App.—Austin 1998, no pet.).  The basis of the employer's responsibility is its own negligence in supervising or retaining in its employ an incompetent employee whom the employer knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others.  See *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.).  For the employer to be liable to a third party for injury caused by its employee, the employee's actions must have been a cause in fact of plaintiffs' injuries and a foreseeable consequence of the employer's retention or supervision of the employee.  See *Wrenn*, 73 S.W.3d at 496.  A cause of action for negligent retention or supervision also requires that the employee have committed an actionable tort causing a legally compensable injury.  See *Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex. App.—San Antonio 1999, no pet.) (plaintiff must establish that employee committed an actionable tort); *Udoewa v. Plus4 Credit Union*, No. H-08-3054, 2009 WL 1856055, at *7 (S.D. Tex, June 29, 2009) (allegation of employee's tort sufficient to defeat Rule 12(b)(6) motion to dismiss).

Chadbourne argues that plaintiffs fail to state a claim against it for negligent supervision or retention because they (1) fail to allege that Sjoblom committed an actionable tort; (2) fail to allege facts to show that Chadbourne had a duty or that any breach was a proximate cause of damage to plaintiffs; and (3) fail to allege facts that Sjoblom's conduct was foreseeable.  As to the argument that Plaintiffs have not alleged the commission of an actionable tort by Sjoblom, plaintiffs allege that while Sjoblom was representing Stanford Financial and SIB on behalf of and while employed by Chadbourne and then Proskauer, he took action to obstruct and impede the SEC's investigation

of Stanford Financial and SIB and acted to conspire with and aid and abet Stanford Financial and SIB in their continuing sales of unregistered and worthless CDs based on their fraudulent representations about the nature and security of such investments.  SAC ¶¶12; 26; 40; 56-65; 67-70; 72-83; 86-88; 97-114).  By these allegations, Plaintiffs assert actionable torts based on fraud and statutory violations committed by Sjoblom.  See *Pearce v. The First National Bank of Pecos*, No. 08-00-00043-CV, 2001 WL 633782, at *5 (Tex. App.—El Paso, June 7, 2001, no pet.) (cause of action for fraud is grounded in tort); *Permian Basin Community Centers for Mental Health and Mental Retardation*, No. 11-07-00321-CV, 2008 WL 2687108, at *2 (Tex. App.—Eastland, July 10, 2008, no pet.) (fraud is an intentional tort); *Lutheran Brotherhood v. Kidder Peabody & Company, Inc.,* 829 S.W.2d 300 (Tex. App.—Texarkana 1992, writ granted w.r.m.) (suit for damages under § 581-33 of Texas Securities Act sounds in tort); Tex. Rev. Civ. Stat. Ann. § 581-33A, F (Vernon Supp. 2009) (seller of security in violation of TSA is liable for rescission or damages to purchaser; person who aids seller is jointly and severally liable).

Plaintiffs also allege that with proper supervision, the law firms should have known that Sjoblom, through his representation of Stanford Financial and SIB, was acting to aid an enterprise, operating in part from Antigua, thwart an SEC investigation into their activities.  (SAC ¶ 114).  Implied in that allegation is that the longer Sjoblom could delay having the firms' clients respond to that investigation, the more time Stanford Financial and SIB had to perpetrate their fraudulent Ponzi scheme on unwitting investors such as the Plaintiffs and class members.  The failure of the law firms to supervise Sjoblom's representation of Stanford Financial and SIB and to remove him from such representation permitted Sjoblom to aid those entities to continue their sale of the SIB CDs.  The purchase thereof by plaintiffs and class members proximately caused them to lose the money they invested with Stanford Financial and SIB.  (SAC ¶ 116).  It was reasonably foreseeable that Sjoblom's representation of such entities, having intentionally organized to do business in the lax

regulatory environment of Antigua, was fraught with the possibility that the clients were conducting business in Antigua for the purpose of evading the laws of the United States, particularly in light of the SEC investigation, and should have caused the law firms to implement oversight policies with respect to the clients' and Sjoblom's activities.  Had they done so, they would have known of Sjoblom's efforts to perpetuate the unlawful offer and sale of the SIB CDs; that he was unfit to represent the Stanford entities; and that the continuation by Sjoblom of his representation posed an unreasonable risk of harm to investors like the Plaintiffs and class members.

Proskauer argues that absent privity, it owed no duty to the Plaintiffs.  Privity is not an element of a negligent supervision or retention claim.  See Wrenn, 73 S.W.3d at 496.  Proskauer's attempt to inject a privity requirement into this analysis by recharacterizing Plaintiffs' negligent supervision and retention claims as legal malpractice claims is baseless.  The *Mecom* case, cited by Proskauer to support its argument, involved a suit by a <u>client</u> of Vinson & Elkins in which the <u>client</u> asserted negligence claims, including one for negligent supervision, based on the services rendered to her by Vinson & Elkins.  See *Mecom v. Vinson & Elkins,* No. 01-98-00280-CV, 2001 WL493426 (Tex. App.—Houston [1st Dist.] 2001).  In broadly characterizing the plaintiff's claims as legal malpractice claims for limitations purposes, the court did not address the negligent supervision claim or the issue of privity with respect to such claim in the context of harm done to a third party. *Id.* at *23 n.9, *24, n.10.  Because privity is irrelevant to Plaintiffs' claims, Proskauer's motion to dismiss should be denied.

Taking Plaintiffs' Second Amended Complaint as a whole, Plaintiffs have alleged sufficient facts which, when proved, will allow them and the class to recover on their claims of negligent supervision and retention.  Therefore, Defendants' motions to dismiss should be denied.  See *People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709-G, 2007 WL 708872, at *7 (N.D. Tex., March 7, 2007) (allegations of mortgage company's negligent supervision of employer sufficient – motion to dismiss denied); See *Udoewa*, No. H-08-3054, 2009 WL 1856055, at *7 (S.D.

Tex, June 29, 2009) (under liberal pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure, plaintiffs not required to allege specifically how defendants breached duty of care in negligent retention case).

## K.      Statute of Limitations

Defendant Chadbourne argues that Plaintiffs' civil conspiracy and negligent retention/supervision claims, as well as two of Plaintiffs' claims under the TSA, for aiding and abetting the sale of unregistered securities and sales of securities by unregistered dealers, are barred by the applicable statute of limitations.

Plaintiffs agree with Defendants that a direct claim for aiding and abetting the sale of unregistered securities and sales of securities by unregistered dealers is subject to the built-in three year limitations period established in the TSA.  But Plaintiffs have also stated a claim against Chadbourne for engaging in a conspiracy to aid and abet the sale of unregistered securities and sales of securities by unregistered dealers under the TSA, and this Court in *Biliouris v. Sundance Resources, Inc*. recognized that a violation of a Texas statute is sufficient to support a cause of action for civil conspiracy.  See *Biliouris*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008)(citing *Laxson*, 48 S.W. 3d 408, 410-411 (Tex. App. – Waco 2001, pet. denied).

As to the common law claims, including the conspiracy to violate the TSA claim, Plaintiffs have alleged the discovery rule (SAC ¶96) and Texas courts have held that the discovery rule applies to a cause of action for civil conspiracy.  See, e.g., *Prostok v. Browning*, 112 S.W. 3d 876, 896 (Tex. App. – Dallas 2003, rev'd in part on other grounds, 165 S.W. 3d 336 [Tex. 2005]); see also *Fisher v. Yates*, 953 S.W.2d 370, 380 (Tex. App.—Texarkana 1997, no pet.).  Texas courts have also applied the discovery rule to claims of negligence.  See, e.g., *Bayou Bend Towers Council of Co-Owners v. Manhattan Constr. Co*., 866 S.W. 2d. 740 (Tex. App.—Houston. [14th Dist.] 1993, writ denied).

A defendant moving for *summary judgment* on limitations grounds has the burden of negating the discovery rule. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1998). The discovery rule defers the accrual of a cause of action when the alleged wrongful act and the nature of resulting injury are "inherently undiscoverable" and evidence of the injury is "objectively verifiably." *S.V. v. R.V.*, 933 S.W.2d. 1, 6 (Tex. 1996); *see also Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998) (discovery rule requires knowledge of the wrongful act and resulting injury). Discovering the nature of the injury requires knowledge of the wrongful act and the resulting injury. *Childs*, 974 S.W.2d at 40. Thus the discovery rule exception "operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the *facts giving rise* to the claim." *Wagner & Brown Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001) (emphasis added).

Because in ¶96 of the SAC Plaintiffs have plead the discovery rule, and plead that they did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants, and that the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud and conspiracy, Chadbourne's Motion to Dismiss based on limitations as to the civil conspiracy and negligent supervision/negligent retention claim must be denied.

**L.       Response to Mauricio Alvarado's Motion**

Plaintiffs adopt and incorporate all of their arguments made throughout this Response in response to Mauricio Alvarado's Motion to Dismiss. Alvarado was the Colombian-born and educated General Counsel for all of Stanford Financial who received his JD degree from South Texas College of Law and became licensed as a Texas lawyer in 1994.

In his arguments for dismissal, Alvarado relies almost exclusively on a pair of clearly self-serving e-mails he sent in February 2009, when the "writing was on the wall" that Stanford

Financial was going to be shut down by the SEC and that indictments were sure to follow thereafter, including one in which he requested that Pendergest's testimony to the SEC be delayed, presumably because she needed more time to practice.

But his self-serving e-mail aside, the bottom line is that Plaintiffs have specifically alleged that Alvarado was part of the conspiratorial group that agreed, back in January 2009, on the fraudulent plan to have Sjoblom *lie* to the SEC about who had more knowledge about the composition of the SIB portfolio.  Davis Plea ¶17(ee).  As such, Alvarado joined the conspiracy to deceive the SEC and obstruct the SEC investigation, which Plaintiffs allege was a central component of Allen Stanford's regulatory evasion campaign designed to allow him to operate as he pleased, completely unfettered by regulatory prohibitions in any country.

The other, self-serving e-mail Alvarado relies on is his February 4, 2009 e-mail to Jim Davis, referenced at footnote 5 of Alvarado's Motion.  Based on that piece of evidence,[30] Alvarado argues that Plaintiffs have not adequately alleged that he knew that the "round trip" real estate transaction he helped "paper", according to Jim Davis' Plea Agreement, was fraudulent.  But Jim Davis' Plea is quite clear.  It describes how, from May 2008 through November 2008, "*Stanford, Davis, Lopez, Kurt, Rodriguez-Tolentino and Alvarado "participated in documenting elements of [the] bogus real estate in the books and records of SIBL designed to fraudulently add billions of dollars in value to SIBL's financial statements*."  Davis Plea, at ¶17(cc).  Alvarado points to his e-mail as proof that he didn't know the real estate transaction was fraudulent.  Basically, Alvarado's defense amounts to "Jim Davis is lying", and Plaintiffs should be afforded the opportunity to depose Jim Davis to counter Alvarado's assertion since it appears to highlight a fact question requiring a determination of the credibility of witnesses.

---

[30]    Again, Plaintiffs object to the Defendants' use of these extraneous evidentiary materials to attempt to create fact issues and/or contradict Plaintiffs' allegations regarding Defendants' knowledge and intent.

The Davis Plea and the SAC outline in detail two occasions in which Alvarado was involved in preparing documents for Leroy King to sign and forward to regulators, including the SEC, and that said responses prepared by Alvarado were "calculated to mislead" the regulators, including one letter "designed to mislead the SEC". Davis Plea at ¶17(v)-(w); SAC ¶66-67. Furthermore, Plaintiffs allege that Alvarado was involved in the policies developed by Stanford Financial in the summer of 2005 designed to evade, hinder and obstruct said SEC investigation, including the destruction of Stanford Financial records that might be uncovered in the SEC investigation. SAC ¶69. Plaintiffs allege that the new policies adopted by Stanford Financial included ordering the removal or destruction of information contained in client or company files in response to an ongoing SEC investigation into SGC's CD sales practices, and purging electronic data from its computers in response to the SEC investigation. SAC ¶70. Plaintiffs allege that in the summer of 2006, all of the assistants to the Stanford Financial brokers were told to remove any information that wasn't on Stanford Financial letterhead, including notes and inter-office e-mail, from their client files, just ahead of an SEC inspection. SAC ¶70. And the SGC brokers were told to stop enumerating any concerns they had about SIB in inter-company e-mails because the e-mails could fall into the hands of the SEC. *Id.*

As the General Counsel for the Stanford Financial group of companies, Alvarado clearly would have been involved in the implementation of such policies. And while Alvarado contends that his knowledge or intent cannot be inferred merely from his position as General Counsel, the Fifth Circuit has held to the contrary. *Dorsey*, 540 F. 3d 333 (5th Cir. 2008). In *Dorsey,* the Fifth Circuit recognized that there can be a "number of special circumstances" which, taken together with an officer's position, may support a strong inference of scienter. *Id.*, at 342. Given his position as the chief legal officer of Stanford Financial coupled with all of the allegations of violations of securities laws described herein (which are questions of law for which Alvarado would have been uniquely positioned to have addressed on a continuing basis for his "client") and the allegations

made in the Davis Plea, as well as his own conduct in preparing the regulatory response letters for King to sign described hereinafter, this Court may infer scienter, at the very least based on severe recklessness.

Finally, as the SEC, the DoJ, and the Receiver, with his teams of lawyers and investigators, continue to unearth details surrounding who did what at Stanford Financial, more details emerge as to the role of Alvarado in the regulatory evasion conspiracy.  To wit, Plaintiffs hereby request that the Court take judicial notice of the Receiver's Response to the Antiguan Liquidators' December 3 Supplemental Brief (docket #61)(the "Receiver's Response") and the Appendix in Support (docket #62)("Receiver's Appendix") filed on December 17, 2009 in the related Chapter 15 Debtor in a Foreign Proceeding case proceeding pending before this Court styled *In re Stanford International Bank Ltd.*, Cause NO. 3-09-CV-0721-N.

In the Receiver's Response, he points out that the Antiguan FSRC's King "actively supported the Ponzi scheme by, among other things, allowing [Alvarado] to draft the FSRC's response to inquiries from the Eastern Caribbean Central Bank" about Stanford Financial's operations.  Receiver's Response, at p. 10.  As evidence of this nefarious act, the Receiver's Appendix attaches a chain of e-mails from Alvarado, dated July 31, 2006 through August 1, 2006, as well as a draft of the response letter that Alvarado prepared for King to sign and send to the Eastern Caribbean Central Bank ("ECCB") as Exhibit "G" thereto.  While Plaintiffs allege some facts regarding this conduct in their SAC at ¶66, Plaintiffs attach a copy of this e-mail and letter hereto as **Appendix "Exhibit B"**, App. 18-22, and request that the Court take judicial notice of this document filed of public record in a related proceeding, or allow the Plaintiffs leave to amend the Complaint to specifically allege these facts.

This e-mail chain is astounding, and absolutely serves as evidence that Alvarado was intimately involved in the regulatory evasion conspiracy at Stanford Financial.  How in the world can the General Counsel of a company being supposedly regulated by an entity like the FSRC

possibly believe that his conduct in preparing the regulator's response to inquiries from another regulatory body about his own company is legitimate and "within the bounds of the law"?

The e-mail chain attaches Alvarado's draft response letter for King to sign (the attachment line clearly references "FSRC Response to ECCB letter of 7-11-06.doc", and in the first July 31, 2006 e-mail Alvarado states "please see…my proposed draft response"), and Alvarado sent the draft response to his other co-conspirators, including Allen Stanford's Chief of Staff (and former Greenberg Traurig partner) Yolanda Suarez and the President of SIB, Juan Rodriguez-Tolentino. App. 19.

The letter that Alvarado prepared for King to sign and send along as if it were his own, was clearly designed to keep the ECCB's nose out of the business affairs of SIB because the FSRC is "taking care of it".  App. 21-22.  In that respect, the last paragraph of the letter is particularly noteworthy in that, in it, Alvarado (through King) tells the ECCB that "*your agency should place reliance in the results of our [the FSRC's] continued monitoring and examination of entities under our supervision.*"  *Id.* at App. 22.  Which sure sounds a lot like exactly what Sjoblom was telling the SEC around this same time period.

## IV.    MOTION FOR LEAVE TO AMEND COMPLAINT

In the alternative, if the Court is inclined to grant the Motions in whole or in part, Plaintiffs request leave pursuant to Rule 15(a), FED. RULES CIV. PROC., to amend the Complaint to correct any defects in pleading, including with regard to those issues specifically identified herein.  When a trial court is considering a motion to dismiss the complaint for failure to state a claim, granting leave to amend is especially appropriate.  *See Great Plains Trust Co., et al., v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002); *See* also *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) (per curiam) (addressing Rule 12(b)(6) dismissal).

Rule 15(a) applies where plaintiffs expressly request to amend even though the request is "not contained in a properly captioned motion paper".  *Willard v. Humana Health Plan of Texas,*

*Inc.*, 336 F. 3d 375, 387 (5th Cir. 2003)(quoting *Balistreri v. Pacifica Police Dep't*, 901 F. 2d 696, 701 (5th Cir. 1988).   A formal motion is not required as long as the requesting party has set forth with particularity the grounds for the amendment and the relief sought.   *Id.*

While Plaintiffs believe they have adequately plead facts sufficient to survive dismissal, nevertheless, and to the extent relevant to this Court's determination of the motions to dismiss, Plaintiffs, as described in detail where referenced herein *supra,*   request leave to amend the Complaint to address several specific grounds for dismissal asserted by Defendants, including leave to amend to address: (1) Stanford Financial's non-compliance with the Reg. D exemption (*supra*, pps. 45-48), and Sjoblom's knowledge of said non-compliance (*supra*, footnote 20); (2)  the "who, what, when, where" of what information was told to or hidden from Plaintiffs by Stanford Financial or its agents (*supra*, footnote 28); and (3) the timing of Plaintiffs' purchases of CDs and that they are not alleging "holder" claims in this lawsuit (*supra*, footnote 9).

If the Court finds said grounds sufficient to grant the Motions in whole or in part, then Plaintiffs request that the Court allow them leave to amend the Complaint to address the Court's concerns.

## V.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court Deny Defendants' Motions to Dismiss the Second Amended Complaint.  In the alternative, if the Court is inclined to grant the Motions in whole or in part, Plaintiffs move the Court pursuant to Rule 15(a), FED. RULES CIV. PROC.  to grant them leave to amend the complaint to address the Court's concerns.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas  78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210


By:  s/ Edward C. Snyder
        EDWARD C. SNYDER
        State Bar No. 00791699
        esnyder@casnlaw.com
        JESSE R. CASTILLO
        State Bar No. 03986600
        jcastillo@casnlaw.com

**LEAD CLASS COUNSEL AND**
**ATTORNEYS IN CHARGE**
**FOR PLAINTIFFS**
**AND THE PUTATIVE CLASS**

Nicholas A. Foley
State Bar No. 07208620
Douglas J. Buncher
State Bar No. 03342700
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301
dbuncher@neliganlaw.com
nfoley@neliganlaw.com

**STRASBURGER & PRICE, LLP**
300 Convent Street, Suite 900
San Antonio, Texas 78205
Telephone:  (210) 250-6000
Facsimile: (210) 250-6100


        EDWARD F. VALDESPINO
        State Bar No. 20424700
        edward.valdespino@strasburger.com
        ANDREW L. KERR
        State Bar No. 11339500
        andrew.kerr@strasburger.com

        DAVID N. KITNER
        State Bar No. 11541500
        david.kitner@strasburger.com
        STRASBURGER & PRICE, LLP
        901 Main Street, Suite 4400
        Dallas, Texas  75202
        Telephone: (214) 651-4300
        Facsimile: (214) 651-4330

## CERTIFICATE OF SERVICE

    I hereby certify that on this 1ST day of February, 2010.  I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to all counsel of records, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.

s/ Edward C. Snyder

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SAMUEL TROICE,** | § | |
| **HORACIO MENDEZ,** | § | |
| **ANNALISA MENDEZ,** | § | |
| **PUNGA PUNGA FINANCIAL, LTD.** | § | |
| **individually and on behalf of a class** | § | |
| **of all others similarly situated** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 3:09-cv-01600-F** |
| | § | |
| **PROSKAUER ROSE, LLP,** | § | |
| **THOMAS V. SJOBLOM,** | § | |
| **P. MAURICIO ALVARADO, and** | § | |
| **CHADBOURNE & PARKE, LLP** | § | |
| | § | |
| **Defendants.** | § | |

---

**APPENDIX**

---

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | APPENDIX PAGES(S) |
|---|---|---|
| | **Declaration of Edward C. Snyder** | |
| 1 | O'CONNOR'S CAUSES OF ACTION (2009) Chapter 40-40C | **1-17** |
| 2 | Exhibit G of Docket #62, filed December 17, 2009 in the related Chapter 15 Debtor in a Foreign Proceeding case proceeding pending before this Court styled *In re Stanford International Bank Ltd.*, Cause NO. 3-09-CV-0721-N. | **18-22** |