UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
SAMUEL TROICE, HORACIO MENDEZ,                                   :
ANNALISA MENDEZ, and                                            :
PUNGA PUNGA FINANCIAL, LTD.,                                    :
individually and on behalf of all others similarly             :
situated,                                                       :
                                                                :
                                                                :
                       Plaintiffs,                              :
                                                                :          Civil Action No. 3:09-cv-01600-N
                                                                :
            - against -                                         :          [Oral Argument Requested]
                                                                :
                                                                :
PROSKAUER ROSE LLP,                                             :
THOMAS V. SJOBLOM,                                              :
P. MAURICIO ALVARADO, and                                      :
CHADBOURNE & PARKE LLP,                                         :
                                                                :
                                                                :
                       Defendants.                              :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPPOSITION OF DEFENDANTS PROSKAUER ROSE LLP, CHADBOURNE & PARKE LLP AND THOMAS V. SJOBLOM TO PLAINTIFFS' OPPOSED MOTION FOR CLASS CERTIFICATION, FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 4

    A.    The SIB CDs at Issue Were Marketed to Investors Around the World Through a Variety of Marketing Materials and Oral Representations. ........ 4

        1.    The Alleged Omissions and Misrepresentations Made to SIB CD Investors Were Not Uniform. ................................................... 5

            a.    Investors Were Not Uniformly Told that SIB Was a "U.S.-Based Business." ..................................................... 5

            b.    Investors Were Not Uniformly Told that SIB CDs Were Subject to U.S. Government Regulation or Backed by U.S. Government Insurance. .............................................. 6

            c.    The Representations about the Liquidity and Safety of the SIB CDs Were Not Uniform. ....................................... 8

        2.    As Far Back as 2005, Putative Class Members Had Information about the SEC's Investigation of Stanford. .................................... 9

        3.    The Putative Class Members Varied in Their Purchases of the SIB CDs. ................................................................................. 10

    B.    Putative Class Members Have Filed Numerous Individual Litigations Against Defendants ............................................................................. 13

    C.    The Instant Proceedings ....................................................................... 14

ARGUMENT ...................................................................................................... 15

    I.    Movants Have Not Satisfied and Cannot Satisfy Rule 23(b)(3)'s Requirements Because Individualized Issues Predominate Over Common Issues .................................................................................... 16

        A.    Material Differences in the Alleged Misrepresentations or Omissions to Putative  Class Members Preclude Certification. ..... 17

        B.    Individual Issues of Reliance Will Predominate with Respect to Plaintiffs' Remaining Common Law Causes of Action. .............. 19

1.   Plaintiffs' Remaining Common Law Claims Require
     Proof of Reasonable or Justifiable Reliance, Precluding
     Certification. ..................................................................19

2.   Movants Are Not Entitled to a Presumption of Reliance
     Under Affiliated Ute......................................................22

C.   Individual Issues of Knowledge Will Predominate With
     Respect to Plaintiffs' Claims Under the TSA. ............................23

D.   Individual Issues Will Predominate in Determining Which of
     the Putative Class Members' Claims Are Barred Holder
     Claims. ......................................................................25

E.   Movants Have Not Established that Common Issues of
     Damages Predominate. .............................................................27

1.   Movants Fail to Offer Any Viable Classwide Damages
     Model..............................................................................27

2.   Movants Fail to Offer a Damages Approach Consistent
     with Any Theory of Liability..........................................30

F.   Choice-of-Law Considerations Preclude Class Certification. .......31

G.   Individual Issues of Timeliness Will Predominate.......................35

II.  A Class Action Is Not Superior to Individual or Joined Actions..............36

A.   Foreign Jurisdictions Would Not Recognize, or Give
     Preclusive Effect to, a Class Action Judgment Against the
     Putative Class. ...........................................................37

1.   Movants Have Not Satisfied Their Burden with Regard
     to Foreign Putative Class Members. ................................39

2.   On the Undisputed Evidence, Courts in the Foreign
     Jurisdictions at Issue Are Highly Unlikely to Give
     Preclusive Effect to a Judgment of the Court, or to a
     Settlement, in this U.S. Opt-Out Class Action. ................45

B.   Movants Have Not Proven, and Cannot Prove, that Putative
     Class Members Lack Sufficient Motive to Bring Individual
     Actions. ......................................................................53

III. Movants Have Not Provided and Cannot Provide Any Evidence that
     a Class Is Ascertainable...........................................................56

IV.    Movants Cannot Satisfy Rule 23's Adequacy or Typicality
Requirements ................................................................................... 61

      A.    The Proposed Class Representatives Have Not Satisfied, and
Cannot Satisfy, Rule 23(a)(4)'s Adequacy Requirement .............. 62

      B.    The Proposed Class Representatives Have Not Satisfied, and
Cannot Satisfy, Rule 23(a)(3)'s Typicality Requirement. ............ 67

V.    Movants Have Not Demonstrated that Investors Who Were Citizens
or Residents of the United States Are Sufficiently Numerous to Form
a Class ............................................................................................. 69

VI.    In the Alternative, If the Court Does Not Deny Class Certification, It
Should Limit the Proposed Class ........................................................ 70

CONCLUSION ........................................................................................ 73

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

Abby v. City of Detroit,
    218 F.R.D. 544 (E.D. Mich. 2003).................................................................... 53, 55

Abell v. Potomac Ins. Co.,
    858 F.2d 1104 (5th Cir. 1988)................................................................................. 22

Affiliated Ute Citizens of Utah v. U. S.,
    406 U.S. 128 (1972) .............................................................................................. 22

Alaska Elec. Pension Fund v. Flowserve Corp.,
    572 F.3d 221 (5th Cir. 2009).......................................................................... 16–17

In re Alstom SA Sec. Litig.,
    253 F.R.D. 266 (S.D.N.Y. 2008)...................................................................... 37, 38

Amchem Prods., Inc. v. Windsor,
    521 U.S. 591 (1997) ..........................................................................17, 43, 54, 61

Am. Tobacco Co. v. Grinnell,
    951 S.W.2d 420 (Tex. 1997)............................................................................ 17, 20

Amgen Inc. v. Conn. Ret. Plans & Trust Funds,
    133 S. Ct. 1184 (2012)........................................................................................... 19

Ansari v. New York Univ.,
    179 F.R.D. 112 (S.D.N.Y. 1998)............................................................................ 38

Anwar v. Fairfield Greenwich Ltd.,
    289 F.R.D. 105 (S.D.N.Y. 2013), vacated on other grounds & remanded sub nom. by
    St. Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V.,
    570 F. App'x 37 (2d Cir. 2014)....................................................................... 43, 44

Askanase v. Fatjo,
    130 F.3d 657 (5th Cir. 1997)........................................................................... 13, 20

In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.,
    228 F. Supp. 2d 348 (S.D.N.Y. 2002) .................................................................... 38

iv

Barasich v. Shell Pipeline Co.,
    Civ. A. No. 05-4180, 2008 WL 6468611 (E.D. La. June 19, 2008) ..........................53

Barnett v. Experian Info. Solutions,
    No. Civ .A. 2:00CV175, 2004 WL 4032909 (E.D. Tex. Sept. 30, 2004)..................71

Barsky v. Arthur Andersen, LLP,
    No. Civ A H-02-1922, 2002 WL 32856818 (S.D. Tex. Aug. 16, 2002)............. 25–26

Bell v. Ascendant Solutions, Inc.,
    No. Civ. A. 301CV0166N, 2004 WL 149009 (N.D. Tex. July 1, 2004)....................19

Bell Atl. Corp. v. AT&T Corp.,
    339 F.3d 294 (5th Cir. 2003)................................................................... 29, 31

Berger v. Compaq Computer Corp.,
    257 F.3d 475 (5th Cir. 2001)....................................................61, 62, 63, 66

Bersch v. Drexel Firestone, Inc.,
    519 F.2d 974 (2d Cir. 1975), abrogated on other grounds by
    Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010).................................. 37, 38

In re BP p.l.c. Sec. Litig.,
    No. MDL No. 10-md-2185, Civ. A. No. 4:10-md-2185,
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)............................................... 29

In re BP p.l.c. Sec. Litig.,
    Civ. A. No. 4:10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ......... 29, 30

Buettgen v. Harless,
    263 F.R.D. 378 (N.D. Tex. 2009)............................................................... 37

Calnin v. Hilliard,
    Nos. 05-C-69, 05-C-1092, 05-C-784, 05-C-1148, 05-C-958,
    2008 WL 336892 (E.D. Wis. Feb. 5, 2008)............................................... 68

Carrera v. Bayer Corp.,
    727 F.3d 300 (3d Cir. 2013)..................................................................... 56

Castano v. Am. Tobacco Co.,
    84 F.3d 734 (5th Cir. 1996)............................................................. passim

City of San Antonio v. Hotels.com,
    Civ. No. SA-06-CA-381-OG, 2008 WL 2486043 (W.D. Tex. May 27, 2008).......... 67

CL-Alexanders Laing & Cruickshank v. Goldfeld,
    127 F.R.D. 454 (S.D.N.Y. 1989)................................................................ 39

Cole v. Gen. Motors Corp.,
    484 F.3d 717 (5th Cir. 2007)............................................................ 31, 33

Comcast Corp. v. Behrend,
    133 S. Ct. 1426 (2013)................................................................. passim

Conger v. Danek Medical, Inc.,
    27 F. Supp. 2d 717 (N.D. Tex. 1998) ........................................................ 72

Corley v. Entergy Corp.,
    220 F.R.D. 478 (E.D. Tex. 2004) ....................................................... 35, 36

Crescendo Invs., Inc. v. Brice,
    61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) ................................... 72

DeBremaecker v. Short,
    433 F.2d 733 (5th Cir. 1970)......................................................... 56, 59, 61

In re Deepwater Horizon,
    739 F.3d 790 (5th Cir. 2014)................................................................ 28

Del Fierro v. Pepsico Int'l,
    897 F. Supp. 59 (E.D.N.Y. 1995)............................................................ 39

Duperier v. Tex. State Bank,
    28 S.W.3d 740 (Tex. App.—Corpus Christi 2000).............................................. 23

Dvorin v. Chesapeake Exploration, LLC,
    Civ. A. No. 3:12-CV-3728-G, 2013 WL 6003433 (N.D. Tex. Nov. 13, 2013).......... 55

Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.,
    Civ. A. No. 7:12-cv-00133-O, 2014 WL 3744976 (N. D. Tex. July 30, 2014).......... 44

Eagle Props., Ltd. v. Scharbauer,
    807 S.W.2d 714 (Tex. 1990)................................................................ 36

Eatmon v. Palisades Collection, LLC,
    No. 2:08-CV-306-DF-CE, 2010 WL 1189571 (E.D. Tex. Mar. 5, 2010) ................ 36

Ellis v. Great Sw. Corp.,
    646 F.2d 1099 (5th Cir. 1981)............................................................... 35

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
    529 F. Supp. 2d 644 (S.D. Tex. 2006)......................................................23, 63, 64, 71

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
    Civ. A. Nos. H-01-3624, G-02-0299, 2007 WL 789141
    (S.D. Tex. Mar. 12, 2007)................................................................................... 25, 26

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
    490 F. Supp. 2d 784 (S.D. Tex. 2007)....................................................................... 25

EQT Prod. Co. v. Adair,
    764 F.3d 347 (4th Cir. 2014) .................................................................................... 58

Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,
    51 S.W.3d 573 (Tex. 2001)....................................................................................... 17

In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,
    No. MDL 071873, 2008 WL 5423488 (E.D. La. Dec. 29, 2008) ............................. 70

In re Ford Motor Co. Bronco II Prod. Liab. Litig.,
    177 F.R.D. 360 (E.D. La. 1997)............................................................................... 64

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ...................................................................... 35

Frey v. First Nat'l Bank S.W.,
    --- F. App'x ---, 2015 WL 728066 (5th Cir. Feb. 20, 2015) ...................................... 58

Gene & Gene LLC v. BioPay LLC,
    541 F.3d 318 (5th Cir. 2008)............................................................................... 25, 26

Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.,
    97 S.W.3d 779 (Tex. App.-Dallas 2003),
    rev'd in part on other grounds by 161 S.W.3d 482 (Tex. 2005) ............................... 72

Goodman v. Harris Cnty.,
    571 F.3d 388 (5th Cir. 2009)..................................................................................... 13

G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc.,
    219 S.W.3d 37 (Tex. App. [San Antonio] 2006, no pet.)........................................... 36

Griffin v Box Griffin v. Box,
    85 F.3d 625, 1996 WL 255296 (5th Cir. May 2, 1996)............................................. 22

Guardian Angel Credit Union v. MetaBank,
    No. 08-cv-261-PB, 2009 WL 2489325 (D.N.H. Aug. 12, 2009)............................... 34

Gyarmathy & Assocs., Inc. v. TIG Ins. Co.,
    No. Civ. A. 3:02-cv-1245,
    2003 WL 21339279 (N.D. Tex. June 3, 2003).................................17–18, 22, 32, 33

Halliburton Co. v. Erica P. John Fund, Inc.,
    134 S. Ct. 2398 (2014)............................................................................ 15, 19, 22

Hancock v. Chi. Title Ins. Co.,
    263 F.R.D. 383 (N.D. Tex. 2009) ...........................................................26

Haralson v. E.F. Hutton Grp., Inc.,
    919 F.2d 1014 (5th Cir. 1990)..................................................................71

In re Hartmarx Sec. Litig.,
    No. 01 C 7832, 2002 WL 31103491 (N.D. Ill. Sept. 19, 2002)................71

Henry Schein, Inc. v. Stromboe,
    102 S.W.3d 675 (Tex. 2003)....................................................................20

Holmes v. Serv. Corp. Int'l,
    Civ. Act. No. H-10-4841, 2014 WL 3046971 (S.D. Tex. July 3, 2014) ...................70

Intercontinental Hotels Corp. v. Girards,
    No. 05-02-01604-CV, 2004 Tex. App. LEXIS 2178 (Tex. App.—Dallas [5th Dist.]
    2004) (no pet)........................................................................................58

John v. Nat'l Sec. Fire & Cas. Co.,
    501 F.3d 443 (5th Cir. 2007)..............................................................56, 60

Joseph v. Wiles,
    223 F.3d 1155 (10th Cir. 2000)...............................................................23

Karnes v. Fleming,
    Civ. Act. No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) .................33

Kelley v. Galveston Autoplex,
    196 F.R.D. 471 (S.D. Tex. 2000) ......................................................35, 36

In re Kosmos Energy Ltd. Sec. Litig.,
    299 F.R.D. 133 (N.D. Tex. 2014)....................................................... passim

Kottler v. Deutsche Bank AG,
    No. 05 Civ. 7773 (PAC), 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010)..................53

Krogman v. Sterritt,
    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................. 22

Lam v. Alpha Realtors, Inc.,
    Civ. A. No. H-09-3041, 2010 WL 4569995 (S.D. Tex. Nov. 4, 2010) ...................... 20

Lee v. Am. Airlines, Inc.,
    No. Civ. A.3:01-CV-1179-P, 2002 WL 31230803 (N.D. Tex. Sept. 30, 2002) ......... 33

Longden v. Sunderman,
    123 F.R.D. 547 (N.D. Tex. 1988) ............................................................. 64

In re LTV Sec. Litig.,
    88 F.R.D. 134 (N.D. Tex. 1980) .............................................................. 63

Maldonado v. Ochsner Clinic Found.,
    493 F.3d 521(5th Cir. 2007) .................................................................... 36

Martin v. Home Depot U.S.A., Inc.,
    225 F.R.D. 198 (W.D. Tex. 2004) ............................................................ 25

McManus v. Fleetwood Enters., Inc.,
    320 F.3d 545 (5th Cir. 2003) ................................................................... 22

Morrison v. Nat'l Austl. Bank Ltd.,
    561 U.S. 247 (2010) ............................................................................. 71

Neilson v. Union Bank of Cal., N.A.,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..................................................... 35

Nicholas v. Crocker,
    687 S.W.2d 365 (Tex. App.—Tyler 1984, writ ref'd n.r.e.) ...................................... 72

Norwood v. Raytheon Co.,
    237 F.R.D. 581 (W.D. Tex. 2006) ................................................... 33, 34, 35

Ogden v. AmeriCredit Corp.,
    225 F.R.D. 529 (N.D. Tex. 2005) ............................................................ 63

Ortiz v. Collins,
    203 S.W.3d 414 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ........................... 20

O'Sullivan v. Countrywide Home Loans, Inc.,
    319 F.3d 732 (5th Cir. 2003) .................................................................... 43

*In re Park Cent. Global Litig.,*
    No. 3:09–cv-765–M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014)................. 19, 22

*Patterson v. Mobil Oil Corp.,*
    241 F.3d 417 (5th Cir. 2001).................................................................. 20

*Pfeffer v. HSA Retail, Inc.,*
    Civ. A. No. SA-11-CV-959-XR,
    2012 WL 1910034 (W.D. Tex. May 24, 2012)............................................ 56, 58, 59

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985) ........................................................................ 33, 61

*Pitman v. Lightfoot,*
    937 S.W.2d 496 (Tex. App.—San Antonio 1996, writ denied)................................ 72

*Pitts v. Greenstein,*
    Civ. A. No. 10-635-JJB-SR, 2011 WL 2193398 (M.D. La. June 6, 2011) .......... 67, 69

*Prospect High Income Fund v. Grant Thornton, L.L.P.,*
    203 S.W.32 602, 616 (Tex. App.—Dallas 2006),
    rev'd in part on other grounds,
    314 S.W.3d 913 (Tex. 2010)................................................................. 20

*Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.,*
    482 F.3d 372 (5th Cir. 2007)................................................................ 23

*Robertson v. Monsanto Co.,*
    287 F. App'x 354 (5th Cir. 2008) .......................................................... 31

*Schlumberger Technology Corp. v. Swanson,*
    959 S.W.2d 171 (Tex. 1997)................................................................ 20

*Shiring v. Tier Techs., Inc.,*
    244 F.R.D. 307 (E.D. Va. 2007) .......................................................... 65

*Simms v. Jones,*
    296 F.R.D. 485 (N.D. Tex. 2013)......................................................... 16, 22

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    482 F.2d 880 (5th Cir. 1973)......................................................... 17, 19, 21

*Smith v. Ayres,*
    845 F.2d 1360 (5th Cir. 1988)............................................................ 23

Spence v. Glock, Ges.m.b.H.,
  227 F.3d 308 (5th Cir. 2000)............................................................. 32, 34

Steering Comm. v. Exxon Mobil Corp.,
  461 F.3d 598 (5th Cir. 2006)............................................................ 27, 28

Sterling Trust Co. v. Adderley,
  168 S.W.3d 835 (Tex. 2005) ............................................................ 24, 35

Stirman v. Exxon Corp.,
  280 F.3d 554 (5th Cir. 2002)............................................................ 62, 68

Stoudt v. E.F. Hutton & Co.,
  121 F.R.D. 36 (S.D.N.Y. 1988).............................................................. 54

In re Superior Offshore Int'l, Inc. Sec. Litig.,
  No. CIV.A.H-08-0687, 2010 WL 2305742 (S.D. Tex. June 8, 2010) ..................... 25

Supernova Sys., Inc. v. Great Am. Broadband, Inc.,
  Cause No. 1:10-CV-319, 2012 WL 425552 (N.D. Ind. Feb. 9, 2012) ...................... 68

Taylor v. CSX Transp., Inc.,
  264 F.R.D. 281 (N.D. Ohio 2007).......................................................... 53

TCA Bldg. Co. v. Entech, Inc.,
  86 S.W.3d 667 (Tex. App.—Austin 2002, no pet.).......................................... 20, 72

Ticknor v. Rouse's Enters., L.L.C.,
  592 F. App'x 276 (5th Cir. 2014) ........................................................... 55

Union Asset Mgmt. Holding A.G. v. Dell, Inc.,
  669 F.3d 632 (5th Cir. 2012)............................................................ 59, 70

In re Vivendi Universal, S.A.,
  242 F.R.D. 76 (S.D.N.Y. 2007)...........................................37, 38, 42, 43

Wal-Mart Stores, Inc. v. Dukes,
  131 S. Ct. 2541 (2011).............................................................. 15, 36, 43

Walsh v. Ford Motor Co.,
  807 F.2d 1000 (D.C. Cir. 1986) ............................................................ 32

Warren v. Reserve Fund, Inc.,
  728 F.2d 741 (5th Cir. 1984)............................................................... 67

STATUTES & RULES

7 Tex. Admin. Code § 139.16 ............................................................................ 67

Fed. R. Civ. P. 23 ............................................................................... passim

Fed. R. Civ. P. 26(a)(2)(d)(ii) & advisory committee's note .......................................... 44

Fed. R. Evid. 702 ............................................................................................ 44

Tex. Civ. Prac. & Rem. Code § 16.003 et seq. ................................................................ 36

Tex. Rev. Civ. Stat. Ann. art. 581-5T ......................................................................... 67

Tex. Rev. Civ. Stat. Ann. art. 581-33 ..................................................................... passim

## OTHER AUTHORITIES

Restatement (Second) Of Conflict Of Laws § 145 (1971) ............................................... 34

## PRELIMINARY STATEMENT

Plaintiffs and proposed plaintiff Pam Reed (collectively, the "Movants") seek certification of an amorphous worldwide class composed of "[a]ll persons or entities that held [certificates of deposit ("CDs")] or other investment accounts with [Stanford International Bank Ltd. ("SIB")]."  The proposed class would include, according to Movants, thousands of unidentified individuals from dozens of different countries, who purchased different kinds of investment products from different entities, at different times, for different reasons, from different brokers and on the basis of different oral representations, marketing materials and offering documents written in different languages.  The proposed class seeks billions of dollars in recovery not from the perpetrators of the fraud—Allen Stanford and SIB (Stanford's wholly owned bank)—but rather from two law firms that are alleged to be liable only on a theory of respondeat superior based on the alleged conduct of a single lawyer, Thomas V. Sjoblom ("Sjoblom"), whom none of the proposed class members is alleged ever to have met, heard of, or interacted with in any way before filing this lawsuit.

The proposed class—and the alternative classes or subclasses Movants proffer—do not meet the requirements of Federal Rule of Civil Procedure 23, and should not be certified.  "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quotation marks omitted).  Proponents of the class must prove each of Rule 23's requirements by a preponderance of the evidence.  Only by ignoring their burden under Rule 23 can Movants here assert that "[t]he instant case is easily certifiable under Rule 23"—an assertion that finds no support in the evidentiary record.

First, Movants have failed to satisfy their burden of proving Rule 23(b)(3)'s predominance requirement.  The putative class's claims—and Defendants' affirmative defenses to those claims—turn on proof of misrepresentations or omissions, reliance, and class members' knowledge about the Securities and Exchange Commission ("SEC") investigation of SIB and public allegations that SIB was operating a Ponzi scheme.  These matters can be established <u>only</u> through individualized inquiries that will depend on what particular class members were told by different financial advisors at different times, what written materials they received or had access to, and which of these diverse pieces of information they considered in deciding to purchase different CD products.  No common evidence can establish what any individual class member was told or relied on in deciding whether to invest, or what additional knowledge they had about the alleged misrepresentations and omissions—which is why claims and defenses that require proof of fraud, reliance, and investor knowledge cannot be certified for class action treatment, as the Supreme Court and Fifth Circuit have repeatedly held.  Under Texas choice-of-law rules, moreover, this Court cannot simply apply Texas common law to the claims of putative class members.  Instead, it must undertake a fact-specific investigation to determine the applicable law of the jurisdiction with the most significant relationship to <u>each</u> class member's purchase.  The individualized nature of these inquiries will swamp any common questions of law or fact, precluding certification of any class under controlling law.

Similarly, Movants have proposed <u>no</u> common methodology for determining whether putative class members were, in fact, damaged by Defendants' alleged conduct, and if so, by how much.  The only evidence in the record conclusively establishes that individualized inquiries will be necessary to determine the fact and amount of damages (if any) sustained by any putative class member.  While Movants assert that the Receiver can compute classwide damages using

the same methodology he used to approve claims on the Receivership estate, that methodology bears no relation to the damages available under any theory of liability asserted in this case, and, therefore undermines—rather than supports—a finding of predominance.

Second, Movants have not demonstrated that a class action is superior to individual or joined actions, as Rule 23(b)(3) requires.  At a minimum, the Court should decline to certify any class that includes citizens or legal residents of countries outside the United States that would neither recognize nor accord res judicata effect to any judgment rendered in this action.  That includes the thousands of proposed class members who hail from Venezuela, Mexico, Colombia, Ecuador, El Salvador, Panama, and Peru.  Movants have failed to present any evidence establishing that any of these foreign jurisdictions would recognize and give res judicata effect to the judgment of this Court in this opt-out class action, and the unrebutted testimony of Defendants' experts establishes that they would not.  In similar situations, federal courts have recognized that class certification is inappropriate because defendants should not be left to face the prospect of repeat litigation of the same issues against the same plaintiffs or class members in jurisdictions outside the United States after a United States court has rendered a final judgment that is intended to bind the entire class.  Additionally, hundreds of putative class members— including hundreds of foreign citizens and legal residents—have already brought individual lawsuits against Defendants, demonstrating that such actions are feasible and that a class action is not a superior alternative.

Third, Movants cannot satisfy Rule 23's other requirements.  Movants cannot demonstrate that the members of their class or alternative classes are ascertainable because no reliable methodology exists to identify putative class members.  And Movants' proposal to assign this task to the Receiver would require him to conduct the very type of individualized,

fact-intensive analysis of complex and potentially inaccurate records that courts routinely find to fail the ascertainability test.  Indeed, these hurdles would exist even if the class were limited solely to U.S. CD purchasers because such a class would still require the Court to identify and exclude "accredited investors," who cannot bring claims under the Texas Securities Act for aiding and abetting unregistered securities sales.  For the same reason, a U.S.-only subclass would be insufficiently numerous to warrant class treatment under Rule 23(a)(1).  Further, no proposed class representative satisfies Rule 23(a)'s adequacy or typicality requirements as they have failed to participate meaningfully in the litigation, have deferred too readily to proposed class counsel or are subject to unique legal and factual defenses that render them unsuitable to represent a class.  For all these reasons, and additional reasons explained below, this Court should not certify a class in this case.

## FACTUAL BACKGROUND

**A.     The SIB CDs at Issue Were Marketed to Investors Around the World Through a Variety of Marketing Materials and Oral Representations**

This case arises from Plaintiffs' claims that Sjoblom aided and abetted the sale of fraudulent CDs by SIB (the "SIB CDs") through his representation of SIB and its affiliates in an SEC investigation.  The SIB CDs were marketed to investors in the United States and over 100 foreign jurisdictions throughout the world.  (Br. 45.)[1]  These investors each had different relationships and communications with Stanford Financial and their respective Stanford Financial advisors, received different marketing materials from different Stanford Financial

---

[1] Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 31, 2014, is referred to as "Motion" or "Mot."  The Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 31, 2014, is referred to as "Brief" or "Br."  All citations to Defendants' Appendix ("App.") referenced herein are attached to the declaration of James P. Rouhandeh, dated March 20, 2015.

entities, and purchased different types of SIB CDs in different amounts over different periods

from the 1990s through February 2009.

1.    The Alleged Omissions and Misrepresentations Made to
      SIB CD Investors Were Not Uniform.

In their Second Amended Complaint ("Complaint" or "Compl."), Plaintiffs allege that

SIB investors were "uniformly" told, and relied on, representations by Stanford representatives

and in Stanford marketing materials that, among other things, SIB was a "U.S.-based business,"

(Compl. ¶ 86); "investments in the SIB CDs were . . . subject to regulation by the United States

government (the SEC and FINRA)," (id. at ¶ 24; see also id. at ¶¶ 40, 86); "SIB was . . . backed

by [Securities Investor Protection Corporation ("SIPC")] . . . insurance coverage" (id. at ¶ 40);

and investments in SIB CDs "were liquid" and "could be redeemed at any time because SIB,

through Stanford Financial, only invested the money in safe, secure and liquid assets" (id. at

¶ 24).  Plaintiffs have attempted, but fail, to re-characterize these alleged misrepresentations as

omissions.  Regardless of how they are characterized, the record is clear that Stanford's alleged

misrepresentations to investors were not "uniform."  (See id. at ¶¶ 86–88.)

a.    Investors Were Not Uniformly Told that SIB Was a "U.S.-Based
      Business."

Despite Plaintiffs' allegation that all investors were told, and relied on, statements that

SIB was a "U.S.-based business" (id. at ¶¶ 86, 88), many investors were repeatedly told that SIB

was an Antiguan bank, chartered under the laws of Antigua and Barbuda, and with offices

located solely in Antigua and Barbuda.  See, e.g., Receiver's Reply Supp. TRO, Prelim. Inj., in

the Alternative, Attach., Concerning Accounts of Former Stanford Employees, Janvey v.

Alguire, No. 3:09-cv-00724-N-BG (N.D. Tex. May 24, 2010), ECF No. 444-2, at Ex. 1, at Ex.

KVT-3 ("2008 Brochure") at 2, 13.  (See also App. 14, 2003 SIB Brochure; App. 32–33, SIB

U.S. Accredited Investor Disclosure Statement); App. 52, December 2008 Monthly Report.)

Indeed, one of the Spanish-language Stanford documents produced by named plaintiff and

proposed class representative Samuel Troice ("Troice") clearly states that SIB "is not a United

States bank."  (App. 58, SIB Q&A.)  Proposed class representative Pam Reed ("Reed")

acknowledged knowing that SIB CDs were issued from Antigua (App. 71–72, Dep. of Pam Reed

("Reed Dep.") Tr. 80:24–81:6),[2] an unsurprising fact given that each CD indicated that it was

executed from "St. John's, Antigua, West Indies" and that SIB had an Antiguan address (e.g.,

(App. 109, Reed SIB CD, dated July 4, 2007; App. 111, Reed SIB CD, dated Apr. 14, 2008).

Troice, however, received oral representations from his Stanford Financial advisor that the CDs

were issued by a U.S. bank.  (App. 127–128, Dep. of Samuel Troice ("Troice Dep.") Tr. 66:14–

22, 68:11–14.)[3]

       b.      Investors Were Not Uniformly Told that SIB CDs Were Subject to U.S. Government Regulation or Backed by U.S. Government Insurance.

Despite Plaintiffs' allegation that all investors were told, and relied on, statements that

their investments in SIB CDs were subject to regulation by the U.S. government (Compl. ¶ 24;

see also id. at ¶¶ 40, 86), Stanford made a number of express disclosures to the contrary.

Stanford repeatedly told investors that SIB:  (1) was regulated by the Financial Services

Regulatory Commission ("FSRC") and the Ministry of Finance of the Government of Antigua

and Barbuda (App. 166, SIB 2007 Annual Report; App. 33, 42, SIB U.S. Accredited Investor

---

[2] Reed's admission in her deposition starkly contrasts with her declaration, stating that "Stanford led [her] husband and [her] to believe that Stanford, including SIBL, was a U.S-based operation."  (App. 107, Declaration of Pam Reed, dated Feb. 13, 2015 ("Reed Decl.") ¶ 8; see also App. 79–80, Reed Dep. Tr. 101:20–102:6.)

[3] Further, both Troice and Reed conceded that if they had known—as some putative class members plainly knew—that SIB was not a "U.S.-based business," it would have altered their investment decisions.  (See App. 126–127, Troice Dep. Tr. 65:20–66:2 (stating that he would not have invested in an "offshore bank"); App. 81–82, Reed Dep. Tr. 103:6–22, 105:3–23 (stating that she would have asked "more questions" of her Stanford financial advisor had she seen an SIB brochure stating that SIB "is an Antiguan bank").)

Disclosure Statement; App. 52, SIB December 2008 Monthly Report); and (2) was not subject to the restrictions or the reporting requirements of any jurisdiction other than Antigua and Barbuda (2008 Brochure at 13; App. 14, 2003 SIB Brochure; see also App. 29, 34, SIB U.S. Accredited Investor Disclosure Statement).  Moreover, numerous Stanford documents disclosed that the SIB CDs were not registered under U.S. federal securities laws or the securities laws of any state or other jurisdiction.  (E.g., App. 34, SIB U.S. Accredited Investor Disclosure Statement; see also App. 14, 2003 SIB Brochure.)

In fact, the testimony of proposed class representative Troice confirms that investors were not uniformly told that SEC and FINRA regulated the SIB CDs.  Troice claimed he had "not heard" that SIB was regulated by FINRA and was not told anything about whether SIB was regulated by the SEC.  (See App. 134, Troice Dep. Tr. 77:3–14.)[4]

Furthermore, despite Plaintiffs' allegations to the contrary, (Compl. ¶ 40), putative class members were not uniformly told that SIB CDs were backed by SIPC or other U.S. government insurance.  Troice, for one, was completely unfamiliar with SIPC.  (App. 141–142, Troice Dep. Tr. 89:23–90:9.)  Indeed, Stanford disclosed to many investors that SIB deposits, including the CDs, were not "covered by the investor protection or securities insurance laws of any jurisdiction such as [SIPC] or the bonding requirements thereunder" (App. 14, 2003 SIB Brochure; App. 29, 34, SIB U.S. Accredited Investor Disclosure Statement), "by deposit insurance protection provided by U.S. Federal Deposit Insurance Corporation," (2008 Brochure at 8, 13; App. 14, 2003 SIB Brochure); see also App. 29, 34, SIB U.S. Accredited Investor Disclosure Statement),

---

[4] Although Troice testified that his Stanford financial advisor, David Nanes, told him that SIB was subject to generic U.S. regulations (App. 131–132, Troice Dep. Tr. 73:13–74:2), Nanes never discussed how SIB actually was regulated (App. 133, Troice Dep. Tr. 76:8–11).  Troice claimed that, had he received and reviewed Stanford's 2008 marketing brochure, he would have known that SIB CDs were not regulated by the U.S. government and would have discontinued his investment.  (App. 134–135, Troice Dep. Tr. 77:21–24, 80:2–23.)

or by "any other agency of the United States government or any state jurisdiction, or by any

insurance program of the government of Antigua and Barbuda," (App. 34, SIB U.S. Accredited

Investor Disclosure Statement).

        c.      The Representations about the Liquidity and Safety of the SIB CDs Were
                Not Uniform.

Despite Plaintiffs' contrary allegations, (Compl. ¶ 24), Stanford investors were not

uniformly told that investments in SIB CDs were liquid, redeemable at any time, and safe.

Indeed, an SEC employee observed that Stanford was "[t]elling foreign investors there is no risk

but American investors are being told there is complete risk."  (App. 87, OIG Report.)  To its

U.S. accredited investors, Stanford disclosed, inter alia, that:

- "Operating results could be adversely affected by . . . management's investment decisions with regard to the U.S. Accredited Investor CD or any products [SIB] offer[s]" (App. 33, SIB U.S. Accredited Investor Disclosure Statement);

- "[T]he ability of SIBL to pay principal and interest on the CD Deposits are dependent on our ability and the ability of our portfolio managers to consistently make profitable global investment decisions.  There can be no assurance that these decisions will continue to yield profitable results for SIBL, or cause the investments made in the U.S. Accredited Investor CD or any other products we offer to produce returns sufficient to fund the payment obligations of the CD Deposits" (id.);

- "YOU MAY LOSE YOUR ENTIRE INVESTMENT UNDER CIRCUMSTANCES WHERE WE MAY BE FINANCIALLY UNABLE TO REPAY THOSE AMOUNTS. PAYMENTS OF PRINCIPAL AND INTEREST ARE SUBJECT TO RISK" (App. 35, SIB U.S. Accredited Investor Disclosure Statement); and

- "Conservation of principal and interest rates on the CD Deposits are dependent upon returns in our investment portfolios . . . . If these returns on the bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the U.S. Accredited Investors CD" (id.).

Yet other investors claim that Stanford made no such disclosures.  For example, both Troice and

Isaac Green ("Green"), principal of named plaintiff and proposed class representative Punga

Punga Financial, Ltd. ("Punga Punga"), claim to have relied on oral representations by their

Stanford financial advisor and the head of Stanford Mexico, David Nanes, that there was no risk of losing their investment in SIB CDs.  (App. 143–144, Troice Dep. Tr. 92:22–93:7; App. 249, Dep. of Isaac Green ("Green Dep.") Tr. 72:14–21.)  Troice claims Nanes told him that he would be able to access and use the money he invested "whenever [he] wanted."  (App. 124, Troice Dep. Tr. 56:3–6.)  As a result, Troice believed the CDs to be "zero risk"; he would not have invested in them had he understood otherwise.  (App. 122–123, 144, Troice Dep. Tr. 48:22–49:16, 93:4–7.)

> 2.    As Far Back as 2005, Putative Class Members Had Information about the SEC's <u>Investigation of Stanford.</u>

Movants also assert that SIB investors were never told that Stanford was under investigation by the SEC.  (<u>E.g.</u>, Br. 6; <u>see also</u> Compl. ¶ 87.)  Yet at least some putative class members had access to public information regarding the SEC's investigation going back to 2005. In or around June 2005—before Stanford retained Sjoblom—the SEC sent letters and questionnaires to Stanford investors asking about the SIB CDs and the way in which they were marketed to investors.  (Br. 15; App. 267, Lena Stinson Aff. ¶ 16; App. 206, 208, 229–230, OIG Report; <u>Janvey v. Alguire</u>, No. 3:09-cv-00724-N, ECF No. 393 at 219–222.)  The letters and questionnaires put investors—both those who received the documents and those who heard about them—on notice that the SEC was examining the SIB CDs.  Indeed, a vice president and financial adviser at Stanford said that his phone "lit up like a Christmas tree the morning [the questionnaire] went out" and "led to 'significant concerns' by investors."  (App. 208, 229–230, OIG Report.)

The press also covered the SEC's investigation of the SIB CDs and the potential fraud. For example, in July 2008, a Bloomberg article entitled "SEC Investigating Stanford Group Offshore-Bank CDs" reported, among other things, that the SEC had issued subpoenas to former

Stanford employees "asking for information about the CD sales" by SIB.  (App. 278, Bloomberg article, <u>SEC Investigating Stanford Group Offshore-Bank CDs</u> (July 3, 2008); <u>see also</u> App. 281, The Daily Telegraph article, <u>The Greatest Final Ever</u>, July 7, 2008.)  A January 2009 article by financial analyst Alex Dalmady published in a Venezuelan magazine also alleged that Stanford was operating a Ponzi scheme.  (App. 283–287, VenEconomy article, <u>Duck Tales</u>, Jan. 2009.)

Knowledge of this public information would have affected some investors' decisions to invest or remain invested in the SIB CDs.  For example, had he known that Stanford was under investigation by the SEC, Troice would not have invested in the CDs.  (App. 136–137, Troice Dep. Tr. 81:15–82:6.)  And, had he heard about the SEC questionnaires or the July 2008 article, he would have withdrawn his money or looked into the issue further.  (App. 139, 140, Troice Dep. Tr. 85:16–20, 86:5–20.)  Similarly, Reed "[m]ost likely" would have altered her investment decisions had she seen press reports of the SEC's investigation, and she would have altered them had she known of the SEC questionnaire.  (App. 73, Reed Dep. Tr. 82:9–18.)  In contrast to the other Movants, however, Green was aware, prior to Stanford's collapse, of the Dalmady article and nonetheless chose to keep his money with Stanford based on his financial advisor's oral assurances.  (App. 235–236, Green Dep. Tr. 51:16–52:16.)

       3.     <u>The Putative Class Members Varied in Their Purchases of the SIB CDs.</u>

In addition to a lack of uniformity as to the alleged misrepresentations and omissions investors received regarding the SIB CDs, there was a lack of uniformity as to the characteristics of the CD investments by putative class members.

SIB sold CD products with varying terms and characteristics.  The available CD maturities ranged from one- to sixty-months.  Some CD products automatically renewed upon maturity, while others did not.  Some CD products allowed additional deposits with a minimum

deposit, while others did not.  Withdrawals from the various CDs were allowed, but with varying limitations and penalties.  (2008 Brochure at 11; see also App. 25, 2003 SIB Brochure; App. 181, 2007 SIB Annual Report; App. 32, 36, SIB U.S. Accredited Investor Disclosure Statement; App. 289–308, Troice SIB CDs.)

Purchases of the SIB CDs by members of the proposed class varied significantly, as illustrated by the purchases of the proposed class representatives:

Troice:  Troice invested in SIB CDs through Stanford's Mexico City offices beginning in 1997.  (App. 310–311, Declaration of Samuel Troice, dated Oct. 27, 2014 ("Troice Decl.") ¶ 4.) Although Troice had a long investment history with Stanford, during which he purchased and renewed a number of CDs, (see App. 314–402, Troice SIB Account Statements; App. 289–308 Troice SIB CDs), the only CD that he held as of February 2009 was a single FlexCD that he originally purchased in January 2004 and renewed in April 2005 (before Stanford retained Sjoblom) for a sixty-month period (see App. 343–344, 308, Troice SIB Account Statements; App. 381, Troice SIB CD; see also App. 465–466, Declaration of Paul Gompers ("Gompers Decl.") Ex. 2).  Troice continued to make deposits into and withdrawals from that FlexCD through February 2009.  (See App. 324–325, Troice SIB Account Statements; App. 475–477, Troice SIB Transaction Detail).

Punga Punga: From 1999 through 2004, Green, the principal shareholder of Punga Punga, invested in SIB CDs in his own name.  (App. 243–244, Green Dep. Tr. 64:17–65:3.) Green formed Punga Punga in Panama in 2004 with the assistance of David Nanes, (App. 482–483, Declaration of Isaac Green, dated Oct. 20, 2014 ("Green Decl.") ¶¶ 4, 5; App. 237–238, 241, Green Dep. Tr. 53:10–54:17, 59:17–25), who recommended that Green invest through a corporation, (App. 237–240, Green Dep. Tr. 53:17–56:20).  Punga Punga then invested in SIB

CDs through Stanford's Mexico City offices.  (App. 483, Green Decl. ¶ 5.)  As of February 2009, Punga Punga held (1) a sixty-month FixedCD purchased in September 2004, (2) a sixty-month FlexCD purchased in November 2004, and (3) a second, sixty-month FlexCD purchased in June 2006.  (See App. 488–489, 491–497, Punga Punga Transaction Detail; see also (App. 465–466, Gompers Decl. Ex. 2).

    Reed:  Reed began investing in SIB CDs from the U.S. in 2007, when she and her husband followed their long-time financial advisor, Nigel Bowman, to Stanford.  (See App. 106–107, Reed Decl. ¶ 4.)  In order to invest in the SIB CDs in the U.S., Reed was required to be, and was in fact, an accredited investor.[5]  (See App. 501, 505 , SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire; App. 29, 32 SIB U.S. Accredited Investor Disclosure Statement; App. 76–78, Reed Dep. Tr. 95:10-14, 99:19-100:12.)  Reed invested in two SIB CDs that she continued to hold as of February 2009:  (1) a sixty-month FixedCD in July 2007; and (2) a three-month FixedCD in Apr. 2008, which was repeatedly renewed, including in January 2009.  (See, e.g., App. 109, Reed SIB CD, dated July 4, 2007; App. 111, Reed SIB CD, dated Apr. 14, 2008; App. 509–510; Reed SIB Transaction Detail; App. 512–513 Reed Statement of Account; see also App. 465–466, Gompers Decl. Ex. 2.)

---

[5] An "accredited investor" was defined to include, among other categories, a natural person who, at the time the CD was acquired, had:  (1) an individual net worth, or joint net worth with his or her spouse exceeding US$1,000,000; or (2) individual income in excess of $200,000, or joint income with his or her spouse in excess of $300,000, in each of the prior two calendar years and a reasonable expectation of reaching the same income level in the current calendar year.  (App. 505, SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire; see also App. 36 SIB U.S. Accredited Investor Disclosure Statement (noting that the "U.S. Accredited Investor CD" was available only to those who qualify as an "[a]ccredited [i]nvestor" under "Rule 501(a) of Regulation D of the Securities Act").)  An "accredited investor" also included an entity that, at the time the CD was acquired, had total assets in excess of $5,000,000 and was not formed for the specific purpose of purchasing the CD.  (App. 505, SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire.)

**B.      Putative Class Members Have Filed Numerous Individual Litigations Against Defendants**

Movants incorrectly assert that "there are no other pending lawsuits filed against these Defendants by Stanford investors other than the current class action."  (Br. 46; see also App. 526, Declaration of Edward F. Sherman, dated Oct. 31, 2014 ("Sherman Decl.") ¶ 33.)[6]  That is false. In fact, hundreds of putative class members—including proposed class representative Reed— have filed multiple cases against Defendants, acting through the same counsel who represent Plaintiffs in this case.  Many of these individual actions remain pending in federal and state courts, although some have been dismissed without prejudice.[7]

---

[6] The Court should exclude the Declaration of Edward F. Sherman ("Sherman Declaration") and Responsive Declaration of Edward F. Sherman ("Sherman Rebuttal Decl."), upon which Movants rely, because they are no more than impermissible legal briefs dressed up as expert testimony.  In his declarations, Professor Sherman offers no more than bare legal conclusions as to whether Movants have satisfied their burden under the rules.  (See generally App. 518–527, Sherman Decl. ¶¶ 7–37; App. 541–549, Sherman Rebuttal Decl. ¶¶ 2–10.)  Such conclusions are barred under the well-settled law of this Circuit.  See Goodman v. Harris Cnty., 571 F.3d 388, 399 (5th Cir. 2009) ("An expert may never render conclusions of law."); Askanase v. Fatjo, 130 F.3d 657, 673 (5th Cir. 1997) ("There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge." (citation and quotation marks omitted)).  For this reason, courts regularly exclude expert testimony as to legal conclusions.  E.g., Askanase, 130 F.3d at 673 (affirming district court's decision to exclude, as impermissible legal opinion, expert's proposed testimony that defendants breached their fiduciary duties).  Defendants have not filed a motion to exclude the Professor Sherman's declarations so as to avoid burdening the Court at this juncture but respectfully request leave to do so if the Court is inclined to rely on them.

[7] See, e.g., Gale v. Proskauer Rose LLP, No. 3:12-cv-1803 (N.D. Tex.) (pending before this Court) (48 plaintiffs); Green v. Proskauer Rose LLP, No. 3:12-cv-1808 (N.D. Tex.) (pending before this Court) (29 plaintiffs); Ibarra v. Proskauer Rose LLP, No. 3:12-cv-1805 (N.D. Tex.) (pending before this Court) (49 plaintiffs); Martin v. Proskauer Rose LLP, No. 3:12-cv-1809 (N.D. Tex.) (pending before this Court) (48 plaintiffs); Reed v. Proskauer Rose LLP, No. 3:12-cv-1806 (N.D. Tex.) (pending before this Court) (49 plaintiffs); Garza v. Proskauer Rose LLP, No. 2011-77793 (Harris Cnty. [281st Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); Arista Trust v. Proskauer Rose LLP, No. 2012-CI-02423 (Bexar Cnty. [131st Dist.]) (pending) (46 plaintiffs); Canuta Trust v. Proskauer Rose LLP, No. 2012-CI-02422 (Bexar Cnty. [73d Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); Soledad Trust v. Proskauer Rose LLP, No. 2012-09838 (Harris Cnty. [152d Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); MFR Inversiones, C.A. v. Proskauer Rose LLP, No. 2012-09824 (Harris Cnty. [113th Dist.]) (dismissed without prejudice for lack of prosecution) (45 plaintiffs);  Rubiano v. Proskauer Rose LLP, No. 2012-CI-02425 (Bexar Cnty. [166th Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); and Valenzuela de Jimenez v. Proskauer Rose LLP, No. 2012-CI-02424 (Bexar Cnty. [150th Dist.]) (dismissed without prejudice for lack of prosecution) (25 plaintiffs).

**C.      The Instant Proceedings**

Plaintiffs' claims against Defendants rest upon their theory that, but for Sjoblom's

defense of his client, Stanford Financial, in an SEC Enforcement Division investigation, "the

SEC would have intervened and shut the Ponzi scheme down prior to 2009." (Compl. ¶ 97.)

Plaintiffs have asserted claims against Defendants for allegedly:  (1) aiding and abetting Stanford

Financial's alleged violations of the registration and antifraud provisions of the Texas Securities

Act (the "TSA"); (2) aiding and abetting Stanford Financial's alleged common law fraud; and

(3) conspiring with Stanford Financial to defraud the putative class.  (Id. at ¶¶ 97–113.)

Following this Court's dismissal of Plaintiffs' claims for negligent hiring and retention, (Order,

ECF No. 176, at 1, 26), the only remaining theory of liability against Defendants is that they are

liable on a respondeat superior theory for Sjoblom's conduct.  (Compl. ¶¶ 114–115.)  The Court

also dismissed Plaintiffs' TSA claims for sales of unregistered securities and sales of securities

by unregistered dealers based on sales taking place prior to October 9, 2006.  (Order, ECF No.

176, at 12–13.)

Plaintiffs claim that damages to the putative class—"the difference between their

investments in SIB as stated in their last account statement and the amount Plaintiffs may receive

from the Receivership distribution"— total "between $4 billion and $7 billion."  (Compl. ¶¶ 105,

107–109, 117.)

Movants seek to certify a class consisting of "[a]ll persons or entities that held CD or

other investment accounts with SIB as of February, 2009 and whose claims are recognized and

authorized by the Receiver in the SEC Action . . . ."  (Id. at ¶ 92; Mot. 4–5.)[8]  In the alternative,

---

[8] Elsewhere in the Complaint, Plaintiffs seek "certification of a class of all investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009" (Compl. ¶ 6 (emphasis added).)  Movants appear to have abandoned this inconsistent definition of the proposed class.  (See Br. 29–30.)

Plaintiffs and proposed class representatives Troice and Punga Punga seek to certify a class composed of "all Mexican citizens and legal residents, or entities owned or controlled by Mexican citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action" (Compl. ¶ 94; see also Mot. 6), and proposed plaintiff and class representative Reed seeks to certify a class composed of "all United States citizens and legal residents, or entities owned or controlled by United States citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action" (Compl. ¶ 95; see also Mot. 5).[9]  As of the date of this memorandum, Reed is not a named plaintiff in this action.  See infra Part IV.A.[10]

## ARGUMENT

"[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23[.]"  Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2412 (2014) (emphasis in original).  The Court must employ a "rigorous analysis" to determine whether the prerequisites of Rule 23 are established and, where appropriate, "probe behind the pleadings before coming to rest on the certification question."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quotation marks

---

[9] In their Motion, Movants propose an additional alternative class of investors composed of "all Latin American citizens and legal residents, or entities owned or controlled by Latin American citizens or legal residents, that had purchased and still held CDs or other depository accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action." (Mot. 6.)  Yet nowhere do Movants specify which countries fall within the term "Latin American" in their proposed alternative class definition.  In any event, Plaintiffs did not plead such an alternative class in their Complaint, (see Compl. ¶¶ 92, 94–95), nor did Movants argue that such an alternative class should be certified in their Brief in support of the Motion.  See Br. 29–31; see also Opposed Mot. to Add Named Pl. & Putative Class Representative, ECF No. 163, at ¶¶ 4, 7–9.)

[10] On January 29, 2015, Plaintiffs filed their Opposed Motion to Add Named Plaintiff and Putative Class Representative, Pam Reed.  (ECF No. 163.)  Plaintiffs' opposed motion was fully briefed as of March 5, 2015, and remains sub judice.  Plaintiffs' Motion to Quash and Motion for Protective Order on Defendants' Notices of Depositions of Annalisa Mendez and Horacio Mendez (ECF No. 164) also remains sub judice; no reply was filed.

omitted).  Because Movants have failed to satisfy their burden to prove each of the predominance and superiority requirements of Rule 23(b)(3), the ascertainability of any class, or the threshold requirements of Rule 23(a), class certification should be denied.

Specifically, as demonstrated below, Movants have failed to satisfy their burden of establishing that common issues predominate over individualized ones with respect to any of their claims for liability.  They likewise have failed to prove, as they must under controlling law, that common issues relating to damages predominate over individualized ones and that their proposed methodology for calculating damages to the putative class is consistent with their theory of liability.  Second, Movants have failed to establish that a class action is a superior mechanism for adjudicating this case, particularly when Movants have proposed a class that includes thousands of individuals from foreign countries that are not likely to recognize or grant res judicata effect to the judgment of a United States court in this opt-out class action.  Third, Movants have failed to show that their proposed class or any of their alternative subclasses is readily ascertainable.  Fourth, Movants have failed to establish that they satisfy the adequacy or typicality requirements of Rule 23(a).  Fifth, Movants have failed to demonstrate that an alternative class or subclass of U.S. investors who can actually assert viable claims would be large enough to satisfy the numerosity requirement of Rule 23(a).  And, finally, in the event any class is certified (which one should not be), it must be far more limited than the unwieldy worldwide class that Movants have proposed.

## I.   Movants Have Not Satisfied and Cannot Satisfy Rule 23(b)(3)'s Requirements Because Individualized Issues Predominate Over Common Issues

Movants have not met their burden of proving, by a preponderance of the evidence, that common questions of law or fact predominate over individual issues affecting individual putative class members.  See, e.g., Fed. R. Civ. P. 23(b)(3); Alaska Elec. Pension Fund v. Flowserve

16

Corp., 572 F.3d 221, 227 (5th Cir. 2009) (per curiam); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623–24 (1997) (describing the predominance requirement as "far more demanding" than Rule 23(a)'s commonality requirement).  Specifically, they fail to account for a number of individual issues that will predominate over common ones, including issues related to: (1) misrepresentations and omissions; (2) reliance; (3) knowledge; (4) holder claims; (5) damages; (6) choice of law; and (7) timeliness of claims.  For this reason, the Court should deny the Motion.

A.      Material Differences in the Alleged Misrepresentations or Omissions to Putative Class Members Preclude Certification.

Movants cannot satisfy Rule 23(b)(3)'s predominance requirement as to the remaining common law claims and the claim for aiding and abetting violations of TSA Article 581-33A(2). This is not a garden variety securities fraud class action in which a group of investors alleges that it purchased a single type of security following a company's misrepresentation or omission in a regulatory filing or offering document.  In this case, there are numerous individual issues as to which alleged misrepresentations or omissions were made to which putative class members.  For each of these claims, the putative class representatives must prove that a misrepresentation or omission was made to them.  Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2); Ernst & Young, L.L.P v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001); Am. Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 438 (Tex. 1997).  Where there are fundamental differences in the alleged misrepresentations or omissions made, courts consistently decline to certify a class, finding that common issues of fact do not predominate.  See, e.g., Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973) (explaining that class certification is inappropriate where "writings contain material variations, emanate from several sources, or do not actually reach the subject investors"); Gyarmathy & Assocs., Inc. v. TIG Ins. Co., No. Civ. A. 3:02-cv-

17

1245, 2003 WL 21339279, at *2–3 (N.D. Tex. June 3, 2003) (Godbey, J.) (finding that "common

issues of fact [did] not predominate" where "documents were not delivered to the putative class

members in identical contexts"); see also Fed. R. Civ. P. 23 Advisory Committee Notes (1966

Amendment, Subdivision (b)(3)) ("[F]raud case[s] may be unsuited for treatment as a class

action" because of "material variation[s] in the representations made").  The presence of alleged

oral misrepresentations or omissions makes denial of class certification only more likely.  See,

e.g., Gyarmathy, 2003 WL 21339279, at *3 (denying class certification, notwithstanding

movant's allegations of uniform written disclosures because the "record reflect[ed] that at least

some potential class members received varying representations from their brokers above and

beyond what [was] contained in the [written material]").  This Court should decline to certify a

class here for the same reasons.

 Even the limited factual record compiled to date disproves Movants' allegations that

misrepresentations and omissions were "uniform" or "consistent" across the proposed class.

(See, e.g., Compl. ¶¶ 40, 86; see also Br. 6, 33, 42.)  Movants' proposed class definition includes

purchasers from different countries, who speak different languages, who invested over a period

of approximately two decades in consultation with different investment advisors, and who read

and reviewed (or did not read or review) different materials in connection with their decisions to

invest in SIB CDs.  Proposed class representatives acknowledged that they consulted different

financial advisors and  reviewed different written materials in making their decisions to invest.

See supra Facts.A.1.  Through these conversations with financial advisors and reviews of

Stanford materials, putative class members received non-uniform substantive information.

 Indeed, in stark contrast to Plaintiffs' allegations, even the proposed class representatives

professed ignorance of certain of the supposed "uniform" misrepresentations put forth in the

Complaint.  (See supra Facts.A.1; compare Compl. ¶ 24 (alleging that class members "were uniformly informed by Stanford Financial . . . that . . . investments in SIB CDs were safe and sound because SIB was . . . subject to regulation by the United States government (the SEC and FINRA)"), with App. 134, Troice Dep. Tr. 77:3–14 (asserting that he had "not heard" that SIB was regulated by FINRA and that his advisor "didn't touch on the subject of the SEC").)

Therefore, these and other individualized issues predominate over common issues and preclude certification of a class including the remaining common law claims and the claim for aiding abetting violations of TSA Article 581-33A(2).

B.     Individual Issues of Reliance Will Predominate with Respect to Plaintiffs' Remaining Common Law Causes of Action.

Individual issues of reliance should preclude class certification in this case because each of Plaintiffs' remaining common law causes of action requires proof of putative class members' reasonable or justifiable reliance on alleged misrepresentations and omissions, and no classwide presumption of reliance applies.

1.     Plaintiffs' Remaining Common Law Claims Require Proof of Reasonable or Justifiable Reliance, Precluding Certification.

Absent any applicable presumption, "the element of reliance cannot be proved on a classwide basis through evidence common to the class," and thus individualized issues of fact or law will overwhelm common ones.  Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1195 (2012); In re Park Cent. Global Litig., No. 3:09–cv–765–M, 2014 WL 4261950, at *10–11 (N.D. Tex. Aug. 25, 2014); see also Halliburton, 134 S. Ct. at 2416 ("Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)."); Bell v. Ascendant Solutions, Inc., No. Civ. A. 301CV0166N, 2004 WL 149009, at *5 (N.D. Tex. July 1, 2004) (Godbey, J.) (denying class

19

certification on predominance grounds because plaintiffs failed to demonstrate the applicability

of a presumption of reliance).  As a result, "[c]laims for money damages in which individual

reliance is an element are poor candidates for class treatment, at best."  Patterson v. Mobil Oil

Corp., 241 F.3d 417, 419 (5th Cir. 2001).

Here, Plaintiffs must prove reliance to recover on their claims for aiding and abetting

fraud,[11] and civil conspiracy.[12]  See Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 693 (Tex.

2003) ("Reliance is an element of . . . fraud"); Ortiz v. Collins, 203 S.W.3d 414, 422–23 (Tex.

App.—Houston [14th Dist.] 2006, no pet.) (holding that where summary judgment was proper

on underlying fraud claim due to lack of justifiable reliance, summary judgment was also proper

on conspiracy to defraud claim); TCA Bldg. Co. v. Entech, Inc., 86 S.W.3d 667, 674 (Tex.

App.—Austin 2002, no pet.) (explaining that common law fraud requires "reasonable or

justifiable" reliance); Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex. 1997)

(holding that reliance is an element of fraud by nondisclosure because fraud by nondisclosure is

a subcategory of fraud).  Indeed, "a fraud class action cannot be certified when individual

reliance will be an issue."  Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996)

---

[11] In its March 4, 2015 Order on Defendants' motions to dismiss, the Court "assume[d] at [the motion to dismiss] stage" that a cause of action for aiding and abetting common law fraud is cognizable under Texas law. (Order, ECF No. 176, at 19.)  Defendants reiterate that such a cause of action is not recognized under Texas law. See, e.g., Prospect High Income Fund v. Grant Thornton, L.L.P., 203 S.W.3d 602, 616 (Tex. App.—Dallas 2006) ("The Texas Supreme Court has not recognized a separate tort of aiding and abetting fraud."), rev'd in part on other grounds, 314 S.W.3d 913 (Tex. 2010).

[12] Civil conspiracy requires proof of an underlying tort.  Askanase, 130 F.3d at 676 (noting that "because the fraud claim fails[,] the fraud based conspiracy claim must fail also"); see also Am. Tobacco Co., 951 S.W.2d at 438 (granting summary judgment on conspiracy claim and noting that "[a]llegations of conspiracy are not actionable absent an underlying [tort]").  Thus, where, as here, individualized issues of reliance overwhelm common issues of fact or law with respect to the underlying tort, see infra Part I.B, they necessarily overwhelm common issues with respect to causes of action predicated on the underlying tort.  See, e.g., Lam v. Alpha Realtors, Inc., Civil Action No. H-09-3041, 2010 WL 4569995, at *20 (S.D. Tex. Nov. 4, 2010) ("[Plaintiffs'] failure to establish a genuine dispute of material fact with regard to the reliance element for their fraudulent-inducement claim necessarily defeats their attempt to establish a civil conspiracy.").

(citing Simon, 482 F.2d at 880).  And, as explained below, see infra Part I.B.2, no presumption of classwide reliance applies.

Thus, even assuming that each putative class member received the same Stanford documents with the same alleged misstatements and omissions—which is not the case, see supra Facts A.1; Part I.A[13]—the proposed class representatives would still have to demonstrate whether each putative class member relied on those alleged misstatements and omissions, the degrees of their reliance,[14] and whether the reliance was "reasonable or justifiable."  Such factors are fatal for class certification in virtually all cases.  And here the need for individualized inquiry is heightened by the fact that there are material differences among putative class members with regard to due diligence inquiries,[15] risk tolerances and profiles,[16] sophistication,[17] and accredited investor status[18]—all of which affect the underlying reliance inquiry.  These individual, fact-intensive issues would swamp any common issues with respect to the putative class members'

---

[13] The wide variety of materials that the putative class members received and reviewed creates an additional reason why Plaintiffs' reliance claims are not susceptible to classwide proof.  See, e.g., Simon, 482 F.2d at 882.

[14] For example, Green relied on monthly brochures, letters regarding insurance coverage, and print and electronic advertisements  (App. 246–247, 248, 250, 256, 257, Green Dep. Tr. 67:2–68:7, 71:3–11, 80:4–11, 124:10–22, 125:4–14), whereas Troice thought it "better to listen to [Stanford broker David Nanes] than to read the [written materials]" (App. 124–125, Troice Dep. Tr. 56:7–57:9).

[15] For example, Green testified that he reviewed his investments daily (App. 253, Green Dep. Tr. 110:5–8), and frequently met with Nanes to discuss his finances (App. 244–245, Green Dep. Tr. 65:25–66:13), while Troice testified that he did not perform any due diligence on the SIB CDs himself (App. 138, Troice Dep. Tr. 83:2–6).  Reed traveled to Antigua with her financial advisor and discussed her potential investment with several Stanford employees, including Allen Stanford.  (App. 86–87, 74, 93, Reed Dep. Tr. 155:19–156:16, 88:16–23, 166:8–10.)

[16] For example, Reed's investment objective was to pursue "low risk" investments that would "retain capital."  (App. 70, Reed Dep. Tr. 79:4–8.)  Yet other U.S. accredited investors who reviewed Stanford disclosures likely had higher risk tolerances because they were told, among other things, that they "may lose [their] entire investment under circumstances where we may be financially unable to repay those amounts."  (App. 35, SIB U.S. Accredited Investor Disclosure Statement; see also supra Facts.A.1.)

[17] For example, both Troice and Reed have advanced degrees.  (See App. 114, Troice Dep. Tr. 10:16–17; App. 64, Reed Dep. Tr. 7:4–8.)

[18] U.S. accredited investors were  provided with additional disclosures not given to all putative class members.  (See App. 551, August 2007 letter to Reed; App. 28–50 SIB U.S. Accredited Investor Disclosure Statement.)

common law claims.  Accordingly, no class including those claims should be certified.  See, e.g., Halliburton, 134 S.Ct. at 2416; In re Park Cent. Global Litig., 2014 WL 4261950, at *10–11.

> 2.      Movants Are Not Entitled to a Presumption of Reliance
> Under Affiliated Ute.

Movants cannot avoid the individualized nature of the reliance inquiry through the presumption of classwide reliance on material omissions recognized in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 152–54 (1972).  The Affiliated Ute presumption does not apply, for two reasons.

First, the Affiliated Ute presumption simply does not apply to the common law fraud claims asserted on behalf of the class.  Gyarmathy, 2003 WL 21339279, at *3 n.6 ("The Fifth Circuit has rejected extending an Affiliated Ute presumption beyond fraud on the market securities theories to this sort of class action context."); see also McManus v. Fleetwood Enters., Inc., 320 F.3d 545, 549 (5th Cir. 2003) ("Reliance may not be presumed under Texas law."); Simms v. Jones, 296 F.R.D. 485, 498, 510 (N.D. Tex. 2013) (holding that "there is no basis to extend Affiliated Ute's reliance presumption to a case" involving common law fraud); see also Griffin v. Box, No. 94-10348, 1996 WL 255296, at *16 n.17 (5th Cir. May 2, 1996) (noting that the "Ute presumption applies only to rule 10b-5 actions based primarily upon omissions rather than misrepresentations" (quotation marks omitted)).

Second, by its own terms, Affiliated Ute does not apply to claims that are based on affirmative misrepresentations.  See Abell v. Potomac Ins. Co., 858 F.2d 1104, 1119 (5th Cir. 1988) ("As our subsequent cases have taught, the Ute presumption attaches only to those rule 10b–5 actions based primarily upon omissions rather than misrepresentations"), vacated on other grounds sub nom. Fryar v. Abell, 492 U.S. 914 (1989).  As alleged in the Complaint, the claims here turn primarily on affirmative misrepresentations made by Stanford brokers to putative class

22

members about the regulation, risks, and liquidity of the SIB CDs.  (See, e.g. Compl. ¶¶ 24, 40,

86–88.) For the presumption to apply, however, the claim must (1) be grounded primarily in

allegations that the defendants failed to disclose any information whatsoever relating to material

facts, and (2) demonstrate that the defendants owed the plaintiffs a duty to disclose those facts.

Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 384 (5th

Cir. 2007).  The Affiliated Ute presumption does not apply where, as here, "[n]on-disclosure is

relevant only [insofar] as it makes the statements either false or misleading."  Smith v. Ayres,

845 F.2d 1360, 1363 (5th Cir. 1988); Krogman v. Sterritt, 202 F.R.D. 467, 478–79 (N.D. Tex.

2001).  Moreover, alleged concealment of a purported fraudulent scheme does not transform a

misrepresentation case into an omissions case.  Joseph v. Wiles, 223 F.3d 1155, 1163 (10th Cir.

2000); In re Enron Corp. Sec., 529 F. Supp. 2d 644, 682 (S.D. Tex. 2006); see also Regents of

Univ. of Cal., 482 F.3d at 384 (explaining that "[m]erely pleading that [a] defendant[] failed to

fulfill [a] duty [to disclose material information] by means of a scheme or an act, rather than by a

misleading statement, does not entitle plaintiffs to employ the Affiliated Ute presumption.").

Because the Complaint is premised on false and misleading statements, not pure omissions, no

presumption of reliance is available under Affiliated Ute.

>        C.      Individual Issues of Knowledge Will Predominate With Respect to
>                Plaintiffs' Claims Under the TSA.

Movants cannot satisfy Rule 23(b)(3)'s predominance requirement with respect to certain

claims brought under the TSA.  Specifically, Defendants cannot be held liable under Article 581-

33A(2) of the TSA to an investor who knew the information allegedly omitted or that the alleged

misstatement was false at the time of the purchase.  Tex. Rev. Civ. Stat. Ann. art. 581-33A(2);

see also Duperier v. Tex. State Bank, 28 S.W.3d 740, 753 (Tex. App.—Corpus Christi 2000, pet.

dism'd by agr.) (noting the TSA "excludes from liability any defendant who can prove the

23

plaintiff knew the misrepresentations or the omissions."). Thus, knowledge is an affirmative defense under the TSA. <u>Sterling Trust Co. v. Adderley</u>, 168 S.W.3d 835, 843 (Tex. 2005).

Given the inherently individual nature of the inquiry as to what an investor knew at the time of purchase, even if one or more class representatives were to succeed in presenting evidence to overcome this defense, they would do so only for themselves. Conversely, if one or more class representatives were to fail in presenting evidence overcoming this defense, that would prove nothing regarding absent class members' ability to overcome the defense.

Here, evidence in the record demonstrates how different putative class members could have had different knowledge of the alleged misrepresentations or omissions at the times of their respective purchases. For example, while proposed class representatives have alleged that they were never informed that Stanford was under investigation by the SEC or that the SEC believed Stanford might be a fraud, (Br. 2, 33, App. 106–107, Reed Decl. ¶ 8; App. 311, Troice Decl. ¶ 6; App. 483, Green Decl. ¶ 8), the record shows that information about both the SEC investigation and the possibility that SIB was a perpetrating a fraud were available in the public record and were in fact known to at least one of the proposed class representatives. Indeed, Green testified at his deposition that he was aware, prior to Stanford's ultimate collapse, of an article in a Venezuelan magazine by Alex Dalmady alleging that Stanford was perpetrating a Ponzi scheme. (App. 235–236, Green Dep. Tr. 51:16-52:16.) As discussed at Facts.A.2, <u>supra</u>, other information suggesting Stanford may have been under investigation, including SEC questionnaires delivered to numerous putative class members, was also publicly available prior to February 2009.

Where, as here, the public record suggests that individual class members could have known the information purportedly giving rise to a violation of the TSA, Defendants are entitled

to try to prove applicability of the knowledge defense as against putative class members on an individualized basis.  See, e.g., In re Kosmos Energy Ltd. Sec. Litig., 299 F.R.D. 133, 154 (N.D. Tex. 2014) ("[A]ffirmative defenses such as investor knowledge are clearly relevant to the predominance analysis."); In re Superior Offshore Int'l, Inc. Sec. Litig., No. CIV.A.H-08-0687, 2010 WL 2305742, at *5 (S.D. Tex. June 8, 2010) (holding that where facts underlying alleged misrepresentations and omissions appeared to be publicly known, "[p]laintiffs ha[d] not satisfied their burden to demonstrate that those issues predominate over the knowledge issue [under Section 11 of the Securities Act of 1933]—an issue that must be determined on an individualized basis as to each investor").  Those individualized inquiries will overwhelm common issues of fact and law.  See Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 329 (5th Cir. 2008) (concluding that need to hold mini-trials on the affirmative defense of consent defeats possibility of class certification); Castano, 84 F.3d at 742 n.15 (finding that individualized issues of knowledge with respect to the effects of smoking rendered a class inappropriate for certification); Martin v. Home Depot U.S.A., Inc., 225 F.R.D. 198, 202 (W.D. Tex. 2004) ("Knowledge is highly individualistic and cannot be determined on a classwide basis." (citation and quotation marks omitted)).

> D.    Individual Issues Will Predominate in Determining Which of the Putative Class Members' Claims Are Barred Holder Claims.

This Court should decline to certify a class in this case because individual issues of fact will predominate in determining which of the putative class members' claims are holder claims, and therefore barred.[19]  The proposed class, however, explicitly includes these disallowed holder

---

[19] As this Court acknowledged in its Order regarding Defendants' motions to dismiss, courts have held that holder claims are not cognizable under the TSA.  (Order, ECF No. 176, at 9–10); see In re Enron Corp. Sec., Derivative & "ERISA" Litig., 490 F. Supp. 2d at 818 ("[T]he express language of the [TSA] excludes 'holder' claims from coverage."); accord In re Enron Corp. Sec., Derivative & "ERISA" Litig., Civil Action Nos. H-01-3624, G-02-0299, 2007 WL 789141, at *1 (S.D. Tex. Mar. 12, 2007); Barsky v. Arthur Andersen, LLP, No. Civ. A

claims.  (Compl. ¶ 92 (seeking certification of a class of "[a]ll persons or entities that held CD or

other investments accounts with SIB as of February, 2009" (emphasis added)); Mot. at 4–5

(same); cf. Pls.' Joint Resp. & Br. in Opp'n to Defs.' Mots. to Dismiss Pls.' Compl. &, in the

Alternative, Mot. for Leave to Amend, ECF No. 50, at 77 (seeking to amend Complaint to allege

"the timing of [p]laintiffs' purchases of CDs and that they are not alleging 'holder claims in this

lawsuit'").)  Thus, certification of the proposed class would require the Court to weed out

putative class members' non-cognizable holder claims, which will cause individual inquiries to

overwhelm common ones.  See, e.g., Gene & Gene LLC, 541 3d at 329 (denying class

certification on predominance grounds where court would need to hold "mini-trials" to determine

an issue on an individual basis); Hancock v. Chi. Title Ins. Co., 263 F.R.D. 383, 390 (N.D. Tex.

2009) (same).

     Movants have not met, and cannot meet, their burden of showing that individualized

issues involved in identifying putative class members' holder claims would not predominate over

common issues.  The individualized issues include:  (1) when each investor purchased each CD;

(2) the type of CD purchased; (3) whether and when the CD was automatically or otherwise

renewed prior to February 17, 2009; and (4) whether the investor deposited additional funds,

other than principal or interest from another Stanford investment, into the CD.  (App. 432–435,

436, Gompers Decl. ¶¶ 40–44, 47.)  Because these inquiries require individualized review of

each proposed class member's account records, individualized questions of fact would

predominate over common issues, rendering class certification inappropriate.

---

H-02-1922, 2002 WL 32856818, at *2 n.3 (S.D. Tex. Aug. 16, 2002).  It is doubtful whether holder claims are
cognizable under Texas common law.  See In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2007 WL 789141,
at *13 ("[T]he Texas Supreme Court would limit, if not totally exclude, holder claims under Texas common law
fraud.").

Indeed, these individualized issues exist even among the proposed class representatives themselves.  For example, both the principal of Punga Punga and Troice began investing in the Stanford CDs in the late 1990s.  (App. 243–244, Green Dep. Tr. 64:17–65:3; App. 310–311, Troice Decl. ¶ 4.)  Prior to Sjoblom's retention by Stanford, both Punga Punga and Troice purchased or renewed FlexCDs that they continued to hold as of February 2009, and into which they continued to make deposits of funds which, in turn, may have come from other Stanford investments made prior to Sjoblom's retention.  (See App. 343–344, Troice SIB Statement of Account; App. 488–489, Punga Punga SIB Transaction Detail; App. 474–480; Troice SIB Transaction Detail; App. 491–497, Punga Punga SIB Transaction Detail; App. 253–255, 258–259, Green Dep. Tr. 110:20–112:19, 139:2–140:2.)  Thus, individualized inquiries would be required on a number of issues to determine whether Punga Punga and Troice's claims involving additional CD deposits should be considered holder claims and therefore disallowed.

E.      Movants Have Not Established that Common Issues of Damages Predominate.

Movants do not, and cannot, demonstrate that common issues predominate over individual issues with respect to the putative class members' alleged damages.  Movants state in passing that "questions of damages can be proven on a class-wide basis" (Br. 54–55), but they do not even attempt to meet their burden to identify such proof. Indeed, Movants have not proposed any methodology for calculating damages, nor have they presented a damages approach consistent with any theory of liability.

1.      Movants Fail to Offer Any Viable Classwide Damages Model.

"[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class."  Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598, 602 (5th Cir. 2006).  Indeed,

27

"[w]ithout presenting [a] [damages] methodology, [the proponents of a class] cannot show Rule 23(b)(3) predominance.  Questions of individual damage calculations will inevitably overwhelm questions common to the class."  Comcast, 133 S. Ct. at 1433.  That is the case here, where Movants have asserted that classwide damages can be calculated according to a common methodology, but have failed to propose any methodology for computing those damages.[20]

Movants assert that "questions of damages can be proven on a class-wide basis by the Receiver's team, specifically FTI," (Br. 54–55 ), but they offer no supporting "evidence" for this contention beyond the Receiver's conclusory say so in his accompanying declaration.  (App. 558, Janvey Decl. ¶ 17.)  The Receiver provides no explanation of how he or FTI would purport to quantify damages for any individual class member.  Instead, the Receiver opaquely states that FTI can do so based on unspecified "data gathered and relied upon as part of the Receivership claims process."  (Id.)[21]

_____

[20] In re Deepwater Horizon, 739 F.3d 790 (5th Cir. 2014), does not command a different analysis.  There, the court declined to apply Comcast because, among other reasons, the "district court's inquiry into predominance was never premised on . . . a damages formula."  Id. at 817.  Here, by contrast, Movants assert that damages can and will be computed on a classwide basis, thus triggering the Comcast analysis.  Because the Receiver has not explained his or his team's damages methodology, Movants have not "establish[ed] that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  Comcast, 133 S. Ct. at 1433.  Additionally, the court in In re Deepwater Horizon declined to apply Comcast because the district court had bifurcated liability and damages.  739 F.3d at 817.  But here, Movants have not asked the court to bifurcate liability and damages, nor should the Court bifurcate the issues sua sponte (especially where, as here, no showing has been made that such bifurcation is possible).  See, e.g., Steering Comm., 461 F.3d at 603–04 (declining to consider bifurcation as "remedy for the obstacles  preventing a finding of predominance" where plaintiffs had not proposed bifurcation to the district court and where plaintiffs failed to demonstrate that common issues of damages, among others, predominated).  Indeed, for the multiple reasons explained herein, certification of any class, let alone a liability-only class, would be inappropriate.

[21] No other document in this case or in the SEC Action bears on the methodology for calculating damages in this case.  Defendants respectfully submit that any suggestion to the contrary by Magistrate Judge Koenig in her March 9, 2015 Order was in error.  (See ECF No. 179 at 5–6.)  The Court's Orders in the SEC Action each relate to the claims against, and distributions from, the Receivership Estate, not claims against, and damages (if any) attributable to Defendants in this case.  See, e.g., Order Approving Receiver's Interim Distribution Plan, SEC v. Stanford Int'l Bank, Ltd., Case No. 3:09-cv-0298-N (N.D. Tex. May 30, 2013) ECF No. 1877 (defining "Claim" as "a potential or claimed right to payment . . . against one or more of the Receivership Entities" or "a potential or claimed right to an equitable remedy . . . against one or more of the Receiver Entities").  The distribution plans approved in such Orders have nothing to do with the separate claims and calculation of damages, if any, in this action—let alone establish a reliable common damages methodology under Rule 23.

A plaintiff does not satisfy its burden under Comcast through an empty assurance that proof of damages "will be offered on a uniform, [c]lass-wide basis." In re Kosmos Energy Ltd. Sec. Litig., 299 F.R.D. 133, 151 (N.D. Tex. 2014) (emphasis in original). Rather, where, as here, "Lead Plaintiff[s'] submissions are akin to no evidence at all, under Comcast, [that] ought to end the Court's predominance inquiry . . . ." Id. As yet another federal court in Texas has explained:

> The Court is left . . . with a conclusory assertion that damages will be calculated on a classwide basis. Plaintiffs bear the burden of proving all relevant elements of Rule 23. That burden is not met by asking the Court simply to trust them.

In re BP p.l.c. Sec. Litig., Civil Action No. 4:10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014) ("BP II"); see also Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 308 (5th Cir. 2003) (holding that "class certification is not appropriate" where plaintiffs "failed to demonstrate that the calculation of individualized actual economic damages, if any, suffered by the class members can be performed in accordance with the predominance requirement of Rule 23(b)(3)"); In re BP p.l.c. Sec. Litig., Civil Action No. 4:10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Plaintiffs cannot avoid th[e] hard look [required under Comcast] by refusing to provide the specifics of their proposed methodology."). Movants' failure to identify any specific methodology for calculating damages in this case defeats any predominance argument premised upon common damages.

In contrast to Movants, who offer "no proof from which to draw an inference that individual inquiries may not be required if the Court were to certify this putative class," In re Kosmos, 299 F.R.D. at 154, Defendants have presented the declaration of Professor Gompers.[22] Professor Gompers' unrebutted declaration shows that individualized issues predominate the

---

[22] Professor Gompers is the Eugene Holman Professor of Business Administration and Faculty Chair of the M.B.A. Elective Curriculum at the Harvard Business School, and a Research Associate at the National Bureau of Economic Research. (App. 412, Gompers Decl. ¶ 1.)

damages inquiry here.  Specifically, determining the existence and nature of any damages would depend on what each putative class member knew, when he or she knew it, on what sources of information he or she relied, and what investment decisions he or she made and would have made as a result.  (See, e.g., App. 427–430, 432–433, 434–435, 436, Gompers Decl. ¶¶ 29–33, 40–41, 44–45, 47.) [23]

> 2. **Movants Fail to Offer a Damages Approach Consistent with Any Theory of Liability.**

At the class certification stage, "any model supporting a [movant's] damages case must be consistent with its liability case."  Comcast, 133 S. Ct. at 1433 (internal quotation marks omitted).  Where a movant's model "does not even attempt" to measure "only those damages attributable to [movant's] theory" of liability, the movant "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  Id.; see also BP II, 2014 WL 2112823, at *1 ("The Court must determine whether [p]laintiffs' proposed damages methodologies (1) quantify the injury caused by [d]efendants' alleged wrongful conduct, and (2) can be deployed on a classwide basis such that common issues will predominate over individualized ones." (citations omitted)).  Movants fail to offer a damages approach consistent with any of their theories of liability.

In their Complaint, Plaintiffs allege that damages can be measured by reference to a putative class member's out-of-pocket losses.  (See Compl. ¶¶ 105, 107).  As explained by Professor Gompers, however, an out-of-pocket approach is inappropriate for determining economic damages, in part, because it is not tied to Plaintiffs' own theory of liability.  (App.

---

[23] Based on the limited data produced by Movants and the Receiver (see App. 468, Gompers Decl. Ex. 3), Professor Gompers has opined that a "reliable [damages] calculation may be impossible" and that if investor data is indeed missing, it would be "impossible to reliably disentangle contributions from investors from purported interest earned," thereby rendering the out-of-pocket damages approach unusable here (App. 438, Gompers Decl. ¶¶ 53–54).

422–431, Gompers Decl. ¶¶ 17-37.)  The out-of-pocket approach inappropriately totals the putative class members' losses, without any "coherent theory of liability" linking such losses to any alleged actions or omissions by Sjoblom, (App. 417, Gompers Decl. ¶ 8.f.), as distinguished from the many other parties whom plaintiffs and the Receiver have sued claiming that they bear full or partial responsibility for Stanford investor losses.  Movants have presented no evidence or expert testimony to rebut Professor Gomper's conclusions.

In particular, Movants fail to offer any reliable methodology to calculate damages purportedly caused by Sjoblom's alleged actions or omissions, because their damages are not measured relative to any but-for world in which Sjoblom acted differently.  Merely labelling all losses from all causes as Sjoblom-related damages is "clearly inadequate." Bell Atl., 339 F.3d at 307.

Movants' failure to advance any damage methodology "consistent with [their] liability case," Comcast, 133 S. Ct. at 1433, dooms their predominance argument, see, e.g., Robertson v. Monsanto Co., 287 F. App'x 354, 362–63 (5th Cir. 2008) (holding that individualized issues of causation and damages precluded certification); see also id. ("Although the alleged cause of the plaintiffs' injuries is a single incident . . . each plaintiff still must show that [defendant's] negligence . . . was proximately connected to the specific injuries complained of.").

F.      Choice-of-Law Considerations Preclude Class Certification.

The Motion should be denied for the additional reason that Plaintiffs' claims raise individualized choice-of-law issues that defeat predominance.

The Fifth Circuit has repeatedly held that "variations in state law may swamp any common issues and defeat predominance." Cole v. Gen. Motors Corp., 484 F.3d 717, 724 (5th Cir. 2007) (quotation marks omitted); Castano, 84 F.3d at 741.  "A district court's duty to

31

determine whether the plaintiff has borne its burden on class certification requires that a court

consider variations in state law when a class action involves multiple jurisdictions." Castano, 84

F.3d at 741. "Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any

problems with predominance . . . can be overcome." Id. at 742. Instead, a plaintiff must

"credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class

certification does not present insuperable obstacles.'" Id. (quoting Walsh v. Ford Motor Co., 807

F.2d 1000, 1017 (D.C. Cir. 1986)); see also Gyarmathy, 2003 WL 21339279, at *1-2 (rejecting,

in the class certification context, the "defendant lives here" approach to choice-of-law analysis in

favor of examining the policies of each state with contacts).

Movants seek to certify a sprawling worldwide class that includes putative class members

in potentially all U.S. jurisdictions and over 100 foreign countries. (Br. 45.) They thus bear the

burden of presenting a sufficient choice-of-law analysis in order to demonstrate that common

issues predominate. Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 313 (5th Cir. 2000). Yet,

Movants have provided no choice-of-law analysis. They have discussed only the application of

Texas law without undertaking any analysis of the substantive laws of the foreign or U.S.

jurisdictions where putative class members reside or are citizens. (Br. 46–51.) [24] This is plainly

inadequate under controlling law. See, e.g., Spence, 227 F.3d at 313 (explaining that plaintiffs

may not "attempt to finesse the choice of law by omitting comparison of laws" and finding that

the district court "could not discharge its duty because plaintiffs did not supply adequate

---

[24] A nationwide class or subclass would potentially implicate the laws of all fifty states, the District of Columbia, and other U.S. territories; a "Latin American" class or subclass would implicate the laws of at least seven countries; and a Mexican class or subclass would involve the laws of potentially thirty-one different states and the Federal District. (See App. 622, Declaration of Dr. Claus von Wobeser, Esq. ("von Wobeser Decl.") at 3 n.4 (noting that Mexico has "a federal government integrating 31 States and 1 Federal District," all of which have a "Civil Code and a Code of Civil Procedure.") Thus, without any evidence or analysis from Movants, the Court is left without the tools to conduct an adequate choice-of-law analysis even as to the proposed alternative classes.

information on the policies of other interested states"); <u>Karnes v. Fleming</u>, Civil Action No. H-07-0620, 2008 WL 4528223, at *4–7 (S.D. Tex. July 31, 2008) (holding that "conclusory assertions" that Texas law governed the claims of all class members were no substitute for the "rigorous analysis required under established law").  Further, as the Supreme Court has emphasized, application of a single jurisdiction's laws to every class member in a nationwide, let alone worldwide, class action may be so "arbitrary and unfair" as to violate a defendant's constitutional due process rights.  <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 816–18, 821–23 (1985) (concluding that it was error for state court to apply its own substantive law to all class members without conducting a choice-of-law analysis).

Movants' failure to present a choice-of-law analysis "in and of itself is sufficient to defeat predominance" as to their proposed class and alternative classes.  <u>See</u> <u>Norwood v. Raytheon Co.</u>, 237 F.R.D. 581, 594 (W.D. Tex. 2006).  The Fifth Circuit and federal district courts in Texas routinely deny class certification on these grounds.  <u>See, e.g.</u>, <u>Castano</u>, 84 F.3d at 752 (concluding that district court abused its discretion in certifying class where plaintiffs had failed to properly address variations in state law such that finding of predominance was based on speculation); <u>Cole</u>, 484 F.3d at 724-25 (holding that plaintiffs did not sufficiently demonstrate predominance because they failed to undertake the required "extensive analysis" of variations in state law concerning their claims and to consider how those variations impact predominance); <u>Gyarmathy</u>, 2003 WL 21339279, at *2 n.1 (noting that a court could conclude its analysis where plaintiff had failed to carry its burden); <u>Lee v. Am. Airlines, Inc.</u>, No. Civ. A.3:01-CV-1179-P, 2002 WL 31230803, at *12 (N.D. Tex. Sept. 30, 2002) ("Because [p]laintiff has not provided the [c]ourt with the factual information necessary to conduct a proper choice-of-law analysis, the

[c]ourt can only speculate as to whether the common issues might predominate over what appear to be these individual issues."). This Court should similarly deny class certification here.

Moreover, under Texas choice-of-law rules, which this Court must apply, determining the applicable substantive law requires a detailed analysis of numerous factors that necessarily will differ for each putative class member, all but precluding a finding of predominance here. [25] And even if there were some way for the Court to readily determine the legal regimes applicable to different class members' claims, substantial differences among the potentially applicable laws would generate still more individualized inquiries. Even a cursory review of relevant case law demonstrates significant variations in state law governing vicarious liability—Plaintiffs' only asserted basis for recovery against the law firm Defendants[26]—as well as the law governing Plaintiffs' common law claims for aiding and abetting fraud and civil conspiracy. [27] See, e.g., Castano, 84 F.3d at 742 (noting "defendants' extensive analysis of how state law varied on fraud"); Norwood, 237 F.R.D. at 598–600 (denying class certification and stating that the law relating to fraud and civil conspiracy differs in U.S. jurisdictions); Guardian Angel Credit Union v. MetaBank, No. 08-cv-261-PB, 2009 WL 2489325, at *6 (D.N.H. Aug. 12, 2009) ("Differences in state laws governing vicarious liability could affect the disposition of class

---

[25] "In diversity cases, federal courts are obliged to apply the choice of law rules of the forum state." Spence, 227 F.3d at 311. Texas's adoption of the most significant relationship test requires a court to consider: "'(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'" Id. at 312 (quoting Restatement (Second) of Conflict of Laws § 145 (1971)). That test also requires that "[t]he policies of each state with contacts must be examined." Id. at 313 (citation omitted).

[26] Because the Court dismissed Plaintiffs' claims for negligent retention/negligent supervision, all of Plaintiffs' surviving claims against Proskauer and Chadbourne are premised on respondeat superior. (See Order, ECF No. 176, at 24-26.)

[27] Because the law of fraud varies from one jurisdiction to another, it follows a fortiori that the showing required for aiding and abetting fraud, which requires proof of the underlying fraud, would also differ.

claims and preclude class-wide analysis.").[28]  Movants, moreover, completely ignore potential

variations in the substantive laws of foreign jurisdictions, where many putative class members

allegedly reside.  Such differences exponentially compound the individualized inquiries

necessary to determine what law applies to any given class member's claims, making this case

especially unsuitable for class treatment.  See Norwood, 237 F.R.D. at 600.[29]

> G.      Individual Issues of Timeliness Will Predominate.

Individual issues concerning the timeliness of each putative class member's claims would

further defeat a finding of predominance.  As discussed in Part I.C, supra, the availability of

affirmative defenses that present individualized issues of fact precludes certification.  See, e.g.,

Corley, 220 F.R.D. at 488 (holding that "varying statutes of limitations, as well as their differing

effects on [p]laintiffs' claims, slay predominance"); Kelley v. Galveston Autoplex, 196 F.R.D.

471, 477 (S.D. Tex. 2000) (holding that predominance was defeated because of "individualized

issues concerning the statute of limitations that would overshadow any potential common

issues.").  That is the case here.

Assuming arguendo that Texas law even applies here,[30] at least three different statutes of

limitations would apply to the putative class's claims:

---

[28] For example, for aiding and abetting liability, Texas requires only that "the alleged aider must possess a general awareness that his role was part of an overall activity that is improper," Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 842 (Tex. 2005) (quotation marks omitted), while other states require actual knowledge, see, e.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (New York law requires that plaintiffs "allege actual knowledge" to bring an aiding and abetting claim); Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1118–19 (C.D. Cal. 2003) (stating that California law requires actual knowledge).

[29] Variations in the laws of the various jurisdictions also affect the superiority inquiry.  See Castano, 84 F.3d at 750 (holding that the complexity of the choice-of-law inquiry in a multi-state class action "makes individual trials a more attractive alternative and, ipso facto, renders class treatment not superior").

[30] Although statutes of limitations are generally procedural rather than substantive, an exception exists where a "foreign jurisdiction's statute creates a right and also incorporates a limitation upon the time within which the suit is to be brought," in which case the foreign statute of limitations applies even though Texas may provide for a longer limitations period.  Ellis v. Great SW, 646 F.2d 1099, 1111 (5th Cir. 1981).  As discussed in Part I.F, supra,

- • two years for civil conspiracy, Tex. Civ. Prac. & Rem. Code § 16.003; G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc., 219 S.W.3d 37, 44 (Tex. App.—San Antonio 2006, no pet.);

- • three years for aiding and abetting Stanford's alleged use of untruths or omissions to sell securities, Tex. Rev. Civ. Stat. Ann. art. 581-33H(2)(a); and

- • four years for aiding and abetting common law fraud, Tex. Civ. Prac. & Rem. Code § 16.051; Eagle Props., Ltd. v. Scharbauer, 807 S.W.2d 714, 725 (Tex. 1990).

If a class is certified in this case, the Court will therefore be left to grapple with whether each putative class member's claims fall outside of each of the relevant statutes of limitations. See Kelley, 196 F.R.D. at 477. These determinations are fact-intensive and individualized, Corley, 220 F.R.D. at 487, causing individual issues to swamp common ones and therefore precluding a finding of predominance.

## II.    A Class Action Is Not Superior to Individual or Joined Actions

In addition to satisfying the other requirements of Rule 23, Movants must establish, by a preponderance of the evidence, that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see also Wal-Mart Stores, 131 S. Ct. at 2558. In assessing superiority, a court must probe "the relevant claims, defenses, facts, and substantive law presented in the case." Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 525 (5th Cir. 2007) (quotation marks omitted).

Here, there are two principal reasons why a class action would not be superior to other available means of adjudication. First, although Movants seek to certify a worldwide class including putative class members from over 100 countries (Br. 45), they have not met their burden of establishing that a judgment in this opt-out class action would be given preclusive

---

the presence of foreign putative class members requires additional inquiry into the nature and length of the limitations period in foreign jurisdictions in order to determine which limitations periods apply.

effect in those foreign jurisdictions.  The undisputed evidence in the record is to the contrary.

Thus, the Court cannot certify a class including non-U.S. investors, and for other reasons

discussed herein, no U.S.-only investor class should be certified.  Second, putative class

members have sufficient incentives to bring—and, indeed, numerous members of the proposed

class have already brought—individual actions based on the same claims asserted here.[31]

> A.    Foreign Jurisdictions Would Not Recognize, or Give Preclusive
>        Effect to, a Class Action Judgment Against the Putative Class.

"Plaintiffs bear the burden of establishing superiority and whether foreign claimants

should be included in the putative class."  (Order, ECF No. 179, at 5.)  A class action with

foreign class members is not "superior to other available methods for fairly and efficiently

adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), if a judgment on the merits would not be

given preclusive effect in a foreign country of which a putative class member is a citizen or legal

resident, see also Buettgen v. Harless, 263 F.R.D. 378, 382–83 (N.D. Tex. 2009); In re Vivendi

Universal, S.A., 242 F.R.D. 76, 95 (S.D.N.Y. 2007) (finding that "res judicata concerns have

been appropriately grafted onto the superiority inquiry"); In re Alstom SA Sec. Litig., 253 F.R.D.

266, 281 (S.D.N.Y. 2008) ("Courts may properly consider res judicata concerns when evaluating

the [s]uperiority [r]equirement with respect to a proposed class that includes foreign class

members.").

This rule is grounded in fairness, reflecting the concern that defendants should not be

subjected to repeat litigation of the same issues against the same plaintiffs or class members.

See, e.g., Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 996 (2d Cir. 1975) (reasoning that "if

defendants prevail against a class[,] they are entitled to a victory no less broad than a defeat

---

[31] Defendants reserve all arguments and defenses they may assert in any of these individual actions.

would have been"), abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., 561 U.S.

247 (2010); In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig., 228 F. Supp. 2d 348, 364

(S.D.N.Y. 2002) (collecting cases finding that "it would be unfair to certify a class" if the class

members "would not be precluded from litigating abroad in their home countries should they

lose in [the U.S.] forum").

Where plaintiffs "are unable to show that foreign court recognition is more likely than

not, this factor weighs against a finding of superiority." In re Vivendi Universal, S.A., 242

F.R.D. at 95 (refusing to certify a class that included members from Germany and Austria); In re

Alstom SA Sec. Litig., 253 F.R.D. at 282 (stating that the standard is whether plaintiffs are able

to establish a reasonable probability that a foreign court will recognize the res judicata effect of a

U.S. class action judgment).  "The closer the likelihood of non-recognition is to being a 'near

certainty,' the more appropriate it is for the [c]ourt to deny certification of foreign claimants."  In

re Vivendi Universal, S.A., 242 F.R.D. at 95.  Indeed, courts routinely refuse to certify proposed

classes that include foreign class members where plaintiffs fail to establish that the foreign courts

where those putative class members are citizens or residents will grant preclusive effect to a

judgment in the proposed class action.  See, e.g., Bersch, 519 F.2d at 996–97 (declining to certify

class where the "record contain[ed] uncontradicted affidavits that England, the Federal Republic

of Germany, Switzerland, Italy, and France would not recognize a [U.S.] judgment in favor of

the defendant as a bar to an action by their own citizens"); Ansari v. N.Y. Univ., 179 F.R.D. 112,

116–17 (S.D.N.Y. 1998) (declining to certify class where plaintiffs had "not submitted any

affidavits on what preclusive effect, if any, a Rule 23(b)(3) class action w[ould] have in the various countries of which the prospective class members are citizens").[32]

Here, Movants seek to certify a worldwide class.  But they offer no evidence, much less a preponderance, that a judgment in this case based on Rule 23's "opt out or you are bound" approach would be enforceable in any foreign jurisdiction.  By contrast, Defendants have submitted declarations from two international law scholars and from practitioners in Mexico and Venezuela, who have concluded that courts in the seven foreign jurisdictions where Movants claim the majority of class members reside would not afford preclusive effect to a class action judgment in this action.  (See generally App. 701–729, Declaration of Professor Antonio Gidi ("Gidi Decl."); App. 731–772, Declaration of Professor Manuel A. Gomez ("Gomez Decl."); App. 620–699, von Wobeser Decl.; App. 774–789, Declaration of Pedro Alberto Jedlicka ("Jedlicka Decl.").)  Movants have failed to rebut the declarations of Defendants' experts on the very question of whether courts in the seven jurisdictions at issue would recognize and give preclusive effect to a U.S. class action judgment in this case in favor of Defendants.

     a.     Movants Have Not Satisfied Their Burden with Regard to Foreign Putative Class Members.

As Plaintiffs have acknowledged, the relevant issue for this Court's superiority analysis is "whether the courts of the countries in which [putative class members] reside will give preclusive effect to a United States court's judgment" in this case.  (Pls.' Resp. to Mot. of Defs. Proskauer & Chadbourne to Compel Producs. of Docs. from Receiver Ralph S. Janvey & Br. in Supp. Thereof ("Pls.' Mot. to Compel Resp."), ECF No. 165, at 6.)  For the overwhelming

---

[32] Accord Del Fierro v. Pepsico Int'l, 897 F. Supp. 59, 64 (E.D.N.Y. 1995) (dismissing action, in part, on the grounds that courts in the Philippines would not "inevitably" give res judicata effect to a foreign judgment in an opt-out class action); CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454, 459-60 (S.D.N.Y. 1989) (declining to certify class where British courts would not recognize a foreign judgment in an opt-out class action).

majority of jurisdictions in which putative class members allegedly reside (see Br. 45), however, Movants submitted no evidence whatsoever. And, for seven Latin American countries for which Movants purport to have proffered evidence—Venezuela, Mexico, Colombia, Ecuador, El Salvador, Panama, and Peru—their evidence does not address whether any of these countries will recognize, and grant res judicata effect to, a judgment in this opt-out class action. Movants' expert, Professor Alejandro Garro, made no attempt to analyze the laws of any country other than these seven.[33] Moreover, he limited his opinion to the enforceability of a U.S. money judgment against a defendant (see generally App. 791–856, Decl. of Professor Alejandro M. Garro ("Garro Decl.")),[34] even though he recognized that "[i]t should not be readily assumed that a U.S. judgment obtained in a class action . . . will be recognized . . . in any of the Latin American countries in question in the same manner as [those countries] have recognized typical money judgments resulting from individualized litigation" (App. 921, Second Decl. of Professor Alejandro M. Garro ("Garro Rebuttal Decl." or "Rebuttal Declaration") ¶ 28.) Indeed, even on rebuttal, Professor Garro was "unable to make a firm representation" as to whether any of the seven countries on which he opined would recognize a "U.S. class action judgment against the putative members of the class" who did not opt out. (App. 917, Garro Rebuttal Decl. ¶ 20.)

---

[33] In his declaration, Professor Garro relied on a declaration by Felipe Torres. (App. 811, Garro Decl. at 20, ¶ 40), who addressed only Mexico (see generally id. at Attachment A (Torres Decl.).) Although Professor Garro expressed a generic opinion about the "enforcement of foreign judgments in general for . . . all of the countries of Latin America," he did not examine the laws of countries other than the seven referred to in the text and had no opinion as to whether "exceptions" might apply. (App. 862–863, Garro Dep. Tr. 41:21–42:21.) Professor Garro was also unaware that Movants were seeking to certify a worldwide class in this case. (App. 862, Garro Dep. Tr. 41:2–11.)

[34] Although Professor Garro paid lip service to "recognition" in his declaration, he conflated the term with "enforcement" based on the faulty assumption that "enforcement of a judgment presumes recognition." (App. 861, Garro Dep. Tr. 34:9–11; see also App. 799, Garro Decl. at 8, ¶ 27 n.3.) Yet even Professor Garro acknowledged that this assumption is problematic. For instance, he acknowledged that the Bustamante Code, described infra n.36, and on which he and Movants rely, could "impose a stricter standard for recognition than for enforcement." (App. 864–867, Garro Dep. Tr. 69:15–72:8.)

Professor Garro thus offered no opinion on the relevant issue in this case:  whether courts in any of these countries would grant res judicata effect to a judgment in this opt-out class action to preclude relitigation by one of its own citizens or residents on the same issues against the same Defendants.  (See App. 895, Dep. of Professor Alejandro M. Garro ("Garro Dep.") Tr. 125:9–24.)  In fact, Professor Garro offered no opinion as to the res judicata effect of a U.S. judgment in any type of case (id.),[35] let alone in an opt-out class action, even though he, like Plaintiffs, acknowledged that "what really needs to be proven in this case is to which extent the judgment rendered in the United States will be given res judicata effects in the Latin American countries in question."  (App. 884, Garro Dep. Tr. 97:11–17; see also Pls.' Mot. to Compel Resp. at 6.)[36]  When asked why he was not offering an opinion on this critical question, Professor Garro testified that Plaintiffs' counsel instructed him not to address it and, instead, to address only whether seven Latin American countries would be willing to enforce a generic money judgment rendered by a U.S. court.  (See App. 859,  860, 872, 873, 875, 901–902, Garro Dep. Tr.

---

[35] Although Professor Garro misleadingly stated in his Rebuttal Declaration that he previously had opined on whether seven Latin American countries would "recognize the res judicata effect of a final money judgment rendered in the United States" (App. 920, Garro Rebuttal Decl. ¶ 26), his deposition testimony belies that assertion (App. 895, Garro Dep. Tr. 125:9–24).

[36] For example, Professor Garro acknowledged that Article 396 of the Bustamante Code states that "the plea of res judicata founded on a judgment of another contracting party shall lie only when the judgment has been rendered in the presence of the parties or their legal representatives" and that, by its terms, the article applies to both defendants and plaintiffs.  (App. 868, 877–878, Garro Dep. Tr. 74:15-22, 85:24–86:8.)  However, Professor Garro did not research how Latin American courts interpret that article.  (App. 878, Garro Dep. Tr. 86:9–23.)  He also acknowledged that "it is a proper question to ask" whether, under the Bustamante Code, "a person who became a class member by virtue of receiving notice of a class action and failing to expressly opt out of the class would be considered to have been present or have their legal representatives present in the case where the class action judgment is rendered."  (App. 869, Garro Dep. Tr. 75:15–78:7.)  However, it was not a question that he considered in preparing his declaration.  (Id.)  Likewise, Professor Garro testified that it is "extremely relevant" whether, under the Bustamante Code, "a person domiciled in a Latin American country who receives notice of a class action in the United States and remains silent in response to that notice would be considered to have been summoned for the trial personally or through their legal representative[.]"  (App. 873–874, Garro Dep. Tr. 79:21–80:15.)  Here, too, Professor Garro offered no opinions because he "was not asked to address [the] question."  (Id.; see also App. 874–875, 875, Garro Dep. Tr. 80:20–81:2, 84:10–17.)

18:3–8, 21:9–15, 78:8–20, 79:4–11, 81:3–9, 148:16–21, 148:25-149:12; App. 920, Garro Rebuttal Decl. ¶ 26.)[37]

In his Rebuttal Declaration, Professor Garro speculated that it is "highly unlikely" that putative class members would ever re-litigate this case "in their home countries" because of, among other things, "the running of the statute of limitations" in those countries.  (Garro Rebuttal Decl. ¶ 10.)  But he did not identify the relevant statutes of limitations or whether any such statute could be tolled by any number of legal or equitable mechanisms.  Moreover, the likelihood of re-litigation is not the relevant inquiry under Rule 23(b)(3); rather, the inquiry is whether courts would grant res judicata effect to a judgment in the case in the event that an absent class member does attempt to re-litigate.  See, e.g., In re Vivendi Universal, S.A., 242 F.R.D. at 95.  If an absent class member brings the same lawsuit against Defendants and is potentially barred by a statute of limitations, the parties would have to litigate that issue in the course of the foreign lawsuit.  Even if Defendants were to prevail in that litigation, they still would have suffered the prejudice of having to litigate the same claims two times (or more).

Because Movants have offered no evidence on the issue of whether a judgment in this case would preclude relitigation by foreign class members in their home jurisdictions, Movants have not met their burden of proving that the proposed worldwide class or any of the alternative classes or subclasses would be superior to individual or joined actions under Rule 23(b).

---

[37] In particular, Movants' counsel told Professor Garro not to address a number of issues that Professor Garro suggested to Movants were directly relevant to whether courts in the countries under consideration would accord res judicata effect to a judgment in this case, including:  (1) "whether a person domiciled in a Latin American country who receives notice of a [U.S.] class action . . . and remains silent in response to that notice would be considered to have been summoned for the trial personally or through their legal representative"; (2) the extent to which foreign courts would consider class members to be parties to the case; and (3) the extent to which a court would analyze the actual ability of class members to participate in the case.  (App. 873–875, 901–903, Garro Dep Tr. 79:21–81:9, 148:5–150:10.)

To the extent that Movants seek to rely on <u>Anwar v. Fairfield Greenwich Ltd.</u>, 289 F.R.D. 105 (S.D.N.Y. 2013), <u>vacated on other grounds & remanded sub nom. by</u> St. Stephen's <u>Sch. v. PricewaterhouseCoopers Accountants N.V.</u>, 570 F. App'x 37 (2d Cir. 2014), as support for certifying a class in this case, such reliance would be misplaced.  In <u>Anwar</u>, the court certified a class with members from several foreign jurisdictions, including some at issue here, applying a standard that allowed the plaintiff to create a "rebuttable presumption" that countries would recognize a foreign judgment by showing only that the countries were "generally inclined to favor that course of action," thereby shifting the burden to defendants to show by "clear and convincing evidence" that a judgment in the actual class action at issue would not be given preclusive effect in those countries.  289 F.R.D. at 115.  By placing such a burden on defendants, however, the <u>Anwar</u> court placed itself in direct conflict with both the Supreme Court—which has expressly held that the "party seeking class certification must affirmatively demonstrate [its] compliance with . . . Rule [23]," <u>Wal-Mart Stores</u>, 131 S. Ct. at 2551; <u>see also</u> <u>Amchem Prods.,</u> <u>Inc.</u> 521 U.S. at 614 (holding that "parties seeking certification must show that the action is maintainable under Rule 23(b)[(3)]")—and this Circuit, <u>see</u> <u>O'Sullivan v. Countrywide Home</u> <u>Loans, Inc.</u>, 319 F.3d 732, 737-38 (5th Cir. 2003) (holding that "[t]he party seeking certification bears the burden of demonstrating that the requirements of [R]ule 23 have been met").  The <u>Anwar</u> decision cites no precedent supporting the burden-shifting standard it applies, and no other court has followed <u>Anwar</u> in applying such a standard.

To the contrary, every other court to address this issue has held that a plaintiff bears the burden of establishing that a judgment <u>in the specific case</u> in which a class is to be certified will be preclusive in class members' home jurisdictions.  <u>See, e.g.</u>, <u>In re Vivendi Universal, S.A.</u>, 242 F.R.D. at 95 (noting that the relevant question is "whether foreign courts would grant preclusive

effect to a United States judgment or settlement <u>in this action</u>" (emphasis added)).  Whether "the

<u>general policy</u> of the [foreign] countr[y] inclines to favor granting recognition to judgments of

United States courts," <u>Anwar</u>, 289 F.R.D. at 120 (emphasis added)—has no bearing on whether a

specific class action before a specific court satisfies the superiority requirement of Rule 23(b).

Rather, a court must ask whether the foreign jurisdictions would recognize a judgment in the

particular type of case at issue—here, an opt-out class action.  This Court should not be the first

to follow <u>Anwar</u> to the contrary.

Even if this Court were to apply <u>Anwar</u>'s burden-shifting standard, which it should not,

this Motion should still be denied.  As detailed below, Defendants have presented undisputed,

affirmative evidence—supported by the deposition testimony of Movants' own expert, Professor

Garro—establishing that courts in the foreign jurisdictions at issue would be highly unlikely to

recognize, and grant res judicata effect to, a class judgment in this case.[38]

---

[38] The Court should not consider the declaration of purported "non-retained expert" Michael Wallace
Gordon (the "Gordon Declaration"), which was proffered by Movants as a rebuttal expert declaration.  As an initial
matter, the Gordon Declaration is inadmissible as "non-retained" expert testimony because he is not a percipient
witness or an individual possessing first-hand knowledge of the factual events at issue in this case—the only
circumstances in which "non-retained" expert testimony is permitted.  See <u>Eagle Oil & Gas Co. v. Travelers Prop.
Cas. Co. of Am.</u>, Civil Action No. 7:12-cv-00133-O, 2014 WL 3744976, at *8 (N. D. Tex. July 30, 2014) (striking a
"non-retained" expert report).  Moreover, the Gordon Declaration is not proper rebuttal testimony because it does
not respond to the opinions of any of Defendants' experts, nor could it, given that it was filed more than three years
earlier in a different case—<u>Anwar</u>.  <u>See Anwar</u>, No. 09-cv-118 (VM) (Jan. 11, 2012), ECF No. 780; <u>see also</u> Fed. R.
Civ. P. 26(a)(2)(d)(ii) & advisory committee's note (1993 Amendments) (explaining that rebuttal expert testimony is
"used solely to contradict or rebut the testimony that may be presented by another party's expert").  Nor does the
declaration consider the facts of this particular case, as it must be considered proper expert testimony.  <u>See</u> Fed.
R. Evid. 702.  In any event, the declaration is of limited value given that not even the <u>Anwar</u> court made findings
based on it. <u>See Anwar</u>, 289 F.R.D. at 119–20 (declining to decide whether Latin American jurisdictions would
recognize a judgment in a U.S. class action and impermissibly shifting the burden to defendant to prove the point).

b.    On the Undisputed Evidence, Courts in the Foreign Jurisdictions at Issue Are Highly Unlikely to Give Preclusive Effect to a Judgment of the Court, or to a Settlement, in this U.S. Opt-Out Class Action.

In response to this Motion, Defendants have submitted declarations from four experts who address whether a class judgment, or settlement, in this case would be recognized, and accorded res judicata effect, in the Latin American jurisdictions discussed by Professor Garro:

- Professor Antonio Gidi, the author of a Model Class Action Code for Civil Law Countries. (App. 703, Gidi Decl. ¶ 7.) Professor Gidi is one of three General Reporters of the Class Action Model Code for Latin American Countries (id.) and an author of three articles "about preclusion in the context of class actions and the recognition of class action judgments abroad" (App. 704, Gidi Decl. ¶ 9). He has made class actions "the object of [his] continuous research for the past twenty-five years." (App. 702, Gidi Decl. ¶ 4.) Professor Gidi opines on whether Latin American countries generally—and Peru, Panama, El Salvador, and Ecuador in particular—would accord res judicata effect to a judgment in this case.

- Professor Manuel A. Gomez, a tenured associate professor and a practicing attorney in Venezuela who has "conducted research and published scholarly works on the status and development of aggregate and collective litigation in Latin America." (App. 701, 702, 703, Gomez Decl. ¶¶ 2, 3, 7.) Professor Gomez opines on whether Latin American countries generally—and Mexico, Venezuela, and Colombia in particular—would accord res judicata effect to a judgment in this case.

- Dr. Claus von Wobeser, a practicing attorney in Mexico and former law professor who has served as the President of the Mexican Bar Association. (App. 620, von Wobeser Decl. ¶ 1.) Dr. von Wobeser addresses whether Mexican courts would accord res judicata effect to a judgment in this case.

- Mr. Pedro Alberto Jedlicka, a practicing attorney in Venezuela and former law professor who has taught Venezuelan civil procedure. (App. 775, Jedlicka Decl. ¶¶ 9, 11.) Mr. Jedlicka addresses whether Venzuelan courts would accord res judicata effect to a judgment in this case.

As explained in detail below, each of these experts reached the same conclusion: the jurisdictions on which they opine would not recognize, and grant res judicata effect to, a class judgment or settlement in this action, and therefore would not preclude relitigation of the same claims against Defendants by putative class members who are citizens or residents of those

45

jurisdictions.  Not only have Movants failed to rebut this conclusion with any contrary evidence or expert opinions, Movants' expert, Professor Garro, agreed with this conclusion in certain respects at his deposition.

Courts in Latin American countries would be highly unlikely to recognize a judgment in this U.S. opt-out class action because doing so would violate, among other things:  (1) the countries' public policies; (2) the countries' due process and notice requirements; and/or (3) the countries' jurisdictional rules.  (<u>See, e.g.</u>, App. 705–706,707, 708, Gidi Decl. ¶¶ 19(1)–(3), 21, 25, 29.)  In addition, Latin American courts—in contrast to U.S. courts—do not recognize issue preclusion, such that class members who are citizens or residents of Latin American countries would be free to relitigate factual issues previously adjudicated by this Court.  (App. 885, Garro Dep. Tr. 98:18-19.)  Finally, as Movants' expert Professor Garro testified, Latin American courts cannot be counted on to apply their own law consistently due to extensive corruption, among other issues.  <u>See</u> <u>infra</u> Part II.A.2 at 52.

<u>First</u>, public policy creates a barrier to the recognition of an opt-out class action judgment in this case.  As Movants' expert, Professor Garro, testified, the public policy exception presents "a serious obstacle" to foreign judgment recognition in the countries he addressed.  (App. 881–882, Garro Dep. Tr. 93:20–94:17; <u>see also</u> App. 879–880, Garro Dep. Tr. 91:20–92:22; App. 882–883, Garro Dep. Tr. 94:18–95:24 (explaining that courts in Central America are "far less" likely than U.S. or European courts to give foreign judgments res judicata effect).)  Yet despite recognizing this undisputed principle, Professor Garro submitted a Rebuttal Declaration in which he makes the unsupported assertion that Defendants' experts' conclusions regarding the public policy exception are "purely speculative."  (App. 918, Garro Rebuttal Decl. ¶ 21; <u>see also</u> App. 911, Garro Rebuttal Decl. ¶ 5.)  Such a conclusory assertion is not evidence, and it is flatly

contradicted by the declarations of Defendants' experts, which set forth in detail their opinions and the authorities on which they are based.  Nowhere in his Rebuttal Declaration does Professor Garro seriously dispute the myriad points in Defendants' experts' declarations as to the public policy reasons for non-recognition in the jurisdictions on which Professor Garro opines.

For example, Professor Garro does not even try to respond to or rebut Defendants' showing as to why Latin American countries that do not have class actions for damages, such as Peru and El Salvador, or countries that have only opt-in class actions, such as Mexico, would find recognizing a class action judgment to violate their respective public policies.  (App. 706–707, 708, 713, 716 Gidi Decl. ¶¶ 21–25, 29, 57, 71; see also App. 628, 629, 632–633, von Wobeser Decl. ¶¶ 23, 24, 37–39.)  Professor Garro's superficial statement that some countries' recent legal scholarship and class action laws make them less hostile to collective actions (App. 914–915, Garro Rebuttal Decl. ¶ 13) is not a response to Defendants' experts' actual analyses of these laws.

Likewise, Professor Garro does not dispute that Peru, which has only injunctive class actions, will not even grant preclusive effect to a Peruvian class action judgment—let alone, a U.S. class action judgment—against Peruvian citizens or legal residents who are absent class members.  (App. 713, 714, Gidi Decl. ¶¶ 57, 59.) [39]  Professor Garro provides no reason to believe that a country like Peru would give greater binding effect to a U.S. class action judgment than it would to its own class action judgments.

---

[39] In other Latin American countries with class actions, it also is often the case that a judgment is not binding on a class where it is favorable to the defendants or favorable to the class but for less than the full amount requested.  (App. 707, Gidi Decl. ¶ 26.)  Furthermore, in some Latin American countries, individuals who were class members in a foreign action will not be bound by a judgment in that action if they simply present so-called "new evidence or facts," including evidence or facts that were previously available but not produced.  (App. 707, Gidi Decl. ¶ 27.)

Nor does Professor Garro dispute Defendants' experts' well-supported analyses of Mexico's legal regime.[40]  As Defendants' experts' explained, and Professor Garro acknowledged, Mexican courts will not recognize a foreign judgment for res judicata purposes if doing so would violate Mexican public policy or "domestic public order."  (App. 626–627, von Wobeser Decl. ¶ 16; see App. 904, Garro Dep. Tr. 160:12–19.)  It is undisputed that, under Mexican law, "silence cannot produce any legal effect."  (App. 631, von Wobeser Decl. ¶ 33; see also App. 631–632, von Wobeser Decl. ¶¶ 34–36.)  Thus, in analyzing a judgment in a foreign opt-out class action, a Mexican court "would find particularly problematic" a legal regime in which absent class members are bound to a class action judgment by silence—i.e., without consenting to be part of the class or to be represented by plaintiffs' counsel.  (App. 628–329, von Wobeser Decl. ¶¶ 23– 24; see App. 734–735, Gomez Decl. ¶ 15.)  It is for these reasons that the opt-out system, which operates to bind absent class members "by virtue of their silence, is illegal in Mexico . . . ."  (App. 628, von Wobeser Decl. ¶ 23; see App. 737, 759, Gomez Decl. ¶¶ 23, 76.)  In fact, Mexico considered and "expressly declined to enact" an opt-out class action system, instead adopting an opt-in system, which requires putative class members' express consent in order to be part of the class. (App. 632–633, von Wobeser Decl. ¶¶ 37–38; cf. App. 905–906, Garro Dep. Tr. 167:23–168:7 (stating that drafts of the class action law in Mexico are relevant to the res judicata inquiry).)  Professor Garro did not acknowledge this, either in his initial declaration or in his rebuttal.

Similarly, Professor Garro completely ignored Defendants' experts' conclusions that Venezuelan public policy would prevent Venezuelan courts from "recognize[ing] a judgment of

---

[40] Indeed, although Professor Garro acknowledged reviewing the declaration of Defendants' expert on Mexican law—Dr. von Wobeser—he did not mention or address any of Dr. von Wobeser's opinions.  (See App. 919, Garro Rebuttal Decl. ¶ 23(f).)

a foreign court in a case [such as this one]."  (App. 777, Jedlicka Decl. ¶ 16; <u>see also</u> App. 774, 778, Jedlicka Decl. ¶¶ 2(a), 17.)  Venezuelan courts would find that only they, and not this Court, are competent to render a judgment in this case because it involves the banking sector, which on public policy grounds is heavily regulated by Venezuelan public law.  (App. 779–780, Jedlicka Decl. ¶¶ 22–25; <u>see also</u> App. 923, Garro Rebuttal Decl. ¶ 32 ("It is beyond controversy that Venezuelan law will not recognize a foreign judgment rendered in a case in which Venezuelan courts claim exclusive jurisdiction . . . .").)  It is also undisputed that Venezuelan courts would find that only they, and not this Court, are competent to render a judgment in this case, because a class action is a case type affecting public policy and reserved for Venezuelan courts.  (App. 780, Jedlicka Decl. ¶¶ 27–29.) [41]

<u>Second</u>, courts in most Latin American countries will refuse to recognize, and grant preclusive effect to, a foreign judgment in this U.S. opt-out class action because of those countries' due process and notice requirements.  (App. 709, Gidi Decl. ¶ 33.)  As Movants' expert, Professor Garro, rightly recognizes, Latin American courts would focus on "whether the American procedure, subject to the law of the forum, ensured adequate protection of the absent members of the class at all stages of the litigation . . . ."  (App. 916, Garro Rebuttal Decl. ¶ 16.)  Applying this standard, courts in most Latin American countries would find anything short of service by rogatory letter deficient (App. 709, Gidi Decl. ¶ 33),[42] depriving absent class members

---

[41] Professor Garro's assertion that "Venezuelan jurisdictional principles and rules will accept the jurisdiction of the foreign U.S. courts in cases such as this one" (App. 923–924, Garro Rebuttal Decl. ¶ 32) cannot be taken seriously because Professor Garro acknowledged that Venezuela "will not recognize a foreign judgment rendered in a case in which Venezuelan courts claim exclusive jurisdiction" (<u>id.</u>) and did not dispute Mr. Jedlicka's conclusion that Venezuelan courts would have exclusive jurisdiction over this case because it involves the banking sector and is a class action (<u>see</u> App. 779–780, Jedlicka Decl. ¶¶ 22–25, 27–29).

[42] Although Professor Garro acknowledged that each of the countries on which he opined would "closely scrutinize whether the due process rights of the parties had been respected," he argued, without support, that only defendants are required to be served by letters rogatory to bind them to a U.S. judgment.  (App. 915–916, Garro Rebuttal Decl. ¶ 14; <u>see also</u> App. 916, Garro Rebuttal Decl. ¶ 15.)  This argument misses the mark, completely

of a real opportunity to protect their interests by directly participating in the action (App. 709, Gidi Decl. ¶¶ 34–37; see also App. 781, 782, Jedlicka Decl. ¶¶ 31, 34, 37 (Venezuelan courts would find deficient the type of notice typical in U.S. opt-out class actions because Venezuela has strict, in-person notice requirements and does not permit notice by mail);[43] App. 714, Gidi Decl. ¶¶ 58-60 (in Peru, binding an absent class member without formal service of process would violate the constitutional principle of due process); App. 716, Gidi Decl. ¶ 72 (Salvadoran courts would find any type of typical opt-out class action notice insufficient to satisfy El Salvador's notice requirement); App. 715, Gidi Decl. ¶ 65 (same with respect to Panama); App. 717, Gidi Decl. ¶ 77 (same with respect to Ecuador); App. 734, 770, Gomez Decl. ¶¶ 14, 105 (same with respect to Colombia).)

Third, Latin American courts will refuse to recognize a class action judgment in this case because they will find that their citizens did not subject themselves to the jurisdiction of this Court in this action.  (App. 710–718, Gidi Decl. ¶¶ 38–79 (reaching this conclusion for "the vast majority of, if not all, Latin American countries"); see also App. 633, von Wobeser Decl. ¶ 40 (explaining that, under Article 594 of the Federal Code of Civil Procedure, "a Mexican judge cannot assume jurisdiction over [class members] who did not expressly agree to be a part of [the] class").)  Indeed, Movants' expert testified that it would be "very unthinkable" for a Venezuelan court to find that a U.S. court had jurisdiction where a class member resided outside the U.S. and

_____

ignoring Professor Gidi's considered opinion that, in the context of a U.S. opt-out class action, "the absent class member's rights are affected in much the same way as a traditional defendant's rights" because "absent class members do not take affirmative steps to bring a class action" but nonetheless have their interests affected.  (App. 710–711, Gidi Decl. ¶ 41.)

[43] Even Professor Garro acknowledged that a Venezuelan court would not recognize a U.S. opt-out class judgment against a class member where that class member did not actually receive notice of the U.S. class action. (App. 896, Garro Dep. Tr. 139:7–13.)

made an investment outside the U.S. based on communications with people outside the U.S. (App. 897–898, 899–900, Garro Dep. Tr. 142:21–143:12, 144:16–145:16.)

In his Rebuttal Declaration, Professor Garro stated that "it seems reasonable to conclude" that "it is more likely than not that the same Latin American [putative class members]" who consented to the jurisdiction of this Court in the SEC Action "will find [it] equally expedient to bring, before the same forum, claims against" Defendants.  (App. 912, Garro Rebuttal Decl. ¶ 7.) That is irrelevant.  The relevant question is whether such individuals would be barred from filing the same claims in their home countries against Defendants if they are unsatisfied with the result of this action.  Further, even Professor Garro acknowledged that putative class members' consent to the jurisdiction of this Court was only for "claims against the Stanford Entities" and "in [the] Receivership proceedings."  (Id.)  Yet he failed to address how a foreign court would treat an absent class member's argument that he did not submit to the jurisdiction of this Court in this action merely by filing a proof of claim in the SEC Action "for claims asserted against the Receivership entities."  (App. 601, Janvey Decl., Ex. A.)  Despite Movants' contrary assertion (Br. 54), foreign putative class members never consented to the jurisdiction of the Court in this case, and foreign courts would not consider these putative class members' consent in the SEC Action when considering whether to recognize, and grant preclusive effect to, a class judgment in this case.  (App. 633–634, von Wobeser Decl. ¶ 41; App. 711–712, Gidi Decl. ¶¶ 42–50.)[44]

Fourth, according to Movants' expert, Professor Garro, no Latin American country would preclude class members from bringing new actions involving the same issues against the same

---

[44] Indeed, if consent to this Court's jurisdiction for the SEC Action constituted consent for this action, Defendants would be able to sue any foreign claimants in the SEC Action for a declaratory judgment that Defendants owe them nothing relating to the claims in this case.  Such a prospect makes all too clear the flawed nature of Movants' argument.

defendants because issue preclusion is "nonexistent in Latin America." (App. 885, Garro Dep. Tr. 98:18–19.)

Fifth, as Professor Garro also explained, throughout Latin America (including the seven countries on which he opined), corruption is a "significant issue" that "impedes an impartial determination of litigated issues." (App. 886–887, 890–891, Garro Dep. Tr. 108:5–109:14, 113:21–114:5.) In many of these countries, "there are . . . pressures exercised by the executive branch" where "an important issue [is] at stake" (App. 892, Garro Dep. Tr. 116:8–20), and "[i]t goes without saying" that courts in each of these countries are more likely to side with their own nationals than with foreigners (App. 894, Garro Dep. Tr. 118:6–11). Therefore, "any statement" about the law in Latin America "has to be considered in light of . . . how [courts] are going to interpret those laws." (App. 888, Garro Dep. Tr. 111:8–14; see also App. 889–890, Garro Dep. Tr. 112:2–113:19 (stating that "the judge in this case[] has to take . . . into consideration" that "the rule in the books as opposed to [the] rule in action are two different worlds" and that the gap between the two is "extraordinarily wide").) In Venezuela, for instance, corruption would be very likely to interfere with a court's ability to recognize, and grant res judicata effect to, a U.S. judgment in this action. (App. 748–749, Gomez Decl. ¶ 55 (concluding that Venezuelan court would be highly unlikely to recognize a class action judgment in this action due to "rampant levels of corruption that affect all levels of government" within Venezuela); App. 893, Garro Dep. Tr. 117:12–19 (concluding that "it is well known" that judicial independence from the executive branch has "essentially disappeared" in Venezuela).)

Based on the foregoing, courts in the jurisdictions for which Movants have purported to present evidence would be highly unlikely to recognize, or to accord res judicata effect to, a class judgment (or settlement) in this action. Accordingly, the Court should decline to certify

52

Movants' proposed worldwide class and its proposed alternative class of Mexican (or Latin American) investors.

> **B.      Movants Have Not Proven, and Cannot Prove, that Putative Class Members Lack Sufficient Motive to Bring Individual Actions.**

Class certification is also inappropriate where, as here, hundreds of putative class members—including numerous foreign citizens and residents—have already demonstrated their willingness and ability to bring individual lawsuits.  See, e.g., Fed. R. Civ. P. 23(b)(3)(B) (listing as a matter pertinent to superiority "the extent and nature of any litigation concerning the controversy already begun by or against class members"); Kottler v. Deutsche Bank AG, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *5 (S.D.N.Y. Mar. 29, 2010) (finding plaintiffs failed to satisfy Rule 23(b)(3)'s superiority requirement where "approximately 25 class members have already brought individual lawsuits"); Barasich v. Shell Pipeline Co., Civil Action No. 05-4180, 2008 WL 6468611, at *6 (E.D. La. June 19, 2008) (denying class certification, noting "existence of [seven] separate federal and state court cases" arising from the same nucleus of common facts "likely eliminates any advantage of a class action device"); Taylor v. CSX Transp., Inc., 264 F.R.D. 281, 296 (N.D. Ohio 2007) (denying class certification, finding "class certification is not the superior method of adjudication," in part, because putative class members had already filed individual lawsuits against defendants); Abby v. City of Detroit, 218 F.R.D. 544, 550 (E.D. Mich. 2003) (denying class certification on superiority grounds where over 100 putative class members had brought individual lawsuits).

Contrary to Movants' bald statement that "there are no other pending lawsuits filed against these Defendants by Stanford investors other than the current class action suit" (Br. 46), as well as a similar statement by Movants' expert, Edward F. Sherman (App. 526, Sherman Decl. ¶ 33), Plaintiffs' own counsel has filed multiple cases against Defendants on behalf of hundreds

of putative class members, including hundreds of foreign citizens and residents, in federal and state courts—many of which remain pending.  For example, in December 2011, approximately 250 putative class members filed six parallel lawsuits in Texas state courts.  See Advisory to the Court from Castillo Snyder P.C. Regarding Filing of Individual State Court Lawsuits, Troice v. Proskauer Rose LLP, No. 3:09-cv-01600-N (N.D. Tex. Jan. 4, 2012), ECF No. 101.  Five of these cases, including one filed by proposed class representative Reed, were removed and transferred to this Court.  See supra Facts.B.  In addition, in February 2012, six other lawsuits were filed by approximately 250 other putative class members.  Of these cases, one is still pending.  Id.  Thus, the fact that hundreds of putative class members have already filed individual actions against Defendants—including hundreds of foreign citizens and residents as well as proposed class representative Reed—shows that individual litigations are a feasible alternative to a class action suit, thereby defeating a finding of superiority.

In drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  Amchem Prods., Inc., 521 U.S. at 617 (quotation marks omitted); (see Br. 45).  But "[w]hen the size of each claim is significant, and each proposed class member therefore possesses the ability to assert an individual claim, the goal of obtaining redress can be accomplished without the use of the class action device."  Stoudt v. E.F. Hutton & Co., 121 F.R.D. 36, 37-38 (S.D.N.Y. 1988) (denying certification on superiority grounds where each class member had claims in the tens of thousands of dollars).

Here, Movants make the conclusory statement that "[m]any Stanford securities investors . . . have claims too small and their finances are too limited to pursue individual suits against the alleged wrongdoers."  (Br. 44–45.)  But Movants themselves have produced data that

54

undermines that assertion and, if credited, suggests that the average claim of a putative class

member would be sufficiently large to motivate individual lawsuits. Based on a summary of

claims from the Antiguan Joint Liquidators, produced by Plaintiffs (App. 926–927, Joint

Liquidators' Summary of Claims), the average claim for putative class members could be as high

as $470,712 in the U.S., $318,125 in Mexico, and $194,303 in Venezuela.[45] And each of the

three proposed class representatives has claims that are each potentially worth millions of

dollars, as calculated by the Receiver.[46]

    In sum, hundreds of putative class members, including hundreds of foreign citizens and

residents, have been motivated to actually file individual actions, and most putative class

members in the instant case appear to have claims exceeding several thousand dollars, if not

several hundreds of thousands of dollars, giving them sufficient incentive to pursue individual

litigation. Therefore, a class action is not the superior litigation mechanism, and Movants have

failed to carry their burden to prove this factor under Rule 23(b)(3).

---

[45] Other materials provided by Movants suggest slightly different results, but all the data they submit point to the existence of many sizeable claims. (See, e.g., Br. 45; App. 963, Direct Test. of Karyl Van Tassel.) As discussed herein, see infra Part VI, such claims are based in part on CD purchases pre-dating Sjoblom's retention by Stanford in August 2005.

[46] (See App. 1016, 1019, 1022, Notices of Determination) (showing that Troice's (and his family's) approved claim is $1,879,818.58, Punga Punga's is $6,022,131.78, and Reed's is $2,150,000).) Movants rely on a declaration submitted by the Examiner of the Stanford Financial Receivership Estate, John J. Little, who briefly notes that a 2010 investigation "revealed that almost 85% of Stanford Investors had total investments (and losses) of less than $500,000." (App. 1027, Decl. of John. J. Little ¶ 7.) Mr. Little provides no further detail about the investigation, nor are the results of this investigation appended to his declaration or to the Motion. This evidence does not satisfy Movants' burden to demonstrate that a class action would be a superior mechanism. In fact, courts have found that claims under $500,000 are more than sufficient to motivate putative class members to file individual lawsuits, thereby defeating superiority. See, e.g., Ticknor v. Rouse's Enters., L.L.C., 592 F. App'x 276, 277 (5th Cir. 2014) (affirming district court's denial of class certification on superiority grounds where individuals could recover between $100 and $1,000, as well as attorneys' fees, costs, and punitive damages); Dvorin v. Chesapeake Exploration, LLC, Civil Action No. 3:12-CV-3728-G, 2013 WL 6003433, at *9 (N.D. Tex. Nov. 13, 2013) (stating that where plaintiffs' claims each would be for several thousand dollars, "[t]his amount is not so small as to render a class action a superior method of adjudication"); Abby, 218 F.R.D. at 549 (denying class certification on superiority grounds, in part, because settlement amounts ranging from $1,000 to $550,000 indicated that individuals had a "substantial stake" in litigation).

### III.    Movants Have Not Provided and Cannot Provide Any Evidence that a Class Is Ascertainable

This Court should deny certification for the additional reason that Movants have not proposed any ascertainable class or subclass.  No ready way exists to identify putative members of any class without resort to an extensive and complicated review of potentially inaccurate records.  Movants have identified no methodology or data through which members of alternative, country-specific classes or subclasses could reliably be determined.  And even identifying members of a U.S.-investors-only class would still present insurmountable hurdles because it would require the Court to identify and exclude "accredited" investors, who cannot bring claims for aiding and abetting unregistered CD sales under TSA Article 581-33(A)(1).

"It is elementary that . . . the class sought to be represented must be adequately defined and clearly ascertainable."  DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970); see also John v. Nat'l Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007) (stating that "[t]he existence of an ascertainable class" is "an implied prerequisite of Federal Rule of Civil Procedure 23").  A class is not sufficiently ascertainable where inclusion turns on definitions that are "patent[ly] uncertain[]," DeBremaecker, 433 F.2d at 734, or would require "fact-intensive, individualized factual inquiries," Pfeffer v. HSA Retail, Inc., Civil Action No. SA-11-CV-959-XR, 2012 WL 1910034, at *3 (W.D. Tex. May 24, 2012).  Moreover, a "plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful," but, rather, "must demonstrate [that] his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership."  Carrera v. Bayer Corp., 727 F.3d 300, 306, 308 (3d Cir. 2013).  Movants fail to meet these requirements.

56

Here, Movants have proposed a class definition that turns entirely on untestable, individualized determinations by the Receiver based on voluminous and potentially inaccurate records.  Specifically, Movants propose to certify a class of "[a]ll persons or entities that held CD or other investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action."  (Mot. 4–5 .)  Movants themselves put forth no evidence that this class is readily ascertainable and disclaim any ability to identify its members; instead they assert that the Receiver can do so using data purportedly in his possession.  (App. 982, Pls.' Resps. to Defs.' First Set of Interrogs.)  But Movants do not propose a specific methodology for identifying class members, and the Receiver has consistently maintained that he lacks the necessary information and resources to identify individual investors who purchased SIB CDs.[47]  For example, the Receiver has confirmed that the claims he approved do not correspond to individual CD holders, but rather may aggregate the accounts of multiple individuals for whom he does not have detailed information.  (See App. 1038, E-mail from Kevin Sadler to Craig Reiser.)  In refusing to provide Defendants with discovery regarding the identity of claimants on the Receivership Estate, the Receiver repeatedly insisted that he would need "to collect the information requested," and that it would be "unduly burdensome, time consuming and expensive" to do so.  (App. 1046, Receiver's Resps. & Objections to Def. Chadbourne's Third Party Subpoena to Produce Documents.)  Further, in opposing Defendants' motion to compel production of that information, the Receiver represented that information about claimant identity requires "revisions or updates," that much of it is not stored in a "readily

---

[47] Even the limited discovery Defendants have been provided to date confirms that the Receiver's data cannot be relied upon to identify claims of individual investors with any degree of accuracy.  For example, Troice testified that although his claim has been approved by the Receivership Estate, he has yet to receive a single distribution because the Receiver has incorrectly aggregated his claim with that of his three sisters despite that his sisters invested in Stanford separate and apart from Mr. Troice.  (App. 147–151, 119–120, Troice Dep. Tr. 111:4–115:7, 39:23–40:8.)

searchable" format, and that he would have to create "custom databases and reports" to work

with it.  (Receiver's Resp. to Proskauer's and Chadbourne's Motion to Compel, ECF No. 167, at

8, 9.)

Clearly, neither Movants nor the Receiver can say who is or is not in the class without

additional, intensive analysis of data that the Receiver does not have readily available and is

unwilling or unable to produce.  As the Fifth Circuit recently indicated, a class that can be

identified only through this type of detailed review of voluminous, individual and potentially

inaccurate account records raises serious doubts about whether the class is sufficiently

ascertainable to be certified.  See Frey v. First Nat'l Bank S.W., --- F. App'x ---, 2015 WL

728066, at *5 (5th Cir. Feb. 20, 2015) (affirming class certification because "there [was] nothing

to suggest that a lengthy individualized analysis of each account and all of its individual

transactions would be necessary to identify class members").  Indeed, both within this Circuit

and elsewhere, courts have refused to certify classes that could be ascertained only through the

individualized review of bank records and transaction data, local land records, and telephone

number logs, among other data-intensive records.  See Pfeffer, 2012 WL 1910034, at *3

(individualized analysis of voluminous bank and personal account records and ATM transactions

defeated ascertainability because no "straightforward administrative procedure" existed to

identify class members); see also EQT Prod. Co. v. Adair, 764 F.3d 347, 358–60 (4th Cir. 2014)

("resolving owernship" of gas leases "based on land records can be a complicated and

individualized process" and "pose[d] a significant administrative barrier to ascertaining" class

membership); Intercontinental Hotels Corp. v. Girards, No. 05-02-01604-CV, 2004 WL 423115,

at *2 (Tex. App.—Dallas [5th Dist.] Mar. 2, 2004) (no pet.) ("[T]here is nothing in the record to

show it is possible, much less administratively feasible, to ascertain the identity of class members

58

from the voluminous list of telephone numbers generated by the daily fax confirmation logs.")

While the Receiver states that he will be able to quantify damages for a class, "assuming the

class definition is based on investors whose claims have been allowed by the Receivership"

(App. 558, Janvey Decl. ¶ 17), this conclusory assertion does not in any way negate the

individualized and fact-intensive nature of the required inquiry.  See Pfeffer, 2012 WL 1910034,

at *4 n.5 (rejecting plaintiff's "lone conclusory statement, without . . . any evidence or

elaboration, that 'there will be no difficulty in determining the putative members of the class'").

Nor does it remove the "patent uncertainty" from the Receiver's unilateral determination of who

is in the class, which is based on an unspecified methodology using unspecified data that

seemingly allows for variation and judgment calls.  See DeBremaecker, 433 F.2d at 734

(rejecting class that included "broad spectrum of positions and activities which could

conceivably be lumped under" the class definition).

 Moreover, as set forth above, determining who is in the class would require still further

individualized analysis to exclude holders, accredited U.S. investors, and individuals who

purchased CDs only before October 2006.  See supra Part I.D; infra Part IV.A at 67; Part VI.

Determining who must be excluded from the class on these bases thus would require

"individualized 'mini-trials,'" and cannot be accomplished using the sort of "mechanical

objective standard" on which the Fifth Circuit has insisted for proof of ascertainability.  Union

Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 640 (5th Cir. 2012) (affirming

certification where class could be ascertained through a "quick look at [the] trading records"

(internal quotation marks omitted)).

 Movants' alternative, geographic-based subclasses merely compound the ascertainability

problem.  (Mot. 5–7.)  Movants' proposed subclasses turn on the countries of citizenship or legal

residence of CD holders.  As Magistrate Judge Koening recently held, "[Movants] bear the

burden of establishing . . . whether foreign claimants should be included in the putative class."

(Order, ECF No. 179, at 5.)  Movants, however, have not met their burden because they have

offered no evidence about the countries of citizenship or legal residence of any class members.

Again, Movants declare that the Receiver can perform this analysis.  But, no evidence exists that

the Receiver has even collected data regarding the citizenship or lawful permanent residence of

individuals whose claims he approved.  The Bar Date Order and Proof of Claim Form did not

solicit information about citizenship or lawful permanent residence.  (App. 603–606, Janvey

Decl., Ex. A.)  The Receiver acknowledges possessing data about the locations of groups of

claimants, (App. 1035, E-mails between Kevin Sadler and Craig Reiser), but this information is

not sufficient to determine whether a proposed class member would be bound by the preclusive

effect of a U.S. class action judgment in this case.  Part II.A, <u>supra</u>.  In any event, the Receiver

admits that the data he has about the geographic location of CD investors is "almost

meaningless" because single claim numbers may aggregate the claims of multiple,

geographically dispersed individuals, people's addresses have changed, and many claimants used

mailing addresses outside their countries of residence.[48]  <u>Id.</u>  The Receiver's declaration makes

no representations at all about his ability to identify the countries of citizenship or permanent

residence of CD investors.  Movants proposed alternative classes therefore fall well short of the

requisite standard for demonstrating an ascertainable class.  <u>John</u>, 501 F.3d at 445.

---

[48] For example, Punga Punga is a Panamanian corporation with a principal (Green) who is a Mexican
citizen.  (App. 482–483, Green Decl. ¶¶ 3-4.)  Green's claim with the Receiver, however, lists his "permanent
mailing address" as the office of his attorneys in Texas.  (App. 1019, Punga Punga Notice of Determination.)
Meanwhile, the address listed on his claim form with the Antiguan Joint Liquidators is an apartment he owns in
Florida.  (App. 251–252, Green Dep. Tr. 96:25–97 :22; App. 1064, Punga Punga Proof of Debt Form.)

Moreover, even if the Court were to exclude all foreign investors and consider certifying a U.S.-only alternative class, such a class still could not be properly ascertained. As discussed infra Part IV.B at 67, accredited U.S. investors cannot assert claims under the TSA for the sale of unregistered securities. Determining whether investors are accredited would require assessing their net worth, income or assets, see supra n.5—inquiries that by definition are individualized. The Receiver does not claim—and Movants offer no evidence—that records even exist that would allow him or his team to differentiate between accredited U.S. CD purchasers and non-accredited ones (if there are any). Because no formulaic and objective analysis exists to reliably ascertain any class in this case, no class can be certified. See, e.g., DeBremaecker, 433 F.2d at 734.

## IV.    Movants Cannot Satisfy Rule 23's Adequacy or Typicality Requirements

A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a)(4). To satisfy this requirement, Movants must prove that putative class representatives are not only "part of the class" but also "possess the same interest and suffer the same injury as the class members." Amchem Prods., Inc., 521 U.S. at 625–26 (citation and quotation marks omitted). The adequacy inquiry thus "'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" Berger v. Compaq Computer Corp., 257 F.3d 475, 479-80 (5th Cir. 2001) (quoting Amchem, 521 U.S. at 625). Courts in this Circuit undertake a "robust review" of adequacy issues, "incorporating the due process considerations inherent in the concept, making certain that the representative[s] possess[] the character traits necessary to guarantee [their] commitment to [their] fiduciary duties to the class." In re Kosmos, 299 F.R.D. at 145; see also Phillips Petroleum Co., 472 U.S. at 812 ("The Due Process Clause of course requires that the named

plaintiff at all times adequately represent the interests of the absent class members."); Berger, 257 F.3d at 484 ("Precedent and due process concerns require that courts protect potential class members by ensuring that the named plaintiffs demonstrate their adequacy.").

Similarly, a class may be certified only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). As the Fifth Circuit has recognized, "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members." Stirman v. Exxon Corp., 280 F.3d 554, 563 n.7 (5th Cir. 2002) (citation and quotation marks omitted).

Movants have not met their burden of proving that the proposed class representatives would be adequate class representatives with claims typical of the proposed class.

A.     The Proposed Class Representatives Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(4)'s Adequacy Requirement.

Movants have not demonstrated that Reed, Troice, and Punga Punga will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[P]laintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." In re Kosmos, 299 F.R.D. at 145 (purported securities class action subject to PSLRA's pleading standards); see also Berger, 257 F.3d at 482–83 (explaining that, under precedent pre-dating the enactment of the PSLRA, class representatives must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation"); id. at 483 n.18 ("[p]laintiffs should understand the actions in which they are

involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel").[49]

Movants' sole evidence of the proposed class representatives' purported adequacy are the conclusory and boilerplate assertions, set forth in their respective declarations, that each has "been actively involved" in this litigation and is "prepared to do what is necessary and appear and testify at trial in this case to vindicate [his or her] rights and the rights of other Stanford victims." (App. 107, Reed Decl. ¶ 10; App. 312, Troice Decl. ¶ 11; App. 486, Green Decl. ¶ 15.) These assertions are insufficient to sustain Movants' burden of proof. See In re Kosmos, 299 F.R.D. at 146–47, 150 (finding class representative inadequate in part because "the only evidence . . . in support of its claims of adequacy" was a declaration that "contain[ed] little more than formulaic, boiler-plate assertions" and "conclusory pronouncements"). Movants' conclusory assertions of adequacy are particularly insufficient in light of the following:

Reed:  Reed's delay in seeking to join this case as a named plaintiff raises substantial doubt as to her "willingness and ability . . . to take an active role in and control the litigation and to protect the interests of absentees." Berger, 257 F.3d at 479 (citation omitted); see also In re LTV Sec. Litig., 88 F.R.D. 134, 151 (N.D. Tex. 1980) (finding that proposed class representative was inadequate in part because she filed complaint three weeks after other plaintiffs had already filed a class certification motion involving the same allegations). Despite learning about this case in 2011 (App. 66, Reed Dep. Tr. 14:12–18), Reed has never attempted to join as a named plaintiff; rather, the Plaintiffs made an untimely motion to have her added at the end of January 2015. (See generally Opposed Mot. to Add Named Pl. & Putative Class Representative, ECF

---

[49] Although the "demanding" Berger standard arose in the federal securities context, it has "since been applied to cases" outside of that context. In re Enron Corp. Sec., 529 F. Supp. 2d at 675 n.43, 725; accord Ogden v. AmeriCredit Corp., 225 F.R.D. 529, 532 (N.D. Tex. 2005).

No. 163.)  Reed admitted in her deposition that she did not read the Complaint until 2015 (App.

67 Reed Dep. Tr. 22:6–9)—months <u>after</u> signing a sworn declaration in support of the motion for

class certification in October 2014 (App. 1072, Declaration of Pam Reed, dated Oct. 25, 2014

("Original Reed Decl."); <u>see, e.g.</u>, <u>In re Enron Sec.</u>, 529 F. Supp. 2d at 733 (finding class

representatives inadequate in part because they "ha[d] not read the majority of documents given

to them by their attorneys, nor even read the complaints carefully").  In her original sworn

declaration, Reed misrepresented her investments in the CDs, suggesting, at a minimum, her lack

of diligence.  (<u>Compare</u> App. 1071, Original Reed Decl. ¶ 5 (stating that she purchased one

"SIBL 'Fixed CD' in the amount of $2,156,286.10" and another "SIBL 'Fixed CD' for the

amount of £160,104.07"), <u>with</u> App. 106, Reed Decl. ¶ 5 (stating that she purchased one "SIBL

'Fixed CD' in the amount of $2 million" and another "SIBL 'Fixed CD' for the amount of

£150,990.00").  (<u>See also</u> App. 97–103, Reed Dep. Tr. 174:7–180:22.)

      Reed further failed to search her e-mails and other electronic files for documents

responsive to Defendants' discovery requests until <u>after</u> her deposition and over a month after

counsel represented that her document production was complete (App. 68, Reed Dep. Tr. 49:10–

50:7; App. 1074–1075, Correspondence between Ed Snyder and Jonathan K. Chang; App. 1077–

1078, Letter from Jonathan K. Chang to Ed Snyder; App. 1082–1083, Letter from Daniel J.

Schwartz to Ed Snyder), which provides an additional "basis to find a class representative

inadequate," <u>Longden v. Sunderman</u>, 123 F.R.D. 547, 558 (N.D. Tex. 1988); <u>see also</u> <u>In re Ford</u>

<u>Motor Co. Bronco II Prod. Liab. Litig.</u>, 177 F.R.D. 360, 367 (E.D. La. 1997) ("Failure to

cooperate in discovery may support a finding that class representatives are inadequate.").  And,

in response to a direct question at her deposition, Reed failed to mention her involvement in two

other Stanford-related lawsuits, including one against Defendants.  (<u>See</u> App. 65, Reed Dep. Tr.

9:15–24).[50]  Such a response, combined with the inaccuracies in her original declaration, call

Reed's overall credibility into question.  See Shiring v. Tier Techs., Inc., 244 F.R.D. 307, 317

(E.D. Va. 2007) (stating that, "to be appointed class representative, a plaintiff must demonstrate

that he exhibits honesty, conscientiousness, and other affirmative personal qualities" (citation

and internal quotation marks omitted)).

Troice:  Troice admitted that he did not verify the accuracy of the allegations in the

Complaint, did not know how the proposed class is defined (or even that there is a proposed class

definition in the Complaint), and failed to correct an incomplete statement of his citizenship in

the Complaint.  (App. 116–117, Troice Dep. Tr. 23:19-24: 25; App. 118, 121, Troice Dep. Tr.

30:10–15, 47:2–13.)  Troice also does not have "any idea" of the methodology the Receiver is

using to calculate damages (App. 145, Troice Dep. Tr. 94:8–11), which is particularly troubling

because Movants have proposed that damages in this case be calculated according to the

Receiver's methodology.  (Br. 54–55).  Nor does Troice know why he and the other Plaintiffs are

seeking to add Reed as a class representative.  (App. 115, Troice Dep. Tr. 16:6–10.)  Like Reed,

Troice failed to search his e-mails for documents responsive to Defendants' discovery requests

until after his deposition (App. 146, Troice Dep. Tr. 99:12-18), and only produced relevant e-

mail correspondence ten days after his deposition and over a month after proposed class counsel

represented to Defendants that Troice's document production was complete.  (App. 68, Reed

Dep. Tr. 49:10–50:7; App. 1074–1075, Correspondence between Ed Snyder and Jonathan K.

---

[50] Reed testified that she was a plaintiff in two lawsuits—one involving construction on her home and Wilkinson v. BDO USA, LLP, No. 3:11-cv-01115 (N.D. Tex.).  (App. 65, Reed Dep. Tr. 9:15–24.)  However, in response to a direct question as to whether she had been named as a plaintiff in any other lawsuits, Reed testified that she had not been (id.), despite the fact that in December 2011, she filed a state court action asserting the same claims against defendants in this action, see Petition, Reed v. Proskauer Rose LLP, No. 2011-CI-20426 (225th Dist. Ct., Bexar Cnty., Tex. Dec. 30, 2011), which was later removed to this Court, and in August 2010, she and others filed a state court action against her Stanford financial advisor, Nigel Bowman, see Petition, Gibbins v. Bowman, No. D-1-GN-10-002715 (200th Dist. Ct., Travis Cnty., Tex. Aug. 4, 2010).

Chang; App. 1077–1078, Letter from Jonathan K. Chang to Ed Snyder; App. 1082–1083, Letter from Daniel J. Schwartz to Ed Snyder).

Punga Punga:  Green admitted that Punga Punga does not control how the litigation is conducted (App. 234, Green Dep. Tr. 44:6–19), and that he neither reads nor understands the materials in this case (App. 234, Green Dep. Tr. 44:14–16 ("If I were reading and understanding about all of this I wouldn't even be able to [conduct] my business.")).  Punga Punga's willingness to defer to counsel belies Movants' contention that Punga Punga would be an "adequate" class representative.  See Berger, 257 F.3d at 483 n.18 ("Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel."). In addition, Green's declaration states that Punga Punga began investing in Stanford Financial in the 1990s (App. 484, Green Decl. ¶ 9), yet Punga Punga was not even formed until 2004 (App. 243–244, Green Dep. Tr. 64:17–65:3).

As a Panamanian corporation owned by a Mexican citizen (Compl. ¶ 5; App. 1085, Punga Punga Articles of Incorporation), Punga Punga would not be a member, much less an adequate representative, of an alternative U.S.-investor-only class, or an adequate or typical representative of a Mexican-investor-only class.  Issues related to Punga Punga's corporate structure, control, and citizenship may also give rise to other unique and relevant questions of fact not shared by other members of the class.[51]

_____

[51] At his deposition, Green testified—incorrectly—that he and his wife were and always had been the only directors of Punga Punga.  (App. 242, Green Dep. Tr. 60:6–12.)  Movants have submitted no documentary evidence that Green has ever been a director of Punga Punga, and the evidence suggests that Green is neither an officer nor a director of Punga Punga.  (See App. 1104, Punga Punga Custody Agreement.)  In fact, the officers and directors of Punga Punga are three Panamanian individuals, Edgardo Díaz, María Vallarino, and Myrna de Navarro  (App. 1091, Punga Punga Articles of Incorporation), who also serve as directors of a Panamanian company named Leinada, (App. 1114, Leinada Articles of Incorporation), which has been implicated in illegal money laundering in connection with bribes paid to associates of a son of former Libyan dictator, Muammar el-Qaddafi.  (Id.; App. 1127, N.Y. Times Article, "Libyan Fund Sues French Bank over $1.5 Billion in Losses on Derivatives").  Furthermore, while Movants' proposed alternative class definition purports to encompass not just "citizens and legal residents" of Mexico but also "entities owned or controlled by Mexican citizens or legal residents," (Mot. 6), Movants offer no

> **B.** The Proposed Class Representatives Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(3)'s Typicality Requirement.

Class certification may be denied where "the facts surrounding the named plaintiff are sufficiently different than other members of the class," in recognition that "representation of the class will suffer if the named plaintiff is preoccupied with a defense which is applicable only to himself." Pitts v. Greenstein, Civil Action No. 10-635-JJB-SR, 2011 WL 2193398, at *5 (M.D. La. June 6, 2011); see also Warren v. Reserve Fund, Inc., 728 F.2d 741, 747 (5th Cir. 1984) ("[T]he presence of [a] characteristic peculiar to the named plaintiff does present a sufficient question of typicality to justify a district court's decision to deny class certification."); City of San Antonio v. Hotels.com, Civil No. SA-06-CA-381-OG, 2008 WL 2486043, at *6 (W.D. Tex. May 27, 2008) ("If the representative plaintiff's claim is subject to a unique defense that is reasonably likely to be a major focus on the litigation, the claim is atypical."). The proposed class representatives' claims are not typical of those of the proposed class for several reasons.

First, because Reed was an "accredited investor" when she invested in the SIB CDs (App. 76, Reed Dep. Tr. 95:10–14), she cannot bring a TSA claim for the sale of unregistered securities. The TSA "exempts from the securities registration requirements . . . the offer and sale by the issuer or a registered dealer without advertising of any security to an individual accredited investor." 7 Tex. Admin. Code § 139.16 (emphasis added); see also Tex. Rev. Civ. Stat. Ann. art. 581-5T (providing that the Texas State Securities Board may issue rules, regulations, or

---

justification for why a Panamanian corporation such as Punga Punga might properly be included in a class of Mexican citizens merely because its largest shareholder is a citizen of Mexico. Because Punga Punga is a Panamanian citizen, a central issue with respect to whether Punga Punga may be included in the class is whether Panama's courts would accord res judicata effect to a U.S. class judgment. See supra Part II.A. That Punga Punga's largest shareholder may be a Mexican citizen is of no particular import to any question relevant to the issue of certification.

orders setting forth exemptions to the TSA's registration requirements).[52]  Accordingly, Reed, as

an accredited investor, cannot bring a claim for the sale of unregistered securities under the TSA.

See Calnin v. Hilliard, Nos. 05-C-69, 05-C-1092, 05-C-784, 05-C-1148, 05-C-958, 2008 WL

336892, at *10–11 (E.D. Wis. Feb. 5, 2008) (granting summary judgment in part in favor of

defendants on plaintiffs' "failure to register claims" under Wisconsin and Florida Blue Sky laws

because plaintiffs were accredited investors and both laws exempted from registration securities

sold to accredited investors); see also Supernova Sys., Inc. v. Great Am. Broadband, Inc., Cause

No. 1:10-CV-319, 2012 WL 425552, at *4–6 (N.D. Ind. Feb. 9, 2012) (same, under Indiana's

Blue Sky law).  For this reason, Reed cannot adequately represent putative class members on

those claims.  See Stirman, 280 F.3d at 563 n.7 (noting that proposed class representative "has no

incentive to fully litigate those claims not applicable to her").

Reed also is not typical of putative class members from other countries because, as a U.S.

accredited investor, she: (1) was required to sign a subscription agreement and make certain

representations not required of putative class members from other countries (see App. 501–502,

SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire); (2) received

different Stanford materials—with additional disclosures—than putative class members from

other countries (see, e.g., App. 551, August 2007 letter to Reed; App. 499–501, SIB U.S.

Accredited Investor Subscription Agreement Investor Questionnaire Reed; App. 28–50 SIB U.S.

Accredited Investor Disclosure Statement.); and (3) likely has greater sophistication than some

other putative class members.

---

[52] Indeed, U.S. accredited investors, like Reed, who participated in SIB's CD program were specifically told that the CDs "have not been nor will they be registered under the U.S. Federal Securities Act of 1933 . . . or the securities laws of any state within the United States."  (App. 84–85, Reed Dep. Tr. 152:16–153:3; see also App. 29, SIB U.S. Accredited Investor Disclosure Statement.)

Second, Troice held only SIB CDs purchased prior to Stanford's retention of Sjoblom in August 2005. (See, e.g., App. 465–466, Gompers Decl. Ex. 2.) Therefore, Troice cannot show a causal connection under the TSA between his purchases of the SIB CDs and Sjoblom's alleged actions or omissions, nor can he satisfy the reliance requirements of Plaintiffs' common law claims. See supra Part I.B; infra Part VI. For these reasons, he will be unable to represent the class.

Third, Punga Punga and Reed are not typical of the putative class due to the unique circumstances under which they invested in Stanford. See Pitts, 2011 WL 2193398, at *5. Green began investing through Punga Punga—a foreign corporation—to mask his identity as a Stanford investor. (App. 237–238, Green Dep. Tr. 53:10–54:24.) Reed began investing in SIB CDs because of her nearly two-decade-long relationship with her longtime broker, Nigel Bowman, whom she followed to Stanford. (App. 105–106, Reed Decl. ¶ 4; see App. 75, Reed Dep. Tr. 93:2–5.) Further, in mid-February 2008, prior to purchasing a new SIB CD, Reed, Bowman and others flew to Antigua to see SIB firsthand. (App. 86, 89, 92, 95–96, Reed Dep. Tr. 155:19–23, 159:10–13, 163:3-16, 172:21–173:24.) Reed went to the bank to discuss the CDs, met and received presentations from various bank employees, and also spoke with Allen Stanford during the trip. (App. 88–89, 90–91, 93, 94, Reed Dep. Tr. 158:17–159:9, 160:2–161:9, 166:8–10, 167:2–3.)

## V.    Movants Have Not Demonstrated that Investors Who Were Citizens or Residents of the United States Are Sufficiently Numerous to Form a Class

Finally, Movants cannot meet their burden of establishing numerosity for their proposed class of U.S. citizens and legal residents because they have not provided any "evidence" of, or even a "reasonable estimate" of, the number of purported class members who can bring a claim

under the TSA for aiding and abetting the sale of unregistered securities.[53]  See Holmes v. Serv.

Corp. Int'l, Civ. Act. No. H-10-4841, 2014 WL 3046971, at *5 (S.D. Tex. July 3, 2014); In re

FEMA Trailer Formaldehyde Prods. Liab. Litig., No. MDL 071873, 2008 WL 5423488, at *4–5

(E.D. La. Dec. 29, 2008) (finding that plaintiffs had not met their burden as to numerosity where

they "alleged that numerosity exists . . . as to the proposed class as a whole" but "fail[ed] to

demonstrate or offer any evidence as to whether numerosity exists as to each proposed sub-

class.").  An accredited investor cannot bring a claim for the sale of unregistered securities under

the TSA.  See infra Part IV.B.  Movants, however, provide no evidence as to the number of non-

accredited, U.S. citizen or resident investors who purchased CDs; indeed, it is doubtful there are

any non-accredited U.S. purchasers, because the CDs were sold in the United States pursuant to

Regulation D, and by law, such securities can only be sold to accredited investors.  Supra n.5.  In

fact, the only proposed class representative who purchased CDs in the United States—Pam

Reed—is an accredited investor.  Supra Part IV.A.  If, as Movants claim, Reed is "typical" of

U.S. purchasers, then there will be few, if any, such purchasers who were not accredited and can

assert TSA registration claims, rendering any U.S.-only class insufficiently numerous to warrant

class status.

## VI.    In the Alternative, If the Court Does Not Deny Class Certification, It Should Limit the Proposed Class

If the Court does not deny class certification, which it should, the Court alternatively

should narrow the proposed class.

Rule 23(a) contains an implied requirement that the class be adequately defined.  Union

Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 639 (5th Cir. 2012).  Where, as here, a

---

[53] For the reasons set forth above, see supra Part I.D , certification also would be inappropriate for a class of U.S. citizens and legal residents bringing any other of Plaintiffs' claims.

class definition is overbroad, "[d]istrict courts are permitted to limit or modify class definitions to provide the necessary precision." In re Enron Corp. Sec., 529 F. Supp. 2d at 671 (internal quotation marks omitted); Eatmon v. Palisades Collection, LLC, No. 2:08-CV-306-DF-CE, 2010 WL 1189571, at *4 (E.D. Tex. Mar. 5, 2010) (modifying class definition to exclude categories of individuals). A class is overbroad, for example, where it encompasses untimely claims, Barnett v. Experian Info. Solutions, No. Civ .A. 2:00CV175, 2004 WL 4032909, at *2 (E.D. Tex. Sept. 30, 2004) (limiting temporal scope of class to include only misrepresentations made within statute of limitations), or where it includes individuals whose alleged injuries could not have been caused by the defendants, In re Hartmarx Sec. Litig., No. 01 C 7832, 2002 WL 31103491, at *6 (N.D. Ill. Sept. 19, 2002) (excluding investors who purchased stock prior to first alleged misrepresentation).

Movants' proposed class is overbroad for several reasons. First, the proposed class encompasses claims that are barred by statutes of limitation or statutes of repose. See supra Part I.G. Second, the proposed class includes non-cognizable holder claims. See supra Part I.D. Third, the proposed class includes claims of investors from jurisdictions that would not recognize, and give preclusive effect to, a class judgment or settlement in this action. See supra Part II.A.[54] Fourth, the proposed class includes accredited investors' invalid claims for the sale of unregistered securities under the TSA. See supra Part IV.B.

Finally, the proposed class includes claims based on CD purchases pre-dating Sjoblom's retention by Stanford in August 2005, which are barred due to lack of at least a causal connection. For a plaintiff to prevail under Article 581-33A(2) of the TSA, a "causal

---

[54] If the Court does not deny class certification as to the claims of investors from foreign jurisdictions, it should nevertheless exclude these investors' TSA claims from the class. The TSA should be interpreted and applied consistent with federal securities laws, see Haralson v. E.F. Hutton Grp., Inc., 919 F.2d 1014, 1032 n.9 (5th Cir. 1990), which laws do not apply extraterritorially. Morrison, 561 U.S. at 265.

connection" is required—namely, that "any misrepresentation or omission was made in connection with the sale of the [security] prior to the sale."  Geodyne Energy Income Prod. P'ship I-E v. Newton Corp., 97 S.W.3d 779, 784 (Tex. App.—Dallas 2003) (emphasis added), rev'd in part on other grounds by 161 S.W.3d 482 (Tex. 2005); see also id. (explaining that "a statement made by the seller after the purchase of a security is not the 'means' by which the security was sold and is thus insufficient to establish a violation of the TSA"); Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied) ("A statement made after purchase of the securities could not induce purchase and is therefore not relevant."); Pitman v. Lightfoot, 937 S.W.2d 496, 531 (Tex. App.—San Antonio 1996, writ denied) ("[T]he plaintiff must show the untrue statements were made before the sale occurred."); Nicholas v. Crocker, 687 S.W.2d 365, 368 (Tex. App.—Tyler 1984, writ ref'd n.r.e.) (explaining that "untrue statements made . . . when the buyer has already purchased the security are not the 'means' by which the security was sold").  The same is true of Plaintiffs' conspiracy and aiding and abetting fraud claims, which each have a causation element based on the fraud cause of action on which they are predicated.  See Conger v. Danek Med., Inc., 27 F. Supp. 2d 717, 721–22  (N.D. Tex. 1998); TCA Bldg. Co. v. Entech, Inc., 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no pet.).

To the extent that putative class members purchased CDs prior to Stanford's retention of Sjoblom in August 2005 and/or prior to Sjoblom's alleged actions or omissions—as did proposed class representatives Troice and Punga Punga (App. 465–466, Gompers Decl. Ex. 2)— they cannot show a causal connection under the TSA or satisfy the causation element of their common law claims.  Therefore, they do not have cognizable TSA, aiding and abetting fraud, or conspiracy claims prior to at least August 2005, if not later, and those claims should be excluded from the class.

72

# CONCLUSION

The powerful tool of class certification is made available only upon the Plaintiffs' clear satisfaction of stringent criteria. The sprawling proposed class here of dissimilar members scattered across numerous countries of the globe, with widely varying circumstances and legal issues, sought to be represented by atypical and uninterested representatives, is a paradigmatic example of what Rule 23's requirements were designed to avoid.

For all of these reasons, the Motion for Class Certification, for Designation of Class Representatives and Class Counsel should be denied.

Dated: March 20, 2015


CARRINGTON, COLEMAN,                    DAVIS POLK & WARDWELL, LLP
SLOMAN & BLUMENTHAL, L.L.P.


By: /s/ Neil R. Burger                          /s/ James P. Rouhandeh
    Neil R. Burger                           James P. Rouhandeh*
     Texas Bar No. 24036289               New York Bar No. 2211837
     nburger@ccsb.com                     rouhandeh@davispolk.com
    Bruce W. Collins                         Daniel J. Schwartz*
     Texas Bar No. 04604700               New York Bar No. 4159430
     bcollins@ccsb.com                    daniel.schwartz@davispolk.com
    901 Main Street, Suite 5500              Jonathan K. Chang*
    Dallas, Texas 75202                       New York Bar No. 4500484
    Telephone: (214) 855-3000                 jonathan.chang@davispolk.com
    Facsimile: (214) 855-1333                450 Lexington Avenue
                                             New York, New York 10017
                                             Telephone: (212) 450-4000
                                             Facsimile: (212) 701-5800
                                             * admitted *pro hac vice*

                                             *Attorneys for Defendant Proskauer*
                                             *Rose LLP*

VINSON & ELKINS LLP

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By: /s/ Harry M. Reasoner
   Harry M. Reasoner
    Texas Bar No. 16642000
    hreasoner@velaw.com
   William D. Sims, Jr.
    Texas Bar No. 24036289
    bsims@velaw.com
   1001 Fannin Street, Suite 2500
   Houston, Texas 77002
   Telephone: (713) 758-2222
   Facsimile: (713) 758-2346

/s/ Daniel J. Beller
   Daniel J. Beller*
    New York Bar No. 1643741
    dbeller@paulweiss.com
   Daniel J. Leffell*
    New York Bar No. 1883776
    dleffell@paulweiss.com
   William B. Michael*
    New York Bar No. 4296356
    wmichael@paulweiss.com
   1285 Avenue of the Americas
   New York, New York 10019-6065
   Telephone: (212) 373-3000
   Facsimile: (212) 757-3990
   * admitted *pro hac vice*

*Attorneys for Defendant Chadbourne & Parke LLP*

FISH & RICHARDSON P.C.

McKENNA LONG & ALDRIDGE LLP

By: /s/ William B. Mateja

   William B. Mateja
    Texas Bar No. 13185350
    mateja@fr.com
   1717 Main Street, Suite 5000
   Dallas, Texas 75201
   Telephone: (214) 747-5070
   Facsimile: (214) 747-2091

/s/ Mindy L. Rattan

   Joshua R. Hochberg*
    D.C. Bar No. 495732
    jhochberg@mckennalong.com
   Mindy L. Rattan*
    D.C. Bar No. 467553
    mrattan@mckennalong.com
   1900 K Street NW
   Washington, DC 20006-1108
   Telephone: (202) 496-7400
   Facsimile: (202) 496-7756
   * admitted pro hac vice

*Attorneys for Thomas V. Sjoblom*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2015, I caused the foregoing document to be served on counsel of record for all parties of record via electronic mail or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ James P. Rouhandeh