UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of all others similarly situated, | : : : : : : : : : | |
| Plaintiffs, | : : | |
| - against - | : : : | Case No. 3:09-cv-01600-N Hon. David C. Godbey |
| PROSKAUER ROSE LLP, THOMAS V. SJOBLOM, P. MAURICIO ALVARADO, and CHADBOURNE & PARKE LLP, | : : : : : | |
| Defendants. | : : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

---

APPENDIX IN SUPPORT OF OPPOSITION OF DEFENDANTS
PROSKAUER ROSE LLP, CHADBOURNE & PARKE LLP AND THOMAS V.
SJOBLOM TO PLAINTIFFS' OPPOSED MOTION FOR CLASS CERTIFICATION,
FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL

---

**Table of Contents**

| EXHIBIT | DOCUMENT | APPENDIX PAGE(S) |
|---|---|---|
|  | Declaration of James P. Rouhandeh | 1-10 |
| 1 | 2003 SIB Brochure | 11-26 |
| 2 | SIB U.S. Accredited Investor Disclosure Statement | 27-50 |
| 3 | December 2008 Monthly Report | 51-53 |
| 4 | SIB Q&A | 54-61 |
| 5 | Deposition of Pam Reed, dated Feb. 5, 2015 | 62-103 |
| 6 | Declaration of Pam Reed, dated Feb. 13, 2015 | 104-107 |
| 7 | Reed SIB CD, dated July 4, 2007 | 108-109 |
| 8 | Reed SIB CD, dated Apr. 14, 2008 | 110-111 |
| 9 | Deposition of Samuel Troice, dated Feb. 3, 2015 | 112-151 |
| 10 | SIB 2007 Annual Report | 152-189 |
| 11 | OIG Report, dated Mar. 31, 2010 | 190-231 |
| 12 | Deposition of Isaac Green, dated Jan. 26, 2015 | 232-259 |
| 13 | Affidavit of Lena Stinson, dated Oct. 27, 2014 | 260-276 |
| 14 | Alison Fitzgerald, "SEC Investigating Stanford Group Offshore-Bank CDs," Bloomberg (July 3, 2008) | 277-279 |
| 15 | Nick Hoult, "The Greatest Final Ever," The Daily Telegraph, July 7, 2008 | 280-281 |
| 16 | Alex Dalmady, "Duck tales," VenEconomy Monthly, Jan. 2009 | 282-287 |
| 17 | Troice SIB CDs | 288-308 |
| 18 | Declaration of Samuel Troice, dated Oct. 27, 2014 | 309-312 |
| 19 | Troice SIB Account Statements | 313-409 |
| 20 | Declaration of Paul Gompers, dated Feb. 13, 2015 | 410-472 |
| 21 | Troice SIB Transaction Detail | 473-480 |
| 22 | Declaration of Isaac Green, dated Oct. 20, 2014 | 481-486 |
| 23 | Punga Punga SIB Transaction detail, dated February 17, 2009 | 487-489 |
| 24 | Punga Punga SIB Transaction detail, dated March 26, 2013 | 490-497 |
| 25 | SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire | 498-507 |
| 26 | Reed SIB Transaction Detail | 508-510 |
| 27 | Reed Statement of Account | 511-513 |

| 28 | Declaration of Edward F. Sherman, dated Oct. 31, 2014 | 514-539 |
|----|----|----|
| 29 | Responsive Declaration of Edward F. Sherman, dated Mar. 13, 2015 | 540-549 |
| 30 | August 2007 Letter to Reed | 550-551 |
| 31 | Declaration of Receiver Ralph S. Janvey, dated Oct. 30, 2014 | 552-618 |
| 32 | Declaration of Dr. Claus von Wobeser, Esq., dated Feb. 13, 2015 | 619-699 |
| 33 | Declaration of Professor Antonio Gidi, dated Feb. 13, 2015 | 700-729 |
| 34 | Declaration of Professor Manuel A. Gomez, dated Feb. 12, 2015 | 730-772 |
| 35 | Declaration of Pedro Alberto Jedlicka, dated Feb. 13, 2015 | 773-789 |
| 36 | Declaration of Professor Alejandro M. Garro, dated Oct. 30, 2014 | 790-856 |
| 37 | Deposition of Professor Alejandro M. Garro, dated Feb. 10, 2015 | 857-906 |
| 38 | Second Declaration of Professor Alejandro M. Garro, dated March 13, 2015 | 907-924 |
| 39 | SIBL – in Liquidation: Summary of Claims by Country and Status | 925-927 |
| 40 | Direct Testimony of Karyl Van Tassel, dated Dec. 5, 2011 | 928-975 |
| 41 | Plaintiffs' Responses to Defendants' First Set of Interrogatories, dated Nov. 26, 2014 | 976-1022 |
| 42 | Declaration of Examiner John J. Little, dated Oct. 29, 2014 | 1023-1031 |
| 43 | E-mail from Kevin Sadler, counsel for the Receiver, to Craig Reiser, counsel for Proskauer, dated 2014 | 1032-1040 |
| 44 | Receiver's Responses & Objections to Defendant Chadbourne's Third Party Subpoena to Produce Documents, dated Dec. 19, 2014 | 1041-1055 |
| 45 | Declaration of Isaac Green, dated October 31, 2014 | 1056-1060 |
| 46 | Punga Punga Proof of Debt Form | 1061-1068 |
| 47 | Declaration of Pam Reed, dated Oct. 25, 2014 | 1069-1072 |
| 48 | Correspondence between Jonathan K. Chang, counsel for Proskauer, and Edward C. Snyder, counsel for Movants, dated Jan. 6, 2015 | 1073-1075 |

| 49 | Letter sent by Jonathan K. Chang, counsel for Proskauer, to Edward C. Snyder, counsel for Movants, dated Feb. 9, 2015 | 1076-1078 |
|---|---|---|
| 50 | E-mail sent by Edward C. Snyder, counsel for Movants, to Jonathan K. Chang, counsel for Proskauer, dated Feb. 13, 2015 | 1079-1080 |
| 51 | Letter sent by Daniel J. Schwartz, counsel for Proskauer, to Edward C. Snyder, counsel for Movants, dated Feb. 23, 2015 | 1081-1083 |
| 52 | Punga Punga Articles of Incorporation | 1084-1101 |
| 53 | Punga Punga Custody Agreement | 1102-1106 |
| 54 | Leinada Articles of Incorporation | 1107-1125 |
| 55 | Jenny Anderson, "Libyan Fund Sues French Bank over $1.5 Billion in Losses on Derivatives," N.Y. Times (March 31, 2014) | 1126-1129 |

Dated:  March 20, 2015

CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL,
L.L.P.

By: /s/ Neil R. Burger
    Neil R. Burger
     Texas Bar No. 24036289
     nburger@ccsb.com
    Bruce W. Collins
     Texas Bar No. 04604700
     bcollins@ccsb.com
    901 Main Street, Suite 5500
    Dallas, Texas 75202
    Telephone: (214) 855-3000
    Facsimile: (214) 855-1333

DAVIS POLK & WARDWELL,
LLP

/s/ James P. Rouhandeh
James P. Rouhandeh*
  New York Bar No. 2211837
  rouhandeh@davispolk.com
Daniel J. Schwartz*
  New York Bar No. 4159430
  daniel.schwartz@davispolk.com
Jonathan K. Chang*
  New York Bar No. 4500484
  jonathan.chang@davispolk.com
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
* admitted *pro hac vice*

*Attorneys for Defendant Proskauer
Rose LLP*

VINSON & ELKINS LLP

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP


By: /s/ Harry M. Reasoner
    Harry M. Reasoner
     Texas Bar No. 16642000
     hreasoner@velaw.com
    William D. Sims, Jr.
     Texas Bar No. 24036289
     bsims@velaw.com
    1001 Fannin Street, Suite 2500
    Houston, Texas 77002
    Telephone: (713) 758-2222
    Facsimile: (713) 758-2346

/s/ Daniel J. Beller
Daniel J. Beller*
  New York Bar No. 1643741
  dbeller@paulweiss.com
Daniel J. Leffell*
  New York Bar No. 1883776
  dleffell@paulweiss.com
William B. Michael*
  New York Bar No. 4296356
  wmichael@paulweiss.com
1285 Avenue of the Americas
New York, New York 10019-6065
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
* admitted *pro hac vice*

*Attorneys for Defendant
Chadbourne & Parke LLP*


FISH & RICHARDSON P.C.

McKENNA LONG & ALDRIDGE
LLP


By: /s/ William B. Mateja

    William B. Mateja
     Texas Bar No. 13185350
     mateja@fr.com
    1717 Main Street, Suite 5000
    Dallas, Texas 75201
    Telephone: (214) 747-5070
    Facsimile: (214) 747-2091

/s/ Mindy L. Rattan

Joshua R. Hochberg*
  D.C. Bar No. 495732
  jhochberg@mckennalong.com
Mindy L. Rattan*
  D.C. Bar No. 467553
  mrattan@mckennalong.com
1900 K Street NW
Washington, DC 20006-1108
Telephone: (202) 496-7400
Facsimile: (202) 496-7756
* admitted pro hac vice

*Attorneys for Defendant Thomas V.
Sjoblom*

6

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2015, a true and correct copy of the foregoing instrument was served on counsel of record for all parties of record via electronic mail or by another manner authorized by Federal Rule of Civil Procedure 5 and Local Rule of Civil Procedure 5.1(d).

/s/ James P. Rouhandeh
James P. Rouhandeh

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| SAMUEL TROICE, HORACIO MENDEZ,<br>ANNALISA MENDEZ, and<br>PUNGA PUNGA FINANCIAL, LTD.,<br>individually and on behalf of all others<br>similarly situated, | :<br>:<br>:<br>:<br>:<br>: |
| Plaintiffs, | :<br>: |
| - against - | :   Case No. 3:09-cv-01600-N<br>:   Hon. David C. Godbey |
| PROSKAUER ROSE LLP,<br>THOMAS V. SJOBLOM,<br>P. MAURICIO ALVARADO, and<br>CHADBOURNE & PARKE LLP, | :<br>:<br>:<br>: |
| Defendants. | :<br>: |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

---

**DECLARATION OF JAMES P. ROUHANDEH IN SUPPORT OF OPPOSITION OF
DEFENDANTS PROSKAUER ROSE LLP, CHADBOURNE & PARKE LLP AND
THOMAS V. SJOBLOM TO PLAINTIFFS' OPPOSED MOTION FOR CLASS
CERTIFICATION, FOR DESIGNATION OF CLASS REPRESENTATIVES AND
CLASS COUNSEL**

---

James P. Rouhandeh, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury:

1.        I am an attorney admitted to practice pro hac vice before this Court, and I am a partner in the law firm of Davis Polk & Wardwell LLP, counsel for Proskauer Rose LLP ("Proskauer") in the above-captioned matter.  I submit this declaration in support of the Opposition of Defendants Proskauer, Chadbourne & Parke LLP, and Thomas V. Sjoblom to Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel.  The matters in this declaration are within my personal knowledge and are true and correct.

2.        Attached hereto as Exhibit 1 is a true and correct copy of Exhibit 8 to the deposition of Pam Reed, entitled "Stanford International Bank Limited," dated 2003.

3.        Attached hereto as Exhibit 2 is a true and correct copy of Exhibit 14 to the deposition of Pam Reed, entitled "Disclosure Statement: U.S. Accredited Investor Certificate of Deposit Program," dated November 15, 2007.

4.        Attached hereto as Exhibit 3 is a true and correct copy of a document produced by Plaintiffs and proposed plaintiff Pam Reed (collectively, the "Movants") as Bates range P682–683, entitled "Stanford Monthly Report," dated December 2008.

5.        Attached hereto as Exhibit 4 is a true and correct copy of a document produced by Movants as Bates range P157–163, entitled "Stanford: What protection offers Stanford International Bank to its depositors?" as well as a certified English translation thereof.

6.        Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the transcript of the deposition of Pam Reed, dated February 5, 2015.

App. 2

7.      Attached hereto as Exhibit 6 is a true and correct copy of a document served on Defendants by Movants, entitled " Declaration of Pam Reed," dated February 13, 2015.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a document produced by Movants as Bates number P226, entitled "Stanford International Bank Ltd.: Certificate of Deposit" in the name of Pam Reed, dated July 4, 2007.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a document produced by Movants as Bates number P227, entitled "Stanford International Bank Ltd.: Certificate of Deposit" in the name of Pam Reed, dated April 14, 2008.

10.     Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the transcript of the deposition of Samuel Troice, dated February 3, 2015.

11.     Attached hereto as Exhibit 10 is a true and correct copy of Exhibit 10 to the deposition of Pam Reed, entitled "Stanford International Bank Annual Report: 2007."

12.     Attached hereto as Exhibit 11 is a true and correct copy of Exhibit 52 to the Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel ("the Motion"), excerpts of a Report of Investigation by the United States Securities and Exchange Commission Office of Inspector General, dated March 31, 2010.

13.     Attached hereto as Exhibit 12 is a true and correct copy of excerpts from the transcript of the deposition of Isaac Green, dated January 26, 2015.

14.     Attached hereto as Exhibit 13 is a true and correct copy of Exhibit 2 to the Motion, entitled "Affidavit of Lena Stinson," dated October 27, 2014.

15.     Attached hereto as Exhibit 14 is a true and correct copy of a <u>Bloomberg</u>

article by Alison Fitzgerald, entitled "SEC Investigating Stanford Group Offshore-Bank CDs," dated July 3, 2008.

16.     Attached hereto as Exhibit 15 is a true and correct copy of a <u>Daily Telegraph</u> article by Nick Hoult, entitled "The Greatest Final Ever," dated July 7, 2008.

17.      Attached hereto as Exhibit 16 is a true and correct copy of a <u>VenEconomy Monthly</u> article by Alex Dalmady, entitled "Duck tales," dated January 2009.

18.     Attached hereto as Exhibit 17 is a true and correct copy of documents produced by Movants as Bates range P135–154, entitled "Stanford International Bank Ltd.: Certificate of Deposit," dated from February 19, 2001 to April 21, 2005.

19.     Attached hereto as Exhibit 18 is a true and correct copy of an excerpt from Exhibit 3 to the Motion, entitled "Declaration of Samuel Troice," dated October 27, 2014.

20.     Attached hereto as Exhibit 19 is a true and correct copy of documents produced by Movants as Bates ranges P75–103, P119–120, P964–1028, entitled "Stanford International Bank Ltd.: Statement of Account," dated from December 31, 2001 to February 22, 2009.

21.     Attached hereto as Exhibit 20 is a true and correct copy of the Declaration of Paul Gompers, dated February 13, 2015, and Exhibits 1, 2, 3, 4, and 5 annexed thereto.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a document produced by Movants as Bates range P927–933, an e-mailed letter labeled "Stanford International Bank Limited – in Liquidation ('The Company') / Re: Claim submitted under Primary Express Account ■5734," dated April 16, 2013, with a document entitled "Transaction Detail" annexed thereto.

App. 4

23.     Attached hereto as Exhibit 22 is a true and correct copy of an excerpt from Exhibit 3 to the Motion, entitled "Declaration of Isaac Green," dated October 20, 2014.

24.     Attached hereto as Exhibit 23 are true and correct copies of documents produced by Movants as Bates range P196–197, entitled "Open-Ended Accounts" and "Balance Enquiry" for account number ■8806, dated February 17, 2009.

25.     Attached hereto as Exhibit 24 is a true and correct copy of a document produced by Movants as Bates range P936–942, an e-mailed letter labeled "Stanford International Bank Limited – in Liquidation ('The Company') / Re: Claim submitted under Primary Express Account ■8806," dated March 26, 2013, with a document entitled "Transaction Detail" annexed thereto.

26.     Attached hereto as Exhibit 25 is a true and correct copy of Exhibit 13 to the deposition of Pam Reed, entitled "Subscription Agreement Investor Questionnaire: U.S. Accredited Investor Certificate of Deposit Program," dated December 2004.

27.     Attached hereto as Exhibit 26 is a true and correct copy of a document produced by Movants as Bates range P934–935, an e-mailed letter labeled "Stanford International Bank Limited – in Liquidation ('The Company') / Re: Claim submitted in Stanford Financial Receivership / Primary Express Account ■7575," dated June 5, 2013, with a document entitled "Transaction Detail" annexed thereto.

28.     Attached hereto as Exhibit 27 is a true and correct copy of a document produced by Movants as Bates range P359–360, labeled "Stanford International Bank Ltd.: Statement of Account" in the name of Bob Gibbins and Pam Reed, dated April 30, 2008.

29.     Attached hereto as Exhibit 28 is a true and correct copy of Exhibit 44 to

the Motion, entitled "Declaration of Edward F. Sherman," dated October 31, 2014, with one attachment annexed thereto.

30.     Attached hereto as Exhibit 29 is a true and correct copy of a document served on Defendants by Movants, entitled "Responsive Declaration of Edward F. Sherman," dated March 13, 2015.

31.     Attached hereto as Exhibit 30 is a true and correct copy of Exhibit 12 to the deposition of Pam Reed, a letter regarding "Notification of Affiliate Referral Fees," dated August 13, 2007, and addressed to Mr. and Mrs. Bob Gibbins.

32.     Attached hereto as Exhibit 31 is a true and correct copy of Exhibit 1 to the Motion, entitled "Declaration of Receiver Ralph S. Janvey," dated October 30, 2014, and Exhibit A annexed thereto.

33.     Attached hereto as Exhibit 32 is a true and correct copy of the Declaration of Dr. Claus von Wobeser, Esq., dated February 13, 2015, and Exhibits A, B, and C annexed thereto.

34.     Attached hereto as Exhibit 33 is a true and correct copy of the Declaration of Professor Antonio Gidi, dated February 13, 2015, and Exhibit A annexed thereto.

35.     Attached hereto as Exhibit 34 is a true and correct copy of the Declaration of Professor Manuel A. Gomez, dated February 12, 2015.

36.     Attached hereto as Exhibit 35 is a true and correct copy of the Declaration of Pedro Alberto Jedlicka, dated February 13, 2015, and Exhibit A annexed thereto.

37.     Attached hereto as Exhibit 36 is a true and correct copy of Exhibit 51 to the Motion, entitled "Declaration of Professor Alejandro M. Garro," dated October 30, 2014, with two attachments annexed thereto.

38.      Attached hereto as Exhibit 37 is a true and correct copy of excerpts from the transcript of the deposition of Professor Alejandro M. Garro, dated February 10, 2015.

39.      Attached hereto as Exhibit 38 is a true and correct copy of a document served on Defendants by Movants, entitled "Second Declaration of Professor Alejandro M. Garro," dated March 13, 2015.

40.      Attached hereto as Exhibit 39 is a true and correct copy of a document produced by Movants as Bates range P222–223, entitled "Stanford International Bank Limited – in Liquidation: Summary of claims by country and status."

41.      Attached hereto as Exhibit 40 is a true and correct copy of Exhibit 49 to the Motion, entitled "Direct Testimony of Karyl Van Tassel," dated December 5, 2011, in In re Stanford Int'l Bank, Ltd., No. 3:09-CV-0721-N (N.D. Tex.).

42.      Attached hereto as Exhibit 41 is a true and correct copy of Plaintiffs' Responses to Defendants Proskauer Rose, LLP and Chadbourne & Parke, LLP's First Set of Interrogatories, dated November 26, 2014, and Exhibits A, B, and C thereto.

43.      Attached hereto as Exhibit 42 is a true and correct copy of Exhibit 48 to the Motion, entitled "Examiner John J. Little's Declaration," dated October 29, 2014.

44.      Attached hereto as Exhibit 43 is a true and correct copy of e-mail correspondence between Kevin M. Sadler, counsel for the Receiver, and Craig M. Reiser, counsel for Proskauer, dated between November 21, 2014 and December 18, 2014.

45.      Attached hereto as Exhibit 44 is a true and correct copy of The Receiver's Responses and Objections to Defendant Chadbourne & Parke, LLP's Third Party Subpoena to Produce Documents, dated December 19, 2014.

46.      Attached hereto as Exhibit 45 is a true and correct copy of a document produced by Movants as Bates range P947–950, entitled "Declaration of Isaac Green," dated October 31, 2014.

47.      Attached hereto as Exhibit 46 is a true and correct copy of Exhibit 6 to the deposition of Isaac Green, entitled "In the Matter of the Liquidation of Stanford International Bank Limited: Proof of Debt," dated February 28, 2012.

48.      Attached hereto as Exhibit 47 is a true and correct copy of an excerpt from Exhibit 3 to the Motion, entitled "Declaration of Pam Reed," dated October 25, 2014.

49.      Attached hereto as Exhibit 48 is a true and correct copy of correspondence between Jonathan K. Chang, counsel for Proskauer, and Edward C. Snyder, counsel for Movants, dated January 6, 2015.

50.      Attached hereto as Exhibit 49 is a true and correct copy of a letter sent by Jonathan K. Chang, counsel for Proskauer, to Edward C. Snyder, counsel for Movants, dated February 9, 2015.

51.      Attached hereto as Exhibit 50 is a true and correct copy of an e-mail sent by Edward C. Snyder, counsel for Movants, to Jonathan K. Chang, counsel for Proskauer, dated February 13, 2015.

52.      Attached hereto as Exhibit 51 is a true and correct copy of a letter sent by Daniel J. Schwartz, counsel for Proskauer, to Edward C. Snyder, counsel for Movants, dated February 23, 2015.

53.      Attached hereto as Exhibit 52 is a true and correct copy of a Certificate of Incorporation for Punga Punga Financial Limited S.A., retrieved from the Panamanian Public Registry, dated April 6, 2004.

54.    Attached hereto as Exhibit 53 is a true and correct copy of a document produced by Movants as Bates range P202–205, entitled "Application: Custody Agreement," dated April 20, 2004.

55.    Attached hereto as Exhibit 54 is a true and correct copy of a Certificate of Incorporation for Leinada Incorporated, retrieved from the Panamanian Public Registry, dated February 24, 2005.

56.    Attached hereto as Exhibit 55 is a true and correct copy of a <u>New York Times</u> article by Jenny Anderson, entitled "Libyan Fund Sues French Bank over $1.5 Billion in Losses on Derivatives," dated March 31, 2014.

57.     I declare under penalty of perjury that the foregoing is true and correct.

Dated:          New York, New York
                March 20, 2015

                                        /s/ James P. Rouhandeh
                                        James P. Rouhandeh

# EXHIBIT 1



STANFORD INTERNATIONAL BANK LTD.

INTERNATIONAL PRIVATE BANKING

because Potential has no Boundaries.

CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00060



THE STANFORD FINANCIAL GROUP

*Stanford International Bank is a member of the Stanford Financial Group, a global network of affiliated companies that together form a powerful resource of financial opportunities—from international private banking to brokerage and investment advisory services, trust administration, commercial banking and real estate investment. Although independent, each company works in cooperation with other Stanford affiliates to provide coordinated wealth management programs for nearly 40,000 investors on six continents.*

CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00061

Stanford International Bank Limited is an Antiguan Bank whose deposits are not covered by deposit insurance protection provided by U.S. Federal Deposit Insurance Corporation.

Stanford International Bank Limited's products are ordinary bank deposit obligations, are not securities under U.S. federal or any state law, and therefore the are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder.

# STANFORD INTERNATIONAL BANK LTD.

**CONFIDENTIAL TREATMENT**
**REQUESTED by Chadbourne & Parke LLP**
**on behalf of its client**

SGC00062

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



## Stanford International Bank Ltd. conducts

business with the world from its headquarters in Antigua. As a member of the Stanford Financial Group, the Bank adheres to business principles grounded in 70 years of proven financial success. Today, Stanford International Bank serves a worldwide community of affluent individuals and their families. Our unique private banking business model provides for the preservation of capital in an atmosphere of professionalism and trust.

Stanford International Bank offers the following advantages:

- Depositor security
- Higher interest rates on deposits
- Secure electronic account access
- Ancillary services
- Five-star personal service
- Innovative products

2

SGC00063

**CONFIDENTIAL TREATMENT REQUESTED by Chadbourne & Parke LLP on behalf of its client**



S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

## DEPOSITOR SECURITY

Our investment philosophy is anchored in time-proven conservative criteria, promoting stability in our certificate of deposit products. Our prudent approach and methodology translate into deposit security for our customers.

Key components of Stanford International Bank's investment criteria include:

Liquidity. We focus on maintaining the highest degree of liquidity as a protective factor for our depositors. The Bank's assets are invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.

Investment Time Horizons. By continuously matching investment time horizons against terms of deposits we're able to ensure adequate liquidity to meet all customers' requirements.

**CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client**

SGC00064

3



CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00065

STANFORD INTERNATIONAL BANK LTD.

**Global Investment Strategy.** Stanford International Bank's global investment strategy minimizes exposure to any one regional market by broadly distributing our investments across many geographic areas.

**No Credit Risk.** Stanford International Bank does not expose its customers to the risks associated with commercial loans. Our only form of lending is done on a cash-secured basis solely to existing customers.

**Insurance.** Stanford International Bank maintains a comprehensive insurance program with the following coverages:

- A depository insolvency policy insuring funds held in correspondent financial institutions
- A bankers' blanket bond
- A directors' and officers' liability policy



*"...our investment strategy minimizes exposure to any one regional market..."*

**CONFIDENTIAL TREATMENT REQUESTED by Chadbourne & Parke LLP on behalf of its client**

STANFORD   INTERNATIONAL   BANK   LTD.



"Interest rates paid to depositors are based on prudent investment return expectations..."

## HIGHER INTEREST RATES ON DEPOSITS

Stanford International Bank pays higher interest rates to depositors for the following reasons:

**Consistent Profitability.** Stanford International Bank has been consistently profitable since inception. Rather than pay dividends to shareholders on earnings, our business model was designed to use these resources to enhance interest rates to depositors.

**Prudent Investments.** Global investments, not loans, are the primary source of Bank earnings. Interest rates paid to depositors are based on prudent investment return expectations and are reviewed quarterly by the Board of Directors.

**Low Overhead.** We minimize operational costs and streamline administrative processes by staying true to our core competency—private banking. The Bank also benefits through operational synergies already in place within the Stanford Financial Group.

CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00067

App. 19

S T A N F O R D   I N T E R N A T I O N A

**Zero-Tax Jurisdiction.** Our domicile does not tax earnings. This results in more available profit for reinvestment and the enhancement of depositor yields.

**No Loan Losses.** By making only cash-secured loans to its existing customers, the Bank eliminates credit risks and the negative impact on earnings due to loan losses.

**Greater Investable Assets.** More than 90% of the Bank's own equity position supplements investable assets, improving our income-producing capabilities.

**CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client**

SGC00068



STANFORD INTERNATIONAL BANK LTD.

INTEREST RATES 1993 - 2002

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB % | 9.14 | 9.14 | 9.25 | 10.35 | 10.13 | 9.25 | 8.71 | 9.63 | 9.13 | 7.17 |
| U.S. % | 3.00 | 4.90 | 5.60 | 5.20 | 5.80 | 5.30 | 4.90 | 5.85 | 3.55 | 1.85 |

Source: Bloomberg

*Over the past decade,*

*Stanford International Bank*

*CDs have outperformed*

*U.S. bank CDs by an*

*average of 4.6%*

Stanford International Bank CDs

U.S. Bank CD Averages

PERFORMANCE 1993 - 2002

$2,408,163

STANFORD INTERNATIONAL BANK

$1,565,971

1993 1994 1995 1996 1997 1998 1999 2000 2001 2002

The above graphs are based on a $1,000,000 deposit invested for 12 months and renewed annually.

CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00069

8

App. 21

STANFORD INTERNATIONAL BANK LTD.

## SECURE ELECTRONIC ACCOUNT ACCESS

Stanford International Bank offers customers access to their account information 24 hours a day, 365 days a year through our private, password-protected Web site. We continue to work toward making customer access easier, while maintaining the optimum level of privacy and security.

Our customer-only site will always utilize the most advanced firewall software and encryption technologies available in the financial services industry. This helps ensure the privacy upon which Stanford International Bank has built its reputation. We invite both existing and prospective customers to visit our public Web site **www.stanfordinternationalbank.com**.

## ANCILLARY SERVICES

Our high performance accounts and respect for customer privacy are supplemented by a range of ancillary services available to depositors. These include hold-mail and automatic bill paying, available upon request.

The Bank also issues some of the world's most respected payment instruments: the American Express® Gold Card, Visa® Gold Card, and Gold MasterCard.®



*"... access to account information 24 hours a day, 365 days a year ..."*

CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00070

9

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

## FIVE-STAR PERSONAL SERVICE

Our Bank was established with a personal service perspective from the very beginning. Individualized attention and a true commitment to depositor needs are standard operating procedure at Stanford International Bank.

Integrity defines our environment, and a firm adherence to an elevated code of values is built into our customer service initiatives. Our private wealth managers speak your language, understand your concerns and discreetly execute your instructions.

Your Stanford wealth manager can help you diversify into a range of wealth management strategies through our affiliation with the Stanford Financial Group. Expert planning is available in brokerage and investment advisory services, trust administration and real estate investment services.

We invite you to contact us by calling (268) 480-3700.



*"... your Stanford private wealth manager can serve as a global resource..."*

CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

10

SGC00071

App. 23



CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00072

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

**CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client**

# INNOVATIVE PRODUCTS

| ACCOUNT | CURRENCY | WITHDRAWALS | ADDITIONAL DEPOSITS | KEY BENEFITS |
|---|---|---|---|---|
| **FixedCD**<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | None allowed. Interest accumulates and is paid upon maturity*<br><br>Interest may be withdrawn* | None allowed | Attractive CD rates<br><br>If rate goes up, eligible balances receive the higher rate<br><br>If rate goes down, clients are guaranteed the original rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **FlexCD**<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | Up to 25% of principal with 5 banking days' notice, with a maximum of 4 withdrawals per calendar year** | Allowed (minimum amount required) | Attractive CD rates with added level of flexibility<br><br>If rate goes up, eligible balances receive the higher rate<br><br>If rate goes down, clients are guaranteed the original rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **Index-Linked CD**<br><br>3 years<br>4 years<br>5 years | U.S. dollars only | Not allowed for the first year; thereafter, withdrawals allowed subject to penalties | None allowed | Guaranteed attractive minimum return on investment<br><br>High growth potential<br><br>Preservation of capital |
| **Performance**<br>*adjustable-rate open-term account* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br><br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Interest compounded daily |
| **Premium**<br>*adjustable-rate open-term account* | U.S. dollars only | Any amount<br><br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Offers yields equivalent to the performance of selected U.S. Treasury bills and notes<br><br>Interest compounded daily |
| **Express**<br>*adjustable market-rate open-term account (offered as a supplementary account to Stanford International Bank clients)* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br><br>Within 24 hours of notification during regular banking days | Any amount, at any time | 24-hour access<br><br>Market-rate interest on qualifying balances**<br><br>Interest compounded daily |

*This information should not be considered an offer. Please contact your Stanford International Bank representative for current account terms and conditions.
*Minimum balance required.
**Or currency equivalent.

**Refer to penalty clauses for early withdrawal.
***Penalties will be assessed on withdrawals greater than 25%.

12

SGC00073



CONFIDENTIAL TREATMENT
REQUESTED by Chadbourne & Parke LLP
on behalf of its client

SGC00074

# EXHIBIT 2

# Disclosure Statement

*U.S. Accredited Investor Certificate of Deposit Program*





STANFORD INTERNATIONAL BANK

COPY NO. ____

# STANFORD INTERNATIONAL BANK LTD.

## DISCLOSURE STATEMENT

### THE U.S. ACCREDITED INVESTOR CERTIFICATE OF DEPOSIT PROGRAM

PARTICIPATION IN THE U.S. ACCREDITED INVESTOR CERTIFICATE OF DEPOSIT PROGRAM (THE "U.S. ACCREDITED INVESTOR CD") OFFERED BY STANFORD INTERNATIONAL BANK LTD. ("WE", "US", "OUR", OR "SIBL") INVOLVES SUBSTANTIAL RISK TO POTENTIAL DEPOSITORS ("YOU", "YOUR", OR THE "DEPOSITORS"). YOU SHOULD CAREFULLY CONSIDER THE INFORMATION SET FORTH UNDER "RISK AND OTHER FACTORS AFFECTING SIBL AND THE U.S. ACCREDITED INVESTOR CD PROGRAM" ON PAGES 3, 4 AND 5, AND DISCLAIMERS ON PAGES 1, 2, 6, 7, 10, 11, 12, 13 AND 16.

WE HAVE NOT REGISTERED THE CD DEPOSITS PROVIDED IN CONNECTION WITH THE U.S. ACCREDITED INVESTOR CD (THE "CD DEPOSITS") OR OUR RELATED CERTIFICATES OF OWNERSHIP (THE "CD CERTIFICATES") UNDER THE U.S. FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT BEING OFFERED TO THE GENERAL PUBLIC BUT ARE AVAILABLE ONLY TO "ACCREDITED INVESTORS." SEE "DESCRIPTION OF THE U.S. ACCREDITED INVESTOR CD" ON PAGE 6 FOR A DEFINITION OF "ACCREDITED INVESTOR." NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER REGULATORY AGENCY HAS APPROVED, RECOMMENDED OR ENDORSED THE U.S. ACCREDITED INVESTOR CD OR THE OFFER OF THE CD DEPOSITS OR CD CERTIFICATES, NOR HAS ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR COMPLETENESS OF THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SIBL'S PRODUCTS ARE NOT SUBJECT TO THE REPORTING REQUIREMENTS OF ANY JURISDICTION, NOR ARE THEY COVERED BY THE INVESTOR PROTECTION OR SECURITIES INSURANCE LAWS OF ANY JURISDICTION SUCH AS THE U.S. SECURITIES INVESTOR PROTECTION INSURANCE CORPORATION OR THE BONDING REQUIREMENTS THEREUNDER. THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") OR ANY OTHER AGENCY OF THE UNITED STATES GOVERNMENT OR ANY STATE JURISDICTION, OR BY ANY INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA AND BARBUDA.

Original Disclosure Statement is dated October 15, 1998.
Amended November 30, 1999.
Amended July 31, 2000.
Amended May 15, 2001.
Amended September 30, 2004.
Amended September 30, 2005.
Amended November 15, 2007.

# TABLE OF CONTENTS

Securities Investment Statement ........................ 1

General Overview .................................. 2

Risk and Other Factors Affecting SIBL
and the U.S. Accredited Investor CD Program ........... 3

Description of the U.S. Accredited Investor CD Program ..... 6

Stanford International Bank Ltd. ..................... 10

Board of Directors ............................... 14

Management .................................... 15

Management's Discussion and Analysis of
Financial Condition and Results of Operations .......... 16

Affiliate Transactions ............................. 17

The Offering .................................... 18

How to Subscribe ................................ 19

# SECURITIES INVESTMENT STATEMENT

## FOR RESIDENTS OF ALL STATES

THE CD DEPOSITS ARE ORDINARY DEPOSIT OBLIGATIONS OF SIBL. WE BELIEVE THAT THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT SECURITIES AS SUCH TERM IS DEFINED UNDER U.S. FEDERAL AND STATE SECURITIES LAWS. NEVERTHELESS, BECAUSE OF THE POSSIBILITY THAT THE CD DEPOSITS OR CD CERTIFICATES COULD BE DEEMED TO BE "SECURITIES" BY U.S. REGULATORY OR JUDICIAL AUTHORITY, WE HAVE ADOPTED THE SAME REGULATIONS AND RESTRICTIONS ON THE SOLICITATION, OFFER, SALE AND RESALE OF THE CD DEPOSITS AND CD CERTIFICATES THAT APPLY TO UNREGISTERED SECURITIES EXEMPT FROM REGISTRATION IN THE U.S. THEREFORE, WE HAVE PREPARED THIS DISCLOSURE STATEMENT TO ALERT YOU OF POTENTIAL RISKS UNDER THE CD DEPOSITS AND CD CERTIFICATES.

BY SIGNING THE SUBSCRIPTION AGREEMENT, YOU ARE ACKNOWLEDGING RECEIPT, AS WELL AS CAREFUL REVIEW AND UNDERSTANDING, OF THIS DISCLOSURE STATEMENT, THE SUBSCRIPTION AGREEMENT, THE INVESTOR QUESTIONNAIRE, ANY ADDITIONAL ACCOUNT DOCUMENTS THAT MAY BE REQUIRED, AND THEIR RESPECTIVE TERMS AND CONDITIONS.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE CD DEPOSITS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONER OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE CD DEPOSITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS OFFERING IS BEING MADE IN THE UNITED STATES SOLELY TO "ACCREDITED INVESTORS" AS DEFINED ON PAGE 6.

**1.**

# GENERAL OVERVIEW

This Disclosure Statement was prepared and is being furnished by Stanford International Bank Ltd. ("we", "us", "our", or "SIBL"), a bank chartered in Antigua and Barbuda under the International Business Corporations Act, No. 28, of 1982, solely for use by certain prospective depositors who reside in the United States and are "Accredited Investors" as defined herein ("you", "your", or the "Depositors") to participate in our U.S. Accredited Investor Certificate of Deposit Program (the "U.S. Accredited Investor CD"). You may purchase three types of time deposits offered by SIBL ("CD Deposits"), each in the initial minimum amount of US$50,000. See section entitled "Description of the U.S. Accredited Investor CD Program" for information regarding the CD Deposits, which includes the FixedCD℠, the FlexCD℠, and the Index-Linked CD℠. We establish a separate account (the "CD Account") in your name for maintenance of each of your subscriptions for a CD Deposit. Renewals of the same type of CD will remain in the same account.

Each CD Deposit will be an account for a maturity you select from a range of maturities we may offer at the time you open the CD Deposit.

For the Fixed CD℠ and the Flex CD℠, during the life of the CD Deposit, you will receive interest on the principal balance in the CD Deposit at the rate, for the maturity selected, as published at the time the CD Deposit is established. We will periodically establish the published rates. At maturity of the CD Deposit, we will provide you the principal amount in the CD Deposit plus any accrued and unpaid interest. Note the five-day notice period required to receive payment (page 6) through your SIBL account. Interest on the CD Deposit, if earned, may be paid monthly or accrue as you and we agree at the time the CD Deposit is established.

For the Index-Linked CD, at maturity, we will pay you, by credit to your SIBL account, the principal plus the greater of (1) the stated interest rate attached at inception, or (2) interest computed at maturity and based on changes in the index you choose at inception.

Payments of principal and interest are subject to the risk factors described in the section "Risk and Other Factors Affecting SIBL and the U.S. Accredited Investor CD Program" on pages 3, 4 and 5, and the information on pages 1,6, 7, 10, 11, 12, 13 and 16.

Figures reflected herein which illustrate past performance are not indicative of future results.

As described in the section entitled "Description of the U.S. Accredited Investor CD Program, Early Withdrawal Penalty," you may incur substantial penalties, including forfeiture of a portion of your principal amount, upon early withdrawal of funds from the CD Deposit.

We intend to file notice of this offering in any jurisdiction where necessary. To date, notice filing requirements have been met for the states of Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington and Wyoming, and for the Commonwealth of Puerto Rico.

# RISK AND OTHER FACTORS AFFECTING STANFORD INTERNATIONAL BANK AND THE U.S. ACCREDITED INVESTOR CD PROGRAM

Before purchasing the CD Deposits you should carefully consider the information in this Disclosure Statement, including the following important factors, among others.

## OPERATING HISTORY

SIBL was organized in 1985 and commenced operations in Antigua in December 1990. There can be no assurance that revenue growth or profitability can be achieved on a quarterly or annual basis. Operating results could be adversely affected by many factors including, but not limited to, increased competition in the market for the private sale of fixed-income securities offered by overseas issuers, management's investment decisions with regard to the U.S. Accredited Investor CD or any products we offer, the ability of SIBL as a private banking institution, to continue operations in Antigua and Barbuda, and the political climate for private banking concerns in Antigua and Barbuda. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" for a discussion of operating history. No person or entity other than SIBL is liable for payment of the CD Deposits.

## GLOBAL INVESTMENT PORTFOLIO

The viability of the U.S. Accredited Investor CD and the ability of SIBL to pay principal and interest on the CD Deposits are dependent on our ability and the ability of our portfolio managers to consistently make profitable global investment decisions. There can be no assurance that these decisions will continue to yield profitable results for SIBL or cause the investments made in the U.S. Accredited Investor CD or any other products we offer to produce returns sufficient to fund the payment obligations of the CD Deposits. Past performance is not indicative of future results. (See description of "Investment Philosophy and Portfolio Diversification" on page 16.)

Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S. corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws, changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on the foreign exchange markets determine international currency exchange rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards, and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods.

## REGULATORY ISSUES

International banking in Antigua and Barbuda has grown rapidly over the past decade. This rapid growth required the Government of Antigua and Barbuda (the "Government") to strengthen its ability to regulate the financial services sector. The Government continuously reviews its regulations and enacts appropriate amendments to ensure compliance with international banking supervision standards. SIBL is subject to regulation by the Financial Services Regulatory Commission and the Ministry of Finance of the Government of Antigua and Barbuda. Our offices are located solely in Antigua and Barbuda. Therefore, we are not generally subject to securities or banking regulation by any governmental authority outside of Antigua and Barbuda. By making this offering to Accredited Investors in the United States, SIBL and its officers are subject to certain laws of the United States, including the anti-fraud provisions of the U.S. federal securities laws and similar state laws. The Government of Antigua and Barbuda could adopt laws imposing additional regulatory burdens that could adversely affect our ability to successfully operate or the viability or success of the U.S. Accredited Investor CD or any other products we offer. New regulations could also affect the type, manner, and nature of any offering of the U.S. Accredited Investor CD.

3.

## JURISDICTIONAL ISSUES

In addition to potential regulatory issues, certain jurisdictional issues exist with respect to your ability to exercise your rights against us. We will make payments under each CD Deposit solely by crediting the principal and accrued interest amount(s) to the account opened in your name at SIBL for the purpose of that CD Deposit. Thereafter, amounts deposited in the account will be transferred as you instruct us in writing. Further, under the Subscription Agreement you sign for each CD Deposit, you will agree that your and our rights and obligations with respect to the CD Deposits will be governed by the laws of Antigua and Barbuda and that the courts of Antigua and Barbuda will have exclusive jurisdiction over any dispute relating to the CD Deposit.

Antigua and Barbuda does not have (and historically has not had) any form of exchange controls restricting our international business, including acceptance of deposits denominated in U.S. Dollars. Nevertheless, there is no absolute certainty that some future enactment of exchange controls or of other restrictive laws in Antigua and Barbuda would not hinder our operations or the performance of our obligations with respect to the CD Deposits or any other products we offer.

## NO U.S. FEDERAL OR OTHER GOVERNMENTAL GUARANTEE OF PRINCIPAL OR INTEREST

SIBL'S PRODUCTS ARE NOT SUBJECT TO THE REPORTING REQUIREMENTS OF ANY JURISDICTION, NOR ARE THEY COVERED BY THE INVESTOR PROTECTION OR SECURITIES INSURANCE LAWS OF ANY JURISDICTION SUCH AS THE U.S. SECURITIES INVESTOR PROTECTION INSURANCE CORPORATION OR THE BONDING REQUIREMENTS THEREUNDER. THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT INSURED BY THE FDIC OR ANY OTHER AGENCY OF THE UNITED STATES GOVERNMENT OR ANY STATE JURISDICTION, OR BY ANY INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA AND BARBUDA.

## DUE DILIGENCE BY DEPOSITOR

We have prepared this Disclosure Statement to provide you selected information about the U.S. Accredited Investor CD. Because this Disclosure Statement cannot be all-inclusive, we recommend you conduct further "due diligence," including examination of supplemental data and information available through us before making definitive commitments. We will make available to you for inspection, during normal business hours, our relevant business, financial and other information and data which you may reasonably request, to make informed judgments with respect to investing in the U.S. Accredited Investor CD, including, but not limited to, our most recently published Annual Report. We will also make available to you an opportunity to ask questions and receive answers, and to obtain such additional information as you may request concerning the U.S. Accredited Investor CD and our financial condition and affairs. Neither SIBL nor any of our respective officers, directors, control persons, employees, affiliates, consultants or agents makes any representation or warranty, express or implied, as to the completeness of this Disclosure Statement, and no legal liability is assumed or is to be implied against any of them based on any such representation or warranty. The only information that will have any legal effect will be that expressly represented in this Disclosure Statement and the accompanying Subscription Agreement and Investor Questionnaire (the "Offering Documents").

## REGISTRATION

We believe that the U.S. Accredited Investor CD is not a "security," as defined under U.S. securities laws, but is an ordinary deposit obligation. Nonetheless, we are making the following disclosure as a precautionary measure:

The CD Deposits have not been, nor will they be, registered under the U.S. Federal Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state within the United States ("BSL") or any other jurisdiction (collectively, "Securities Laws"). Depositors should be aware that this Disclosure Statement was prepared in connection with the offering of the CD Deposits and does not contain all of the information that might be required in a prospectus or offering circular intended to be distributed to persons other than "Accredited Investors," as defined on page 6. See cover page entitled "Disclosure Statement".

4.

## RESTRICTIONS ON TRANSFER OR RESALE OF THE CD DEPOSITS

You are restricted from transferring or reselling your CD Deposits pursuant to the Securities Laws and the terms of the U.S. Accredited Investor CD.

## INVESTMENT RISK AND STRATEGY

YOU MAY LOSE YOUR ENTIRE INVESTMENT UNDER CIRCUMSTANCES WHERE WE MAY BE FINANCIALLY UNABLE TO REPAY THOSE AMOUNTS. PAYMENTS OF PRINCIPAL AND INTEREST ARE SUBJECT TO RISK.

Conservation of principal and interest rates on the CD Deposits are dependent upon returns in our investment portfolios. Depending upon the climate in global investment markets, we utilize various investment strategies for the bank's portfolios, which may include fixed income, equities and currencies. The returns on the Index-Linked CD will also be affected by the Market Index you choose. If the returns on the bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the U.S. Accredited Investor CD.

## REFERRAL FEES

Referral Fees are paid to persons who introduce Depositors to us. See "Description of the U.S. Accredited Investor CD Program, Referral Fees" on page 9 for a more detailed discussion of these fees. We currently pay a referral fee of 3% to our affiliate Stanford Group Company. Such fees are subject to change on an annual basis. Referral fees paid to others will not reduce the principal amount of your CD Deposit or the interest earned thereon.

5.

App. 35

# DESCRIPTION OF THE
# U.S. ACCREDITED INVESTOR CD PROGRAM

## AVAILABILITY AND AMOUNT

The U.S. Accredited Investor CD is available only to a Depositor who qualifies as an "Accredited Investor" as defined in Rule 501(a) of Regulation D under the Securities Act, and who deposits with SIBL the required minimum balance of US$50,000 (the "Minimum Balance"). We reserve the unilateral right to suspend or discontinue the U.S. Accredited Investor CD and/or to refuse a subscription for a CD Deposit at any time. In those cases we will promptly return any amounts received in connection with a refused subscription. We offer three types of CD Deposits, as follows:

### FIXED CD℠

Each CD Deposit will be maintained for an agreed term of from 3 to 60 months. The term of the CD Deposit will commence on the first business day in St. John's, Antigua and Barbuda (the "Commencement Date"), following the business day on which we receive from you available funds, in an amount equal to or over the Minimum Balance, for purchase of the CD Deposit, as well as a fully executed and completed Subscription Agreement and Investor Questionnaire. Each CD Deposit will mature depending on the maturity you select and, unless we receive written notice to the contrary at least five (5) business days prior to maturity, each CD will be rolled over upon maturity (with accrued interest added to principal) for a similar term at the then prevailing interest rate we offer. If we have received proper notice, at maturity we will pay you by credit to your account at SIBL any principal and accrued and unpaid interest owed on the CD Deposit, and will then transfer the funds as you may instruct us in writing. Funds will become available on the business day following maturity. Interest will be compounded daily and may be withdrawn on a monthly basis or capitalized, subject to our policies. No additional deposits may be made. **Payments of principal and interest are subject to risk. See pages 1, 2, 3, 4, 5, 10, 11, 12, 13 and 16.**

### FLEX CD℠

Each CD Deposit will be maintained for an agreed term of from 3 to 60 months. The term of the CD Deposit will commence on the first business day in St. John's, Antigua and Barbuda (the "Commencement Date"), following the business day on which we receive from you available funds, in an amount equal to or over the Minimum Balance, for purchase of the CD Deposit, as well as a fully executed and completed Subscription Agreement and Investor Questionnaire. **Each CD Deposit will mature depending on the maturity you select and, unless we receive written notice to the contrary at least five (5) business days prior to maturity, each CD will be rolled over upon maturity (with accrued interest added to principal) for a similar term at the then prevailing interest rate we offer.** If we have received proper notice, at maturity we will pay you by credit to your account at SIBL any principal and accrued and unpaid interest owed on the CD Deposit, and will then transfer the funds as you may instruct us in writing. Funds will become available on the business day following maturity. Minimum additional deposits may be made in increments of US$2,500, and at the same interest rates as the initial deposit. Interest will be compounded daily and may be withdrawn at any time. Withdrawals of up to 25% of the principal deposited are allowed without penalties, provided that we have been properly notified at least five (5) working days in advance. There is a limit of four (4) withdrawals per year. Any withdrawals over and above 25% of the principal deposited is subject to early withdrawal penalties, as described below. **Payments of principal and interest are subject to risk. See pages 1, 2, 3, 4, 5, 10, 11, 12, 13 and 16.**

### INDEX-LINKED CD℠

Each CD Deposit will be maintained for an agreed term of 36, 48, or 60 months. The term of the CD Deposit will commence on the last calendar day of the month in St. John's, Antigua and Barbuda (the "Commencement Date"), following the business day on which we receive from you available funds in an amount equal to or over the Minimum Balance, for purchase of the CD Deposit, as well as a fully executed and completed Subscription Agreement and Investor Questionnaire. The Initial Index Value will be determined by using the last market day's index values as published on Bloomberg L.P. Each CD Deposit will mature depending on the maturity you select and will not renew automatically. At maturity, we will pay you by credit to your SIBL account: the principal plus the greater of (1) the stated interest rate agreed upon at inception, or (2) interest computed at maturity and based on the average percentage *change*, from month to month, in the selected index over the term of the CD multiplied by the Index Participation Rate (as described below in the section entitled "Index-Linked CD" and sub-sections entitled "Index-Linked Rate of Return" and "Index Participation Rate"). We will then transfer the funds as you may instruct us in writing

**6.**

App. 36

Funds will become available on the business day following maturity. You will receive interest only at maturity. The principal and minimum rate of return are subject to a penalty for early withdrawal. Payments of principal and interest are subject to risk. See pages 1, 2, 3, 4, 5, 10, 11, 12, 13 and 16.

## RATE OF RETURN

### FIXEDCD™ AND FLEXCD™

Interest on the principal balance in the CD Deposit may be paid monthly or accrued at the rate we publish for the maturity selected at the time the CD Deposit is established. We will periodically publish applicable rates, which you may obtain by contacting us. For all legal purposes, payment of accrued and unpaid interest will take place when we credit your account at SIBL. A calendar year of 365 days will be used for purposes of calculating interest subject to our ordinary practices and wire transfer charges as then in effect.

### INDEX-LINKED CD™

Interest on the principal balance will be calculated and paid at maturity, and will be the greater of the specified fixed rate of return or an index-linked rate of return, as defined below and calculated as follows:

#### FIXED RATE OF RETURN

We will use the current 30-day rate for a fixed CD at the time of the initial investment. A calendar year of 365 days will be used for purposes of calculating interest subject to our ordinary practices used for daily compounding.

#### INDEX-LINKED RATE OF RETURN

We will calculate the Rate of Return (R) based on the Average Percentage Increase in Value (APIV) of the index of choice multiplied by the Index Participation Rate (IPR), as shown in the following formula:
R = APIV * IPR

In that formula, Average Percentage Increase in Value (APIV) is calculated as follows:
APIV = (Average month-end Index Value − Initial Index Value) / Initial Index Value

In other words, the index value on the day the product is opened (the last business day of the month) is established as the "Initial Index Value." Thereafter, we record the index value as of the last business day of each month during the term of the product ("month-end Index Value"). The Initial Index Value and all month-end Index Values will be determined by using the last market day's index values as published on Bloomberg L.P. At maturity, we compute the average of the month-end Index Values over the duration of the term by adding together the month-end Index Values (not including the Initial Index Value) and then dividing that total by the total number of months in the term to determine the Average Index Value. We then compute the average percentage increase or decrease in the index, if any, by taking this index value, subtracting from it the Initial Index Value, and then dividing by the Initial Index Value and multiplying by the IPR agreed upon at inception. (See below.)

## INDEX OPTIONS

### S&P 500 INDEX

Standard & Poor's Corporation (S&P) 500 Stock Index. A capitalization-weighted index of 500 stocks designed to measure the performance of the broad U.S. domestic economy.

### NASDAQ-100 INDEX

National Association of Securities Dealers Automated Quotes System (NASDAQ) -100 Index. A capitalization-weighted index of the 100 largest U.S. and international non-financial companies listed on the NASDAQ Composite Stock Market Index.

### DJ EURO STOXX 50 INDEX

Dow Jones (DJ) Europe STOXX 50 Index. A capitalization-weighted index of 50 European blue-chip stocks

**7.**

App. 37

### INDEX PARTICIPATION RATE

Participation Rate is agreed upon at inception for the selected index. When you purchase each CD Deposit, the Index Participation Rate for that purchase is contractually agreed upon, and rates may vary for subsequent purchases. If you select an index-linked rate of return, your rate of return will be calculated on the average percentage *change*, from month to month, in the selected index over the term of the CD.

### OPENING OF THE CD DEPOSIT

To open the CD Deposit, you must complete, sign and return to us the Subscription Agreement, the Investor Questionnaire, and any other documents we may require, along with available funds equal to a: least US$50,000.

### ADDITIONAL DEPOSITS

Additional deposits to a CD Deposit will not be permitted after the CD Deposit is opened, except as allowed for the FlexCD™. You may instead purchase a new CD Deposit in the minimum amount of US$50,000.

### ROLLOVERS

#### FIXEDCD™ AND FLEXCD™

Automatic renewals of CD Deposits will continue indefinitely in the future until we receive written notice from you or terminate the U.S. Accredited Investor CD. We may, at any time in our sole discretion, decline to automatically renew a CD Deposit, if the continuation of the account would be contrary to the best interests of SIBL or SIBL's policies, procedures or best practices, and, instead, on any business day following a maturity date of a CD Deposit, send you, at your mailing address on our books, a check in an amount equal to the combined principal and accrued and unpaid interest.

#### INDEX-LINKED CD™

The Index-Linked CD will not renew automatically.

### EARLY WITHDRAWAL PENALTY

#### FIXEDCD™ AND FLEXCD™

Withdrawals from the CD Deposits prior to their maturity date may not be made, except as allowed for the FlexCD™. Any such withdrawal will be permitted only with SIBL's consent and will be subject to a penalty for early withdrawal. The penalty will be an amount equal to one month's interest for a CD Deposit with a term of 185 days duration or less, two month's interest for a CD Deposit with a term from 186 to 365 days in duration, and three month's interest for a CD Deposit with a term greater than 365 days in duration. SIBL will use the compounded daily interest rate in effect to calculate the amount of the penalty. SIBL will charge the penalty first against the interest remaining payable on the CD Deposit at the time of the withdrawal and any excess will be deducted from the principal balance. In the event that any withdrawal would reduce the balance on any CD Deposit below the Minimum Balance, SIBL reserves the right to treat any such withdrawal as a withdrawal of the entire account, terminate the CD Deposit and calculate the amount of penalty accordingly.

#### INDEX-LINKED CD™

No withdrawals will be allowed during the initial 12 month period. After the initial 12 months, withdrawals from the CD Deposits prior to their maturity date will be subject to a penalty for early withdrawal. Redemption will be allowed with the understanding that you may receive a smaller amount of principal and interest than if held to maturity. SIBL will determine the redemption price by computing the current market value of the investment index calculation less a penalty of 10%. No Index Participation Rate (IPR) will be applied.

**8.**

## ACCOUNT STATEMENTS

### FIXEDCD™ AND FLEXCD™

Upon acceptance of the Subscription and establishment of an account, we will issue you a certificate for a CD Deposit (the "CD Certificate"). Additionally, we will mail to you at your address on our books a monthly, quarterly or semi-annual statement for the CD Deposit reflecting the amount of interest earned and paid.

### INDEX-LINKED CD™

Upon acceptance of the Subscription and establishment of an account, we will issue you a notification of the purchase showing the Index-Linked CD™ opening date, the amount deposited, the index option chosen and the market's Initial Index Value, the contracted Index Participation Rate, and the minimum fixed interest rate. Additionally, we may mail you quarterly statements for informational purposes only, reflecting projected or unrealized returns. At maturity, we will mail you to your address on our books a final statement of account containing settlement information.

## FEES

We will charge no application or maintenance fees to you in connection with the maintenance of the CD Deposit account. However, we reserve the right to charge other fees, such as wire transfer fees, which will be published from time to time.

## REFERRAL FEES

We may engage certain persons to introduce potential Depositors to the U.S. Accredited Investor CD and pay them a referral fee. We may also pay additional incentive bonuses to our representatives. You may obtain information regarding any of these fees from us upon written request. Among the firms with which SIBL has entered into referral agreements is Stanford Group Company, a United States registered broker/dealer and an affiliate of SIBL. See section entitled "Affiliate Transactions" for a discussion of this arrangement. Referral fees paid to others will not reduce the principal amount of your CD Deposit or the interest earned thereon.

## TAXES AND REPORTING

Interest on the CD Deposits will not be subject to any tax, withholding or other charge in Antigua and Barbuda under current law. Citizens and residents of the United States may be subject to U.S. federal and state income tax on interest earned on CD Deposits. In addition, an investment in the CD Deposits may trigger certain U.S. government reporting requirements. We do not provide tax reporting or legal advice to Depositors. Therefore, you should consult with your tax advisor or legal counsel as to the tax and reporting consequences of an investment in the CD Deposits.

9.

# STANFORD INTERNATIONAL BANK LTD.

## IN GENERAL

SIBL is a private financial institution chartered under the laws of Antigua and Barbuda

SIBL was originally organized in Montserrat in 1985, but moved to and commenced operations in Antigua in December 1990. As an international business corporation, we may not take deposits from persons resident in Antigua and Barbuda, or accept deposits in local currency (the East Caribbean Dollar, or EC$). As a result, all of our assets and liabilities are denominated in foreign currency, predominantly the U.S. Dollar

We are presided over by a Board of Directors consisting of seven individuals, a President a Chief Financial Officer and other officers, managers and employees (See pages 14 and 15.) Our primary offices are located at No. 11 Pavilion Drive, St. John's Antigua, West Indies.

Our primary business is to provide private banking services and to issue certificates of deposit.

The funds deposited with us are primarily invested in foreign and U.S. investment grade bonds and securities, and Eurodollar and foreign currency deposits. The following data shows our historical portfolio investment by specific categories of investment and the approximate percentage of funds invested for 2003, 2004, 2005 and 2006:

| Products | 12/31/06 | 12/31/05 | 12/31/04 | 12/31/03 |
|---|---|---|---|---|
| Equities | 57.40% | 54.90% | 52.20% | 39.00% |
| Treasury Bonds, Notes, Corporate Bonds | 21.90% | 23.30% | 32.30% | 53.00% |
| Metals | 13.00% | 13.40% | 15.50% | 8.00% |
| Alternatives | 7.70% | 8.40% | 0.00% | 0.00% |
| | | | | |
| Cash Positions | | | | |
| Canadian Dollar | 3.12% | 1.08% | 3.60% | 0.34% |
| East Caribbean Dollar | 0.07% | 0.04% | 0.03% | 0.01% |
| Euro | 6.29% | 25.56% | 24.85% | 0.53% |
| Pound Sterling | 11.14% | 4.79% | 0.81% | 0.00% |
| United States Dollar | 79.38% | 68.53% | 70.71% | 99.12% |

Past performance is not a guarantee of future results.

**1 0.**

The following data shows our historical ten (10) year operating profits. The same data is illustrated by the graph below.

| Year | Operating Profit |
|------|------------------|
| 2006 | US $28,849,367 |
| 2005 | US $35,911,234 |
| 2004 | US $36,213,977 |
| 2003 | US $33,121,812 |
| 2002 | US $23,705,899 |
| 2001 | US $12,160,997 |
| 2000 | US  $5,012,965 |
| 1999 | US  $3,808,991 |
| 1998 | US  $1,768,620 |
| 1997 | US  $2,233,174 |



**Operating Profit**

Past performance is not a guarantee of future results.

**11.**

Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S. corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws, changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on the foreign exchange markets determine international currency exchange rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards, and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods.

While we do not generally provide unsecured credit facilities, we do provide loans to customers, often secured by the customer's deposits at SIBL, usually in an amount greater than the amount of the loan. We also issue letters of credit on behalf of our customers to support debt obligations or to finance the shipment of goods. Customers' deposits typically secure letters of credit with SIBL in an amount equal to or greater than the letters of credit issued.

We are regulated by the Financial Services Regulatory Commission and the Ministry of Finance of the Government of Antigua and Barbuda. We have audited financial statements prepared by C.A.S. Hewlett & Co., Chartered Certified Accountants and Registered Auditors. Copies of the most recent statement (included in SIBL's 2006 Annual Report) are available upon request.

The insurance coverage held by SIBL includes Property and Casualty, Exporter's Package, Vehicle, Worker's Compensation and Travel. Fidelity coverages include Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency Insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. This insurance does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States.

On December 31, 2006, we had US$5,336,317,447 in total assets, US$311,303,197 in shareholder's equity and US$5,010,083,766 in total deposits. Our net income for the year ended December 31, 2006, was US$28,849,367.

**12.**

## DESCRIPTION OF ANTIGUA AND BARBUDA

Antigua and Barbuda is located in the eastern Caribbean Islands at the southern end of the Leeward Islands, 250 miles southeast of Puerto Rico, and consists of two islands. Antigua is 108 square miles in size and the island of Barbuda is 62 square miles. Antigua and Barbuda has been a stable, functioning democracy since it achieved full independence on November 1, 1981. In similar fashion with many other former British colonies, Antigua and Barbuda remained part of the English monarchy after achieving independence and is a member of the British Commonwealth. Queen Elizabeth II, as head of the British Commonwealth, is represented by a Governor General. Antigua and Barbuda has a bicameral Legislature. There is a 17-member upper house, or Senate, appointed by the Governor-General, mainly on the advice of the Prime Minister. The Prime Minister and the Cabinet are responsible to the Parliament, the normal life of which is five years.

The legal system is based on English law. The Eastern Caribbean Court of Appeals has exclusive original jurisdiction of all court actions and all appeals go to a panel consisting of a Chief Justice and five other justices, and from there to the Privy Council in London, England.

Antigua and Barbuda has a combined year-round population of approximately 80,000. Antigua and Barbuda's economy is primarily service oriented with tourism being the most important determinant of economic performance. Antigua and Barbuda is burdened by a large and growing external debt which remains a serious economic problem and which could hamper its development.

Antigua and Barbuda does not have (and historically has not had) any form of exchange controls restricting SIB's international business, including acceptance of deposits denominated in U.S. Dollars. Nevertheless, there is no absolute certainty that some future enactment of exchange controls or of other restrictive laws in Antigua and Barbuda would not hinder SIB's operations or the performance of its obligations in respect of the Account.

Antigua and Barbuda maintains laws and regulations concerning bank supervision, anti-money laundering and prevention of terrorism financing that meet international standards. In recent years, compliance with those standards has been validated by international bodies. The International Monetary Fund reviewed compliance with Basel I Core Principles for banking supervision. Antigua and Barbuda will be implementing Basel II by 2008. The Caribbean Financial Action Task Force (CFATF) of which Antigua and Barbuda is a member country, reviewed compliance with the 40 recommendations against money laundering and 9 recommendations for the prevention of terrorism financing made by the Financial Action Task Force (FATF).

## MISCELLANEOUS

Prior to making an investment, you should consult your own legal, tax and financial advisors concerning the U.S. Accredited Investor CD generally. Should you desire further information about us or the U.S. Accredited Investor CD to make a more informed business decision, you should request the same from:

Stanford International Bank Ltd.
No. 11 Pavilion Drive
St. John's, Antigua, West Indies
Attn: Operations Manager
Phone: (268) 480-3700
sibprivate@stanfordeagle.com

**13.**

# BOARD OF DIRECTORS

**Sir Allen Stanford**
Chairman
Director

Sir Allen Stanford, elected Chairman of the Board in December 1997. Sir Allen previously served as President and Chief Executive Officer of SIBL from commencement of SIBL's operations until December 1997. He is also principal shareholder, officer and director of various affiliated companies. Sir Allen graduated from Baylor University in 1974 with a degree in finance.

**James A. Stanford**
Chairman Emeritus

James A. Stanford, elected Chairman Emeritus in December 1997. Mr. James A. Stanford previously served as Chairman of the Board of Directors from the commencement of SIBL's operations in 1985 until December 1997. He graduated from Baylor University in 1948 with a degree in business administration.

**Sir Courtney N. Blackman, Ph.D.**
Vice Chairman
Director

Sir Courtney N. Blackman, elected member of the Board on October 1, 1998. Dr. Blackman graduated from the University of the West Indies in 1956 with a B.A. in Modern History, received a MBA in 1964 from Inter-American University in San Germaine, Puerto Rico, and was awarded a Ph.D. degree in 1969 from Columbia University's Graduate School of Business in New York. In January 1995, Dr. Blackman was appointed as Barbados' Ambassador to the United States and the Permanent Representative to the Organization of the American States, and currently serves in that capacity. In addition to numerous positions as consultant to governments and lecturer, Dr. Blackman served as the first Governor of the Central Bank of Barbados from 1972 to 1987. Dr. Blackman also serves on the Board of Bank of Antigua Limited, an affiliate of SIBL.

**James M. Davis**
Director
Chief Financial Officer

James M. Davis, has been associated with SIBL and its affiliated companies for more than ten years. He graduated from Baylor University in 1975 with degrees in accounting and business administration.

**O.Y. Goswick**
Director

O.Y. Goswick, member of the Board from the date of commencement of SIBL's operation. As well as being an active cattle rancher, Mr. Goswick is a principal owner of a Ford and GM car dealership.

**Kenneth C. Allen, Q.C.**
Director
Secretary and Treasurer

Kenneth C. Allen, Q.C., member of the Board from commencement of SIBL's operations. Mr. Allen is Queen's Counsel and a graduate of the University of London in law, a barrister-at-law and a member of the Society of the Middle Temple. He has practiced law for over 40 years in the United Kingdom and Eastern Caribbean, and has served as judge of the High Court of Justice in Antigua. Mr. Allen also serves on the Board of Bank of Antigua Limited, an affiliate of SIBL.

**Robert S. Winter**
Director

Robert S. Winter, elected member of the Board on October 1, 1998. Mr. Winter received a Bachelor of Science Degree from Texas A&M University in 1948. Mr. Winter has been a bond specialist throughout his career in the insurance industry. Mr. Winter is currently a financial specialist with Bowen, Miclette & Britt, Inc. in Houston, Texas. Prior to joining Bowen, Miclette & Britt, Inc., Mr. Winter was a Vice President at Sedgwick James of Houston. Bowen, Miclette & Britt, Inc. is currently the primary agent for all of the insurance policies held by SIBL and its affiliated companies.

**14.**

# MANAGEMENT

**Juan Rodriguez-Tolentino**
President

Juan Rodriguez-Tolentino joined SIBL in 1992 after more than a decade with the Bank of Nova Scotia and the Bank of Boston. He was promoted to Chief Operating Officer in December 2001 and then President in November 2003. Mr. Rodriguez-Tolentino graduated from the Inter-American University of Puerto Rico with a degree in management and economics. He also holds a diploma in banking operations management from the BAI School for Bank Administration at the University of Wisconsin Graduate School of Business.

**Miguel Pacheco**
Senior Vice President

Miguel Pacheco joined SIBL in September 2004. He previously served in various managerial positions with major international banks including Bank of Boston, Banco Santander and Commercebank N.A. in bank operations/administration. Prior to that, Mr. Pacheco was employed for 17 years with the Bank of Nova Scotia in San Juan, Puerto Rico and Toronto, Canada. He holds a degree in Computer Programming and has completed various courses in banking operations. He also graduated from the National Graduate Compliance School at the University of Oklahoma.

**Pedro E. Rodriguez, CRCM**
Vice President and
Senior Compliance Officer

Pedro E. Rodriguez joined SIBL in July 2000. Mr. Rodriguez has been in banking since 1972 and has held the positions of Vice President, Compliance and Compliance Officer/Internal Auditor with Banco Popular de Puerto Rico, Chase Manhattan Bank and Banco Santander PR. He also served as Internal Auditor and Compliance Officer at Bancaracas International Banking Corporation. Mr. Rodriguez graduated from the Inter-American University of Puerto Rico in 1983 with a degree in finance and accounting. He also holds a diploma in auditing from the BAI School of Banking at the University of Wisconsin.

**Jevgenijs (Eugene) Kipper**
Vice President

Jevgenijs (Eugene) Kipper joined SIBL in September 2005, bringing with him more than ten years experience in banking. Mr. Kipper has a background in a wide range of banking specialties including overseas operations management, international customer service and private banking, and has held positions as Private Banking Manager and Private Banker at Viktorija banka and Multibanka respectively, both banking institutions in Latvia. Mr. Kipper holds a degree in economics from the Technical University of Riga, Latvia, and is a Latvian national.

**Beverly Jacobs**
Operations Manager

Beverly Jacobs joined SIBL in September 1993. Prior to joining SIBL, Ms. Jacobs was an Executive Assistant.

**Patricia Kelsick**
Client Accounts Manager

Patricia Kelsick joined SIBL in April 1999. Prior to joining SIBL, Ms. Kelsick was Supervisor of Foreign Trade Services at the Bank of Antigua Limited, an affiliate of SIBL.

**15.**

App. 45

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## OVERVIEW

We believe that the key factors in our profitability and that of the U.S. Accredited Investor CD are our management team, investment philosophy and global diversification in the investment market. For detailed information on our management, see the section entitled "Management."

## INVESTMENT PHILOSOPHY AND PORTFOLIO DIVERSIFICATION

Our investment philosophy is to seek capital preservation and a consistent annual flow of revenues. Our strategy is based on an investment methodology that seeks to minimize risk, and achieve liquidity, portfolio efficiency, operational flexibility and actual returns versus relative returns based on comparisons to indexes. We seek to obtain this through global diversification of asset classes, economic sectors, issuers, currencies, and geographic areas. Our investment strategy is set annually and reviewed quarterly by our Board of Directors. Generally, assets are allocated among cash, fiduciary deposits, precious metals, government bonds, corporate bonds, equities, and alternative investments. The portfolio includes readily marketable private equities and government instruments from around the world. When selecting equities, we seek companies with demonstrated consistency in earnings, reasonable P/Es, above-average dividend yields, above-average growth rates, and low price-to-sales ratios. Leverage is utilized when deemed appropriate.

## RESULTS OF OPERATIONS

Interest and non-interest income generated for the year ending December 31, 2006, increased by US$133,946,426 to US$565,677,112 when compared to the same period for the previous year. Similarly, revenue net of interest paid also reflected an increase from US$210,939,045 at December 31, 2005, to US$255,042,466 at December 31, 2006.

## LIABILITY AND CAPITAL RESOURCES

We have current and long-term liabilities of US$5,025,014,250 (including deposits of US$5,010,083,766) as of December 31, 2006, compared to US$3,776,659,957 (including deposits of US$3,763,011,040) as of December 31, 2005. SIBL's total assets were US$5,336,317,447 (including an investment portfolio of US$4,935,651,097 and cash and cash equivalents of US$322,887,339) as of December 31, 2006, compared to US$4,059,113,787 (including an investment portfolio of US$3,753,765,105 and cash and cash equivalents of US$257,474,934) as of December 31, 2005.

Past performance is not a guarantee of future results.

**16.**

# AFFILIATE TRANSACTIONS

Among the persons or entities that may offer the U.S. Accredited Investor CD to Depositors on our behalf is Stanford Group Company ("SGC"), a Texas corporation which is a registered broker/dealer in the United States and is affiliated with us through common ownership. In such instances, SGC will be acting as an independent contractor, for which we will pay a referral fee for SGC's services. (See "Referral Fee" sections on pages 5 and 9.) We have not authorized anyone to give any information or to make any representation other than as contained in the Offering Documents. No other information or representation may be relied upon as having been authorized by us.

We, not SGC, are solely responsible for the contents of this Disclosure Statement and the other Offering Documents, and we, not SGC, will be solely responsible to you for all amounts due in respect of the CD Deposit. In the event of nonpayment of funds due and owing under the CD Deposit for any reason, you will have no claim or right against SGC or any other dealer or sales representative.

SIBL and an affiliated company, Stanford Financial Group Company ("SFG"), have had a marketing and service contract in force since 1995, which provides us with marketing and management services for a negotiated fee. This contract is automatically renewed on a yearly basis unless terminated by one of its parties. We are also party to a referral fee agreement with SGC. The fees paid pursuant to the referral fee agreement with SGC are calculated as a percentage of SGC's referred client portfolio, and are currently 3%, negotiated annually. Referral fees paid do not reduce the principal amount of any CD Deposits or any interest earned theron.

We also entered into a long-term building lease in April 2002 for new state-of-the-art facilities owned by our affiliate, Stanford Development Company Limited. The new facilities provide additional operational and private banking office space to accommodate the growth of our operations.

WE HAVE NOT AUTHORIZED ANY DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT. IF GIVEN OR MADE, SUCH INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY SIBL. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY FIXED INCOME PRODUCT OF SIBL OTHER THAN THE U.S. ACCREDITED INVESTOR CDS TO WHICH THIS DISCLOSURE STATEMENT RELATES, AND DOES NOT CONSTITUTE AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. YOU MAY UNDER NO CIRCUMSTANCES CONSIDER THE DELIVERY OF THIS DISCLOSURE STATEMENT OR ANY SALE MADE HEREUNDER AS AN IMPLICATION THAT OUR AFFAIRS HAVE NOT CHANGED SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THIS DATE.

17.

App. 47

# THE OFFERING

We originally offered the U.S. Accredited Investor CD for a period of one (1) calendar year from October 15, 1998, the effective date of the original Disclosure Statement. The amended Disclosure Statement dated November 30, 1999, extended the offering period indefinitely, until we terminate it.

We intend to file notice of this offering in any jurisdiction where necessary. To date, notice filing requirements have been met for the states of Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington and Wyoming, and for the Commonwealth of Puerto Rico.

We will pay all costs and expenses in connection with the offering, including, but not limited to, all expenses related to the costs of preparing, reproducing or printing this Disclosure Statement, legal expenses and other expenses incurred in qualifying or registering the offering for sale under the Blue Sky laws of the states and such other jurisdictions where necessary. It is anticipated that the total of all costs and expenses (excluding fees and commissions) in connection with this offering should not exceed approximately US$ 300,000.00.

**18.**

# HOW TO SUBSCRIBE

## SUBSCRIPTIONS AND PAYMENTS

Depositors desiring to acquire U.S. Accredited Investor CDs should carefully read and follow the instructions set forth in the Offering Documents, complete and sign the Subscription Agreement and Investor Questionnaire and deliver them along with the subscription amount to us. The subscription amount must be paid by cashier's check, personal check or wire transfer made payable to "Stanford International Bank Ltd." In the event your subscription is not accepted by us, we will return the funds to you. We may accept any subscription in whole but not in part. In addition, we reserve the right to reject any subscription at our sole discretion for any reason whatsoever and withdraw the Accredited Investor CD Program at any time prior to acceptance of subscriptions.

By signing the Subscription Agreement and Investor Questionnaire, you acknowledge and agree that you have not offered or sold any portion of the CD Deposit and have no present intention of dividing your CD Deposit with others or of reselling or otherwise disposing of any portion of your CD Deposit either concurrently or after the passage of a fixed or determinable period of time or upon the occurrence or nonoccurrence of any predetermined event or circumstances. You may not solicit, directly or indirectly (whether through an agent or otherwise), the participation of another person or entity without our prior written approval. You also agree that disclosure, either directly or indirectly, of the Disclosure Statement or any part thereof to any person or entity, or use of this Disclosure Statement or any of its contents, or photocopying or other duplication without our prior written consent is strictly prohibited.

## PURCHASE OF CD DEPOSITS

Depositors desiring to acquire CD Deposits should carefully read and follow the instructions set forth in the Subscription Agreement and Investor Questionnaire. Each Depositor will be required to return the executed Subscription Agreement and Investor Questionnaire accompanied by a personal check, cashier's check or wire transfer in the amount of the proposed CD Deposit set forth in such Depositor's Investor Questionnaire. All checks should be made out in the name of Stanford International Bank Ltd. and wire transfers should be addressed as set forth in the Subscription Agreement.

This amended Disclosure Statement is dated November 15, 2007. The information contained herein is only good as of this date.

For further information concerning the U.S. Accredited Investor CD or the proposed offering of CD Deposits, please contact

Stanford International Bank Ltd.
No. 11 Pavilion Drive
St. John's, Antigua, West Indies
Attn: Operations Manager
Phone: (268) 480-3700
sibprivate@stanfordeagle.com

**19.**



STANFORD INTERNATIONAL BANK

No. 11 Pavilion Drive
St. John's, Antigua, West Indies
Tel. (268) 480-3700
Fax (268) 480-3737
stanfordinternationalbank.com

Member of Stanford Financial Group

SIB10 ENG                          © 2007 Stanford International Bank Ltd.                          26771  11 07  10M  WEB

# EXHIBIT 3



# STANFORD

# MONTHLY REPORT

DECEMBER 2008

**W**ELCOME TO THE FIRST EDITION OF THE Stanford International Bank Ltd. (SIBL) Monthly Report. As the world's financial markets are experiencing some of their most turbulent times in modern history our goal with this Monthly Report is to provide you with an overview of SIBL's financial condition and keep you informed on the current topics within the markets and their impact on SIBL. We will continue to produce the in-depth SIBL Quarterly Report, but due to these unprecedented times we know our clients need a constant flow of current information about the institution in which they have placed their trust.

One of the biggest topics in the news at this time is Bernard Madoff's hedge fund collapse and the companies and investors impacted. We want our depositors to know that SIBL had no direct or indirect exposure to any of Madoff's investments. Just as the Bank had no direct or indirect exposure to the securitized debt or subprime meltdown. Also, SIBL has never made a structured loan or a commercial loan. All loans are cash secured and to SIBL clients only at a maximum 80% loan to 100% cash collateral ratio.

All SIBL credit card exposure (Visa, Master Card, American Express) is again to SIBL clients only and cash secured.

The Bank's investment strategy has always been long term, hands on and globally diversified with strong liquidity and minimal leverage. SIBL has never had to chase short term and shortsighted returns for shareholders.

We have seen measured and manageable growth over the past several decades as SIBL's Board of Directors, organizational structure, management and business model are the same since inception. SIBL operates from one head office and one representative office world wide. When new business is generated referral fees are paid. In other words, no business . . . no expense . . . far different from a bank with hundreds of branches and high overhead. The products offered by SIBL are geared to high-net-worth individuals, are time tested and have delivered a premium return to our clients. It is evident that we have found success in following this conservative approach as today we have over 30,000 clients from 131 countries representing $8.5 billion in total assets.

We would also like to take this opportunity to remind you of certain facts about the Bank and the jurisdiction in which it operates. SIBL is an international financial institution chartered under the laws of Antigua and Barbuda, a sovereign nation and member of the British Commonwealth. It is regulated by the Financial Services Regulatory Commission and the Ministry of Finance. Antigua and Barbuda maintains laws and regulations concerning bank supervision, anti-money laundering, and prevention of terrorism



EXHIBIT 11
WIT: Reed
DATE: 2-5-15
S. Klinger, RMR-CRR

P682

App. 52

financing that meet or exceed international standards. In recent years, compliance with those standards has been validated by international bodies. Most recently, the International Monetary Fund reviewed compliance with Bassel I Core Principles for banking supervision. Basel II Core Principles will be fully implemented by the end of December 2008 which means SIBL will be subject to the most stringent bank regulatory standards in the world. Additionally, the Bank undergoes an onsite safety and soundness inspection, conducted by the Financial Services Regulatory Commission, every year. The most recent inspection was conducted in September 2008, and the Bank was found to be in good standing.

The Bank also maintains the following insurance coverage through Lloyd's and other underwriters: Bankers Blanket Bond; Directors and Officers Liability; Professional Liability (errors and omissions); and Excess FDIC. This extensive insurance program has been in place for years and requires that a regular review of the Bank's risk management practices be conducted to determine that adequate safeguards are in place.

Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%. This places our Bank in a position to well exceed Basel II capital requirements as we continue to grow in 2009.

We hope you find this information helpful, and we look forward to serving you over the coming year.

Best wishes to all.

Juan Rodriguez-Tolentino
President

## FINANCIAL & ECONOMIC HIGHLIGHTS

| Treasury Bond Yields (11/28/08) | | Index Returns (Percent Change YTD as of 11/28/08) | | SIBL Flex CD Rates (as of 11/28/08) (Based Upon $100,000 Deposit) | |
|---|---|---|---|---|---|
| 2 - yr. | 0.985% | Dow Jones Industrial Average | -33.4402% | 3 - mo. | 2.250% |
| 5 - yr. | 1.916% | Dow Jones STOXX® 50 (Europe) | -41.3908% | 6 - mo. | 3.250% |
| 10 - yr. | 2.922% | NASDAQ 100 Stock Index | -43.1276% | 1 - yr. | 4.500% |
| | | S&P 500 | -38.9632% | 3 - yr. | 5.375% |

| *SIBL Data (11/28/08) | | Interest Rates (11/28/08) | |
|---|---|---|---|
| Total Assets | $ 8,593,460,480 | 1 - wk. LIBOR Fixed | 1.211% |
| Shareholder Equity | $ 1,020,029,802 | 3 - mo. LIBOR Fixed | 2.217% |
| Year-to-Date Earnings | ($ 110,691,959) | 4 - mo. LIBOR Fixed | 2.353% |
| Investment Portfolio | $ 8,411,256,448 | Prime Rate | 4.000% |

* Unaudited figures are subject to adjustment.

# EXHIBIT 4

THE STATE OF TEXAS    §
                            §
COUNTY OF HARRIS    §

### AFFIDAVIT OF TRANSLATION

Before me, the undersigned Notary appears RAMON M. DEL VILLAR who, after being first duly sworn, deposes and says that the facts contained herein are true and correct and based upon his personal knowledge:

1. "My name is Ramón Miguel del Villar. I am over the age of twenty-one years and competent to make this affidavit. I have personal knowledge of all the facts stated in this affidavit and they are true and correct.

2. I am a court interpreter certified for Spanish/English proceedings by the Administrative Office of the United States Courts.

3. I am an attorney licensed in the State of Texas with Texas State Bar Number 00785814.

4. I am the Chief Interpreter for the United States District Court, Southern District of Texas.

5. I am the holder of license number 292 as a State of Texas court interpreter.

6. I hereby certify that the document attached hereto is an English translation of a Spanish document with the heading: "Stanford. What protection does Stanford International Bank offer its depositors?"

7. I further certify that said translation is a fair and accurate translation of the poorly drafted and punctuated Spanish language document provided to me for translation of which a copy is kept in my records."

FURTHER AFFIANT SAYETH NOT.

RAMON M. DEL VILLAR

BEFORE ME, the undersigned Notary Public, appeared today RAMON M. DEL VILLAR who, having first been placed under oath, under his oath stated that he is the person whose signature appears affixed to the foregoing statement and further stated

1

under his oath that what said statement contains is of his personal knowledge and true and correct.

SUBSCRIBED before me on this 18th day of June of 2009.

_____
Notary Public in and for the State of Texas

My commission expires:   5/6/2011

2

### Stanford

#### *What protection offers Stanford International Bank to its depositors?*

The funds of Stanford International Bank and its clients are protected by one of the insurance programs, <u>unique in its class</u>, that provide the following coverage:

Insolvency policy that insures the funds that SIB maintains in deposit with correspondent institutions, including a coverage of the excess over the FDIC in case of United States banks. This policy is issued by Brit Insurance Ltd. and scored by AM. Best *"A+"* (Excellent) and by Fitch *A+*.

General bond for bankers with Lloyds of London, one of the insurance companies with great reputation and more important of London and the score granted by AM. BEST is *"AA-"* (Excellent).

Policy of liability of directors and executives with Lloyds of London scored by AM. BEST *"AA+"* (Excellent).

All the correspondent banks utilized by Stanford International Bank have great reputation (TORONTO DOMINION BANK, UBS and HSBC) have already been pre-approved by the insurance companies that issued the policies for the coverage that these institutions require to guarantee our operations in their banks and thus guarantee the funds that SIB maintains in these institutions for any insolvency of some of these banks.

To be able to qualify Stanford International Bank, and to have the following coverage the Bank is audited annually by the insurance companies. Another external company also makes a risk analysis to determine if the Bank is doing everything necessary to protect its assets. This provides another safety element for the clients. These policies have been kept in SIB for over 20 years granting firmness and seriousness, to over 75,000 clients in the world, and to the almost $6 billion dollars in direct deposits in instruments that belong to SIB.

In general, financial institutions that do not make commercial loans are safer than those who do, investment banks and those who do not make commercial loans are not exposed to this type of risk. One of the main causes for which a bank goes bankrupt is due to its portfolio of uncollectible loans. Throughout the years, banks around the world have experienced problems with loans that it has not been possible to collect. This is our greater virtue, why Stanford being *Private Investment Banking* only engaged in seeking safe products with stable earnings and with the minimum investment exposure risk, this offers a without par advantage the funds of its clients are in investments in which there are always positive results and in favor of the interests and assets of the institution.

Stanford International Bank in its investment funds same as the banks with the better reputation makes its investments of the greater part of its assets in titles such as first grade investment bonds (AAA, AA+, AA) and shares of stock (of great reputation, liquidity and credibility) and in negotiable instruments in the financial markets and easily made liquid should it be necessary. In contrast, commercial banks or savings banks normally place a big part of their funds in loans which are not easily made liquid upon requirements of the bank to be able to have cash liquidity and also possess other long term assets given as guarantee which are not easily made liquid in a fast market, which is why these commercial banks only maintain a minimum part of their available funds which makes them by very susceptible to any instability of liquidity and availability for their clients should it be needed.

Debtors of Stanford International Bank are the issuers of the titles that the Bank maintains in its portfolio (renowned companies, multinationals and prestigious international banks) whose risk of insolvency is minimum.

The Bank has resources available for productive investments greater than the total of deposits in that the Bank also has available for this purpose most of its capital (The long term assets of the Bank are minimal).

The Clients of Stanford International Bank come from 102 countries. This great diversification minimizes the exposure of a regional market.

Because Stanford International Bank is not a United States bank, it is not covered by the FDIC Insurance (Federal Deposit Insurance Company). Nevertheless nowadays FDIC provides only a relatively poor protection, that has not been changed since 1929: where FDIC, First, only covers up to $100,000 per account/client. Second, currently the reserve funds of FDIC only cover a minimum part of the deposits of all the banks that are insured in a proportion of 1 to 1000 and in the third place, FDIC does not make any bank safer, nor prevents a bank from becoming bankrupt, the banks that go bankrupt do so because of bad practices in the use of their resources and investments, where FDIC is very clear and states that there is no coverage whatsoever of Federal Insurance for this type of bankruptcies.

American banks in case of a need to cover the funds by the FDIC, the client must directly address in a personal manner the governmental agency that would be in charge of programming the payments to its depositors in case an institution has to be covered for being insolvent, but there is no FDIC coverage should the bank go bankrupt because of conversion of the deposits and funds of its clients.

NASD and SIPC, , are two safety entities that are utilized by the New York stock exchange, where Stanford Group is a member, which insure that the financial companies that invest the funds of their clients in financial instruments of any kind that are traded in the stock exchange, be invested in companies that

represent for the stock exchange of high security and trust for these two supervision and guarantee entities in the stock exchange markets, measuring firmness and safety so that the funds utilized be well invested.

*Stanford International Bank is probably the only International Bank that offers this type of security to its clients.*

Thank you for considering us for your next investment.

 **Stanford**

### ¿Que protección le ofrece Stanford International Bank a sus depositantes?

Los fondos de Stanford International Bank y de sus clientes están protegidos por uno de los programas de seguros, únicos en su clase, que proporciona las siguientes coberturas:

Póliza de insolvencia que asegura los fondos que SIB mantiene en depósito en instituciones corresponsales, incluyendo una cobertura del banco sobre el FDIC en caso de bancos norteamericanos. Esta póliza está emitida por Best Insurance Ltd. y calificada por AM. BEST "A+" (Excelente) y por Fitch A+.

Fianza general para banqueros con Lloyds of London, una de las empresas de seguros de alta reputación y más importante de Londres y la calificación otorgada por AM. BEST es de "AA-" (Excelente).

Póliza de responsabilidad de directores y ejecutivos con Lloyds of London calificada por AM. BEST "AA-" (Excelente).

Todos los bancos corresponsales utilizados por Stanford International Bank son de alta reputación (TORONTO DOMINION BANK, UBS y HSBC) ya han sido pre-aprobados por las compañías aseguradoras que emitieron las pólizas para la cobertura que estas instituciones requieren, para garantizar nuestras operaciones en sus bancos y así garantizar los fondos que SIB mantiene en estas instituciones por cualquier insolvencia de alguno de estos Bancos.

Para poder calificar a Stanford International Bank, y para tener las siguientes coberturas el Banco es auditado anualmente por las compañías de seguros. Otra empresa externa también hace un análisis de riesgo, para determinar si el Banco está haciendo todo lo necesario para proteger sus activos. Esto proporciona otro elemento de seguridad para los clientes. Estas pólizas las han tenido en SIB por más de 20 años, dirigido por si sistema a más de 75.000 clientes en el mundo, y a los casi 3.6 Mil Millones de dólares en depósitos directos en instrumentos propios de SIB.

En general, las instituciones financieras que no hacen préstamos comerciales son más seguras que aquellas que sí lo hacen, la banca de inversión y que no hacen préstamos comerciales no se exponen a este tipo de riesgo. Una de las principales causa por la cual un banco quiebra es debido a su cartera de préstamos incobrables. A través de los años, los bancos alrededor del mundo han experimentado problemas por préstamos que no han podido cobrarse. Esta es nuestra mayor virtud, por la cual Stanford al ser *Private Investment Banking* donde solo se dedican a buscar productos seguros de rentabilidad estable y con el mínimo riesgo de exposición de inversión, esto ofrece una ventaja inigualable los fondos de sus clientes está en inversiones en las cuales hay siempre resultados positivos y a favor de los intereses y activos de la institución.

Stanford International Bank en sus fondos de inversión al igual que los bancos de mas alta reputación hacen sus inversiones de la gran parte de sus activos en títulos tales como bonos de primer grado de inversión (AAA, AA+, AA) y acciones (de alta reputación, liquidez y credibilidad) y en instrumentos negociables en los mercados financieros y fácilmente liquidables en caso de ser necesario. En contraste, los bancos comerciales o los bancos de ahorros normalmente colocan una gran parte de sus fondos en préstamos los cuales no son fácilmente liquidables a requerimientos del banco para poder disponer de liquidez monetaria y también poseen otros activos fijos, dados en garantía los cuales no son liquidables fácilmente en un mercado rápido, por lo cual estos bancos comerciales solo mantienen una mínima parte de sus fondos disponibles lo que hace que sean muy susceptibles a cualquier inestabilidad de iliquidez y de disponibilidad para sus clientes de ser requerida.

Los deudores de Stanford International Bank son los emisores de los títulos que el Banco mantiene en su cartera (compañías de renombre, multinacionales y bancos internacionales de prestigio) cuyo riesgo de insolvencia es mínimo.

El Banco tiene recursos disponibles para inversiones productivas mayores del total de los depósitos ya que el Banco también tiene disponible para esto efecto la mayor parte del capital (Los activos fijos del Banco son mínimos).

Los clientes de Stanford International Bank provienen de 102 países. Esta gran diversificación minimiza la exposición a un mercado regional.

Como Stanford International Bank no es un banco estadounidense, no lo cubre el seguro de FDIC (Federal Deposit Insurance Company). Sin embargo, hoy el FDIC proporciona una protección relativamente pobre, que desde 1929 no ha sido cambiada; donde el FDIC, Primero, que solamente cubre hasta por $100,000 por cuenta/cliente. Segundo, actualmente los fondos de reserva del FDIC solo cubren una mínima parte de los depósitos de todos los bancos que están asegurados en una relación, y a 1000, y en tercer lugar, el FDIC no hace mas seguro a ningún banco, ni evita que un banco entre en quiebra, los bancos que quiebran son por mala practica en el uso de sus recursos e inversiones, donde el FDIC es muy claro y manifiesta que no existe ninguna cobertura del seguro Federal a este tipo de quiebras.

Los bancos americanos en caso de una necesidad de cubrir los fondos por el FDIC, el cliente deberá dirigirse directamente en forma personal al organismo gubernamental que se encuentra de programar el pago a sus depositantes en caso de tener que cubrir a una institución por insolvente; mas no existe la cobertura del FDIC en caso que el banco quiebre por malversación de los depósitos y fondos de sus clientes.

El NASD y el SIPC, son dos entes de seguridad que utiliza la bolsa de valores de New York, donde Stanford Group es miembro, los cuales aseguran que las empresas financieras que invierten los fondos de sus clientes en instrumentos financieros de cualquier índole que maneja en la bolsa, estén invertidos en empresas que representan para la bolsa de alta seguridad y confianza para estos dos entes de vigilancia y garantía en los mercados bursátiles, midiendo la solidez y seguridad para que los fondos utilizados estén bien invertido.

*Stanford International Bank es indiscutiblemente el único Banco Internacional que ofrece este tipo de seguridad para sus clientes.*

Gracias por tomarnos en cuenta para su próxima inversión.

# EXHIBIT 5

Page 1

1                    REED - 2/5/15
2            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
     ----------------------------
4    SAMUEL TROICE, HORACIO MENDEZ,
     ANNALISA MENDEZ, and
5    PUNGA PUNGA FINANCIAL, LTD.,
     individually and on behalf
6    of a class of all others
     similarly situated,
7                         Plaintiffs,
8    vs.                  CIVIL ACTION NO.
                          3:09-CV-1600-N
9    PROSKAUER ROSE, LLP,
     THOMAS V. SJOBLOM,
10   P. MAURICIO ALVARADO, and
     CHADBOURNE & PARKE LLP,
11
                         Defendants.
12   ----------------------------
13
14      VIDEOTAPED DEPOSITION OF PAM REED
15              DALLAS, TEXAS
16             FEBRUARY 5, 2015
17
18
19
20
21
22
23
24   Reported by:  Susan S. Klinger, RMR-CRR, CSR
25   Job No. 89574

Page 7

REED - 2/5/15

1   record?

3       A.    Pamela Gayle Reed.

4       Q.    And you are an attorney; is that

5   correct?

6       A.    I was.

7       Q.    How long did you practice?

8       A.    About 15 years.

9       Q.    What type of law did you practice?

10      A.    Medical malpractice defense.

11      Q.    So you are familiar with

12  depositions, I assume?

13      A.    I am.

14      Q.    Is it okay if I dispense with the

15  normal admonitions?

16      A.    Yes.

17      Q.    Okay.  Aside from medical

18  malpractice defense, did you have any

19  experience in any other substantive areas of

20  law?

21      A.    That was about it, just defending

22  insurance companies.

23      Q.    Did you ever defend insurance

24  companies in the context of a securities case?

25      A.    No, I did not.

1                    REED - 2/5/15

2        A.    It was -- I was a plaintiff, and it

3    involved the construction of our home.

4        Q.    When was that deposition?

5        A.    About five years ago, I believe.

6        Q.    Has that lawsuit been resolved?

7        A.    It has.

8        Q.    And was there a trial or other

9    testimony that you provided in that case?

10       A.    There was no trial.  The case was

11   settled.

12       Q.    Other than that one deposition, have

13   you ever provided sworn testimony?

14       A.    No.

15       Q.    Have you ever been named -- other

16   than the construction lawsuit that you just

17   referred to, have you ever been named as a

18   plaintiff in a lawsuit?

19       A.    I have in one other class action

20   lawsuit for Stanford.

21       Q.    And which one is that?

22       A.    BDO.

23       Q.    Any other lawsuits?

24       A.    That's all.

25       Q.    Is there anything that might affect

1                     REED - 2/5/15

2         Q.    Okay.  When did you first learn

3    about today's deposition?

4         A.    I'm not sure.  When Mr. Snyder first

5    talked to me about it, which was, I'm not sure,

6    last month -- yeah, I think last month --

7    whenever you-all first discussed it is when I

8    learned about it.

9         Q.    Other than Mr. Snyder, have you

10   discussed today's deposition with anyone else?

11        A.    No.

12        Q.    When did you first learn about this

13   case?

14        A.    When I saw on TV -- oh, this case.

15        Q.    Yes, this specific case.

16        A.    Probably in 2011.  It's when all of

17   the cases involving Stanford started to be

18   filed.

19        Q.    How did you learn about the case?

20        A.    When I retained Mr. Snyder to be my

21   individual attorney.

22        Q.    How did you come to retain

23   Mr. Snyder in 2011?

24        A.    A friend referred me to him.

25        Q.    What's that friend's name?

REED - 2/5/15

1

2      A.    I have looked at it, yes.

3      Q.    What do you mean by "looked at it"?

4      A.    I guess it's semantics.  I have read

5   it.

6      Q.    Okay.  When did you first read it?

7      A.    Probably a few weeks ago.

8      Q.    So sometime in 2015?

9      A.    Yes.

10     Q.    Was there anything in the amended

11  complaint that you disagreed with when you

12  first read it?

13     A.    No.

14     Q.    And you filed a motion to be added

15  as a named plaintiff in this case; is that

16  right?

17     A.    Yes.

18     Q.    Why did you file that motion?

19     A.    Because I wanted to be added as a

20  named plaintiff in the complaint.

21     Q.    Why do you want to be a named

22  plaintiff in the complaint?

23     A.    Because I feel like it's something

24  that I can do rather than be angry and

25  frustrated, and that I can help the attorneys

1                    REED - 2/5/15

2   but I've had that discussion, so this overall

3   net is what we have to go with at this point.

4        Q.    What do you mean, you've had that

5   discussion?

6        A.    I have communicated with Grant

7   Thornton, saying that I thought that it was

8   incorrect, and they have said that it was

9   correct.

10       Q.    How did you communicate with Grant

11  Thornton about that?

12       A.    I believe that it was by email.

13       Q.    Do you have a copy of that email?

14       A.    Not with me, but I'll be glad to

15  search my sent.

16       Q.    Were you asked to search for

17  documents relating to the Stanford debacle or

18  your Stanford accounts in connection with this

19  case?

20       A.    I was asked to -- yes, to provide

21  whatever we had.

22       Q.    What did you do to search for

23  documents?

24       A.    I asked my assistant to go through

25  our file.

Page 50

REED - 2/5/15

1

2      Q.     Is that one in the hard copy file?

3      A.     Yes.

4      Q.     Have you or your assistant looked

5  through any emails or other electronic

6  documents?

7      A.     I don't believe that I did.

8           MR. CHANG:  We can follow up by

9      letter, but we're going to ask that

10      Ms. Reed go through her emails.

11           THE WITNESS:  Sure.

12           MR. SNYDER:  Because I don't think

13      an email in 2013 with Grant Thornton is

14      relevant in any way to your request, but we

15      can talk about it.

16           MR. CHANG:  Okay.

17      Q.     What is the name of your assistant?

18      A.     Kathy Lincoln.

19      Q.     Did she have a role in maintaining

20  your file with respect to the Stanford

21  investments?

22      A.     Yes.

23      Q.     What was that role?

24      A.     She maintained it.

25      Q.     Was she responsible for maintaining

REED - 2/5/15

1
2  discussions?
3      A.    Yes.
4      Q.    Did you have any investment
5  objectives relating to the Stanford CDs?
6      A.    I think all of our investment
7  objectives were low risk and to -- to retain
8  capital.
9      Q.    At the time that you were introduced
10 to Stanford CDs, what other types of
11 investments did you have in your portfolio?
12     A.    We had normal securities, bonds,
13 another product that we bought from Smith
14 Barney.  It was -- it was a pretty well rounded
15 portfolio.
16     Q.    But it was all targeted to be low
17 risk?
18     A.    Yes.
19     Q.    Maintain capital?
20     A.    Correct.
21     Q.    Do you remember what attracted you
22 to the Stanford CDs?
23     A.    Well, they were low risk, and they
24 paid slightly more interest than what was -- we
25 would have been receiving in the U.S.

                    REED - 2/5/15

1

2      Q.    Did you have an understanding prior

3  to investing in the CDs as to how Stanford was

4  able to return slightly more interest than what

5  was available in the U.S.?

6      A.    It was -- it was that he invested

7  some other money in the stock market and would

8  use that to return -- to pay a higher interest

9  rate on the CDs.

10     Q.    Did you understand at the time that

11 the CDs were issued by an offshore bank?

12     A.    Well, I understood they were issued

13 from some part of the Stanford company, which

14 was based in Houston.  And the bank was in

15 Antigua, but that it was part of the Stanford

16 family or whatever.

17     Q.    Would it have been important for you

18 to know who regulated the bank that issued the

19 CDs?

20          MR. SNYDER:  Objection, form.  Would

21      it have been important?

22     Q.    Well, let me just -- let me withdraw

23 that.  I will ask another question.

24          You testified that you knew that the

25 bank was in Antigua, but that it was part of

1              REED - 2/5/15

2    the Stanford family.  It was your understanding

3    that the Antiguan bank issued the CDs; is that

4    right?

5         A.    That's where the certificate came

6    from, right.

7         Q.    Did you have an understanding as to

8    who or what regulated that bank?

9         A.    Well, I assume that the FDIC played

10   a part in it, and I did -- I was not told.  If

11   I had -- I can say if I knew then what I know

12   now, it would have been a different scenario.

13        Q.    And if you knew then that the

14   Antiguan regulators regulated the bank, would

15   it have been a different scenario?

16        A.    Most likely.

17        Q.    Earlier you testified -- withdrawn.

18              Earlier you testified that you

19   understood the CDs were able to return a higher

20   rate of return than U.S.-based products because

21   of investments in stocks.  Did you have an

22   understanding as to whether those stock

23   investments were U.S. based or foreign based?

24        A.    I assumed they were U.S. based.

25        Q.    And if you had known that those

1                    REED - 2/5/15

2      investments were not U.S. based, would that

3      have changed your calculation?

4           A.    Well, probably as part of their

5      alleged portfolio, there were international

6      investments as well.  That's what portfolios

7      look like, so that would not have been a

8      problem.

9           Q.    Okay.  Would it have been a

10     different scenario if you had known that the

11     press had reported Stanford was under

12     investigation by the SEC?

13          A.    Most likely.

14          Q.    Would it have been a different

15     scenario if you had known that other investors

16     in Stanford CDs had received questionnaires

17     from the SEC?

18          A.    It would have been.

19          Q.    Would it have been a different

20     scenario if you had known that brokers who were

21     formerly employed by Stanford resigned because

22     they alleged Stanford forced them to

23     participate in illegal activities?

24          A.    I'm sure it would have been

25     something I would have looked at had I known

1           REED - 2/5/15

2      Q.     Do you have an understanding about

3  how many financial advisors Stanford employed?

4      A.     There is -- you know, I heard a

5  number of things after the fact.  And I know

6  that he ramped up his whole U.S. operation --

7  well, during the time that Nigel Bowman was

8  caught in his net, so I'm sure there were a

9  number of FAs that he had hired at that point.

10     Q.     And I think -- I think you have

11  already testified to this, but let me confirm,

12  you have never spoken to any other Stanford FAs

13  other than Mr. Bowman?

14     A.     Well, the people -- I spoke to other

15  people in the Austin office.

16     Q.     Okay.  Who else did you speak with?

17     A.     Carol McCann, who was the director

18  of the Austin office, and there was one other

19  gentleman there.  His name I don't remember.

20     Q.     Did Ms. McCann or the other

21  gentleman ever discuss with you the SIB CDs?

22     A.     I'm sure that Ms. McCann did, but I

23  don't remember any specific conversations.

24     Q.     Do you remember if he told you

25  anything different?

1              REED - 2/5/15

2         Q.    Is it fair to say that you relied on

3    Mr. Bowman in deciding to invest in the SIB

4    CDs?

5         A.    Yes.

6         Q.    Other than information Mr. Bowman

7    provided you, did you do any diligence or

8    investigation concerning the SIB CDs prior to

9    purchasing them?

10        A.    I don't remember.  That was -- I

11   didn't Google then.  So I'm sure that there --

12   no, that I relied on Nigel.  Performing due

13   diligence now is very different than it was --

14        Q.    Yes.

15        A.    -- eight years ago.

16        Q.    Do you recall ever being told that

17   the CDs were subject to regulation by the

18   Antiguan banking regulatory commission?

19        A.    No.

20        Q.    Do you recall being told that the

21   CDs were safer than U.S. bank-issued CDs

22   because of the Lloyd's of London insurance?

23        A.    I don't know that I was ever told

24   safer, but as safe, and that there was that

25   additional protection.

REED - 2/5/15

1

2    Q.    And all of that information that you

3  remember being told was told to you by

4  Mr. Bowman?

5    A.    Yes.

6    Q.    Do you know what it means to be an

7  accredited investor?

8    A.    It means that you have half a brain

9  to know what you're doing.

10   Q.    In 2007, were you an accredited

11 investor?

12         COURT REPORTER:  Half a brain?

13         THE WITNESS:  Half a brain.

14   A.    Yes.  Yes, I was.

15   Q.    Half?

16   A.    H-A-L-F.

17   Q.    Do you understand that as an

18 accredited investor you're eligible to invest

19 in unregistered securities?

20         MR. SNYDER:  Objection, form.

21   A.    I know that now.

22   Q.    When did you learn that?

23   A.    Probably in the last few years.

24   Q.    As a result of the Stanford debacle?

25   A.    Uh-huh.

1                    REED - 2/5/15

2    and would have pursued a line of questioning

3    like that, most likely.

4         Q.    Do you recall being provided any

5    information -- withdrawn.

6              Do you recall being provided with

7    any documentation that disclosed that SIB was

8    chartered in Antigua?

9         A.    I don't recall any information.

10        Q.    If you had been provided that

11   information, you would have known that SIB was

12   not based in the U.S.; is that right?

13        A.    I'm not sure what I would have

14   deducted from that.

15        Q.    Do you recall entering into

16   something called a subscription agreement in

17   connection with the SIB CDs?

18        A.    I don't.

19        Q.    Do you recall having to certify that

20   you were an accredited investor prior to

21   investing in the CDs?

22        A.    I don't recall, but it was something

23   that we did on a number of occasions, so it

24   wouldn't have been unusual.

25        Q.    So other than the SIB CDs, you had

1                          REED - 2/5/15

2    invested in other unregistered securities?

3         A.    Well, not that I knew were

4    unregistered or not.  With Smith Barney we had

5    invested in a number of things that I had to

6    submit -- I had to sign the subscription

7    agreement.

8         Q.    And that's the subscription

9    agreement, among other things, that

10   demonstrated that you were an accredited

11   investor?

12        A.    Correct.

13        Q.    Do you recall what those investments

14   were?

15        A.    I have no recollection.

16        Q.    But those were investments

17   recommended to you by Mr. Bowman?

18        A.    Usually, yes.

19        Q.    Do you recall any specific

20   investments that required a subscription

21   agreement that was not recommended by

22   Mr. Bowman?

23        A.    I just thought of one.  There was a

24   film production company that, against

25   Mr. Bowman's advice, it was friends of mine,

1                    REED - 2/5/15

2      and I had to sign a subscription agreement with

3      that.

4          Q.    And this is a different investment

5      than the one that you have described earlier

6      that your husband was interested in?

7          A.    Yes.  I blamed it all on him.  There

8      was one that I had, too.

9          Q.    So if you had been provided a

10     subscription agreement in connection with the

11     SIB CDs, would you have reviewed it before

12     signing it?

13         A.    Most likely, yes.

14         Q.    Was that your practice with other

15     subscription agreements that you signed?

16         A.    Yes.

17         Q.    Take a look at Exhibit 2, which is

18     your declaration.

19         A.    Yes.

20         Q.    Paragraph 8, the last sentence says

21     that, instead -- quote, "Instead, Stanford led

22     my husband and me to believe that Stanford,

23     including SIBL, was a U.S.-based operation with

24     headquarters in Houston, Texas regulated by the

25     U.S. government and compliant with U.S. laws."

1                    REED - 2/5/15

2    Do you see that?

3         A.    Yes.

4         Q.    And you were led to believe that by

5    Mr. Bowman?

6         A.    Correct.

7               (Exhibit 8 marked.)

8               MR. CLEMENTS:   7?

9               MR. CHANG:   8.

10        Q.    Ms. Reed, you have been handed a

11   document marked as Reed Exhibit 8.  Have you

12   ever seen a document like this before?

13              MR. SNYDER:   Do you want to take the

14        time to look through it?

15        A.    May I look through it for just a

16   second?

17        Q.    Sure.

18        A.    I truly can't say that I've seen

19   this specific document.

20        Q.    But this is a -- I guess a brochure

21   about SIB?

22        A.    It purports to be, yes.

23        Q.    Have you seen other brochures?

24        A.    I'm sure I saw something, yes.

25        Q.    Let me direct your attention to the

1              REED - 2/5/15

2    third page of this document.  It's in a yellow

3    page.  On the upper right-hand corner there is

4    a white box?

5         A.    Correct.

6         Q.    Can you read the upper -- the text

7    in the upper right-hand box into the record?

8         A.    Is this a test?  "Stanford

9    International Bank Limited is an Antiguan bank

10   whose deposits are not covered by deposit

11   insurance protection provided by U.S. Federal

12   Deposit Insurance Corporation.  Stanford

13   International Bank Limited's products are" --

14   "ordinary bank deposit obligations are not

15   securities under U.S. federal or any state law

16   and, therefore," typo, are not -- said they --

17   "are not subject to the reporting requirements

18   of any jurisdiction, nor are they covered by

19   the investor protection or securities insurance

20   laws of any jurisdiction such the US Securities

21   and Investor Protection Insurance Corporation

22   or the binding requirement thereunder."

23             MR. SNYDER:  Where is this document

24        coming from -- where is this whole --

25        A.    And that looks like it has been

REED - 2/5/15

1

2          MR. SNYDER:  Okay.

3      Q.    Ms. Reed, if you had read that

4   language prior to investing in the Stanford

5   CDs, you would know that Mr. Bowman's

6   representation that the CDs were covered by the

7   FDIC was false?

8      A.    Well, I would have asked a lot more

9   questions.  But I never did see anything like

10  that, and this is a very odd-looking document.

11     Q.    And you would have known that --

12  withdrawn.

13          If you had read this disclosure

14  statement prior to investing in the CDs, you

15  would have known that the CDs are not

16  securities under U.S. law?

17     A.    Well, this says that.  That's what

18  this says.  I don't know what I would have

19  known, but that's what this apparently

20  superimposed warning says.

21     Q.    That would have triggered you to ask

22  Mr. Bowman more questions?

23     A.    Yes, more questions.

24     Q.    And that would have been

25  inconsistent with what Mr. Bowman did tell you?

1                REED - 2/5/15
2        Q.    Can you just take a moment to flip
3    through this document and let me know if you
4    have ever seen this before?
5        A.    Well, I know I was never given a
6    copy in Spanish.
7        Q.    This document is in Spanish; right?
8        A.    Yes.
9        Q.    Or the first few pages are; right?
10       A.    All of it.  The charts appear to be
11   in English, but the narrative is in Spanish.
12       Q.    So you have never -- withdrawn.
13             You have never seen any written
14   materials that Stanford disseminated that were
15   in Spanish?
16       A.    Not that I remember.
17       Q.    If you take a look, part of this
18   document is not numbered by page, but I think
19   it's about halfway through the document it says
20   note 1 at the top.
21       A.    Will you show me what it looks like?
22             MR. SNYDER:  What page is it?
23             MR. CHANG:  There are no numbers.
24   It's note 1 to the financial statements.
25       A.    Yes.

Page 152

REED - 2/5/15

1

2        A.     I do.

3        Q.     Are you aware that you could ask to

4    review a copy of the annual report?

5        A.     Well, I could do that with anybody.

6    Yes, I assume it could happen.

7        Q.     Did you ever ask to review a copy of

8    the annual report?

9        A.     Not that I remember.

10       Q.     Did Mr. Bowman ever tell you that he

11   reviewed a copy of the annual report?

12       A.     I don't remember if he did or not.

13       Q.     The next section on this page it

14   says "Registration."  Do you see that?

15       A.     I do.

16       Q.     The second paragraph of that section

17   says, quote, the CD deposits have not been nor

18   will they be registered under the U.S. Federal

19   Securities Act of 1933 as amended, paren, the,

20   quote, Securities Act, closed quote, closed

21   paren, or the securities laws of any state

22   within the United States, paren, quote, U.S.,

23   closed quote, closed paren, or any other

24   jurisdiction, paren, collectively, quote,

25   securities laws, closed quote, closed paren,

1                    REED - 2/5/15

2    closed quote.  Do you see that?

3         A.    I do.

4         Q.    And this, again, is information you

5    did not know in 2007; is that right?

6         A.    No.

7         Q.    And would this, again, have caused

8    you to ask more questions, had you known this?

9         A.    Most likely.

10        Q.    Next page, page 5.  You see the

11   section that says "Investment Risk and

12   Strategy"?

13        A.    I see it.

14        Q.    The first paragraph, it's in all

15   caps and says, quote, you may lose your entire

16   investment under circumstances where we may be

17   financially unable to repay those amounts.

18   Payments of principal and interest are subject

19   to risk, closed quote.  Do you see that?

20        A.    I do.

21        Q.    Were you ever told this information

22   in 2007?

23        A.    No.

24        Q.    Were you ever told this information

25   prior to the Stanford debacle?

1                    REED - 2/5/15

2           MR. SNYDER:  Objection, form, as to

3      what his state of mind is.

4      A.    I have no idea.

5      Q.    Okay.  After deciding -- after

6  deciding to invest in the SIB CDs in 2007, what

7  was the frequency and nature of your

8  communication with Mr. Bowman concerning the

9  CDs?

10     A.    I'm not sure how much discussion

11 there was about the CDs.  We had other

12 investments with him, and that was most likely

13 the primary discussion.

14     Q.    After deciding to invest in the CDs

15 in 2007, did you have discussions concerning

16 the CDs with anyone else affiliated with

17 Stanford?

18     A.    Not that I remember.

19     Q.    Do you recall going to Antigua?

20     A.    I do.

21     Q.    When did you go to Antigua?

22     A.    It is -- I believe you've got all of

23 that in front of you -- is it in 2008, I think.

24     Q.    Why don't we mark the itinerary.

25     A.    Okay.

1                REED - 2/5/15

2        Q.    I guess while she's finding it, do

3   you remember how that trip came about?

4        A.    Mr. Bowman had said that he was

5   going to take some people to Antigua and would

6   I like to go.

7        Q.    And you said yes?

8        A.    I said yes.

9        Q.    Did you have to pay anything to go

10  on that trip?

11       A.    I did not.

12       Q.    Do you know why you were invited to

13  go?

14       A.    I assume because I was good friends

15  with Mr. Bowman and had invested, and he wanted

16  me to have a trip.

17       Q.    Was your husband invited as well?

18       A.    No.  My husband was in bad shape at

19  the time.

20       Q.    Sorry to hear that.

21       A.    Thank you.

22       Q.    Did you know --

23       A.    That was one of the reasons Nigel

24  did it.

25       Q.    Do you know any other investors who

                    REED - 2/5/15

1    to Antigua.  Secondly there is a travel

2    itinerary, and then page 3 begins the draft

3    agenda, and again, travel itinerary for the

4    return.

5         Q.    Other than -- withdrawn.

6               Did Mr. Bowman explain to you the

7    purpose of this trip?

8         A.    The purpose was a trip to Antigua,

9    basically.

10              MR. SNYDER:  Sounds pretty nice.

11        A.    Expensive.

12        Q.    How did you get there?

13        A.    In one of Sir Allen's private jets.

14        Q.    Was it nice?

15        A.    Very nice.

16        Q.    Do you recall meeting with anyone

17   from SIB when you were in Antigua?

18        A.    I met -- we were at the bank, and I

19   met with either the vice-president or the

20   president, and then just various employees at

21   the bank.

22        Q.    Were the Stanford CDs discussed

23   during this trip?

24        A.    Yes, and they -- they talked about

1            REED - 2/5/15

2   how they wanted to -- it just came back to me,

3   flash -- how they wanted to grow the effort,

4   how they wanted different hedge funds and

5   retirement funds to be able to invest in the

6   CDs.

7        Q.    I see.  So they wanted to make it

8   more widely available to investors?

9        A.    Yes, thank you.

10        Q.    How long was the trip?

11        A.    It was a weekend, or it was a

12   Monday, the 18th -- Saturday, the 16th through

13   Monday, the 18th of February.

14        Q.    Do you recall how much time was

15   spent discussing SIB or the CDs as opposed to

16   recreational activities?

17        A.    It was mainly recreational.  The

18   time that we discussed the CDs was when we were

19   at the bank.

20        Q.    How long was that visit to the bank?

21        A.    Probably two hours.

22        Q.    And just directing your attention to

23   the page Bates stamp P339, it's part of the

24   itinerary.

25        A.    Uh-huh.

1             REED - 2/5/15

2        Q.    That page has the itinerary for

3    Monday, February 18, 2008; is that right?

4        A.    Yes.

5        Q.    10:30 a.m. it says, quote, SIBL

6    overview and jurisdiction presented by Juan

7    Rodriguez-Tolentino, president, and Miguel

8    Pacheco, senior vice-president, Stanford

9    International Bank, closed quote.  Do you see

10   that?

11       A.    Yes.

12       Q.    Do you remember that presentation?

13       A.    Yes.  That's what I was describing

14   to you a moment ago.

15       Q.    Do you remember what was discussed

16   other than expanding the availability?

17       A.    There was just more discussion about

18   what a safe investment it was and, you know,

19   the usual propaganda that we had been hearing

20   all along.

21       Q.    Do you recall what was discussed

22   about the jurisdiction issues?

23       A.    There was nothing said about that.

24       Q.    So you don't remember jurisdiction

25   being discussed --

REED - 2/5/15

1

2     A.     No.

3     Q.     -- in the presentation entitled

4  "SIBL overview and jurisdiction"?

5     A.     No.

6     Q.     So Mr. Rodriguez-Tolentino and

7  Mr. Pacheco were the presenters of that

8  presentation?

9     A.     I believe they were.

10    Q.     Do you remember if they used any

11  sort of PowerPoint or slide show?

12    A.     I'm sure there was some sort of

13  slide show.

14    Q.     So you don't remember being told

15  during that presentation that SIBL was

16  regulated by the Financial Services Regulatory

17  Commission of the government of Antigua and

18  Barbuda?

19    A.     No.  I remember just what we've been

20  told before, safe, great.

21    Q.     Presumably if you had been told that

22  it was regulated by the FSRC, you would have

23  asked some questions?

24    A.     Well, I probably would have, and if

25  they ever did tell us that it was regulated by

1               REED - 2/5/15

2  withdrawn.

3          If you take a look at page Bates

4  stamp P338, it's the first page of the

5  itinerary.

6      A.    Uh-huh.

7      Q.    There is a, I guess, row that says

8  "Guests"?

9      A.    Uh-huh.

10     Q.    And your name is here, the Gales are

11  here, Nigel Bowman is here and there are two

12  additional names, Ms. Carolyn Beckett and

13  Mrs. Elizabeth Schurig?

14     A.    Schurig, uh-huh.

15     Q.    Were they on this trip?

16     A.    They were.

17     Q.    Did you know them before the trip?

18     A.    I did.

19     Q.    And do they also live in Austin?

20     A.    They do, yes.

21     Q.    How did you know them?

22     A.    They had -- they were friends of

23  mine, and Mr. Bowman had wanted them to help

24  expand the -- help expand bringing people in to

25  buy CDs.

1                    REED - 2/5/15

2        A.      Uh-huh.

3        Q.      Was there any discussion about

4   SIB --

5        A.      No.

6        Q.      -- with her?

7        A.      No.

8        Q.      Did you meet Allen Stanford during

9   this trip?

10       A.      I did.

11       Q.      Where did you meet him?

12       A.      At the Sticky Wicket Cricket Club,

13  aptly named.

14       Q.      And how long was that meeting?

15       A.      It was a cricket game, and the club

16  had a big area where there was food and people

17  would sit and eat and watch the game.

18       Q.      Like a box?

19       A.      Yeah, exactly, like a box, a big,

20  big box.

21       Q.      And you and Mr. Stanford attended

22  the entire match?

23       A.      Well, he was there, as were lots of

24  other people, but yes, we stayed for the whole

25  match.

REED - 2/5/15

1

2      Q.      Did you talk to him?

3      A.      I did.

4      Q.      How long -- what did you talk to him

5  about?

6      A.      Well, about himself, egomaniacal

7  ass.

8      Q.      His film business back in Texas?

9      A.      Yeah.  In Mexia, yeah.

10     Q.      How long did you talk to him for?

11     A.      Not long, because he was busy

12  with -- I'm sorry -- the bimbette of the night,

13  so he was -- he was occupied.

14     Q.      I take it from your recounting of

15  this that you didn't have a favorable

16  impression of Mr. Stanford?

17     A.      Mr. Stanford -- it was -- I recall

18  later that night, or, you know, much later

19  that -- that I had no -- there was nothing that

20  would have said to me this man is a criminal.

21  He was a pompous ass, totally egomaniacal, but

22  if I had thought that all the men that I worked

23  with or met with my life who acted like that

24  were criminals -- no, I had no -- no idea that

25  he was a criminal, and women too, let's say

1                    REED - 2/5/15

2        Q.    The Austin office?

3        A.    Yeah, uh-huh.

4        Q.    And she's the person that you

5   described earlier?

6        A.    Previously, yeah.

7        Q.    Does this refresh your recollection

8   as to when you met her?

9        A.    On this trip, yeah.

10        Q.    What was her role on this trip?

11        A.    Just a hostess, like -- Nigel and

12   she were our host and hostess.

13        Q.    Did you discuss the CDs with her

14   during this trip?

15        A.    There was not a lot of -- there

16   was -- the talk was about how much fun this

17   trip was, and it was -- it was a chatty group

18   of people having a good time on a trip.  So I

19   can't say -- I don't remember talking to her

20   specifically about CDs at all.

21        Q.    So this trip, based on the

22   itinerary, was in February of 2008; correct?

23        A.    Yes, based on the itinerary.  Seven

24   years ago.

25        Q.    If we could go back to, I think it's

REED - 2/5/15

1  Exhibit 3, Grant Thornton.  Exhibit 3 is the

2  5th of June, 2013, Grant Thornton letter?

3       A.    Yes.

4       Q.    This is the document with

5  transaction detail page --

6       A.    Uh-huh.  Yes.

7       Q.    -- on page 2?

8       A.    Yes.

9       Q.    So do you see the third account

10 listed, account number ███4808?

11      A.    Yes.

12      Q.    The date of that account appears it

13 was opened on the 14th of April, 2008?

14      A.    Yes.

15      Q.    So that account was opened after the

16 trip to Antigua?

17      A.    Yes.

18      Q.    Did the trip to Antigua influence

19 your decision to open this account?

20      A.    No, no.  The -- this account was

21 opened after I sold a building, and we had

22 talked about that this is what we were going to

23 put that in.

24      Q.    Let's go to Exhibit 2, which is your

1                    REED - 2/5/15

2    declaration.  Why don't you just read paragraph

3    5 to yourself, or you can read it into the

4    record if you would like.

5         A.    That's okay.  (Reviewing document.)

6    Okay.

7         Q.    Paragraph 5 says that on April --

8         A.    Right.

9         Q.    -- 11, 2007 you invested $2.4

10   million approximately, and you purchased a

11   fixed CD in the amount of 160,104 --

12        A.    Pounds.

13        Q.    --  .07 pounds.  And another fixed

14   CD in the amount of 2.156 --

15        A.    Right.

16        Q.    -- million dollars.  Do you see

17   that?

18        A.    Uh-huh.

19        Q.    So based on Exhibit 3, it appears

20   that the timing of the --

21        A.    Yes.

22        Q.    -- account in pounds sterling is not

23   correct?

24        A.    Right.  It needs to be 2008 rather

25   than 2007.  I can make that change.

REED - 2/5/15

1   

2   Q.    And the amount; is that correct?

3   A.    There's a -- there has been that

4   differentiation between Grant Thornton and what

5   we had.  So I can go back over that, too.

6   Q.    Why don't we go back to -- I think

7   it's Exhibit 5, which is a copy of the CD in

8   pounds sterling.

9   A.    Got it.

10   Q.    Do you see the amount on the left

11   side of the eagle, and then it looks like

12   150,990 to the right of the eagle.

13   A.    Uh-huh.

14   Q.    Do you see that?

15   A.    Uh-huh.

16   Q.    So does that suggest to you that the

17   amount identified in pounds sterling in

18   paragraph 5 of your declaration is incorrect?

19   A.    Yes.  I'll be glad to look at it

20   again.  One may have come from some of our

21   accounting records.  I'll be glad to look at it

22   again.

23   Q.    Okay.  If there are any updates, we

24   just ask --

25   A.    Sure.

1          REED - 2/5/15

2     Q.     -- that you provide it to us.

3     A.     Oh, yeah, of course.

4     Q.     And then in paragraph 5 of your

5  declaration says that the other SIBL fixed CD

6  was the amount of approximately $2.156 million?

7     A.     Uh-huh.

8     Q.     Do you see that?

9     A.     Uh-huh.

10    Q.     That says account number ███8069?

11    A.     Correct.

12    Q.     If we go back to Exhibit 3, the

13 transaction -- the document with the

14 transaction detail, we can look at the CD copy

15 if you want --

16    A.     Okay.  I'm just getting.

17    Q.     -- which is Exhibit 4.

18    A.     Trying to get the exhibits in, okay.

19    Q.     You are on Exhibit 3?

20    A.     Yes.

21    Q.     Okay.  So the transaction detail for

22 that account number ███8069, it says there that

23 it was opened on July 4, 2007 in the amount of

24 $2 million.  Do you see that?

25    A.     Yes.

REED - 2/5/15

1

2     Q.     Does that suggest to you that the

3   amount in the declaration is incorrect?

4     A.     One of them is, and I'll be glad to

5   go back over it.

6            (Exhibit 17 marked.)

7     Q.     Ms. Reed, you have been handed what

8   is marked as Exhibit 17?

9     A.     Yes.

10    Q.     I'll represent the upper left-hand

11  corner is -- I'll represent this is how it was

12  produced to us by Mr. Snyder.  Do you know what

13  this document is?

14    A.     Not really.

15    Q.     Do you see on the upper right it

16  says statement as of July 31, 2007?

17    A.     Yes.

18    Q.     And then halfway down the page there

19  is a heading that says "Accounts Details"?

20    A.     Yes.

21    Q.     And there are two boxes.  The second

22  box says account number ████8069.  Do you see

23  that?

24    A.     Yes.

25    Q.     Okay.  And that's the same account

REED - 2/5/15

1   number that's in your declaration; right?

2        A.   Yes.

3        Q.   And here on July 4, 2007, there are

4   several entries, but the second one says

5   transferred from, FR, ■7575, $2 million.  Do

6   you see that?

7        A.   Correct, yes.

8        Q.   Does this suggest that the initial

9   deposit in your CD that was account number

10  ■8069 was $2 million?

11       A.   It does.

12       Q.   So does that suggest that the amount

13  listed in your declaration is incorrect?

14       MR. SNYDER:  Objection.  She's

15       already stated that that's -- that that's

16       true.

17       A.   Yeah.  I will be glad to go back.

18       Q.   Okay.  So I misunderstood.  I

19  thought you were going to go back to check your

20  records and confirm.

21       A.   Yeah.  I mean, we'll change the

22  declaration to -- to read, if this is what --

23  I'm trying to think what the -- we may have had

24  a -- we'll fix it.

REED - 2/5/15

Q.    Okay.  I believe with respect to the pounds sterling, how you said there has been some discrepancy?

A.    There is, yeah, on what the exchange rate was and a number of things such as that.

Q.    Let me show you a document that might help resolve that discrepancy.

(Exhibit 18 marked.)

Q.    So, Ms. Reed, you have been handed what has been marked as Exhibit 18?

A.    Correct.

Q.    Do you recognize this document?

A.    It says it's a statement of accounts for my husband and me.

Q.    In other words, did you have a practice of reviewing your statements?

A.    No.

Q.    So you would receive them and just have them filed away?

A.    No.  Our assistant would review them.

Q.    Okay.  Ms. Lincoln?

A.    Correct.

Q.    On page 2 of this document is

1                   REED - 2/5/15

2    entitled "Accounts Details"?

3         A.    Yes.

4         Q.    And you see there are -- it looks

5    like four accounts listed.  The last one is

6    account number ███4808 --

7         A.    Yes.

8         Q.    -- do you see that?  And that's the

9    same account number that's in your declaration

10   for the pounds sterling account.

11        A.    Okay.

12        Q.    And here it says April 14, 2008,

13   beginning balance, and then the next line says

14   transferred from ███7575, 150,990 pounds

15   sterling.  Do you see that?

16        A.    Correct, yes.

17        Q.    Does that refresh your recollection

18   about which amount is correct for the

19   initial --

20        A.    Sure, yeah, and I will be glad to

21   make that change.

22        Q.    Okay.

23              (Exhibit 19 marked.)

24        Q.    Ms. Reed, you have been handed what

25   has been marked as Exhibit 19?

# EXHIBIT 6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, | § | |
| HORACIO MENDEZ, | § | |
| ANNALISA MENDEZ, | § | |
| PUNGA PUNGA FINANCIAL, LTD. | § | |
| individually and on behalf of a class | § | |
| of all others similarly situated | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 3:09-cv-01600** |
| | § | |
| PROSKAUER ROSE, LLP, | § | |
| THOMAS V. SJOBLOM, | § | |
| P. MAURICIO ALVARADO, and | § | |
| CHADBOURNE & PARKE, LLP | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF PAM REED

1. My name is Pam Reed. I am over eighteen (18) years of age and competent to testify to the matters set forth herein.

2. I have personal knowledge of each of the facts stated in this Declaration, and they are true and correct. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

3. I am a U.S. citizen resident in Austin, Texas.

4. My husband Bob Gibbins (now deceased) and I invested with the Stanford Financial Group of companies ("Stanford") via Stanford's Austin office from approximately 2007 through 2009. For approximately 18 years, Nigel Bowman had been our trusted financial advisor at

Smith Barney. In early 2007 Nigel Bowman ("Bowman") decided to leave Smith Barney and affiliate with Stanford. Bowman convinced my husband and me that Stanford was a reputable investment firm and we decided to relocate our investment to Stanford Group Company ("SGC"). In April 2007, we moved our investment funds from Smith Barney to SGC. Bowman thereafter convinced us to invest our money in CDs issued by Stanford International Bank, Ltd. ("SIBL CDs").

5.      On April 11, 2007, we invested $2 million with SGC. With that money, and following the advice of Bowman, in July 2007 my husband and I purchased one SIBL "Fixed CD" in the amount of $2 million (SIBL Acct # ██8069). Later, in April 2008, we purchased another SIBL "Fixed CD" for the amount of £150,990.00 (SIBL Acct # ██4808).

6.      In making decisions to invest in the SIBL CDs, I received and reviewed various Stanford Financial marketing materials and brochures regarding SIBL and Stanford Financial as a whole, including materials that described Stanford as a Houston, Texas-based financial services conglomerate. I was also told that Stanford Financial was regulated by the U.S. Government. We were told that our CDs and investments had the same governmental protections as any investments we had at Smith Barney.

7.      No one at Stanford ever informed me that Stanford was under investigation by the U.S. Government or by the U.S. Securities & Exchange Commission ("SEC") or that the SEC considered that Stanford was operating some type of fraud or Ponzi scheme. Similarly no one from Stanford ever informed me that Stanford was evading U.S. Government regulatory oversight of SIBL's activities and Stanford's activities generally, or that Stanford would not allow the SEC to have an understanding of SIBL's investment portfolio or how SIBL invested the money it received from investors. Instead, Stanford led my husband and me to

believe that Stanford, including SIBL, was a U.S.-based operation with headquarters in Houston, Texas, regulated by the U.S. Government and compliant with U.S. laws.

8.  Had I known that Stanford and SIBL were evading U.S. Government regulation and were under investigation by the SEC, I would not have invested in SIBL CDs.

9.  My husband and I lost an immense amount of money in investments in the SIBL CDs. My claim has been approved by the U.S. Receiver.

10.  I am determined to exercise my rights through litigation to recover the maximum amount possible for my losses and for the losses of those who were similarly defrauded by Stanford. I understand my role as a putative class representative. I have been actively involved in Stanford litigation and serve as a putative class representative in other Stanford-related cases. My counsel has also provided periodic written and oral reports to me about the progress of the litigation, including the appeal to the United States Supreme Court. I have also attended, at my expense, two separate mediations in New York concerning related Stanford cases in which I appear as a Plaintiff and class representative. I am prepared to do what is necessary and appear and testify at trial in this case to vindicate my rights and the rights of other Stanford victims.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 13 , 2015.

PAM REED

# EXHIBIT 7



**STANFORD**

STANFORD INTERNATIONAL BANK LTD.

No. 11 Pavilion Drive, P.O. Box 3300, St. John's, Antigua, West Indies

ACCOUNT NUMBER

8069

DATE    04-JUL-2007

"We" means the financial institution. "You" means the depositor(s) named above. We will pay this certificate to you when you surrender it to us on the maturity date. If more than one of you are named above, you will own this certificate as joint tenants with right of survivorship (and not as tenants in common). We will treat any one of you as owner for purposes of surrender, payments of principal and interest, presentation (demanding payment of amount due), transfer and any notice for or from you. Each of you appoints the other as your agent for the purposes described above. We will use the address on our records for mailing notices to you. You cannot transfer or assign this certificate or any rights under it without our written consent. This certificate is subject to the Bank's General Terms and Conditions and applicable Deposit Terms, which are incorporated herein by reference. Unless otherwise stated, all amounts specified are in U.S. Dollars or an equivalent amount if deposits are made in currency other than U.S. Dollars.

This   FIXED CD - USA/ - USD - 60 MONTHS          matures on   29-JUN-2012

THIS CERTIFICATE MATURES ON THE MATURITY DATE STATED ABOVE; IT WILL BE AUTOMATICALLY RENEWED FOR SUCCESSIVE TERMS, EACH EQUAL TO THE ORIGINAL TERM, UNLESS THE BANK IS ADVISED OTHERWISE FIVE (5) BANKING DAYS PRIOR TO MATURITY.

INTEREST ... DATE WILL ACCRUE AT THE BASE RATE
OF ... THE ANNUAL YIELD WILL BE   10.82 %

This rate ... ance with the Bank's General Terms and Conditions
and appl...

Executed at St. John's, Antigua, West Indies

by AUTHORIZED SIGNATORY

*original
in
Safety deposit
box @
TOB*



EXHIBIT  4
WIT: *Reed*
DATE: *2-5-15*
S. Klinger, RMR-CRR

P226

App. 109

# EXHIBIT 8



**≋STANFORD**

STANFORD INTERNATIONAL BANK LTD.

No. 11 Pavilion Drive, P.O. Box 3300, St. John's, Antigua, West Indies

ACCOUNT NUMBER

4606

DATE   14 APR 2008

CERTIFICATE OF DEPOSIT

ORIGIN...

...BOB GIBBINS  AND PAM REED

DEPOSIT... ...150,990.00

AMOUNT

CURRENC...

"We" means the financial institution. "You" means the depositor(s) named above. We will pay this certificate to you when you surrender it to us on the maturity date. If more than one of you are named above, you will own this certificate as joint tenants with right of survivorship (and not as tenants in common). We will treat any or all of you as owner for purposes of surrender, payment of principal and interest, presentation (demanding payment of amount due), transfer and any notice for or from you. Each of you appoints the other as your agent for the purposes described above. We will use the address on our records for mailing notices to you. You cannot transfer or assign this certificate or any rights under it without our written consent. This certificate is subject to the Bank's General Terms and Conditions and applicable Deposit Terms, which are incorporated herein by reference. Unless otherwise stated, all amounts specified are in U.S. Dollars or an equivalent amount deposits are made in currency other than U.S. Dollars.

This      Fixed CD USAI      3 MONTHS   GBP   Matures on    14 JUL 2008

THIS CERTIFICATE MATURES ON THE MATURITY DATE STATED ABOVE; IT WILL BE AUTOMATICALLY RENEWED FOR SUCCESSIVE TERMS, EACH EQU TO THE ORIGINAL TERM, UNLESS THE BANK IS ADVISED OTHERWISE FIVE (5) BANKING DAYS PRIOR TO MATURITY.

INTEREST...  ...DATE WILL ACCRUE  AT THE  BASE RATE

OF...          ...THE ANNUAL YIELD WILL BE 7.03   %

This rate...  ...nce with the Bank's General Terms and Conditions
and appli...

Executed at St. John's, Antigua, West Indies

by AUTHORIZED SIGNATORY

*to Safe Deposit Box*
*© TOB*
*9/22/08*

EXHIBIT S

WIT: Reed

DATE: 2-5-15

S. Klinger, RMR-CRR

# EXHIBIT 9

1                    TROICE - 2/3/15
2              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
3                 DALLAS DIVISION
    -----------------------------
4   SAMUEL TROICE, HORACIO MENDEZ,
    ANNALISA MENDEZ, and
5   PUNGA PUNGA FINANCIAL, LTD.,
    individually and on behalf
6   of a class of all others
    similarly situated,
7                         Plaintiffs,
8   vs.                   CIVIL ACTION NO.
                          3:09-CV-1600-N
9   PROSKAUER ROSE, LLP,
    THOMAS V. SJOBLOM,
10  P. MAURICIO ALVARADO, and
    CHADBOURNE & PARKE LLP,
11
                          Defendants.
12  -----------------------------
13
14      VIDEOTAPED DEPOSITION OF SAMUEL TROICE
15              DALLAS, TEXAS
16            FEBRUARY 3, 2015
17
18
19
20
21
22
23
24  Reported by:  Susan S. Klinger, RMR-CRR, CSR
25  Job No. 89573

TROICE - 2/3/15

1

2    A.    May I take out my passport?

3    Q.    Of course.

4    A.    2005.

5    Q.    Are you a legal, permanent resident

6  of any country?

7    A.    Yes.

8    Q.    What countries?

9    A.    Mexico.

10    Q.    But you are also a citizen of

11  Mexico?

12    A.    Yes.

13    Q.    Mr. Troice, could you briefly

14  describe your highest level of education?

15    A.    University.

16    Q.    What kind of degree did you receive?

17    A.    Business administration.

18    Q.    And what year did you receive your

19  degree in approximately?

20    A.    It has been 35 years.

21    Q.    And how are you currently employed,

22  Mr. Troice?

23    A.    I'm the CEO of a factory of paint,

24  paint factory.

25    Q.    Is that paint factory in Mexico?

1          TROICE - 2/3/15

2     A.    In these last conversations, recent

3  conversations that I have had with my attorney.

4     Q.    Approximately when did you learn?

5     A.    2 or 3 weeks ago approximately.

6     Q.    Do you know why she is being added?

7          MR. SNYDER:   Again, I will instruct

8     the witness not to divulge any

9     attorney-client privileged communications.

10    A.    No, I don't know.

11    Q.    Mr. Troice, who are the defendants

12  in this lawsuit?

13    A.    The attorneys, Chadbourne,

14  Proskauer, Thomas Sjoblom and Mauricio

15  Alvarado.

16          THE INTERPRETER:   And the witness

17    said that he's going to charge the

18    interpreter half of what the interpreter is

19    earning because the witness is helping the

20    interpreter with his Spanish and the

21    interpreter concurs.

22    Q.    Prior to bringing this lawsuit, did

23  you know of any of the defendants that you just

24  listed?

25    A.    No.

1             TROICE - 2/3/15

2    any of the Stanford cases?

3         A.    When I signed this to the firm, it

4    is this contract, has to be with --

5             THE INTERPRETER:  The interpreter is

6         getting clarification.

7         A.    When I signed this contract in, in

8    April of 2009.

9         Q.    And how much was that fee?

10        A.    $4,000.

11        Q.    If this case were to settle, do you

12   have an understanding of how much each law firm

13   would be entitled to?

14        A.    No.

15        Q.    Have you paid anything else to any

16   of the law firms in connection with their

17   representation of you in this action?

18        A.    No.

19        Q.    Mr. Troice, could you please

20   describe the proposed class in this case?

21        A.    Describe it in what way?

22        Q.    Sort of the definition that is being

23   used in this case for the class?

24            MR. SNYDER:  Objection to the

25        translation.  Can you repeat the question?

1              TROICE - 2/3/15

2         The definition of the class that we're

3         asking for?

4         Q.    Right, the definition of the

5    proposed class in this case?

6         A.    There are many people that have been

7    defrauded in the world, all of them.  And the

8    receiver accepted their claims so that each one

9    wouldn't have to file his or her own lawsuit.

10   There is a group of people like Isaac Green and

11   like, like I that are the representatives to be

12   a participant in all of these events, and to

13   represent the whole group with just one

14   collective lawsuit.

15        Q.    So are you saying that anyone whose

16   claims were accepted by the receiver would be a

17   member of the class?

18        A.    I'm not an attorney.  I don't know

19   how it works, but I do know, but I do know that

20   I represent a large group of people.

21        Q.    Do you understand that there is a

22   proposed class that has been put forward in the

23   Complaint?

24             MR. SNYDER:  In la demanda.

25        A.    I didn't understand that.

1              TROICE - 2/3/15

2              MR. SNYDER:  Objection, form.  I'm

3          not sure what that means.  He read it.

4          What do you mean what does it entail?

5          Q.    Did you read the Complaint?

6          A.    I read it in English and so then I

7    did not understand a lot of terms.  My wife is

8    American, she helped me to understand it.  And

9    I have also reviewed it with the attorney.

10         Q.    And what, if anything, did you do to

11   verify the accuracy of the allegations in the

12   Complaint?

13             MR. SNYDER:  Objection, form.

14         A.    The one who does that work is the

15   attorney and that is why he has been hired.

16         Q.    If you could turn to paragraph 2,

17   which is on page 2.  This paragraph says that

18   you are a citizen of Mexico; correct?

19         A.    Correct.

20         Q.    And you testified earlier that you

21   are also a citizen of the United States;

22   correct?

23         A.    Correct.

24         Q.    Did you notice that that was not

25   part of this paragraph when you reviewed the

1                  TROICE - 2/3/15

2       her own investments not jointly with you in the

3       SIB CDs?

4            A.    No, she doesn't work.  She doesn't

5       have her own money, she has my money.

6            Q.    Okay.  This also says if you look

7       back at the response that Patricia Troice is

8       your sister; is that correct?

9            A.    Correct.

10           Q.    And what information does Patricia

11      Troice have about your investments in the SIB

12      CDs?

13           A.    Knowledge as far as my investments

14      with Stanford, but not as far as the amounts.

15           Q.    So she knows that you invested in

16      the CDs?

17           A.    Yes.

18           Q.    What other information does she have

19      about the investments in the CDs other than

20      that you made the investments?

21           A.    May I answer for my 3 sisters,

22      because it is the same?

23           Q.    Sure.  Who are your 3 sisters?

24           A.    Silvia, Flora, Patricia.  I have 6

25      sisters.  So my sisters also invested with

1                    TROICE - 2/3/15

2   Stanford.  So we all knew that we had money in

3   Stanford.  I knew about their investments and

4   they knew about my investments.

5        Q.    And were any of those joint

6   investments?

7        A.    Not mine with my sisters or my

8   sisters with me, no.

9        Q.    And did your sisters invest through

10  the Mexico office of Stanford?

11       A.    Yes.

12       Q.    And who was each of their FAs,

13  financial advisors?

14       A.    David Nanes.

15       Q.    Did you recommend to your sisters

16  that they invest in the Stanford, in the SIB

17  CDs?

18       A.    No, I don't know if they took me or

19  how we arrived at Stanford.  But Patricia and I

20  knew together the same day, we met the same day

21  David Nanes.

22       Q.    Who -- do you know of the 4 of you

23  who invested first in the, in the SIB CDs?

24       A.    No.

25       Q.    Who is Galia Chiquiar?

TROICE - 2/3/15

1

2      Q.    If you could look at paragraph 3

3  which appears on the first page of the

4  declaration.  It says, "I'm a dual citizen of

5  the Republic of Mexico and the United States

6  and reside in Mexico City;" correct?

7      A.    Correct.

8      Q.    So as between the paragraph we

9  reviewed in the Complaint and this paragraph in

10  the declaration, which one is the accurate one

11  as to your citizenship?

12          MR. SNYDER:  Objection, form.

13      A.    This one.

14      Q.    If you could turn to the next page,

15  the second page, paragraph 5.  The first

16  sentence says, "Nanes always promoted the SIBL

17  CDs to me as the only investment product

18  offered by Stanford Financial."  Do you see

19  that?

20      A.    Yes.

21      Q.    If you had known that Stanford was

22  offering other investment products, would that

23  have changed your decision to invest in the

24  SIBL CDs?

25          MR. VALDESPINO:  Objection, form.

1          TROICE - 2/3/15

2          MR. SNYDER:  Objection, form, calls

3      for speculation.

4      A.    Offering different products is not

5  the problem.  Here the problem was that it was

6  fraudulent.  I could have seen other products,

7  that wasn't the motive for my decision.

8      Q.    The question was if you had known

9  that there were other products, that Stanford

10  was offering other products, would that have

11  changed your decision to invest in the SIB CDs?

12          MR. SNYDER:  Objection, form.

13      A.    I repeat what products.  There are a

14  lot of products in the market.  If I knew that

15  they were fraudulent, I would not have

16  invested.

17      Q.    So you're saying it doesn't matter

18  if other products had been offered to you, you

19  still would have purchased the SIB CDs?

20      A.    It depends on the products, the risk

21  and the security, safety.

22      Q.    So risk is something that you

23  considered when you were making your

24  investments?

25      A.    No, zero.  I'm zero risk.  I'm only

TROICE - 2/3/15

1
2   when the risk is with me in my hands.

3       Q.    So risk is something that you

4   considered, so risk was important to you?

5       A.    No, I said zero.

6           MR. SNYDER:  I think it is a

7       mistranslation.  He is saying it is not

8       important, because he doesn't want risk.

9       A.    Zero risk.

10      Q.    You considered risk when you were

11  making your investments whether there was any

12  risk when you made your investments?

13          MR. VALDESPINO:  Objection, form.

14      A.    I didn't consider, I didn't consider

15  that the CDs were at risk.  I would not have

16  invested.

17      Q.    If we could look at paragraph 7 of

18  your declaration.  It says, "I invested a large

19  amount of money in the SIBL CDs after August

20  2005."  Do you see that?

21      A.    Yes.

22      Q.    How much money did you invest in

23  SIBL CDs after August 2005?

24      A.    I don't have the exact amount, but

25  it is in the files.

1                    TROICE - 2/3/15

2        A.     Correct.

3        Q.     What did Mr. Nanes tell you about

4   liquidity?

5        A.     Liquidity as far as my money

6   movements could be done whenever I wanted.

7        Q.     Did Mr. Nanes provide you with any

8   materials, written materials?

9        A.     Brochures, brochures that had been

10  printed, yes.

11       Q.     What was in the brochures?

12       A.     All of the bank information,

13  photographs of the directors, the publicity for

14  the insurance and the benefits of being with

15  them.

16       Q.     Were the brochures in Spanish or in

17  English?

18       A.     In Spanish.

19       Q.     Did you review the materials that

20  you were given?

21       A.     Part of it.

22       Q.     Which part do you recall reviewing?

23       A.     Possibly the first 2 paragraphs.

24       Q.     Do you remember what, what was in --

25  what the content was that you reviewed?

1          TROICE - 2/3/15

2          MR. SNYDER:  Objection, are we

3     talking about what time frame?

4     Q.    At this first meeting?

5     A.    The publicity of the bank and then

6     the benefits of the bank.  Basically that is

7     all that David Nanes offered was what was said

8     in the brochures, or in other words it was

9     better to listen to him than to read it.

10    Q.    Did you ask Mr. Nanes any questions

11    about the SIB CDs.

12    A.    Yes.

13    Q.    What did you ask him?

14    A.    About the security of the money.

15    Q.    What did he tell you?

16    A.    He showed me letters from the

17    companies that were insuring the people, the

18    bank and the money.

19    Q.    Did you ask him anything else?

20    A.    A lot of things.  How the money

21    could be moved, payments, payments that I might

22    need to have made, and with what ease they

23    could be made.  The documentation, the

24    information that I would receive as far as my

25    account, statements, anything that a normal

1     TROICE - 2/3/15

2   VIDEOGRAPHER:   The deposition is

3  continued on the record at 12:47.

4   Q. Good afternoon, Mr. Troice.

5   A. Good afternoon.

6   Q. If you could get out Exhibit 2 and

7  Exhibit 4, we may be referring to those.  So if

8  you wanted to keep those and if you could clear

9  the other ones aside, just so you --

10   A. Okay, yes.

11   Q. If you, if you could turn to your

12  declaration, which is Exhibit 4 in paragraph 6.

13  You say that you were led to believe -- this is

14  the end of paragraph 6, you say you were led to

15  believe that Stanford including SIBL was a U.S.

16  based operation with headquarters in Houston,

17  Texas regulated by the U.S. government in

18  compliance with U.S. laws.  Do you see that?

19   A. Yes, I see it.

20   Q. Is it your testimony that you would

21  not have invested in the SIB CDs if you had

22  known at the time that the CDs were issued by a

23  non U.S. bank?

24   MR. SNYDER:   Objection, form.

25   A. I would not have invested in an

1                    TROICE - 2/3/15

2    offshore bank.

3         Q.    Did you understand that these CDs

4    were issued by Stanford International Bank?

5         A.    Yes.

6         Q.    And you understood that SIBL was

7    located in Antigua; correct?

8         A.    Some, some of the offices, yes, but

9    offices in Houston and Miami and I think

10   Tennessee.

11        Q.    I'm referring to Stanford

12   International Bank specifically?

13        A.    For me Stanford was everything.

14        Q.    Where did you understand Stanford

15   International Bank to be based?

16        A.    The headquarters, the base was in

17   Houston.

18        Q.    What was that understanding based

19   on?

20        A.    In the offices, the building in

21   which I was also on some occasions, comments by

22   David Nanes.  In Houston they gave services and

23   also financial advice, advice about accountings

24   basically.

25        Q.    When were you in Houston?

1                       TROICE - 2/3/15

2                  THE INTERPRETER:   The interpreter

3          found it.

4          A.    Yes, I see it.

5          Q.    Is that a true statement with

6    respect to yourself?

7          A.    That's correct.

8          Q.    So as you sit here today, you're

9    saying that you don't understand that SIBL was

10   located in Antigua?

11         A.    No, I didn't say that.  I said that

12   as far as the CDs they told us they were

13   issued, they were issued and controlled by a

14   U.S. bank.

15         Q.    Again, paragraph 24 says, "Many

16   foreign investors in SIB to this day never

17   understood that they had invested in CDs issued

18   by an Antiguan bank."  Are you saying that

19   sitting here today you don't understand that

20   the CDs were issued by an Antiguan bank?

21         A.    That's correct.

22                MR. SNYDER:   Let the record reflect

23          that the Exhibit 2, the Amended Complaint

24          when it says to this day, the Complaint was

25          filed in October of 2009.

TROICE - 2/3/15

1

2          Were you told that your investment

3  in SIB was completely safe and secure because

4  SIB was regulated by the Antiguan banking

5  regulatory commission?

6      A.    No, they told me that they were

7  secure through the companies that sent out the

8  insurance letters.

9      Q.    Mr. Troice, in your declaration

10  Exhibit 4 in paragraph 6, I'm sorry, in

11  paragraph 5 you say that you received and

12  reviewed various Spanish language Stanford

13  Financial marketing materials and brochures

14  regarding SIBL and Stanford Financial as a

15  whole including materials that describe

16  Stanford as a Houston, Texas based financial

17  services conglomerate regulated by the U.S.

18  government.  Do you see that?

19      A.    That's correct.

20          (Exhibit 5 marked.)

21      Q.    Mr. Troice, you have been handed

22  what has been marked as Troice Exhibit 5.  It

23  bears Bates numbers P157 through 167.  Do you

24  recognize -- this appears to be something that

25  has been submitted in a case but was produced

TROICE - 2/3/15

1

2  on your behalf.  Do you recognize the documents

3  that have been translated in there?

4      A.    What I took out of the brochures,

5  yes.

6      Q.    So these are documents that you,

7  that you had from Stanford brochures that you

8  received?

9      A.    That's correct.

10     Q.    And these are some of those Spanish

11 language marketing materials that you were

12 referring to in your declaration; is that

13 correct?

14     A.    Correct.

15     Q.    When did you receive these

16 documents?

17     A.    When I met Nanes the first times

18 that I met with him he gave me brochures.

19     Q.    And so that would be as you said in

20 1997, 1998?

21     A.    Around then, yes.

22     Q.    If you could turn to -- I don't

23 speak Spanish, so I can only read the English,

24 English version but it would be the, the first

25 document in the 1, 2, 3, 4, 5, 6 --

1        TROICE - 2/3/15

2        MR. SNYDER:  You want to refer to it

3    by the Bates label page?

4        MS. TENZER:  It is P160 is the

5    English version, I guess, is what I'm

6    trying to get at.

7    Q.    We can look at the English version,

8 you understand some English.  On page 160, the

9 5th paragraph the very first sentence begins,

10 "because Stanford International Bank is not a

11 United States bank."  Do you see that?

12   A.    Yes.

13   Q.    So Mr. Troice, you knew at the time

14 you received and reviewed this document in 1997

15 or 1998 that SIB was not a United States bank;

16 isn't that correct?

17        MR. SNYDER:  Objection, form.

18   A.    It had offices in Houston, Miami,

19 Antigua, and other places in the world, and

20 Mexico and other places of the world.  And they

21 told us that it was regulated as far as the

22 movements, activities for -- by regulations,

23 United States regulations to be able to do

24 business in the United States.

25   Q.    Mr. Nanes told you that?

1              TROICE - 2/3/15

2      A.     That's correct.

3      Q.     Do you know what other investors

4  received this document that we just reviewed?

5      A.     I wasn't present when David had

6  clients, that was private, but it was a

7  brochure.  They would pass out these brochures

8  like flyers.

9      Q.     So you don't know what investors

10 received this document that we just reviewed?

11     A.     I know that my sisters did and just

12 like them, many others.

13     Q.     Do you know if investors in any

14 other countries received this document?

15     A.     I don't know if this one exactly,

16 but with similar information they must have

17 received it.

18     Q.     But you don't know one way or the

19 other what exact brochures other investors

20 received; isn't that correct?

21     A.     No, I don't.

22     Q.     You would have to ask each of those

23 investors to know what documents they received;

24 correct?

25     A.     I would have to do it.

TROICE - 2/3/15

1

2   correct, how they were regulated?

3        A.    I trusted Nanes, I relied on Nanes.

4   I relied on the information from the brochures.

5   I relied on the fact that there were several

6   clients, a lot of clients and, and the letters

7   that it was insured.

8        Q.    What did Mr. Nanes tell you about

9   how SIB was regulated?

10       A.    It is a subject about which we never

11  spoke and I never asked him.

12       Q.    So what is the basis of your

13  understanding that SIB was under U.S.

14  regulation?

15       A.    Offices in the United States,

16  information when I went to Houston, when I went

17  to Miami, they had information for me.  I could

18  take money out in Miami, everything was

19  transparent.

20       Q.    When you say they had information

21  for you, what do you mean?

22       A.    Information about my accounts, my

23  file.

24       Q.    Were you told that SIB was regulated

25  by FINRA?

1                    TROICE - 2/3/15

2        A.    I don't know what that is.

3        Q.    So you were never told that SIB was

4   regulated by FINRA?

5        A.    I had never heard that word.  Not

6   these letters, FINRA, but if they told me what

7   it was, then yes.

8        Q.    F-I-N-R -- F-I-N-R-A or the

9   Financial Industry Regulatory Authority?

10       A.    I had not heard that.

11       Q.    Were you told that SIB was regulated

12  by the U.S. Securities and Exchange Commission?

13       A.    We didn't, we didn't touch on the

14  subject of the SEC.

15       Q.    Would you have invested in the SIB

16  CDs if you understood that they were not

17  regulated by the U.S. government?

18            MR. SNYDER:  Objection, form.  They

19       being who?  You said they were not being

20       regulated.  Who were you talking about?

21       Q.    I'm sorry.  Would you have invested

22  in the SIB CDs if you understood that those CDs

23  were not regulated by the U.S. government?

24       A.    No.

25            (Exhibit 6 marked.)

1          TROICE - 2/3/15

2      Q.    If you go to the bottom of the page

3  where the asterisk appears it says, "Stanford

4  International Bank Limited CDs are not FDIC

5  insured and are not subject to regulation or

6  oversight of any agency of the U.S. government

7  nor are they subject to any restrictions on how

8  portfolios are invested."

9      A.    Correct.

10     Q.    So if you had received and reviewed

11 this document, you would have known at the time

12 that the SIB CDs were not subject to regulation

13 or oversight of any agency of the U.S.

14 government; correct?

15          MR. SNYDER:  Objection, form.

16     A.    That's correct, but I repeat these

17 brochures did not come to our hands.  This was

18 in 2008 when Stanford already had now problems.

19     Q.    If you had received this document,

20 Mr. Troice, would you have invested in the SIB

21 CDs?

22          MR. SNYDER:  Objection, form.

23     A.    No.

24     Q.    Do you know who received this

25 document?

1                    TROICE - 2/3/15

2       A.    No.

3       Q.    If you wanted to know which

4  investors received this document, you would

5  have to ask each of those investors; correct?

6       A.    Correct.

7       Q.    Let's go back to your declaration,

8  which is Troice Exhibit 4.  If you could turn

9  to the second page, paragraph 6, the paragraph

10  starts, "No one at Stanford ever informed me

11  that Stanford was under investigation by the

12  U.S. government or by the U.S. Securities and

13  Exchange Commission."  Do you see that?

14      A.    Yes.

15      Q.    If you had known that Stanford was

16  under investigation by the U.S. Securities and

17  Exchange Commission, would that have changed

18  your decision to invest in the SIB CDs?

19      A.    I would not have invested.

20      Q.    Did you ask Mr. Nanes if there was

21  any pending investigation of Stanford by the

22  SEC?

23            MR. SNYDER:  Objection.  At which

24      time?

25            MS. TENZER:  At any time.

1              TROICE - 2/3/15

2      A.     No, I never asked.

3      Q.     Did you do anything to research

4  whether there was any investigation of Stanford

5  by the SEC?

6      A.     No.

7      Q.     Why didn't you do any investigation?

8             MR. SNYDER:   Objection, form.

9      Investigation about SEC investigations?

10     Q.     Why didn't you do any research --

11  sorry, withdrawn.

12             Why didn't you do any research as to

13  whether there was any investigation of Stanford

14  by the SEC?

15     A.     If I had to do some research, it

16  would have been better for me not to invest.

17  If, if I had mistrusted them, why would I

18  invest?  I was sure that everything was in

19  order.

20     Q.     So you relied completely on

21  Mr. Nanes?

22             MR. SNYDER:   Objection, form.

23     A.     I relied on everything that I saw at

24  the bank and its operations and also on

25  Mr. Nanes and his paperwork.

1              TROICE - 2/3/15

2      Q.    Did you do any of your own due

3  diligence on SIB or the SIB CDs?

4              THE INTERPRETER:   SIB and?

5      Q.    The SIB CDs?

6      A.    No.

7      Q.    Did you receive a questionnaire sent

8  by the SEC in May 2005 regarding Stanford Group

9  Company and its marketing of Stanford

10 International Bank CDs?

11             THE INTERPRETER:   The interpreter is

12         going to ask counsel to repeat the question

13         and chunk it up in 2 parts.

14     Q.    Did you receive the questionnaire

15 sent by the SEC in May 2005 regarding Stanford

16 Group Company and its marketing of Stanford

17 International Bank CDs?

18             MR. SNYDER:   Just objection

19         translation.  You said Stanford Group.  It

20         is actually Stanford Company,

21         broker/dealer.  Not the -- that confuses

22         him.  He thinks he's talking about the

23         overall Stanford Group as opposed to a

24         specific company called Stanford Group

25         Company, which is what you are asking

1                    TROICE - 2/3/15

2        stands corrected.

3               MR. SNYDER:  I object to the

4        translation.

5               MS. TENZER:  I will repeat the

6        question.

7               THE INTERPRETER:  Yes, ma'am.

8        Q.    You would not have paid attention if

9    you had heard the SEC was sending

10   questionnaires to Stanford investors?

11       A.    I don't understand.  I would not

12   have paid attention to what?

13              MR. SNYDER:  I think that he's

14       confused.  I think there was a bad

15       translation before.

16       Q.    If you had heard the SEC had sent

17   questionnaires to Stanford investors, would you

18   have -- would you recall that?

19       A.    I would have asked for all of my

20   money to be returned to me.

21       Q.    Did you follow press reports

22   regarding Stanford at the time you were

23   investing in the SIB CDs?

24              MR. SNYDER:  Objection, form,

25       assumes facts not in evidence that there

                        TROICE - 2/3/15

1
2       were press reports about Stanford.

3       A.    I did not follow them.

4             (Exhibit 7 marked.)

5       Q.    You have been shown what has been

6    marked as Troice Exhibit 7.  This is an article

7    that appeared on July 3rd of 2008 and the

8    headline is, "SEC investigating Stanford Group

9    offshore bank CDs, update 1."  Did you see this

10   article?

11      A.    I don't remember if I saw exactly

12   this article.  I don't usually read Bloomberg.

13      Q.    Do you recall seeing a similar, a

14   similar article?

15      A.    No.

16      Q.    Did anyone mention this article to

17   you at the time in July of 2008?

18      A.    No.  If they had mentioned it to me,

19   I would have asked for my money or I would have

20   researched it more deeply.

21      Q.    Earlier you mentioned several times

22   insurance.  Did you rely on what Mr. Nanes told

23   you about how the SIB CDs were insured?

24      A.    Yes.

25      Q.    And you relied on the insurance

1                    TROICE - 2/3/15

2         Q.    I will repeat the question.   Before

3    you bought the SIB CDs, did you ever purchase a

4    U.S. bank issued CD?

5         A.    Yes.

6         Q.    And why did you buy those, the pre

7    SIB CDs?

8              MR. SNYDER:   Same objection as to

9         relevance.

10        A.    From the bank in the United States;

11   correct?  It was many years ago when I lived in

12   El Paso, Texas and I had the tire business so I

13   would buy CDs.

14        Q.    Was there a reason that you

15   purchased CDs over other types of investments?

16        A.    I don't like, I don't like risk in a

17   bank.

18        Q.    Have you purchased U.S. bank issued

19   CDs since your investment in the SIB CDs?

20        A.    No.

21        Q.    Why is that?

22        A.    I don't have money any longer.

23        Q.    Mr. Troice, were you told that your

24   investment in the SIB CDs would be covered by

25   the Securities Investor Protection Corporation?

TROICE - 2/3/15

1

2          THE INTERPRETER:  The last part,

3      counselor?

4      Q.    Securities Investor Protection

5  Corporation?

6      A.    What is that one?

7      Q.    SIPC?

8      A.    I have never heard about that

9  company.

10      Q.    You have mentioned several times the

11  insurance letters that you received?

12      A.    Yes.

13      Q.    You understood those letters to be

14  from companies that at the time were providing

15  insurance to Stanford; is that correct?

16      A.    Correct.

17      Q.    At the time you received the

18  letters, did you understand the insurance

19  companies and brokers who provided those

20  letters to be reputable?

21      A.    That is the way I understood it.

22      Q.    And at the time you received the

23  letters, did you understand those letters to be

24  providing an independent endorsement of SIB by

25  those insurers?

TROICE - 2/3/15

1

2      Stanford?

3      Q.     Fraud by Stanford?

4      A.     The employees that worked in

5 Stanford.

6      Q.     Yes.  What did Mr. Nanes tell you

7 about the insurance coverage that was provided?

8      A.     That the people that work at the

9 bank are insured for mismanagement and

10 bankruptcy.  And basically all that has to do

11 with mismanagement and also fraud and

12 bankruptcy.

13      Q.     Mr. Troice, what is the basis for

14 your understanding that the SIB CDs were zero

15 risk?

16      A.     I never allowed, and I intended to,

17 I wanted to let my money be invested in shares

18 or portfolios of high risk.  That is why I

19 preferred CDs with less interest rates very

20 close to, to the interest rates of the United

21 States with minimal risk.

22      Q.     Earlier today you testified that you

23 had an understanding that SIB CDs had no, zero

24 risk; correct?

25      A.     Yes.  Well, yes, everything has a

1          TROICE - 2/3/15

2  risk, but it was zero risk as far as, well,

3  losing your money.

4      Q.    Did Mr. Nanes tell you that there

5  was no risk of you losing your money?

6      A.    Of course.  If he had told me that

7  there was a risk, I would not have invested.

8              MS. TENZER:  Take a quick break?

9              MR. SNYDER:  Sure.

10             VIDEOGRAPHER:  Deposition paused to

11     go off the record.

12             (Recess, 1:47 to 2:00 p.m.)

13             VIDEOGRAPHER:  Back on the record at

14     2:00 p.m.

15     Q.    Mr. Troice, what is your

16 understanding of how damages will be calculated

17 in this case?

18             MR. SNYDER:  For him or for

19     everybody?

20     Q.    For everybody?

21     A.    The damages as far as the, as far as

22 for everybody it is $5 billion.  How can you

23 calculate that?  It is very hard to say.

24     Q.    Well, when you say it is $5 billion,

25 what is that based on?

TROICE - 2/3/15

1

2          A.     On the calculations and the comments

3     of the receiver.

4          Q.     Who is the receiver?

5          A.     Mr. Janvey.

6          MR. SNYDER:   J-A-N-V-E-Y.

7          THE INTERPRETER:   Thank you.

8          Q.     Do you know what methodology the

9     receiver Mr. Janvey is using to calculate those

10    damages?

11         A.     No, I don't have any idea.

12         Q.     Did you submit a claim to the

13    receiver?

14         A.     Yes.

15         Q.     Did you, did you submit the claim or

16    did someone do it on your behalf?

17         A.     I turned it over to the attorney and

18    the attorney presented it.

19              (Exhibit 8 marked.)

20         Q.     Mr. Troice, you are being shown what

21    has been marked as Troice Exhibit 8.  It bears

22    Bates numbers P194 to 195.  Do you recognize

23    this document?

24         A.     Yes.

25         Q.     What is this document?

TROICE - 2/3/15

1

2      translation.  Not that he received

3      documents, asking for documents, was he

4      asked.

5      A.    To my wife via email?

6      Q.    Were you asked to collect documents

7   in response to a request from the defendants in

8   this case, Troice versus Proskauer?

9      A.    They asked for -- I was asked for

10   files from my attorney and what I had I gave to

11   him.

12      Q.    And my question is, in collecting

13   your files for that purpose, did you look at

14   your, through your emails for emails that would

15   have been responsive to the document request?

16          THE INTERPRETER:  Responsive to?

17      Q.    The document requests?

18      A.    No.

19      Q.    If you could turn to the next page

20   the document sort of, I think, because it was

21   an online document, it sort of cuts off.  But

22   at the top of the following page do you see

23   where it says total claim amount and it is

24   $2,195,706.  Do you see that?

25      A.    Yes, I see it.

TROICE - 2/3/15

1

2     A.     The notice of how much the receiver

3     determined the amount of my claim.

4     Q.     And if you could turn to the, the

5     chart that appears on P963 under the heading

6     "Claimants" and under the heading "Payees"?

7          THE INTERPRETER:  Did counsel say

8     payees?

9     Q.     Payees?

10    A.     Yes.

11    Q.     In addition to yourself and your

12    wife, it also lists your sisters, Silvia Troice

13    and Flora Troice; correct?

14    A.     Correct.

15    Q.     Do you know why your claims have

16    been grouped with your sisters' claims by the

17    receiver?

18    A.     I don't have any idea.

19          MR. SNYDER:  We're trying to find

20    that out.

21    A.     We're trying to find that out.

22    Q.     And how are you trying to find that

23    out?

24    A.     My attorney is trying to find that

25    out.

1                   TROICE - 2/3/15

2        Q.     Who do you think has that

3    information?

4                MR. SNYDER:  From the receiver?

5        A.     I imagine that the receiver and I

6    imagine the Stanford offices, but there is no

7    reason for them to mix my account with those of

8    my sisters.

9        Q.     In terms of the claim numbers that

10   are shown in the left-hand column, do you know

11   which one of those is your claim?

12       A.     I think the first one and the last

13   one.  In fact, if you let me take out my cell

14   phone I ought to have the numbers in it if it

15   is necessary.

16       Q.     Sure.

17                MR. SNYDER:  You really need to know

18           that information?

19                MR. BUNCHER:  Whose cell number?

20                MR. SNYDER:  No, they want to know

21           which of the claim numbers in the

22           receivership claims process are his.  He

23           can look at his cell phone.

24       Q.     We can continue.  The total claimed

25   amount that appears on P963 is larger than the

1                    TROICE - 2/3/15

2     amount you and your wife claimed; correct?

3          A.    Yes.

4          Q.    Do you know why?

5          A.    I think because they added, added up

6     my account with that of my sisters or those of

7     my sisters.  I don't have them here.  I thought

8     that they would be here.  No, they're not

9     there.

10         Q.    The allowed claim amount is

11    $1,879,818.58; correct?

12         A.    Correct.

13         Q.    And you don't know what portion of

14    the allowed claim amount is attributed to you

15    and your wife as opposed to your sisters; is

16    that correct?

17         A.    No, because the major part of that

18    amount is mine.  I don't know how they added up

19    the amounts of my sisters' accounts nor why,

20    but I do know for them to accept the claim they

21    take the principal amount less interest.  That

22    was a ghost.

23              MR. VALDESPINO:  Fictitious.

24         A.    Fictitious interest.

25              MR. SNYDER:  Interest.

1          TROICE - 2/3/15

2      A.     And I'm trying to find out why my

3  sisters are on there.  And for them to take

4  them off Stanford, well, not Stanford the

5  receiver made the distribution of 1 percent.  I

6  didn't receive, because I'm -- have submitted a

7  claim as far as this subject that my sisters

8  don't have to be in with me.

9          MR. SNYDER:  Just listen to the

10      question, answer the question.

11      Q.     Have you, have you formally

12  challenged or objected to the receiver's claim

13  determination?

14          THE INTERPRETER:  The last part of

15      the question, counselor?

16      A.     I did that through my attorney and

17  my attorney is taking charge of that subject.

18      Q.     But do you know if you have

19  submitted any form of challenge or objection to

20  the receiver's claim determination?

21      A.     Yes.

22      Q.     Has the receiver ever adjusted the

23  allowed claim amount?

24      A.     Not yet.

25      Q.     And you testified that you have not

1                     TROICE - 2/3/15

2    received any distribution from the receiver; is

3    that correct?

4         A.    That's correct.

5         Q.    Have your sisters received a

6    distribution?

7         A.    No.

8               (Exhibit 11 marked.)

9         Q.    Mr. Troice, what is the basis of

10   your objection to the receiver's claim

11   determination?

12        A.    To ask why they're lowering from my

13   account as far as the amount that I am claiming

14   against what he determined.

15        Q.    So it is based on the difference

16   between what you claimed and the, and the

17   allowed claim amount?

18        A.    There is, there are differences in

19   the accounts and the amounts and I do want to

20   know why.

21        Q.    And so are you challenging, are you

22   challenging the receiver's damage calculation

23   methodology?

24              MR. SNYDER:  Objection, form.

25        A.    I don't challenge anybody.  I just