# EXHIBIT 10

STANFORD

EXHIBIT 10
WIT: Reed
DATE: 2-5-15
S. Klinger, RMR-CRR

STANFORD INTERNATIONAL BANK          REPORTE ANUAL    |  2007

EN STANFORD INTERNATIONAL BANK, NUESTRO SERVICIO PERSONALIZADO, las relaciones con los clientes y una estrategia de inversión global que trasciende fronteras, es lo que nos permite la preservación e incremento del capital de nuestros clientes, contribuyendo a su seguridad financiera en cualquier clima económico.

DEDICACIÓN AL TRABAJO. VISIÓN CLARA. VALOR PARA EL CLIENTE.<sup>SM</sup> | *Preservación*

En Stanford International Bank, nuestra perspectiva de acción prudente se traduce en un enfoque en lo que podemos realizar a largo plazo y en descubrir nuevas oportunidades de inversión viables. Mediante el uso de investigación y un análisis minucioso, procuramos alcanzar metas realistas en materia de rentabilidad de la inversión y la preservación del patrimonio de nuestros clientes.



## FINANCIAL HIGHLIGHTS

(Expressed in thousands of United States dollars)

YEAR ENDED 31 DECEMBER 2007

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| **RESULTS** | | | |
| TOTAL REVENUE (see Figure 1) | $   789,479 | $   565,677 | $   431,731 |
| Interest Paid to Clients | 437,193 | 310,635 | 220,792 |
| Fees and Operating Expenses | 308,667 | 226,193 | 175,028 |
| Total Expenses | 745,860 | 536,828 | 395,820 |
| **EARNINGS** | $   43,619 | $   28,849 | $   35,911 |
| **CAPITAL** | | | |
| Shareholder's Equity | $   354,922 | $   311,303 | $   282,454 |
| Percent of Total Assets* | 5.03% | 5.83% | 6.96% |
| Percent of Total Client Deposits* | 5.31% | 6.21% | 7.51% |
| **YEAR-END BALANCES** | | | |
| TOTAL ASSETS (see Figure 2) | $ 7,057,883 | $ 5,336,317 | $ 4,059,114 |
| TOTAL DEPOSITS (see Figure 2) | $ 6,689,964 | $ 5,010,084 | $ 3,763,011 |

*Based on year-end equity as a percentage of year-end balances of assets and client deposits.

Figure 1. **REVENUES**
Dollars (in millions)



Figure 2. **ASSETS AND DEPOSITS**
Dollars (in billions)



LA ESTRATEGIA DE INVERSIÓN DE STANFORD INTERNATIONAL BANK está
diseñada con el fin de minimizar el riesgo sistemático y no sistemático,
al mismo tiempo que se mantiene la liquidez, la eficiencia de nuestra
cartera (máximo rendimiento/mínimo riesgo), la flexibilidad de las
operaciones y las rentabilidades absolutas.

DEDICACIÓN AL TRABAJO. **VISIÓN CLARA.**
VALOR PARA EL CLIENTE.[SM]                    *Crecimiento*

Administramos prudentemente en pos de rentabilidades absolutas
en vez de rentabilidades relativas en función de índices de referencia,
porque creemos que tener una visión clara significa que aún cuando el
mercado está en auge y todo sale bien, no debemos perder de vista lo
más importante – generar rentabilidad a largo plazo. Esa estrategia es
la razón por la cual el Banco ha tenido más de 20 años de crecimiento
consecutivo, sobrepasando los $6,000 millones en activos totales a
mediados de 2007 y los $7,000 millones a fin de año. Y es así como, con
un firme enfoque en previsión, seguridad y paz mental, que generamos
rentabilidades sólidas y constantes para nuestros clientes.





STANFORD INTERNATIONAL BANK va más allá de la metodología
tradicional de banca y crédito y ofrece un planteamiento perspicaz
e innovador – esencialmente, no permitimos que haya capital inactivo.
Ponemos el capital a trabajar, invirtiendo en lo que consideramos
que brindará las mejores oportunidades para nuestros clientes. Como
institución privada, nuestra prioridad principal es generar valor para
nuestros clientes. Nunca perdemos de vista las expectativas que los
clientes tienen de nuestra institución y anteponemos sus intereses y
sus altos rendimientos sobre cualquier otro interés.

DEDICACIÓN AL TRABAJO. VISIÓN CLARA.     |     *Seguridad*
VALOR PARA EL CLIENTE.<sup>SM</sup>

Creemos que generar valor para nuestros clientes genera valor en el
capital. Tanto el suyo como el nuestro. Es por eso que administramos
celosamente, para lograr un balance general sólido, un flujo de fondos
abundante y un capital con rendimiento estable. Además, nuestro
accionista único reinvierte cada dólar ganado en utilidades acumuladas;
un acto de previsión que ha fortalecido sostenidamente nuestra base
de capital para el crecimiento futuro. Y es por eso que podemos
pagar rendimientos constantes a nuestros clientes, año tras año,
independientemente de los altibajos del mercado.





Estimados Clientes y Amigos,

En nombre de la Junta Directiva, la gerencia y el personal de Stanford International Bank, me complace destacar los logros y metas alcanzadas durante los 22 años de operaciones del Banco.

En 2007 el Banco obtuvo ganancias récord, generó mayores ingresos que en ningún otro período en su historia y marcó un nuevo hito hacia fin de año al superar la marca de $7,000 millones en activos totales.

El año fiscal se inició con previsiones económicas sólidas de una economía global en crecimiento. Fueron pocos los que percibieron el enorme apalancamiento utilizado junto con la gran cantidad de deuda titularizada y suscrita por algunos de los bancos y firmas de inversión más respetados en el mercado norteamericano. La excesiva expansión del crédito y las decisiones de inversión con una perspectiva a corto plazo tomadas en años precedentes generaron una burbuja que estalló en junio. Desde entonces, se ha generado una constante corriente de noticias negativas relacionadas con la economía estadounidense. Todos hemos leído historias sobre las pérdidas multimillonarias que han sufrido bancos y firmas comisionistas de bolsa a raíz del desastre en el sector de deudas hipotecarias titularizadas. También vimos que estas grandes compañías han despedido a ejecutivos de alto nivel y a miles de empleados. El surgimiento de esta crisis crediticia global obligó a los bancos centrales a bajar las tasas de interés y a introducir liquidez masiva a beneficio de mercados financieros en dificultades.

CARTA DEL PRESIDENTE | *Descripción General*

Los rumores y temores acerca de un futuro incierto produjeron una caída en los índices de las bolsas mundiales de valores. Por momentos imperó el caos y la confusión. A esto se sumaron otros factores como la situación del mercado de viviendas familiares en EE.UU. colmado de embargos hipotecarios y decenas de miles de unidades sin vender en el segmento de condominios; el precio récord del petróleo; la guerra en Irak que llega a su sexto año y cuyo costo para la economía estadounidense se mide actualmente en billones de dólares; un creciente desequilibrio en la balanza comercial de EE. UU., a pesar de la depreciación del dólar; los efectos adversos del cambio climático en el mundo; la divergencia en los precios de productos básicos e insumos; y el encarecimiento sin precedentes de los alimentos en todo el mundo, con 89 naciones que se encuentran actualmente en plena crisis alimenticia según un informe de las Naciones Unidas, dejan en claro que los Estados Unidos de América podría ir camino a una recesión.

¿Cuánto durará, cuán severa será y en qué medida repercutirá esta recesión en el resto del mundo? Nadie lo sabe a ciencia cierta. Sin embargo, se ven aspectos positivos. Sin duda, las economías productoras de petróleo del mundo gozan actualmente de niveles de prosperidad nunca antes vistos y existen otros segmentos de mercado en economías emergentes y desarrolladas que también muestran un desempeño satisfactorio. Pero para conocer y comprender estos mercados es preciso tener conocimiento íntimo de los mismos. Hay que trabajar con dedicación para comprender adecuadamente el riesgo y así poder tomar decisiones de inversión acertadas. Nunca existió, ni existirá, una forma fácil de hacer dinero. Se requiere disciplina, conocimiento, experiencia, una ardua labor y sentido común básico. Cuando la mayoría en nuestra industria tomó el camino fácil hacia ganancias aparentemente altas en el mercado de deuda titularizada, nosotros decidimos no seguir sus pasos. La razón por la cual Stanford International Bank logró evitar el desastre ocurrido en el sector de préstamos hipotecarios de alto riesgo (subprime) fue muy simple: como no podíamos definir el riesgo claramente, el potencial de rentabilidad dejó de

ser relevante. Hoy en día, algunos en nuestra industria luchan por sobrevivir, nuestro negocio en cambio registra crecimiento. Mientras otros en la industria han cambiado por completo su equipo gerencial y se ven forzados a desarrollar una nueva estrategia de negocios, nuestro equipo ejecutivo se mantiene intacto, al igual que nuestra filosofía de inversión de diversificación global. Mientras que otros, incluso los más grandes del mundo, se vieron obligados a tomar medidas extremas para recapitalizar sus balances, la liquidez general de Stanford International Bank y el capital efectivo en dinero (tier one) actualmente son más sólidos que nunca en nuestra historia.

Aunque nuestro mundo actual es muy diferente al mundo en que vivía mi abuelo cuando se inició la primera empresa Stanford en 1932, y la tecnología ha cambiado dramáticamente la forma en que vivimos y hacemos negocios, el viejo dicho de que "cuanto más cambian las cosas, más permanecen iguales" nunca ha comprobado ser más cierto. Por ser una empresa fundada en medio de la Gran Depresión, una época de desesperación y pesimismo, poseemos una íntima comprensión de cómo se pueden generar oportunidades que brinden importantes beneficios a largo plazo, inclusive durante el más severo ciclo de contracción económica. Esta demostrada y bien fundamentada filosofía, al momento de tomar decisiones de inversión y ofrecer asesoramiento de inversión les brindará beneficios a ustedes, nuestros clientes, especialmente hoy, durante estos tiempos de gran conmoción.

## RESULTADOS FINANCIEROS

Los sólidos resultados que registramos en 2007 hablan por sí mismos. El total de activos creció un 32.3 por ciento, alcanzando los $7,100 millones. Los depósitos crecieron un 33.5 por ciento, ascendiendo a $6,700 millones y el Banco registró una ganancia operativa récord de $43.6 millones. Al cierre del año fiscal, el monto del capital fue de $354.9 millones, lo que equivale a un incremento del 14 por ciento con relación a 2006. Las inversiones a valor razonable aumentaron en $1,400 millones para alcanzar los $6,300 millones, lo que representa un crecimiento del 28.6 por ciento comparado con el año anterior. Los ingresos totales fueron de $789.5 millones, que constituyen un crecimiento de 39.6 por ciento con respecto a 2006. Los ingresos por concepto de inversiones en 2007 llegaron a $641.8 millones, que representan el 81.3 por ciento de los ingresos totales, los cuales fueron superiores a los registrados en 2006 en un 33.9 por ciento. Los intereses pagados a depositantes en 2007 totalizaron $437.2 millones, o un 40.7 por ciento más que los intereses pagados sobre depósitos en 2006. Los saldos en efectivo del Banco totalizaron $627.3 millones al cierre de 2007, cifra 94.6 por ciento superior a la de 2006.

## MIRANDO HACIA EL FUTURO

Durante el primer trimestre de 2008, el Banco implementó Temenos T24, un sistema operativo de software bancario internacional de vanguardia que brinda a nuestros clientes acceso a información de sus cuentas en tiempo real, las 24 horas del día, los 7 días de la semana. El nuevo sistema permite que el Banco amplíe su oferta de productos y servicios en un ambiente aún más seguro.

Sir Courtney N. Blackman, Ph.D., quien por mucho tiempo ha sido miembro de la Junta Directiva y un prestigioso economista y ex director del Banco Central de Barbados, fue designado Vicepresidente de la Junta Directiva y asumirá mayores responsabilidades al presidir los Comités de Auditoría e Inversiones del Banco. Como he comentado en muchas oportunidades en el pasado, la Junta Directiva y los Asesores del Banco, que en su mayoría han acompañado al Banco en sus 22 años de trayectoria, han sido trascendentales en los éxitos cosechados y seguirán teniendo un papel fundamental en el futuro del Banco.

Por otra parte, hacia fines de 2008, las operaciones del Banco cumplirán con la normativa bancaria de Basilea II, la normativa bancaria más rigurosa del mundo.

Para finalizar, deseo agradecer a todos nuestros clientes por la confianza que han depositado en Stanford International Bank durante este último año. Tengan la plena seguridad de que los principios de dedicación al trabajo, visión clara y generación de valor para el cliente seguirán siendo la firme base de nuestra institución.  Será un gusto el continuar prestándoles nuestros servicios.

Atentamente,

Sir Allen Stanford
Presidente de la Junta Directiva

INCOME STATEMENT
(Expressed in United States dollars)

YEAR ENDED 31 DECEMBER 2007

| NOTE | | | 2007 | | 2006 |
|---|---|---|---|---|---|
| | **OPERATING INCOME** | | | | |
| 5 | NET INVESTMENT INCOME | $ | 641,775,996 | $ | 479,175,564 |
| | | | | | |
| | Interest Income | | 164,843,390 | | 86,441,691 |
| | Interest Expense | | 437,192,793 | | 310,634,646 |
| 6 | NET INTEREST INCOME/(EXPENSE) | $ | (272,349,403) | $ | (224,192,955) |
| | | | | | |
| | Fee Income | | 3,030,799 | | 1,545,734 |
| | Fee Expense | | 150,075,660 | | 107,454,298 |
| 7 | NET FEE INCOME/(EXPENSE) | $ | (147,044,861) | $ | (105,908,564) |
| | | | | | |
| 8 | Other Income/(Loss) | | (20,171,473) | | (1,485,877) |
| | TOTAL OPERATING INCOME (see Figure 3) | $ | 202,210,259 | $ | 147,588,168 |
| | | | | | |
| | **OPERATING EXPENSES** | | | | |
| 9 | Personnel Expenses | | 3,512,747 | | 2,796,766 |
| 10 | General and Administrative Expenses | | 154,226,063 | | 115,056,703 |
| 14 | Depreciation of Property and Equipment | | 852,885 | | 885,332 |
| | TOTAL OPERATING EXPENSES | $ | 158,591,695 | $ | 118,738,801 |
| | | | | | |
| | **OPERATING PROFIT** (see Figure 4) | $ | 43,618,564 | $ | 28,849,367 |

The notes on pages 12 to 31 are an integral part of these financial statements.



Figure 3. OPERATING INCOME
Dollars (in millions)



Figure 4. OPERATING PROFIT
Dollars (in millions)

## BALANCE SHEET

AT 31 DECEMBER 2007

*(Expressed in United States dollars)*

| NOTE | | 2007 | 2006 |
|---|---|---|---|
| | **ASSETS** | | |
| 11 | Cash and Balances with Other Banks | $ 627,822,483 | $ 322,887,339 |
| 12 | Financial Assets at Fair Value | 6,347,631,574 | 4,935,651,097 |
| 13 | Loans and Advances to Clients | 69,732,601 | 64,626,474 |
| 14 | Property and Equipment | 6,910,778 | 4,554,743 |
| 15 | Other Assets | 5,785,277 | 8,597,794 |
| | **TOTAL ASSETS** | $ 7,057,882,713 | $ 5,336,317,447 |
| | | | |
| | **LIABILITIES AND SHAREHOLDER'S EQUITY** | | |
| 16 | Deposits from Clients (see Figure 5) | 6,689,964,303 | 5,010,083,766 |
| 17 | Other Liabilities and Provisions | 12,996,649 | 14,930,484 |
| | **TOTAL LIABILITIES** | $ 6,702,960,952 | $ 5,025,014,250 |
| | | | |
| 18 | Share Capital | 10,000,000 | 10,000,000 |
| 18 | Share Premium | 103,500,000 | 103,500,000 |
| 19 | Retained Earnings (see Figure 6) | 241,421,761 | 197,803,197 |
| | **TOTAL SHAREHOLDER'S EQUITY** (see Figure 6) | $ 354,921,761 | $ 311,303,197 |
| | | | |
| | **TOTAL LIABILITIES AND SHAREHOLDER'S EQUITY** | $ 7,057,882,713 | $ 5,336,317,447 |

The notes on pages 12 to 31 are an integral part of these financial statements.



Figure 5. DEPOSITS FROM CLIENTS
Dollars (in billions)



Figure 6. EARNINGS AND EQUITY
Dollars (in millions)

Retained Earnings
Shareholder's Equity

## STATEMENT OF CHANGES IN EQUITY
(Expressed in United States dollars)

YEAR ENDED 31 DECEMBER 2007

|  | SHARE CAPITAL | SHARE PREMIUM | RETAINED EARNINGS | TOTAL SHAREHOLDER'S EQUITY |
|---|---|---|---|---|
| **AT 31 DECEMBER 2005** | $ 10,000,000 | $ 103,500,000 | $ 168,953,830 | $ 282,453,830 |
| Additional Contributions | 0 | 0 | 0 | 0 |
| Net Income for the Year | 0 | 0 | 28,849,367 | 28,849,367 |
| **AT 31 DECEMBER 2006** | $ 10,000,000 | $ 103,500,000 | $ 197,803,197 | $ 311,303,197 |
| Additional Contributions | 0 | 0 | 0 | 0 |
| Net Income for the Year | 0 | 0 | 43,618,564 | 43,618,564 |
| **AT 31 DECEMBER 2007** | $ 10,000,000 | $ 103,500,000 | $ 241,421,761 | $ 354,921,761 |

The notes on pages 12 to 31 are an integral part of these financial statements.

App. 164

## STATEMENT OF CASH FLOWS | YEAR ENDED 31 DECEMBER 2007
*(Expressed in United States dollars)*

| NOTE | | 2007 | | 2006 |
|---|---|---|---|---|
| | **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| 5 | Investment Income | $  641,775,996 | $ | 479,175,564 |
| 6 | Interest Received | 164,843,390 | | 86,441,691 |
| 6 | Interest Paid | (437,192,793) | | (310,634,646) |
| 7 | Fees Received | 3,030,799 | | 1,545,734 |
| 8 | Other Income/(Loss) | (20,171,473) | | (1,485,877) |
| | Cash Payments to Employees and Suppliers | (307,814,470) | | (225,307,767) |
| | **CASH FLOWS FROM OPERATING PROFITS** | $    44,471,449 | $ | 29,734,699 |
| | | | | |
| | **CHANGES IN OPERATING ASSETS AND LIABILITIES** | | | |
| 12 | Net (Increase) in Financial Instruments at Fair Value | (1,411,980,477) | | (1,180,885,992) |
| 13 | Net (Increase) in Loans and Advances to Clients | (5,106,127) | | (26,177,626) |
| 15 | Net (Increase)/Decrease in Other Assets | 2,812,516 | | (3,772,181) |
| 16 | Net Increase in Deposits from Clients | 1,679,880,537 | | 1,247,072,726 |
| 17 | Net Increase/(Decrease) in Other Liabilities | (1,933,835) | | 1,281,567 |
| | **NET CASH FLOWS FROM OPERATING ACTIVITIES** | $   308,144,063 | $ | 67,253,193 |
| | | | | |
| | **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| 14 | Purchase of Property and Equipment | (3,260,285) | | (1,205,939) |
| | Proceeds from Sale of Property and Equipment | 51,366 | | 365,151 |
| | **NET CASH FLOWS FROM INVESTING ACTIVITIES** | $     (3,208,919) | $ | (840,788) |
| | | | | |
| | **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| 18 | Contribution to Share Premium Account | 0 | | 0 |
| | Net Cash Flows from Financing Activities | $              0 | $ | 0 |
| | | | | |
| | Net Increase in Cash and Cash Equivalents | $   304,935,144 | $ | 66,412,405 |
| | | | | |
| | **CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR** | $   322,887,339 | $ | 256,474,934 |
| 11 | **CASH AND CASH EQUIVALENTS AT END OF YEAR** (see Figure 7) | $   627,822,483 | $ | 322,887,339 |

The notes on pages 12 to 31 are an integral part of these financial statements.

Figure 7. **CASH AND CASH EQUIVALENTS**
Dollars (in millions)



NOTES TO THE FINANCIAL STATEMENTS | YEAR ENDED 31 DECEMBER 2007
*(Expressed in United States dollars)*

## NOTE 1 - GENERAL INFORMATION

Stanford International Bank Limited ("the Bank") provides private banking services to the international market. The Bank has in excess of 50,000 clients from more than 100 countries around the world.  The Bank is registered under the International Business Corporations Act No. 28 of 1982 as amended ("the Act"). The Bank's activities are governed by the Act and by every other act currently in force concerning international business corporations and affecting the corporation in Antigua and Barbuda. The Bank is also regulated by the Financial Services Regulatory Commission (FSRC). International banks are subject to annual audits, regulatory inspections and licensing requirements by this body. The supervisory authority for money laundering and other financial crimes is the Office of National Drug and Money Laundering Control Policy (ONDCP). The FSRC and the ONDCP, although independent, work closely together.

These financial statements have been approved for issue by the Board of Directors on 18 April 2008.

## NOTE 2 - ACCOUNTING POLICIES

The principal accounting policies applied in the preparation of these financial statements are set out below.  These policies have been consistently applied to all years presented unless otherwise stated.

**2.1 BASIS OF PRESENTATION**
Stanford International Bank's financial statements have been prepared in accordance with International Financial Reporting Standards (IFRS). The financial statements have been prepared under the historical cost convention, as modified by the revaluation of financial assets held at fair value through profit or loss and all derivative contracts.

The preparation of financial statements in conformity with IFRS requires the use of certain critical accounting estimates. It also requires management to exercise its judgement in the process of applying the Bank's accounting policies. The areas involving a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the financial statements, are disclosed in Note 4.

The Bank has adopted the following IFRS, which are relevant to its operations.  All other standards do not currently apply to the Bank's operations.

| | |
|---|---|
| IFRS 7 | Financial Instruments: Disclosures |
| IAS 01 | Presentation of Financial Statements |
| IAS 07 | Cash Flow Statements |
| IAS 08 | Accounting Policies, Changes in Accounting Estimates and Errors |
| IAS 16 | Property, Plant and Equipment |
| IAS 18 | Revenue |
| IAS 21 | The Effects of Changes in Foreign Exchange Rates |
| IAS 24 | Related Party Disclosures |
| IAS 36 | Impairment of Assets |
| IAS 37 | Provisions, Contingent Liabilities and Contingent Assets |
| IAS 39 | Financial Instruments: Recognition and Measurement |

All changes in the accounting policies have been made in accordance with the provisions in the respective standards.

**2.2 FOREIGN CURRENCY TRANSLATION**
The financial statements are presented in United States dollars, which is the Bank's functional and presentation currency.

Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translations at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognized in the income statement. Translation differences on nonmonetary items, such as equities held at fair value through profit and loss, are reported as part of the fair value gain or loss.

**2.3 DERIVATIVE FINANCIAL INSTRUMENTS**
Derivatives are initially recognized at fair value on the date on which a derivative contract is entered into and are subsequently remeasured at their fair value. Fair values are obtained from quoted market prices in active markets, including recent market transactions and also from valuation techniques such as discounted cash-flow models and options-pricing models, as appropriate. All derivatives are carried as assets when fair value is positive and as liabilities when fair value is negative.

The best evidence of the fair value of a derivative at initial recognition is the transaction price (i.e., the fair value of the consideration given or received) unless the fair value of the instrument is evidenced by comparison with other observable current market transactions in the same instrument (i.e., without modification or repackaging) or based on a valuation technique whose variables include only data from observable markets.  When such evidence exists, the Bank recognizes profits on day one.

NOTES TO THE FINANCIAL STATEMENTS    CONTINUED
*(Expressed in United States dollars)*

The Bank uses the following derivative instruments and strategies for hedging and non-hedging purposes:

Financial futures contracts represent commitments to buy and sell underlying financial instruments in the future and are accounted for on a recognition and specific identity basis.

Forward foreign exchange contracts are agreements to buy or sell fixed amounts of currency at agreed rates of exchange on specific future dates.

Cross-currency swaps are agreements to exchange, and on termination of the swap, re-exchange principal amounts denominated in different currencies. Cross-currency swaps may involve the exchange of interest payments in one specified currency for interest payments in another specified currency for specific periods.

A currency option gives the buyer the right, but not the obligation, to buy or sell specified amounts of currency at agreed rates of exchange on or before a specified future date.

Interest-rate futures are typically exchange-traded documents to buy or sell a standard amount of a specified fixed-income security or time deposit at an agreed interest rate on a standard date.

A forward rate agreement gives the buyer the ability to determine the underlying rate of interest for a specified holding period commencing on a specified future date. There is no exchange of principal, and settlement is effected on the settlement date.  The settlement amount is calculated by reference to the difference between the contract rate and the market rate prevailing on the settlement date.

Interest-rate options give the buyer the right, but not the obligation, to fix the rate of interest on a future deposit or loan for a specified period and commencing on a specified future date.

Interest-rate caps and floors give the buyer the ability to fix the maximum or minimum rate of interest. There is no facility to deposit or draw down funds; instead the writer pays to the buyer the amount by which the market rate exceeds or falls short of the cap rate or the floor rate respectively. A combination of an interest-rate cap and floor is known as an interest-rate collar.

Equities options give the buyer the right, but not the obligation, to buy or sell specified amounts of equities or a basket of equities in the form of published indices.

## 2.4 INTEREST INCOME AND EXPENSE
Interest income and expense are recognized in the income statement for all instruments measured at amortized cost using the effective interest method.

The effective interest method is a method of calculating the amortized cost of a financial asset or a financial liability and of allocating the interest income or interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments or receipts through the expected life of the financial instrument or, when appropriate, through a shorter period to the net carrying amount of the financial asset or financial liability. When calculating the effective interest rate, the Bank estimates cash flows considering all contractual terms of the financial instrument (for example, prepayment options) but does not consider future credit losses. The calculation includes all fees and points that are an integral part of the effective interest rate, transaction costs and all other premiums or discounts that have been paid or received between parties to the contract.

Once a financial asset or a group of similar financial assets has been written down as a result of an impairment loss, interest income is recognized using the rate of interest utilized to discount the future cash flows for the purpose of measuring the impairment loss.

## 2.5 FEE INCOME
Commission and fees arising from negotiating or participating in the negotiation of a transaction for a third party – such as the arrangement of the acquisition of shares or other securities or the purchase or sale of businesses – are recognized on completion of the underlying transaction. Investment and other management advisory and service fees are recognized based on the applicable service contracts, usually on a time-apportionable basis. Asset management fees related to investment funds are recognized ratably over the period the service is provided. The same principle is applied for wealth management, financial planning and custody services that are continuously provided over an extended period of time.

## 2.6 INSURANCE
The insurance coverage of the Bank includes Property and Casualty, Worldwide Package, Vehicle, Workers' Compensation and Travel Accident coverage. Financial coverage includes Banker's Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability. The Bank also maintains Depository Insolvency coverage for its correspondent banks.

The Bank's insurance program is independently reviewed. The latest review was performed by Stogniew & Associates, an independent risk management consultant. The primary objective of each review is to provide assurance that the risk management and internal controls currently implemented minimize the Bank's exposure to loss. The most recent assessment stated that the Bank had reasonable internal controls and risk management systems in place and found no material weaknesses in these areas.

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
(Expressed in United States dollars)

## 2.7 FINANCIAL ASSETS

The Bank classifies its financial assets in the following categories: financial assets at fair value through profit or loss; loans and receivables; held-to-maturity investments; and available-for-sale financial assets. Management determines the classification of its investments at initial recognition.

Financial assets at fair value through profit or loss have two subcategories: financial assets held for trading and those designated at fair value through profit or loss at inception. A financial asset is classified in this category if acquired principally for the purpose of selling in the short term or if so designated by management. Derivatives are also categorized as held for trading unless they are designated as hedges.

Purchases and sales of financial assets at fair value through profit or loss are recognized on trade date – the date on which the Bank commits to purchase or sell the asset. Financial assets are derecognized when the rights to receive cash flows from the financial assets have expired or where the Bank has transferred substantially all risks and rewards of ownership.

Available-for-sale financial assets and financial assets at fair value through profit or loss are subsequently carried at fair value. Gains and losses arising from changes in the fair value of the "financial assets at fair value through profit or loss" category are included in the income statement in the period in which they arise. Interest calculated using the effective interest method is recognized in the income statement.

The fair values of quoted investments in active markets are based on current bid prices. If the market for a financial asset is not active (for unlisted securities), the Bank establishes fair value by using valuation techniques. These include the use of recent arm's-length transactions, discounted cash flow, option pricing models and other valuation techniques commonly utilized by market participants.

## 2.8 IMPAIRMENT OF FINANCIAL ASSETS

(a) Assets carried at amortized cost

The Bank assesses at each balance sheet date whether there is objective evidence that a financial asset or group of financial assets is impaired. A financial asset or a group of financial assets is impaired and impairment losses are incurred if, and only if, there is objective evidence of impairment as a result of one or more events that occurred after the initial recognition of the asset (a "loss event") and that loss event (or events) has an impact on the estimated future cash flows of the financial asset or group of financial assets that can be reliably estimated. Objective evidence that a financial asset or group of assets is impaired includes observable data that comes to the attention of the Bank about the following loss events:

(i) significant financial difficulty of the issuer or obligor;
(ii) a breach of contract, such as a default or delinquency in interest or principal payments;
(iii) the Bank granting to the borrower, for economic or legal reasons relating to the borrower's financial difficulty, a concession that the lender would not otherwise consider;
(iv) the growing probability that the borrower will enter bankruptcy or other financial reorganization;
(v) the disappearance of an active market for that financial asset because of financial difficulties; or
(vi) observable data indicating that there is a measurable decrease in the estimated future cash flows from a group of financial assets since the initial recognition of those assets, although the decrease cannot yet be identified with the individual financial assets in the group, including:
a. adverse changes in the payment status of borrowers in the group; or
b. national or local economic conditions that correlate with defaults on the assets in the group.

The Bank first assesses whether objective evidence of impairment exists individually for financial assets that are individually significant, and then individually or collectively for financial assets that are not individually significant. If the Bank determines that no objective evidence of impairment exists for an individually assessed financial asset, whether significant or not, it includes the asset in a group of financial assets with similar credit risk characteristics and collectively assesses them for impairment. Assets that are individually assessed for impairment and for which an impairment loss is or continues to be recognized are not included in a collective assessment of impairment.

If there is objective evidence that an impairment loss on loans and receivables or held-to-maturity investments carried at amortized cost has been incurred, the amount of the loss is measured as the difference between the asset's carrying amount and the present value of estimated future cash flows discounted at the financial asset's original effective interest rate. The carrying amount of the asset is reduced through the use of an allowance account and the amount of the loss is recognized in the income statement. As a practical expedient, the Bank may measure impairment on the basis of an instrument's fair value using an observable market price. The calculation of the present value of the estimated future cash flows of a collateralized financial asset reflects the cash flows that may result from foreclosure less costs for obtaining and selling the collateral, whether or not foreclosure is probable.

For the purposes of a collective evaluation of impairment, financial assets are grouped on the basis of similar credit risk characteristics (i.e., on the basis of the Bank's grading process that considers asset type, industry, geographical location, collateral type, past-due status and other relevant factors). Those characteristics are relevant to the estimation of future cash flows for groups of such assets by being indicative of the debtors' ability to pay all amounts due according to the contractual terms of the assets being evaluated. Future cash flows in a group of financial assets that are collectively evaluated for impairment are estimated on the basis of the contractual cash flows of the assets in the Bank and historical loss experience for assets with credit risk characteristics similar to those in the group. Historical loss experience is adjusted on the basis of current observable data to reflect the effects of current conditions that did not affect the period on which the historical loss experience is based and to remove the effects of conditions in the historical period that do not exist currently.

NOTES TO THE FINANCIAL STATEMENTS    CONTINUED
*(Expressed in United States dollars)*

Estimates of changes in future cash flows for groups of assets should reflect and be directionally consistent with changes in related observable data from period to period (for example, changes in unemployment rates, property prices, payment status or other factors indicative of changes in the probability of losses in the group and their magnitude). The methodology and assumptions used for estimating future cash flows are reviewed regularly by the Bank to reduce any differences between loss estimates and actual loss experience.

(b) Assets carried at fair value
The Bank assesses at each balance sheet date whether there is objective evidence that a financial asset or a group of financial assets is impaired. Impairment losses recognized in the income statement on equity instruments are not reversed through the income statement.

## 2.9 LOANS AND ADVANCES TO CLIENTS
Stanford International Bank does not expose its clients to the risks associated with commercial loans. The Bank's only form of lending is done on a cash-secured basis solely to existing clients. Loans and advances to clients are permitted up to 80 percent of deposits maintained by the client at the Bank. The deposits serve as guarantee to the loan and therefore no additional provision is needed to support a potential loan loss.

## 2.10 PROPERTY AND EQUIPMENT
Property and equipment includes land and buildings and is comprised mainly of offices. All property and equipment is stated at historical cost less depreciation. Historical cost includes expenditure that is directly attributable to the acquisition of the items.

Subsequent costs are included in the asset's carrying amount or are recognized as a separate asset. All other repairs and maintenance are charged to the income statement during the financial period in which they are incurred.

Land is not depreciated. Depreciation on other assets is calculated using the straight-line method to allocate their cost to their residual values over their estimated useful lives, as follows:

- Buildings                          20 years
- Leasehold Improvements    20 years, or over the period of the lease if less than 20 years
- Computer Equipment         5 years
- Furniture and Equipment    3–8 years
- Motor Vehicles                  5 years

The assets' residual values and useful lives are reviewed, and adjusted if appropriate, at each balance sheet date. Assets that are subject to amortization are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. An asset's carrying amount is written down immediately to its recoverable amount if the asset's carrying amount is greater than its estimated recoverable amount. The recoverable amount is the higher of the asset's fair value less costs to sell and value in use. Gains and losses on disposals are determined by comparing proceeds with the carrying amounts. These are included in the income statement.

## 2.11 LEASES
The leases entered into by the Bank are primarily operating leases for office space and equipment. Payments made by the Bank under operating leases are charged to the income statement on a straight-line basis as defined in the lease agreements in effect for the period. If an operating lease is terminated before the lease period has expired, any payment required to be made by the Bank as a penalty is recognized as an expense in the period in which termination takes place.

Income received by the Bank is recorded as rental income in the other income section of the income statement and is not part of the normal business of the Bank.

## 2.12 CASH AND CASH EQUIVALENTS
For the purposes of the cash flow statement, cash and cash equivalents comprise balances with less than three months' maturity from the date of acquisition, including cash and nonrestricted balances with central banks; treasury bills and other eligible bills; loans and advances to banks; amounts due from other banks; and short-term government securities.

## 2.13 SHARE CAPITAL
(a) Ordinary shares
All authorized shares have been issued, fully paid and carry a par value of $100 per share.

(b) Share premium
Contributions made by the shareholder in excess of the par value of the issued capital.

(c) Dividends
No dividends have been authorized or distributed. All excess earnings have been reinvested into the Bank.

## 2.14 COMPARATIVES
Where necessary, comparative figures have been adjusted to conform to changes in presentation in the current year.

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

# NOTE 3 - FINANCIAL RISK MANAGEMENT

## 3.1 STRATEGY IN USING FINANCIAL INSTRUMENTS

The strategy of the Bank is to efficiently manage its assets and liabilities. In this process, assets primarily consist of securities and, to a lesser degree, client credits that are matched in premium and timing. The Bank's assets are invested in a well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements.

The Bank's investment portfolio maintains a stable and well-balanced structure due to a high proportion of fixed-income investments and a diversified investment advisory network resulting in an optimum diversification process. There is a policy of maintaining sufficient liquidity, thus protecting longer-term investments with significant returns.

## 3.2 CREDIT RISK

The Bank takes on exposure to credit risk, which is the risk that a counterparty will be unable to pay amounts in full when due. Significant changes in the economy, or in the health of a particular industry segment that represents a concentration in the Bank's investments, could result in losses that are different from those provided for at the balance sheet date. Management therefore carefully manages its exposure to credit risk.

The Bank structures the levels of credit risk it undertakes by placing limits on the amount of risk accepted in relation to one borrower, or groups of borrowers, and to geographical and industry segments. Such risks are monitored on a revolving basis and subject to weekly review. Limits on the level of credit risk by product, industry sector and by country are approved quarterly by the Board of Directors.

The exposure to any one borrower is further restricted by sub-limits covering on- and off-balance sheet exposures, and daily delivery risk limits in relation to trading items such as forward foreign exchange contracts. Actual exposures against limits are monitored daily. Exposure to credit risk is managed through regular analysis of the ability of borrowers and potential borrowers to meet interest and capital repayment obligations and by changing these lending limits where appropriate. Exposure to credit risk is also managed in part by obtaining collateral and corporate and personal guarantees.

### (a) Derivatives
The Bank maintains strict control limits on net open derivative positions (i.e., the difference between purchase and sale contracts), by both amount and term. At any one time, the amount subject to credit risk is limited to the current fair value of instruments that are favorable to the Bank (i.e., assets where their fair value is positive), which in relation to derivatives is only a small fraction of the contract, or notional values used to express the volume of instruments outstanding. This credit risk exposure is managed as part of the overall exposures from market movements. Collateral or other security is not usually obtained for credit risk exposures on these instruments.

### (b) Credit-related commitments
The primary purpose of these instruments is to ensure that funds are available to a client as required. Guarantees and standby letters of credit – which represent irrevocable assurances that the Bank will make payments in the event that a client cannot meet its obligations to third parties – carry the same credit risk as loans. Documentary and commercial letters of credit that are written undertakings by the Bank on behalf of a client authorizing a third party to draw drafts on the Bank up to a stipulated amount under specific terms and conditions – are generally collateralized by compensating cash balances to which they relate and therefore carry less risk than a direct borrowing. Commitments to extend credit represent unused portions of authorizations to extend credit in the form of loans, guarantees or letters of credit.

## 3.3  GEOGRAPHICAL CONCENTRATIONS OF ASSETS, LIABILITIES AND OFF-BALANCE SHEET ITEMS

The Bank has a global investment strategy that ensures that rates are not directly affected by prevailing rates in any single market. The Bank's assets consist of established, quality companies, governments and agencies from around the world. The portfolio investments are leaders in particular fields, financially strong with demonstrated consistency in earnings. The Bank invests in companies, governments and agencies whose managements have proven demonstrated ability. Investments favored are those with global diversification.

Antigua and Barbuda, West Indies, is the Bank's domicile. The Bank has also maintained a representative office in Montreal, Canada, since December 2004. The Bank has in excess of 50,000 depositors and clients from more than 100 countries around the world. The Bank's certificates of deposit and other investment accounts are primarily denominated in U.S. dollars, British pounds/sterling, euros and Canadian dollars.

## 3.4 MARKET RISK

Capital preservation and steady annual flow of revenues is a specific objective of the investments. This objective is met by the investment methodology that pursues a minimization of risk (both systematically and unsystematically), liquidity (marketability), investment efficiency (highest return/minimum risk), operational flexibility and absolute, as opposed to index-linked, yields on investments. Risk is monitored and managed on a day-to-day basis, and a major part of this management is to remain widely diversified on an international scale. This objective is attained through diversification in asset classes (debt, equity, cash and hard assets), economic sectors (health, financials, energy, etc.), issuers (governments, multinationals, commercial banks, etc.), currencies (U.S. dollars, Swiss francs, Japanese yen, euros and other currencies), and geographical areas (United States, Switzerland, England, France, Austria, Australia, Asia/Pacific Rim, etc.). Furthermore, the Bank's investment policy specifies selling limits at 7 percent to 8 percent on the downside for equity holdings and monitors historical statistical information for diversified investments, such as funds, for exposure to risk.

App. 170

NOTES TO THE FINANCIAL STATEMENTS          CONTINUED
*(Expressed in United States dollars)*

The measurement techniques used to measure and control market risk are outlined below.

(a) Value at risk
The Bank applies a "value-at-risk" methodology (VAR) to its trading portfolios to estimate the market risk of positions held and the mathematical chance of maximum losses based upon a number of assumptions for various changes in market conditions and asset classes. The Board of Directors sets limits on the value of risk that may be accepted for the Bank that are monitored on a daily basis by the Bank's finance division.

VAR is a statistically based estimate of the potential loss on the current portfolio from significant market movements. It expresses the "maximum" amount the Bank might lose, but only to a certain level of confidence. There is therefore a specified statistical probability that actual loss could be greater than the VAR estimate. The VAR model assumes a certain "holding period" until positions can be closed (10 days). It also assumes that market moves occurring over this holding period will follow a similar pattern to those that have occurred over 10-day periods in the past. The Bank's assessment of past movements is based on historical data for the past five years. The Bank applies these historical changes in rates, prices, indices, etc. directly to its current positions − a method known as historical simulation. Actual outcomes are monitored regularly to test the validity of the assumptions and parameters/factors used in the VAR calculation.

The use of this approach does not prevent losses outside of these limits in the event of more significant market movements. The main purpose of VAR is risk management of a worse case occurrence within a certain level of confidence. As VAR constitutes an integral part of the Bank's market risk control regime, VAR limits are established by the Board of Directors annually for all trading portfolio operations. Actual exposure against limits is reviewed daily by the Bank's finance division. The quality of the VAR model is continuously monitored by back-testing the VAR results for trading books. All back-testing exceptions and any exceptional revenues on the profit side of the VAR distribution are investigated, and all back-testing results are reported to the Board.

(b) Stress tests
Stress tests provide an indication of the potential size of losses that could arise in extreme conditions. The stress tests carried out by the Bank's finance division include: risk factor stress testing, where stress movements are applied to each risk category; emerging market stress testing, where emerging market portfolios are subject to stress movements; and ad hoc stress testing, which includes applying possible stress events to specific positions or regions − for example, the stress outcome to a region following a currency peg break. The results of the stress tests are reviewed by senior management in each business unit and by the Board of Directors. The stress testing is tailored to the business and typically uses scenario analysis.

|  | 2 0 0 7  V A R | 2 0 0 6  V A R |
|---|---|---|
| Risk Potential | -4.40% | -4.85% |
| Probability | 5.00% | 5.00% |
| Maximum Drawdown | -1.88% | -2.34% |

As a bank, Stanford International Bank matches its assets and liabilities. However, most banks have portfolios that invest predominately in loans and credits and to a much lower degree in investable assets. The Bank's portfolio is primarily invested in investable assets with a minimal amount in cash-backed loans. The investment philosophy focuses on global diversification utilizing various products and sectors to minimize volatility while providing consistent returns. Achieving this balance is an integral component of portfolio management. As reflected in the above tables VAR figures for the Bank's 2006 portfolio had a 5 percent chance of having a maximum drawdown of -4.85 percent. The actual maximum drawdown during that year was -2.34 percent. For 2007 the Bank's portfolio had a 5 percent chance of a maximum drawdown of -4.4 percent. The actual maximum drawdown for 2007 was -1.88 percent. Both portfolio declines fall within our set of probable outcomes within a normal distribution curve. The decline in VAR from 2006 to 2007, was due to reduction in currency and equity market volatility. The reduction in equity volatility was primarily affected by the removal of 11 September 2001 data and its extreme volatility from the trailing five years of data used for the calculations.

These VAR figures were calculated independently from the underlying positions and historical market moves. The aggregate of the trading VAR results does not constitute the Bank's VAR due to correlations and consequent diversification effects between risk types and portfolio types. Also credit risk and currency risk are combined in the overall VAR analysis due to the interdependent nature of the portfolio's holdings and asset classes. This should give a clearer picture of actual risk.

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

### 3.5 CURRENCY RISK

The Bank takes on exposure to effects of fluctuations in the prevailing foreign currency exchange rates on its financial position and cash flows. The table below summarizes the Bank's exposure to foreign currency exchange rate risk at 31 December. Included in the table are the Bank's assets and liabilities at carrying amounts, categorized by currency.

### CONCENTRATIONS OF ASSETS, LIABILITIES AND OFF-BALANCE SHEET ITEMS

| At 31 December 2007 | US$ | € | £ | ¥ | OTHER | TOTAL |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Cash and Deposits with Other Banks | $ 504,078,060 | $ 52,285,974 | $ 44,519,296 | $ 0 | $ 26,939,153 | $ 627,822,483 |
| Financial Instruments at Fair Value | 4,755,807,798 | 860,137,548 | 45,424,724 | 66,148,793 | 620,112,711 | 6,347,631,574 |
| Loans and Advances to Clients | 68,752,433 | 704,748 | 275,420 | 0 | 0 | 69,732,601 |
| Property and Equipment | 6,910,778 | 0 | 0 | 0 | 0 | 6,910,778 |
| Other Assets | 5,273,018 | 47,765 | 274,331 | 0 | 190,163 | 5,785,277 |
| TOTAL ASSETS | $ 5,340,822,087 | $ 913,176,035 | $ 90,493,771 | $ 66,148,793 | $ 647,242,027 | $ 7,057,882,713 |
| | | | | | | |
| LIABILITIES AND SHAREHOLDER'S EQUITY | | | | | | |
| Deposits from Clients | 6,307,979,494 | 265,317,720 | 86,550,601 | 404,886 | 29,711,602 | 6,689,964,303 |
| Other Liabilities and Provisions | 12,994,005 | 0 | 0 | 0 | 2,644 | 12,996,649 |
| TOTAL LIABILITIES | $ 6,320,973,499 | $ 265,317,720 | $ 86,550,601 | $ 404,886 | $ 29,714,246 | $ 6,702,960,952 |
| | | | | | | |
| NET ON-BALANCE SHEET POSITION | $ (980,151,412) | $ 647,858,315 | $ 3,943,170 | $ 65,743,907 | $ 617,527,781 | $ 354,921,761 |
| Credit Commitments | $ 77,660,315 | $ 0 | $ 0 | $ 0 | $ 0 | $ 77,660,315 |
| | | | | | | |
| AT 31 DECEMBER 2006 | | | | | | |
| Total Assets | 2,779,672,897 | 730,096,421 | 413,038,900 | 439,766,513 | 973,742,716 | 5,336,317,447 |
| Total Liabilities | 4,772,911,379 | 172,993,563 | 65,434,350 | 0 | 13,674,958 | 5,025,014,250 |
| | | | | | | |
| NET ON-BALANCE SHEET POSITION | $ (1,993,238,482) | $ 557,102,858 | $ 347,604,550 | $ 439,766,513 | $ 960,067,758 | $ 311,303,197 |
| Credit Commitments | $ 61,961,521 | $ 0 | $ 0 | $ 0 | $ 0 | $ 61,961,521 |

### 3.6 CASH FLOW AND FAIR VALUE INTEREST RATE RISK

Cash flow and fair value interest rate risk is the risk that future cash flows of a financial instrument will fluctuate due to changes in market interest rates. The Bank takes on exposure to the effects of fluctuations in the prevailing levels of market interest rates on both its fair value and cash flow risks. The system of global interest rate risk monitoring rests almost solely on two points. Firstly, depositor payables in the form of fixed income products are paid a minimum interest rate that for the past two decades has ensured extremely low volatility and accounted for an incredible deposit base growth rate. Secondly, on the asset side, modern securities investment management systems are utilized and spread across multiple investment managers in several countries. The Board of Directors monitors interest rates on a quarterly basis.

### 3.7 LIQUIDITY RISK

The Bank is exposed to daily calls on its available cash resources from maturing deposits, current accounts and other drawdowns. The Bank monitors client account maturities on the daily management report. Then, based on this information, the treasury department ensures short-term deposits are made accordingly in laddered fiduciary or overnight deposits as deemed appropriate to cover liquidity needs. The Board of Directors sets limits on the minimum percentage of cash and cash-in-kind assets and liquidity to cover withdrawals at unexpected levels of demand.

Assets primarily consist of securities and, to a lesser degree, client credits that are matched in premium and timing. It is unusual for banks to be completely matched due to terms and types of products. An unmatched position potentially enhances profitability, but may increase the risk of losses.

The maturities of assets and liabilities, and the ability to replace liabilities as they mature, are important factors in assessing the liquidity of the Bank and its exposure to changes in interest rates and exchange rates.

Liquidity requirements to support calls under guarantees and standby letters of credit are considerably less than the amount of the commitment because the Bank does not generally expect the third party to draw funds under the agreement. The total outstanding contractual amount of commitments to extend credit does not necessarily represent future cash requirements, as many of these commitments will expire or terminate without being funded.

## NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
(Expressed in United States dollars)

| AT 31 DECEMBER 2007 | ASSETS UP TO 1 MONTH | 1–3 MONTHS | 3–6 MONTHS | 6–12 MONTHS | OVER 12 MONTHS | NON-INTEREST-BEARING | TOTAL |
|---|---|---|---|---|---|---|---|
| Cash and Balances with Other Banks | $ 627,322,483 | $ 0 | $ 0 | $ 0 | $ 0 | $ 500,000 | $ 627,822,483 |
| Financial Assets at Fair Value | 5,636,685,438 | 197,098,866 | 25,289,803 | 80,451,575 | 408,105,892 | 0 | 6,347,631,574 |
| Loans and Advances to Clients | 69,732,601 | 0 | 0 | 0 | 0 | 0 | 69,732,601 |
| Property and Equipment | 0 | 0 | 0 | 0 | 0 | 6,910,778 | 6,910,778 |
| Other Assets | 0 | 0 | 0 | 0 | 0 | 5,785,277 | 5,785,277 |
| TOTAL ASSETS | $ 6,333,740,522 | $ 197,098,866 | $ 25,289,803 | $ 80,451,575 | $ 408,105,892 | $ 13,196,055 | $ 7,057,882,713 |
| LIABILITIES | | | | | | | |
| Deposits from Clients | 480,040,692 | 530,340,338 | 716,474,596 | 1,107,864,300 | 3,855,244,377 | 0 | 6,689,964,303 |
| Other Liabilities | 0 | 0 | 0 | 0 | 0 | 12,996,649 | 12,996,649 |
| TOTAL LIABILITIES | $ 480,040,692 | $ 530,340,338 | $ 716,474,596 | $ 1,107,864,300 | $ 3,855,244,377 | $ 12,996,649 | $ 6,702,960,952 |
| NET LIQUIDITY GAP | $ 5,853,699,830 | $ (333,241,472) | $ (691,184,793) | $ (1,027,412,725) | $ (3,447,138,485) | $ 199,406 | $ 354,921,761 |
| AT 31 DECEMBER 2006 | | | | | | | |
| Total Assets | $ 4,459,272,893 | $ 51,283,001 | $ 15,366,000 | $ 55,867,001 | $ 740,876,015 | $ 13,652,537 | $ 5,336,317,447 |
| Total Liabilities | $ 383,888,899 | $ 446,715,265 | $ 213,738,713 | $ 1,203,585,335 | $ 2,762,155,554 | $ 14,930,484 | $ 5,025,014,250 |
| NET LIQUIDITY GAP | $ 4,075,383,994 | $ (395,432,264) | $ (198,372,713) | $ (1,147,718,334) | $ (2,021,279,539) | $ (1,277,947) | $ 311,303,197 |

### 3.8 CAPITAL MANAGEMENT

The Bank's objectives when managing capital, which is a broader concept than the "equity" on the face of balance sheets, are: (1) to comply with the capital requirements set by the regulator of the banking market where the Bank operates; (2) to safeguard the Bank's ability to carry on as a going concern so that it can continue to provide returns for clients and the shareholder and benefits for the stakeholders; and (3) to maintain a capital base to support the development of its business.

Capital adequacy and the use of regulatory capital are monitored routinely by the Bank's management, employing techniques based on the guidelines developed by the Basel Committee, as implemented by the FSRC for supervisory purposes. The required information is filed with the Regulatory Authority on a quarterly basis.

The Authority requires each bank to: (1) hold all the minimum level of the regulatory capital, and (2) maintain a capital ratio to assets at or above the minimum of 5 percent.

The Bank's regulatory capital as managed by its finance division is made up of share capital, share capital premium and retained earnings.

The table below summarizes the composition of regulatory capital and the ratios of the Bank for the two years ended 31 December 2007. During those two years, the Bank complied with all of the externally imposed capital requirements to which they are subject.

| Tier 1 Capital | 2007 | 2006 |
|---|---|---|
| Ordinary Share Capital | $     10,000,000 | $     10,000,000 |
| Share Premium | 103,500,000 | 103,500,000 |
| Retained Earnings | 241,421,761 | 197,803,197 |
| TOTAL QUALIFYING TIER 1 CAPITAL | $   354,921,761 | $   311,303,197 |
| TOTAL RISK-WEIGHTED ASSETS | $ 4,350,750,278 | $ 3,867,120,459 |
| Capital Ratio | 8.16% | 8.05% |

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

# NOTE 4 – CRITICAL ACCOUNTING ESTIMATES AND JUDGEMENTS IN APPLYING ACCOUNTING POLICIES

The Bank makes estimates and assumptions that affect the reported amounts of assets and liabilities within the next financial year. Estimates and judgments are continually evaluated and are based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

### 4.1 FAIR VALUE OF DERIVATIVES

The fair value of financial instruments that are not quoted in active markets are determined by using valuation techniques. Where valuation techniques (for example, models) are used to determine fair values, they are validated and periodically reviewed by qualified personnel independent of the area that created them. All models are certified before they are used, and models are calibrated to ensure that outputs reflect actual data and comparative market prices. To the extent practical, models use only observable data; however, areas such as credit risk (both own and counterparty), volatilities and correlations require management to make estimates. Changes in assumptions about these factors could affect reported fair values of financial instruments.

### 4.2 INCOME TAX

As a company formed under the Act, the Bank is exempt from all direct taxes with respect to any international trading, investment or commercial activity including withholding taxes and stamp duties.

### 4.3 LEGAL ACTIONS

At this time, there is no significant pending legal activity. In the normal course of business, the Bank is subject to legal actions. The Bank is not able to predict whether or not there will be an adverse effect on results of operations in a particular future period.

# NOTE 5 – NET INVESTMENT INCOME

|  | 2007 | 2006 |
|---|---|---|
| Equities | $ 269,717,040 | $ 286,972,011 |
| Fixed Income | 126,488,427 | 32,357,931 |
| Alternative | 163,011,443 | 74,456,110 |
| Precious Metals | 82,559,086 | 85,389,512 |
| **TOTAL** (see Figures 8 and 9) | **$ 641,775,996** | **$ 479,175,564** |

Figure 8. **INVESTMENT INCOME**
Dollars (in millions)



Figure 9. **INVESTMENT INCOME**



## NOTES TO THE FINANCIAL STATEMENTS   CONTINUED
(Expressed in United States dollars)

# NOTE 6 - NET INTEREST INCOME/(EXPENSE)

|  | 2007 | 2006 |
|---|---|---|
| **INTEREST INCOME** | | |
| Cash and Short-Term Funds | $   18,598,765 | $   14,000,508 |
| Investment Securities | 140,186,796 | 67,628,600 |
| Loans and Advances | 6,057,829 | 4,812,583 |
| TOTAL (see Figure 10) | $  164,843,390 | $   86,441,691 |
| | | |
| **INTEREST EXPENSE** | | |
| Banks and Clients | $  437,192,793 | $  310,634,646 |
| TOTAL (see Figure 11) | $  437,192,793 | $  310,634,646 |
| | | |
| NET INTEREST INCOME/(EXPENSE) | $  (272,349,403) | $  (224,192,955) |



Figure 10. INTEREST INCOME
Dollars (in millions)



Figure 11. INTEREST EXPENSE
Dollars (in millions)

App. 175

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

## NOTE 7 - NET FEE INCOME/(EXPENSE)

|  | 2007 | 2006 |
|---|---|---|
| **FEE INCOME** | | |
| Loan Processing Fees | $ 132,085 | $ 77,892 |
| Early Withdrawal Fees | 2,898,714 | 1,467,842 |
| TOTAL | $ 3,030,799 | $ 1,545,734 |
| | | |
| **FEE EXPENSE** | | |
| Bank Fees | 245,632 | 332,489 |
| Commissions | 618,890 | 161,414 |
| Credit Card Losses | 69,160 | 98,402 |
| Waived Annual Fees | 116,568 | 76,207 |
| Referral Fees | 149,025,410 | 106,795,786 |
| TOTAL | $ 150,075,660 | $ 107,454,298 |
| | | |
| NET FEE INCOME/(EXPENSE) | $ (147,044,861) | $ (105,908,564) |

Referral fees are paid to Stanford Group Company, Stanford Trust Company Limited and Stanford Group (Antigua) Limited. The fees are a percentage of the managed client investments and are negotiated annually.

## NOTE 8 - OTHER INCOME/(LOSS)

|  | 2007 | 2006 |
|---|---|---|
| Gain/(Loss) on Foreign Exchange | $ (20,209,739) | $ (1,756,255) |
| Gain/(Loss) on Disposal of Fixed Assets | (51,365) | 19,148 |
| Rental Income | 33,951 | 37,037 |
| Miscellaneous Income | 55,680 | 214,193 |
| TOTAL | $ (20,171,473) | $ (1,485,877) |

## NOTE 9 - PERSONNEL EXPENSES

|  | 2007 | 2006 |
|---|---|---|
| Wages and Salaries | $ 2,812,032 | $ 2,268,149 |
| Company Portion of Payroll Taxes | 165,159 | 139,248 |
| Employee Insurance | 105,363 | 77,035 |
| Employee Benefits | 380,419 | 258,803 |
| Personnel Recruitment, Training and Education | 49,774 | 53,531 |
| TOTAL | $ 3,512,747 | $ 2,796,766 |
| | | |
| Average Number of Employees During the Year | 75 | 65 |

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
(Expressed in United States dollars)

## NOTE 10 - GENERAL AND ADMINISTRATIVE EXPENSES

| | 2007 | 2006 |
|---|---|---|
| Rent and Maintenance of Offices and Equipment | $    540,455 | $   1,434,146 |
| Telephone, Telex and Fax | 534,965 | 712,353 |
| Mail and Delivery Services | 1,523,608 | 1,432,001 |
| Advertising and Promotion | 624,984 | 549,958 |
| Travel and Accommodations | 983,939 | 680,193 |
| Insurance | 1,513,444 | 1,566,638 |
| Management Fees (see Figure 12) | 142,699,711 | 105,882,842 |
| Directors' Emoluments | 175,550 | 97,500 |
| Information Technology | 323,540 | 259,928 |
| Professional Fees | 1,559,776 | 1,347,499 |
| Audit Fees | 60,650 | 66,000 |
| Other General and Administrative Expenses | 3,685,441 | 1,027,645 |
| **TOTAL** | **$ 154,226,063** | **$ 115,056,703** |

Management fees consist of expenses related to the marketing and service agreement in place with Stanford Financial Group Global Management, LLC. These services include treasury-related functions, establishing and implementing trading policy, client communications, research, marketing and branding, government and public relations, technology and other related administrative costs. The service agreement is negotiated annually and was renewed for the year 2007 on 29 December 2006.

Figure 12. **MANAGEMENT FEES**



## NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

### NOTE 11 - CASH AND BALANCES WITH OTHER BANKS

|  | 2007 | 2006 |
|---|---|---|
| Included in Cash and Cash Equivalents | $ 627,322,483 | $ 322,387,339 |
| Mandatory Reserve Deposits Placed with Local Entities | 500,000 | 500,000 |
| TOTAL | $ 627,822,483 | $ 322,887,339 |

Mandatory reserve deposits are not available for use in the Bank's day-to-day operations.

### NOTE 12 - FINANCIAL ASSETS AT FAIR VALUE

|  | | |
|---|---|---|
| Equity | $ 3,717,219,465 | $ 2,832,866,747 |
| Fixed Income | 1,182,339,462 | 1,146,887,233 |
| Alternative | 989,785,316 | 316,879,526 |
| Precious Metals | 458,287,331 | 639,017,591 |
| TOTAL (see Figures 13 and 14) | $ 6,347,631,574 | $ 4,935,651,097 |

Figure 13. FINANCIAL ASSETS



Figure 14. TOTAL FINANCIAL ASSETS
Dollars (in billions)



## NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
(Expressed in United States dollars)

### NOTE 13 - LOANS AND ADVANCES TO CLIENTS

|  | 2007 | 2006 |
|---|---|---|
| **Loans and Advances (see Figure 15)** | | |
| Loan Principal | $ 65,908,580 | $ 60,962,752 |
| Accrued Interest on Loans | 3,824,021 | 3,663,722 |
| **TOTAL** | **$ 69,732,601** | **$ 64,626,474** |
| **By Client Type (see Figure 16)** | | |
| Corporate | 45,252,393 | 39,581,519 |
| Private | 24,480,208 | 25,044,955 |
| **TOTAL** | **$ 69,732,601** | **$ 64,626,474** |
| **By Geographic Region (see Figure 17)** | | |
| North America | 3,291,023 | 3,356,037 |
| Central America | 32,655,197 | 30,378,904 |
| South America | 13,712,054 | 16,689,359 |
| Caribbean | 18,751,338 | 12,975,600 |
| Other | 1,322,989 | 1,226,574 |
| **TOTAL** | **$ 69,732,601** | **$ 64,626,474** |
| **By Type of Collateral** | | |
| Guarantees | **$ 69,732,601** | **$ 64,626,474** |



Figure 15. **LOANS AND ADVANCES**
Dollars (in millions)

Figure 16. **BY CLIENT TYPE**

Private 35.1%
Corporate 64.9%

Figure 17. **BY GEOGRAPHIC REGION**

Other 1.9%   North America 4.7%
Caribbean 26.9%
Central America 46.8%

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

## NOTE 14 - PROPERTY AND EQUIPMENT

| | LAND, BUILDING AND LEASEHOLD | COMPUTER AND SOFTWARE | FURNITURE AND EQUIPMENT | MOTOR VEHICLES | ARTWORK | WIP | TOTAL |
|---|---|---|---|---|---|---|---|
| **HISTORICAL COST** | | | | | | | |
| At 31 December 2006 | $ 5,929,162 | $ 2,503,712 | $ 1,187,958 | $ 242,734 | $ 53,592 | $ 683,411 | $ 10,600,569 |
| Additions | 72,376 | 297,639 | 133,669 | 17,890 | 0 | 2,738,711 | 3,260,285 |
| Disposals and Write-Offs | 0 | (84,194) | (238,168) | 0 | 0 | 0 | (322,362) |
| AT 31 DECEMBER 2007 | $ 6,001,538 | $ 2,717,157 | $ 1,083,459 | $ 260,624 | $ 53,592 | $ 3,422,122 | $ 13,538,492 |
| **DEPRECIATION** | | | | | | | |
| At 31 December 2006 | $ 3,514,177 | $ 2,006,764 | $ 432,521 | $ 88,234 | $ 4,130 | $ 0 | 6,045,826 |
| Additions | 338,552 | 386,041 | 76,388 | 46,919 | 4,985 | 0 | 852,885 |
| Disposals and Write-Offs | 0 | (82,699) | (188,298) | 0 | 0 | 0 | (270,997) |
| AT 31 DECEMBER 2007 | $ 3,852,729 | $ 2,310,106 | $ 320,611 | $ 135,153 | $ 9,115 | $ 0 | $ 6,527,714 |
| **CARRYING AMOUNT** | | | | | | | |
| 31 DECEMBER 2007 (see Figures 18 and 19) | $ 2,148,809 | $ 407,051 | $ 762,848 | $ 125,471 | $ 44,477 | $ 3,422,122 | $ 6,910,778 |
| **CARRYING AMOUNT** | | | | | | | |
| 31 DECEMBER 2006 (see Figure 18) | $ 2,414,985 | $ 496,948 | $ 755,437 | $ 154,500 | $ 49,462 | $ 683,411 | $ 4,554,743 |



Figure 18. PROPERTY AND EQUIPMENT
Dollars (in millions)



Figure 19. PROPERTY AND EQUIPMENT

## NOTE 15 - OTHER ASSETS

| | 2007 | 2006 |
|---|---|---|
| Accounts Receivable | $ 147,500 | $ 3,003,513 |
| Prepayments | 4,207,509 | 4,520,900 |
| Other Assets | 1,430,268 | 1,073,381 |
| **TOTAL** | $ 5,785,277 | $ 8,597,794 |

NOTES TO THE FINANCIAL STATEMENTS  |  CONTINUED

*(Expressed in United States dollars)*

# NOTE 16 - DEPOSITS FROM CLIENTS

**EXPRESS℠ ACCOUNTS**
Funds from these accounts are generally invested in short-term instruments and foreign currency deposits.

**PERFORMANCE℠ ACCOUNTS**
Funds from these accounts are generally invested in investment-grade bonds, securities and foreign currency deposits.

**CERTIFICATES OF DEPOSIT**
The certificates of deposit accounts will pay the interest rate stated at inception until maturity. Funds from these accounts are generally invested in investment-grade bonds, securities and foreign currency deposits.

**FLEXCD℠** – A certificate of deposit that accepts additional deposits and withdrawals (up to 25 percent of the balance and a maximum of four per year) without incurring early withdrawal penalties or additional fees. This product is available in most international currencies.

**FIXEDCD℠** – A certificate of deposit that does not accept additional deposits and withdrawals and is subject to early withdrawal penalties. This product is available in most international currencies.

**INDEX-LINKED CERTIFICATE OF DEPOSIT℠ (ILCD)** – A certificate of deposit that is linked to the performance of either the S&P 500 Index, the NASDAQ 100 Index or the Dow Jones Euro STOXX 50 Index. At term end, the depositor receives the initial amount invested plus a fixed interest rate or an index participation rate, whichever is greater. This product does not renew automatically, is only available in U.S. dollars and withdrawals are subject to an early withdrawal penalty.

|                                          |    | 2007          |    | 2006          |
| ---------------------------------------- | -- | ------------- | -- | ------------- |
| Express Accounts                         | $  | 159,023,555   | $  | 118,325,271   |
| Performance Accounts                     |    | 3,236,470     |    | 4,715,073     |
| FlexCD                                   |    | 1,622,986,167 |    | 1,392,764,570 |
| FixedCD                                  |    | 4,895,305,628 |    | 3,480,560,148 |
| Index-Linked Certificate of Deposit (ILCD) |  | 9,412,483     |    | 13,718,704    |
| **TOTAL** (see Figures 20 and 21)        | $  | 6,689,964,303 | $  | 5,010,083,766 |



Figure 20. CERTIFICATES OF DEPOSIT
AND CLIENT DEPOSITS
Dollars (in billions)

Figure 21. CERTIFICATES OF DEPOSIT

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
(Expressed in United States dollars)

|  | 2007 | 2006 |
|---|---|---|
| ACCRUED INTEREST COMPONENT OF CLIENT DEPOSITS AT 31 DECEMBER WERE: |  |  |
| Express Accounts | $ 53,990 | $ 31,438 |
| Performance Accounts | 0 | 1,233 |
| FlexCD | 81,730,215 | 61,508,068 |
| FixedCD | 308,801,188 | 184,751,974 |
| Index-Linked Certificate of Deposit (ILCD) | 483,591 | 997,916 |
| TOTAL | $ 391,068,984 | $ 247,290,629 |
|  |  |  |
| DEPOSITS PER ACCOUNT ON AN AVERAGE BASIS: |  |  |
| Express Accounts | $ 121,583,329 | $ 94,020,036 |
| Performance Accounts | 3,497,644 | 6,226,777 |
| FlexCD | 1,506,018,350 | 1,332,080,188 |
| FixedCD | 4,253,208,032 | 2,928,147,452 |
| Index-Linked Certificate of Deposit (ILCD) | 12,322,531 | 15,130,699 |
| TOTAL | $ 5,896,629,886 | $ 4,375,605,152 |

## NOTE 17 - OTHER LIABILITIES AND PROVISIONS

|  | 2007 | 2006 |
|---|---|---|
| Accounts Payable Trade | $ 2,644 | $ 107,069 |
| Accounts Payable to Related Parties | 12,421,752 | 12,811,568 |
| Other Liabilities | 572,253 | 2,011,847 |
| TOTAL | $ 12,996,649 | $ 14,930,484 |

## NOTE 18 - SHARE CAPITAL AND SHARE PREMIUM

|  | NUMBER OF SHARES AUTHORIZED | ISSUED | ORDINARY SHARES | SHARE PREMIUM | TOTAL |
|---|---|---|---|---|---|
| AT 31 DECEMBER 2005 | 100,000 | 100,000 | $ 10,000,000 | $ 103,500,000 | $ 113,500,000 |
| Additional Contributions | 0 | 0 | 0 | 0 | 0 |
| AT 31 DECEMBER 2006 | 100,000 | 100,000 | $ 10,000,000 | $ 103,500,000 | $ 113,500,000 |
| Additional Contributions | 0 | 0 | 0 | 0 | 0 |
| AT 31 DECEMBER 2007 | 100,000 | 100,000 | $ 10,000,000 | $ 103,500,000 | $ 113,500,000 |

All shares have a par value of $100.00 and have been fully paid.

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
(Expressed in United States dollars)

## NOTE 19 - RETAINED EARNINGS

|  | 2007 | 2006 |
|---|---|---|
| **MOVEMENTS IN RETAINED EARNINGS WERE:** | | |
| At 1 January | $   197,803,197 | $   168,953,830 |
| Net Profit for the Year | 43,618,564 | 28,849,367 |
| **AT 31 DECEMBER** (see Figure 22) | **$   241,421,761** | **$   197,803,197** |

Figure 22. RETAINED EARNINGS
Dollars (in millions)



Accumulated Earnings
Current Year Earnings

## NOTE 20 - CONTINGENT LIABILITIES AND COMMITMENTS

| | | |
|---|---|---|
| Guarantees and Standby Letters of Credit | $   77,660,315 | $   61,961,521 |

Letters of credit and guarantee documents issued by the Bank on behalf of clients are fully cash secured and do not represent a direct contingent liability or risk to the Bank.

NOTES TO THE FINANCIAL STATEMENTS | CONTINUED
*(Expressed in United States dollars)*

## NOTE 21 - RELATED-PARTY TRANSACTIONS

Stanford International Bank is a member of the Stanford Financial Group, which is a privately held global group of wholly owned, independently managed financial services companies founded by Lodis B. Stanford in 1932. Stanford's core businesses are wealth management for high-net-worth individuals and investment banking for institutions and emerging growth companies. Knowledgeable private and institutional investors have availed themselves of Stanford's global expertise in asset allocation strategies, investment advisory services, equity and fixed income research, international private banking and trust administration, commercial banking, investment banking, merchant banking, institutional sales and trading, real estate investment and insurance. Stanford serves clients from more than 100 countries on six continents.

A number of banking transactions are entered into with related parties in the normal course of business. These include but are not limited to loans, deposits and foreign currency transactions. The volumes of related-party transactions, outstanding balances at year end and related expenses for the year are as follows:

|  | 2007 | 2006 |
|---|---|---|
| DEPOSITS AT 31 DECEMBER | $ 41,883,288 | $ 24,413,129 |
| **EXPENSES** | | |
| Interest on Deposits | $ 1,971,553 | $ 1,349,126 |
| Rent | 124,355 | 970,069 |
| Referral Fees | 149,025,410 | 106,795,786 |
| Management Fees | 142,699,711 | 105,882,842 |
| **TOTAL** | $ 293,821,029 | $ 214,997,823 |
| Accounts Receivable Balance at 31 December | $ 147,500 | $ 3,003,513 |
| Accounts Payable Balance at 31 December | $ 12,421,752 | $ 12,811,568 |

Referral fee agreements exist between the Bank and Stanford Group Company, Stanford Trust Company Limited and Stanford Group (Antigua) Limited. The fee is a percentage of the managed client investment portfolio of each company and is negotiated annually.

A management fee agreement related to marketing and services exists between the Bank and Stanford Financial Group Global Management, LLC. The services include treasury-related functions, establishing and implementing trading policy, client communications, research, marketing and branding, government and public relations, technology and other related administrative services.

All Bank personnel are compensated in the same manner and no special benefits exist for management.

| Directors' Remuneration | $ 175,550 | $ 97,500 |
|---|---|---|

A listing of the members of the Board of Directors is shown on page 35 of this annual report.

NOTES TO THE FINANCIAL STATEMENTS   CONTINUED
*(Expressed in United States dollars)*

## NOTE 22 - INTERNATIONAL BUSINESS CORPORATIONS (IBC) ACT DISCLOSURE INFORMATION

Under authority of section 350 of the IBC Act, the Bank is required to disclose the following information as it pertains to the expenses that impact the national economy of Antigua and Barbuda.

|  | 2007 | 2006 |
|---|---|---|
| **OPERATING EXPENSES** (see Figures 23 and 24) |  |  |
| Salaries | $ 2,211,932 | $ 1,810,025 |
| Other Staff Cost | 1,300,816 | 904,298 |
| Vehicle Expense | 16,461 | 17,493 |
| Rent | 306,223 | 1,162,369 |
| Professional Fees | 289,465 | 218,638 |
| Electricity and Water | 232,498 | 219,094 |
| Telephone/Fax | 484,109 | 682,049 |
| Travel and Entertainment | 707,544 | 408,276 |
| General Office | 1,402,803 | 1,230,619 |
| Insurance | 212,954 | 87,077 |
| Management Fees – Local | 1,117,642 | 801,144 |
| Repairs and Maintenance | 156,170 | 258,895 |
| Subscriptions and Donations | 129,442 | 212,767 |
| Licenses and Permits | 100,639 | 43,135 |
| **TOTAL** | $ 8,668,698 | $ 8,055,879 |
|  |  |  |
| **CAPITAL EXPENSES** |  |  |
| Asset Purchases | $ 313,620 | $ 107,524 |



Figure 23. HEADQUARTERS EXPENSE
Dollars (in millions)



Figure 24. HEADQUARTERS EXPENSE

DEDICACIÓN AL TRABAJO. VISIÓN CLARA. VALOR PARA EL CLIENTE.[SM]   *Reportes*

REPORTS | AUDITORS' REPORT

We have audited the accompanying balance sheet of Stanford International Bank Limited as at 31 December 2007 and the related statements of income, changes in shareholder's equity and cash flows for the year then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with international auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatements. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We consider that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements are fair in all material respects, and they show a true position of the company as at 31 December 2007, and the results of its operations and its cash flow for the year in accordance with international financial reporting standards.

*Cashmen & Co*

C. A. S. Hewlett & Co. Ltd.
Chartered Accountants
St. John's Street, St. John's, Antigua
18 April 2008

MANAGEMENT | DIRECTORS, OFFICERS AND PROFESSIONAL ADVISORS

**BOARD OF DIRECTORS**

**Sir Allen Stanford**
Chairman of the Board

**James A. Stanford**
Chairman Emeritus

**Sir Courtney N. Blackman, Ph.D.**
Vice Chairman

**James M. Davis**
Chief Financial Officer

**O. Y. Goswick**
Investments

**Kenneth C. Allen, Q.C.**
Secretary and Treasurer

**Robert S. Winter**
Insurance

**BANK MANAGEMENT**

**Juan Rodriguez-Tolentino**
President

**Miguel Pacheco**
Senior Vice President

**Eugene Kipper**
Vice President

**Beverly M. Jacobs**
Vice President

**Bhanoo P. Persaud, ACCA**
Accounting Manager

**COMPLIANCE**

**Pedro E. Rodriguez, CRCM**
Vice President &
Senior Compliance Officer

**BANK REPRESENTATIVE OFFICE**

**Alain Lapointe**
Senior Vice President
1800 McGill College Ave., 30th Floor
Montreal, Quebec, Canada

**AUDITORS**

**C. A. S. Hewlett & Co. Ltd.**
Chartered Accountants
St. John's Street, St. John's, Antigua

**INSURANCE AND RISK MANAGERS**

**Bowen, Miclette & Britt, Inc.**
1111 North Loop West, Suite 400
P.O. Box 922022
Houston, Texas 77008

**Willis Limited**
10 Trinity Square
London 3C3P 3AX
United Kingdom

**BARRISTERS AND SOLICITORS**

**Hunton & Williams**
Barclays Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131



# EXHIBIT 11

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## OFFICE OF INSPECTOR GENERAL

### Case No. OIG-526

### Investigation of the SEC's Response to Concerns
### Regarding Robert Allen Stanford's Alleged Ponzi Scheme

### March 31, 2010

## **REDACTION KEY**

AC = Attorney-Client Privilege

DPP = Deliberative Process Privilege

LE = Law Enforcement Privilege

PII = Personal Identifying Information

PP = Personal Privacy

WP = Attorney Work Product

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

# Report of Investigation

### Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme

### Case No. OIG-526

# Table of Contents

INTRODUCTION AND BACKGROUND ........................................................................ 1

SCOPE OF THE OIG INVESTIGATION ...................................................................... 2

I.     E-MAIL SEARCHES AND REVIEW OF E-MAILS........................................... 2

II.    DOCUMENT REQUESTS AND REVIEW OF RECORDS ............................... 3

III.   TESTIMONY AND INTERVIEWS .................................................................... 4

RELEVANT STATUTES, RULES AND REGULATIONS ........................................... 10

EXECUTIVE SUMMARY ........................................................................................... 16

RESULTS OF THE INVESTIGATION ....................................................................... 29

I.     IN 1997, THE FWDO EXAMINATION STAFF REVIEWED
       STANFORD'S BROKER-DEALER OPERATIONS AND
       MADE A REFERRAL TO ENFORCEMENT DUE TO A
       CONCERN THAT ITS SALES OF CDs CONSTITUTED A
       PONZI SCHEME................................................................................................. 29

       A.     Two Years After Stanford Group Company Began
              Operations, the SEC Identified It as a Risk and a Target For
              an Examination Based on Suspicions That Its CD Sales
              Were Fraudulent....................................................................................... 29

       B.     After Conducting a Short Examination, the Examination
              Staff Concluded That Stanford Was Probably Operating a
              Ponzi Scheme .......................................................................................... 30

       C.     As a Result of Their Concerns That Stanford Was
              Operating a Ponzi Scheme, the Examination Staff Referred
              Their Stanford Findings to the Enforcement Staff.................................... 33

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

II.   EIGHT MONTHS AFTER THE EXAMINATION STAFF REFERRED STANFORD, THE ENFORCEMENT STAFF OPENED, AND QUICKLY CLOSED, A MATTER UNDER INQUIRY ................................................................................... 34

    A.   The 1998 Stanford MUI Was Likely Not Even Opened in Response to the Examination Staff's Referral, But in Response to a Concern From the U.S. Customs Department That Stanford Was Laundering Money ...................................................... 34

    B.   After Stanford Refused to Produce Documents, No Further Investigative Steps Were Taken ................................................................. 36

    C.   The Enforcement Staff Closed the 1998 Stanford MUI Three Months After It Was Opened .......................................................... 37

        1.   The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Was Not Warranted Because of the Lack of U.S. Investors ............................................. 38

        2.   The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Would Be Too Difficult Because of the Staff's Inability to Obtain Records From Antigua ...................................................................... 39

        3.   SGC's Outside Counsel, a Former Head Of The SEC's Fort Worth Office, May Have Assured Barasch That "There Was Nothing There" ...................................... 40

III.  IN 1998, THE FWDO EXAMINATION STAFF EXAMINED SGC'S INVESTMENT ADVISER OPERATIONS AND REACHED THE SAME CONCLUSION AS THE BROKER-DEALER EXAMINERS:  STANFORD'S CD SALES WERE PROBABLY FRAUDULENT .......................................................................... 42

    A.   The 1998 Examination Concluded That SGC's Sales of SIB CDs Were Not Consistent With SGC's Fiduciary Obligation to Its Clients Under the Investment Advisers Act ........................................................................................................... 44

    B.   The Enforcement Staff Failed to Consider the Investment Adviser Examiners' Concerns in Deciding Not to Investigate Stanford Further .................................................................... 46

App. 194

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

IV.   IN 2002, THE SEC EXAMINERS EXAMINED SGC'S
      INVESTMENT ADVISER OPERATIONS AGAIN AND
      REFERRED STANFORD TO ENFORCEMENT ........................................... 47

      A.   In the 2002 Examination, the Examiners Found That
           Stanford's CD Sales Had Increased Significantly, Which
           Led to Concerns That the Potential Ponzi Scheme Was
           Growing ...................................................................................... 47

      B.   The 2002 Examination Found That SGC Was Violating the
           Investment Advisers Act By Failing to Conduct Any Due
           Diligence Related to the SIB CDs ............................................. 50

      C.   During the 2002 Examination, the FWDO Enforcement
           Staff Received a Letter From the Daughter of an Elderly
           Stanford Investor Concerned That the Stanford CDs Were
           Fraudulent ................................................................................. 53

      D.   The FWDO Did Not Respond to the [Complainant 1] Letter and
           Did Not Take Any Action to Investigate Her Claims ............... 55

      E.   Although a Decision Was Made to Forward the [Complainant 1]
           Letter to the Texas State Securities Board, the Letter Was
           Never Forwarded ....................................................................... 56

      F.   In December 2002, the Examination Staff Referred Their
           Stanford Findings to the Enforcement Staff ............................. 56

      G.   Based on the Earlier Decision to Forward the [Complainant 1]
           Letter to the TSSB, the "Matter" Was Considered Referred
           to the TSSB Even Before the 2002 Examination Report
           Was Sent to Enforcement .......................................................... 57

      H.   The Enforcement Staff Did Not Open an Inquiry Into
           Stanford and Did Not Even Review the 2002 Examination
           Report ......................................................................................... 58

      I.   The Enforcement Staff Did Not Refer the 2002
           Examination Report Findings to the TSSB ............................... 59

      J.   In December 2002, the SEC Examination Staff Attempted
           to Interest the Federal Reserve in Investigating Stanford,
           But Concluded That the Federal Reserve Had [DPP]
           [DPP]        of Stanford ............................................................ 60

iii

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

V.  IN 2003, THE SEC ENFORCEMENT STAFF RECEIVED TWO COMPLAINTS THAT STANFORD WAS A PONZI SCHEME, BUT NOTHING WAS DONE TO PURSUE THOSE COMPLAINTS ................................................................ 63

    A.  Confidential Source in a Ponzi Scheme Case Filed By the SEC Noted Several Similarities Between That Case and Stanford's Operations ................................................ 63

    B.  An Anonymous Insider Warned That Stanford Was Operating "a Massive Ponzi Scheme" ...................................... 65

VI. IN OCTOBER 2004, THE EXAMINATION STAFF CONDUCTED A FOURTH EXAMINATION OF SGC IN ORDER TO REFER STANFORD TO THE ENFORCEMENT STAFF AGAIN ................................................................ 70

    A.  The Examination Staff Was Alarmed at the Increasing Size of the Apparent Ponzi Scheme, and Accordingly, Made Another Enforcement Referral of Stanford a "Very High Priority"................................................................ 70

    B.  The 2004 Examination Report Concluded That the SIB CDs Were Securities and Were Part of a "Very Large Ponzi Scheme" ................................................................ 72

    C.  The Examination Staff Conducted Significant Investigative Work During the Six Months From October 2004 Through March 2005 to Bolster Its Anticipated Enforcement Referral ................................................................ 74

    D.  In March 2005, Barasch and Degenhardt Learned of the Examination Staff's Work on Stanford and Told Them That it Was Not a Matter That Enforcement Would Pursue ............................ 79

VII. IN APRIL 2005, IMMEDIATELY AFTER BARASCH LEFT THE SEC, THE EXAMINATION STAFF REFERRED STANFORD TO ENFORCEMENT................................................................ 80

    A.  The Enforcement Staff Initially Reacted Enthusiastically to the Referral and Opened a MUI................................................ 83

    B.  By June 2005, the Enforcement Staff Had Decided to Refer the Matter to the NASD, Apparently as a Precursor to Closing the Matter.................................................... 86

iv

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

C.   In September 2005, the Enforcement Staff Decided to Close the Stanford Investigation, But the Examination Staff Fought to Keep the Matter Open ............................................................ 90

D.   In November 2005, the Head of the FWDO Enforcement Group Overruled Her Staff's Objections to Continuing the Stanford Investigation and Decided to Seek a Formal Order in Furtherance of That Investigation ........................................................ 95

VIII.  THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN "EMERGENCY ACTION" AGAINST SIB BASED ON CIRCUMSTANTIAL EVIDENCE THAT IT WAS OPERATING A PONZI SCHEME ......................................... 98

IX.   THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN ACTION AGAINST SGC'S BROKER-DEALER FOR VARIOUS VIOLATIONS OF THE FEDERAL SECURITIES LAWS ..................................................................... 103

X.    THE ENFORCEMENT STAFF DID NOT CONSIDER FILING AN ACTION UNDER THE INVESTMENT ADVISERS ACT THAT COULD HAVE POTENTIALLY SHUT DOWN SGC'S SALES OF THE SIB CDs .................................................................. 109

A.   The Issue of Whether the Stanford CDs Were Securities Was Irrelevant to an Action Against SGC For Violations of the Anti-Fraud Provisions of the Investment Advisers Act .................... 110

B.   The Enforcement Staff Did Not Consider Filing a Section 206 Case or Conducting a Section 206 Investigation ............................ 112

1.   The 2005 Referral Did Not Mention Section 206 .......................... 112

2.   Neither Cohen's nor Preuitt's November 2005 Memorandum Discussed a Section 206 Violation .......................... 113

3.   When the FWDO Staff Met With Addleman, She Was Unaware That SGC Was an Investment Adviser ................... 114

C.   The Enforcement Staff Could Have Filed a Section 206 Case With the Potential For Shutting Down SGC's Sales of the SIB CDs and/or Discovering Evidence of the Ponzi Scheme ................. 115

XI.   HAD THE SEC FILED AN ACTION EARLIER, SIGNIFICANT INVESTOR LOSSES COULD POTENTIALLY HAVE BEEN AVOIDED .............................................................................. 118

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

XII.  THE SEC ENFORCEMENT STAFF'S FAILURE TO BRING
      AN ACTION AGAINST STANFORD EARLIER WAS DUE,
      IN PART, TO THE STAFF'S PERCEPTION THAT THE
      CASE WAS DIFFICULT, NOVEL, AND NOT THE TYPE OF
      CASE FAVORED BY THE COMMISSION ................................... 121

      A.   Senior Enforcement Management Emphasized the Need
           For "Stats" ................................................ 121

      B.   The Pressure For "Stats" May Have Discouraged the Staff
           From Pursuing Difficult Cases ............................. 124

      C.   Ponzi Scheme Cases Were Disfavored by Senior
           Enforcement Officials ..................................... 128

      D.   The SEC Bureaucracy May Have Discouraged the Staff
           From Pursuing Novel Legal Cases ........................... 129

XIII. AFTER LEAVING THE SEC, BARASCH SOUGHT TO
      REPRESENT STANFORD IN CONNECTION WITH THE
      SEC INVESTIGATION ON THREE SEPARATE OCCASIONS
      AND DID REPRESENT STANFORD FOR A LIMITED
      PERIOD OF TIME ............................................... 131

      A.   In June 2005, Two Months After Leaving the SEC, Barasch
           Sought to Represent Stanford and Was Advised He Could
           Not Do So ................................................. 131

      B.   In September 2006, Stanford Retained Barasch to
           Represent it in Connection With the SEC's Investigation of
           Stanford, and Barasch Performed Legal Work on Behalf of
           Stanford .................................................. 137

      C.   In Late November 2006, After He Had Already Performed
           Legal Work on Stanford's Behalf, Barasch For the Second
           Time Sought SEC Approval to Represent Stanford and Was
           Again Told He Could Not Do So ............................. 142

      D.   Immediately After the SEC Sued Stanford on February 17,
           2009, Barasch Again Sought to Represent Stanford, This
           Time in the Litigation .................................... 145

CONCLUSION ......................................................... 149

vi

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

# EXECUTIVE SUMMARY

The OIG investigation found that the SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme, having come to that conclusion a mere two years after Stanford Group Company ("SGC"), Stanford's investment adviser, registered with the SEC in 1995. We found that over the next 8 years, the SEC's Fort Worth Examination group conducted four examinations of Stanford's operations, finding in each examination that the CDs could not have been "legitimate," and that it was "highly unlikely" that the returns Stanford claimed to generate could have been achieved with the purported conservative investment approach. Fort Worth examiners dutifully conducted examinations of Stanford in 1997, 1998, 2002 and 2004, concluding in each case that Stanford's CDs were likely a Ponzi scheme or a similar fraudulent scheme. The only significant difference in the Examination group's findings over the years was that the potential fraud grew exponentially, from $250 million to $1.5 billion.

While the Fort Worth Examination group made multiple efforts after each examination to convince the Fort Worth Enforcement program ("Enforcement") to open and conduct an investigation of Stanford, no meaningful effort was made by Enforcement to investigate the potential fraud or to bring an action to attempt to stop it until late 2005. In 1998, Enforcement opened a brief inquiry, but then closed it after only 3 months, when Stanford failed to produce documents evidencing the fraud in response to a voluntary document request from the SEC. In 2002, no investigation was opened even after the examiners specifically identified multiple violations of securities laws by Stanford in an examination report. In 2003, after receiving three separate complaint letters about Stanford's operations, Enforcement decided not to open an investigation or even an inquiry, and did not follow up to obtain more information about the complaints.

In late 2005, after a change in leadership in Enforcement and in response to the continuing pleas by the Fort Worth Examination group, who had been watching the potential fraud grow in examination after examination, Enforcement finally agreed to seek a formal order from the Commission to investigate Stanford. However, even at that time, Enforcement missed an opportunity to bring an action against SGC for its admitted failure to conduct any due diligence regarding Stanford's investment portfolio, which could have potentially completely stopped the sales of the Stanford International Bank ("SIB") CDs though the SGC investment adviser, and provided investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent. The OIG investigation found that this particular action was not considered, partially because the new head of Enforcement in Fort Worth was not apprised of the findings in the investment advisers' examinations in 1998 and 2002, or even that SGC had registered as an investment adviser, a fact she learned for the first time in the course of this OIG investigation in January 2010.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The OIG did not find that the reluctance on the part of the SEC's Fort Worth Enforcement group to investigate Stanford was related to any improper professional, social or financial relationship on the part of any former or current SEC employee.  We found evidence, however, that SEC-wide institutional influence within Enforcement did factor into its repeated decisions not to undertake a full and thorough investigation of Stanford, notwithstanding staff awareness that the potential fraud was growing.  We found that senior Fort Worth officials perceived that they were being judged on the numbers of cases they brought, so-called "stats," and communicated to the Enforcement staff that novel or complex cases were disfavored.  As a result, cases like Stanford, which were not considered "quick-hit" or "slam-dunk" cases, were not encouraged.

The OIG investigation also found that the former head of Enforcement in Fort Worth, who played a significant role in multiple decisions over the years to quash investigations of Stanford, sought to represent Stanford on three separate occasions after he left the Commission, and in fact represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so.

The first SEC examination of Stanford occurred in 1997, two years after SGC began operations and registered with the SEC, when the SEC Fort Worth Examination staff identified SGC as a risk and target for examination.  After reviewing SGC's annual audit in 1997, a former branch chief in the Fort Worth Broker-Dealer Examination group noted that, based simply on her review of SGC's financial statements, she "became very concerned" about the "extraordinary revenue" from the CDs and immediately suspected the CD sales were fraudulent.

In August 1997, after six days of field work in an examination of Stanford, the examiners concluded that SIB's statements promoting the CDs appeared to be misrepresentations.  The examiners noted that while the CD products were promoted as being safe and secure, with investments in "investment-grade bonds, securities and Eurodollar and foreign currency deposits" to "ensure safety of assets," the interest rate, combined with referral fees of between 11% and 13.75% annually, was simply too high to be achieved through the purported low-risk investments.

The branch chief concluded after the 1997 examination that the SIB CDs purported above-market returns were "absolutely ludicrous," and that the high referral fees SGC was paid for selling the CDs indicated they were not "legitimate CDs."  The Assistant District Administrator for the Fort Worth Examination program concurred, noting that there were "red flags" about Stanford's operations that caused her to believe it was a Ponzi scheme, specifically the fact that the "interest that they were purportedly paying on these CDs was significantly higher than what you could get on a CD in the United States."  She further concluded that it was "highly unlikely" that the returns Stanford claimed to generate could be achieved with the purported conservative investment approach.

17

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The examiners also were concerned about the recurring annual "trailer" or "referral" fee that SGC received from SIB for referring CD investors to SIB, which they viewed to be "oddly high" and suspicious.  This suspicion was heightened because the examiners found that SGC did not maintain books and records for the CD sales, and purported to have no actual information about SIB or the bases for the generous returns that the CDs generated, notwithstanding the fact that they were recommending the CDs to their clients and receiving these annual recurring fees for their referrals.

Further, the examiners made the surprising discoveries of a $19 million cash contribution that Robert Allen Stanford made personally to SGC in 1996, and of significant loans from SIB to Stanford personally, discoveries which the branch chief testified were red flags that made her assume that Stanford "was possibly stealing from investors."  In the SEC's internal tracking system, in which it recorded data about its examinations, the Broker-Dealer Examination group characterized its conclusion from the 1997 examination of SGC as "Possible misrepresentations.  Possible Ponzi scheme."

The OIG investigation found that in 1997, the examination staff determined that as a result of their findings, an investigation of Stanford by the Enforcement group was warranted, and referred a copy of their examination report to Enforcement for review and disposition.  In fact, when the former Assistant District Administrator for the Fort Worth Examination program retired in 1997, her parting words to the branch chiefwere, "keep your eye on these people [referring to Stanford] because this looks like a Ponzi scheme to me and some day it's going to blow up."

Despite the examiners' referral of their serious concern that SGC was part of a Ponzi scheme, the Enforcement staff did not open a matter under inquiry ("MUI") into the Stanford case until eight months later, in May 1998, and did so only after learning that another federal agency suspected Stanford of money laundering.  The OIG investigation further found the only evidence of any investigative action taken by Enforcement in connection with this MUI was a voluntary request for documents that the SEC sent SGC in May 1998.  We found that after Stanford refused to voluntarily produce numerous documents relating to SGC's referrals of investors to SIB, no further investigative steps were taken; after being opened for only three months, in August 1998, the MUI was closed.

Reasons provided by Enforcement as to why the inquiry was closed related to the lack of U.S. investors affected by the potential fraud and the difficulty of the investigation because it would have to obtain records from Antigua.  However, we found other, larger, SEC-wide reasons why the Stanford matter was not pursued, including the preference for "quick hit" cases as a result of internal SEC pressure, and the perception that Stanford was not a "quick hit" case.

The OIG investigation also found that in June 1998, while the Stanford MUI was open, the Investment Adviser Examination group in Fort Worth began another examination of SGC.  This investment adviser examination came to the same conclusions

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

as the broker-dealer examination, finding Stanford's "extremely high interest rates and extremely generous compensation" in the form of annual recurring referral fees, and the fact that SGC was so "extremely dependent upon that compensation to conduct its day-to-day operations," very suspicious.

The investment adviser examiners also noted during the 1998 examination the complete lack of information SGC had regarding the CDs and the SIB investment portfolio that purportedly supported the CDs' unusually high and consistent returns.  The examiners concluded that SGC had "virtually nothing" that "would be a reasonable basis" for recommending the CDs to its customers.  In fact, the examiners found that no one at SGC even maintained a record of all advisory clients who invested in the CDs. Accordingly, the examiners identified possible violations of SGC's fiduciary duty as an investment adviser to its clients, noting the affirmative obligation on the part of an investment adviser to employ reasonable care to avoid misleading clients, and that any departure from this fiduciary standard would constitute fraud under Section 206 of the Investment Advisers Act of 1940 ("Investment Advisers Act").

The OIG investigation found, however, that the Enforcement staff completely disregarded the investment adviser examiners' concerns in deciding to close the Stanford MUI, and there was no evidence that the Enforcement staff even read the investment advisers' 1998 examination report.  Notwithstanding this lack of Enforcement action, by the summer of 1998, it was clear that both the investment adviser and broker-dealer examiners "knew that [Stanford] was a fraud."

In November 2002, the SEC's investment adviser Examination group conducted yet another examination of SGC.  In the 2002 examination, the investment adviser examiners found that Stanford's operations had grown significantly in the four years since the 1998 Examination, from $250 million in investments in the purported fraudulent CDs in 1998, to $1.1 billion in 2002.  In 2002, these examiners identified the same red flags that had been noted in the previous two examinations:  "the consistent, above-market reported returns," which were "very unlikely" to be able to be achieved with "legitimate" investments, and the high commissions paid to SGC financial advisers for selling the SIB CDs without an understanding on the part of SGC as to what they were referring.

The investment adviser examiners also found that the list of investors provided by SGC was inaccurate, as the list they received from SGC of the CD holders did not match up with the total CDs outstanding based upon the referral fees SGC received in 2001. The examiners noted that although they did follow up with SGC about this discrepancy, they never obtained "a satisfactory response, and a full list of investors."

The 2002 Examination concluded that SGC was violating Section 206 of the Investment Advisers Act by failing to conduct any due diligence related to the SIB CDs. The 2002 Examination report stated:

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> A review of SGC's "due diligence" files for the SIB [CDs] revealed that SGC had little more than the most recent SIB financial statements (year end 2001) and the private offering memoranda and subscription documents. There was no indication that anyone at SGC knew how its clients' money was being used by SIB or how SIB was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC.

When the investment adviser examiners raised this issue with SGC, SGC markedly changed its representations to the SEC concerning its due diligence regarding SIB's CDs.  Previously, SGC represented that they essentially played no role in the investment decisions by SIB, but when challenged, SGC changed its story, and stated that they regularly visited the offshore bank, participated in quarterly calls with the Chief Financial Officer of the bank, and received quarterly information regarding the bank's portfolio allocations (by sector and percentage of bonds/equity), investment strategies, and top five equity and bond holdings.  SGC also told the examiners that information regarding the portfolio allocations was included in SGC's due diligence files.  Although the investment adviser examiners were surprised and suspicious about this discrepancy, and actually contemplated "drop[ping] by unannounced [at SGC] and ask[ing] to look at [the purported documents]," the OIG investigation found that the SEC did not follow up to obtain or review the newly-claimed due diligence information.

After the examiners began this third examination of Stanford, the SEC received multiple complaints from outside entities reinforcing and bolstering their suspicions about Stanford's operations.  However, the SEC failed to follow up on these complaints or take any action to investigate them.  On December 5, 2002, the SEC received a complaint letter from a citizen of Mexico who raised concerns similar to those the examination staff had raised.  The October 28, 2002 complaint from [Complainant 1] [Complainant 1] to the SEC Complaint Center raised several issues, including the considerably higher interest rate of the Stanford CDs when compared with that which other banks were offering, the fact that Stanford's returns were steady while other similar investments were significantly down, and noting that SIB's auditor was in Antigua without significant regulatory oversight.

While the examiners characterized [Complainant 1] concerns as "legitimate," the OIG investigation found that the SEC did not respond to the [Complainant 1] complaint and did not take any action to investigate her claims.  We found that while an SEC examiner drafted a letter to [Complainant 1] asking for additional information, he was told that Enforcement had decided to refer her letter to the Texas State Securities Board ("TSSB") and thus, never actually sent his draft letter to [Complainant 1].  However, the OIG investigation found that although there was an intention to forward the [Complainant 1] letter to the TSSB, there is no evidence that it was sent to the TSSB, either.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

In addition, the OIG investigation found that although the examiners met with Enforcement officials in late 2002 to attempt to convince Enforcement to open an investigation or even an inquiry into the 2002 Examination Report's findings, Enforcement staff declined to open a matter and likely never even read the 2002 Examination Report.  Moreover, even though the examiners were informed by Enforcement that the findings in the 2002 Examination Report were referred to the TSSB together with the ⬛Complainant 1⬛ letter, after interviewing officials from the Enforcement staff and the TSSB, we found that no such referral was made.

Thus, by 2003, it had been approximately six years since the SEC Examination staff had concluded that the SIB CDs were likely a Ponzi scheme.  During those six years, the SEC had conducted three examinations which concluded the Stanford fraud was ongoing and growing significantly, but no meaningful effort was made to obtain evidence related to the Ponzi scheme.

In 2003, the SEC Enforcement staff received two new complaints that Stanford was a Ponzi scheme, but the OIG investigation found that nothing was done to pursue either of them.  On August 4, 2003, the TSSB forwarded to the SEC a letter from ⬛Confidential Source⬛ ⬛Confidential Source⬛ in another Ponzi scheme action entitled ⬛PII⬛ ⬛PII⬛, which discussed several similarities between the ⬛PII⬛ Ponzi scheme and what was known at the time about Stanford's operations.  Before sending the letter to the SEC, the TSSB Director of Enforcement called the SEC to discuss the matter and informed the SEC that because ⬛PII⬛ was such a large fraud, he thought he needed to bring ⬛Confidential Source⬛ ⬛Confidential Source⬛'s concerns regarding Stanford Group to the SEC's attention.  While the ⬛Confidential Source⬛'s complaint was forwarded to a branch chief in Enforcement, no action was taken to follow up.

On October 10, 2003, the NASD forwarded a letter dated September 1, 2003, from an anonymous Stanford insider to the SEC's Office of Investor Education and Assistance ("OIEA") which stated, in pertinent part:

> STANFORD FINANCIAL IS THE SUBJECT OF A
> LINGERING CORPORATE FRAUD SCANDAL
> PERPETUATED AS A "MASSIVE PONZI SCHEME"
> THAT WILL DESTROY THE LIFE SAVINGS OF
> MANY; DAMAGE THE REPUTATION OF ALL
> ASSOCIATED PARTIES, RIDICULE SECURITIES
> AND BANKING AUTHORITIES, AND SHAME THE
> UNITED STATES OF AMERICA.

The OIG investigation found that while this letter was minimally reviewed by various Enforcement staff, Enforcement decided not to open an investigation or even an

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

inquiry, but to refer it to the Examination group for yet another examination.  The Enforcement branch chief explained his rationale as follows:

> [R]ather than spend a lot of resources on something that could end up being something that we could not bring, the decision was made to – to not go forward at that time, or at least to – to not spend the significant resources and – and wait and see if something else would come up.

It is not clear what the Enforcement staff hoped to gain by "wait[ing] [to] see if something else would come up" after the SEC had conducted three examinations of SGC finding that the SIB CDs were likely a Ponzi scheme and received three complaints about Stanford.  It is also not clear what purpose the Enforcement staff thought would be served by having the examiners conduct a fourth examination of SGC.

However, they ultimately did just that.  In October 2004, the Examination staff conducted its fourth examination of SGC.  In fact, the broker-dealer Examination staff initiated this fourth examination of Stanford solely for the purpose of making another Enforcement referral.  By October 2004, approximately seven years since the SEC's first examination of SGC, the SEC examiners found that SGC's revenues had increased four-fold, and sales of the SIB CDs accounted for over 70 percent of those revenues.  As of October 2004, SGC customers held approximately $1.5 billion of CDs with approximately $227 million of these CDs being held by U.S. investors.  The 2004 examination concluded that the SIB CDs were securities and part of a "very large Ponzi scheme."

The examiners analyzed the SIB CD returns using data about the past performance of the equity markets and found that they were improbable.  The examination staff concluded that SGC's sales of the SIB CDs violated numerous federal securities laws and rules, including NASD's suitability rule, material misstatements and failure to disclose material facts, in violation of Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"); failure to disclose to customers its compensation for securities transactions, in violation of Rule 10b-10 of the Exchange Act; and possible unregistered distribution of securities in violation of Section 5 of the Securities Act of 1933.

The 2004 Examination Report advocated that the SEC act against SGC for these violations, in part, because of the difficulties in proving that SIB was operating a Ponzi scheme.  One examiner stated that after the 2004 Examination, he believed it was incumbent on the SEC to do whatever it could to stop the growing fraud, noting, as follows, "although it may be difficult to prove that the offering itself is fraudulent, SGC has nonetheless committed numerous securities law violations which can be proved without determining the actual uses of the invested funds."

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The Examination staff also conducted significant investigative work during the seven months from October 2004 through April 2005 to bolster its anticipated Enforcement referral.  They reached out to the SEC's Office of Economic Analysis ("OEA") for assistance in taking the Examination staff's quantitative analysis of Stanford's historical returns "a step further."  However, OEA did not assist the examiners with any analysis of Stanford's returns.  The examiners also contacted an attorney in the SEC's Office of International Affairs ("OIA") for information regarding Antigua's regulation of Stanford.  In addition, they interviewed a former registered representative of SGC, who told them that the sale of SIB's CDs was a "Ponzi scheme."

However, in March 2005, senior Enforcement officials in Fort Worth learned of the Examination staff's work on Stanford and told them that it was not a matter that Enforcement would pursue.  A Special Senior Counsel in the Broker-Dealer Examination group made a presentation about her ongoing work on Stanford at a March 2005 quarterly summit meeting attended by the SEC, NASD, and state regulators from Texas and Oklahoma.  Immediately after her presentation, she recalled that she got "a lot of pushback" from both the head of the Fort Worth office and head of Enforcement who approached her and "summarily told [her] . . . [Stanford] was not something they were interested in."

As the examiners were preparing a formal referral memorandum to the Enforcement staff in an attempt to finally convince them to open an investigation, it was announced that the head of Fort Worth Enforcement was leaving the SEC.  Since he had made it "very clear … he wasn't going to accept [the Stanford referral]" at the March 2005 meeting, the examiners waited until he left the SEC to forward the referral to Enforcement.

The 2005 Enforcement Referral characterized the SIB CD returns as "too good to be true," noting that "from 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3% . . .[while] [t]he indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002."

The Enforcement staff initially reacted enthusiastically to the referral and opened a MUI.  They also contacted OIA to assist them in getting records from SIB in Antigua.  Further, the Enforcement staff sent questionnaires to U.S. and foreign investors in an attempt to identify clear misrepresentations by Stanford to investors.  However, by June 2005, the Enforcement staff had decided to refer the matter to the NASD, apparently as a precursor to closing the inquiry.  They had considered several options to obtain further evidence, including a request under the Mutual Legal Assistance in Criminal Matters Treaties, which were designed for the exchange of information in criminal matters and administered by the U.S. Department of Justice.  However, after the questionnaires revealed no valuable information, the only tangible action taken was the sending of a voluntary request for documents to Stanford.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On August 29, 2005, the Enforcement staff sent SIB its voluntary request for documents.  However, requesting voluntary document production from Stanford was a completely futile exercise.  Moreover, the Enforcement staff sent SIB the "standard request" six days *after* SIB's attorney "made it clear that SIB would not be producing documents on a voluntary basis."  The only reason for the staff's document request to Stanford was apparent in a July 2005 e-mail from the branch chief, stating as follows:

> I feel strongly that we need to make voluntary request for docs from bank.  If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.

The Enforcement staff sent the request even though it recognized that its efforts to obtain the requested documents voluntarily were "moot[]."

After Stanford refused to voluntarily produce documents that would evidence it was engaging in fraud, the SEC Enforcement staff was poised to close the Stanford investigation.  However, the Examination staff fought to keep the Stanford investigation open.  They appealed to the new head of Enforcement and considerable time was spent over the next few months in an internal debate in the Fort Worth office concerning whether to close the Stanford matter without investigation.  While the two sides debated whether to conduct an investigation, all agreed that Stanford was probably operating a Ponzi scheme.  One senior official noted, "[i]t was obvious for years that [Stanford] was a Ponzi scheme."

Finally, in November 2005, the new head of Fort Worth Enforcement overruled her staff's and her predecessor's objections to continuing the Stanford investigation and decided to seek a formal order in furtherance of that investigation.  However, the Enforcement staff rejected the possibility of filing an "emergency action" against SIB based on what they deemed circumstantial evidence that it was a Ponzi scheme.  They also decided that attacking Stanford's alleged Ponzi scheme indirectly by filing an action against SGC for violations of the NASD's suitability rule, or failures to disclose or other misrepresentations, would not be worthwhile.  Most significantly, the Enforcement staff did not even consider bringing an action against Stanford under Section 206 of the Investment Advisers Act, which establishes federal fiduciary standards to govern the conduct of investment advisers.  Such an action against SGC could have been brought for its *admitted* failure to conduct any due diligence regarding Stanford's investment portfolio based upon the complete lack of information produced by SGC regarding the SIB portfolio that supposedly generated the CDs returns.

Had the SEC successfully prosecuted an injunctive action against SGC for violations of Section 206, an anti-fraud provision, it could have completely stopped the sales of the SIB CDs though the SGC investment adviser.  Further, the filing of such an action against SGC could have potentially given investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent.  A Stanford

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Victims Coalition survey indicated that approximately 95% of 211 responding Stanford investors stated that knowledge of an SEC inquiry would have affected their decision to invest. One Stanford victim, who invested the money that she "saved through several years of business, nights working late and skipping vacations [she] could have taken with [her] family," said that had she "known that Stanford Group was ever under investigation by the SEC, [she] would not have bought at all." Indeed, the questionnaire that was sent out by Enforcement in June 2005 raised significant concerns among Stanford investors. A former vice president and financial adviser at Stanford from 2004 through 2007 who later contacted the SEC with concerns about Stanford, said that his phone "lit up like a Christmas tree the morning [the SEC questionnaire] went out." However, after investors received the questionnaire about Stanford, many continued to invest because financial advisers told them that the fund had been given "a clean bill of health" by the SEC. Stanford officials were able to persuasively represent that Stanford had been given this "clean bill of health" because in fact, Stanford had been examined on multiple occasions and only been issued routine deficiency letters which they purportedly remedied. However, had a Section 206 action been commenced in 2005, it could have put many of Stanford's victims on notice that there were regulatory concerns about their investments.

The other significant benefit of bringing an action under Section 206 of the Investment Advisers Act (which the SEC eventually did when it filed its complaint in 2009) was that it did not require that the fraud involve a security. DPP, WP

DPP, WP

DPP, WP

The OIG investigation found that the decision not to even consider a Section 206 action was based at least partially on the fact that the new head of Enforcement was unaware that the investment adviser Examination staff had done examinations of SGC in 1998 and 2002, and was unaware that SGC was a registered investment adviser when the staff briefed her on the matter in November 2005. In fact, she only learned that SGC had been a registered investment adviser during her OIG testimony in the course of this investigation in January 2010. Because the Enforcement staff was not familiar with the findings of the 1998 and 2002 investment adviser examinations, they were not aware that this option had been documented by the examiners on more than one occasion.

The OIG investigation also found evidence of larger SEC-wide reasons that the Stanford matter was not pursued over the years. We found that the Fort Worth Enforcement program's decisions not to undertake a full and thorough investigation of Stanford were due, at least in part, to Enforcement's perception that the Stanford case was difficult, novel and not the type favored by the Commission. The former head of the Fort Worth office told the OIG that regional offices were "heavily judged" by the number of cases they brought and that it was very important for the Fort Worth office to bring a high number of cases. This same person specifically noted that he personally had been "very outspoken" while at the SEC, but felt he was "bullet proof" because of the high number of cases that Fort Worth brought and, as a result, the Commission "could not get

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

rid of him."  The former head of Enforcement in Fort Worth also concurred that the

"number of cases [brought] were extremely important."  A Fort Worth Assistant Director who worked on the Stanford matter stated:

> Everybody was mindful of stats. …  Stats were recorded internally by the SEC in Washington. …  I think when I was assistant director, there was a lot of pressure to bring a lot of cases.  I think that was one of the metrics that was very important to the home office and to the regions.

The former head of the Examination program in Fort Worth testified that Enforcement leadership in Fort Worth "was pretty upfront" with the Enforcement staff about the pressure to produce numbers and communicated to the Enforcement staff, "I want numbers.  I want these things done quick."  He also testified that this pressure for numbers incentivized the Enforcement staff to focus on "easier cases" – "quick hits." Accordingly, as a result of the "pressure on people to produce numbers, … anything that didn't appear … likely … to produce a number in a very short period of time got pretty short shrift."  A former Fort Worth Examination branch chief also testified that the Enforcement staff "were concerned about the number of cases that they were making and that perhaps if it wasn't a slam-dunk case, they might not want to take it because they wanted to make sure they had enough numbers because that's what they felt the Commission wanted them to do."  The OIG investigation found that because Stanford "was not going to be a quick hit," Stanford was not considered as high priority of a case as easier cases.  The former branch chief in the Fort Worth broker-dealer Examination group testified that the Enforcement Assistant Director working on the Stanford matter "only wanted to bring cases that were slam dunk, easy cases."

In addition, according to the former head of the Fort Worth office, senior management in Enforcement at headquarters expressed concern to Fort Worth that they were bringing too many Temporary Restraining Order, Ponzi, and prime bank cases, which they referred to as "kick in the door and grab" cases, or "mainstream" cases.  Fort Worth was told to bring more Wall Street types of cases, like accounting fraud.  The former head of Enforcement in Fort Worth told the OIG that when he was hired to his position, Enforcement management in Washington, DC told him to clean up Fort Worth's inventory and repeatedly told him that Fort Worth's emphasis should be on accounting fraud cases.  He was cautioned that Fort Worth was spending way too much of its resources on "mainstream" cases, and that those resources would be better deployed on accounting fraud cases.  He specifically recalled that in November 2000, after Fort Worth brought several Ponzi scheme cases, he was told by a senior official in the Enforcement Division:  "[Y]ou know you got to spend your resources and time on financial fraud. What are you bringing these cases for?"

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The OIG investigation also found that the SEC bureaucracy may have discouraged the staff from pursuing novel legal cases.  The former head of the Fort Worth office confirmed that the arduous process of getting the SEC staff's approval in Washington, DC to recommend an Enforcement action to the Commission was a factor in deciding which investigations to pursue.  A former branch chief in the examination program stated that she believed that the desire of the Enforcement staff to avoid difficult cases was partly due to the challenges in dealing with the Commission's bureaucracy.

Finally, the OIG investigation revealed that the former head of Enforcement in Fort Worth, who played a significant role in numerous decisions by the Fort Worth office to deny investigations of Stanford, sought to represent Stanford on three separate occasions after he left the SEC, and represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so.

This former head of Enforcement in Fort Worth was responsible for:  (1) in 1998, deciding to close a MUI opened regarding Stanford after the 1997 broker-dealer examination; (2) in 2002, deciding to forward the [Complainant 1] complaint letter to the TSSB and deciding not respond to the [Complainant 1] complaint or investigate the issues it raised; (3) in 2002, deciding not to act on the Examination staff's referral of Stanford for investigation after its investment adviser examination; (4) in 2003, participation in a decision not to investigate Stanford after receiving [Confidential Source]'s complaint letter comparing Stanford's operations to the [PII] fraud; (5) in 2003, participating in a decision not to investigate Stanford after receiving the complaint letter from an anonymous insider alleging that Stanford was engaged in a "massive Ponzi scheme;" and (6) in 2005, informing senior Examination staff after a presentation was made on Stanford at a quarterly summit meeting that Stanford was not a matter they planned to investigate.

Yet, in June 2005, a mere two months after leaving the SEC, this former head of the Enforcement in Fort Worth e-mailed the SEC Ethics Office that he had been "approached about representing [Stanford] . . . in connection with (what appears to be) a preliminary inquiry by the Fort Worth office."  He further stated, "I am not aware of any conflicts and I do not remember any matters pending on Stanford while I was at the commission."

After the SEC Ethics Office denied his request in June 2005, in September 2006, Stanford retained this former head of Enforcement in Fort Worth to assist with inquiries Stanford was receiving from regulatory authorities, including the SEC.  He met with Stanford Financial Group's General Counsel in Stanford's Miami office and billed Stanford for his time.  Following the meeting, he billed 6.5 hours to Stanford on October 4, 2006, for, *inter alia*, "review[ing] documentation received from company about SEC and NASD inquiries."  On October 12, 2006, he billed Stanford 0.7 hours for a "[t]elephone conference with [Stanford Financial Group's General Counsel] regarding status of SEC and NASD matters."  In late November 2006, he called his former subordinate, the Assistant Director who was working on the Stanford matter in Fort

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Worth, who asked him during the conversation, "[C]an you work on this?" and who in fact told him, "I'm not sure you're able to work on this."  Near the time of this call, he belatedly sought permission from the SEC's Ethics Office to represent Stanford.  The SEC Ethics office replied that he could not represent Stanford for the same reasons given a year earlier and he discontinued his representation.

In February 2009, immediately after the SEC sued Stanford, this same former head of Enforcement in Fort Worth contacted the SEC Ethics Office a third time about representing Stanford in connection with the SEC matter – this time to defend Stanford against the lawsuit filed by the SEC.  An SEC Ethics official testified that he could not recall another occasion in which a former SEC employee contacted his office on three separate occasions trying to represent a client in the same matter.  After the SEC Ethics Office informed him for a third time that he could not represent Stanford, the former head of Enforcement in Fort Worth became upset with the decision, arguing that the matter pending in 2009 "was new and was different and unrelated to the matter that had occurred before he left."  When asked why he was so insistent on representing Stanford, he replied, "Every lawyer in Texas and beyond is going to get rich over this case.  Okay? And I hated being on the sidelines."

The OIG investigation found that the former head of Enforcement in Fort Worth's representation of Stanford appeared to violate state bar rules that prohibit a former government employee from working on matters in which that individual participated as a government employee.  Accordingly, we are referring this Report of Investigation to the Commission's Ethics Counsel for referral to the Office of Bar Counsel for the District of Columbia and the Chief Disciplinary Counsel for the State Bar of Texas, the states in which he is admitted to practice law.

We are also recommending that the Chairman carefully review this report's findings and share with Enforcement management the portions of this ROI that relate to the performance failures by those employees who still work at the SEC, so that appropriate action (which may include performance-based action, if applicable) is taken, on an employee-by-employee basis, to ensure that future decisions about when to open an investigation and when to recommend that the Commission take action are made in a more appropriate manner.  We are also recommending that the Chairman and Director of Enforcement give consideration to promulgating and/or clarifying procedures with regard to seven specific areas of concerns that we identify in the report.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

that while she was "still standing in the room where the presentation had been made," Barasch and Degenhardt approached her and "summarily told [her] … it was not something they were interested in."  *Id.* at 9-10; *see also* Prescott Testimony Tr. at 39-40. Prescott felt "blindsided" when Barasch and Degenhardt told her that Stanford "was not something that they wanted to pursue, that they had looked at [it] before."  Prescott Interview Tr. at 10.  She was "really taken by surprise that [Barasch and Degenhardt] would have already formed an opinion and that their minds appeared to be closed to it." *Id.*  Prescott explained further:

> It was a very perfunctory conversation, and it was very -- it was not a matter for -- it was not up for discussion.  I was being told. … And, you know, I just -- I felt a little bit – I don't know, I felt like I'd been put in an awkward position. … I had no idea what all had gone on, apparently, and here I though I'd turned in a good piece of work and was talking about it to significant players in the regulatory community, and I no sooner sit down, shut up and the meeting ended, but then I got pulled aside and was told this has already been looked at and we're not going to do it.

*Id.* at 12.  *See also* Prescott Testimony Tr. at 44-45, 56-58.  Preuitt described Degenhardt's and Barasch's "dismissive" reaction to Prescott's presentation as "very disheartening."  January 26, 2010 Preuitt Testimony Tr. at 33.[60]

## VII.   IN APRIL 2005, IMMEDIATELY AFTER BARASCH LEFT THE SEC, THE EXAMINATION STAFF REFERRED STANFORD TO ENFORCEMENT

Preuitt testified that because Barasch had made it "very clear … he wasn't going to accept [the Stanford referral]" at the March 2005 meeting, the Examination staff "waited till after he left the Commission … to go ahead and refer it over."  Preuitt Interview Tr. at 7-8; *see also, id.* at 13 ("[W]e waited until after [Barasch] left to actually send over the enforcement memo" in order "to avoid a repeat of before.").

On April 5, 2005, Preuitt e-mailed ███████████, an Assistant Director in Enforcement, the most recent draft of Prescott's referral memorandum – a March 14, 2005 Draft Memorandum from Victoria Prescott to Spencer Barasch[61] (the "2005

---

[60]   Barasch told the OIG that he had attended the March 2005 meeting with other regulators, but that he had "no recollection" of Prescott's presentation or a conversation with her about that presentation.  Barasch Interview Tr. at 49-50.

[61]   The March 14, 2005 draft referral memorandum that Preuitt sent ████ was addressed to Barasch.  *See* Exhibit 101.  On March 9, 2005, the SEC announced Barasch's departure.  *See* SEC Press Release No. 2005-34 (March 9, 2005), attached as Exhibit 112.  Barasch's last day at the SEC was April 14, 2005.  *See* SEC personnel record, attached as Exhibit 113.

(Footnote continued on next page.)

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Enforcement Referral"), attached as Exhibit 101; *see* April 5, 2005 E-mail from Julie Preuitt to ▮ENF Asst Dir 1▮, attached as Exhibit 114 at 3.  Preuitt's e-mail to ▮ENF Asst Dir 1▮ stated:

> Victoria [Prescott] put this together.  I think it does a great job of summarizing our concerns.  It has been looked at by Hugh [Wright], but not by anybody in enforcement.

> I don't think we can get the Bank (be clear when you read), but I do think that we can get the [broker-dealer] which will ultimately get the Bank.  A LOT of money involved.

*Id.*

The 2005 Enforcement Referral began with the following:

> An October 2004 examination of Commission-registered broker-dealer SGC, headquartered in Houston, Texas, has uncovered evidence suggesting that SGC and its affiliated company Stanford International Bank ("SIB") may be violating the securities laws.  Specifically, we are concerned that:

> - SGC is selling unregistered securities, possibly without a valid exemption;

> - SGC and SIB are making misrepresentations and/or inadequate disclosures regarding the unregistered offering(s), most notably to foreign investors;

> - SIB may be engaging in a fraudulent scheme (possibly either a money laundering and/or a Ponzi scheme) through the sales of the unregistered securities, and refuses to provide the staff with sufficient information to dispel this concern.

Exhibit 101 at 1.  It also stated, "As of October 2004, SGC customers held approximately $1.5 billion of CDs.  Approximately $227 million of these CDs were held by U.S. investors." *Id.*

---

Prescott testified that when she began drafting the referral memorandum, she had intended to send it to Barasch.  Prescott Testimony Tr. at 48-49.  However, the announcement of his departure changed that intention.  *Id.* at 47-50, 54-55.  Barasch told the OIG that he did not recall receiving the 2005 Enforcement Referral, and that he was certain that he never read it.  Barasch Interview Tr. at 47-48.  Barasch explained, because he had already announced that he was leaving the SEC for private practice by the date of the 2005 Enforcement Referral, March 14, 2005, he had recused himself from all new matters by that time, and he had been out of the office on leave a lot around that time.  *Id.* at 47-49.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The 2005 Enforcement Referral also stated:

> SGC claims that it keeps no records regarding the portfolios into which SIB places investor funds and that it cannot get this information from SIB.  Indeed, SGC has related to the Staff that SIB claims it cannot divulge the specifics of how it has used customers' deposits, based (variously) upon the bank secrecy laws of Antigua and SIB's own internal "Chinese Wall" policies with SGC.

*Id*. at 2 (footnotes omitted).

The 2005 Enforcement Referral characterized the SIB CD returns as "too good to be true," explaining:

> SIB's high interest rates are inconsistent with its claimed portfolio. …  Moreover, the Staff is equally suspicious of SIB's *recurring annual 3%* trailer.  We are unaware of any legitimate, short-term, low or no-risk investments that will pay a 3% concession every year an investor keeps his funds invested in any product.
> …
>
> [F]rom 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3%. This return seems remarkable when you consider that during this same time frame … [t]he indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002.  It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio.  For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002.

*Id*. at 5 (emphasis in original) (footnotes omitted).

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

A.      **The Enforcement Staff Initially Reacted Enthusiastically to the Referral and Opened a MUI**

The immediate reaction from the Enforcement staff to the Stanford referral was very positive.  On April 8, 2005, ██████ e-mailed Preuitt and Prescott:

> [T]his memo is terrific.  Very nicely done.
>
> Moreover, I agree with the preliminary legal conclusions in the memo, including the deduction that this almost certainly has to be fraudulent.
>
> I would like to get together with both of you and talk in greater depth about possible courses of action.  From a tactical standpoint, the international dimension concerns me because it limits our investigative powers.  The [broker-dealer] is domestic, of course, but I'm concerned that taking action only against the domestic [broker-dealer] will have a limited long-term effect on the whole apparently-criminal organization, most of which is overseas.  Moreover, the immediate impact on U.S. investors of an action against the domestic [broker-dealer] might not be favorable.

Exhibit 114.

Preuitt immediately responded to ██████ observations about the "international dimension" as follows:

> The problem is very interesting. We agree with many of your concerns.  Its a difficult choice.  It seems too difficult to go after the foreign entity so nothing happens or it seems too limiting to go after the US [broker-dealer] when we know the whole thing must be a fraud.  *As a result, we've just sat around for ten years fussing about what is going on at this firm/bank.*

*Id*. (emphasis added).

Although ██████ was very interested in the case, he did not have a staff attorney available, so on April 12, 2005 ██████ forwarded the referral to Jeffrey Cohen and ██████

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[ENF Asst Dir 2] the other two Assistant Directors in FWDO Enforcement, with the following explanation:

> I've reviewed this and spoken to Victoria and Julie, and I believe this case is worth pursuing.  Victoria's memo … does a good job of laying out the apparent violations.  If, after reviewing it, you find yourself wondering why I thought the case was worth pursuing, let me know.  I don't think that will be your reaction, but I'm happy to share my impression of this if it would be helpful. … One of the obvious logistical and jurisdictional problems with this case is the location of the issuer in Antigua.[62]

April 12, 2005 E-mail from [ENF Asst Dir 1] to Jeffrey Cohen, attached as Exhibit 115.  One day later, Cohen forwarded [ENF Asst Dir 1] e-mail to [ENF BC 3] a branch chief in Cohen's group, and asked, "[W]hat's [ENF Staff Atty 5] ] handling?  Does she have time for this one?"  *Id.*

On April 14, 2005, [ENF BC 3] e-mailed Prescott:

> Your memo was fantastic.  Will be very helpful going forward. [ENF Staff Atty 5] and I are opening MUI with hope of bringing case quickly (possibly [Temporary Restraining Order]).  May need some help from you and [other members of the Examination staff] to make it happen.[64]

April 14, 2005 E-mail from [ENF BC 3] to Victoria Prescott, attached as Exhibit 116.  On April 15, 2005, Cohen responded to [ENF Asst Dir 1] April 12, 2005 e-mail, "We've opened a MUI in [ENF Staff Atty 5] name."  April 15, 2005 E-mail from Jeffrey Cohen to [ENF Asst Dir 1] [ENF Asst Dir 1] attached as Exhibit 117 at 2.  Later the same day, Cohen e-mailed [ENF Asst Dir 1] that the Stanford matter "look[ed] promising."  *Id.* at 1.

---

[62] [ENF Asst Dir 1] testified that it was "almost impossible … if you're telling people you've got a CD and it's safe like a bank CD …  I don't know how anybody can generate returns in double digits while still offering that kind of security.  I mean, all of this is implausible." [ENF Asst Dir 1] Testimony Tr. at 29.

[63]  At that time, [ENF Staff Atty 5] was a FWDO Enforcement staff attorney.

[64]  [ENF BC 3] explained his initial reaction to the memorandum as follows:

> [T]here was the thought that this could have been a Ponzi scheme and that if, essentially, we could get kind of bank records that would reflect, you know, the money basically going in and then not being used for legitimate investment purposes but being used to kind of pay back prior investors, that, you know, we'd be able to bring a case quickly.

[ENF BC 3] Testimony Tr. at 20 [ENF BC 3] testified that he had hoped to bring a case quickly because it seemed as though the matter was an ongoing fraud and he wanted to stop it as quickly as possible.  *Id.* at 20-21.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Early in the investigation, the Enforcement staff contacted OIA to assist them in getting records from SIB in Antigua. ███ENF BC 3███ Testimony Tr. at 24.  In May 2005, the Enforcement staff sent questionnaires to U.S. and foreign investors in an attempt to identify clear misrepresentations by Stanford to investors.  June 3, 2005 E-mail from ███ENF BC 3███ to Jeffrey Cohen, attached as Exhibit 118; *see also* ███ENF BC 3███ Testimony Tr. at

Charles Rawl, a financial advisor at SGC from 2005 through 2007 who raised concerns about Stanford with the SEC in 2008, told the OIG in an interview that the investor questionnaires led to "significant concerns" by investors in the CDs.  Rawl and Tidwell Interview Tr. at 6-10.  Mark Tidwell, another financial advisor at SGC from 2004 through 2007, who later raised concerns about Stanford with the SEC, told the OIG that his phone "lit up like a Christmas tree" with client concerns after the questionnaires were sent out.  *Id.* at 8.

███DPP, WP, PII███████████████████████████████████

███ENF BC 3███ Testimony at 36.  Of course, as ███ENF BC 3███ and ███ENF Staff Atty 5███ acknowledged, until a Ponzi scheme begins to collapse, its victims are unsuspecting and not in a position to provide the SEC staff with evidence of the ongoing Ponzi scheme. ███ENF BC 3███ testified, "[U]nlike a lot of Ponzi schemes that have collapsed when you've got investors calling you and … they can't get their money out or there's clear misrepresentations … here … we just didn't have that."  *Id.* at 34. ███ENF BC 3███ further explained that while a Ponzi scheme is ongoing, it is difficult to get investors to complain about it because they are still getting paid.  *Id.* at 35. ███ENF Staff Atty 5███ testified that it was generally hard to bring a Ponzi scheme case before the Ponzi started to unravel because:

> [Y]ou don't have any witnesses, you don't have anybody complaining about anything going wrong, everybody is happy, so they are not particularly cooperative.  In fact, they are usually against us when we go in and talk to them, as was the case with a lot of the investors in Stanford. They were against us even meddling.

███ENF Staff Atty 5███ Testimony Tr. at 18-19.

As demonstrated below, after the Stanford investors failed to deliver any evidence that the Enforcement staff believed would have allowed them to bring a case against Stanford, the staff attempted to close the matter and refer it to the NASD.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

### B. By June 2005, the Enforcement Staff Had Decided to Refer the Matter to the NASD, Apparently as a Precursor to Closing the Matter.

[BD Exam BC 2] testified that at a meeting with Cohen and others shortly after the referral, Cohen was "not real excited" about the Stanford matter, and that Cohen expressed [DPP, WP] [DPP, WP] [BD Exam BC 2].[65] Testimony Tr. at 24-25. By June 2005, two months after opening the MUI, Enforcement's interest in the matter had waned.[66] On June 14, 2005 [Sen Cnsl], an attorney [PII] who was assisting the Enforcement staff with the Stanford matter, asked [ENF Staff Atty] for a "pithy email … explaining to [the Antiguan regulator] why our case is compelling." *See* June 14, 2005 E-mail from [Sen Cnsl] to [ENF Staff Atty 5], attached as Exhibit 124, at 2. [ENF Staff Atty 5] forwarded [Sen Cnsl] e-mail to [ENF BC 3] with the sarcastic comment, "Uhhh--yeah….we'll send a persuasive e-mail setting out why our case is so compelling…" *Id.* at 1 (ellipses in original). [ENF BC 3] responded jokingly, "Apparently he hasn't seen your closing memo." *Id.*

At June 21, 2005 quarterly regulators meeting, Cohen expressed pessimism about the viability of the SEC's investigation. *See* Minutes of June 21, 2005 Regulatory Coordination Meeting, attached as Exhibit 125. Attendees at the meeting included Degenhardt, Cohen, Prescott, Preuitt and a representative from NASD. *Id.* at 5. The minutes of that meeting memorialized Cohen's remarks as follows:

> Stanford – Jeff [Cohen] not optimistic about viable
> enforcement referral disclosure very cleverly crafted -
> impeccable for most part investors well off, enjoying
> returns -no concrete evidence of Ponzi

---

[65] There is some indication that Cohen might have spoken to Barasch about Stanford a few days after Barasch left the SEC and approximately one week after Cohen opened the MUI. As discussed above in footnote 63, Barasch's last day at the Commission was April 14, 2005. On Friday, April 22, 2005, a social function was held in Barasch's honor. *See* April 24, 2005 E-mail from Jeffrey Cohen to Harold Degenhardt, *et al.*, attached as Exhibit 119. At 6:35 p.m. on Sunday, April 24, 2005, Cohen e-mailed several SEC employees the remarks he had written for Barasch's party. *Id.* Four hours later, at 10:34 p.m. on Sunday April 24, 2005, Cohen e-mailed [ENF BC 3] "Must discuss this case with both of you ASAP—critical." April 24, 2005 E-mail from Jeffrey Cohen to [ENF BC 3], attached as Exhibit 120.

[66] On April 19, 2005, the SEC received from the Department of Labor's Occupational Safety & Health Administration (OSHA) a copy of a Sarbanes-Oxley whistleblower complaint from an individual alleging that he was terminated in reprisal for reporting illegal financial activities. *See* SEC Complaint/Tip/Referral database printout, Control Number 13639, attached as Exhibit 121. On June 21, 2005 [ENF Asst Dir 1] e-mailed Degenhardt about the FWDO's receipt of this whistleblower complaint, stating, "In rare cases, the referrals contain information that does justify follow-up, and this one appears to be an example of that. Stanford Group is a very problematic broker-dealer that has been the subject of enforcement investigations." June 21, 2005 E-mail from [ENF Asst Dir 1] to Harold Degenhardt, attached as Exhibit 122. [ENF Asst Dir 1] then sent an e-mail to [ENF BC 3] about the whistleblower complaint, stating, "This whistle blower [sic] may provide some valuable inside info on the firm that otherwise would be hard to get." June 21, 2005 E-mail from [ENF Asst Dir 1] to [ENF BC 3], attached as Exhibit 123. [ENF BC 3] testified that he did not recall talking to this complainant. [ENF BC 3] Testimony Tr. at 45-46.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> Trying to reach out to some foreign investors for more information.
>
> Calls it a CD when it's more like a hedge fund. Telling foreign investors there is no risk but American investors are being told there is complete risk. Moneys are being held in Stanford's Antigua Bank. The fee is not disclosed to foreigners and to US they are not told fees are reoccurring. …

*Id*. at 1-2.

A July 8, 2005 e-mail from [Sen Cnsl] to [ENF BC 3] discussed "[o]ptions to obtain [Stanford] bank documents."  July 8, 2005 E-mail from [Sen Cnsl] to [ENF BC 3], attached as Exhibit 126. [Sen Cnsl] summarized these options as follows:

> 1. MLAT[67] (Requires criminal interest, even soft interest, to make this request);[68]
>
> 2. Ask [the IRS attaché to Antigua] to lean on Leroy King;[69] and
>
> 3. Ask for the documents voluntarily from Stanford.

*Id*. at 2.

---

[67]   The SEC's intranet describes Mutual Legal Assistance in Criminal Matters Treaties ("MLATs") as follows:

> … MLATs are designed for the exchange of information in criminal matters and are administered by the US Department of Justice …  Despite the fact that MLATs are primarily arrangements to facilitate cross-border criminal investigations and prosecutions, the SEC may be able to use this mechanism in certain cases. …  US criminal interest in the matter may be required….  Notwithstanding the slowness of the process …, MLATs may be an effective mechanism to obtain assistance …"

*See* "Obtaining Documents And Testimony From Abroad," attached as Exhibit 127, at 3.

[68]   [ENF Staff Atty 5] testified that the staff drafted a MLAT request but it required "criminal interest, and … [t]he criminal authorities [the U.S. Department of Justice] wouldn't step up." [ENF Staff Atty 5] Testimony Tr. at 44-45.  Consequently, [ENF Staff Atty 5] testified that a MLAT request was not sent while she worked on the Stanford matter [in 2005 and 2006].  *Id*.

[69]   Leroy King was the Administrator and Chief Executive Officer of the Antigua Financial Services Regulatory Commission.  As discussed below, King has been indicted for criminal obstruction of the SEC's Stanford investigation.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[Sen Cnsl] e-mail prompted [ENF BC 3] to e-mail Prescott:

> I feel strongly that we need to make voluntary request for docs from bank.  If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.  As for MLAT, we probably should discuss further.  Talked to FBI agent in Houston who was aware of Standford [sic].[70] [DPP, WP] [DPP, WP] As for having [the IRS attaché to Antigua] lean on Leroy King, can't hurt.

*Id.* at 1.

In June 2005,[71] Degenhardt directed Prescott to refer the matter to the NASD.  *See* Prescott Interview Tr. at 31-32.  The decision to refer the matter to the NASD apparently was made within days of a meeting attended by, Degenhardt, Cohen and a NASD representative, during which Cohen expressed that he was "not optimistic about [a] viable enforcement referral."[72]

According to Prescott, Degenhardt did not give her "much in the way of explanation" for why he wanted the matter referred to the NASD.  *Id.*; *see also* Prescott

---

[70] [ENF BC 3] testified that he could not recall any discussions with the FBI regarding Stanford in 2005.  [ENF BC 3] Testimony Tr. at 52.

[71]   A June 29, 2005 draft of the NASD referral letter is attached as Exhibit 128.  The final referral letter that was sent to the NASD on July 21, 2005, is attached as Exhibit 129.  The letter included essentially the same information contained in the 2005 Enforcement Referral.  The letter noted, "SGC's admitted inability to get information from SIB about the investments underlying the CDs suggests that SGC may be violating NASD Rule 2310 (Suitability)."  Exhibit 129 at 2.

According to a September 2009 FINRA report released on October 2, 2009, the NASD conducted a routine examination of Stanford sometime in 2005.  *See* Report of the 2009 Special Review Committee on FINRA's Examination Program in Light of the Stanford and Madoff Schemes ("FINRA Report"), attached as Exhibit 130, at 18.  The lead examiner on FINRA's 2005 Stanford examination gave "special attention to the CD issue [because of] … substantial concerns in the Dallas office regarding the Stanford firm and the CD program in particular.  *Id.* at 20.  The lead examiner and his manager "decided that it made sense to take a broad look and 'see what we reel in.'"  *Id.*

[ENF Staff Atty 1] the former SEC Enforcement staff attorney who had worked on the SEC's 1998 MUI concerning Stanford, worked at FINRA [PII] and "joined the discussion on the CD issue" while the FINRA examiners prepared for their Stanford exam.  *Id.*; [ENF Staff Atty] Tr. at 33.  "From the moment she became involved in discussions regarding the CD aspect of the 2005 Stanford cycle exam, [ENF Staff Atty 1] reportedly expressed the view that the Stanford CDs were *not* 'securities' regulated under the federal securities laws, and were therefore outside of FINRA's jurisdiction."  Exhibit 120 at 20 (emphasis in original).

[72]   *See* Exhibit 125.  The meeting where Cohen made his pessimistic comments about the Stanford investigation occurred on June 21, 2005.  *Id.*  By June 29, 2005, Prescott had drafted the referral letter.  *See* Exhibit 128.

88

App. 220

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Testimony Tr. at 68 ("[T]he case was being referred to the NASD because we were instructed to do so, and my recollection is that came from Hal Degenhardt….").

Prescott testified that she had been "unhappy" about the decision to refer the Stanford matter to the NASD.  Prescott Testimony Tr. at 68.  Prescott "felt like that it was unlikely that the NASD would be able to be able to create the same kind of result that we could here at the Commission."  *Id*.  She "wanted to see [the SEC] work the case."  *Id*. at 68-69.

Prescott's "impression and understanding was that we were referring it to the NASD because we would not be working it."  *Id*. at 69.  Prescott explained that Degenhardt's "intent was probably to [shut down the investigation].  But in the meantime we kept arguing and lobbying for it here, Julie [Preuitt] taking the lead, and I was assisting her with that.  Julie [Preuitt] is pretty relentless when she decides something needs to happen.  And so she was continuing to lobby and talk to people."  Prescott Interview Tr. at 33.

Preuitt also told the OIG that the NASD referral had been made because Enforcement was "trying to get rid of it."  Preuitt Interview Tr. at 9.  As discussed in Section XII, the OIG investigation found that Enforcement was reluctant to take these types of cases for a variety of reasons, including:  the difficulties in obtaining approval from the SEC staff in Washington, DC to pursue novel investigations; the pressure in the FWDO to bring a lot of cases; the preference for "quick hit" cases as a result of that pressure; and the fact that Stanford was not a "quick hit" case.  Preuitt testified that referring the matter to the NASD was "ludicrous," and "after the referral was made I just pretended like it had never happened."  January 26, 2010 Preuitt Testimony Tr. at 44.

By mid-August 2005, the Enforcement staff had apparently conveyed to ⬛⬛⬛ their intention to close the matter because Stanford was refusing to voluntarily produce documents.  In an August 17, 2005 e-mail from ⬛⬛ to ⬛⬛ discussing OIA's comments regarding a draft request for documents, ⬛⬛

> As this letter may mark the end of your investigation, I
> think it makes sense that we think long and hard about the
> type of letter we wish to send.

August 17, 2005 E-mail from ⬛⬛⬛ to ⬛⬛ , attached as Exhibit 131.

In late August 2005, the Enforcement staff sent SIB a voluntary request for documents.  *See* September 1, 2005 E-mail from ⬛⬛ to Jeffrey Cohen, attached as Exhibit 132.  However, requesting voluntary document production from Stanford was a completely futile exercise. ⬛⬛ noted in his August 17, 2005 e-mail, the ineffectiveness of sending Stanford "a letter that relies on the good will of the recipient." Exhibit 131.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Moreover, the Enforcement staff sent SIB this "standard" request six days *after* SIB's attorney "made it clear that SIB would not be producing documents on a voluntary basis."  *See* August 23, 2005 E-mail from ███████ to ███████, attached as Exhibit 133.  The Enforcement staff sent the request even though it recognized that its efforts to obtain the requested documents voluntarily were "moot[]."  *Id.*

The reason behind the staff's document request to Stanford was apparent in a July 10, 2005 e-mail from ███████ to Victoria Prescott as follows:

> I feel strongly that we need to make voluntary request for docs from bank.  If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.

Exhibit 126.

It is not clear why the Enforcement staff would have expected Stanford to produce documents evidencing that it was operating a Ponzi scheme.  In this instance, the staff knew that the request was futile, but decided to send it anyway so as not to later appear foolish.  As discussed below, their decision to close the matter was overruled by new senior management in the FWDO.

### C.   In September 2005, the Enforcement Staff Decided to Close the Stanford Investigation, But the Examination Staff Fought to Keep the Matter Open

In the fall of 2005, the FWDO Enforcement staff considered closing its Stanford investigation after it had reached an impasse due to Stanford's lack of cooperation and the staff's lack of access to SIB's records in Antigua.  ███████ described this impasse in a September 1, 2005 e-mail to Cohen and ███████:

> Antigua will not compel bank to produce docs.  After much time talking with OIA, we finally received green light to issue volun[t]ary doc request to bank, care of the bank's attorney.  Letter issued last week. ███████ spoke with attorney for bank, who stated bank would not be producing docs. …



**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

September 1, 2005 E-mail from to ████████ to Jeffrey Cohen, attached as Exhibit 132.  Cohen responded, "Close the case." *Id.*

However, the examination staff, Preuitt in particular, fought to keep the Enforcement investigation open.  On September 21, 2005, at 9:46 a.m., █████ e-mailed Cohen the following:

> On Stanford, this morning I heard that people from [the Examination staff] met with [James] Clarkson [the newly appointed Acting Director of the FWDO[74]] yesterday about it.  A little annoying, eh?  Do you know anything about that?  I'll tell you what I know when I see you.[75]

September 21, 2005 E-mail from █████████ to Jeffrey Cohen, attached as Exhibit 136.  At virtually the same time that ██████ sent her e-mail to Cohen, Preuitt e-mailed the examination staff's "report on Stanford" to Clarkson ██████ and ██████ *et al. See* September 21, 2005 E-mail from Julie Preuitt to James Clarkson, attached as Exhibit 137. Approximately one hour later, at 10:41 a.m., Cohen e-mailed ██████ regarding Preuitt's e-mail to Clarkson, "Please call me about this." *Id.*  At 11:35 a.m., Cohen responded to ██████ e-mail telling him "that people from [the Examination staff] met with Clarkson yesterday about [Stanford]" as follows:

> Who from [the Examination staff]?  How did you hear it? Where's ██████?

Exhibit 136.  Four minutes later, after receiving no response from ██████ to his questions, Cohen e-mailed ██████:

> Please respond (I'm not reaching ██████).  Who from [the Examination staff]…and are you talking about our office or DC?

*Id.* (ellipse in original).

---

[73]   Cohen testified that he decided to close the Stanford matter "out of deference to ██████ recommendation."  Cohen Testimony Tr. at 52-53 ██████ disputed this assertion, stating his belief that Cohen decided to close the case because he felt that it was appropriate to do so, not because Cohen was deferring to ██████ recommendation.  ██████ Testimony Tr. at 79-80.

[74]   Degenhardt's departure from the SEC was announced on August 15, 2005.  *See* SEC Press Release 2005-116 (Aug. 15, 2005), attached as Exhibit 134.  On August 31, 2005, James Clarkson was named as the Acting Director of the FWDO.  *See* SEC Press Release 2005-123 (Aug. 31, 2005), attached as Exhibit 135.

[75]   The e-mail exchange indicates that Cohen was out of the office which is supported by the fact that he responded from his blackberry.  *See* Exhibit 136.

91

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[ENF Staff Atty 5] replied:

> …Julie [Preuitt] said they talked to Clarkson and expressed their frustration with the fact that enforcement didn't want to bring a case ….

*Id.*

However, Preuitt's efforts did not change Cohen's decision to close the case.  On October 24, 2005, [ENF Staff Atty 5] e-mailed Prescott and Preuitt:

> FYI, we have decided to recommend closing the Stanford investigation.  We're preparing the closing memo.  I'll keep you posted.

October 24, 2005 E-mail from [ENF Staff Atty 5] to Victoria Prescott, attached as Exhibit 138 at 2.[76]  Twenty minutes after receiving this message, Preuitt forwarded it to Katherine Addleman, FWDO Associate District Director for Enforcement,[77] copying Cohen and [ENF Staff Atty 5] and asked, "Can we discuss before closing?"  *Id*.  Preuitt testified that she also "went to Kit [Addleman] telling her how much we needed not to close this and that angered [Cohen]."  January 26, 2010 Preuitt Testimony Tr. at 56.

Cohen responded to Preuitt's e-mail, copying Addleman and [ENF Staff Atty 5]

> Since our last meeting in [ENF Staff Atty 5] office last week [ENF Staff Atty 5] and I met to discuss with the legal intern … the fruits of her research. [DPP, WP, LE]
> [DPP, WP, LE]

Exhibit 138.

According to an October 26, 2005 e-mail exchange between [ENF BC 3] and [ENF Staff Atty 5] the Examination staff advocated for continuing the investigation and the rcement staff continued advocating that the matter be closed.  [ENF Staff Atty 5] described the status of the matter as follows:

> Well, Stanford is kind of a goat screw.  Long story short, Jeff [Cohen] told me to kill it, Julie [Preuitt] was upset, started an e-mail battle, long talks with Julie, fight b/w Julie and Jeff (Julie won), now I'm researching and doing all kinds of stuff on it, but still am finding [DPP, WP]

---

[76]   Prescott testified that she was "unhappy" when she received [ENF Staff Atty 5] e-mail that said Enforcement was closing the Stanford investigation.  Prescott Testimony Tr. at 74.

[77]   Addleman replaced Barasch as the FWDO Associate District Director for Enforcement on August 23, 2005.  *See* SEC Press Release 2005-120 (Aug. 23, 2005), attached as Exhibit 123.  Addleman was FWDO Associate District Director for Enforcement until 2007.  Addleman Testimony Tr. at 9.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

██████, but having to run down every possible scenario.  It's not so much fun.  That's about all.[78]

October 26, 2005 E-mail from ██████ to ██████ attached as Exhibit 141. ██████ responded, "On Stanford, agree with Jeff [Cohen].  If no offering fraud, not worth pursuing."  *Id.* ██████ replied, "I totally do agree with Jeff.  Julie is just really passionate about this and is fighting hard, going to Kit [Addleman], etc. and so we have to do all this stuff.  It's frustrating!"  *Id.*

On October 27, 2005, Clarkson e-mailed Preuitt:

> I advised Jeff [Cohen] that I understood that the exam staff
> and the folks in enforcement were wrestling with how to
> deal with the Sandford [sic] matter.  I requested that he
> prepare for me a brief memo setting out the reasons why
> enforcement feels that the case can't be made.
> I would like you to do the same from an exam staff
> perspective.  … When I return to the FWDO on November

---

78   It appears that until November 2005, the Enforcement staff spent more time and energy trying to close the Stanford matter than they spent investigating it.  On October 27, 2005, Wright e-mailed Clarkson regarding his concerns about Cohen's interactions with the examination staff in connection with Stanford.  *See* October 27, 2005 E-mail from Hugh Wright to James Clarkson, attached as Exhibit 140.  Specifically, Wright tried to "clarify the situation as it relates to Julie [Preuitt], Victoria [Prescott], and maybe ██████ ██████"  *Id.* at 1.  Wright explained:

> Basically, Julie is scared of Jeff's reactions to anything that crosses him. … According to Julie, Victoria is also very concerned ██████
> ██████
> ██████ … Whether resolving the issues about the Stanford case will alleviate the situation is questionable. … If the decision is made to close Stanford, that is certainly up to Kit and the enforcement staff. … The point that I am trying to make clear is that at least one member of the staff, and maybe more, are personally concerned ██████
> ██████
> ██████

*Id.* at 2.

The staff tension may have been exacerbated by the fact that Cohen had been Degenhardt's choice to replace Barasch, but on August 23, 2005, Addleman was named as Barasch's successor instead.  *See* Exhibit 139; Addleman Testimony Tr. at 55-56.  Addleman had worked in the FWDO office as a branch chief at one point.  *See* Exhibit 139.  She was serving as an Assistant Regional Director for Enforcement in the SEC's Denver Regional Office when she was promoted to Associate District Director for Enforcement in FWDO.  *Id.*  Addleman testified that Cohen had been "unhappy with my appointment to that position over him."  Addleman Testimony Tr. at 19-20.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> 7th, Kit [Addleman] and I will plan to sit down with you
> and Jeff and resolve this matter one way or the other.

October 27, 2005 E-mail from James Clarkson to Julie Preuitt, attached as Exhibit 142 at 1-2.

In response to Clarkson's request, Preuitt prepared a November 7, 2005 memorandum for Clarkson and Addleman that summarized the Examination staff's concerns about Stanford.  *See* November 7, 2005 Memorandum from Hugh Wright to James Clarkson (the "Preuitt Memorandum"), attached as Exhibit 143.  In addition to discussing the significant circumstantial evidence that the SIB CDs were a Ponzi scheme, the Preuitt Memorandum noted:

> Stanford is expanding rapidly.  From what records we can
> obtain it has increased its assets by approximately 50%
> over the last 18 to 24 months.  Per our discussions with
> current and former Stanford Group personnel, Stanford
> Bank has been in a consistent state of growth over the past
> ten years and the pressure to increase the amount of sales
> has increased over the last two or three years.  Accordingly,
> Stanford Bank has not had to undergo any period when
> withdrawals have exceeded deposits.  Such pressure to
> increase sales is frequently associated with fraudulent
> schemes.

*Id*. at 2.  The Preuitt Memorandum closed with a recommendation that the Enforcement staff obtain a formal order of investigation as follows:

> In light of the earmarks of fraud noted above, it is troubling
> to imagine the Commission failing to resolve its concerns
> regarding the legitimacy of the product offered because the
> relevant parties either refuse to or cannot provide the
> requested, necessary information to confirm or dispel those
> concerns.  Just as troubling, is to imagine the Commission
> to continue allowing a U.S. registered broker-dealer to offer
> a product about which it does not have the necessary
> information to make a reasonable basis for a
> recommendation.

*Id*. at 2.

The Preuitt Memorandum convinced senior management to overrule Cohen and continue the investigation.  This decision ultimately ended the feuding between the examiners and the Enforcement staff that had consumed most of the time spent on the matter to that point.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> **D.     In November 2005, the Head of the FWDO Enforcement Group Overruled Her Staff's Objections to Continuing the Stanford Investigation and Decided to Seek a Formal Order in Furtherance of That Investigation**

In response to Clarkson's request for a memorandum setting forth Enforcement's perspective regarding the Stanford investigation, Cohen prepared an eleven-page memorandum (the "Cohen Memorandum") that discussed the status of the investigation, the difficulties confronting the staff, and Cohen's view of the options going forward. *See* November 14, 2005 Memorandum from Jeffrey Cohen to James Clarkson, attached as Exhibit 144. Cohen addressed the Examination staff's recommendation for a formal order as follows:



*Id*. at 1-2.

Cohen recommended that, if the Stanford investigation continued, it should focus on causes of action. *Id*. at 11. After discussing the Cohen made the following recommendation:



**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> example, the chart in here that shows the difference between what the U.S. CDs were paying and this purportedly Antiguan CD, there's reason to raise a red flag that would require additional fiduciary duties upon an adviser that wouldn't or might not be there with respect to a broker.  *So, yes, I see that as a potentially straightforward way to have attempted to approach it.*[92]

*Id*. at 45-46 (emphasis added).

## XI.    HAD THE SEC FILED AN ACTION EARLIER, SIGNIFICANT INVESTOR LOSSES COULD POTENTIALLY HAVE BEEN AVOIDED

The 1998 Examination Report estimated that "SGC brokerage and advisory clients may have invested as much as $250 million in the CDs."  Exhibit 55 at 1.  The 2002 Examination Report stated, "SIB's financial statements for the year ended December 31, 2001, discussed in more detail below, indicated total 'certificates of deposit' of $1.1 billion."  Exhibit 70 at 10.  The 2002 Examination Report estimated that $640 million of those outstanding CDs were attributable to SGC.  *Id*. at 2.  The 2004 Examination Report indicated that SIB had $1.5 billion of outstanding CDs, of which $227 million were held by U.S. citizens.  Exhibit 98 at 4.

The growth in sales of the fraudulent CDs continued to increase at an alarming rate after the 2004 Examination.  The SEC's brief filed in support of its February 16, 2009 action against Stanford described that growth as follows:

> SIB sold more than $1 billion in CDs per year between 2005 and 2007, including sales to U.S. investors.  The bank's deposits increased from $3.8 billion in 2005, to $5 billion in 2006, and $6.7 billion in 2007.  SIB markets CDs to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement.  In connection with the private placement, SIB filed a Form D with the Commission.

---

[92]    In contrast to Addleman, Cohen testified that a Section 206 claim would have been just as difficult to bring as a Section 10b-5 claim.  Cohen Testimony Tr. at 80-86.  However, it should be noted:  (1) a Section 206 claim would not have posed the jurisdictional question of whether the SIB CDs were securities; (2) SGC's lack of due diligence regarding its sales of the SIB CDs would have more easily supported a Section 206 fiduciary-based claim than a claim that those sales violated the NASD suitability rule; and (3) Section 206(2) has a lower scienter standard in which only a showing of negligence is necessary for a successful action.  *See* Exhibit 149 at 26-27.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Memorandum of Law in Support of Motion for Ex Parte Temporary Restraining Order, Preliminary Injunction and Other Emergency Relief ("SEC Brief"), filed on February 17, 2009, attached as Exhibit 149 at 7. In its Complaint filed on February 16, 2009, the SEC alleged that "SIB, acting through a network of SGC financial advisors, has sold approximately $8 billion of self-styled 'certificates of deposits' …" Exhibit 1 at ¶ 2.

A Stanford Victims Coalition survey indicated that losses could have potentially been minimized for a significant percentage of investors had the investors been aware of an investigation or examination of Stanford in 1997, when SEC examiners first raised concerns about the fund.[93] Nearly a third of the Stanford investors who responded to the survey indicated that they invested with Stanford prior to 2005. *See* Exhibit 154 at 1. Approximately 95% of the 211 responding Stanford investors stated that knowledge of an SEC inquiry would have affected their decision to invest. *See id*. at 4. One Stanford victim, who invested the money that she "saved through several years of business, nights working late and skipping vacations [she] could have taken with [her] family," said that had she "known that Stanford Group was ever under investigation by the SEC, [she] would not have bought at all." *See* February 2010 Inspector General Survey Response Excerpts, attached as Exhibit 155 at 1; February 2010 Stanford Victims Coalition Survey Response Excerpts, attached as Exhibit 156 at 1.[94] Two other investors said that an SEC investigation "would have been a very large red flag" and they "would have transferred out of that bank immediately." Exhibit 156 at 2.

Indeed, over 99 percent of the surveyed investors had no knowledge of the SEC's inquiry at the time they first invested. Exhibit 154 at 3. One Stanford investor stated, "[I] [h]ad no knowledge of any prior SEC complaints or inquiries. I researched on [the] internet and could find no registered complaints against Stanford. Obviously, [I] would not have invested with Stanford if there was any sign of trouble." Exhibit 155 at 2.

The action taken by SEC Enforcement as part of its investigation in June 2005 in sending a questionnaire out to Stanford investors in an attempt to identify clear misrepresentations by Stanford, as discussed in Section VII.A of this report, raised significant concerns among the investors. Rawl and Tidwell Interview Tr. at 8. Mark Tidwell, a vice president and financial adviser at Stanford from 2004 through 2007 who later contacted the SEC with concerns about Stanford, said that his phone "lit up like a Christmas tree the morning [the questionnaire] went out." *Id*. This flurry of phone calls from his clients led Tidwell to believe that had the SEC sent clients questionnaires prior to 2005, it would have "absolutely" raised red flags with clients, and made them more

---

[93]    In February 2010, at the request of the OIG, the Stanford Victims Coalition, an organization of Stanford investors, sent a survey to investors in the SIB CDs. The Stanford Victims Coalition received 211 responses to its survey. *See* February 2010 Inspector General Survey Summary, attached as Exhibit 154. Respondents to the survey certified that all answers provided were correct to the best of their knowledge.

[94]    The Stanford Victims Coalition conducted its own survey of Stanford investors in February 2010.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

hesitant to invest in Stanford at earlier dates.  *See id*. at 7, 8.  Rawl also testified that the 2005 SEC investor questionnaire led to "significant concerns" by investors in the CDs. *See id*. at 7.

However, even after investors received the questionnaire about Stanford in June 2005, many continued to invest because financial advisers told them that the fund had been given a "clean bill of health" by the SEC.  Exhibit 155 at 3.  Advisers told their investors that the inquiry was "routine," a result of a "disgruntled employee," and that "the investigation was complete and fined SGC a very small amount for some 'sloppy accounting'…."  *Id.* at 29, 37.  In fact, financial advisers used the fact that the SEC had previously examined Stanford to reassure investors about the fund's safety.  One investor said that her broker told her that "regulators came constantly" and everything at Stanford was "perfect."  Stanford Victim Interview Memorandum, attached as Exhibit 157. Investors were told that the SEC  regulated Stanford and Stanford had "always passed with flying colors."  Exhibit 155 at 4.  Ironically, this gave investors "comfort knowing that [Stanford was] being watched."  *Id*. at 5.  Tidwell noted that he was told "there was never an issue with any regulatory body," that there may have been some regulatory "grumbling here or there, but all those matters were closed" and that anything that a governmental agency had looked into was "fine," and there was "nothing ongoing." Rawl and Tidwell Interview Tr. at 10-12.

Tidwell stated that it gave him comfort when he was told by Stanford management that nothing was found by any regulatory inquiries, and that his understanding that regulatory entities looked into Stanford and found nothing was an "endorsement."  *Id*. at 12-13.  Stanford officials were able to persuasively represent that Stanford had been given a "clean bill of health" by the SEC because, in fact, Stanford had been examined on multiple occasions and only been issued routine deficiency letters; deficiencies that they purportedly remedied.  The 1997, 1998, 2002 and 2004 SEC examinations of SGC all resulted in deficiency letters sent from the FWDO examiners to SGC.  SGC responded to each of these deficiency letters in a manner that would allow them to claim that they had responded to and addressed the SEC's concerns.  *See, e.g.,* October 17, 1997 Letter from Lena Stinson to ▓Staff Acct 1▓ ("[T]he deficiencies have been noted and your recommendations implemented."), attached as Exhibit 158.

Some even increased their investments due to confidence in the SEC's audits. One investor stated, "[I]n late 2008 I increased my CD investment by 150% due to the confidence in the SEC audit … and the approval of the SEC."  Exhibit 155 at 2.[95]

---

[95]   Ironically, Enforcement branch chief ▓ENF BC 3▓ testified that he was concerned that if the SEC brought a technical violation against SGC, that could do more harm than good in the sense that SGC would publicize that the SEC has been investigating them and all that was wrong was a minor issue. ▓ENF BC 3▓ Testimony Tr. at 70.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

One investor reported that her husband contacted the SEC to inquire about Stanford's stability.  *See* Stanford Victim Interview Memorandum.  This investor said that SEC representative stated the fund was "very solid," "the most solid group in Texas." *Id*.  She said that the SEC confirmed that Stanford was a "prestigious" fund that had been "functioning well for 18 years." *Id*.

In addition, investors reported that they relied on favorable remarks concerning Stanford by Federal government leaders, including a 2008 commendation from President George W. Bush, in making their decision to invest in Stanford.  *See* February 20, 2008 letter from George W. Bush, attached as Exhibit 159.  For example, one investor stated: "[T]here was nothing but praise by our congressmen, senators, and our own President Bush [as to] how wonderful [t]his company and man was and the safest sound company." Exhibit 155 at 6.  Another investor stated that "SGC had an impec[c]able record and had received many awards and commendations[,] one even from President Bush commending Allen Stanford for his exemplary conduct in the business community." *Id*. at 7.

## XII.  THE SEC ENFORCEMENT STAFF'S FAILURE TO BRING AN ACTION AGAINST STANFORD EARLIER WAS DUE, IN PART, TO THE STAFF'S PERCEPTION THAT THE CASE WAS DIFFICULT, NOVEL, AND NOT THE TYPE OF CASE FAVORED BY THE COMMISSION

### A.    Senior Enforcement Management Emphasized the Need For "Stats"

Degenhardt told the OIG that he "absolutely felt that it was important to convey to the Commission the number of cases that his office brought."  Degenhardt Interview Memorandum at 2.  He said the regional offices were "heavily judged" by the number of cases they brought when he first came to the SEC.  *Id*.  Degenhardt stated that after 1997, the FWDO brought more cases than any other regional office on a per-capita basis.  *Id*. He said the FWDO, the third-smallest regional office, was always in the "top three" for overall number of cases brought from 1997 through 2005, and in 2001, the FWDO brought the highest number of cases of any regional or district office.  *Id*.  He emphasized that this was a "source of great pride" for himself, Spencer Barasch as the head of Enforcement in the FWDO, and the FWDO as a whole.  *Id*.

Degenhardt described himself as having been "very outspoken" while he was at the SEC, but felt he was "bullet proof" because of the high number of cases that the FWDO brought and, as a result, the Commission "could not get rid of him." *Id*. at 4. Degenhardt said he would often "fight with the bureaucrats in DC" and would tell the staff, "You are my shield, because of the high numbers of cases you are bringing, so if you like me working here, keep bringing a lot of cases." *Id*.

According to Degenhardt, Barasch was even more concerned about "stats" than Degenhardt was, stating that "it was very important to Barasch that the FWDO bring a high number of cases." *Id*. at 4.  Degenhardt stated that the FWDO's high number of cases "was a feather in Barasch's cap." *Id*.

# EXHIBIT 12

1              GREEN - 1/26/15
2          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
   ----------------------------
4  SAMUEL TROICE, HORACIO MENDEZ,
   ANNALISA MENDEZ, and
5  PUNGA PUNGA FINANCIAL, LTD.,
   individually and on behalf
6  of a class of all others
   similarly situated,
7                     Plaintiffs,
8  vs.                CIVIL ACTION NO.
                      3:09-CV-1600-N
9  PROSKAUER ROSE, LLP,
   THOMAS V. SJOBLOM,
10 P. MAURICIO ALVARADO, and
   CHADBOURNE & PARKE LLP,
11
                    Defendants.
12 ------------------------------
13
14     VIDEOTAPED DEPOSITION OF ISAAC GREEN
15            DALLAS, TEXAS
16           JANUARY 26, 2015
17
18
19
20
21
22
23
24 Reported by:  Susan S. Klinger, RMR-CRR, CSR
25 Job No. 89571

1                    GREEN - 1/26/15

2        Q.    Do you recall seeing this before it

3    was filed?

4        A.    I don't know when this was filed.

5    Here it says -- no, I don't know.

6        Q.    The filing date is, is October 9th

7    of 2009.  This is the second amended Complaint

8    in this case?

9        A.    I will, I will repeat and I will say

10   again, that I'm not an attorney.  And my

11   attorney informed me that this happened and

12   this happened.  And besides, besides that, this

13   has been going on for 4 or 5 years, hasn't it?

14   If I were reading and understanding about all

15   of this and I wouldn't even be able to eat

16   through my business.  The important thing is

17   that there be communication among the people,

18   those of us who have been damaged by this and

19   the attorneys.

20            MR. SNYDER:  Again, listen to the

21        question, only answer the question.

22        Q.    Did you have a chance to make

23   changes to this document?

24        A.    I didn't have any reason to make

25   changes.

1                     GREEN - 1/26/15

2     you heard anything about this article by

3     Mr. Dalmady?

4          A.    Well, in some talks that I had with

5     some friends a comment was made about a

6     Venezuelan that had written this article, but

7     that was in February.

8          Q.    Was it in February before -- strike

9     that.

10               Did you invest additional money with

11    Stanford in February of 2009?

12         A.    Afterwards?

13         Q.    Okay.

14               MR. SNYDER:  I think we need to

15         demarcate the date of the SEC intervention.

16         Q.    Okay.  The SEC brought an action

17    against Stanford on February 16th or 17th of

18    2000.  Do you understand that?

19         A.    Yes.

20         Q.    Had I heard about the article by

21    Mr. Dalmady before that date?

22         A.    Well, as I commented before, I heard

23    something and I commented on that today, to

24    David.  And in fact, he told me another story

25    about this gentleman from Venezuela.

1                    GREEN - 1/26/15

2        Q.    And what did he tell you about him?

3        A.    That none of this was true.

4        Q.    Did you look to see if you could

5    find Mr. Dalmady's article?

6        A.    Yes, but I didn't find anything.

7        Q.    You had said that your friend had

8    mentioned this article to you?

9        A.    Yes, a friend, someone mentioned it

10   to me.

11       Q.    Did you ask that person if he or she

12   had read the article?

13       A.    It was just a comment like, well, he

14   had just commented on that to me.  If I ever

15   had any doubt, I would always go to David and

16   he would, he would clear up my supposed doubts.

17             (Exhibit 4 marked.)

18       Q.    Mr. Green, I'm showing you a

19   document that has been labeled Green Exhibit 4.

20       A.    Yes.

21       Q.    Do you recognize this document?

22       A.    Yes, of course.

23       Q.    And what is it?

24       A.    The statement that I make to my

25   attorney about the case.

1                    GREEN - 1/26/15

2        Q.    If you look at paragraph 3 it says,

3    "I'm a citizen of the Republic of Mexico and

4    reside in Mexico City."  And you testified to

5    that previously today; correct?

6        A.    Yes.

7        Q.    Are you a citizen of any other

8    country besides Mexico?

9        A.    No.

10        Q.    If you look at the next paragraph,

11    it says, "I am the principal of Punga Punga

12    Financial, Ltd.  Punga is a Panamanian

13    corporation whose principal place of business

14    is in Mexico and which is wholly owned by my

15    wife and I;" is that correct?

16        A.    Yes.

17        Q.    It goes on to say, "At the

18    recommendation of our Stanford financial

19    advisor, David Nanes, who was the president of

20    Stanford-Mexico, we established Punga with the

21    specific and sole purpose of investing with

22    Stanford."

23        A.    Yes.

24        Q.    Why did Mr. Nanes recommend

25    establishing a company to invest in the

1            GREEN - 1/26/15

2    Stanford CDs?

3            MR. SNYDER:  Objection, form.  He

4        can't testify about what Mr. Nanes -- why

5        he did -- go ahead, maybe rephrase it.

6        Q.    That's fine, I will rephrase it.

7    Did Mr. Nanes tell you why he thought you

8    should establish a company to invest in the

9    Stanford CDs?

10       A.    Through his recommendation, an

11   alarming situation there was danger of

12   kidnapping.  There was another word, extortions

13   and that is one of the main problems in Mexico.

14   And he said your name -- will try for there to

15   be another name for your safety and for your

16   family.  And he made the whole package.  He did

17   all of the, created all of the package for me.

18       Q.    In terms of the danger that

19   Mr. Nanes talked about, what -- how did he say

20   you would be in danger if you invested in your

21   own name?

22       A.    Well, simply and quite frankly that

23   my name would be easy to detect and so it's

24   mainly for safety.

25       Q.    Where would your name be easy to

1          GREEN - 1/26/15

2    detect?

3         A.    I don't know.  It was a

4    recommendation of his.

5              THE INTERPRETER:  And the

6         interpreter is getting clarification.

7         A.    For that reason I paid attention to

8    what he was saying as far as that and other

9    things.  I mean you are not -- if you, if you

10   knew Mr. Nanes, then you would understand why

11   he is the way he is.

12             THE INTERPRETER:  And the witness is

13        pointing to counsel.

14             MR. SNYDER:  Again, you are not here

15        to -- can we take a break?  I need to use

16        the restroom.

17             MR. SCHWARTZ:  Yes, absolutely.

18             MR. SNYDER:  It's 11:10.

19             VIDEOGRAPHER:  The deposition is

20        paused to go off the record at 11:07.

21             (Recess, 11:07 to 11:16 a.m.)

22             VIDEOGRAPHER:  The deposition is

23        continued on the record at 11:16 a.m.

24        Q.    Welcome back, Mr. Green.  Before we

25   went off the record, we were talking about your

1              GREEN - 1/26/15
2    declaration in this case.
3         A.    Yes.
4         Q.    And we were talking about Mr. Nanes'
5    recommendation for establishing Punga to invest
6    in Stanford?
7         A.    Correct.
8         Q.    How did Mr. Nanes -- strike that.
9              Did you understand how Mr. Nanes
10   thought you would be in danger if you invested
11   in Stanford in your own name?
12             MR. SNYDER:   Objection, form.
13        A.    Yes, I understood and I paid
14   attention to his advice, his recommendation.
15        Q.    Did you ask him where people would
16   see your name as investing in Stanford if you
17   invested directly?
18        A.    No, I didn't ask him.
19        Q.    Is that because you trusted him?
20        A.    Yes.
21        Q.    Did other members of your family who
22   invested in Stanford set up companies to invest
23   in the, in Stanford?
24        A.    No.
25        Q.    Why would they have not been in

1           GREEN - 1/26/15

2      Q.    Were they -- did you have more or

3 less money invested in sovereign debt than you

4 invested in the Stanford CDs?

5      A.    It is important that I make the

6 statement that I left my relationship that I

7 had with the brokerage firm.  I discontinued

8 that and then I was transferring my investments

9 to Stanford.

10     Q.    I understand that.  I'm trying to

11 understand why the investments in the Stanford

12 CDs presented a different risk of kidnapping

13 and extortion than your prior investments?

14     A.    It doesn't run more or less risk.

15 It was a recommendation of David Nanes.  He

16 sold that recommendation to me and I bought it.

17     Q.    Did Mr. Nanes say why Punga should

18 be incorporated in Panama?

19     A.    No, he said it was a good place.  I

20 remember he gave me several options and we took

21 that one.  I don't remember which ones.

22     Q.    And you said that he arranged to

23 have it set up, he arranged to have Punga set

24 up?

25     A.    Yes.

1                   GREEN - 1/26/15

2        Q.    Did you have any interaction with

3   the people who set up Punga in Panama?

4        A.    Just when I made out the check to

5   pay.

6        Q.    And does Punga have directors?

7        A.    Yes.

8        Q.    And who are these directors?

9        A.    My wife and I.

10        Q.    And was that always the case that

11   you were the directors?

12        A.    Yes.

13        Q.    Does Punga have bank accounts?

14        MR. SNYDER:   Today?

15        Q.    Well, yes, does it have bank

16   accounts today?

17        A.    No, not bank accounts.

18        Q.    Did it have bank accounts prior to

19   March of 2009?

20        MR. SNYDER:   Other than Stanford?

21        Q.    Yes, other than accounts with

22   Stanford?

23        A.    I don't understand.  Accounts with

24   Punga or what accounts are you talking about?

25        Q.    I mean did Punga have accounts with

1                    GREEN - 1/26/15

2        Q.    So is there a certificate of

3   incorporation?

4        A.    Yes.

5        Q.    Are there any other documents?

6        A.    Yes, the documents of the

7   corporation, witnesses.  It was, it was a

8   package that had several pages and at one point

9   I read it.  A checkbook with several checks.

10       Q.    Did, did you ever go to Panama for

11  purposes of doing business for Punga Punga

12  there?

13       A.    Never, no.

14       Q.    All of the meetings you had with

15  your wife about Punga Punga were in Mexico?

16       A.    Yes.

17       Q.    If you look at paragraph 5 it says

18  that you invested with the Stanford Financial

19  Group of companies via Stanford's Mexico City

20  offices from approximately 1999 through 2009;

21  is that correct?

22       A.    Yes.

23       Q.    When was Punga formed, in 1999?

24       A.    No, I think it was in 2004.

25       Q.    So before 2004 you had invested in

1                       GREEN - 1/26/15

2      your own name?

3          A.    That's correct.

4          Q.    Was there something particular that

5      happened in 2004 that caused you to have a

6      discussion with Mr. Nanes about forming a

7      company to invest?

8              THE INTERPRETER:  The very last part

9          of counsel's question?

10         Q.    About forming a company type

11     investment?

12         A.    The situation in the country and

13     David Nanes had offered this to me before, but

14     I was thinking about it.

15         Q.    The next or later in the paragraph

16     it says, "In purchasing the SIB LCDs I had

17     direct dealings with the president of

18     Stanford's Mexico operations, David Nanes, and

19     Nanes was my and Punga's personal financial

20     advisor at Stanford."

21             MR. SNYDER:  Is that a question?

22         Q.    No, prelude to a question.  Is that

23     correct?

24         A.    Yes.

25         Q.    And how did you, how did you have

1          GREEN - 1/26/15

2 dealings with Mr. Nanes?  Was it in-person, did

3 you have personal meetings with Mr. Nanes?

4          MR. SNYDER:  Talking about always or

5      just in the beginning or --

6          MR. SCHWARTZ:  In general.

7      A.    In general we saw each other every

8 day because my business is across the street

9 from where he had meetings -- well, not here,

10 but very close to where he would have meetings

11 with other people, and every day he would greet

12 me.  If we had something to talk about, we

13 would talk.  So it was very often.

14      Q.    So you would talk with him.  Would

15 you talk in your offices or in his office?

16      A.    If there were important things to

17 talk about, we would go to his office, because

18 in my office as well, people talked about other

19 things.  And those types of things were not,

20 should not be talked about in my office.

21      Q.    Did you also have phone

22 conversations with Mr. Nanes?

23      A.    Yes.

24      Q.    How about email communications?

25      A.    Very little.

GREEN - 1/26/15

1

2     Q.     And did you have any other written

3  communications with Mr. Nanes?

4     A.     Yes, letters that I would look at or

5  folders or brochures, booklets that I would

6  look at.

7     Q.     And what sort of letters?

8     A.     Well, obviously accounts, statement

9  of accounts.  But obviously it was easy to go

10  to the internet, put in the password and then

11  see the balances.  When we had to prepare

12  something, he would prepare some information as

13  far as my accounts and investments and how they

14  were doing.  We would, we would look them over

15  and see when some were going to expire or --

16              MR. SNYDER:  Mature.

17     A.     To mature.  And then the meeting

18  would be over and we would put the paper in the

19  shredder.  Why -- so I wouldn't have to take

20  all of this paperwork with me.

21     Q.     How frequently would, would he give

22  you brochures?

23     A.     That is a question that I can't

24  answer it by saying weekly or monthly.  Well, I

25  can say with assuredness that he would give me

1             GREEN - 1/26/15

2    the yearly calendar.  Every month he would give

3    me a little brochure saying how the bank was

4    doing and it would say that the bank had grown

5    I don't know how many millions of dollars.

6    That was each month and publications and then

7    invitations to cocktail parties that they gave.

8        Q.    How did you meet Mr. Nanes?

9        A.    At my business, he arrived there.

10       Q.    Was he looking to purchase art or

11   did he come to try to interest you in investing

12   in Stanford?

13       A.    He first arrived like a customer.

14       Q.    Did he buy anything?

15       A.    Of course, yes.

16       Q.    At what point did you start talking

17   about investing in Stanford CDs?

18       A.    I waited.  It took me about 2 years

19   before I decided to invest with him.

20       Q.    And what, what were you doing, what

21   were you thinking about during that -- strike

22   that.

23             Were you doing any sort of research

24   on Stanford during that 2-year period?

25       A.    No.

1               GREEN - 1/26/15

2    about the certificates in Antigua.

3         Q.    And what, what did he tell you that

4    convinced you to invest in the certificates?

5         A.    The safety that they had, the

6    security.  And he showed that to me in

7    documents.

8         Q.    And what documents did he show you?

9         A.    Letters.

10        Q.    The insurance letters?

11        A.    Yes.

12        Q.    In paragraph 9 it says that, "Punga

13   invested large amounts of money in the SIBL CDs

14   after August of 2005."  What, what, what, what

15   is the distinction between the investment prior

16   to August 2005 and after August of 2005?

17        A.    Well, I was believing in the

18   company.  One can see clearly when they have

19   offices in Miami, in Houston, in New Orleans,

20   in Baton Rouge and then when they opened an

21   office in Venezuela then one realizes that

22   there is growth.  And in fact, in Mexico it was

23   growing, Puebla, P-U-E-B-L-A, Monterrey,

24   M-O-N-T-E-R-R-E-Y.  That is not, if that is not

25   an indication of growth, I don't know what is.

1          GREEN - 1/26/15

2     Q.    So --

3     A.    That is why I started to invest

4  more.

5     Q.    Because they were opening more

6  offices and they seemed like a strong company?

7     A.    Because I saw the growth, I saw it.

8  I'm sorry.  And he would show me the monthly

9  magazine to show me the billions of dollars

10  that it had increased or something to that

11  effect.  And but the thing is I didn't know

12  what they were spending that on or what they

13  were doing.

14     Q.    Did you ever ask Mr. Nanes what,

15  what they were investing in?

16     A.    I really, I really didn't ask them

17  what they were doing with the money.  He said

18  that they were investing it professionally.

19  But no, I didn't ask him exactly in what they

20  were investing.  But he always said that the

21  investments were completely safe and secure.

22     Q.    In the next paragraph it says that

23  you met with Mr. Nanes on several occasions in

24  September of 2008 as the world financial crisis

25  grew.  And that Mr. Nanes assured you that

GREEN - 1/26/15

1

2      A.    One is going to think that it is a

3  very strong oak tree.

4      Q.    Did you understand that the CDs were

5  completely insured against fraud?

6      A.    Yes.  And in fact, it said on the

7  letter if there were fraud among the directors

8  or the employees or the executives, executive

9  people in high positions that if they did

10  something wrong there was insurance that would

11  cover that.

12      Q.    And did you trust Mr. Nanes?

13      A.    Yes.

14      Q.    And did you consider him a friend?

15      A.    Yes.

16      Q.    Just going back to one of the topics

17  we had talked about this morning.  Did

18  Mr. Snyder or another lawyer who works with him

19  ever ask you to preserve your Stanford-related

20  documents?

21      A.    The documents were presented when I

22  was asked for them.

23      Q.    And when, when were you asked for

24  them?

25      A.    I presented the documents from the

1                    GREEN - 1/26/15

2   remember that the maintenance fees were paid.

3   Dollars more, dollars less at a high percentage

4   rate.  That is what that is.

5        Q.    But I'm just asking when you filled

6   it out, you were doing it based on your

7   recollection?

8        A.    Yes.

9        Q.    And you were not looking at an

10  account statement, for example?

11       A.    No, no, no.  With my, with my 53

12  years of age, I have all of my statements in my

13  head.  I know what I need to pay.

14       Q.    And so, and that is true of the

15  table on page 208 as well, the prior page?

16       A.    Yes.

17       Q.    So again, you were doing it off of

18  your memory not looking at some kind of

19  accounting?

20       A.    If I look at my statement now, and I

21  see that I have 105,000 pesos, or dollars, if

22  the system doesn't work tomorrow, then the day

23  after tomorrow, I ought to still have 105,000

24  pesos.

25       Q.    If you look at the next page, page

1          GREEN - 1/26/15

2    210.  There is a mailing address that is

3    listed.

4         A.    Yes.

5         Q.    Do you know whose address that is?

6         A.    My apartment.

7         Q.    Okay.  So you have an apartment in

8    Aventura, Florida?

9         A.    Yes.

10        Q.    Was that the apartment for which the

11   maintenance costs were deducted from your

12   Stanford accounts?

13        A.    Exactly.

14        Q.    Does anybody live there?

15        A.    No.

16             MR. SNYDER:  You mean permanently?

17        Q.    Yes.

18             MR. SNYDER:  They go and obviously

19   stay there.

20        A.    Because of my business, I travel

21   every 3 to 4 weeks.  And I go there and I stay

22   there and then I come back home.

23             (Exhibit 7 marked.)

24        Q.    While we're at it, can we mark the

25   page of notes?  I'm not going to...

1          GREEN - 1/26/15

2   aren't, haven't been -- weren't come up with in

3   a perfect way, but they have their system but

4   there isn't anyone with whom to speak.

5       Q.    And you testified earlier that you

6   would review your accounts on an approximately

7   daily basis; correct?

8       A.    Yes, but in that daily review the

9   details from the last 5 years don't show up.

10  At the most a month some of the details.

11      Q.    Do you have any reason to doubt that

12  you bought a CD on May 7 of 2004 that then came

13  due on January 29 of 2009?

14      A.    No, if that is the way it was

15  bought, then that is what it is.  If it is this

16  amount on the 7th of May and then 4 or 5 years

17  go by, then it is logical that it is going to

18  be 4 and a little bit as far as the interest

19  rate.

20      Q.    And if you look at the next page, if

21  you go down to the last account listed that is

22  ▮5011?

23      A.    What page, I'm sorry.

24      Q.    It says page 5 of 6 and it is hard

25  to see, but it says P941?

                          GREEN - 1/26/15

1

2       A.     Yes.

3       Q.     So the first date listed for that

4    account is November 17, 2004?

5       A.     Correct.

6       Q.     And the last date is February 10 of

7    2009?

8       A.     That's correct.

9       Q.     And this shows a transaction deposit

10   into this account of 4.2 approximately million

11   dollars on February 10 of 2009; correct?

12      A.     This amount is the -- this is not

13   new money.  It is the same money that came due

14   in the Exhibit Number 8.  It is the same money

15   and then it was, it was reinvested into this

16   account.  It is a matter of getting the

17   calculator and showing that the money came out

18   of here and came into here.  It is not new

19   money.

20      Q.     And this is money that came from

21   account ██8865; correct?

22      A.     I think so.  There is -- I can't

23   really see it very well, but there it is.  Here

24   it says clearly transferred from ██ -- well,

25   you can't see it very well.  If you -- and then

1                     GREEN - 1/26/15

2    if you could get a document that you could see

3    more clearly, you could see that this was a

4    withdrawal and it was transferred to this

5    account minus the $500,000 that never got to

6    its destination.

7         Q.    Okay.  And if you look -- if you go

8    back to page 4 of 6 that is P940, this is in

9    Green Exhibit 10.  So this is the transaction

10   detail for account number ██8865.  Do you see

11   that?

12        A.    Yes.

13        Q.    And if you go back now to page 5 of

14   6, P941 and you look at the last transaction

15   for that account you see payment of

16   approximately 4.7 million dollars on January

17   29, 2009; correct?

18        A.    Yes, we're going back to the same.

19   These are internal transfers.

20        Q.    And that transaction is consistent

21   with what it shows in the prior document of a

22   deposit of 4.7 million dollars on January 29th,

23   2009 from the account number that appears to be

24   ██8865; is that correct?

25             MR. SNYDER:  Objection, asked and

1                    GREEN - 1/26/15

2        Q.    Good afternoon, Mr. Green.   My name

3    is William Michael.   I represent the defendant

4    Chadbourne & Parke in this action.   You

5    testified earlier that Mr. Nanes gave you

6    certain brochures and other written materials.

7    Do you recall that?

8        A.    Yes, they put out a monthly

9    publication.

10       Q.    And other than the monthly

11   publication, do you recall any additional

12   written materials that Mr. Nanes gave you to

13   review?

14       A.    Yes.  Well, I mentioned that before,

15   maybe an invitation or an event or the

16   statement or the famous letters about the

17   insurance.  I just received a lot of publicity,

18   advertisements praising the company.  Of course

19   I didn't receive any articles saying that there

20   were any, any investigations going on, of

21   course I wouldn't receive that.  They knew that

22   and that was it, we didn't.

23       Q.    The written materials that you did

24   receive from Mr. Nanes, were those all written

25   in Spanish?

                    GREEN - 1/26/15

1

2      A.      There were some in English and

3 Spanish.

4      Q.      Did you rely on the information in

5 those materials in making your decision to

6 invest or to keep money with Stanford?

7      A.      Well, that is reinforced through the

8 publicity.  The publicity makes the company.

9 If I wanted to go to the office in Mexico, I

10 would sit there for 3 to 5 minutes and I would

11 read some papers.  I might read something that

12 was in a -- they paid for a lot of advertising

13 in magazines and also commercials, also on

14 television, sports events and lots of things.

15      Q.      Seeing that material was,

16 contributed to your decision to invest and to

17 keep your money with Stanford?

18      A.      Of course.  Yes, well, they would

19 put out their publications and they would take

20 pictures of the seller or the broker that had

21 sold the most.  And maybe he would get some

22 sort of award for selling millions of dollars

23 in some country.  I thought that I was very

24 close to Stanford having a very good friendship

25 with David.  And that made me think, well, as

1          GREEN - 1/26/15

2          Q.     This was a deposit you made in this

3    CD; correct?

4          A.     I never deposited $4 million in my

5    life.  If I did a renewal -- I've never made

6    those types of deposits of $4 million.

7          Q.     When did you purchase this CD and

8    I'm talking about account ██5011?

9          A.     Please get out your Exhibit Number

10   8, P196.  And you are going to see that there

11   is a withdrawal of $4,225,555.  And this must

12   have been the maturity date, and then it was

13   deposited into a new account.  This amount

14   coincides with this amount exactly.  And this,

15   this 10th of February of 2009 coincides with

16   this 10th of February of 2009.  It is not that

17   I won the lottery and I won another $4,225,555.

18         Q.     The deposit was into CD number

19   ██5011; correct?

20         A.     I don't know how they liquidated one

21   CD and had them internally and then how they

22   opened another one.  The movements activity

23   that was done within the bank, I just saw the

24   amounts.  I suppose that it matured, and then

25   they created another number because that is the

```
1                      GREEN - 1/26/15
2    way that it is.
3         Q.    So your understanding is that there
4    was a new CD that you purchased on February
5    10th, 2009?
6              MR. SNYDER:   Objection, form.
7         Documents speak for themselves.  It is a
8         renewal.
9         Q.    What was the -- so okay.  Was, what
10   was the number for the CD that was renewed on
11   February 10th, 2010?
12        A.    I don't know, I don't know.  I can't
13   really read it and you have me very confused.
14        Q.    Can you find it listed on Green 10?
15        A.    Here it is, $4,225,550, it is a
16   deposit.
17        Q.    And that was a deposit into CD
18   number ▮5011; correct?
19        A.    Here it says that.
20        Q.    And that was a CD that you bought on
21   November 17th, 2004; correct?
22        A.    It is a renewal when things end and
23   then one renews.  It is a renewal.
24        Q.    Sir, when did you buy the CD number
25   ▮5011?
```

# EXHIBIT 13

**EXHIBIT "2"**

STATE OF TEXAS              §
                           §
COUNTY OF HARRIS           §

## AFFIDAVIT OF LENA STINSON

Lena Stinson, being first duly sworn to oath, deposes and says:

1.  My name is Lena Stinson.  I am over eighteen (18) years of age and competent to testify to the matters set forth herein.

2.  I have personal knowledge of each of the facts stated in this Affidavit, and they are true and correct.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

3.  I was previously employed with the Stanford Financial group of companies ("Stanford Financial") for 13 years.  I first joined Stanford Group Company ("SGC") in June 1996 after leaving my job at Shearson Lehman in Chicago.  I was recruited to SGC by Ellen McCorkle, with whom I had worked while at Shearson.  At that time SGC was a brand new "start-up" broker dealer, based in Houston, Texas, and I was excited by the opportunity.  SGC was also a licensed investment adviser firm.

4.  My first position at SGC was in the Operations Department under Ellen McCorkle, who at that time was the Chief Operations Officer for SGC.  During this time period Alvaro Trullenque ("Trullenque") and Jay Comeaux ("Comeaux") were the co-presidents of SGC, and they both reported to Allen Stanford ("Stanford") who was the ultimate owner of SGC and all of the other Stanford Financial entities.  In those early days I primarily assisted with the recruitment of new brokers and financial advisers ("FAs") for SGC and also assisted with the expansion of new offices, including SGC's establishment of its office in Baton Rouge Louisiana, and operational issues with respect to SGC's clearing

broker at the time, Bear Stearns.

5.     In mid-1997, McCorkle was asked to leave SGC because she and Trullenque and Comeaux did not see eye to eye, and I was promoted to become COO in her place. In that position, I assumed responsibility for, among other things, SGC's regulatory compliance. In roughly the second half of 1997, I recruited Fred Ferrara and Rep Poppel as SGC's co-chief Compliance Officers. But I was overall head of compliance for SGC until 2001, when Jane Bates became head of compliance for SGC.

6.     Of course, after joining SGC I became aware of SGC's sister companies, including the Antiguan bank Stanford International Bank Ltd. ("SIBL"), and that one of the products SGC could offer was the SIBL CD. It was always very clear to me throughout the 13 years I worked for Stanford Financial entities, that SIBL was Allen Stanford's primary focus and the one thing Stanford cared about and promoted the most. This was especially apparent in the Stanford Financial Group meetings I would regularly attend, which were meetings of the heads of the various Stanford companies convened on an irregular basis by Stanford. In those meetings, Stanford always talked about the Bank (SIBL) and how to promote the Bank and increase CD sales. Stanford was always very leery of the U.S. government and did not want them looking into what Stanford Financial was doing. Stanford would talk about this in leaders meetings, chairman's meetings and meetings of company heads, and talked about someone in the government supposedly having a vendetta against him for things that had happened in Antigua.

7.     When I first joined SGC in 1996, SIBL was mostly promoted to investors in Latin America through Spanish-speaking "private bank" FAs of Latin American origin based in the Houston and Miami offices of Stanford Financial. I do not recall which Stanford

Financial entity these Latin American "private bank" FAs were technically employed by in the U.S., but they were trained by Stanford Financial employee Oreste Tonarelli and acted under his direction and primarily (if not exclusively) sold SIBL CDs to Latin American clients. The Stanford Financial private bank FAs received Latin American clients at Stanford Financial offices in Houston and Miami and marketed and sold them the SIBL CDs, and the FAs also traveled heavily throughout Latin America to meet with existing or prospective clients and promote and sell the SIBL CDs.

8.    This changed in late 1996 or early 1997, when Stanford mandated that the "private bank" FAs obtain their U.S. securities licenses and become FAs licensed under SGC. Many of the Latin American "private bank" FAs studied and obtained their Series 7 and 63 licenses, but some others did not want to do that and just wanted to continue being "private bank" FAs selling the SIBL CDs. While some of these "private bank" FAs eventually left Stanford Financial if they did not obtain their securities licenses, a few of the "private bank" FAs that did not get their securities licenses wound up becoming "assistants" to the FAs that were licensed, and continued to market and sell the SIBL CDs to Latin American clients.

9.    In fact, since July 1997, the President of Stanford Mexico who managed all of Stanford Financial's operations in Mexico, David Nanes, was a NASD-licensed broker directly employed by SGC. Moreover, several of the Stanford Mexico FAs who worked in Stanford Financial's Mexico City office like Rochelle Sydney, Jorge Mauricio Aviles, Maria Eugenia Putz, Juan Carlos Terrazas, Arturo Prum and Ana Tanur, were NASD/FINRA-licensed brokers operating under SGC pursuant to Foreign Associate Service Agreements whereby SGC directly contracted with the foreign FAs to help

promote SGC's products and services in those countries.  I am aware that there were 3 such Foreign Associates under contract with SGC in Venezuela;  6 or more Foreign Associates under contract with SGC in Mexico;  and 1 Foreign Associate under contract with SGC in Ecuador. I attach hereto as **Exhibit "1"**, a true and correct copy of a Foreign Associate Service Agreement utilized by SGC.

10.    In 1998 Stanford created a new entity with offices in Miami (and later Houston and San Antonio) called Stanford Fiduciary Investor Services ("SFIS"), which employed FAs to sell SIBL CDs to investors from Latin America through offshore trusts established with STC Antigua.  SFIS became the new platform for the same type of Latin American "private banker" FAs to continue to market and sell the SIBL CDs from offices in the U.S. to investors from Latin America.

11.    Houston was always the nerve center for Stanford's worldwide operations, because that is where the Office of the Chairman (Allen Stanford) was located and where Stanford Financial Group Company ("SFG"), the administrative support arm for all of the Stanford entities, and SGC were headquartered.  SFG provided services like legal, accounting, information technology ("IT"), human resources and other administrative functions to all the other Stanford entities worldwide and was basically the umbrella entity operating under Allen Stanford and Jim Davis.  In terms of IT, SFG in Houston managed and controlled Stanford Financial's global "Intranet" through which Stanford Financial FAs around the world could access Stanford Financial materials including training manuals and marketing materials.

12.    Houston was also the base for Stanford's worldwide marketing efforts, including the production of all of the Stanford marketing brochures and materials.  Allen Stanford

owned his own publishing company, Idea Advertising, that was also based in Houston, and Idea designed, prepared and published all of the written marketing materials for the different Stanford entities – including SIBL - from Houston.  For example, if Stanford Mexico wanted a new marketing brochure, it would order it to be printed and published by Idea and then shipped to Mexico from Houston.  Same for SIBL, except that SIBL marketing materials (in both English and Spanish) were distributed from Houston to various Stanford entities throughout the world.  Of course, prior to finalizing and publishing the marketing materials, all marketing materials for all companies in Stanford Financial had to be reviewed and approved by the Legal department of Stanford Financial in Houston.  Eventually Idea was shut down and these marketing functions were internalized at SFG in Houston.  Idea and/or SFG also published and distributed the "Stanford Eagle" magazine, which was then distributed by the various Stanford Financial companies to existing and prospective clients around the world.

13.    In my view, all of the sales material, marketing and promotional activities for Stanford Financial originated from and took place in Texas, and all of the sales training manuals (which were accessible on the Stanford Financial Intranet), promotional materials for SIBL, including the Spanish-language promotional materials, were created, approved, printed, packaged and mailed from Stanford's Houston headquarters for the sale of the SIBL CDs worldwide during the entire time that I worked at Stanford from 1996 through 2009.

14.    The SIBL CDs were marketed and sold to "accredited investors" in the U.S. under a Reg D filing.  Stanford's former General Counsel and eventual Chief of Staff, Yolanda Suarez, along with Stanford Financial's in-house and outside counsel established the Reg

Affidavit of Lena Stinson

D sales program in the U.S. a few years after SGC had been formed and prepared the disclosures for investors.

15. I was involved in the SEC's examinations of SGC in 1997, 1998, 2001 and 2004. During the 1998 examination the SEC sent SGC a letter in which the SEC raised questions and concerns about the offering of the SIBL CDs. Thus I knew since 1998 that the SEC was focused on and questioned the offering of the SIBL CDs through SGC.

16. The nature of the SEC examinations changed when, in May 2005, the SEC sent (via FedEx) letters and questionnaires to SGC's clients asking about the SIBL CDs and the way SGC was marketing the CDs. It was at this same time, in May 2005, that Stanford asked me to move laterally and change my employment from SGC to the Chairman's Office and SFG. My new title was "Director of Global Compliance" and I reported directly to Suarez.

17. At that time, I was assigned to work with Stanford Financial's General Counsel, Alvarado, on the 2005 SEC investigation. Given the very serious nature of the letters that the SEC had sent to the SGC clients questioning the marketing and sales of the SIBL CDs, Stanford decided that we needed to hire "expert" outside counsel, specialized in SEC matters, to help us respond to the SEC investigation. Alvarado recommended Tom Sjoblom ("Sjoblom") of the law firm Chadbourne & Parke as the expert outside counsel because Sjoblom had worked in enforcement at the SEC for many years.

18. Sjoblom flew to Houston in late June 2005 and I arranged for him to conduct interviews of various SGC employees over two days. Sjoblom interviewed several SGC FAs in Houston on June 29 and June 30, 2005, including SGC's top management officials like Comeaux and Green. I sat through the majority of those interviews of FAs. Sjoblom

asked the FAs if they knew how SIBL invested the money it held in its portfolio, and none of them could tell Sjoblom anything about SIBL's portfolio other than general categories and asset classes provided in SIBL's annual reports and quarterly reports produced by SFG's Memphis office.

19. Throughout the time I worked at SGC and Stanford Financial, it was clear to me that no one knew how SIBL invested the money it received from investors or what was in SIBL's portfolio except Allen Stanford, Jim Davis ("Davis"), Laura Pendergest-Holt ("Holt") and the SIBL bank president.  Like other SGC employees, I was given percentages and general asset classes but never told any details.  I was always told by, for example, Suarez and Alvarado, that the contents of SIBL's portfolio was proprietary and confidential due to Antiguan confidentiality and privacy laws.  Of course, since they were the lawyers for Stanford Financial, I never questioned whether that was true, and never looked at Antiguan laws until later in January 2009.

20. I sat in multiple meetings with Sjoblom and Alvarado in 2005 regarding the SEC investigation.  It was very clear to me based on those meetings that Sjoblom's "marching orders" from Alvarado and Stanford were to aggressively oppose the SEC investigation and to maintain and defend the position of SGC (and Stanford Financial generally) that the details of SIBL's portfolio were confidential and not to be disclosed and that the SEC was not entitled to and should not get access to what was in SIBL's portfolio.

21. Through my dealings with Sjoblom in 2005, he advised me that the he thought the SEC suspected SIBL was some type of "Prime Bank" scheme.  Sjoblom told me in a meeting between just he and I in the summer of 2005 that the SEC lawyers or investigators he was dealing with had told him that they believed Stanford was running a "Prime Bank"

scheme through SIBL and that was the reason the SEC wanted to see the SIBL portfolio. I also was one of the persons at Stanford Financial receiving and reviewing the communications to SGC from the SEC as they came in, including the September 12, 2005 letter to Comeaux in which the SEC accused SGC of violating Rule 10b-5 through the sale of the SIBL CDs and of recommending unsuitable investments (the SIBL CDs) because SGC did not know how SIBL was investing the money. But again, Stanford – through Alvarado – instructed Sjoblom to be as aggressive as possible to make sure that the SEC never gained access to the SIBL portfolio, and Sjoblom thereafter implemented that strategy.

22.     Stanford's attitude towards the SEC didn't surprise me. I had been in many meetings with Stanford himself over the years where he expressed disdain and disrespect for the U.S. Government and regulators in general. He was very wary of the Government and regulators, and seemed to have a phobia about the Government that I understood from conversations with him came from what he described as a type of "witch hunt" against him by the Government related to his activities when he led the effort to reform Antigua's banking laws. At least that was the way he always described it. But his general attitude was he didn't want government regulators snooping around in his businesses.

23.     After Sjoblom's interviews in Houston, Sjoblom travelled to Antigua to continue his due diligence, this time on SIBL. I personally met with Sjoblom while he was in Antigua and know that he also met in Antigua with Stanford, Yolanda Suarez and SIBL President Juan Rodriguez-Tolentino ("Rodriguez"). He also met Leroy King, the director of SIBL's regulator, the Antiguan Financial Services Regulatory Commission ("FSRC").

Affidavit of Lena Stinson

24. Sjoblom's official position with respect to the SEC's investigation was that the SIBL CDs were not securities that the SEC had no jurisdiction over SIBL because it was a foreign bank regulated pursuant to Antiguan law, and that SGC had no control over SIBL or its portfolio even though Allen Stanford owned both entities. This was the position he took with respect to the SEC consistently from 2005 up until 2009.

25. From 2005 until February 2009, I worked extensively with Sjoblom, along with Alvarado and Stanford Financial in-house counsel Rebecca Hamric ("Hamric") and Chief Compliance officers Jane Bates and, after she left, Bernie Young ("Young"), with respect to the SEC investigation of SGC and SIBL and was in regular contact with Sjoblom and his associate Jackie Perrell ("Perrell") during that time period.

26. As the SEC investigation progressed from informal to formal demands on SGC for documents pertaining to SIBL, Sjoblom's strategy, consistent with his marching orders from Alvarado, was to push the SEC off and tell them that they needed to get permission from the FSRC to access documents related to SIBL's portfolio.

27. In October or November, 2006, Sjoblom informed me that the SEC investigation had converted to a formal investigation. Thereafter, on or about November 29, 2006, SGC received a formal Subpoena from the SEC for the production of documents.

28. Alvarado assigned myself, Hamric, and Young to work with Sjoblom and his associate Perrell to work on SGC's responses to the Subpoena. Sjoblom and Perrell traveled several times to Houston to meet with us in strategy sessions regarding the production of documents to the SEC. In meetings and/or teleconferences I participated in with Alvarado and Sjoblom, Alvarado and Sjoblom discussed and agreed that SGC would "take its time" and take a "slow boat" approach to producing documents to the SEC. For

example, when it came to electronic discovery, whenever we suggested a faster way to get the production of e-mails expedited, Alvarado rejected it, preferring that we take our time and always take the longer route.  This happened more than once, but I specifically remember one occasion where I suggested to Alvarado and Sjoblom that we employ a certain software to speed up SGC's production of e-mails to the SEC.  Alvarado rejected this suggestion and told me he preferred to take the slower route, and I advised Sjoblom of my continued frustrations and concerns about this approach.

29. During our review of documents responsive to the Subpoena for production to the SEC, we (myself, Hamric and/or Young) would flag and set aside documents that we were not sure about so that Sjoblom could review them and make the final decision on whether or not to produce them.  We always deferred to Sjoblom on this since he was the lawyer and SEC specialist.

30. One of the documents we found (Bernie Young found it) and set aside for Sjoblom to review was a contract between SGC and SIBL called "Financial Consulting and Advisory Services Agreement" (the "contract").  I attach a true and correct copy of that contract hereto as **Exhibit "2"**.  We set the contract aside for Sjoblom to review and determine whether we should produce it to the SEC or not.  When Young, Hamric and I showed it to Sjoblom, he told us it was not responsive and not to produce it.  So Young put it into a folder with a yellow sticky on it that said "do not produce per Tom", and we never produced it to the SEC.  Looking back on it now, I don't understand Sjoblom's reasoning on why the document was not responsive to the SEC Subpoena or why he instructed us to withhold the contract from the SEC.

31. In September 2008 the Miami office of SFIS received a Subpoena for records from the

Federal Reserve Board ("FRB"). Alvarado gave me a copy of the FRB Subpoena and assigned Hamric and I to work with Sjoblom on responding to it. I learned immediately that the FRB had opened up its own investigation of SIBL, with primary focus on whether SIBL was operating unregistered bank representative offices in the U.S. via SFIS' offices in Miami, Houston and San Antonio. Sjoblom told me that the FRB was investigating whether SFIS was in reality operating as an unregistered branch office of SIBL in the United States, and that as such the FRB claimed it had jurisdiction over SFIS and SIBL under federal banking laws. The FRB Subpoena to SFIS requested documents relating to, among other things, the relationship between SFIS and STCL (Antigua), as well as documents related to marketing and sales by SFIS of the SIBL CDs, and all communications related to SIBL CDs between SFIS and other Stanford Financial-related entities. The FRB also issued a similar Subpoena to the Stanford Trust Company ("STC") in Baton Rouge, Louisiana.

32.     On January 12, 2009, we found out that FINRA examiners had raided several SGC offices, including Miami, Tupelo MS, Dallas, Memphis, Baton Rouge, and Charlotte. I was involved in that emergency, and was in multiple meetings and phone calls most of that day with Alvarado, Sjoblom and others. The FINRA examiners were searching for information related to the SIBL CD program, and demanded access to SGC's computers and documents.

33.     FINRA demanded access to the hard drives from computers at the Memphis office that were used by Laura Pendergest-Holt's ("Holt") team to, as I understood it at the time, oversee the management of SIBL's portfolio by outside money managers. FINRA took the position that, because the employees in Memphis were registered brokers or

investment advisers under SGC, FINRA had jurisdiction and the right to gain access to their computers. Sjoblom got into heated arguments with FINRA about that. Sjoblom took the position that even though they were SGC employees, those Memphis employees were in fact dual employees of both SGC and SFG, and that it was only as employees of SFG that the Memphis employees had access to the SIBL portfolio information and that therefore FINRA was not entitled to the information. FINRA ended up imaging the hard drives in Memphis.

34.     Also in January 2009, the SEC served subpoenas on Stanford, Davis and Holt requiring their testimony and the production of documents related to SIBL's investment portfolio.

35.     On January 21, 2009, I attended a meeting at the Stanford airplane hangar in Miami, Florida with Stanford, Davis, Holt, Alvarado, Sjoblom and others, to discuss the SEC investigation and to determine who should testify before the SEC in response to the subpoenas. At that meeting, we discussed the new SEC subpoenas. Sjoblom was adamant that Stanford and Davis not appear to testify before the SEC. Therefore Alvarado and Sjoblom informed us that Sjoblom would seek to convince the SEC that Stanford and Davis weren't involved in the day-to-day affairs of SIBL and therefore were not appropriate persons to testify about SIBL's portfolio of assets, and that Holt and SIBL President Rodriguez were better positioned to present testimony and evidence to the SEC regarding SIBL's investment portfolio.

36.     From that hangar meeting in Miami, I flew back to Houston with Sjoblom. During that trip home, I asked Sjoblom how Holt could testify to the SEC about the contents of the SIBL portfolio without violating the Antiguan confidentiality and privacy laws that Stanford Financial had been relying on for years as the basis for withholding that same

information from the SEC. Juan Rodriguez had also raised this as a concern during the hangar meeting.

37.     Perhaps because of those questions I asked, on January 29, 2009, Sjoblom wrote to me and requested a legal opinion from SIBL's Antiguan counsel "with an interpretation under the IBC Act that information regarding SIBL's assets...is confidential". I called the head of Stanford Financial's legal department for the Caribbean region in St. Croix and asked him for legal support for our position, and in response he sent me the FSRC regulations, which I forwarded to Sjoblom. Basically what those regulations said was the FSRC was supposed to maintain the confidentiality of *its own Examination findings*, not that SIBL was prohibited from disclosing the contents of the SIBL portfolio to outside regulators like the SEC. I never heard anything further from Sjoblom about this and therefore don't know whether he was surprised or concerned about it.

38.     As follow up to the hangar meeting, and in order to prepare Holt and Rodriguez for their interviews by the SEC, we all gathered at the Miami office of SGC on February 3rd through 6th, 2009. Myself, Sjoblom, Davis, Holt, Rodriguez Tolentino, Alvarado, and (President of SGC) Bogar were all in attendance. During the meetings, specifically on Wednesday, February 4, 2009, Holt disclosed that the value of the assets she actually managed in Tier 2 of the SIBL portfolio totaled approximately $350 million, down from $850 million in June of 2008. After Holt's presentation, Davis revealed the contents of Tier 3 of SIBL's investment portfolio, and disclosed via a Powerpoint presentation that Tier 3 was made up of: (1) real estate valued at in excess of $3 billion; (2) $1.8 billion in personal loans to Stanford; and (3) various other private equity investments. At that point, Rodriguez stated that he would not testify before the SEC.

Affidavit of Lena Stinson

App. 274

39.   The next day, Thursday, February 5, 2009, Stanford himself made an appearance at the meetings and informed us that SIBL had "at least $850 million more in assets than liabilities". Then Stanford, Davis and Sjoblom held separate meetings between just the three of them over the next two days (Thursday and Friday).

40.   On Friday morning we all gathered again in the Stanford main conference room. Danny Bogar began to cry. Sjoblom walked around the table and put his hands on Bogar's shoulders and suggested that everyone pray together. I turned to Stanford and Davis and told them that I blamed them for what had happened, and that the company needed to do what was right for the clients.

41.   Thereafter, Stanford, Davis and Sjoblom split off and spent most of the rest of the day in private meetings. Toward the end of the day on Friday, February 6, 2009, Sjoblom told me that we all needed to meet again at 5:30 that day, and declared that the "party is over". So we all gathered to meet with Stanford late Friday afternoon, and during that meeting Sjoblom confirmed that Rodriguez would not testify before the SEC and that only Holt would appear to provide testimony to the SEC. I asked Sjoblom who was going to inform the SEC what we had learned about the contents of Tier 3 of the SIBL portfolio. Stanford responded that he would "probably" go with Holt to testify before the SEC.

42.   At some point in January 2009, when the SEC was at SGC's offices in Houston interviewing employees, Sjoblom came out of a meeting with the SEC and mentioned to me that the SEC had concerns about a December 2008 newsletter sent to investors in which SIBL described that it had "Excess FDIC" insurance. Sjoblom asked me to locate a copy of the newsletter. I thereafter looked for it but couldn't locate it until after the February meetings in Miami. I thereafter provided a copy of the December 2008

newsletter to Sjoblom. I never heard anything further from him about it. I attach hereto as **Exhibit "3"** a true and correct copy of that December 2008 newsletter.

43.    After presenting Holt's testimony to the SEC on February 10, 2009, on or about February 11 or 12, 2009 Sjoblom informed me that he and his law firm Proskauer Rose were withdrawing from representation of SGC and Stanford Financial. Sjoblom told me that he didn't want to withdraw but that his firm was forcing him to withdraw and that he "had no choice".

The foregoing matters are, within my personal knowledge are true and correct.

FURTHER AFFIANT SAYETH NOT.

Executed this 27th of Oct. , 2014.



_____
LENA STINSON

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this 27 day of Oct, 2014, to certify which, witness my hand and seal of office.

AGATA ALICIA KRAWCZYK
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-11-17

_____
Notary Public in and for the State of Texas

# EXHIBIT 14

 Logo_post_b

# SEC Investigating Stanford Group Offshore-Bank CDs (Update1)

By Alison Fitzgerald - Jul 03, 2008

July 3 (Bloomberg) -- The U.S. Securities and Exchange Commission is investigating sales of certificates of deposit by Stanford Group Company at its offshore bank, which has $6 billion in assets in Antigua.

The SEC issued subpoenas yesterday to two former Stanford Group employees asking for information about the CD sales by its offshore bank, Stanford International Bank Ltd. The subpoenas also demanded sales-training materials for the CDs and so-called mutual fund wrap programs, which are portfolios of diversified mutual funds. Houston-based Stanford Group is owned by billionaire R. Allen Stanford. Its companies have more than $43 billion under management or advisement, according to its Web site.

The subpoenas were provided to Bloomberg News by Mike O'Brien, the Houston-based attorney for two former employees, Charles Rawl and Mark Tidwell. They are both suing Stanford Group, accusing the company of forcing them to resign because they did not want to participate in illegal activities that they say Stanford Group was requiring them to carry out.

Stanford Group spokeswoman Lula Rodriguez said the company is ``not aware of any formal actions by the SEC related to either Mr. Tidwell or Mr. Rawl or connected to any of our clients.''

Rodriguez said the allegations ``have been made by disgruntled employees and are totally without merit.''

SEC spokesman John Nester said the agency does not confirm or deny the existence of an investigation. Rawl and Tidwell were both investment advisers for Stanford Group in Houston.

`Leave That Place'

``All we wanted to do was leave that place, get out of there and get our clients out safe and sound,'' Rawl said in an interview.

In the lawsuit, Rawl and Tidwell claim that the company failed to file forms to the U.S. Treasury Department disclosing its clients' offshore holdings and did not advise its clients to file those forms.

The lawsuit also alleges that Stanford Group purged files and destroyed documents as early as last year related to what Tidwell and Rawl claim is an ongoing SEC investigation regarding the CD sales practices. The lawsuit alleges that the company gave clients false historical performance data for its securities.

In court papers, Stanford Group said it had fired Tidwell and Rawl and that the two owe the company repayment of loans made to them.

Rawl said he owes Stanford Group $579,441. He said the company paid him a bonus upon his hiring in 2005 that would vest over time and that he was required to pay back when he left the company early. Tidwell owes the company $155,598, according to court papers filed by Stanford Group.

R. Allen Stanford was ranked the 605th-richest person in the world by Forbes Magazine this year, with an estimated net worth of $2.0 billion. The Texas native holds dual citizenship after becoming a citizen of Antigua in 1999. Stanford International Bank had $6 billion in assets as of July, 2007, according to its Web site.

To contact the reporter on this story: Alison Fitzgerald in Washington at Afitzgerald2@bloomberg.net

To contact the editor responsible for this story: Michael Forsythemforsythe@bloomberg.net

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT 15



144 of 1160 DOCUMENTS

Copyright 2008 Telegraph Media Group Limited
All Rights Reserved

**The Daily Telegraph**

The Daily Telegraph (London)

**July** 7, 2008 Monday

**SECTION:** SPORT; CRICKET; Pg. 1

**LENGTH:** 198  words

**HEADLINE:** The greatest final ever

**BYLINE:** Nick Hoult

**BODY:**

AN OFFSHORE banking company owned by Sir Allen **Stanford,** who recently signed a  pounds 100 million deal with the England and Wales Cricket Board, are facing an **investigation** in the US.

The **Stanford Group** are believed to be the subject of preliminary inquiries by the powerful **Securities and Exchange Commission.**

**Stanford's** company control more than $6 billion of assets in Antigua, the island that will host November's $20 million match between an All Stars team and England. The **SEC** are the body in America who **investigate** alleged corporate crimes and scams.

It emerged they are set to **investigate the Stanford Group** after subpoenas were issued to two former employees asking for information about sales by **Stanford's** offshore bank.

Charles Rawl and Mark Tidwell are suing **Stanford Group,** accusing the company of forcing them to resign because they did not want to participate in allegedly illegal activities. **Stanford's** company vehemently deny the allegations. **Stanford Group** spokesman, Lula Rodriguez, said: "We have active litigation against them. Those allegations have been made by disgruntled ex-employees and are totally without merit.'' The ECB were last night refusing to comment.

**LOAD-DATE:** July 10, 2008

# EXHIBIT 16

# Duck tales

*One does not have to be a detective, or even a financial expert, to spot financial institutions that **may** prove insolvent, or worse, with the passage of time. As the saying goes, if it looks like a duck, if it waddles like a duck and if it quacks like a duck, it must be a duck.*

The financial world has been in a state of turmoil after the recent financial and investment scandals. The collapse of seemingly rock-solid institutions, billion-dollar swindles and hoaxes are everywhere. It seems there is a new case every day.

The "talking heads" of the world have naturally taken up on this. Calls for stricter regulation are a constant, which is quite understandable. Nobody likes to see "innocent" people suffer at the hands of unscrupulous financiers.

But one has to be a realist also. These rackets and hustles are as old as humanity itself and have been going on since Ug sold Og the "magic stone" that made fire. Regardless of how much effort is put into controlling or supervising everything, there will always be a loophole somewhere that a rip-off artist can wiggle himself through. There is a proverb in Spanish "Hecha la ley, hecha la trampa" (or Italian "fatta la legge, trovato l'inganno) which is something like "where there's a law, there's a loophole." Scams will continue regardless of the regulatory hurdles thrown at them. They'll morph or mutate, much as pathological bacteria do when facing an antibiotic attack.

One must also face up the fact that if you are on this planet long enough, you will become a direct or indirect victim of one of these frauds. Sooner or later, it will happen. It can be from being confident, trusting, naïve, greedy or careless. Or simply stupid. But it will happen. We've all been "taken" at some point. If not in a monetary deception, who hasn't been deceived by a 'friend," relative or "significant other?" It's human nature. Gall will usually trump incredulity and skepticism. When one thinks "he/she couldn't have," well they could…and then some.

How can you protect yourself? How does one avoid being the victim of the next Madoff, DMG, La Vuelta, Gumi or Banco Latino?

First off, one must realize that nothing is safe or sacred. There is a risk and margin of error in everything, and in financial issues, even more so. The rubber stamp of the CNV, SEC, FDIC or an auditor or the "word" of a friend or partner are all relative. Nothing is safe or "sure." Madoff duped the SEC, Enron had its way with "Arthur Anderson," and recently Saytam, a large Indian company, tricked the powerful auditing firm of PriceWaterhouseCoopers.

Everything is relative and everything can be a lie. However, unless you wish to live like a hermit there is no modern life without risks. The goal is to assume the risks that you think you can manage and do your best to keep them under control. In business (and why not?..in love also!), if you don't bet you can't win and if you don't play you can never win.

Another thing many can't grasp is why these scams aren't uncovered. The truth is that most of them are "found out" all by themselves or when the circumstances make it obvious. Madoff could have continued forever had he not faced fund redemptions with which he couldn't comply. Pyramid schemes collapse when they run out of marks. And it's not just because the participants are happy while they are collecting profits. It's that a good scam is really hard to detect and almost impossible to uncover without inside help.

Being "almost sure" is usually "not enough." How do you blow the whistle when you're "almost sure"? It's preferable to not get involved and the skeptic will keep it to himself. Frankly, what does a whistle blower have to gain? So normally he'll back away from the suspicious deal and leave things as they were.

With financial institutions, it is twice as touchy. A suspicion can be considered a "destabilizing rumor" and on certain occasions (though less often than one thinks), an unfounded rumor can turn into a self-fulfilling



prophecy. Yours truly still recalls when an extract from a report about Banco Mercantil was taken out of context and splattered on the front page of a newspaper, generating a mini-run on the bank. The bank survived obviously (it was structurally sound…a fact also stated in the report), but the affair left a bad aftertaste. The analysis was correct and the quote was word for word, but a third party maliciously manipulated it.

Back to how to protect yourself. The best scam antidote is common sense or what is called the "Duck Theory." The Duck Theory states quite simply that: if it "quacks" like a duck, if it walks like a duck and it has a bill like a duck…IT'S A DUCK!

The only way to be 99.99% sure that it's a duck is to extract its DNA and analyze it and even then there is margin for error. I respect Heisenberg; there is no absolute certainty.

So what does a financial duck look like? Its traits are many and varied, but here are a few:

## 1. It's too good (to be true)

I still recall that Gumi (a pyramid scheme in Bolivar in the '90s) would pay 20% monthly interest on deposits. DMG (Colombia) offered to fully recharge members' prepaid cards after six months for free. Madoff didn't make any claims, but he had a track record of producing returns that consistently outpaced the market, without the volatility (risk) that usually goes with it. Banco Latino's rates were far higher than the rest of the banks'…and so on.

There's usually something very attractive or juicy being offered or else no one would get in. The catch is that it can be too attractive. The most successful schemes, such as Madoff's, straddle the "limit of reasonability," and that allows them to survive for a long time.

## 2. It can do what no one else can

Finance is a lot simpler than most people are led to believe (we analysts must appear to be important). Most things can be explained with simple arithmetic. When the numbers or the explanations become too complex…beware!

What was Gumi doing that enabled it to pay 20% a month? The whispered answer was that it was financing drug traffickers.

Not true! Frankly, why would traffickers need to finance their operations at those loan shark rates? Drug lords had the opposite problem, tons of cash to launder. It was all a lie of course; Gumi was a simple pyramid scheme.

Enron, in its day, was into innovative and "exotic" businesses. They even had supposedly established a trading market for "bandwidth." Their financial statements were almost impossible to decipher and there was good reason for that. They were a lie.

More recently, Madoff's hedge funds would rack up extremely consistent monthly gains, which were far above the market average. It didn't seem that strange; there are people who are very good at the investing game. But they were a bit too large and too consistent. Everyone gets tripped up once in a while. Not Bernie. Quite a few people thought he operated with insider information…and that's why they invested with him!

## 3. There are few people (or only one person) overseeing everything

It is suspected that Madoff operated alone or with a small group of collaborators. His auditor was a personal firm that worked out of a storefront office in New York. His multi billion-dollar hedge fund operated on a secret floor manned by only 19 people.

In the Barings scandal (1995), trader Nick Leeson managed to be able to execute his trades and control how and when they were booked. He lost a billion dollars and "broke the bank" before anyone found out. A similar story emerged in 2008, when Jerome Kurviel lost five million euros for Société Général. The point is that lies and secrets are best kept when few people are involved.

## 4. Few incentives for whistle blowers

Madoff was a philanthropist and a NASD director. His client list was a "who's who" of the rich and famous. His detractors and those who suspected his activities weren't "kosher" were considered envious of his success.

Who was going to uncover the mess? The SEC? Based on what? Madoff sent all the information legally required of him and signed by his auditor. The SEC (not unlike the Venezuelan CNV) doesn't conduct audits itself; it just makes sure that somebody does.

At one point, 22,000 people worked for Enron and they were all really busy. But the company overvalued assets at offshore affiliates (aside from other accounting tricks) and was one big house of cards. Who was going to risk their job and career, trying to discover and denounce the truth?

## A case study

Thank you for bearing with me up until this point. Your patience is about to be rewarded. Here is a case study: a duck "possibility" or better stated, something that could be a duck.

And a "live" one, to boot.

A friend contacted me recently to ask about an offshore bank where he had deposited part of his savings. Not a great amount in the large scheme of things, but an important sum for him. I promised I would take a look at the "animal." Fortunately, there was information about the bank on the Internet, along with its audited financial statements.

This is a bank that operates on a small Caribbean island, inhabited by less than 100,000 people. Roughly, a population the size of Altagracia de Orituco.

## What is being offered?

The bank offered (still offers) high interest rates on CDs. Up until recently the rate was about 7.5% on a one-year deposit. That compares quite favorably with 4-5% that U.S. banks were

**Economy and Finance**

paying in the best case scenario, and recently rates have fallen below 3%. My friend told me that its rates had always been that high.

This has been an extremely successful strategy for the bank, at least as far as deposit growth is concerned. The bank's deposits have grown from $624 million in 1999 to over $8.4 billion at year-end 2008. That's an average compound growth rate of 34%!

Now, **that** is unusual. Very aggressive deposit growth is usually a "red flag" for banks. It's difficult to invest such a deluge of money efficiently. It also indicates that something may be "too attractive."

Oops…I think I saw a feather!

## How does the bank operate? What does it do with the money?

The bank operates on a quite unique business model. It basically takes deposits from investors all around the world mainly in the form of time deposits. But it doesn't make loans (technically, a depositor can take out a loan with his/her own CD as collateral, but that's all). It has practically no service revenue.

Only 75 people actually work for the bank on the island, but it captures deposits through a global network of independent affiliated "advisors" who receive a commission for delivering deposits to the bank (a high one…1.5% per annum).

In order to make money, the bank invests in the capital markets. Stocks, Bonds, Hedge Funds, Precious Metals and currencies. Those are really fascinating things that go up and down and deliver great profits sometimes, not so much on other occasions, and at times (not few, especially recently) go down in value as well.

You may be inclined to say: "lots of banks do that." Not so. The so-called "investment banks (of which there are few left), have several other businesses which generate revenue, such as underwriting, mergers and acquisitions, brokerage and asset management. Yes, they have trading divisions, but the fee-based businesses generate a stable flow of income that (usually) allows them to weather the ups and downs of the trading business.

Commercial or retail banks will also "invest" money as part of their strategy. But these are usually arbitrage situations. For example, if a bank can receive deposits from the public at 2% and use them to buy government paper with a 4% yield and a similar maturity, it is a low risk strategy which banks will execute quite gladly.

But that's not their main business. Normally banks will pay little, charge a lot and still have a hard time making money on the margin. They make their profits with service charges.

Back to our bank, which according to its financial statements, as of the end of 2007, was 42% invested in stocks, 20% in fixed income (bonds), 25% in hedge funds and 13% in precious metals. That is a relatively typical allocation for this bank and over

**PORTFOLIO RETURNS**

| Year | Overall Portfolio | Stocks | Hedge Funds | Precious Metals | S&P Index |
|------|------|------|------|------|------|
| **2003** | 14.4% | N/A | N/A | N/A | 26.4% |
| **2004** | 11.5% | 8.2% | 16.9% | 12.3% | 9.0% |
| **2005** | 10.3% | 8.8% | 21.6% | 9.3% | 3.0% |
| **2006** | 11.0% | 11.7% | 25.1% | 14.9% | 12.8% |
| **2007** | 11.4% | 8.2% | 25.0% | 15.0% | 3.8% |
| **2008** | 6.0% | N/A | N/A | N/A | -38.4% |

the last few years it has gone from a low of 27% in stocks (2004) to a high of 60% in 2006. Nothing to see here, right?

How about this? The return on the portfolio over the last years: 2003: 14.4%, 2004: 11.5%, 2005: 10.3%, 2006: 11.0%, 2007: 11.4%. Can you see a pattern emerging? One of consistency.

Considering only the stock portfolio, the returns were: 2004: 8.2%, 2005: 8.8%, 2006: 11.7%, 2007: 8.2%. Nothing out of the ordinary, right?

Consider the returns on the S&P 500 the same years: 2004: 9%, 2005: 3%, 2006: 12.8%, 2007: 3.8% (we'll talk about 2008 later). The bank did quite a bit better than average.

As for other categories, they report a 22% average annual profit on their hedge funds and 12% on precious metals. Not bad at all.

This could seem quite "normal" for someone who is not in the investment world, but these performance figures are very, very good. The last few years have been incredibly challenging for investing in most of these categories. In the '80s or '90s, returns of this magnitude could be considered "normal." Since 2000, however, they are on the "limit of the credible universe."

I really would like to know which stocks, bonds, funds and metals these folks have invested in to achieve such returns.

Unfortunately, that is something they don't reveal. As an investor, I love to "toot my own horn" when I get something right. The bank doesn't. One could argue that their portfolio is made up of private companies, not publicly traded ones. There is some of that in the group of companies mentioned to be associated with the bank, but it´s not clear if those positions are in this portfolio. Anyway, that private equity portfolio includes stock in a resort developer, three motion pictures, a golf club manufacturer, a golf course, an auction house and a restaurant in Memphis. These are small companies which could not represent a large portion of the bank's assets and frankly looking at their nature, look more to be a millionaire's "toys" than investments.

Back to our case study. Even if everything that this institution publishes and states is 100% true (apologies to Heisenberg), a "depositor" at this bank is effectively lending it money so the bank can then go out and play the markets with that money (the bank has $16 in deposits for each dollar of equity). That fact alone is somewhat unsettling. Fortunately, the bank has consistently achieved above-average results in all its investment

App. 285



categories.

That is, they have done what few (or no) others can.

What's that? I think I heard a "quack."

## Who manages and controls this animal?

As stated above, the bank has 75 employees on the island. But a small group manages it. There is mention of an investment committee, but the members of the committee are not named. A few years ago there was an actual investment manager or VP; now the position appears to be vacant. There is one board member, an 85-year-old cattle rancher and used car dealership owner who has the title of "Investments," so one can presume that he advises some about that.

The management team and board has basically been the same for many years. There is no mention of any special investment technology or strategy that can account for the results obtained so far. That is, unless you count "long-term, hands-on and globally diversified" as a strategy and not just a catch phrase. An $8 billion portfolio is not easy to manage, at least not efficiently (to which the Barings and Société Général traders can attest).

Without further information, we must assume that the administrators are extraordinary beings.

What about the stockholders? There is only one. He has the title of Chairman of the Board and doesn't appear to have management responsibilities at the bank.

Auditors? Well, yes, the financial statements of the bank are audited. The auditor is a local (island) firm. The principal is a 72-year-old gentleman who has been auditing the bank for many years (at least ten). PriceWaterhouseCoopers and KPMG have offices on the island, and it is a good internal control practice to change auditors every few years, but the bank prefers to stick with its trusted firm.

The banking authorities which supervise the bank are those from the island. The same island with the population similar to Altagracia de Orituco. The bank does not take institutional deposits or deposits from other banks. This is not necessarily a bad thing, but corporate depositors would be expected to do some due diligence on the bank before committing their money.

Hmm. This animal walks in a very peculiar way. Like a waddle.

So why hasn't anyone noticed or said anything?

There isn't really an interest in drawing attention to this case. The depositors are not likely to suspect and much less say anything. Does anyone really read those financial statements that are lying around in bank offices? The local authorities prefer to leave these people alone. If the bank goes elsewhere, who is going to build schools and maintain the roads and gardens? The bank plays an important social role on the island.

The depositors are people from around the world, but perhaps not enough from one place in particular to arouse the interest of a regulatory agency. It is out of their jurisdiction anyway.

The owner is a powerful man. A "Forbes" list billionaire. Any unsubstantiated suspicion could have legal consequences for the denouncer. Perhaps the nature of this beast is a "well-known secret." Many think it's strange, but no one wants to say anything.

Hey…the animal has webbed feet!

IT'S A DUCK! (I presume.)

I almost forgot. The bank's name. It's the Stanford International Bank, located in the paradisiacal island of Antigua in the Eastern Caribbean.

The name has nothing to do with Stanford University, a well-known U.S. learning institution. It takes its name from owner Sir Allen Stanford, a Texan billionaire and cricket aficionado. Sir Allen has organized cricket matches on the island with $20 million prizes for the players. The Antiguan authorities knighted him, not her majesty Queen Elizabeth II. He was recently named World's Finance's "Man of the Year" for 2008.

A little update on things also. For those who may not know, 2008 was an awful year for investing. The S&P had its worst performance since the great depression, falling 38%. Few investment categories weathered the storm. For stocks, corporate bonds, commodities, currencies and/or hedge funds, it was all pretty bad.

In a Nov. 28 note to its depositors, the Stanford International Bank acknowledged that it had performed poorly. But just "a little" poorly. They acknowledge a $110 million loss up until that date (a quarter of the equity). Doing a little math, that doesn't mean that the bank's investment portfolio lost money (like almost everyone). It means that they didn't profit enough to get back to break even. Since the bank invests the money of its depositors and has to pay them interest plus the commissions to its affiliated advisors, it must earn at least 8-9% on its investments in order to compensate these costs. The bank is recognizing that in 2008, the year of the great crash in the markets, it "only" made a 5-6% return on its portfolio. Quite an act of contrition. The bank also affirms that it had no positions in Bernie Madoff's funds. What a relief!

Additionally, to improve the bank's financial standing, the bank has issued $541 million in new capital, presumably out of Sir Allen's bank account. This was for the peace of mind of the bank's over 30,000 clients. But then, the 2007 audited statements affirm that bank had over 50,000 clients. Well, if it's more than 50,000, it's more than 30,000 also, right? Or maybe a few clients got lost.

Another little tidbit extracted from the Internet. Health Systems Solutions (HSSO) is a small ($8 million market cap) health technology company in which SIB reportedly has a 20% stake. In October 2008, HSSO offered to buy another company in the industry: Emageon Inc (EMAG) for $62 million. Emageon accepted and the deal was to close in December after EMAG's stockholders approved it. SIB was supposed to fund the deal (we're assuming taking an equity stake, since they do not pro-

vide loans by definition). SIB did not send the money when agreed and EMAG filed a complaint in Federal Court. The two parties (HSSO and EMAG) later reaffirmed their merger intent and agreed (on Dec. 29) to extend the closing deadline to Feb. 11. Because of SIB's initial failure to fund, HSSO was required to put up additional escrow amounts and faces additional penalties if it fails to deliver again.

SIB's failure to deliver those $62 million is a bit perplexing. According to its financial statements, the bank is extremely liquid. Even if the 2007 statements are a bit dated, at that time there was $627 million in cash and of the $7 billion portfolio, about 90% of the portfolio was listed at a term or one month or less. Such liquidity is a constant in SIB's financial statements over the years, so we must presume that this time the deal should close. We'll be keeping an eye on it.

All along this taxonomical discussion, we have been saying that the animal certainly looks like a duck. True to Heisenberg, we must be willing to admit that it may not be a duck, if better evidence indicates that it is not. What would be better evi-dence in this case? How about a complete audit by a more familiar name such as KPMG? Or maybe a statement by the bank's global custodian, a Credit Suisse or a Morgan Stanley, affirming…"yeah these guys have $8 billion worth of securities in custody with us." That would be nice. A DNA test very difficult to refute, if you will. But if it were only the animal saying it's not a duck…that would sound like a bunch of quack.

Summing it up, be careful. But in particular, be careful with animals that look like ducks that say that they're something else. Because they could be that other something, although it's very likely that they are just ducks.

**Disclaimer:** The Stanford Group operates a commercial bank in Venezuela. I have not analyzed this bank and am unaware of its relationship with Stanford International Bank. Please, do not accuse me of destabilizing the financial system.

*Alex Dalmady*
(comments@oneupper.com)
The author is a financial analyst.